STACEY M. LEYTON, SBN 203827
sleyton@altber.com
BARBARA J. CHISHOLM, SBN 224656
bchisholm@altber.com
CONNIE K. CHAN, SBN 284230
cchan@altber.com
AMANDA C. LYNCH, SBN 318022
alynch@altber.com
JUHYUNG H. LEE, SBN 315738
hlee@altber.com
SANDY PECHT, SBN 355877
specht@altber.com
**ALTSHULER BERZON LLP**
177 Post St., Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151

*Counsel for Plaintiffs AAUP, AFT,*
*UC-AFT, CNA/NNU, and UAW*

[Additional counsel on signature page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS; AMERICAN FEDERATION OF TEACHERS; AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, LOCAL 3299; BERKELEY FACULTY ASSOCIATION; CALIFORNIA NURSES ASSOCIATION/NATIONAL NURSES UNITED; COUNCIL OF UC FACULTY ASSOCIATIONS; DAVIS FACULTY ASSOCIATION; IRVINE FACULTY ASSOCIATION; RIVERSIDE FACULTY ASSOCIATION; SAN DIEGO FACULTY ASSOCIATION; SANTA CRUZ FACULTY ASSOCIATION; INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA; TEAMSTERS LOCAL 2010; UAW LOCAL 4811; UC MERCED FACULTY ASSOCIATION; UC SANTA BARBARA FACULTY ASSOCIATION; UCSF FACULTY ASSOCIATION; UNIVERSITY OF CALIFORNIA LOS ANGELES FACULTY ASSOCIATION; UNIVERSITY COUNCIL–AMERICAN FEDERATION OF TEACHERS; UNIVERSITY PROFESSIONAL AND TECHNICAL

Case No.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

EMPLOYEES—COMMUNICATION WORKERS
OF AMERICA,

                Plaintiffs,

     v.

DONALD J. TRUMP, in his official capacity as
President of the United States;
U.S. DEPARTMENT OF JUSTICE;
PAMELA BONDI, in her official capacity as U.S.
Attorney General of the U.S. Department of Justice;
LEO TERRELL, in his official capacity as Assistant
Attorney General for Civil Rights and head of the
U.S. Department of Justice Task Force to Combat
Anti-Semitism;
U.S. DEPARTMENT OF HEALTH AND HUMAN
SERVICES;
ROBERT F. KENNEDY, JR., in his official
capacity as U.S. Secretary of U.S. Department of
Health and Human Services;
ROBERT FOSTER, in his official capacity as
Acting General Counsel of U.S. Department of
Health and Human Services;
NATIONAL INSTITUTES OF HEALTH;
JAYANTA BHATTACHARYA, in his official
capacity as Director of the National Institutes of
Health;
 U.S. CENTERS FOR DISEASE CONTROL AND
PREVENTION;
JIM O'NEILL, in his official capacity as Acting
Director of U.S. Centers for Disease Control and
Prevention;
U.S. FOOD AND DRUG ADMINISTRATION;
MARTIN MAKARY, in his official capacity as
Commissioner of the U.S. Food and Drug
Administration;
 U.S. DEPARTMENT OF EDUCATION;
LINDA MCMAHON, in her official capacity as
U.S. Secretary of Education;
THOMAS E. WHEELER, in his official capacity as
Acting General Counsel of the U.S. Department of
Education;
CRAIG TRAINOR, in his official capacity as
Acting Assistant Secretary for the Office for Civil
Rights, U.S. Department of Education
U.S. GENERAL SERVICES ADMINISTRATION;
MICHAEL RIGAS, in his official capacity as

Acting Administrator of the U.S. General Services Administration;
JOSH GRUENBAUM, in his official capacity as Commissioner of the Federal Acquisition Service within the U.S. General Services Administration;
U.S. NATIONAL SCIENCE FOUNDATION;
BRIAN STONE, in his official capacity as Acting Director of the U.S. National Science Foundation;
U.S DEPARTMENT OF ENERGY;
CHRISTOPHER A. WRIGHT, in his official capacity as Secretary of the U.S. Department of Energy;
U.S. DEPARTMENT OF DEFENSE; PETER B. HEGSETH, in his official capacity as Secretary of the U.S. Department of Defense;
NATIONAL AERONAUTICS AND SPACE ADMINISTRATION;
SEAN P. DUFFY, in his official capacity as Acting Administrator of National Aeronautics and Space Administration;
U.S. DEPARTMENT OF AGRICULTURE;
BROOKE L. ROLLINS, in her official capacity as Secretary of the U.S. Department of Agriculture;
U.S. DEPARTMENT OF COMMERCE;
HOWARD LUTNICK, in his official capacity as Secretary of the U.S. Department of Commerce;
U.S. DEPARTMENT OF THE INTERIOR;
DOUG BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior;
U.S. DEPARTMENT OF STATE;
MARCO RUBIO, in his official capacity as Secretary of the U.S. Department of State;
NATIONAL ENDOWMENT FOR THE HUMANITIES;
MICHAEL MCDONALD, in his official capacity as Acting Chairman of National Endowment for the Humanities;
U.S. ENVIRONMENTAL PROTECTION AGENCY;
LEE ZELDIN, in his official capacity as Administrator of U.S. Environmental Protection Agency;
U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT;
SCOTT TURNER, in his official capacity as Secretary of the U.S. Department of Housing and Urban Development;
INSTITUTE OF MUSEUM AND LIBRARY

SERVICES;
KEITH SONDERLING; in his official capacity as
Acting Director of Institute of Museum and Library
Services;
U.S. DEPARTMENT OF TRANSPORTATION;
SEAN DUFFY, in his official capacity as Secretary
for the U.S. Department of Transportation;
AMERICORPS (a.k.a. the CORPORATION FOR
NATIONAL AND COMMUNITY SERVICE);
JENNIFER BASTRESS TAHMASEBI, in her
official capacity as Interim Director Head of
AmeriCorps,

                    Defendants.

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................v

INTRODUCTION .........................................................................................................1

PARTIES .......................................................................................................................5

    A.    Plaintiffs ...........................................................................................5

    B.    Defendants.......................................................................................12

JURISDICTION & VENUE .......................................................................................15

FACTUAL ALLEGATIONS ......................................................................................16

    I.    Public Universities Like the University of California Are Crucial Engines of Free Thought and Academic Inquiry, Scientific Research, and Economic Mobility..............16

    II.    For Decades, the Federal Government Has Funded UC Because UC Produces Results: Public Goods of Immeasurable Value........................18

    III.    Defendants Are Waging a Campaign to Undermine Free Speech and Academic Freedom at America's Universities ................................21

        A.    The Trump Administration's Openly Stated Goal Is to Purge "Left" and "Woke" Viewpoints From University Campuses .........................21

        B.    The Trump Administration Has Been Implementing Its Funding Coercion Playbook at Dozens of Universities and Warning Others They Are Next .....................26

            (1)    Columbia.............................................................................27

            (2)    Brown..................................................................................32

            (3)    Penn....................................................................................34

            (4)    Harvard ..............................................................................35

    IV.    Defendants Conduct Pretextual Investigations, Unlawfully Terminate Funding, and Make Extortionate Threats in Attempt to Coerce the UC into Sacrificing the Constitutional and State Law Rights of Its Faculty, Students, Academic Employees, and Staff .......................42

        A.    Defendants Disregard Title VI Statutory and Regulatory Requirements Constraining Termination of and Refusal to Grant Federal Funding.......45

        B.    Defendants Disregard Title IX Statutory and Regulatory Requirements Constraining Termination of and Refusal to Grant Federal Funding.................................51

C.  Defendants Fail to Provide a Reasoned Decision for Terminating $584 Million in Research Grants ................................................................. 53

D.  Defendants Demand that the UC Pay $1 Billion as Ransom, Despite No Lawful Basis for Demanding Such Payment ........................... 59

E.  Defendants Demand that, in Exchange for Federal Funding, the UC Agree to Infringe the Free Speech and Academic Freedom Rights of Its Faculty, Students, Academic Employees, and Staff ............................................. 62

F.  Defendants Demand that, in Exchange for Federal Funding, the UC Agree to Measures to Limit Lawful Diversity, Equity, and Inclusion Efforts. ........................... 63

G.  Defendants Demand that, in Exchange for Federal Funding, the UC Agree to Violate the Rights of Transgender Individuals ............................... 64

H.  Defendants Threaten to Impose the Same Demands on the Entire UC System ............. 65

V.  Defendants' Coercive Attacks Have Harmed and Will Continue to be Irreparably Harm Plaintiffs and Their Members if Not Enjoined ......................... 67

A.  Defendants' Coercive Demands Have Already Caused UC to Begin Infringing on the Academic Freedom, Free Speech, Privacy, and Other Rights of Faculty, Students, Academic Employees and Staff Employees ..................... 68

B.  Plaintiffs and Their Members Have Suffered Harm Caused by Defendants ................. 71

    (1)  AAUP, AFT, CUCFA, and UC Campus FAs and Their Members Have Been and Will Continue to Be Irreparably Harmed ....................... 72

    (2)  AFSCME and Its Members Have Been and Will Continue to Be Irreparably Harmed ..................................................... 80

    (3)  UPTE-CWA and Its Members Have Been and Will Continue to Be Irreparably Harmed ..................................................... 83

    (4)  UC-AFT's Members Have Been and Will Continue to Be Irreparably Harmed ..................................................... 86

    (5)  AFSCME, UPTE, UC-AFT, UC Santa Cruz Faculty Association, CNA/NNU, UAW, and UAW Local 4811 and Their Members Have Been and Will Continue to Be Irreparably Harmed ..................... 87

    (6)  UAW and UAW 4811's Members Have Been and Will Continue to Be Irreparably Harmed ..................................................... 88

    (7)  Teamsters Local 2010 and Its Members Have Been and Will Continue to Be Irreparably Harmed ..................................................... 91

CAUSES OF ACTION ....................................................................................... 92

COUNT I          Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions;
                 Violation of First Amendment Freedom of Speech
                 (Unconstitutional Coercion; Retaliation; Content and Viewpoint Discrimination)
                 (Against All Defendants) ............................................................ 92

COUNT II         Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions;
                 Separation of Powers
                 (Against All Defendants) ............................................................ 94

COUNT III        Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions;
                 Unconstitutional Conditions / Spending Clause
                 (Against All Defendants) ............................................................ 96

COUNT IV         Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions;
                 Violation of Tenth Amendment / Spending Clause
                 (Against All Defendants) ............................................................ 98

COUNT V          Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions
                 Violation of Fifth Amendment (Due Process; Void for Vagueness)
                 (Against All Defendants) ........................................................... 100

COUNT VI         Violation of Administrative Procedure Act, 5 U.S.C. §706(2)(A), (C), (D)
                 (Contrary to Title VI; Without Observance of Required Procedure)
                 (Against Defendants DOJ, Bondi, Terrell, and Funding Agency Defendants) ....... 101

COUNT VII        Violation of Administrative Procedure Act, 5 U.S.C. §706(2)(A), (C), (D)
                 (Contrary to Title IX; Without Observance of Required Procedure)
                 (Against Defendants DOJ, Bondi, Terrell, and Funding Agency Defendants) ...... 104

COUNT VIII       Violation of Administrative Procedure Act, 5 U.S.C. §706(A)
                 (Arbitrary and Capricious)
                 (Against Defendants DOJ, Bondi, Terrell, and Funding Agency Defendants) ....... 106

COUNT IX         Violation of Administrative Procedure Act, 5 U.S.C. §706(2)(A),
                 (B): Contrary to Constitution (First Amendment)
                 (Against Defendants DOJ, Bondi, Terrell, and Funding Agency Defendants) ....... 107

COUNT X          Violation of Administrative Procedure Act, 5 U.S.C. §706(2)(A),
                 (B): Contrary to Constitution (Separation of Powers)
                 (Against Defendants DOJ, Bondi, Terrell, and Funding Agency Defendants ........ 108

COUNT XI         Violation of Administrative Procedure Act, 5 U.S.C. §706(2)(A),
                 (B): Contrary to Constitution (Unconstitutional Conditions / Spending Clause)
                 (Against Defendants DOJ, Bondi, Terrell, and Funding Agency Defendants) ....... 108

COUNT XII        Violation of Administrative Procedure Act, 5 U.S.C. §706(2)(A),
                 (B): Contrary to Constitution (Tenth Amendment / Spending Clause)
                 (Against Defendants DOJ, Bondi, Terrell, and Funding Agency Defendants) ....... 109

COUNT XIII    Violation of Administrative Procedure Act, 5 U.S.C. §706(2)(A),
(B): Contrary to Constitution (Fifth Amendment))
(Against Defendants DOJ, Bondi, Terrell, and Funding Agency Defendants) ....... 110

PRAYER FOR RELIEF ................................................................................................... 111

Plaintiffs are labor unions and associations that collectively represent tens of thousands of faculty, students, academic employees, and staff employees throughout the University of California ("UC" or the "UC System"), including the American Association of University Professors; the American Federation of Teachers and University Council–American Federation of Teachers; the American Federation of State, County, and Municipal Employees Local 3299; the California Nurses Association/National Nurses United; Teamsters Local 2010; the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") and UAW Local 4811; the University Professional and Technical Employees–Communication Workers of America ("UPTE"); the Council of UC Faculty Associations; and the campus-specific Faculty Associations ("UC FAs") comprised of the Berkeley Faculty Association, Davis Faculty Association, Irvine Faculty Association, Riverside Faculty Association, San Diego Faculty Association, Santa Cruz Faculty Association, UC Merced Faculty Association, UC Santa Barbara Faculty Association, UCSF Faculty Association, and University of California Los Angeles Faculty Association, (collectively, "Plaintiffs"). Plaintiffs bring this complaint against the President of the United States and multiple federal agencies and their officers, as outlined below, seeking declaratory and injunctive relief to enjoin these Defendants from continuing to use the unlawful threat of federal funding cuts not authorized by law to illegally coerce the UC into suppressing free speech and academic freedom rights, implementing harmful federal policies on the Trump administration's behalf, and otherwise violating the constitutional and state law rights of UC faculty, students, academic employees, and staff employees. Plaintiffs hereby allege as follows:

## INTRODUCTION

1.      In the midst of World War II, as fascism raged throughout Europe, the United States Supreme Court proclaimed that "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion, or force citizens to confess by word or act their faith therein." *West Virginia State Board of Education v. Burnett*, 319 U.S. 624 (1943) (Jackson, R.).

2.      Unfortunately, today, the Trump administration is seeking to eclipse this fixed star, through a scheme of targeting, bullying, and unconstitutional actions aimed at institutions of higher education across the country. Determined to exert ideological control over the nation's core institutions, the Trump administration is engaged in tactics that violate the central norms of our democracy, the United States Constitution, and duly enacted federal laws. In this campaign, it has now set its sights on one of the nation's leading institutions—the University of California system—prompting UC faculty, academic and other staff, and students to band together to file this federal court action challenging the Trump administration's violation of the First Amendment and federal law.

3.      The University of California is an engine of free thought and intellectual inquiry, research and invention. It is arguably the premiere public university in the world. The breadth and importance of its contributions to life sciences, physical sciences, social sciences, literature and the arts, medicine, and technological advancement is well-illustrated by its production of 70 Nobel Prize winners, 101 MacArthur "Genius" grant award winners, 66 National Medal of Science winners, and 42 Pulitzer Prize winners. That output is the product of a culture that encourages free speech, values diversity, and challenges orthodoxy.

4.      Beyond the academic and scientific output of the University of California, the system is an engine of economic productivity, providing healthcare to millions of Californians annually and jobs to hundreds of thousands, while serving as a vehicle for economic mobility and opportunity for its innumerable first-generation, working and middle class students from California and across the nation.

5.      Yet rather than acknowledging educational institutions like the UC as the assets to this nation that they are, the Trump administration views them as barriers to the President's agenda of ideological dominance. Even before his reelection, President Trump took direct aim at the country's top universities, pledging "to reclaim our once great educational institutions from the radical Left and Marxist maniacs." This rhetoric from President Trump and his officials has continued and, indeed, escalated since the beginning of his second term. Once in office, President Trump gained access to tools of the United States government that his administration is wielding, unlawfully, to seek to stamp out movements, opinions, and ideas that challenge his worldview. The President's attempt to require that universities conform to his worldview is un-American and unconstitutional.

6.       Defendants' actions against the University of California follow a Trump administration playbook that has already succeeded in undermining free speech and academic freedom in the United States. The playbook echoes one employed by autocratic movements around the world—be it Hungary, Turkey, or Brazil. Through a series of actions targeting institutions of higher education, the Trump administration is attempting to coerce colleges and universities across the country to do what the Trump administration cannot do directly itself: infringe on the speech rights of faculty, academic and other staff, and students.

7.       The blunt cudgel the Trump administration has repeatedly employed in this attack on the independence of institutions of higher education has been the abrupt, unilateral, and unlawful termination of federal research funding on which those institutions and the public interest rely. These terminations are accompanied by threats to cancel even more (or all) federal funding, unless the targeted colleges and universities capitulate to the Trump administration's demands for control of the curriculum, adoption of the President's ideological viewpoints, and restrictions on free speech, among other incursions on faculty, student and employee rights.

8.       As detailed here, on multiple occasions, Defendants have wielded federal civil rights laws against the UC and other universities as the purported basis for terminating federal funding and grant awards, while disregarding the statutory constraints that govern the circumstances under which the civil rights laws authorize the termination or withholding of federal funds. These constraints include requirements that the federal government provide notice, hearing, and other procedural protections to recipients of federal funding and others who rely on it, to guard against this kind of arbitrary, ideologically driven, and unlawful use of financial coercion.

9.       Defendants' economic coercion has succeeded in some cases, allowing it to secure control over some formerly independent universities. For example, after the Trump administration unilaterally cancelled hundreds of millions of dollars of federal grants and threatened to cancel even more, Columbia University acceded to numerous settlement terms that violate the academic freedom and free speech rights of Columbia's faculty, staff, and students. Other efforts at coercion, most prominently those targeted at Harvard University—which went beyond the cancellation of grants and extended to threats to take over patent rights and prevent international students from attending Harvard or even entering the

country—have encountered resistance and been declared unconstitutional and otherwise unlawful. Thus, in *President & Fellows of Harvard College v. United States Department of Health and Human Services*, the District of Massachusetts found that the administration "used antisemitism as a smokescreen for a targeted, ideologically-motivated assault on this country's premier universities, and did so in a way that runs afoul of the APA, the First Amendment and Title VI." __ F.Supp.3d __, 2025 WL 2528380, *36 (D. Mass. Sep. 3, 2025).

10.     The Trump administration is now taking aim at the University of California, which comprises ten campuses, three national affiliate laboratories, six academic health centers, and numerous additional institutes, centers, and research laboratories across the State. The administration has made clear its intention to commandeer this public university system and to purge from its campuses viewpoints with which the President and his administration disagree. To accomplish this, Defendants first unlawfully canceled hundreds of millions in research grants to the University systemwide pursuant to Executive Orders attacking "'diversity, equity, inclusion, and accessibility' (DEIA)" programs— cancellations that have been declared unlawful and enjoined. *See Thakur v. Trump*, 2025 WL 1734471 (N.D. Cal. June 23, 2025). Undeterred, Defendants then cut, froze, or terminated $584 million more from research projects run by the University of California at Los Angeles ("UCLA") under the guise of a Title VI investigation into antisemitism allegations. As in the Harvard case, the Trump administration's campaign of economic coercion against the University of California threatens the health and safety of the people of this country. *See President & Fellows of Harvard College*, 2025 WL 2528380, at *33 ("Research that has been frozen could save lives, money, or the environment, to name a few."). The federal government has further initiated pretextual investigations of other UC campuses and their faculty, staff, and students, with a looming threat to additional federal funds unless the UC capitulates to the Trump administration's attempt to "promote[] a governmental orthodoxy in violation of the First Amendment." *Id.* at *25.  The UC system receives $17 billion annually (one-third of the University's entire operating budget) from the federal government for research, student aid, and health care services.

11.     Defendants' demands, which are outlined in a letter dated August 8 ("August 8 Demand Letter"), seek to impose this type of "governmental orthodoxy" upon the University of California as well, by forcing the UC to cede control over curriculum, faculty hiring and promotion, and university

admissions to the federal government and its government-appointed monitor. They further demand the adoption of restrictions on protest and other expressive activity; agreement to disclose student disciplinary records; elimination of "diversity, equity, and inclusion" measures to ensure that students, workers, and faculty of diverse backgrounds can thrive at the University of California; announcement that the university does not recognize transgender individuals; and an end to gender-inclusive policies and gender-affirming medical care to minors—among other policy changes that, if adopted, would violate the constitutional and state law rights of faculty, students, and staff. If granted this control, the federal government will be re-shaping UC in its own image for years, possibly decades, to come.

12.    The punishments inflicted on UC as part of this campaign of ideological control exceed what is permitted under the law. In defiance of applicable law, Defendants have unilaterally and without warning punished the UC by cutting off hundreds of millions of dollars in essential research grant funding, with threats to withhold more, before any finding has been made by any competent tribunal of wrongdoing, without any hearing, and without providing the UC and other affected stakeholders with their right under federal law to contest any finding of wrongdoing. On top of their illegally imposed financial penalties and unlawful policy demands, Defendants are further demanding that the UC pay more than $1 billion to the federal government, despite no statutory or other lawful basis for imposing any such fine.

13.    To prevent Defendants from achieving their unlawful objectives through illegitimate means, a coalition of labor unions and associations that represent faculty, students, academic employees, and staff employees at the UC have banded together to file this challenge. The plaintiff coalition seeks declaratory and injunctive relief forbidding the further use of financial threats to coerce the UC to accede to demands that will harm faculty, academic employees, staff employees, and students, in violation of the federal Constitution and duly enacted law.

## PARTIES

### A. Plaintiffs

14.    Plaintiff **American Association of University Professors ("AAUP")** is a nonprofit membership association and labor union of faculty and academic professionals throughout the country. AAUP is headquartered in Washington, D.C. Founded in 1915, the AAUP remains the nation's leading

organization primarily dedicated to protecting academic freedom and shared governance in higher education. The AAUP has approximately 50,000 members on college and university campuses across the country, including a large number of faculty members who rely on federal grants to support their work across a range of academic disciplines. AAUP's mission is to advance academic freedom and shared governance of higher education institutions; to define fundamental professional values and standards for higher education; to promote the economic security of faculty, academic professionals, graduate students, postdoctoral fellows, and all those engaged in teaching and research in higher education; to help the higher education community organize to make its goals a reality; and to ensure higher education's contribution to the common good. The AAUP has helped to shape American higher education by developing the standards and procedures that maintain quality in education and academic freedom in this country's colleges and universities.

15.     Plaintiff **American Federation of State, County, and Municipal Employees, Local 3299 ("AFSCME")** is a labor organization and the exclusive collective bargaining representative of more than 40,000 service workers, patient care technical workers, skilled craft workers, and more at UC's ten campuses, five medical centers, numerous clinics, research laboratories, and UC College of the Law, San Francisco. Since 1948, AFSCME has prided itself on effectively representing UC workers while relentlessly fighting to provide social justice and economic opportunity not just to UC workers, but to the greater public. AFSCME's diverse membership includes approximately 79 percent people of color.

16.     Plaintiff **American Federation of Teachers ("AFT")** is a national labor organization headquartered in Washington, D.C. and representing over 1.8 million members, including more than 400,000 who are employed as higher education faculty and professional staff, primarily in research and teaching positions; federal, state, and local government employees; pre-K through 12th-grade teachers, early childhood educators, paraprofessionals, and other school-related personnel; and nurses and other healthcare professionals. AFT has many members who receive funding, training, classroom resources, and other opportunities made possible by federal grants and contracts. AAUP and University Council-American Federation of Teachers ("UC-AFT") are affiliates of AFT. As a result, all current AAUP and UC-AFT members are also AFT members. AFT's mission is to champion fairness, democracy, economic

opportunity and high-quality public education, healthcare and public services for students, families, and communities.

17.      Plaintiff **Berkeley Faculty Association ("BFA")** is an independent representative of the Berkeley faculty, legally empowered to provide a voice to faculty outside the regular channels of the Academic Senate and University administration. BFA believes maintaining the public mission of the University of California is vital to ensure that world class faculty can deliver the highest quality teaching and research for all Californians. BFA advocates for faculty rights and welfare, including academic freedom.

18.      Plaintiff **California Nurses Association/National Nurses United ("CNA/NNU")** is a labor organization founded in 1903 and headquartered in Oakland, California. CNA/NNU represents over 150,000 Registered Nurses ("RNs") in hospitals, clinics, and home health agencies in California and other states across the United States. This includes approximately 23,500 RNs employed by the Regents of the University of California, at all University of California campuses. CNA/NNU's mission is to improve professional standards for RNs, to promote the welfare of RNs, and to ensure safe health care for all. The National Institutes for Health is the largest funder of medical research at UC facilities, with funding totaling $2.6 billion in the last academic year. CNA/NNU's members who work at the University of California perform nursing care within the context of clinical trials funded by NIH. NIH funding has led to life-saving medical discoveries. Playing a role in this research is a professional calling for RNs who work in the UC system.

19.      Plaintiff **Council of UC Faculty Associations ("CUCFA")** is an umbrella organization for UC Faculty Associations, which are independent, dues-supported associations on the UC campuses that are composed of members of the Academic Senate. CUCFA exists to further the professional and scholarly values held by the faculty of the UC, to protect those privileges and responsibilities traditionally reserved to the faculty for the purpose of maintaining and improving the academic quality of the University, to support the principles of University governance embodied in the Academic Senate, and to improve the economic status and general welfare of the faculty.

20.      Plaintiff **Davis Faculty Association ("DFA")** is an independent membership association of Senate faculty members across all departments and schools at UC Davis. DFA was established in

1979 with the mission of furthering faculty's professional and scholarly values, protecting the privileges and responsibilities traditionally reserved to faculty for the purpose of maintaining and improving the quality of academic research and instruction, and improving faculty's economic status and general welfare. DFA advocates at the campus, system, and state level for strong and democratic governance, sustainable state funding for public higher education, and academic freedom.

21.     Plaintiff **Irvine Faculty Association ("IFA")** is a voluntary, dues-paying faculty association whose mission is to keep its members informed about matters of concern to University of California, Irvine (UCI) faculty and to represent UCI faculty to the UCI administration and to the UC Office of the President and the state legislature through CUCFA. IFA advocates for faculty on matters of employment, compensation, workload, and benefits; speaks out on matters related to academic freedom and shared governance; and lobbies on behalf of enhanced state support for public higher education in California. IFA's members come from a wide and diverse range of departments and schools across UCI. IFA represents all UCI Senate faculty regardless of membership in its political advocacy and communications. Many IFA members rely on federal grants to support their research and fund their salaries and those of their postdoctoral researchers and graduate student workers.

22.     Plaintiff **Riverside Faculty Association ("RFA")** is a voluntary membership organization of Senate and non-Senate faculty. RFA was founded in 1975 and works to safeguard the welfare of the faculty, support principles of shared governance, and further UC Riverside faculty's scholarly and professional values. RFA provides faculty with an independent instrument for representing faculty interests and for supporting public education in California.

23.     Plaintiff **San Diego Faculty Association ("SDFA")** is a voluntary, dues-supported organization comprised of Academic Senate members. SDFA's core mission is improving the economic status and general welfare of the UC San Diego (UCSD) faculty. SDFA is the only organization at UCSD solely dedicated to protecting and improving the faculty's basic employment rights, including academic freedom and shared governance.

24.     Plaintiff **Santa Cruz Faculty Association ("SCFA")** is an independent union and the exclusive bargaining representative of all UC Santa Cruz Senate faculty members. SCFA is separate from, but partners with, the campus Academic Senate and strengthens the promise of shared governance

by backing it with the power of collective bargaining. SCFA advocates for faculty rights and welfare and believes that higher education is a vital social good that deserves robust public funding.

25.     Plaintiff the **International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW")** is one of the largest and most diverse unions in North America, with members in the United States, Canada, and Puerto Rico, and in virtually every sector of the economy. From its earliest days, the UAW has been a leader in the struggle to secure economic and social justice for all people. It has a rich history of supporting inclusion, equity, and diversity in the higher education sector and in all workplaces. The UAW has nearly 1,000,000 active and retired members and represents approximately 120,000 workers in higher education—graduate students, postdoctoral scientists, researchers, university staff, and faculty— at institutions across the country including University of California, California State University, University of Southern California, California Institute of Technology, UC Law San Francisco, California Institute of the Arts, University of Oregon, University of Washington, Washington State University, Columbia University, New York University, Harvard University, University of Pennsylvania, Princeton University, and Johns Hopkins University, among many others. Tens of thousands of UAW members rely on federal grant funding for their jobs and training. UAW, jointly with UAW Local 4811, is the exclusive bargaining representative of 48,000 academic employees at the UC, including over 6,000 at UCLA. In addition, UAW is the exclusive bargaining representative for two bargaining units of professional staff employees at the University of California: 7,000 research and public service employees, and 5,000 student services and advising employees. In total, UAW represents more than 60,000 employees at the UC, many of whom work at UCLA.

26.     Plaintiff **Teamsters Local 2010** represents 25,000 workers in California education including over 20,000 employees of the University of California. The UC employees represented by Teamsters Local 2010 include administrative, skilled trades and healthcare workers. Teamsters Local 2010 members work at UC's medical centers, clinics, labs and at UC's National Defense Lab. Thousands of Teamsters Local 2010's members hold UC positions funded all or in part by federal grants. Teamsters Local 2010 and its members proudly engage in collective action and the exercise of First Amendment rights to fight for living wages and dignity on the job.

27.    Plaintiff **UAW Local 4811 ("Local 4811")** is a labor union that, jointly with UAW, is the exclusive collective bargaining representative for 48,000 workers at the UC across three distinct bargaining units and has a membership comprised of graduate student employees and non-student academic employees at UC. The Academic Student Employees unit represented by UAW and Local 4811 consists of over 36,000 UC employees working in positions such as graduate student researcher, teaching assistant, reader, and tutor. The Postdoctoral Scholars unit represented by UAW and Local 4811 consists of over 7,000 UC non-student employees working as postdoctoral scholars, who are early career scientists with doctorate degrees that perform research, much of which is funded by the federal government. The Academic Researchers unit represented by UAW and Local 4811 consists of over 5,000 UC non-student employees working in positions such as researcher, project scientist, specialist, and coordinator of public programs, many of whom conduct research funded by the federal government. At UCLA, UAW and Local 4811 represents approximately 5,000 academic student employees, 1,000 postdoctoral scholars, and 500 academic researchers. Many members of Local 4811 hold positions funded by federal government research grants from the National Science Foundation, National Institutes of Health, and/or the Department of Energy.

28.    Plaintiff **UC Merced Faculty Association ("UCMFA")** is an independent faculty advocacy organization dedicated to representing and advocating for the interests of Senate faculty at UC Merced. The association works towards fostering a supportive academic environment and addressing faculty concerns. The UCMFA addresses a wide range of issues, including but not limited to, academic policies, working conditions, and representation.

29.    The **UC Santa Barbara Faculty Association ("SBFA")** is a voluntary, dues-supported organization comprised of Academic Senate members dedicated to the improvement of UC Santa Barbara (UCSB) faculty's economic status and general welfare. SBFA is the only organization at UCSB solely dedicated to protecting and improving the faculty's employment rights, including academic freedom and shared governance.

30.    Plaintiff **UCSF Faculty Association ("UCSF FA")** is a voluntary, dues-supported organization comprised of UCSF faculty members across all the UCSF health professions schools and the Graduate Division. UCSF FA is dedicated to the protection and improvement of the UCSF faculty's

working conditions and rights. In partnership with the UCSF Academic Senate, UCSF FA advocates to the UCSF Administration on behalf of faculty for academic freedom and shared governance at UCSF, for faculty's ability to fulfill their academic mission and provide high quality patient care, and for faculty salary, benefits and other employment rights. UCSF FA also addresses policy and regulatory issues of concern to the UCSF faculty through state and federal legislative advocacy.

31. Plaintiff **University of California Los Angeles Faculty Association ("UCLA-FA")**, founded in 1979 and reconstituted in May 2024, is a nonprofit membership association of UCLA Senate faculty with members in a wide variety of departments and schools across UCLA. UCLA-FA represents UCLA faculty collective interests on employment and academic freedom issues, under the auspices of the Higher Education and Employment Relations Act, and advocates for a vibrant and well-funded public higher education system in California.

32. Plaintiff **University Council–American Federation of Teachers ("UC-AFT")** is a labor organization and exclusive bargaining representative of 7000 librarians and teaching faculty across 10 UC campuses. UC-AFT's members teach approximately 30-40% of credit hours at UC, providing crucial mentorship and support to its most marginalized and historically underserved student populations. UC-AFT's members are also stewards of the largest library system in the world, protecting California's vital records and its cultural heritage. UC-AFT's members include writers and architects, scientists and world-class musicians, nurses and lawyers, librarians and archivists, scholars and artists, K-12 instructors and supervisors of teacher education. Through its contract campaigns, UC-AFT has fought for and won reappointment protections that create more stable career pathways for teaching faculty at every stage of their careers. Since 2003, when UC-AFT first secured landmark protections for Continuing Lecturers, UC-AFT has worked to transform teaching "gigs" into more stable, full-time jobs.

33. Plaintiff **University Professional and Technical Employees–Communication Workers of America ("UPTE")** is a labor organization and the exclusive bargaining representative of more than 20,000 health care professionals, research support professionals, and technical employees at the UC's ten campuses, five medical centers, and numerous clinics and research laboratories. Approximately 7,000 of UPTE's members are professional researchers, including staff research

associates, clinical research coordinators, laboratory technicians and others, many of whose positions are funded directly or indirectly by federal grants.

### B.    Defendants

34.    Defendant **Donald J. Trump** is the President of the United States and is sued in his official capacity.

35.    Defendant the **U.S. Department of Justice ("DOJ")** is a federal agency headquartered in Washington, D.C. The DOJ is an agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. §§551(1), 701(b)(1).

36.    Defendant **Pamela Bondi** is the U.S. Attorney General and is sued in her official capacity.

37.    Defendant **Leo Terrell** is Senior Counsel to the Assistant Attorney General for Civil Rights and head of the DOJ Task Force to Combat Anti-Semitism and is sued in his official capacity.

38.    The following federal departments and agencies, including their identified leaders, are sometimes referred to collectively herein as the "Funding Agency Defendants."

39.    Defendant the **U.S. Department of Health and Human Services ("HHS")** is a federal agency headquartered in Washington, D.C. HHS is an agency within the meaning of the APA.

40.    Defendant **Robert F. Kennedy, Jr.** is the U.S. Secretary of Health and Human Services and is sued in his official capacity.

41.    Defendant **Robert Foster** is the Acting General Counsel of HHS and is sued in his official capacity.

42.    Defendant the **National Institutes of Health ("NIH")**, housed within HHS, is a federal agency headquartered in Bethesda, Maryland. NIH is an agency within the meaning of the APA.

43.    Defendant **Jayanta Bhattacharya** is the Director of the NIH and is sued in his official capacity.

44.    Defendant **U.S. Centers for Disease Control and Prevention ("CDC")**, housed within HHS, is a federal agency headquartered in Atlanta, Georgia. CDC is a federal agency within the meaning of the APA.

45.    Defendant **Jim O'Neill** is Acting Director of CDC and is sued in his official capacity.

46.     Defendant **U.S. Food and Drug Administration ("FDA")**, housed within HHS, is a federal agency headquartered in Silver Spring, Maryland. FDA is a federal agency within the meaning of the APA.

47.     Defendant **Martin Makary** is Commissioner of the FDA and is sued in his official capacity.

48.     Defendant the **U.S. Department of Education ("ED")** is a federal agency headquartered in Washington, D.C. ED is an agency within the meaning of the APA.

49.     Defendant **Linda McMahon** is the U.S. Secretary of Education and is sued in her official capacity.

50.     Defendant **Thomas E. Wheeler** is Acting General Counsel of the ED and is sued in his official capacity.

51.     Defendant **Craig Trainor** is Acting Assistant Secretary for the Office for Civil Rights, U.S. Department of Education and is sued in his official capacity.

52.     Defendant the **U.S. General Services Administration ("GSA")** is a federal agency headquartered in Washington, D.C. GSA is an agency within the meaning of the APA.

53.     Defendant **Michael Rigas** is Acting Administrator of the GSA and is sued in his official capacity.

54.     Defendant **Josh Gruenbaum** is Commissioner of the Federal Acquisition Service within the GSA and is sued in his official capacity.

55.     Defendant **U.S. National Science Foundation ("NSF")** is a federal agency headquartered in Alexandra, Virginia. NSF is an agency within the meaning of the APA.

56.     Defendant **Brian Stone** is Acting Director of NSF and is sued in his official capacity.

57.     Defendant the **U.S. Department of Energy ("DOE")** is a federal agency headquartered in Washington, D.C. DOE is an agency within the meaning of the APA.

58.     Defendant **Christopher A. Wright** is Secretary of DOE and is sued in his official capacity.

59.     Defendant **U.S. Department of Defense ("DOD")** is a federal agency headquartered in Arlington County, Virginia. DOD is an agency within the meaning of the APA.

60.     Defendant **Peter B. Hegseth** is Secretary of DOD and is sued in his official capacity.

61.     Defendant **National Aeronautics and Space Administration ("NASA")** is a federal agency headquartered in Washington, D.C. NASA is an agency within the meaning of the APA.

62.     Defendant **Sean P. Duffy** is Acting Administrator of NASA and is sued in his official capacity.

63.     Defendant **U.S. Department of Agriculture ("USDA")** is a federal agency headquartered in Washington, D.C. USDA is an agency within the meaning of the APA.

64.     Defendant **Brooke L. Rollins** is Secretary of USDA and is sued in her official capacity.

65.     Defendant **U.S. Department of Commerce ("DOC")** is a federal agency headquartered in Washington, D.C. DOC is a federal agency within the meaning of the APA.

66.     Defendant **Howard Lutnick** is Secretary of DOC and is sued in his official capacity.

67.     Defendant **U.S. Department of the Interior ("Interior" or "DOI")** is a federal agency headquartered in Washington, D.C. DOI is a federal agency within the meaning of the APA.

68.     Defendant **Doug Burgum** is Secretary of the Interior and is sued in his official capacity.

69.     Defendant **U.S. Department of State ("State")** is a federal agency headquartered in Washington, D.C. State is a federal agency within the meaning of the APA.

70.     Defendant **Marco Rubio** is Secretary of State and is sued in his official capacity.

71.     Defendant **National Endowment for the Humanities ("NEH")** is a federal agency headquartered in Washington, D.C. NEH is a federal agency within the meaning of the APA.

72.     Defendant **Michael McDonald** is Acting Chairman of NEH and is sued in his official capacity.

73.     Defendant **U.S. Environmental Protection Agency ("EPA")** is a federal agency headquartered in Washington, D.C. EPA is a federal agency within the meaning of the APA.

74.     Defendant **Lee Zeldin** is Administrator of the EPA and is sued in his official capacity.

75.     Defendant **U.S. Department of Housing and Urban Development ("HUD")** is a federal agency headquartered in Washington, D.C. HUD is an agency within the meaning of the APA.

76.     Defendant **Scott Turner** is Secretary of HUD and is sued in his official capacity.

77.    Defendant **Institute of Museum and Library Services ("IMLS")** is a federal agency headquartered in Washington, D.C. ILMS is a federal agency within the meaning of the APA.

78.    Defendant **Keith Sonderling** is Acting Director of IMLS and is sued in his official capacity.

79.    Defendant **Department of Transportation ("DOT")** is a federal agency headquartered in Washington, D.C. DOT is a federal agency within the meaning of the APA.

80.    Defendant **Sean Duffy** is Secretary of DOT and is sued in his official capacity.

81.    Defendant Corporation for National and Community Service ("**AmeriCorps")** is a federal agency headquartered in Washington, D.C. AmeriCorps is a federal agency within the meaning of the APA.

82.    Defendant **Jennifer Bastress Tahmasebi** is Interim Director of AmeriCorps and is sued in her official capacity.

## JURISDICTION & VENUE

83.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 because this action arises under the Constitution and laws of the United States, including the Administrative Procedure Act, 5 U.S.C. §§551 *et seq.*, and 5 U.S.C. §§702, 704.

84.    An actual controversy exists between the parties within the meaning of 28 U.S.C. §2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§2201-02 and 5 U.S.C. §§705-706. Plaintiffs do not seek money damages or an order mandating specific performance of any contract.

85.    Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2) and (e)(1), including because UC has three campuses located within this District (UC Berkeley, UC San Francisco, and UC Law San Francisco) and a substantial part of the events or omissions giving rise to the claim occurred in this District, Defendants are officers and agencies of the United States served in their official capacities, no real property is at issue in this case, and Plaintiffs represent members who are citizens of California and residents of this District, where many of the harms alleged have occurred and will continue to occur unless Defendants' alleged unlawful conduct is enjoined.

86.     Intradistrict assignment is appropriate in the San Francisco/Oakland division of this Court.

## FACTUAL ALLEGATIONS

### I.  Public Universities Like the University of California Are Crucial Engines of Free Thought and Academic Inquiry, Scientific Research, and Economic Mobility.

87.     In a democracy, institutions of higher education exist not only as places for research, teaching and learning, but as core civic spaces in which ideas—about science, literature, politics, and society—are formed, tested, and debated.

88.     By contrast, autocratic governments consider independent inquiry and thought to be a threat. In the 1930s, as Nazism was rising in Germany, books from university libraries that were deemed to be in conflict with the National Socialist party and/or books by Jewish authors or with Jewish themes were removed and burned in town squares. Curriculum was modified. Today, authoritarian governments in Hungary,[1] Turkey,[2] and Brazil[3] have each attempted to place universities under the control of the central government.

89.     The University of California is a leading academic institution in the United States. Indeed, it is among the world's premier institutions of higher learning. The UC System has ten campuses (UC Berkeley, UC Davis, UC Irvine, UCLA, UC Merced, UC Riverside, UC San Diego, UC San Francisco, UC Santa Barbara, and UC Santa Cruz), three affiliate national laboratories (Lawrence Berkeley National Laboratory, Lawrence Livermore National Laboratory, and Los Alamos National Laboratory), six academic health centers systems (UC Davis Health, UC San Diego Health, UCI Health, UCLA Health, UCR Health, and UCSF Health), and numerous institutes, centers, and research laboratories across the state.

90.     As alleged in *Thakur v. Trump*, Case No. 25-cv-04737-RFL (N.D. Cal.), research by participants in the UC System has contributed to the public interest in immeasurable ways. To name just

---

[1] Lydia Gall, *Hungary Continues Attacks on Academic Freedom*, Human Rights Watch (Sept. 3, 2020), https://www.hrw.org/news/2020/09/03/hungary-continues-attacks-academic-freedom.
[2] Muzaffer Kaya, *Turkey's Purge of Critical Academia*, Middle East Research and Information Project (2018), https://merip.org/2018/12/turkeys-purge-of-critical-academia/.
[3] Pedro Salgado, *The Crisis of Brazilian Universities: Higher Education Under Bolsonaro*, International Research Group on Authoritarianism and Counter-Strategies (July 22, 2021), https://irgac.org/articles/the-crisis-of-brazilian-universities-higher-education-under-bolsonaro/.

a few examples, the UC System's research laid the groundwork for the internet,[4] plug-in hybrid cars,[5] and the world's largest 3-D map of the universe.[6]

91.    In the medical field, UC System research has led to development of MRI machines,[7] cochlear implants that restore hearing,[8] a universal viral vaccine,[9] a brain implant that prevents Parkinson's symptoms,[10] and the use of CRISPR gene-editing to cure sickle cell disease.[11]  UC cancer research has contributed to a decline in cancer deaths by one-third over the past three decades, an equivalent of 3.8 million lives saved.[12]

92.    The UC System has produced 70 Nobel Prize winners, 101 MacArthur "Genius" grant award winners, 66 National Medal of Science winners, and 42 Pulitzer Prize winners.[13]  Since 2013, the UC System has topped the National Academy of Inventors' list of universities worldwide with the most utility patents.[14]

---

[4] Pranay Bhattacharyya, *UCLA: Birthplace of the Internet*, US Tech News (Apr. 28, 2021), https://uctechnews.ucop.edu/ucla-birthplace-of-the-internet.

[5] USPath Center, *4 Unexpected Discoveries from UC*, UCPath Jobs, https://ucpathjobs.org/lifestyle/4-unexpected-discoveries-uc/ (last visited May 27, 2025).

[6] Lauren Biron, *First Results from DESI Make the Most Precise Measurement of Our Expanding Universe*, Berkeley Lab News Center (Apr. 4, 2024), https://newscenter.lbl.gov/2024/04/04/desi-first-results-make-most-precise-measurement-of-expanding-universe/.

[7] Kara Manke, *Jerome R. Singer, pioneer of magnetic resonance imaging, dies at 97*, US Berkeley News (Aug. 6, 2019), https://news.berkeley.edu/2019/08/06/jerome-r-singer-pioneer-of-magnetic-resonance-imaging-dies-at-97/.

[8] Pete Farley, *Neuroscientist Wins Prize for Cochlear Implant Contributions*, Univ. of Cal. (Jan. 8, 2015), https://www.universityofcalifornia.edu/news/neuroscientist-wins-prize-cochlear-implant-contributions.

[9] Jules Bernstein, *Vaccine Breakthrough Means No More Chasing Strains*, Univ. of Cal., Riverside (Apr. 15, 2024), https://news.ucr.edu/articles/2024/04/15/vaccine-breakthrough-means-no-more-chasing-strains.

[10] Robin Marks, *New Parkinson's Treatment Helps Former Pro Keep Skateboarding*, Univ. of Cal. S.F. (Apr. 19, 2024), https://www.ucsf.edu/news/2024/04/427391/new-parkinsons-treatment-helps-former-pro-keep-skateboarding.

[11] Robert Sanders, *FDA Approves First Test of CRISPR to Correct Genetic Defect Causing Sickle Cell Disease*, Univ. of Cal. (Apr. 1, 2021), https://www.universityofcalifornia.edu/news/fda-approves-first-test-crispr-correct-genetic-defect-causing-sickle-cell-disease.

[12] Julia Busiek, *What Cuts to NIH Funding Mean for Cancer Patients and Their Families*, Univ. of Cal. (Feb. 26, 2025), https://www.universityofcalifornia.edu/news/what-cuts-nih-funding-mean-cancer-patients-and-their-families.

[13] Univ. of Cal., *The University of California at a Glance* (Feb. 25, 2025), https://ucop.edu/institutional-research-academic-planning/_files/uc-facts-at-a-glance.pdf.

[14] Univ. of Cal., *Federal Investment in UC Research* (Apr. 2025), https://ucop.edu/communications/_files/federal-investment-in-uc-research-2025.pdf.

93.    Through continual development of new technologies, UC research has been essential to the state's and the nation's economy, leading to job growth, the founding and expansion of companies and industries, and significant scientific advancements. Industries that have grown out of UC research include biotechnology, computing, semiconductors, telecommunications, and agriculture.[15]

94.    UC research is making ongoing and rapid contributions to the nation's economic progress and knowledge. The UC System averages four new inventions per day. In 2023, 78 startups were launched using UC intellectual property or technology.[16] Almost one-tenth of all U.S. academic research is conducted by UC researchers.[17]

95.    All of this output comes from the vitality of UC's academic and social culture, which encourages and promotes intellectual debate, challenges to orthodoxy, interdisciplinary collaboration, and diversity in all of its forms. This culture has produced tremendous public goods for decades and has been expressed in activism and advocacy for causes that were unpopular—and counter to government positions—in their time: for example, the fight for civil rights, opposition to the Vietnam War, and challenges to South African apartheid.

## II.    For Decades, the Federal Government Has Funded UC Because UC Produces Results: Public Goods of Immeasurable Value.

96.    The UC System's research, like that of other major academic institutions in the United States, relies heavily on its partnership with the federal government, including on the funding that the federal government provides for research that is essential to the nation. For decades, this partnership has produced groundbreaking innovations that improve the health, safety, knowledge base, and competitiveness of the American public.

97.    Federal funding is an indispensable source of UC research funding, comprising the majority of the UC System's total research awards.[18] In fiscal year 2024, the UC System received $4.069 billion in federal research awards covering 10,256 distinct awards.[19]

---

[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*

98.    The UC System receives more National Institutes of Health ("NIH") and National Science Foundation ("NSF") funding than any other institution.[20]

99.    In fiscal year 2024, the UC System received approximately the following amounts in research funding, by agency:[21]

           a.    $2.54 billion from NIH

           b.    $525 million from NSF

           c.    $326 million from Defense

           d.    $160 million from Energy

           e.    $122 million from other agencies of HHS

           f.    $104 million from NASA

           g.    $86 million from USDA

           h.    $68 million from Commerce

           i.    $39 million from Interior

           j.    $27 million from Education

           k.    $20 million from State

           l.    $47 million from other agencies

100.    These federal funding sources, and the research talent they attract and support, have enabled the UC System to make essential contributions to human progress for decades. Because the nature of research requires years of ongoing work, the UC system has operated research programs across presidential administrations for generations.

101.    The innovations the UC System has enabled would be impossible if federal grant funding were terminated.

102.    The faculty members and other research personnel who conduct this research depend on federal grants. And in turn, their careers—their hiring, tenure, promotion, and retention—depend on federally supported research.

103.    The UC's dependence on its partnership with the federal government, and its contribution to the nation's welfare, extends beyond its research function. The UC System is also an important

---

[20] *Id.*
[21] *Id.*

provider of health care to the population of California. The UC System's medical centers provide care to millions of Californians annually, including 10.8 million outpatient visits, 1.32 million inpatient days, and 474,000 emergency room visits, at a net community benefit of $2 billion.[22]

104.    As such, systemwide, UC Health receives almost $5.3 billion annually from the federal Medicare program and nearly $4.6 billion annually from the federal portion of the federal-state Medicaid program, or $9.9 billion in total.[23]

105.    The UC System is also a leading engine of economic mobility for its students. One in every three students who enter college in the bottom 20 percent of income move to the top 20 percent in income as adults.[24] After graduating, UC graduates who entered college from families who are in the bottom 20 percent of income earn as much as students from middle-income families; and similarly, graduates who were first-generation college students earn as much as students whose parent graduated from college by five years after graduation.[25] A majority of the UC's first-generation college students and federal financial aid grant recipients earn more than their families within four years of graduation.[26] Ninety-three percent of the UC's lowest-income students go on to earn more than their parents.[27]

106.    The UC System's contribution to economic mobility depends on federal funding. The UC receives $1.9 billion in student financial aid funding annually, including $494 million in Pell Grants, over $1 billion in federal student loans, $86 million in graduate fellowships and scholarships, $21 million in federal work-study, and more than $25 million in other undergraduate grants and scholarships.[28]

107.    In total, including research, health care, and student financial aid funding, the UC receives over $17 billion per year from the federal government.

---

[22] Univ. of Cal., *UC and the Federal Government* (May 2025), https://ucop.edu/communications/_files/uc-and-the-federal-government.pdf.
[23] *Id.*
[24] *New data shows University of California degrees lead to jobs, economic prosperity*, Univ. of Cal. Off. of the President (July 14, 2025), https://www.universityofcalifornia.edu/press-room/new-data-show-university-california-degrees-lead-jobs-economic-prosperity.
[25] Univ. of Cal., *UC helps level the playing field and promotes economic mobility, particularly for low-income students*, https://www.ucop.edu/institutional-research-academic-planning/_files/CLIMB-a-mobility-analysis.pdf.
[26] *New Data*, *supra* note 24.
[27] *UC and the Federal Government*, *supra* note 22.
[28] *Id.*

108.    The UC is also the second largest employer in the state. Nearly 275,000 people work at the UC campuses and medical centers, and the UC indirectly supports over 500,000 jobs.[29]

109.    The UC System contributes in myriad ways to the well-being of Californians in every county, throughout the state.

### III.    Defendants Are Waging a Campaign to Undermine Free Speech and Academic Freedom at America's Universities.

#### A.    The Trump Administration's Openly Stated Goal Is to Purge "Left" and "Woke" Viewpoints From University Campuses.

110.    President Trump expressly campaigned on a promise "to reclaim our once great educational institutions from the radical Left and Marxist maniacs."[30]

111.    President Trump's 2024 campaign website included this promise and numerous statements describing his intention to curtail academic freedom and control the viewpoints expressed on campuses. His campaign website pledged, "we will take the billions and billions of dollars that we will collect by taxing, fining, and suing excessively large private university endowments, and we will then use that money to endow a new institution called the American Academy."[31]

112.    The Trump administration is particularly focused on suppressing views that challenge its preferred narrative with respect to the Israeli-Palestinian conflict, and with respect to race and gender—what it refers to as "diversity, equity, and inclusion," or "DEI," or sometimes "wokeness."

113.    President Trump's campaign website highlighted that such viewpoints would be prohibited at the American Academy, stating that "there will be no wokeness or jihadism allowed—none of that's going to be allowed."[32]

---

[29] Letter from James B. Milliken, President, Univ. of Cal., to Scott D. Wiener, Cal. State Sen. (Sept. 3, 2025), https://ucop.edu/communications/_files/sen-wiener-response-letter-090325.pdf.

[30] *Agenda47: Protecting Students from the Radical Left and Marxist Maniacs Infecting Educational Institutions*, DonaldJTrump.com (July 17, 2023) , https://www.donaldjtrump.com/agenda47/agenda47-protecting-students-from-the-radical-left-and-marxist-maniacs-infecting-educational-institutions, https://perma.cc/7HZN-5MW8.

[31] *Agenda47: The American Academy*, DonaldJTrump.com (Nov. 1, 2023), https://www.donaldjtrump.com/agenda47/agenda47-the-american-academy, https://perma.cc/B66V-ZXMT.

[32] *Id.*

114.    Vice President JD Vance has for years similarly expressed his intention to target universities on the basis of disfavored viewpoints. In a speech titled "The Universities are the Enemy" given at the National Conservatism Conference on November 2, 2021, he warned that "[t]he professors are the enemy"[33] and that "the universities are the enemy," and urged an "aggressive[] attack [on] the universities in this country."[34] On September 17, 2021, Vance stated, "we should seize the institutions of the left and turn them against the left … we need a de-wokeification program in the United States … you go down American institutions, and make it possible for conservatives to actually govern and succeed."[35] As an example, Vance stated, "you're not allowed to teach critical race theory anymore, you're not allowed to teach critical gender theory anymore … you're not allowed to do those things and get a dollar of federal funding."[36]

115.    In October 2021, Vance described the strategy of using federal funding to coerce viewpoint compliance at universities: "We got a tool here …. We have got to cut off the flow of funding to the universities that are indoctrinating our children …. If we're going to spend money on these universities, they should have to teach things that are consistent with our values and our worldview … we go to the universities, we use the hundreds of billions of dollars that we send to them as leverage and we say: 'Unless you stop indoctrinating our children, unless you stop indoctrinating our entire society, you don't get another dime of our money.'"[37]

116.    On December 14, 2023, Vance posted to X, "[t]he endowments at Penn, Harvard & MIT have a combined $95B+ in assets," and the schools "use these funds to push DEI and woke insanity[.]"[38]

---

[33] Henry Reichman, *"The Professors Are the Enemy,"* The Chron. of Higher Educ. (Dec. 14, 2021), https://www.chronicle.com/article/the-professors-are-the-enemy.
[34] National Conservatism, *J.D. Vance | The Universities are the Enemy | National Conservatism Conference II*, YouTube (Nov. 10, 2021), https://www.youtube.com/watch?v=0FR65Cifnhw, https://perma.cc/WQF6-QU6V.
[35] Jack Murphy Live, *J.D. Vance - JML #070*, YouTube (Sept. 17, 2021), at 26:00, https://www.youtube.com/watch?v=PMq1ZEcyztY.
[36] *Id.* at 27:52.
[37] Forbes Breaking News, *JD Vance: Cut Funding to Universities Indoctrinating Our Children*, YouTube (Oct. 3, 2021), https://www.youtube.com/watch?v=MZistOc5g0A.
[38] JD Vance (@JDVance), X.com (Dec. 14, 2023, 12:03 PM ET), https://x.com/JDVance/status/1735329724321206537, https://perma.cc/Z7Q7-8BLW.

And on June 12, 2024, Vance posted on X, "DEI is racism, plain and simple. It's time to outlaw it nationwide, starting with the federal government."[39]

117.    Since becoming Vice President, Vance has praised Hungarian President Victor Orbán's aggressive strategy to make Hungarian universities better reflect Orbán's own ideology.[40]

118.    Defendant Leo Terrell, appointed by Trump to head the newly created DOJ "Task Force to Combat Anti-Semitism" ("DOJ Task Force"), has more recently echoed these same sentiments and confirmed the Trump administration's strategy to use the threat of federal funding losses to coerce universities into adopting the Trump administration's preferred viewpoints.

119.    On February 26, 2025, a news article reported Defendant Terrell as saying, "When you see universities start losing millions of dollars in federal funding, you're going to see a change in their behavior."[41]

120.    A few days later, Defendant Terrell stated in a Fox Business clip he later shared on X, "I've targeted ten schools. Columbia, Harvard, Michigan, UCLA, USC. Let me tell you what we're going to do. We're going to take away your funding."[42]

121.    Defendant Terrell starkly described Defendants' funding coercion strategy on Fox News on or about March 9, 2025: "We're taking away their money. We're gonna bankrupt these universities. We're gonna take away every single federal dollar. … The academic system in this country has been hijacked by the left, has been hijacked by the Marxists. They have controlled the mindset of our young people … and we have to put an end to it. … If these universities do not play ball, lawyer up, because the federal government is coming after you."[43]

---

[39] JD Vance (@JDVance), X.com (Jun. 12, 2024, 9:55 AM ET), https://x.com/JDVance/status/1800889737718505697, https://perma.cc/C2PE-JH2Q.

[40] Rob Dreher, *"I would like to see European elites actually listen to their people for a change": An Interview with J.D. Vance*, The European Conservative (Feb. 22, 2024), https://europeanconservative.com/articles/dreher/i-would-like-to-see-european-elites-actually-listen-to-their-people-for-a-change-an-interview-with-j-d-vance/, https://perma.cc/5WJK-KC8P.

[41] Akiva Van Koningsveld, *Head of DOJ Antisemitism Task Force: We'll Put Hamas Supporters in Jail 'for Years,'* Jewish News Syndicate (Feb. 26, 2025), https://www.jns.org/head-of-doj-antisemitism-task-force-well-put-hamas-supporters-in-jail-for-years/, https://perma.cc/5327-BU4R.

[42] Leo Terrell (@TheLeoTerrell), X.com (Feb. 28, 2025, 11:48 AM ET), https://perma.cc/5NBW-B6P5.

[43] Mark McMillan, *Leo Terrell with Mark Levin- How we'll defeat antisemitism in the USA*, YouTube (Mar. 9, 2025), https://www.youtube.com/watch?v=NOFIKRr2Sco, https://perma.cc/5V4R-M692.

122.    Other Trump administration officials have expressed similar sentiments. On February 17, 2025, Acting United States Attorney for the District of Columbia Edward Martin sent a letter to Georgetown University Law School asserting that it was "unacceptable" for the private Jesuit university to "teach and promote" diversity, equity, and inclusion, and seeking to pressure the institution to remove such content from its "curriculum," "courses," and "teaching."[44] On May 23, 2025, Defendant McMahon posted to X, "Every student deserves an education free from … ideological agendas that undermine equal opportunity."[45]

123.    Shortly after taking office, President Trump issued a series of Executive Orders that laid the groundwork for his administration's coordinated attack on academic freedom and free speech and campaign to control universities.

124.    On January 20, 2025, President Trump signed Executive Order 14151, titled "Ending Radical and Wasteful Government DEI Programs and Preferencing."[46] Executive Order 14151 proclaims that "'diversity, equity, inclusion, and accessibility' (DEIA)" programs are "illegal and immoral discrimination programs." The Order directs "[e]ach agency, department, or commission head" to "terminate, to the maximum extent allowed by law, all … 'equity-related' grants or contracts."[47]

125.    On January 21, 2025, President Trump signed Executive Order No. 14173, titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity."[48] Executive Order 14173 states that "'diversity, equity, and inclusion' (DEI)," and "'diversity, equity, inclusion, and accessibility' (DEIA)" policies are "illegal," "dangerous," and "immoral" and can violate federal civil rights laws. The Order directs federal agencies to take action "[h]olding Federal contractors and subcontractors responsible for taking 'affirmative action'" against DEI and DEIA policies and directs the heads of all agencies to "take all appropriate action with respect to the operations of their agencies to advance in the private sector the

---

[44] Letter from Edward R. Martin, United States Attorney for the District of Columbia, to William M. Treanor, Dean, Georgetown Law Center, (Feb. 17, 2025), https://www.ncronline.org/files/2025-03/3.7.24%20Ed%20Martin%20letter%20%20to%20Georgetown%20law.pdf, https://perma.cc/JBE9-UJZK.
[45] Secretary Linda McMahon (@EDSecMcMahon), X.com (May 23, 2025, 9:01 AM ET), https://x.com/EDSecMcMahon/status/1925899998337675670, https://perma.cc/RD56-DGQ3.
[46] Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025).
[47] Id.
[48] Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025).

policy of individual initiative, excellence, and hard work," which the Executive Order asserts is inconsistent with "DEIA."[49]

126.    Executive Order 14173 further directs the Attorney General to submit a report containing "a proposed strategic enforcement plan" that includes "up to nine potential civil compliance investigations" of institutions including "institutions of higher education with endowments over 1 billion dollars."[50]

127.    Neither Executive Order 14151 nor Executive Order 14173 define the terms "DEI," "DEIA," "diversity," "equity," "inclusion," or "accessibility."

128.    On January 27, 2025, the Office of Management and Budget ("OMB") issued a memorandum requiring all agencies to "temporarily pause all activities related to obligations or disbursement of Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernment organizations, DEI, woke gender ideology, and the green new deal."[51]

129.    On January 29, 2025, President Trump signed Executive Order 14188, titled "Additional Measures to Combat Anti-Semitism."[52] Executive Order 14188 requires the heads of all executive agencies or departments to submit reports identifying all civil and criminal authorities or actions within their jurisdictions "that might be used to curb or combat anti-Semitism, and containing an inventory and analysis of all pending administrative complaints, as of the date of the report, against or involving institutions of higher education alleging civil-rights violations related to or arising from post-October 7, 2023, campus anti-Semitism."[53]

---

[49] *Id.*

[50] *Id.*

[51] Acting Director Matthew J. Vaeth, *M-25-13 Temporary Pause of Agency Grant, Loan, and Other Financial Assistance*, Off. of Mgmt. & Budget (Jan. 27, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/03/M-25-13-Temporary-Pause-to-Review-Agency-Grant-Loan-and-Other-Financial-Assistance-Programs.pdf, https://perma.cc/37SF-RFEA.

[52] Exec. Order No. 14188, 90 Fed. Reg. 8847 (Feb. 3, 2025).

[53] *Id.*

130.    Executive Order 14188 explicitly reaffirmed Executive Order 13899, which President Trump issued during his first term on December 11, 2019. Executive Order 13899 specifically invokes Title VI enforcement as the means for agencies to combat antisemitism on university campuses.[54]

131.    Executive Order 14188 makes no mention of the First Amendment or the need to balance protection of free speech with the imperative to eradicate illegal discrimination and harassment.

132.    On February 3, 2025, Defendant DOJ announced the creation of the multi-agency DOJ Task Force, led by Defendant Terrell, to carry out the mandate of the executive order.[55] The DOJ Task Force includes representatives from Defendant DOJ, Defendant ED, and Defendant HHS.

133.    Later that day, Defendant ED announced new Title VI investigations into UC Berkeley, Columbia, Northwestern University, Portland State University, and the University of Minnesota, Twin Cities, where ED stated that "widespread antisemitic harassment has been reported."[56]

134.    On or about February 14, 2025, the Department of Education issued a Dear Colleague Letter requiring all educational institutions to "cease all efforts to circumvent prohibitions on the use of race by relying on proxies or other indirect means to accomplish such ends" and to "cease all reliance on third-party contractors, clearinghouses, or aggregators that are being used by institutions in an effort to circumvent prohibited uses of race."[57] The February 14 Dear Colleague Letter instructed universities to end all DEI programs within 14 days or risk losing federal funding.

### B. The Trump Administration Has Been Implementing Its Funding Coercion Playbook at Dozens of Universities and Warning Others They Are Next.

135.    Since taking office, the Trump administration has targeted universities where faculty, students, and academic and staff employees have expressed viewpoints with which the Trump administration disagrees, and consistently executed the playbook described by Vance, Terrell, and others

---

[54] Exec. Order No. 13899, 84 Fed. Reg. 68779 (Dec. 11, 2019).

[55] Off. of Pub. Aff., *Justice Department Announces Formation of Task Force to Combat Anti-Semitism*, U.S. Dep't of Just. (Feb. 3, 2025), https://www.justice.gov/opa/pr/justice-department-announces-formation-task-force-combat-anti-semitism, https://perma.cc/KCF4-LB52.

[56] *U.S. Department of Education Probes Cases of Antisemitism at Five Universities*, U.S. Dep't of Educ. (Feb. 3, 2025) https://www.ed.gov/about/news/press-release/us-department-of-education-probes-cases-of-antisemitism-five-universities, https://perma.cc/M547-JNKP.

[57] Dear Colleague Letter from Craig Trainor, Acting Assistant Secretary for Civil Rights, U.S. Dep't of Educ. (Feb. 14, 2025), https://www.ed.gov/media/document/dear-colleague-letter-sffa-v-harvard-109506.pdf, https://perma.cc/Y62G-MZJG.

to bring public and private universities under the Executive's control: cite alleged but unproven civil rights violations as a basis for summarily terminating hundreds of millions of dollars of critical research grants without legal basis, and then threaten to withhold *all* federal funding from the university unless it accedes to the Trump administration's demands, which include the payment of money and sweeping reforms that strike at the core of free speech, academic freedom, independent governance, and a host of other faculty, student, and employee rights.

### (1) Columbia

136.    On March 3, 2025, Defendants HHS, ED, and GSA announced a "comprehensive review of Columbia's federal contracts and grants in light of ongoing investigations for potential violations of Title VI of the Civil Rights Act."[58] The announcement referred to "Columbia's ongoing inaction in the face of relentless harassment of Jewish students" and declared that, as a result, "Stop Work Orders for $51.4 million in contracts between Columbia University and the Federal Government" were being considered. It further stated that the task force would "conduct a comprehensive review of the more than $5 billion in federal grant commitments to Columbia University to ensure the university is in compliance with federal regulations, including its civil rights responsibilities."[59]

137.    The following day, on March 4, 2025, President Trump posted on Truth Social, "All Federal Funding will STOP for any College, School, or University that allows illegal protests. Agitators will be imprisoned/or permanently sent back to the country from which they came. American students will be permanently expelled or, depending on the crime, arrested. NO MASKS! Thank you for your attention to this matter."[60]

138.    Just three days later, on March 7, 2025, Defendants DOJ, HHS, ED, and GSA announced the "immediate cancellation of approximately $400 million in federal grants and contracts to Columbia University due to the school's continued inaction in the face of persistent harassment of Jewish

---

[58] *HHS, ED, and GSA announce additional measures to end anti-Semitic harassment on college campuses*, U.S. Gen. Servs. Admin. (Mar. 3, 2025), https://www.gsa.gov/about-us/newsroom/news-releases/hhs-ed-and-gsa-announce-additional-measures-to-end-antisemitic-harassment-03032025, https://perma.cc/7QHZ-E4KU.

[59] *Id.*

[60] Donald Trump (@realDonaldTrump), Truth Social (Mar. 4, 2025, 7:30AM ET), https://truthsocial.com/@realDonaldTrump/posts/114104167452161158.

students."[61] The March 7 announcement stated that these cuts were only "the first round of action" and threatened that "additional cancellations are expected to follow." [62]

139.    Immediately thereafter, on March 10, 2025, the Department of Education's Office of Civil Rights sent letters to 60 other universities supposedly also "under investigation for antisemitic discrimination and harassment," including UC Davis, UC San Diego, UC Santa Barbara, and UC Berkeley, "warning them of potential enforcement actions if they do not fulfill their obligations under Title VI of the Civil Rights Act to protect Jewish students on campus …."[63]

140.    In their press release publicizing these warning letters to 60 universities, Defendants underscored that they had "announced the immediate cancellation of $400 million in federal grants and contracts to Columbia University due to the school's continued inaction to protect Jewish students from discrimination."[64] The clear import of the press release was to threaten UC and the other universities that received the letter that they, too, might be subject to "immediate cancelation" of federal grants and contracts if they did not, in the words of Defendant Terrell, "play ball."[65]

141.    On March 13, 2025, HHS, ED, and GSA sent another letter to Columbia "outlin[ing] immediate next steps that we regard as a precondition for formal negotiations regarding Columbia University's continued financial relationship with the United States government."[66] The letter listed nine demands, including *inter alia* that Columbia impose specific forms of discipline (including "expulsion or multi-year suspension") on students involved in particular protests, restructure its entire student disciplinary system in a centralized manner dictated by the federal government, institute a "mask ban,"

---

[61] *DOJ, HHS, ED, and GSA announce initial cancellation of grants and contracts to Columbia University worth $400 million*, U.S. Gen. Servs. Admin. (Mar. 7, 2025), https://www.gsa.gov/about-us/newsroom/news-releases/doj-hhs-ed-and-gsa-announce-initial-cancellation-of-grants-and-contracts-03072025, https://perma.cc/6GA5-JSB5.
[62] *Id.*
[63] *U.S. Department of Education's Office for Civil Rights Sends Letters to 60 Universities Under Investigation for Antisemitic Discrimination and Harassment*, U.S. Dep't of Educ., (Mar. 10, 2025), https://www.ed.gov/about/news/press-release/us-department-of-educations-office-civil-rights-sends-letters-60-universities-under-investigation-antisemitic-discrimination-and-harassment, https://perma.cc/6CPX-SBL7.
[64] *Id.*
[65] *Leo Terrell with Mark Levin*, *supra* note 43.
[66] Letter from J. Gruenbaum to K. Armstrong (Mar. 13, 2025), https://static01.nyt.com/newsgraphics/documenttools/6d3c124d8e20212d/85dec154-full.pdf. The March 13, 2025 letter did not say what federal "policy" requires over and above federal law, nor did it allege any specific violations of federal law.

place the Middle East, South Asian, and African Studies department into receivership, and overhaul its "undergraduate admissions, international recruiting, and graduate admissions practices."[67]

142.    In a March 19, 2025 interview, Defendant Terrell was asked if it was his "intention" to "get a consent decree where Columbia gets a new law school dean, they get a new president, a new board, a new department of history, a new set of reasonable time, place, and manner regulations for a [sic] speech on campus that ban masks." Terrell answered, "Yes, yes, and yes."[68]

143.    On March 21, 2025, Columbia shared updated policies appearing to give in to nearly all of Defendants' demands.[69] Among other things, Columbia agreed to expand "intellectual diversity among faculty"; abolish its independent body responsible for discipline decisions and centralize disciplinary proceedings; hire "special officers" with the "ability to remove individuals from campus and/or arrest"; and appoint a new Senior Vice Provost to review the Middle East, South Asian, and African Studies department and "ensure the educational offerings are comprehensive and balanced," review a new process for hiring faculty in these programs, review the process for "approving curricular changes," and make recommendations about "necessary changes" and "academic restructuring" to "ensure academic excellence and complementarity" in Columbia's Middle East programs.[70]

144.    Nevertheless, the $400 million in terminated funding was not reinstated or restored to Columbia at that time. Instead, the Trump administration escalated the funding freezes. Defendant NIH alone terminated or froze approximately $1.2 billion in funding to Columbia, and other federal agencies—such as Defendant NSF—terminated or froze additional funding.[71]

145.    It was not until Columbia on July 23, 2025 agreed to a host of additional, onerous demands that further infringe on the speech and academic freedom rights of faculty and students—as

---

[67] *Id.*

[68] *On Crushing Anti-Semitism on Campus*, Hughniverse Podcast (Mar. 19, 2025), https://hughhewitt.com/leo-terrell-senior-counsel-to-the-attorney-general-for-civil-rights-on-crushing-anti-semitism-on-campus, https://perma.cc/6YHF-VZKG.

[69] Columbia Off. of the President, *Advancing Our Work to Combat Discrimination, Harassment, and Antisemitism at Columbia* (Mar. 21, 2025), https://president.columbia.edu/sites/default/files/content/03.21.2025%20Columbia%20-%20FINAL.pdf.

[70] *Id.*

[71] Sharon Otterman, *Columbia Agrees to $200 Million Fine to Settle Fight With Trump*, N.Y. Times (Jul. 23, 2025), https://www.nytimes.com/2025/07/23/nyregion/columbia-trump-funding-deal.html.

well as payment of $200 million to the United States, despite no basis for imposition of any monetary penalty under the civil rights statutes—that the Trump administration finally restored the grants terminated by HHS and NIH and resumed "[t]reat[ing] Columbia as eligible for further grants, contracts, and awards in the ordinary course, without disfavored treatment."[72]

146.    In response to the Trump administration's coercive demands, and as a condition of regaining access to federal funds, Columbia entered into a settlement agreement that infringes on faculty and student First Amendment rights and imposes a series of obligations having nothing to do with Title VI compliance. Among other things, the agreement requires Columbia to: pay a $200 million fine to the United States; establish a Resolution Monitor to monitor Columbia's compliance with the settlement; maintain the Senior Vice Provost to "conduct a thorough review of the portfolio of programs in regional areas across the University, starting immediately with the Middle East," "ensure the educational offerings are comprehensive and balanced," "[r]eview all and curriculum," create "new programs to address the full range of fields," create a new process for hiring non-tenured faculty across the university, review the process for "approving curricular changes," and make recommendations to the President and Provost about "necessary changes, academic restructuring, or investments that will ensure academic excellence and complementarity in the given academic areas"; appoint new faculty members with joint positions in both the Institute for Israel and Jewish Studies and the departments of economics, political science, or the School of International and Public Affairs, who must contribute to an "intellectually diverse academic environment"; and eliminate "programs that promote unlawful efforts to achieve race-based outcomes, quotas, diversity targets, or similar efforts," or that "provide benefits or advantages to individuals on the basis of protected characteristics in any school, component, division, department, foundation, association or element within the entire Columbia University system," and provide a report to the Resolution Monitor, including "an assurance that Columbia has acted responsibly to ensure its programs do not promote unlawful DEI goals," which term is not defined.[73]

---

[72] *Columbia University Resolution Agreement* (Jul. 23, 2025), https://president.columbia.edu/sites/default/files/content/July%202025%20Announcement/Columbia%20University%20Resolution%20Agreement.pdf.
[73] *Id.*

147.     The agreement further requires Columbia to provide the Resolution Monitor and the federal government with detailed admissions data; requires Columbia to "maintain merit-based admissions policies"; prohibits Columbia from using any "proxy for racial admission … Columbia may not use personal statements, diversity narratives, or any applicant reference to racial identity as a means to introduce or justify discrimination;" prohibits the use of "race, color, sex, or national origin as a factor—implicit or explicit—in hiring decisions across all schools, departments, and programs;" requires Columbia to "undertake a comprehensive review of its international admissions processes and policies," ensure international students are "asked questions designed to elicit their reasons for wishing to study in the United States," and ensure "all students, international and domestic, are committed to the longstanding traditions of American universities"; and "comply with all requests for immigration information" relating to the Student and Exchange Visitor Program, including "all disciplinary actions involving student visa-holders resulting in expulsions or suspensions, and arrest records that Columbia is aware of for criminal activities ... to the extent permitted by FERPA."[74]

148.     The agreement further requires Columbia to impose new protest restrictions and reform its disciplinary processes so that students will no longer serve on University Judicial Board (UJB) panels.[75]

149.     After the Columbia settlement was announced, on July 25, 2025, Defendant McMahon posted on X, "The deal with Columbia should serve as a roadmap for institutions across the country," and stated on Fox News, "I'm hoping that this negotiation will become a template for other universities across the country that have these same kinds of practices."[76]

---

[74] *Id.* at 8-10.

[75] *Id.* at 10.

[76] Secretary Linda McMahon (@EDSecMcMahon), X.com (Jul. 25, 2025, 10:53 AM ET), https://x.com/EDSecMcMahon/status/1948758537468792992, https://perma.cc/ZS3M-MEH8.

1

### (2) Brown

2

150.    The Trump administration has taken similar action aimed at controlling Brown

3

University.

4

151.    Brown was one of the 60 universities to receive the March 10, 2025 letter warning of

5

potential Title VI enforcement actions arising from discrimination against Jewish students.[77]

6

152.    On April 3, the *New York Times* reported that the Trump administration intended to block

7

$510 million in federal contracts and grants to Brown.[78]

8

153.    On or about April 10, 2025, HHS expanded a Title VI investigation—originally opened

9

in February 2025 and concerning only the medical school's May 2024 commencement ceremony—to

10

include incidents occurring at the entire university from October 7, 2023 to the present.[79]

11

154.    Beginning in April, Brown ceased receiving reimbursements for expenses incurred for

12

active grants from NIH.[80] Those unreimbursed funds totaled over $50 million at the time Brown entered

13

the agreement described below; that number was increasing by approximately $3.5 million per week at

14

the time of the agreement.[81] The Trump administration additionally terminated eight federal contracts

15

and more than 30 federal grants to Brown.[82]

16

17

18

19

[77] *U.S. Department of Education's Office for Civil Rights Sends Letters to 60 Universities Under
Investigation for Antisemitic Discrimination and Harassment*, U.S. Dep't of Educ. (Mar. 10, 2025),

20

https://www.ed.gov/about/news/press-release/us-department-of-educations-office-civil-rights-sends-
letters-60-universities-under-investigation-antisemitic-discrimination-and-harassment.

21

[78] Anemona Hartocollis et al., *Trump Administration Set to Pause $510 Million for Brown University*,
N.Y. Times (Apr. 3, 2025), https://www.nytimes.com/2025/04/03/us/trump-administration-brown-

22

university-funding-pause.html.

23

[79] Elise Haulund and Sophia Wotman, D*epartment of Health and Human Services places Brown under
federal Title VI investigation,* The Brown Daily Herald (Apr. 10, 2025),

24

https://www.browndailyherald.com/article/2025/04/brown-university-officially-under-title-vi-federal-
investigation.

25

[80] *Agreement with federal government to restore Brown research funding, resolve compliance reviews*,
News from Brown (July 30, 2025), https://www.brown.edu/news/2025-07-30/brown-united-states-

26

resolution-agreement.

27

[81] *Id.*

[82] Christina H. Paxson, President of Brown University, *Brown and U.S. government reach agreement*,

28

Brown University Office of the President (July 30, 2025),
https://president.brown.edu/president/brown-and-us-government-reach-agreement.

155.     It was not until Brown capitulated and agreed to a host of demands by the Trump administration that the administration finally restored the frozen federal funding and terminated grants.[83]

156.     As a condition of regaining access to the frozen funds and having its future applications for federal funding "[f]airly consider[ed] … without disfavored treatment,"[84] Brown agreed to pay a $50 million fine to state workforce development organizations.[85] The settlement also requires Brown to adopt the administration's definitions of "male," "female," and "sex," as set forth in Executive Orders 14168 and 14201; requires Brown to offer women the option of "female-only housing, restrooms, and showering facilities" and ensure students have access to "single-sex floors in on-campus housing"; and prohibits Brown from performing gender reassignment surgery or prescribing puberty blockers or hormones "to any minor child for the purpose of aligning the child's appearance with an identity that differs from his or her sex."[86]

157.     The settlement agreement directly regulates academic freedom and the content of speech at the university. Brown must "support ... research and education about Israel, and a robust Program in Judaic Studies ... renewed partnerships with Israeli academics and national Jewish organizations, and a convening of alumni, students, and faculty to celebrate 130 years of Jewish life at Brown in the 2025-2026 academic year."[87]

158.     Other provisions mirror those in the Columbia agreement, including those outlawing "DEI" initiatives and the use of personal statements as a "proxy" for race in admissions.[88]

159.     After the Trump Administration reached an agreement with Brown University, on July 30, 2025, Defendant McMahon posted to X, "The Trump Administration is successfully reversing the decades-long woke-capture of our nation's higher education institutions."[89]

---

[83] *Agreement with federal government*, *supra* note 80.

[84] *Id.* at 2–3.

[85] *Brown and United States Resolution* Agreement, (July 30, 2025), https://www.brown.edu/sites/default/files/brown-and-united-states-resolution-agreement_July-30-2025.pdf.

[86] *Id.* at 4.

[87] *Id.*

[88] *Id.*

[89] Secretary Linda McMahon (@EDSecMcMahon), X.com (July 30, 2025, 4:51 PM ET), https://x.com/EDSecMcMahon/status/1950660487055552617, https://perma.cc/L97J-7A6R.

160.    On July 31, 2025, President Trump posted to Truth Social, "Woke is officially DEAD at Brown."[90]

### (3) Penn

161.    The Trump administration has also targeted the University of Pennsylvania ("Penn").

162.    On February 6, 2025, the Department of Education's Office of Civil Rights ("ED OCR") notified Penn that ED OCR had initiated a Title IX investigation into the university on the basis of Penn permitting a transgender woman to compete on the Penn women's swimming and diving team.[91] On or about March 19, 2025, the Trump administration announced it was freezing $175 million in federal funding to Penn. The administration did not notify the university, which learned of the freeze from media reports.[92] Penn faculty across seven schools received stop work orders on federally contracted research, and several federal grants were canceled.[93]

163.    To restore the $175 million in federal funding that the Trump administration unlawfully terminated, Penn capitulated to the administration's demands and "entered into a Resolution Agreement to comply with Title IX," announced by the Department of Education on July 1.[94]

164.    The Resolution Agreement requires Penn to "restore to female athletes all individual UPenn Division I swimming records, titles, or similar recognitions which were misappropriated by male athletes allowed to compete in female categories"; "issue a public statement to the University community … specifying that UPenn will not allow males to compete in female athletic programs or occupy Penn Athletics female intimate facilities"; in that public statement, "adopt biology-based definitions for the

---

[90] Donald J. Trump (@realDonaldTrump), Truth Social (July 31, 2025, 9:01 AM ET), https://truthsocial.com/@realDonaldTrump/posts/114947973077448174.

[91] U.S. Department of Education Announces the University of Pennsylvania Has Entered into a Resolution Agreement to Resolve its Title IX Violations, U.S. Dep't of Ed. (Jul. 1, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-announces-university-of-pennsylvania-has-entered-resolution-agreement-resolve-its-title-ix-violations.

[92] Alana Wise, *Trump suspends $175 million in funding to University of Pennsylvania over trans athletes*, NPR (Mar. 20, 2025), https://www.npr.org/2025/03/20/nx-s1-5333675/university-pennsylvania-upenn-trump-suspends-funding-trans-student-athletes.

[93] An update to the Penn community on federal funding, University of Pennsylvania Office of the President (Mar. 25, 2025), https://president.upenn.edu/announcements/update-penn-community-federal-funding.

[94] *Id.*; Amanda Musa and Betsy Klein, *Trump administration releases $175 million in federal funding to Penn after transgender athletes agreement*, CNN (Jul. 2, 2025), https://www.cnn.com/2025/07/01/us/upenn-transgender-women-sports-lia-thomas/.

words 'male' and 'female' pursuant to Title IX and consistent with President Trump's Executive Orders 'Defending Women from Gender Ideology Extremism' and 'Keeping Men Out of Women's Sports'"; "post the statement in a prominent location on its main website and on each of its websites for women's athletics"; and "send a personalized letter of apology to each impacted female swimmer."[95]

165.    On July 31, 2025, Defendant McMahon posted to X, "The Trump Administration is dismantling decades of woke control over America's universities. Major wins at Brown, Columbia, and UPenn are restoring higher education as a place to learn—not to indoctrinate."[96]

### (4)  Harvard

166.    The Trump administration has taken similar action aimed at controlling Harvard University—but the District Court of Massachusetts has enjoined and declared those efforts unlawful in violation of the First Amendment, Title VI, and the APA, based on the court's finding that, among other things, "Defendants unconstitutionally sought to force Harvard to better manifest the government's favored worldview" by "urg[ing] and threaten[ing] Harvard ... to hire faculty and make curricula and research choices that better aligned with the government's preferred viewpoints, to the detriment of professors and researchers with competing views."[97]

167.    On March 31, 2025, the Trump administration announced "a comprehensive review of federal contracts and grants at Harvard University and its affiliates" as "part of the ongoing efforts of the Joint Task Force to Combat Anti-Semitism."[98] The announcement stated that the Task Force would "review the more than $255.6 million in grants between Harvard University, its affiliates and the Federal Government" as well as "more than $8.7 billion in multi-year grant commitments to Harvard University and its affiliates to ensure the university is in compliance with federal regulations, including its civil rights responsibilities."[99]

---

[95] An update to the Penn community on federal funding, University of Pennsylvania Office of the President (Mar. 25, 2025), https://president.upenn.edu/announcements/update-penn-community-federal-funding.

[96] Secretary Linda McMahon (@EDSecMcMahon), X.com (July 31, 2025, 12:33 PM ET), https://x.com/EDSecMcMahon/status/1950957895954149493, https://perma.cc/FJX4-HXG2.

[97] *Presidents and Fellows of Harvard Coll.*, 2025 WL 2528380, at *27.

[98] *HHS, ED, and GSA Initiate Federal Contract and Grant Review of Harvard University*, Dep't of Health and Hum. Servs. (Mar. 31, 2025), https://www.hhs.gov/press-room/task-force-antisemitism-harvard-contracts-grants.html.

[99] *Id.*

168.    The announcement did not point to any specific allegations of antisemitic discrimination, nor did it request or advise Harvard of any steps to deter or remedy such discrimination.

169.    The announcement further criticized Harvard for "promoting divisive ideologies over free inquiry,"[100] although it did not specify what it meant by "divisive ideologies" or provide any specific allegations of promoting such ideologies.

170.    On April 3, 2025, the Task Force sent a letter to Harvard outlining "immediate next steps that we regard as necessary for Harvard University's continued financial relationship with the United States government" and listing nine demands "that the government views as necessary for Harvard to implement to remain a responsible recipient of federal taxpayer dollars."[101]

171.    The list contained a sweeping range of vaguely defined provisions, only a few of which had any apparent connection to combating antisemitism, including demands to:

- review and make "necessary changes" to unspecified "[p]rograms and departments that fuel antisemitic harassment";

- make unspecified programmatic changes "to address bias, improve viewpoint diversity, and end ideological capture";

- overhaul student discipline, among other things to ensure that "senior administrative leaders are responsible for final decisions";

- enact a "mask ban";

- hold student groups accountable for unspecified "violations of Harvard policy"

- undertake sweeping "[g]overnance and leadership reforms" described only as "meaningful" and designed to "empower faculty and administrative leaders who are committed to implementing the changes indicated in this letter";

- adopt "merit-based admissions policies" and "[m]erit-based hiring reform" without any description of what those polices entail other than an additional demand to "cease all preferences based on race, color, or national origin";

---

[100] *Id.*

[101] Letter from Josh Gruenbaum to Alan M. Garber (Apr. 3, 2025), https://s3.documentcloud.org/documents/25879226/april-3-harvard-preconditions-letter.pdf.

1    • "shutter" all "DEI programs," which Defendants allege "teach students, faculty,

2    staff, and leadership to make snap judgments about each other based on crude race and

3    identity stereotypes, which fuels division and hatred based on race, color, national origin, and

4    other protected identity characteristics" without specifying what programs constitute "DEI

5    programs";

6    • "cooperate with law enforcement to ensure student safety" without further

7    elaboration; and

8    • "commit to full cooperation with DHS," and "make organizational changes as

9    necessary to enable full compliance.

10    172.    On April 11, 2025, the Trump administration sent another letter to Harvard ("the April

11    11 Letter"). The April 11 Letter listed conditions for "maintain[ing] Harvard's financial relationship with

12    the federal government," including:

13    • "'commission[ing] an external party … to audit the student body, faculty, staff,

14    and leadership for viewpoint diversity, such that each department, field, or teaching unit must

15    be individually viewpoint diverse';

16    • 'abolish[ing] all criteria, preferences, and practices, whether mandatory or

17    optional, throughout [Harvard's] admissions and hiring practices, that function as ideological

18    litmus tests'; for departments, fields, and teaching units found to 'lack viewpoint diversity';

19    • 'hiring a critical mass of new faculty' and 'admitting a critical mass of students'

20    to provide the government's preferred balance of viewpoint diversity; 'reform[ing] and

21    restructuring' governance;

22    • 'reducing the power held by students and untenured faculty,' as well as "the power

23    held by faculty ... more committed to activism than scholarship'; and 'shutter[ing]' all DEI

24    programs 'through structural and personnel changes.'"[102]

25    173.    On April 14, 2025, Harvard rejected the terms in the April 3 and April 11 Letters.[103]

26

27    ────────────────────────

[102] *President & Fellows of Harvard College*, 2025 WL 2528380, at *4; Letter from Josh Gruenbaum to
Alan M. Garber (Apr. 11, 2025), https://www.harvard.edu/research-funding/wp-
content/uploads/sites/16/2025/04/Letter-Sent-to-Harvard-2025-04-11.pdf.

28    [103] *Harvard College*, 2025 WL 2528380, at *4.

174.    Within hours, the Federal Task Force froze over $2.2 billion in grants to Harvard.[104]

175.    Over the course of the following week, President Trump issued a series of social media posts expressly stating his goal of using federal funding to purge leftist viewpoints from the university.

176.    On April 14, President asked, "What if we never pay them? Wouldn't that be cool?"[105] A senior government official described the Trump administration's strategy as "mak[ing] examples of elite schools to intimidate other universities."[106]

177.    The next day, President Trump posted on Truth Social, "Perhaps Harvard should lose its Tax Exempt Status and be Taxed as a Political Entity if it keeps pushing political, ideological, and terrorist inspired/supporting 'Sickness?'"[107] "Harvard has been hiring almost all woke, Radical Left, idiots and 'birdbrains' …. Harvard is a JOKE, teaches Hate and Stupidity, and should no longer receive Federal Funds."[108]

178.    On April 16, 2025, President Trump posted on Truth Social: "Everyone knows that Harvard has 'lost its way.' They hired, from New York (Bill D) and Chicago (Lori L), at ridiculously high salaries/fees, two of the WORST and MOST INCOMPETENT mayors in the history of our Country, to 'teach' municipal management and government. These two Radical Left fools left behind two cities that will take years to recover from their incompetence and evil. Harvard has been hiring almost all woke, Radical Left, idiots and "bird- brains" who are only capable of teaching FAILURE to students and so-called "future leaders." Look just to the recent past at their plagiarizing President, who so greatly embarrassed Harvard before the United States States [sic] Congress. When it got so bad that they just couldn't take it anymore, they moved this grossly inept woman into another position, teaching, rather than firing her ON THE SPOT. Since then much else has been found out about her, but she remains in place. Many others, like these Leftist dopes, are teaching at Harvard, and because of that, Harvard can no longer be considered even a decent place of learning, and should not be considered on any list of the

---

[104] *Id.* at *5.

[105] Michael C. Bender et al., *Inside Trump's Pressure Campaign on Universities*, N.Y. Times (Apr. 14, 2025), https://www.nytimes.com/2025/04/14/us/politics/trump-pressure-universities.html.

[106] *Id.*

[107] *Id.*

[108] Donald Trump    (@realDonaldTrump),    Truth Social (Apr.    15,    2025,    10:09AM) https://truthsocial.com/@realDonaldTrump/posts/114342374504628520.

World's Great Universities or Colleges. Harvard is a JOKE, teaches Hate and Stupidity, and should no longer receive Federal Funds. Thank you for your attention to this matter!"[109]

179.    On April 24, 2025, President Trump posted on Truth Social, "Harvard is an Anti-Semitic, Far Left Institution, as are numerous others …. The place is a Liberal mess, allowing a certain group of crazed lunatics to enter and exit the classroom and spew fake ANGER AND HATE."[110]

180.    On May 5, 2025, Defendant McMahon sent a letter to Harvard "recit[ing] the government's objection to what it characterized as an imbalance of viewpoints in Harvard's governance, reiterat[ing] its earlier demands from the April letters, and stated that '[t]he Administration's priorities have not changed.'"[111]

181.    In early and mid-May, Harvard received letters from various government agencies terminating grants related to medical, scientific, technological, and other projects.[112]

182.    The termination letters did not "present[] any program-specific rationale for the terminations."[113] "None of the Termination Letters identified any specific instance of antisemitism on Harvard's campus, specified how Harvard failed to respond to any such acts of antisemitism in a way that violated Title VI, or reflected any effort to follow the Title VI procedural requirements that govern the termination of federal funding."[114]

183.    On April 11, 2025, the AAUP and AAUP-Harvard Faculty Chapter filed a complaint against the Trump administration (later joined by UAW, Harvard Graduate Students Union, and Harvard Academic Workers) seeking to enjoin the Trump administration's unlawful and coercive conduct and grant terminations.[115] The plaintiffs alleged that the defendants violated the First Amendment by retaliating based on the exercise of First Amendment rights, imposing content- and viewpoint-based burdens on those rights, and unconstitutionally coercing Harvard to suppress free speech and academic

---

[109] Donald Trump (@realDonaldTrump) (Apr. 16, 2025 7:05AM) https://truthsocial.com/@realDonaldTrump/posts/114347313852363347.
[110] Donald Trump (@realDonaldTrump), Truth Social (Apr. 24, 2025, 6:33 AM) https://truthsocial.com/@realDonaldTrump/posts/114393194962253226.
[111] *President & Fellows of Harvard Coll.*, 2025 WL 2528380, at *6.
[112] *Id.* at *7.
[113] *Id.*
[114] *Id.* at *8.
[115] *Id.* at *1, *10.

freedom, and that the defendants violated Title VI of the Civil Rights Act of 1964 by failing to comply with the statute's required procedures prior to terminating the grants, and that the grant terminations were arbitrary and capricious in violation of the Administrative Procedures Act ("APA").

184.    On April 21, 2025, the President and Fellows of Harvard College filed its own suit against the Trump administration, asserting claims similar to those asserted in the *AAUP* complaint as well as an unconstitutional conditions claim, and seeking to vacate and set aside the various termination letters and freeze orders. The two actions were consolidated and proceeded directly to summary judgment, with all parties agreeing to expedited briefing.[116]

185.    On May 28, 2025, President Trump expressed his intent to retaliate against Harvard for refusing to accede to the administration's demands and instead filing suit, stating "every time [Harvard] fight[s], they lose another $250 million."[117]

186.    On September 3, 2025, the district court issued a decision vacating the various termination letters and freeze orders as violating the First Amendment, Title VI and the APA. The court enjoined "any other termination, fund freezes, stop work orders, or otherwise withholding payment on existing grants or other federal funding, or refusing to award future grants, contracts, or other federal funding to Harvard in retaliation for the exercise of its First Amendment rights, or on any purported grounds of discrimination without compliance with the terms of Title VI."[118]

187.    The court's factual findings were based primarily on the administrative record filed in the case.[119] The court found that, through its demands in the April 11, 2025 letter, the federal government impermissibly sought to impose ideological control over Harvard: "In brief, the April 11 Letter purported to require Harvard to overhaul its governance, hiring, and academic programs to comport with the government's ideology and prescribed viewpoint."[120] The court further found that the April 11 letter conditioned the grants on Harvard "acceding to the government's demands" for ideological control.[121]

---

[116] *Id.* at *10.

[117] *Id.* at *9.

[118] *Id.* at *38.

[119] *Id.* at *1 n.2.

[120] *Id.* at *23.

[121] *Id.* at *24; *see also id.* at *27 (defendants "condition[ed] Harvard's federal funding … on Harvard's realigning its campus to better reflect a viewpoint favored by the government").

188.    This attempted ideological control included "whether Harvard was 'vetting students who are coming in from outside of the country to make sure they're not activists' and 'vetting professors that [it is] hiring to make sure that they're not teaching ideologies.'"[122] The court pointed out that the government "specifically conditioned funding on agreeing to its ten terms, ... six related to ideological and pedagogical concerns, including who may lead and teach at Harvard, who may be admitted, and what may be taught."[123]

189.    Similarly, the court concluded that "Defendants unconstitutionally sought to force Harvard to better manifest the government's favored worldview … To do so, Defendants … urged and threatened Harvard … to hire faculty and make curricula and research choices that better aligned with the government's preferred viewpoints, to the detriment of professors and researchers with competing views."[124] Thus, "Defendants required the [AAUP and UAW] members to rebalance and alter their speech to save Harvard's funding."[125]

190.    The court further "found that the Freeze Orders and Termination Letters resulted from Harvard's exercise of its First Amendment rights," noting that "the conditions here are particularly concerning because, as discussed, many of them were based on Harvard's 'particular beliefs,' *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024), and sought to dictate the content of speech on campus and the 'particular views taken by speakers on [particular] subject[s],' *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)."[126]

191.    The court also rejected the federal government's argument that its actions were based on fighting antisemitism: "The idea that fighting antisemitism is Defendants' true aim is belied by the fact that the majority of the demands they are making of Harvard to restore its research funding are directed, on their face, at Harvard's governance, staffing and hiring practices, and admissions policies—all of which have little to do with antisemitism and everything to do with Defendants' power and political views."[127] The court pointed out that the government "specifically conditioned funding on agreeing to

---

[122] *Id.* at *25 n.22.
[123] *Id.* at *24.
[124] *Id.* at *27.
[125] *Id.*
[126] *Id.* at *26.
[127] *Id.* at *37.

its ten terms, only one of which related to antisemitism, while six related to ideological and pedagogical concerns."[128] At base, "the government-initiated onslaught against Harvard was much more about promoting a governmental orthodoxy in violation of the First Amendment than about anything else, including fighting antisemitism."[129]

192.     The court concluded that "what lies at the core of this dispute is the fact that Defendants are trying to pressure Harvard to accede to the government's demands in a way that squarely violates Plaintiffs' First Amendment rights and ignores the procedural requirements of Title VI and, to a certain extent, the APA."[130] The court found there was "little connection between the research affected by the grant terminations and antisemitism," and that "a review of the administrative record makes it difficult to conclude anything other than that Defendants used antisemitism as a smokescreen for a targeted, ideologically-motivated assault on this country's premier universities, and did so in a way that runs afoul of the APA, the First Amendment and Title VI."[131]

### IV. Defendants Conduct Pretextual Investigations, Unlawfully Terminate Funding, and Make Extortionate Threats in Attempt to Coerce the UC into Sacrificing the Constitutional and State Law Rights of Its Faculty, Students, Academic Employees, and Staff.

193.     On May 9, 2025, DOJ, through the Educational Opportunities Section of the Civil Rights Division, notified the UC that it had opened an investigation "into the University of California System's (UC or UC System) response to incidents of antisemitic discrimination, harassment, abuse, and retaliation against students that occurred within the educational environment of the UC System."[132]

194.     On July 29, 2025, DOJ issued a "Notice of Findings Regarding the University of California, Los Angeles" ("Notice of Findings"), in which DOJ stated, "[W]e have found that UCLA's response to its students' complaints of antisemitism on UCLA's campus violated its obligations under the Equal Protection Clause of the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d (Title VI)."[133] The Notice of Findings' conclusion related specifically to "UCLA's

---

[128] *Id.* at *24.
[129] *Id.* at *25.
[130] *Id.* at *37.
[131] *Id.* at *36.
[132] Letter from Harmeet K. Dhillon, Assistant Attorney General, to Michael Drake, President, University of California (Jul. 29, 2025), https://www.justice.gov/crt/media/1409416/dl?inline.
[133] *Id.* at 1.

response to the protest encampment on its campus in the spring of 2024," and the Notice did not discuss any allegations of harassment or discrimination outside the time period of April 25 to May 1, 2024.[134]

195.    The Notice of Findings stated that "[t]he Department's investigation of the greater UC System remains ongoing," and that "[t]he Department has not yet reached a conclusion regarding whether any other UC System school has violated the Equal Protection Clause or Title VI, as those investigations are still ongoing."[135] The Notice of Findings also asserted that the investigation into allegations of discrimination against Jewish and Israeli students that resulted in the Notice "is separate and distinct from [DOJ's] investigations relating to the University of California's admissions practices and allegations of employment discrimination."[136]

196.    The following day, on July 30, 2025, three Funding Agency Defendants—NIH, NSF, and DOE—summarily cut off a combined $584 million in research funds from UCLA.

197.    On July 30, 2025, NSF sent UCLA a letter with the subject "Notice of Award Suspensions," identifying approximately 300 awards worth a combined total of approximately $170 million, with $90 million remaining unspent, and stating that, "Effective immediately, the attached awards are suspended until further notice."[137] The July 30 NSF letter stated that it reflects "the final agency decision and [is] not subject to appeal" and that the decision was made "on the basis that the awards no longer effectuate program goals or agency priorities."[138]

198.    On August 1, 2025, NSF sent an "Updated Notice of Award Suspensions" to UCLA, which "officially notified [UCLA] that the [NSF] is hereby suspending the attached list of grant awards to the [UCLA]," and directed UCLA to "immediately cease all activities on these award numbers." The stated basis for the indefinite suspension was purportedly "to address concerns reported and observed in UCLA programs and ensure compliance with applicable Federal statutes and regulations, and the terms and conditions of the[] Federal awards." The Updated Notice stated that it was effective July 30, 2025.

---

[134] *Id.* at 3-6.
[135] *Id.* at 1.
[136] *Id.*
[137] *Thakur*, Dkt. 79-1; Molly Shan, *NSF Grant Suspensions at UCLA total $90M lost in value*, Grant Witness (Aug. 1, 2025), https://grant-witness.us/posts/UCLA-new-terminations/; Mikhail Zinshteyn, *UCLA research grants suspended after Trump administration faulted campus for antisemitism*, Cal Matters (Jul. 31, 2025), https://calmatters.org/education/higher-education/2025/07/ucla/.
[138] Thakur, Dkt. 79-1.

199.    The August 1 letter stated that, "[b]ased on UCLA's failure to comply with federal requirements, policies and procedures, NSF is suspending the attached award[,]" and that "NSF has identified the following specific examples of noncompliance: [(1)] UCLA engages in racism, in the form of illegal race-based preferences in admissions practices; [(2)] UCLA fails to promote a research environment free of antisemitism and bias; [(3)] UCLA discriminates against and endangers women by allowing men in women's sports and private women-only spaces."[139]

200.    In particular, the letter stated NSF's "belie[f] that UCLA's 'holistic review' admissions process, which considers factors such as an applicant's neighborhood/zip code, family income, and school profile—and invites the disclosure of an applicant's race via personal statements—is a transparent attempt to engage in race-based admissions in all but name."[140] It cited "UCLA's own Task Force to Combat Antisemitism and Anti-Israeli Bias" as revealing anti-Semitic incidents "antithetical to the safe and welcoming environment for effective research."[141] And it expressed "serious[] concern[]" that UCLA was "allowing males to compete in women's sports and utilize women-only facilities, … create[ing] an unsafe environment for women that further threatens the integrity of the campus research environment."[142]

201.    In an August 4, 2025 court filing in *Thakur v. Trump*, Case 3:25-cv-04737-RFL (N.D. Cal.), NSF stated that the July 30 and August 1 grant suspensions were based on "findings by the Department of Justice that UCLA violated federal civil rights law."[143] The *Thakur* court held that the suspensions violated its June 23, 2025 preliminary injunction, which barred the termination of grants with insufficiently specific explanations, and vacated those terminations.[144]

202.    Like NSF, on July 31, NIH sent a letter notifying UCLA that NIH was suspending hundreds of grant awards to UCLA, based on the same three conclusions of noncompliance listed in the

---

[139] *Thakur*, Dkt. 79-2.
[140] *Id.*
[141] *Id.*
[142] *Id.*
[143] *Id.*
[144] *Thakur*, Dkt. 96 at 7-8; *see also id.* at 11-12 (explaining that if preliminary injunction did not cover these grant terminations, modification would be appropriate).

August 1 NSF letter (in near-identical language): that UCLA was guilty of "illegal affirmative action," "antisemitism and bias," and "discriminat[ion] against and endanger[ing of] women."[145]

203.    NIH provided the same explanation as did NSF regarding its concern about UCLA's "holistic review" admissions process, elaborating that "UCLA's surreptitious—and unlawful—prioritization of race over merit has significantly disadvantaged white and Asian applicants and must end."[146] "With respect to antisemitism," NIH, like NSF, cited to UCLA's Antisemitism Task Force, and also to the Republican Staff Report of the U.S. House of Representatives Committee on Education and the Workforce regarding antisemitism on 11 university campuses.[147] NIH's letter repeated concerns about transgender students, warning that "NIH cannot sit idly by as a major grants recipient systematically marginalizes its female students, faculty, and staff by stripping away necessities, like safe and secure bathrooms, and extracurricular opportunities."[148]

204.    A motion to enjoin the NIH grant terminations is pending in the *Thakur* case, with a hearing set for September 18, 2025.

205.    On July 30 or 31, 2025, the DOE suspended two UCLA grant awards. On information and belief, DOE sent similar letters basing the grant terminations on the same three noncompliance conditions on which NSF and NIH relied, namely, (1) race-based preferences in admissions practices, (2) the failure to promote an environment free of antisemitism and bias, and (3) discrimination against women by permitting transgender women to participate in extracurricular activities and to use women's facilities.

### A. Defendants Disregard Title VI Statutory and Regulatory Requirements Constraining Termination of and Refusal to Grant Federal Funding.

206.    NSF, NIH, and DOE terminated $584 million in grant funds to UCLA based on the DOJ's finding that UCLA had violated Title VI of the Civil Rights Act of 1964, which prohibits discrimination on the basis of race, color, or national origin in all programs receiving federal funding. 42 U.S.C. §2000d ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from

---

[145] *Thakur*, Dkt. 118-1 at 2.
[146] *Id.* at 2-3 (citing a complaint filed in the Central District of California and a 2012 article by Richard Sander).
[147] *Id.* at 3 (citing UCLA Task Force and Republican Staff Report).
[148] *Id.*

participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.").

207.    Section 602 of Title VI, however, prescribes specific procedural requirements that federal agencies must follow *before* taking "any action terminating, or refusing to grant or continue, [federal financial] assistance because of failure to comply with [Section 601]." 42 U.S.C. §2000d-1.

208.    First, the agency must provide the funding recipient with notice of the alleged violation. But that is only the first step. The agency must then attempt to secure the funding recipient's voluntary compliance. If the agency "has determined that compliance cannot be secured by voluntary means," then it must make "an express finding on the record, after opportunity for hearing, of a failure to comply with [Section 601]." *Id.* Even then, it still cannot terminate funds. Rather, Section 602 provides that the agency must then "file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action," and "[n]o [terminating] action shall become effective until thirty days have elapsed after the filing of such report." *Id.*

209.    Section 602 further limits the scope of funding that the agency may terminate after exhausting all these mandatory procedures, providing that any "termination or refusal [to grant or to continue assistance under Title VI] shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made and, *shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found.*" *Id.* (emphasis added).

210.    These stringent procedural requirements and scope limitations for termination or refusal to grant or continue assistance reflect congressional intent to safeguard against the potential exploitation of Title VI funding leverage as a "vindictive or punitive" measure against federal funding recipients.[149] From the very inception of the Civil Rights Act of 1964, lawmakers were aware of and concerned about the far-reaching authority Title VI grants the federal government over programs receiving federal funds. The congressional notice requirement, presidential approval of agency regulations implementing Title

---

[149] 88 Cong. Rec. 7063 (1964) (statement of Senator Pastore), https://www.congress.gov/88/crecb/1964/04/07/GPO-CRECB-1964-pt6-1-1.pdf, https://perma.cc/95VE-5QL8.

VI (discussed below), and requirement for a hearing on the record were all introduced as amendments to the original bill and were expressly aimed at preventing abuses of power.[150]

211.     Senator John Pastore from Rhode Island, who was the floor manager in the Senate for the Civil Rights Act of 1964, explained that "Failure of a recipient to comply with a rule, regulation, or order issued by an agency may ultimately lead to a termination or refusal of Federal assistance. Cutoff of assistance is not the object of title VI, however. I wish to repeat: Cutoff of assistance is not the objective of title VI. Fund cutoff is a last resort, to be used only if all else fails to achieve the real objective—the elimination of discrimination in the use and receipt of Federal funds."[151]

212.     Senator Pastore further elaborated on the importance of the statutory and regulatory safeguards in ensuring that revocation of funding was "a last resort" rather than a "punitive or vindictive measure," noting that "cutoff of funds would not be consistent with the objective of the Federal assistance statutes if other effective means of ending discrimination are available."[152]

213.     Section 602 "direct[s]" federal agencies to "issu[e] rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken." 42 U.S.C. §2000d-1. Agencies are required to seek approval of those regulations from the President, *id.*, who has delegated that authority to the Attorney General. The Attorney General oversees and coordinates enforcement of Title VI among federal agencies. *See, e.g.*, Exec. Order No. 12250 (1980) at §§1–2; Exec. Order 11764, 3A C.F.R. §124 (1974 Comp.); Exec. Order 11247, 3 C.F.R. 1964–1965 Comp. 348 (Sept. 24, 1965).

214.     Pursuant to Section 602, and consistent with this legislative intent, DOJ, NSF, HHS (whose regulations bind NIH), DOE, and other defendant agencies have promulgated regulations imposing additional procedural requirements on the termination of federal funding for alleged noncompliance with Section 601.

---

[150] *See* 88 Cong. Rec. 2498 (1964) (statement of Rep. Willis); *id.* at 2499, 2505 (statements of Rep. Lindsay), https://www.congress.gov/88/crecb/1964/02/07/GPO-CRECB-1964-pt2-8-2.pdf, https://perma.cc/WJK5-8K7G.

[151] 88 Cong. Rec. 7059 (1964) (statement of Senator Pastore), https://www.congress.gov/88/crecb/1964/04/07/GPO-CRECB-1964-pt6-1-1.pdf, https://perma.cc/KGN2-86X9.

[152] *Id.* at 7059, 7063.

215.    These regulations typically provide that "[n]o order suspending, terminating or refusing to grant or continue Federal financial assistance shall become effective until: (1) The responsible Department official has advised the applicant or recipient of his failure to comply and has determined that compliance cannot be secured by voluntary means, (2) There has been an express finding on the record, after opportunity for hearing, of a failure by the applicant or recipient to comply with a requirement imposed by or pursuant to this subpart, ... and ([3]) The expiration of 30 days after the [head of the agency] has filed with the committee of the House and the committee of the Senate having legislative jurisdiction over the program involved, a full written report of the circumstances and the grounds for such action." 28 C.F.R. §42.108(c) (DOJ); *see, e.g.*, 45 C.F.R. §611.8(c) (NSF); 45 C.F.R. §80.8(c) (HHS); NIH Grants Policy Statement 4.1.2.1 (applying the HHS implementing regulations for Title VI); 10 C.F.R. §1040.114 (DOE).

216.    On information and belief, Defendants failed to comply with the foregoing requirements before terminating funding on July 30-August 1. Among other things, Defendants did not attempt to secure the UC's voluntary compliance, or determine that such compliance could not be achieved, before terminating $584 million in federal grants. Defendants did not provide an opportunity for hearing or make an express finding on the record as to the University's noncompliance with Title VI. Nor did any "responsible Department official" determine that the University's compliance could not be secured by voluntary means. Moreover, no head of any Federal department or agency has filed with any committees of the House and Senate a "full report of the circumstances and the grounds" for the action terminating or refusing to grant or continue federal assistance to the University because of a failure to comply with Title VI. Nor have thirty days elapsed after the filing of any such report.

217.    Additionally, Title VI regulations typically impose requirements on the conduct of pre-termination hearings. Among other requirements, "[w]henever an opportunity for a hearing is required ... reasonable notice shall be given by registered or certified mail, return receipt requested, to the affected applicant or recipient. That notice shall advise the applicant or recipient of the action proposed to be taken, the specific provision under which the proposed action against it is to be taken, and the matters of fact or law asserted as the basis for that action. The notice shall (1) Fix a date not less than 20 days after the date of such notice, within which the applicant or recipient may request that the

responsible Department official schedule the matter for hearing, or (2) advise the applicant or recipient that a hearing concerning the matter in question has been scheduled and advise the applicant or recipient of the place and time of that hearing." 28 C.F.R. §42.109(a) (DOJ); *see, e.g.*, 45 C.F.R. §611.9(a) (NSF); 45 C.F.R. §80.9(a) (HHS); NIH Grants Policy Statement 4.1.2.1; *cf.* 10 C.F.R. §1040.121 (DOE) (establishing similar requirements regarding notice of opportunity for hearing).

218.    Those regulations also typically further provide that "[t]he hearing, decision, and any administrative review thereof shall be conducted in conformity with 5 U.S.C. 554-557 (sections 5–8 of the Administrative Procedure Act)," and that "[b]oth the Department and the applicant or recipient shall be entitled to introduce all relevant evidence on the issues as stated in the notice for hearing or as determined by the officer conducting the hearing." 28 C.F.R. §42.109(d)(1) (DOJ); *see, e.g.*, 45 C.F.R. §611.9(d)(1) (NSF); 45 C.F.R. §80.9(d)(1) (HHS); NIH Grants Policy Statement 4.1.2.1. All such evidence "shall be open to examination by the parties and opportunity shall be given to refute facts and arguments advanced on either side of the issues," and "[a] transcript shall be made of the oral evidence except to the extent the substance thereof is stipulated for the record." 28 C.F.R. §42.109(d)(2) (DOJ); *see, e.g.*, 45 C.F.R. §611.9(d)(2) (NSF); 45 C.F.R. §80.9(d)(2) (HHS); NIH Grants Policy Statement 4.1.2.1.

219.    On information and belief, Defendants failed to comply with the foregoing procedures governing pre-termination hearings. Among other things, Defendants did not conduct a hearing at all or provide any notice.

220.    These regulations also impose requirements regarding post-hearing termination decisions and notices. For example, "[i]f the hearing is held by a hearing examiner, such hearing examiner shall either make an initial decision, if so authorized, or certify the entire record, including his recommended findings and proposed decision, to the [responsible Department official] for a final decision, and a copy of such initial decision or certification shall be mailed to the applicant or recipient." 28 C.F.R. §42.110(a) (DOJ); *see, e.g.*, 45 C.F.R. §611.10(a) (NSF); 45 C.F.R. §80.10(a) (HHS); NIH Grants Policy Statement 4.1.2.1.

221.    Moreover, "[e]ach decision of a hearing officer or responsible Department official shall set forth his ruling on each findings, conclusion, or exception presented, and shall identify the

requirement or requirements imposed by or pursuant to this subpart with which it is found that the applicant or recipient has failed to comply." 28 C.F.R. §42.110(d) (DOJ); 45 C.F.R. §611.10(d) (NSF); 45 C.F.R. §80.10(d) (HHS); NIH Grants Policy Statement 4.1.2.1; *cf.* 10 C.F.R. §1040.121(b) (DOE) ("An applicant or recipient may ... waive or fail to request a hearing, without waiving the requirement for findings of fact and conclusions of law."). And "[w]henever a record is certified to the responsible Department official for decision or he reviews the decision of a hearing examiner ... the applicant or recipient shall be given a reasonable opportunity to file with him briefs or other written statements of its contentions, and a copy of the final decision of the responsible Department official shall be given in writing to the applicant or recipient and to the complainant, if any." 28 C.F.R. §42.110(b) (DOJ); *see, e.g.*, 45 C.F.R. §611.10(b) (NSF); 45 C.F.R. §80.10(b) (HHS); NIH Grants Policy Statement 4.1.2.1; *cf.* 10 C.F.R. §1040.121(b) (DOE) ("[T]he applicant or recipient may also submit written information or argument for the record if he/she does not request a hearing.").

222.    On information and belief, Defendants failed to issue a decision consistent with the foregoing regulations. Among other things, Defendants did not provide the UC with a reasonable opportunity to file briefs or other written statements of its contentions.

223.    These Title VI regulations further provide that "[a]ny action to suspend or terminate or to refuse to grant or to continue Federal financial assistance shall be limited to the particular political entity, or part thereof, or other applicant or recipient as to whom such a finding has been made and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found." 28 C.F.R. §42.108(c) (DOJ); 45 C.F.R. §611.8 (NSF); 45 C.F.R. §80.8(c) (HHS); NIH Grants Policy Statement 4.1.2.1; 10 C.F.R. §1040.114(e) (DOE).

224.    Defendants did not limit the July 30-August 1 funding withdrawals to any particular program, or part thereof, in which noncompliance has been found. Nor was such withdrawal limited in its effect to any particular program, or part thereof, in which noncompliance has been found. Rather, the withdrawal—and the effect of such withdrawal—is widespread and reaches departments and individuals, including Plaintiffs' members, as to whom there has been no finding of noncompliance.

225.    Defendants' failure to comply with Section 602 and the Defendant agencies' respective regulations is not authorized by any law.

**B.    Defendants Disregard Title IX Statutory and Regulatory Requirements Constraining Termination of and Refusal to Grant Federal Funding.**

226.    In summarily terminating $584 million in grant funds to UCLA, NSF, NIH, and DOE cited as an additional basis UCLA's purported discrimination on the basis of sex, which is prohibited in education programs and activities that receive federal financial assistance by Section 901 of Title IX of the Civil Rights Act. 20 U.S.C. §1681(a).

227.    Section 902 of Title IX, however, prescribes specific procedural requirements that federal agencies must follow *before* taking "any action terminating, or refusing to grant or continue, [federal financial] assistance because of failure to comply with [Section 901]." 20 U.S.C. §1682.

228.    First, the agency must provide the funding recipient with notice of the alleged violation. But that is only the first step. The agency must then attempt to secure the funding recipient's voluntary compliance. If the agency "has determined that compliance cannot be secured by voluntary means," then it must make "an express finding on the record, after opportunity for hearing, of a failure to comply with [Section 901]." *Id.* Even then, it still cannot terminate funds. Rather, Section 902 provides that the agency must then "file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action," and "[n]o [terminating] action shall become effective until thirty days have elapsed after the filing of such report." *Id.*

229.    Section 902 further limits the scope of funding that the agency may terminate after exhausting all these mandatory procedures, providing that any "termination or refusal [to grant or to continue assistance under Title IX] shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made and, *shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found.*" *Id.* (emphasis added).

230.    These stringent procedural requirements and scope limitations are identical to the Title VI procedural requirements that, as discussed above, reflect congressional intent to safeguard against the potential exploitation of federal funding leverage as a "vindictive or punitive" measure against federal funding recipients. The congressional notice requirement, presidential approval of agency regulations implementing Title IX (discussed below), and requirement for a hearing on the record all mirror the Title VI requirements expressly aimed at preventing abuses of power.

231.     Section 902 "direct[s]" federal agencies to "issu[e] rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken." 20 U.S.C. §1682. Agencies are required to seek approval of those regulations from the President, *id.*, who has delegated that authority to the Attorney General, *see* Exec. Order No. 12250 (1980) at §1-102. The Attorney General oversees and coordinates enforcement of Title IX among federal agencies. *Id.* at §1-2.

232.     Pursuant to Section 902, and consistent with this legislative intent, DOJ, NSF, HHS (whose regulations bind NIH), DOE, and other defendant agencies have promulgated regulations imposing additional procedural requirements on the termination of federal funding for alleged noncompliance with Section 901.

233.     Specifically, these agencies have "adopted and incorporated" into their Title IX implementing regulations the "procedural provisions applicable to Title VI" described above. 28 C.F.R. §54.605 (DOJ) (applying the Title VI procedural provisions "found at 28 CFR 42.106 through 42.111"); 45 C.F.R. §618.605 (NSF) (applying the Title VI procedural provisions "found at 45 CFR part 611"); 45 C.F.R. §86.71 (HHS) (applying the Title VI procedural provisions "found at 45 CFR 80.6 through 80.11 and 45 CFR part 81"); NIH Grants Policy Statement 4.1.2.2 (applying the HHS implementing regulations for Title IX); 10 C.F.R. §1042.605 (DOE) (applying the Title VI procedural provisions "found at 10 CFR part 1040, subparts G and H").

234.     On information and belief, Defendants did not comply with any of the foregoing requirements before terminating funding on July 30-August 1. Among other things, Defendants did not issue to the UC a notice of findings of any alleged violations of Title IX. Defendants did not attempt to secure the UC's voluntary compliance before terminating $584 million in federal grants or determine that such voluntary compliance could not be achieved. Defendants did not provide an opportunity for hearing or make an express finding on the record as to the University's noncompliance with Title IX. Nor did any "responsible Department official" determine that the University's compliance could not be secured by voluntary means. Moreover, no head of any Federal department or agency has filed with any committees of the House and Senate a "full report of the circumstances and the grounds" for the action

terminating or refusing to grant or continue federal assistance to the University because of a failure to comply with Title IX. Nor have thirty days elapsed after the filing of any such report.

235.    Nor has any "responsible Department official or his designee" sought to resolve the University's alleged violations of Section 901 through informal means before termination of funding by Defendants NSF and NIH, even though such informal resolution may have been possible.

236.    On information and belief, Defendants failed to comply with the foregoing procedures governing pre-termination hearings. Among other things, Defendants did not conduct a hearing at all or provide any notice.

237.    On information and belief, Defendants failed to issue a decision consistent with the foregoing regulations. Among other things, Defendants did not provide the UC with a reasonable opportunity to file briefs or other written statements of its contentions.

238.    Defendants did not limit the July 30-August 1 funding withdrawals to any particular program, or part thereof, in which noncompliance has been found. Nor was such withdrawal limited in its effect to any particular program, or part thereof, in which noncompliance has been found. Rather, the withdrawal—and the effect of such withdrawal—is widespread and reaches departments and individuals, including Plaintiffs' members, as to whom there has been no finding of noncompliance.

239.    Defendants' failure to comply with Section 902 and the Defendant agencies' respective regulations is not authorized by any law.

### C.    Defendants Fail to Provide a Reasoned Decision for Terminating $584 Million in Research Grants.

240.    Defendants failed to provide any reasoned basis for their actions.

241.    Defendants' July 29 Notice of Findings, NSF and NIH grant termination letters, the August 8 Demand Letter, and, on information and belief, the DOE grant termination communication do not identify any specific evidence of any antisemitic harassment to which UC was deliberately indifferent, any specific evidence of race-based or gender discrimination, or any other evidence of wrongdoing.

242.    Defendants have not acknowledged the efforts UCLA and other campuses in the UC System are making to address alleged antisemitism and prevent racial discrimination in admissions. UC

has issued a number of statements, studies, reports, and policy changes in response to complaints of antisemitism and discrimination on campus. Those have included the launch in 2024 of a Systemwide Office of Civil Rights,[153] a systemwide Anti-Discrimination Policy,[154] and a systemwide directive on policies impacting expressive activities.[155]

243.    Additionally, on December 20, 2024, the UC System announced it had entered into a voluntary agreement with the U.S. Department of Education Office for Civil Rights ("OCR") to resolve claims of discrimination based on actual or perceived shared ancestry, including shared Jewish, Israeli, Palestinian, Arab, and Muslim ancestry, and ensure compliance with Title VI.[156] The voluntary agreement relates to complaints of discrimination at the UCLA campus, as well as at the UC Davis, UC San Diego, UC Santa Barbara, and UC Santa Cruz campuses. The agreement established several reporting and review frameworks between the UCs and the OCR regarding anti-discrimination policy and campus safety, including responses to a protest or demonstration on a University campus. For example, pursuant to the voluntary agreement, UC agreed to provide any proposed revision to its systemwide anti-discrimination policies and procedures to OCR for its review and approval and to provide annual investigator training related to discrimination and harassment based on actual or perceived national origin, including shared Jewish, Palestinian, Muslim, and/or Arab ancestry or association with these national origins/ancestries. Under the voluntary agreement, "[i]f OCR has any concerns about the adequacy of the University's rationale to not open an investigation or its investigations or any of its proposed remedial or corrective actions, OCR will communicate those concerns to the University in writing[,]" and "the University will respond to address OCR's concerns

---

[153] *Systemwide Office of Civil Rights*, Univ. of Cal. (last visited Sept. 14, 2025), https://ucop.edu/civil-rights/index.html.

[154] *University of California Policy: Anti-Discrimination*, Univ. of Cal. (Aug. 29, 2024), https://policy.ucop.edu/doc/1001004/Anti-Discrimination.

[155] *Updates on UC campus climate efforts*, Univ. of Cal. (Aug. 19, 2024), https://www.universityofcalifornia.edu/press-room/updates-uc-campus-climate-efforts.

[156] *UC reaches voluntary agreement with U.S. Department of Education Office for Civil Rights*, Univ. of Cal. (Dec. 20, 2024), https://ucnet.universityofcalifornia.edu/employee-news/uc-reaches-voluntary-agreement-with-u-s-department-of-education-office-for-civil-rights/; *see also* Resolution Agreement between U.S. Department of Education Office for Civil Rights and the University of California (Dec. 18, 2024), https://ocrcas.ed.gov/sites/default/files/ocr-letters-and-agreements/09222257-b.pdf.

with proposed revised corrective action(s)" "[w]ithin 30 calendar days of receiving notice of any such concerns."[157]

244.    Defendants' July 29 Notice of Findings, funding termination letters, and August 8 Demand Letter do not explain why the procedures, reporting, and commitments that are set forth in the December 20, 2024 voluntary agreement are insufficient to address the allegations of antisemitism contained in those findings, termination letters, and demand. The Notice of Findings merely notes a December 20, 2024 agreement as a document DOJ reviewed, explains the concerns raised by OCR, and fails entirely to acknowledge steps OCR and UC agreed to in that voluntary agreement.[158] Defendants' failure to do so is unreasonable and arbitrary given that the July 29 Notice of Findings, along with the funding termination letters and August 8 Demand Letter, cite only to events that occurred *prior to* the OCR's December 20 voluntary agreement with UC and are addressed by the provisions of the voluntary agreement. The Notice of Findings, funding termination letters, and August 8 Demand Letter do not identify any specific allegations of antisemitism that were not addressed by the December 20, 2024 voluntary agreement; nor do they state that the December 20, 2024 voluntary agreement has been insufficient to address the allegations of antisemitism, including those set forth in the October 2024 report of the Task Force to Combat Antisemitism and Anti-Israeli Bias at UCLA.

245.    Defendants have also failed, in issuing the Notice of Findings, the funding terminations, and the August 8 Demand Letter, to address actions taken by UCLA as part of and pursuant to a settlement of *Frankel v. Regents of University of California*. That lawsuit, filed June 5, 2024 by three Jewish students from UCLA and a UCLA professor against the Regents, claimed that UCLA had subjected Jewish students to discrimination and a hostile environment in violation of Title VI of the Civil Rights Act.[159] In settling this litigation, UC agreed to be bound by a Consent Judgment and Permanent Injunction prohibiting UCLA from offering any programs, activities, or campus areas that are not fully and equally accessible to Jewish students, faculty, and/or staff as to other students, faculty, and/or staff, and, among other things, agreed to contribute $2.33 million to eight organizations that combat

---

[157] University of California Resolution Agreement, *supra* note 156.

[158] U.S. Department of Justice Notice of Findings Regarding the University of California, Los Angeles, at 2 & n.2 (July 29, 2025), *https://www.justice.gov/crt/media/1409416/dl?inline*.

[159] Compl., *Frankel v. Regents of the Univ. of Cal.*, 24-cv-04702 (C.D. Cal. June 5, 2024), ECF No. 1.

antisemitism and support the UCLA Jewish community and $320,000 to UCLA's Initiative to Combat Antisemitism, an effort announced by UCLA in March 2025.[160] The Initiative seeks to implement the recommendations of the Task Force to Combat Antisemitism and Anti-Israel Bias. In announcing the *Frankel* settlement, UC also identified other steps it had taken to combat antisemitism.[161]

246.     The *Frankel* settlement was executed on July 28 and was publicly released by no later than July 29, 2025. Nonetheless, DOJ issued its Notice of Findings that UCLA was in violation of Title VI due to allegations of antisemitism on campus on July 29, 2025. The Notice of Findings did not address the *Frankel* settlement or the UCLA Initiative to Combat Antisemitism; nor has DOJ or any Defendant subsequently addressed the impact of the *Frankel* settlement, the UCLA Initiative to Combat Antisemitism, or any other of the actions UCLA and UC have implemented to address allegations of antisemitism. The Notice of Findings states that DOJ reviewed the "pleadings and other materials referenced" in *Frankel*,[162] but makes no reference to the settlement.

247.     Similarly, on July 30, July 31, and August 1, Defendants NSF and NIH, and on information and belief DOE, issued letters withdrawing funding from UCLA purportedly on the basis of complaints about antisemitism on campus without addressing the December 20, 2024 voluntary agreement between UC and OCR, the *Frankel* settlement, the UCLA Initiative to Combat Antisemitism, or any other steps UC identified as addressing these complaints.

248.     DOJ, in its Notice of Findings, relies heavily on the UCLA Task Force Report from October 2024, but does not acknowledge, let alone address, the UCLA Initiative to Combat Antisemitism, which seeks to implement the recommendations of the Task Force Report. DOJ provides no explanation of its failure to do so.

249.     The Notice of Findings is based entirely on events in the spring of 2024 related to an encampment on UCLA's campus to protest Israel's military actions in Gaza and student complaints

---

[160] Settlement Agreement and Release of Claims (July 28, 2025), https://www.universityofcalifornia.edu/sites/default/files/2025-07/frankel-settlement-agreement-fully-executed-w-ex-a.pdf; Julio Frenk, Chancellor, *Initiative to Combat Antisemitism*, Univ. of Cal. L.A. (Mar. 10, 2025), https://chancellor.ucla.edu/messages/initiative-to-combat-antisemitism.

[161] *Frankel Settlement Fact Sheet*, Univ. of Cal. (Jul. 29, 2025), https://www.universityofcalifornia.edu/sites/default/files/2025-07/frankel-settlement-fact-sheet.pdf.

[162] University of California Resolution Agreement, *supra* note 156, at 2 & n.2.

received between April 25 and May 1, 2024.[163] DOJ does not cite to or rely on any occurrences of antisemitism that occurred outside this time period. And yet DOJ, in its July 29, 2025 Notice of Findings, does not cite to or consider any steps taken by UC and/or UCLA since May 2, 2024 to address complaints of antisemitism and discrimination.

250.    NSF cites no factual or legal basis for its suspension of awards in its July 30, 2025 letter. In its August 1, 2025 Updated Notice, NSF purports to base the award suspensions on concerns regarding antisemitism "during the 2024 pro-Palestinian encampment," citing solely to the UCLA Task Force report as evidence of "noncompliance" with "applicable Federal statutes and regulations" "[w]ith respect to antisemitism."[164] NIH similarly cites to the UCLA Task Force findings as evidence of non-compliance. Yet neither NSF nor NIH addresses, or even acknowledges, the UCLA Initiative to Combat Antisemitism, or any other steps the UC and/or UCLA have taken to address the findings of the Task Force. NIH's July 31, 2025 letter suspending grant awards also cites, "[w]ith respect to antisemitism," a Republican Staff Report that investigated antisemitism on 11 university campuses and which includes information regarding the events at UCLA in late April and early May 2024.[165]

251.    Defendants have not made a reasoned determination whether UC's and UCLA's responses to complaints of antisemitism and discrimination on campus were or were not sufficient under Title VI, and Defendants did not make any such determination prior to sending the July 29 Findings, the funding termination letters, or the August 8 Demand Letter.

252.    The NIH and NSF funding termination letters and, on information and belief, the DOE funding termination letter, cite concerns about UCLA's "holistic review" admissions process and asserts that it is "a transparent attempt to engage in race-based admissions in all but name."[166] NSF and NIH, however, recognize that "UCLA expressly disclaims reliance on race." That UCLA may consider an applicant's zip code or personal statement is not unlawful and the funding termination letters do not come close to establishing the presence of unlawful race-based admissions processes. The agencies'

---

[163] Notice of Findings, *supra* note 158, at 3-6.

[164] *Thakur*, Dkt. 79-2 at 2-3 (Aug. 1, 2025 NSF letter).

[165] *Thakur*, Dkt. 118-1 at 3 (July 31, 2025 NIH letter, citing Republican Staff Report, https://edworkforce.house.gov/uploadedfiles/10.30.24_committee_on_education_and_the_workforce_republican_staff_report_-_antisemitism_on_college_campuses_exposed.pdf).

[166] *Thakur*, Dkt. 79-2 at 1; *Thakur*, Dkt. 118-1 at 2-3.

citation to UCLA websites explaining its admissions process is simply not a reasonable basis for finding that UCLA has engaged in unlawful practices. NIH also cites to allegations in a First Amended Complaint filed in June 2025 in the District Court for the Central District of California, *Students Against Racial Discrimination v. The Regents of the University of California*, C.D. Case No. 8:25-cv-00192, but a complaint's allegations are not evidence and it is unreasonable for NIH to rely on such allegations as a basis for concluding that UCLA is engaged in unlawful, race-based practices. NIH's reliance on a 2012 article by Richard Sander is also an entirely insufficient and unreasonable basis on which to conclude that UCLA is engaged in unlawful practices.

253.    The NIH and NSF funding termination letters and, on information and belief, the DOE funding termination communications, are unreasonably based on purported concerns about UCLA's policies allowing transgender women access to extracurricular opportunities and facilities, and apparent conclusion that these policies "fail[] to comply with federal requirements, policies, and procedures."[167] The only evidence cited by the agencies is a UCLA Gender Recognition Taskforce: Recommendations Report from 2020 and, for NIH, a 2019 map showing gender-inclusive restrooms. The Taskforce's recommendations focus on how to address and comply with new state law and nothing in the report constitutes evidence of unlawful discrimination on the basis of sex. Defendants' reliance on this report for its finding that UCLA has failed to comply with federal law is unreasonable and arbitrary and capricious. NIH's additional reliance on a map of bathrooms is similarly unreasonably and arbitrary, and cannot support any finding of unlawful discrimination.

254.    Defendants also have provided no basis for the breadth of their attacks on and threats to UC's federal funding. For example, Defendants have not explained which grants have been selected for review and potential termination and on what basis, or whether these grants have any connection to any alleged Title VI violation. Nor have Defendants identified any such connection for the grants they have terminated or for which they have declined to disburse funding since July 30, 2025.

255.    The lack of any connection between Defendants' funding freezes, threatened funding cuts, and unconstitutional conditions, and Defendants' purported legal basis for those freezes, cuts, and conditions, has exacerbated the harm to Plaintiffs and their members, as Plaintiffs and their members do

---

[167] *Thakur*, Dkt. 79-2 at 1-2; *Thakur*, Dkt. 118-1 at 3-4.

not know and cannot anticipate whether any program receiving federal funding will be impacted, requiring all such programs to prepare for the possibility of significant and immediate termination of funding.

256.    Defendants also have not reasonably considered the enormous reliance interests implicated by their freezing of hundreds of millions of dollars supporting critical research and other activities. The funding termination letters make no mention of the incalculable damage that Defendants' actions will cause—to patients whose clinical trials will end, faculty whose careers will be derailed, research partners around the world whose studies are in jeopardy, and the public who will no longer benefit from the research those federal grants support. NIH's and NSF's statements that they "considered UCLA's reliance interests in continued availability of funding" for the suspended grant awards and "they are outweighed by the concerns" identified in the funding termination letters are not supported by any reasoned analysis and are arbitrary and capricious, as the district court found in *Thakur*.[168]

257.    Defendants also have failed to explain the basis for any of the many conditions they have imposed and, on information and belief, seek to impose on UC (including on UCLA), nor have they explained how those demands would bring UC into compliance with Title VI, Title VII, or Title IX.

### D.    Defendants Demand that the UC Pay $1 Billion as Ransom, Despite No Lawful Basis for Demanding Such Payment.

258.    Shortly after Defendants abruptly cut off $584 million in grant funding, the UC reached out to the Department of Justice and offered to engage in good faith dialogue with the DOJ.

259.    On or about August 8, 2025, the UC received a document ("August 8 Demand Letter") from the DOJ demanding that UCLA pay $1 billion or more as part of a settlement to restore the $584 million that had already been cut.[169] The August 8 Demand Letter specifies that if its demands are met then the terminated $584 million in grants will be restored, but specifies that it does not prevent the

---

[168] *Thakur*, Dkt. 96 at 2.
[169] *Statement from UC President James B. Milliken in response to the Department of Justice's proposed $1 billion settlement from UCLA*, Univ. of Cal. (Aug. 8, 2025), https://www.universityofcalifornia.edu/press-room/statement-uc-president-james-b-milliken-response-department-justices-proposed-1-billion; Jaweed Kaleem, *Here are the details of Trump's $1.2-billion call to remake UCLA in a conservative image*, L.A. Times (Sept. 15, 2025), https://www.latimes.com/california/story/2025-09-15/trump-doj-proposed-settlement-demand-letter-ucla-university-of-california.

federal administration from taking further legal actions against or asserting new claims against UCLA including under Title VI, Title VII, Title IX, or other provisions of federal law.

260.    On information and belief, there has been no finding of any Title VI (or Title VII or Title IX) violation on the record. Even if there had been, neither DOJ nor any other Defendant is authorized by law to demand a $1 billion monetary penalty for violations of Title VI, Title VII, or Title IX.

261.    Upon receiving DOJ's demands, UC President James Milliken issued a public statement that same day stating, "[A] payment of this scale would completely devastate our country's greatest public university system as well as inflict great harm on our students and all Californians."[170]

262.    In a letter to California Legislators dated September 3, 2025, UC President Milliken described the Trump administration's actions as posing "one of the gravest threats in UC's 157-year history," explaining that "[r]ecent actions by the federal government with the distinct possibility of more to come, place the entire University of California system at risk, and by extension the many Californians and communities we serve."[171]

263.    As UC President Milliken explained, "the stakes are high, and the risks are very real." The UC receives more than $17 billion per year from the federal government, including $9.9 billion in Medicare and Medicaid funding, $5.7 billion in research funding, and $1.9 billion in student financial aid per year. The UC President warned: "A substantial loss of federal funding would devastate our university and cause enormous harm to our students, our patients, and all Californians. Classes and student services would be reduced, patients would be turned away, tens of thousands of jobs would be lost, and we would see UC's world-renowned researchers leaving our state for other more seemingly stable opportunities in the US or abroad. It is hard to conceive of a more damaging consequence for our state."[172]

264.    On September 15, 2025, UC President Milliken sent an email to the entire UC community in which he addressed the Los Angeles Times' reporting regarding the Trump administration's "demand that the university pay the federal government over $1 billion" and described the reporting as

---

[170] *Id.*

[171] Letter from James B. Milliken, UC President, and Scott D. Weiner, California State Senator (Sept. 3, 2025), https://www.documentcloud.org/documents/26083258-uc-response-to-lawmakers/#document/p1.

[172] *Id.*

"summarizing some of the administration's demands."[173] President Milliken also confirmed that "the federal government is … pursuing investigations and actions … against all 10 UC campuses."[174] President Milliken described the scope of federal funding at risk and noted that "[t]he funds at risk support the doctors and nurses who care for millions of Californians each year, the researchers working to find new cures and make important technological discoveries, and the financial aid that keeps UC accessible for students of all backgrounds"; and asserted that a loss of this federal funding "will mean fewer classes and student services, reduced access to health care, tens of thousands of lost jobs across the state, and an exodus of world-class faculty and researchers to other states or countries."[175]

265.    Losing a sizeable portion of federal funding would have a significant impact on the UC's budget. The UC's operating revenue in 2024-2025 was approximately $53 billion.[176] The federal government's threats have put billions of the University's budget at risk. The $17 billion of UC funding that UC President Milliken has identified as coming from the federal government comprises almost one-third of the UC's budget.

266.    According to UC budget documents, federal funds accounted for 52 percent of all UC research expenditures in 2023-24, and "were the University's single most important source of support for research."[177] Similarly, "[f]ederal student aid programs represent the single largest source of financial aid for UC students."[178]

/ / /

/ / /

---

[173] James Milliken, *A message from President James B. Milliken to the UC Community*, Univ. of Cal. Press Room (Sept. 15, 2025), https://www.universityofcalifornia.edu/press-room/letter-president-james-b-milliken-uc-community.
[174] *Id.*
[175] *Id.*
[176] Mikhail Zinshteyn, *UC faces half-billion-dollar budget shortfall and increases tuition for new nonresident students*, Cal Matters (Nov. 14, 2024), https://calmatters.org/education/higher-education/2024/11/uc-regents/.
[177] *Budget for Current Operations: Context for the Budget Request, 2025-26*, Univ. of Cal., https://www.ucop.edu/operating-budget/_files/rbudget/2025-26-budget-detail.pdf, at 21.
[178] *Id.* at 22.

1
2

### E. Defendants Demand that, in Exchange for Federal Funding, the UC Agree to Infringe the Free Speech and Academic Freedom Rights of Its Faculty, Students, Academic Employees, and Staff.

3
4
5

267.    The August 8 Demand Letter makes a number of demands upon UCLA that would impinge on the free speech and academic freedom rights of UCLA's faculty, students, academic employees, and staff employees.[179]

6
7
8
9

268.    For example, the August 8 Demand Letter demands that UCLA prohibit demonstrations, protests, displays, and other expressive activities in specified locations on the UCLA campus; prohibit overnight demonstrations in any location; and prohibit demonstrators from wearing masks in order to protest anonymously.[180]

10
11
12
13
14
15

269.    The August 8 Demand Letter makes additional demands that would inhibit speech by non-citizen students, including requiring UCLA to share disciplinary records of international students with the federal government and to implement policies that ensure it does not recruit or admit international students who are "likely to engage in anti-Western, anti-American, or antisemitic disruptions or harassment," and implement trainings to "socialize" international students to campus norms.[181]

16
17
18

270.    On information and belief, the August 8 Demand Letter also demands cooperation with local and federal law enforcement and does not except cooperation with federal immigration authorities from this demand.

19
20
21
22

271.    The August 8 Demand Letter demands appointment of a resolution monitor and gives that monitor significant authority over campus affairs; if UCLA and the administration cannot reach agreement on who should be appointed as that monitor, the letter demands that the administration have the authority to appoint that individual.[182]

23
24
25

272.    The August 8 Demand Letter requires a review of policies and programs related to diversity, equity, and inclusion efforts, including, on information and belief, faculty hiring, retention,

26
27

[179] Jaweed Kaleem, *Here are the details of Trump's $1.2-billion call to remake UCLA in a conservative image*, L.A. Times (Sept. 15, 2025), https://www.latimes.com/california/story/2025-09-15/trump-doj-proposed-settlement-demand-letter-ucla-university-of-california.

28

[180] *Id.*
[181] *Id.*
[182] *Id.*

and promotion; a process for approving any curricular changes; and recommendations for academic restructuring across programs.

273.    Besides the requirement to provide the disciplinary records of international students, the August 8 Demand Letter demands that the federal government have access to and the ability to regularly view a wide variety of records of academic employees, staff employees, faculty, and students, as deemed necessary by the resolution monitor.[183] The only exception is for attorney-client privilege, not for speech, association, or privacy purposes.[184]

274.    On information and belief, the August 8 Demand Letter requires regular reports to the external monitor regarding all of these measures.

275.    In making these demands, the Trump administration is seeking to impose speech restrictions upon students, faculty, academic employees, and staff employees that would violate the First Amendment if imposed directly either by the university itself or by the federal government.

### F.    Defendants Demand that, in Exchange for Federal Funding, the UC Agree to Measures to Limit Lawful Diversity, Equity, and Inclusion Efforts.

276.    The August 8 Demand Letter also makes demands aimed at ending UCLA's lawful diversity, equity, and inclusion efforts, including a review of policies and programs related to such efforts in faculty and other staff hiring, retention, and promotion.[185]

277.    Under the August 8 Demand Letter's demands, UCLA would eliminate supposed racial preferences and ensure what the federal government deems to be merit-based practices.

278.    Included among those demands are that UCLA must end any race or ethnicity-based scholarships and remove eligibility criteria deemed discriminatory.[186]

279.    Further, the letter demands the end to the use of any "proxy" for race in the admissions process, and calls for a bar on "personal statements, diversity narratives, or an applicant's [own] reference to racial identity."[187] Although UCLA does not consider standardized test scores in its

---

[183] *Id.*
[184] *Id.*
[185] *Id.* Notably, the University of California does not engage in affirmative action and has not done so in almost 30 years, since the implementation of Proposition 209.
[186] *Id.*
[187] *Id.*

admissions process, the document requires disclosure of test scores and other admissions information, by race and gender, to the administration and the general public.[188]

280.    The bar on the use of "proxies" appears modeled after demands made by the Department of Education's Office for Civil Rights' February 14, 2025 "Dear Colleague" letter, which, among other things, falsely deems numerous lawful means to recruit and admit a diverse student body, and to establish a diverse and inclusive college community, to be unlawful under *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College* ("*SFFA*"), 600 U.S. 181 (2023), among other authorities. Contrary to that view, for example, *SFFA* specifically contemplates that universities may consider personal statements wherein an applicant includes a "discussion of how race affected his or her life, be it through discrimination, inspiration, or otherwise." 600 U.S. at 230; *cf. also Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 788-89 (2007) (Kennedy, J., concurring) (discussing "race-conscious measures" to achieve equal educational opportunity "without treating each student in [a] different fashion solely on the basis of a systematic, individual typing by race").

281.    That February 14, 2025 "Dear Colleague" letter has been held unlawful and vacated in its entirety. *See AFT v. Dep't of Educ.*, __ F.Supp.3d __, 2025 WL 2374697 (D. Md. Aug. 14, 2025). Because the Trump administration cannot impose these measures directly, it is attempting to use funding conditions to coerce the UC to comply.

282.    On information and belief, the August 8 Demand Letter requires regular reports to the external monitor regarding all of these measures, including how UCLA is working to end supposedly discriminatory programs and policies.

283.    Notably, the August 8 Demand Letter does not include measures to address anti-Semitism.

### G.    Defendants Demand that, in Exchange for Federal Funding, the UC Agree to Violate the Rights of Transgender Individuals.

284.    The August 8 Demand Letter demands a number of changes in UCLA's policies as relates to transgender students and other transgender individuals.

---

[188] *Id.*

285.     Among the demands are that UCLA make a public statement, and post that statement on UCLA's websites, that UCLA does not recognize transgender people's gender identities and, on information and belief, that it agrees with the administration's definitions of "male," "female," and "sex," as set forth in Executive Order 14168. Section 2 of that executive order includes the following definitions:

(a)  "Sex" shall refer to an individual's immutable biological classification as either male or female. "Sex" is not a synonym for and does not include the concept of "gender identity."

…

(d)  "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.

(e)  "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell.

286.     Besides making a public statement, the August 8 Demand Letter demands that UCLA rescind any guidance that allows equal participation by transgender students in UCLA sports and, on information and belief, that it review and rescind all records, titles, honors, and awards previously granted to transgender athletes; issue a personal apology letter to any cisgender women who did not receive such records, titles, honors, and awards as a result of transgender athletics participation; and refrain from delegating its obligation to comply with Title IX to any outside entity.

287.     Outside the realm of athletic participation, the August 8 Demand Letter demands that UCLA bar gender inclusive and gender appropriate use of locker rooms, dorm rooms, and restrooms, by restricting access to such spaces based on individuals' sex assigned at birth.[189]

288.     The terms of the August 8 Demand Letter terms reportedly apply to UC's medical centers, and demand that regardless of medical judgment the UC medical centers refrain from providing any gender affirming medical care, including "hormonal interventions," to individuals under the age of 18.[190]

---

[189] *Id.*
[190] *Id.*

289. The August 8 Demand Letter's demands would require the UC to violate federal anti-discrimination law as well as California laws that prohibit discrimination on the basis of sex, sexual orientation, or gender identity.

**H.    Defendants Threaten to Impose the Same Demands on the Entire UC System.**

290. Beyond the DOJ's July 29 Notice of Findings to UCLA, Defendants have launched a barrage of additional purported civil rights investigations against the UC System and various UC campuses that remain pending.

291. On February 3, 2025, the Department of Education's Office for Civil Rights ("OCR") opened an investigation under Title VI against UC Berkeley (and four other universities) pursuant to President Trump's Executive Order, "Additional Measures to Combat Anti-Semitism."[191]

292. On March 5, 2025, the Federal Task Force to Combat Anti-Semitism announced that DOJ had opened a civil pattern or practice investigation into the UC under Title VII of the Civil Rights Act of 1964, to "assess whether UC has engaged in a pattern or practice of discrimination based on race, religion and national origin against its professors, staff and other employees by allowing an Antisemitic hostile work environment to exist on its campuses."[192]

293. On March 10, 2025, OCR sent a letter "warn[ing] of potential enforcement actions" to UC Davis, UC San Diego, UC Santa Barbara, and UC Berkeley, along with 56 other universities that OCR stated were "under investigation or monitoring in response to complaints filed with OCR" for alleged Title VI violations.[193]

294. On March 14, 2025, OCR announced it was opening Title VI investigations into UC Berkeley, along with 44 other universities, pursuant to OCR's February 14 "Dear Colleague Letter" requiring all educational institutions to "cease all efforts to circumvent prohibitions on the use of race by relying on proxies or other indirect means to accomplish such ends" and to "cease all reliance on

---

[191] *U.S. Department of Education Probes Cases of Antisemitism at Five Universities*, U.S. Dep't of Educ. (Feb. 3, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-probes-cases-of-antisemitism-five-universities.

[192] *U.S. Justice Department Launches Investigation of University of California Under Title VII of the Civil Rights Act of 1964*, Off. of Pub. Aff., U.S. Dep't of Just. (Mar. 5, 2025), https://www.justice.gov/opa/pr/us-justice-department-launches-investigation-university-california-under-title-vii-civil.

[193] *Office for Civil Rights Sends Letters to 60 Universities*, *supra* note 63.

third-party contractors, clearinghouses, or aggregators that are being used by institutions in an effort to circumvent prohibited uses of race."[194] OCR stated that the March 14 investigations were prompted by "allegations that these institutions have violated Title VI … by partnering with 'The PhD. Project,' an organization that purports to provide doctoral students with insights into obtaining a Ph.D. and networking opportunities, but limits eligibility based on the race of participants."[195]

295. On June 26, 2025, DOJ notified the UC that it was opening a new Title VII investigation into the UC System, "including the individual University of California campuses," to determine whether the UC's "UC 2030 Capacity Plan" caused a pattern or practice of unlawful race- or sex-based employment discrimination.[196]

296. On May 9, 2025, the DOJ launched its Title VI investigation of the entire UC System's response to antisemitism. On information and belief, the DOJ's investigation of the remaining UC campuses other than UCLA "remains ongoing."[197]

297. On information and belief, while the August 8 Demand Letter is facially directed only at UCLA, Defendants have informed the UC that the same demands enumerated in the August 8 Demand Letter to UCLA will be made to the rest of the UC System, except that the amount demanded will be greater than $1 billion.

## V. Defendants' Coercive Attacks Have Harmed and Will Continue to Irreparably Harm Plaintiffs and Their Members if Not Enjoined.

### A. Defendants' Coercive Demands Have Already Caused UC to Begin Infringing on the Academic Freedom, Free Speech, Privacy, and Other Rights of Faculty, Students, Academic Employees, and Staff Employees.

298. Defendants' threats and coercive conduct have caused a pervasive sense of fear and intimidation among UC faculty, students, academic employees, and staff employees, who have seen the

---

[194] Dear Colleague Letter from Acting Assistant Secretary Craig Trainor (Feb. 14, 2025), https://www.ed.gov/media/document/dear-colleague-letter-sffa-v-harvard-109506.pdf.

[195] *Office for Civil Rights Initiates Title VI Investigations into Institutions of Higher Education*, U.S. Dep't of Educ. (Mar. 14, 2025), https://www.ed.gov/about/news/press-release/office-civil-rights-initiates-title-vi-investigations-institutions-of-higher-education-0.

[196] Letter from Harmeet K. Dhillon, Assistant Attorney General, to Michael Drake, President, University of California (June 26, 2025), https://www.justice.gov/opa/media/1404751/dl.

[197] Letter from Harmeet K. Dhillon, Assistant Attorney General, to Michael Drake, President, University of California (July 29, 2025), https://www.justice.gov/crt/media/1409416/dl?inline.

UC already begin to alter its policies and practices seemingly in capitulation to the Trump administration. Defendants' coercive threats, and the UC's foreseeable response, have had a widespread chilling effect.

299.    For example, on or about August 6, 2025, the UC announced a new policy expanding Immigration and Customs Enforcement's ("ICE") access to Ronald Reagan UCLA Medical Center, Santa Monica UCLA Medical Center, Orthopedic Hospital, and Resnick Neuropsychiatric Hospital at UCLA, and UCLA West Valley Medical Center. This new policy has caused widespread fear among Plaintiffs' members, many of whom are immigrants and fear for themselves and their family members who work at, study at, or receive health services at UCLA medical centers.

300.    As another example, on September 12, 2025, it was reported that UC Berkeley provided the Trump administration's Department of Education the names of 160 faculty members, students, academic employees, and staff employees who are members of Plaintiffs and whose names have appeared in reports of "alleged antisemitic incidents."[198] It was reported that UC Berkeley's usual procedures for handling complaints had been suspended, and that UC Berkeley's disclosure of names was directed by the UC Office of the General Counsel. Some of the individuals whose names were disclosed to the federal government had never even been informed that a complaint had been filed with the University against them, nor were they informed of the basis for the alleged charges, let alone afforded an opportunity to contest the allegations. It was also reported that UC Berkeley did not notify the affected individuals that their names had been disclosed to the federal government until weeks after the fact. Those whose names were disclosed to the federal government have been directly harmed by the disclosure, and the reports of this disclosure have had far-reaching chilling effects through the UC community.

301.    If the UC accedes to some or all of the Trump administration's demands, Plaintiffs' members will face further injury.

302.    The Trump administration's demanded restrictions on workers', students', faculty, and others' demonstrations and expressive activity in certain locations and at certain times, and the demand

---

[198] *UC Berkeley shares 160 names with Trump administration in 'McCarthy era' move*, The Guardian (Sept. 12, 2025), https://www.theguardian.com/us-news/2025/sep/12/uc-berkeley-trump-administration-antisemitism.

that protestors not be permitted to protest anonymously, if implemented, would infringe on the First Amendment rights of Plaintiffs' members who wish to participate in such expressive activity.

303.    If implemented, the demands to share disciplinary records of international students with the federal government, to avoid recruitment of "anti-Western" or "anti-American" international students, and to "socialize" international students interfere with the expressive rights of Plaintiffs' international student members and the rights of other Plaintiffs' members to hear the uninhibited views of those international students, particularly given the absence of any universally accepted definition of "anti-Western" or "anti-American." The entirely vague but ominous threat to international students' visas and the students' ability to express dissent from dominant ideologies would also inhibit solidarity between University employees, their unions, and students from around the world.

304.    The demand to cooperate with law enforcement including immigration authorities, if implemented, will harm Plaintiffs' members who face potential harassment and adverse actions from immigration authorities and will also have a chilling effect on speech and on the ability to receive necessary health care. Thousands of Plaintiffs' members are health care providers and/or receive their health care from UC providers.

305.    The demands to review all diversity, equity, and inclusion policies and programs, including as relate to faculty hiring, retention, and promotion, as well as the process for approving curricular changes and for academic restructuring across programs, if implemented, would infringe on academic freedom and harm Plaintiffs' members who rely on and benefit from such programs and curriculum. It would also infringe on free speech and free association rights.

306.    If implemented, the demand to eliminate supposed racial preferences and ensure what Defendants term merit-based practices, including by ending all race or ethnicity-based scholarships and any supposedly discriminatory eligibility criteria and by ending the use of purported "proxies" for race in the admissions process including through personal statements, would harm Plaintiffs' members by infringing on their free speech rights, reducing the diversity of the UC student body, and preventing the wholistic assessment of student applicants.

307.    The demand to make and publicize a statement that UCLA does not recognize transgender people's gender identities and agrees with the Trump administration's definitions of "male," "female,"

and "sex," and implement that definition by ending gender-inclusive policies as relates to restrooms and other private spaces and stripping previously awarded athletics honors from transgender athletes, if implemented, would harm Plaintiffs' members, including transgender members.

308. If implemented, the demand that medical centers cease provision of gender-affirming care to minors would harm Plaintiffs' members with transgender children who receive medical care through the University.

309. The demands to cede authority to a government-appointed external monitor, to give the federal government access to and the ability to regularly view a wide variety of records of academic employees, staff employees, faculty, and students as deemed necessary by the monitor, harms all of Plaintiffs' members by chilling speech and academic discourse.

310. The Trump administration's demands have already impacted the content of the work the University is willing to support. For example, in November 2024, UCLA submitted to a private funder a grant proposal that an interdisciplinary team of UCLA faculty had prepared. The proposal sought support for a project concerning academic freedom, including specifically in the context of pro-Palestinian speech. UCLA selected this proposal following a competitive internal review process, and senior administrators at the University committed more than $140,000 in University matching funds to support the initiative that was the subject of the grant. When the private funder later requested that the team demonstrate the support of senior administrators at the University, however, the University—having just had $584 million in funding summarily canceled and having received Defendants' August 8 Demand Letter—balked. On August 20, 2025, senior UCLA administrators informed the team that they would no longer be endorsing the project, despite the significant support they had previously demonstrated. The private funder informed the faculty members that the lack of senior administrator support was disqualifying. Despite months of work to prepare a highly competitive grant application, the faculty members no longer intend to pursue this project because they have no realistic prospect of obtaining sufficient funding for it, and team members are concerned about their ability to seek support from the private funder in the future without the support of UCLA.

/ / /

/ / /

**B.    Plaintiffs and Their Members Have Suffered Harm Caused by Defendants.**

311.    Plaintiffs' members have experienced and are continuing to experience significant harms to their First Amendment rights to free speech and academic freedom because of Defendants' actions and credible threats. Defendants' course of conduct, coupled with UC's response, has created a climate of fear that now pervades the teaching, research, and public discourse of Plaintiffs' members across UC's campuses. Plaintiffs' members' speech and academic freedom have been chilled in myriad pernicious ways and will be further chilled and suppressed if UC accedes to the unlawful demands set forth in the August 8 Demand Letter.

312.    Plaintiffs' members have also experienced and are continuing to experience harms to their financial and professional well-being as a result of Defendants' unlawful funding cuts and coercive threat to further withhold still more federal funding from the UC System. Plaintiffs' members have been directly and irreparably harmed by the unlawful termination of federal funding for specific projects the government had previously committed to support. Faculty who are members of AAUP, AFT, UC-AFT, UAW, UAW Local 4811, CUCFA and its affiliated UC Campus FAs have been forced to immediately cease ongoing research, which results in a cascade of harms not only to the research itself but also to the graduate students (many of whom are members of UAW and UAW Local 4811), undergraduate students, academic employees, and staff employees whose financial and professional fates are directly affected by this grant funding.

313.    Members of all Plaintiffs at UC campuses continue to be harmed by the looming threat of additional funding cuts. Defendants have so far terminated $584 million from UCLA, but the entire UC receives approximately $5.7 billion in research funding annually, and another approximately $11.3 billion in Medicaid, Medicare, and student federal financial aid, all of which could potentially be at stake if the UC does not accede to Defendants' coercive demands.

314.    This complaint provides a few examples of the extensive irreparable harms that Defendants' conduct as alleged herein has caused and will continue to cause Plaintiffs and their members unless enjoined.

/ / /

**(1)  AAUP, AFT, CUCFA, and the UC Campus FAs and Their Members Have Been and Will Continue to Be Irreparably Harmed.**

315.  Because they fear retaliation by the Trump administration, faculty members of Plaintiffs AAUP, AFT, CUCFA, and the UC FAs have engaged in self-censorship with respect to the development of their curricula, conduct of their research and writing, association with faculty and student groups, and conversations with faculty and students, among other contexts.

316.  For example, the curriculum development and public discourse of various members of faculty unions and associations have been chilled by the Trump administration's actions. One member of AAUP, AFT, and UCLA FA, for example, is now uncertain whether he will continue to teach an article addressing an aspect of the Palestinian-American experience in one of his courses. While he previously offered support to student demonstrations with which he agreed, he now fears lending support to student action regarding Palestine, lest he be photographed, identified, and subject to retribution by the federal government.

317.  A member of Davis FA, CUCFA, AAUP, and AFT who teaches history with a focus on migration in the Middle East was specifically recruited to UC Davis to develop this curriculum. The federal investigation into alleged actions of antisemitism has created an environment in which she been publicly called a "terrorist" and threatened with physical violence. Initially, she decided to avoid teaching any undergraduate classes to try to avoid public attention but recently decided not to teach at all for the academic year 2025-2026 to try to protect herself. As a result, she is unable to advance her scholarship.

318.  Similarly, the administration's actions against UCLA and other universities, and UCB's willingness to turn over names to the federal government on the basis of student complaints, has caused a BFA member concern about addressing the topic of climate change in her class. She has historically worked with students to analyze evidence and critically evaluate arguments regarding climate change, and she feels that doing so is her responsibility as an instructor in her field. Because of the administration's funding cuts to universities and the possibility that even an unsubstantiated complaint could make her a target of the federal government, she worries that teaching about climate change in a manner inconsistent with the views of the administration could jeopardize her career, including her ability to obtain federal grants in the future.

319.    Another AAUP, AFT, and UCLA FA member who is involved in organizing other faculty members and students intends to engage in collective action over the coming school year in support of labor and Palestinian rights, as well as students' free expression rights. His ability to do so has been and will be affected by any restrictions on campus speech the University imposes as a result of the federal government's threats and demands.

320.    One UCLA professor who is a member of UCLA-FA and AAUP and serves in multiple departments has observed significantly chilled speech on campus. She and colleagues now devote substantial time to being hypervigilant about their speech, including reframing the narratives surrounding their work to avoid any descriptions that might result in targeting by the federal government. She reports that this self-censorship is impacting the areas of research that she and others in her departments focus on.

321.    Suspension of grant funding has also subjected the members of AAUP, AFT, UC-AFT, the UC Campus FAs, and CUCFA to immediate and irreparable harms that will expand dramatically if additional grant funding is cut in the future.

322.    As a result of canceled NSF, NIH, Department of Energy, and other grants, AAUP, AFT, CUCFA, UCLA FA, UAW Local 4811, and UPTE members report having to cease all work on ongoing research projects, which, in turn, has already meant delayed project timelines; missed gating points for scientific research, such as institutional review board meetings; clinical trials and projects halted midstream, resulting in untreated patients and the lost value of already-expended research effort; and the potential for lost human capital as talented and meticulously trained researchers and support staff begin searching for work elsewhere. If these cessations continue, these members expect they or their labs will be forced to take even more harmful steps, such as euthanizing lab animals or permanently dismissing staff.

323.    AAUP, AFT, CUCFA, UCLA and other campus FAs, UAW Local 4811, and UPTE members report that, in some cases, if the research projects and clinical trials they work on can no longer access grant funding, they expect they will soon need to abruptly shut down partnerships with study participants and third-party collaborators with whom these members have spent years carefully cultivating personal and professional relationships. These abrupt shutdowns would not only devastate

the research they are working on today but also make it more difficult for them to structure future work—because they would have imperiled trust with program participants, who may suffer significant adverse health impacts as a result of delays and may be reluctant to trust the University going forward, and tarnished important relationships with service partners, who will be unwilling to invest in future collaborative work with UC researchers.

324.    UCLA FA members have seen their federal funding cut, forcing them to abandon or significantly scale back important research projects and layoff or furlough members of their research teams. Defendants have suspended all federal grant funding to some departments, like the Department of Integrative Biology and Physiology, and institutes, like the Institute for Pure and Applied Mathematics within the Mathematics Department. UCLA FA members have also observed that Defendants appear to be targeting training grants for cancellation or suspension, and many members have expressed concern about continued funding for their students and about the future of their fields.

325.    For example, one UCLA FA, AAUP, and AFT member who is a professor affiliated with multiple departments has had four NSF grants impacted by suspensions and terminations. Two NSF grants, supporting work with veterans and interdisciplinary research on water management, were suspended on August 1, 2025. Although these suspensions were enjoined by a federal court order, the suspensions have nevertheless subjected this professor and her teams to ongoing harm, including undermining the hard-won trust of veterans, their families, and community partners who support her project's work and difficulty advancing the goals of these projects because of uncertainty about funding and staffing for the projects going forward.

326.    Another UCLA professor who is a UCLA FA, AAUP, and AFT member has had two NIH grants suspended. These grants supported research on neurological disorders and career development, and funded equipment, lab supplies, and the salaries of the members of the research team. On August 1, 2025, the professor was directed to immediately stop spending on these grant accounts. These grant suspensions have caused this professor and the research team substantial harm, including interrupting lines of investigation that were several years in the making, requiring a postdoctoral researcher who no longer has salary support to shift to an entirely different project, and uncertainty that is precluding this professor from hiring additional staff to support his research.

327.    A member of UCLA FA, CUCFA, AAUP, and AFT who runs a neuroscience research lab has had three-quarters of his funding frozen. His research focuses on basic brain functions, such as memory. This research is crucial to understanding any neuropsychology condition or neurological decay. Due to the precarity of funding, he is uncertain whether he will be able to retain anyone who works in the lab including the researchers who have extremely specialized skills and are not easily replaced. Some in the lab have already been forced to find other work. As a result of the funding freeze, the member cannot hire someone to take care of the research animals. Every scientist in his lab now rotates taking care of the animals, leaving less time for research. The remaining lab staff have slowed down the animals' rate of breeding because funding is uncertain, which means that future research will be more limited. This member is also a co-mentor for a post-doctoral student whose NIH grant has been frozen. As a result of this freeze, the post-doctoral student reports being unsure whether s/he will be able to pursue a career in scientific research at all.

328.    A member of UCLA FA, CUCFA, AAUP, and AFT and professor saw her federal funding suspended recently. Her program is funded by an NIH training grant that funds graduate student genetics research in psychiatric and neurological brain disorders. At least half the students work with animal and cell models. Funding suspensions have meant sacrificing the animals, leading to an enormous and unethical waste in resources. One of the students in the program works as part of a lab that has recently made breakthroughs in research on Huntington's and Alzheimer's diseases using genetically engineered mice—research that is being hindered by Defendants' actions. Other students are looking to taking on Teaching Assistant positions to replace funding, taking away time and energy they could be using to further their important research. The member is concerned about the future of these research projects, the labs the students work in, and the training program.

329.    NIH recently suspended two grants to a UCLA FA, CUCFA, AAUP, and AFT member and professor without any explanation. His research focuses primarily on neurodevelopmental and neurodegenerative disorders such as epilepsy, seizures and autism, etc. His lab develops brain organoids using stem cells derived from patients with these disorders and uses these organoids to study brain wave alterations common in these disorders. As a result of Defendants' actions, he has had to rely on lab funds generally reserved for repairing and maintaining research equipment. The precarity of the funding led

the postdoctoral researcher in the lab, who authored prior published papers and was working on another currently under review, to take a position elsewhere. If funding is not restored in the next several months, the lab will be shut down.

330.    A UCMFA member conducting federally funded public health research on lesbian, gay, bisexual, transgender, queer, intersex, and asexual populations was directed by the federal funding agency to change all language in the project materials referencing transgender individuals. The federal agency then cut the funding completely, requiring the member to terminate the entire research project. Defendants did not offer the member an opportunity to appeal the cancellation.

331.    Another UCMFA member's federal funding for public health research on physicians in Puerto Rico in the aftermath Hurricane Maria was cut. While this funding was eventually reinstated, the member was forced to cease data collection during the suspension period, which set the research project back a whole year. Defendants have suspended and then reinstated research funding for at least two other UCMFA members, causing significant disruption to their research projects.

332.    A SDFA member conducted a federal-grant-funded training in addressing partner violence for early career physicians. Defendants cancelled the grant. The stated reason was that the grant included the word "equity" in the project title. The member has been forced to terminate the training program, and the twelve early career physicians who were enrolled in it will most likely not receive this training. Defendants have also delayed grant funding for a project led by the same member that involved developing youth-led communication materials to address vaccine hesitancy among Hispanic teenagers. Continued funding disruptions risk harming or destroying community relationships necessary to conduct this project that the member spent significant time developing. Funding uncertainty due to Defendants' actions has also made it difficult for the member to retain staff and pay staff salaries.

333.    Defendants cancelled a SBFA member's federal funding for public health research into racial and ethnic disparities in exposure to harmful chemicals. This member's research project employed multiple researchers, including two to three undergraduate student researchers. The member anticipates terminating those undergraduate student researchers due to the funding cancellation.

334.    Defendants have also cancelled research funding for at least two other SBFA members— one whose research involved developing tools for under-resourced cultural heritage organizations to

digitize their collections and another whose research involved developing computational methods to identify misinformation and disinformation involving social science theories. Those members were, in turn, forced to terminate the employment of five graduate students and two undergraduate student researchers working on those projects.

335.    Defendants have paused grant funding for another SBFA member's Airforce and NIH funded research. Defendants also cancelled an SBFA member's training program for health workers supporting racially diverse transgender youth and their families, only to reinstate this funding three months later. During this three-month funding disruption, the member was forced to stop recruitment and lost multiple potential participants who had initially expressed interest in taking part in the project. The member was also forced to spend their personal research funds to support graduate students who would have otherwise been funded by the suspended grant.

336.    The administration's demand that the UC cease providing medically necessary care for minor children suffering from gender dysphoria will also irreparably harm Plaintiffs and their members. At least one member of the AAUP, AFT and UCLA-FA is a professor and faculty member whose adolescent child has been diagnosed with gender dysphoria. As part of the professor's benefits as a faculty member and employee of the UC, the UCLA-FA member has had access to gender-affirming care to treat his child's gender dysphoria at UCLA Health. Before the child began treatment for her gender dysphoria, she experienced serious mental health issues that impacted all aspects of her life. Since receiving care, her life has dramatically improved and she has benefited extensively from that care. Terminating this medically necessary care at UC would cause immediate and irreparable harm to this child and her family, and to other families affected by such a policy. This faculty member's child has been prescribed medically necessary hormone medication to treat her gender dysphoria. Without access to this medication and to her clinicians, the child will be at risk of again experiencing the well-known and serious effects of untreated gender dysphoria.

337.    Should the administration cut additional federal funds to the UCs, the impacts would be even more wide-ranging and catastrophic. Faculty across the UC system who are members of AAUP, AFT, the Campus FAs, and CUCFA would see the funding required to complete research and other essential work evaporate.

338.    For example, one UCLA professor—who is a member of AAUP, AFT, the UCLA FA, and a representative from the UCLA FA to CUCFA—was recently notified that the funding associated with a federal grant for foreign language learning, on-campus area studies programs, and overseas research that supported her work was no longer available. This professor was no longer able to fund a visiting expert who was to evaluate her students' work, and if federal grant funding does not continue, neither she nor her students will have the financial or logistical support necessary to engage in the overseas field work that is at the heart of her discipline.

339.    AAUP, AFT, CUCFA, and the individual FAs have themselves suffered harms as a result of Defendants' course of conduct.

340.    As part of their core organizational activities, the AAUP and AFT regularly consult, work with, and represent local chapters and individual members regarding academic freedom, faculty governance, and other issues involving the employment relationship between university employees and their employers, including but not limited to collective bargaining. Through their local chapters, AAUP and AFT also provide for the representation of individual members regarding academic freedom, shared governance, and due process issues in proceedings before their university employers. AAUP and AFT perform these activities on behalf of members at UC. Investigations of individual complaints of institutions violating academic freedom principles in relationship to AAUP members are authorized by the Executive Director and conducted by a subcommittee appointed by the Executive Director.

341.    The AAUP also specifically maintains a standing committee, known as Committee A on Academic Freedom and Tenure, which "[p]romotes principles of academic freedom, tenure, and due process in higher education through the development of policy documents and reports relating to these subjects and the application of those principles to particular situations that are brought to its attention."

342.    As another example, in 2024, the AFT launched a multi-year, million-dollar campaign to support its higher-education chapters in promoting increased public investment in higher education, safeguarding free speech and academic freedom on campuses, and establishing meaningful job security for higher-education workers while ending contingent employment for academic workers. As part of this campaign, the AFT has hosted a series of organizing webinars, providing its higher education members with the skills they can use to shape and strengthen their own campaigns to support academic freedom,

make higher education more accessible, and ensure contingent faculty have appropriate job security and a livable wage.

343.    The AFT also administers the AFT Defense Fund, which provides funding to members for legal proceedings involving, among other subjects, violations of academic freedom, enforcement of tenure rights, and other threats to job security.

344.    Defendants' actions have directly impaired these and other activities of Plaintiffs.

345.    Defendants' actions have undermined and eroded the longstanding principles of academic freedom, shared governance, and due process that AAUP and AFT previously helped secure at UC and other institutions where their members are employed. As a direct result of Defendants' actions, UC and other universities no longer adhere to these principles.

346.    Defendants' actions have made it more difficult and resource-intensive for Plaintiffs to carry out their representation of individual members. Because Defendants have pressured UC and other universities to abandon their commitment to academic freedom, shared governance, and due process principles, Plaintiffs must now expend more time and money to ensure that their members' rights in these regards are adequately protected. In particular, AFT and AAUP anticipate that they will have to make significantly more expenditures from their respective Defense Funds to provide for the legal representation of individual members as a direct result of Defendants' actions and UC's potential capitulation to Defendants' demands.

347.    Defendants' actions have also made it more difficult and resource-intensive for Plaintiffs to provide accurate and effective guidance to their chapters and members regarding these principles. Plaintiffs have had to divert staff and financial resources to address the significant influx of inquiries from chapter leaders and members regarding the effect of such actions on members' academic freedom, shared governance, and due process rights, and to ensure that individual members are adequately represented before their university employers. In addition to responding to such individual requests, staff for Plaintiffs have had to conduct nationwide calls and virtual meetings with chapter leaders regarding Defendants' actions and how to represent individual members in the face of such actions. The AAUP has sent staff who would otherwise be performing other duties to UCLA to support the UCLA FA. And AAUP leadership has diverted a great deal of time and resources to supporting faculty across the UCs

who are facing the various challenges posed by Defendants' threats and funding cuts, and the UC's actions in response to those threats and funding cuts.

348.    Defendants' actions have also caused a pervasive sense of fear and intimidation among AAUP and AFT's members. Because of Defendants' actions and the threats of further cuts to research and other federal funding, some AAUP/AFT members no longer feel comfortable participating in and supporting the AAUP's activities, or asserting their academic freedom, shared governance, and due process rights.

349.    CUCFA and all the affiliated campus-based FAs have been forced to devote much of their scarce resources to advocating for their members' continued federal funding and the opportunity to continue members' research in an unrestricted fashion consistent with scientific norms and academic freedom. This has included helping faculty navigate the obscure internal procedures implicated in Defendants' attacks on protected political speech, pressing UC administrators for transparency about the scope of federal funding reductions, and advising colleagues on ways to recover lost federal resources and mitigate their impact on FA members' own salaries and research and on their postdoctoral researchers and graduate student workers. This has prevented the CUCFA and FAs from being able to devote the necessary resources to serving their core mission of advocating with the UC for improvements to the working conditions of their members. Some FAs also report struggling to recruit and expand their membership because of a concern by some faculty that joining could cause them or their research to be targeted. Some FAs have felt compelled to chill their own speech in order to protect their members and their campus. For example, one FA reports avoiding discussion of Palestine in communications with members despite interest in the issue among the members and faculty.

### (2) AFSCME and Its Members Have Been and Will Continue to Be Irreparably Harmed.

350.    In negotiations with AFSCME over AFSCME members' terms and conditions of employment, the UC has cited federal funding cuts and federal demands for financial penalties as reasons to demand concessions from AFSCME and its members, including staffing cuts. For example, on March 19, 2025, the UC announced a systemwide hiring freeze. The UC's stated reason for the freeze was to

prepare for federal cuts to "lifesaving research, patient care, and education support."[199] As a result of this freeze, the UC has not hired new people into AFSCME-represented positions, diminishing AFSCME's membership and burdening AFSCME's existing members by depriving them of the staffing they need in their work.

351.    In June 2025, the UC announced mass layoffs of AFSCME patient care technical worker members from UCSD Health and UCSF Health, citing a lack of funds. UCSF told AFSCME that layoffs and involuntary reductions in time were the "result of a loss of federal grant funding."

352.    On or about August 1, 2025, the UC advised AFSCME that due to the federal government's suspension of research funding to UCLA, the UC would be "assessing potential impacts on University operations, including potential employment impacts," meaning layoffs and/ or other takeaways from AFSCME members.

353.    The collective bargaining agreements between AFSCME and the UC expired by their own terms on July 21, 2024 and the parties have been in negotiations for more than sixteen months. The cuts to federal funding and threats of future cuts have contributed to a paralysis in negotiations. This has required AFSCME's members to continue to work without a contract and required AFSCME to continue to spend the majority of its staff time and considerable resources—several tens of thousands of dollars— on its campaign to insist that the University bargain with the Union in good faith and reach a fair agreement.

354.    Defendants' actions and threats have also caused a pervasive sense of fear and intimidation among many of AFSCME's members. For example, more than 40 percent of AFSCME's members are Latino and a substantial number are immigrants, many of whom are living in acute fear that they or their family members will be rounded up and detained (or worse) by ICE. These fears arise in the context of widespread reports that ICE has harassed and/or detained Latino people who are U.S. citizens or are otherwise authorized to be in the United States, simply on the basis of their perceived race or ethnicity.

---

[199] Michael V. Drake, *A message from UC President Michael V. Drake on the University of California's financial outlook*, UC News (Mar. 19, 2025), https://ucnet.universityofcalifornia.edu/employee-news/president-drake-on-the-university-of-california-financial-outlook/.

355.    On June 24, 2025, ICE agents entered the Emergency Department of Ronald Reagan UCLA Medical Center where AFSCME members work in a variety of roles such as ER Techs, nurse assistants, admissions and janitorial services.[200] Armed ICE agents wearing military-style clothes with masks covering their faces remained inside the patient care area of the emergency department for more than four hours. A van of three to four more agents waited parked outside the main doors where patients enter and exit. The impact on the workplace and healthcare services was immediate and damaging. Staff feared for their own safety and the safety of patients and co-workers and impeded in their ability to perform their jobs providing frontline assistance to emergency room patients.

356.    The adverse impact did not end when ICE left. Some AFSCME members feared going to work in the days after. In addition, on information and belief, some AFSCME members and members of the public were afraid to seek healthcare because of the risk of encountering masked, armed ICE agents again.[201]

357.    On or about August 6, 2025, the UC announced a pending new policy that expands ICE's access to Ronald Reagan UCLA Medical Center, Santa Monica UCLA Medical Center, Orthopedic Hospital, and Resnick Neuropsychiatric Hospital at UCLA, and UCLA West Valley Medical Center and limits workers' ability to enforce their rights and protect the rights of patients. Despite California law requirements to do so, the revised policy does not require federal agents to produce a warrant or court order or consistently demonstrate that they have legal custody of a detained patient before they may enter patient care areas of the facility. Nor does the policy require administrators to insist that ICE officers identify themselves, remove their masks, or defer to the clinical decisions of health care providers.

358.    On information and belief, the UC changed this policy as a result of threats to withdraw federal funding if UCLA did not facilitate cooperation with ICE.

359.    As a result of Defendants' threats, some AFSCME members  have been concerned about going to work or about receiving medical care at UCLA medical facilities. These actions have required

---

[200] Clara Harter and Jaweed Kaleem, *ICE agents entered UCLA Ronald Reagan Medical Center. It wasn't a raid, officials say.*, L.A. Times (June 24, 2025) https://www.latimes.com/california/story/2025-06-24/ice-agents-enter-ucla-medical-center-to-seek-emergency-care-for-detainee.
[201] *Id.*

AFSCME to spend resources counseling members about immigration-related issues and educating them about their legal rights.

360.    AFSCME also has members who identify as transgender. These members work at multiple UC locations, including at UCLA. AFSCME and its membership have fought for and won protections for all members from discrimination based on gender, sexual orientation, gender identity and gender expression, among other categories. AFSCME's transgender members would be substantially harmed if in response to the federal demands and threats the UC imposed new restrictions on transgender employees, such as restrictions on bathroom access or if the UC imposed policies defining "sex" or "gender" in ways that deny transgender members' identity. In addition to working for the UC, AFSCME's members and their families are consumers and patients of UC healthcare services. The UC encourages AFSCME members to participate in UC-affiliated healthcare benefit plans and more than 10,000 of AFSCME's members have access to UC healthcare as part of their employee benefits. Eliminating access to necessary medical care at UC medical centers such as access to gender-affirming care for minors would harm AFSCME members who need or may need such care for their families and would substantially degrade the quality of their healthcare benefit. On information and belief, AFSCME has members with minor children who require gender affirming care.

### (3)  UPTE-CWA and Its Members Have Been and Will Continue to Be Irreparably Harmed.

361.    The UC has cited threats of federal funding cuts and federal demands as reasons to demand concessions from UPTE and its members, including staffing cuts. UC laid off UPTE members at UCSF Health including workers who held critical roles that directly provided and supported patient care, such as rehab specialists, clinical laboratory scientists and physical therapists. The UC pointed to "serious financial challenges" as its justification for the layoffs, which was understood to include federal funding cuts.[202] The UC also laid off UPTE members at UC San Diego, including approximately sixteen career animal technicians who perform critical work for ongoing research studies aimed at battling

---

[202] Madilynne Medina, *'Heartless' mass firings at major Bay Area health care network spark pushback*, SFGATE (July 8, 2025), https://www.sfgate.com/bayarea/article/heartless-firings-bay-area-health-care-network-20761887.php.

serious diseases like cancer and Alzheimer's. The UC claimed that "mounting financial pressures caused by federal impacts on health care" was a reason for the layoffs.[203]

362.    The collective bargaining agreements between UPTE and the UC expired by their own terms on September 30, 2024 (for healthcare professionals) and on October 31, 2024 (for technical employees and research support employees). The parties have been in negotiations for more than a year. The cuts to federal funding and threats of future cuts have contributed to a paralysis in negotiations, which has required UPTE's members to continue to work without a contract and required UPTE to continue to spend the majority of its staff time and considerable resources—several tens of thousands of dollars—on its campaign to insist that the University bargain with the Union in good faith and reach a fair agreement.

363.    Defendants' actions and threats have also caused a pervasive sense of fear and intimidation among many of UPTE's members and have chilled UPTE members in the exercise of their First Amendment rights. For example, UPTE has many members whose jobs are funded by federal grants, including members who are personally named in those grants. One such member works under a federal grant that funds a long-term study on children's health. In the spring of 2025, several years into the grant, the federal agency required a reduction in the budget to remove so-called "diversity, equity and inclusion" components of the project. The federal agency required the project to eliminate one of the aims of the study that included the word "equity" in the description and required the project to terminate its association with a trusted community organization that had a word disfavored by the Trump administration in its name. The organization was one of the grant's original principal investigators and provided valuable support for the project, including for the work of the UPTE member specifically. The threatened cut in grant funding placed the UPTE member at potential risk of layoff. Through a federal court injunction in the *Thakur* case, the conditions on federal funding were subsequently lifted, but the UPTE member remains worried that the funding will be lost if the project were to continue as originally planned and maintain its association with the community organization.

---

[203] Eric S. Page, *UC San Diego Health laying off hundreds of workers*, NBC San Diego (June 23, 2025), https://www.nbcsandiego.com/news/local/uc-san-diego-health-laying-off-hundreds-of-workers/3854437/.

364.    The risk of future cuts has led the UPTE member and her colleagues to self-censor in the hope that by doing so, their project will stay out of the federal agency's crosshairs. For example, the UPTE member now avoids talking to the press about the project's work despite the help that media coverage could provide the project in recruiting participants and despite public interest in the subject of the grant. The UPTE member and her colleagues have also removed from their public-facing documents words or expressions known to be disfavored by the Trump administration (e.g., "equity," "race," "justice," "diversity," "transgender") and citations to anything including those words and are censoring themselves from using such terms publicly for fear the funding will be cut.

365.    Another UPTE member is a staff research associate whose career and future as a scientific researcher has been jeopardized. She has worked in research at UC for more than a decade and was recently hired for a project that seeks to help diagnose and cure genetic mutations in newborns. However, the federal government has frozen the project's funding and the UPTE member does not know whether she will be able to keep her job and perform this valuable work. Her professional future is uncertain and for the first time in over a decade, she is having to look outside of UC for work. Her job search has shown her that the job market is extremely competitive right now because numerous people are in similar situations to her. Despite her qualifications, she is facing the prospect of not being able to advance her career as she had hoped and potentially having to leave scientific research altogether.

366.    UPTE also has members who are transgender. These members work at multiple UC locations, including at UCLA. UPTE and its membership have fought for and won protections for all members from discrimination based on sex, sexual orientation, gender identity, gender expression. UPTE's transgender members would be substantially harmed if the UC imposed new restrictions on transgender employees, such as restrictions on bathroom access or if the UC imposed policies defining "sex" or "gender" in ways that deny transgender members' identity.

367.    In addition to working for the UC, many UPTE's members and their families are consumers and patients of UC healthcare services. The UC encourages UPTE members to participate in UC-affiliated healthcare benefit plans and the vast majority of UPTE's members have access to UC healthcare as part of their employee benefits. Restrictions on access to necessary medical care at UC medical centers such as access to gender-affirming care for minors would harm UPTE members who

1    need or may need such care for their families and would substantially degrade the quality of their

2    healthcare benefit. On information and belief, UPTE has members with minor children who require

3    gender affirming care.

### (4)  UC-AFT's Members Have Been and Will Continue to Be Irreparably Harmed.

368.    UC-AFT members' jobs, privacy, free speech rights, and academic freedom have been and will continue to be harmed. More than 200 UC-AFT represented lecturers and librarians have been laid off or faced reductions in time and the University has justified these actions as a direct or indirect result of federal funding cuts. Some layoff notices from the University to UC-AFT members have expressly cited federal funding cuts as a cause.

369.    Defendants' threats and actions have also generated a pervasive sense of fear and intimidation among UC-AFT members. UC-AFT member lecturers fear teaching material in their field if it touches on subjects perceived to be disfavored by Defendants and have at times declined to teach such material because of a concern that Defendants would use the material to further threaten the University with sanctions and funding cuts. This fear is reasonable given the cuts the University community has already seen, especially to grants related to subjects that the Trump administration disfavors.

370.    For example, a UC-AFT member and lecturer at UCLA reports substantial fears among her colleagues who teach courses in ethnic studies. They have considered whether they need to change their course syllabi to avoid cuts to their department or school.

371.    Another UC-AFT member and lecturer, on information and belief, removed a unit in his class because it contained material that offered a critique of a portion of the U.S. economy. The lecturer feared that teaching the material could cause the lecturer or department to be targeted by the federal government.

372.    News that on or about September 4, 2025, UC Berkeley turned over 160 names of students, faculty and staff to the federal government in connection with the antisemitism investigation has exacerbated UC-AFT members' fears and increased the chilling of the members' speech and academic freedom. The 160 names included at least one UC-AFT member.

373.    UC-AFT members at UC Berkeley report being afraid to attend any protest or rally out of concern that they will end up on a "list" and have their names and contact information divulged to the federal government and suffer an as-yet unspecified harm as a result. Some members even report being fearful about being on campus.

374.    Defendants' demand that UC cease providing certain types of healthcare threatens serious harm to UC-AFT members. UC-AFT members and their families are consumers and patients of UC's healthcare services and medical systems. Defendants' demand that UC eliminate gender affirming care for minors at UC medical centers would seriously degrade the healthcare benefits UC-AFT members and their dependents receive and potentially place the health of UC-AFT members' minor children at risk. For example, UC-AFT has at least one member whose child received gender affirming care from UCLA Medical Center as a minor. Had UC medical center categorically refused to provide such care when this family needed it, this child could have suffered serious ongoing health effects.

375.    UC-AFT also has members who are transgender themselves. UC-AFT's transgender members would be substantially harmed if in response to the federal demands and threats the University imposed new restrictions on transgender employees, such as if the University imposed policies defining "sex" or "gender" in ways that deny transgender members' identity or restricts access to restrooms.

**(5)    AFSCME, UPTE, UC-AFT, UC Santa Cruz Faculty Association, CNA/NNU, UAW, and UAW Local 4811 and Their Members Have Been and Will Continue to Be Irreparably Harmed**

376.    Plaintiffs AFSCME, UPTE, UC-AFT, UC Santa Cruz Faculty Association, CNA/NNU, UAW, and UAW Local 4811 are labor unions under California with the exclusive legal right to bargain with the UC on behalf of their members over their terms and conditions of employment. This includes the right to bargain with the UC over access to the UC's property to communicate with UC employees the union represents, distribute literature, investigate workplace conditions, assess contractual and statutory compliance, and voice the union's and its members concerns about working conditions. This also includes the right to bargain over time, place, and manner speech restrictions, and the location of union protests. These rights are not the University's to give away. Yet the administration's demands that the UC unilaterally impose new restrictions on access and protest activity would deny these unions their rights to negotiate such matters directly with UC.

377.    Plaintiffs AFSCME Local 3299, UPTE, UC-AFT, UC Santa Cruz Faculty Association, CNA/NNU, UAW, and UAW Local 4811 would also be irreparably harmed if in response to the federal demands and threats, the University imposed policies defining "sex" or "gender" in ways that deny transgender members' identity and make them unwelcome in the workplace as would the imposition of new restrictions on transgender employees, such as restrictions on restroom access. These policies are contrary to these unions' missions to improve the working conditions of their respective members, and contrary to contractual language the unions have negotiated to prohibit discrimination based on gender identity. The unions have spent resources to win protections for transgender members in bargaining which protections could be eviscerated if the UC gave in to the federal demands and threats.

378.    With respect to CNA/NNU, RNs have a professional duty to provide the highest level of care to all patients, using evidence-based scientific knowledge. The elimination of diversity, equity, and inclusion within the UC system will interfere with RNs' professional duties. Such programs in healthcare settings are necessary to ensure that racial bias does not interfere with the delivery of appropriate medical care. Implicit biases have resulted in, e.g., disparate maternal mortality rates along race lines, and pervasive unscientific beliefs about pain tolerance in non-white patients. These negative health outcomes can be addressed by education about implicit biases, and prioritizing diversity in medical school admissions and hiring of healthcare workers. Toward this end, CNA/NNU and UC have negotiated the formation a joint labor management committee on diversity, equity, and inclusion. The committee is tasked with carrying out education, training, and other steps toward addressing racial and ethnic disparities in health outcomes and to promote and improve the delivery of culturally sensitive health care. If all such programs are eliminated as a result of the Trump administration's threats, CNA/NNU will lose this negotiated benefit. CNA/NNU will no longer be able to rely on UC to be a partner in these programs that are critical to its members' professional duties, and CNA will need to increase the resources that it expends on these programs.

### (6)  UAW and UAW 4811's Members Have Been and Will Continue to Be Irreparably Harmed.

379.    Plaintiffs UAW and Local 4811, as part of being the joint collective bargaining representatives for 48,000 employees at the University of California, advocate for members' job security,

fair wages, academic freedom, and safe working conditions, including protections from bullying, harassment, and discrimination. In addition, UAW and Local 4811 have a long-standing history at the UC of supporting the expansion of civil and workers' rights including non-discrimination protections, as well as increased federal funding for scientific research, due to its importance for innovation, economic growth, and public health.

380.    Defendants' actions have directly impaired these and other central activities of UAW and Local 4811. UAW and Local 4811 have been forced to spend significant time and resources responding to the fallout from Defendants' actions, including counseling members who anticipate loss of jobs or funding and connecting members with outside resources, instead of doing the representational, organizing, and advocacy work that is its core mission. Notably, UAW and Local 4811 are currently in the midst of negotiations with the UC for a new collective bargaining agreement covering 36,000 academic student employees. UAW is also bargaining and preparing to bargain first contracts for two new bargaining units covering 15,000 professional staff employees at the UC. UAW and Local 4811 have had to divert their staff and their financial resources from these core activities to address the significant influx of inquiries from members regarding the effect of the administration's actions on research funding, academic freedom, and due process rights.

381.    UAW Local 4811 members have been and will be directly harmed by the current funding freezes, terminations, and potential additional cuts. Federal grants represent the principal funding source for UAW Local 4811 members in non-student academic employee positions such as postdoctoral scholar, researcher, and project scientist. The scientists in these positions rely on outside grant funding in order to maintain their research and employment at UC, and this funding largely comes from the federal government. Researchers and project scientists are also often named as a Principal Investigator on federal grants. The suspension of federal grants on or about July 30, 2025 resulted in immediate suspension of numerous research projects conducted by UAW Local 4811 members. These employees have had to redirect their time away from critical, time-sensitive research to instead search for replacement funding. Without replacement funding, these employees risk losing their positions at UC. Even if replacement funds are located, no other funding can replace the academic prestige that federal funding grants confer on the recipient scientist.

382.    Federal grants are also a significant source of funding for UAW Local 4811 members who are graduate student researchers at UC. A graduate student researcher position is a salaried employment position that UC graduate students rely on as their source of income to pay rent and living expenses. Student employees with graduate student researcher positions at a 25 percent appointment or above also have their tuition reimbursed by UC. The loss of federal grants means that the affected UC laboratories will lose their ability to hire graduate student researchers, resulting in many UAW 4811 members losing both their employment, as well as their eligibility for tuition reimbursement. Cutting federal grants will also interrupt the thesis and dissertation research UAW 4811 members are completing thus slowing the timeline to degree completion and causing some members to reconsider their projects or even drop out of their programs.

383.    UAW Local 4811 members employed at UC have also curtailed their public speech out of fear of having research grants cancelled. This includes some members decreasing their use of social media to post their views on current political topics, as well as other members deciding not to travel to and speak at research conferences they previously attended in order to publicize their work and collaborate with other scientists.

384.    A UAW Local 4811 member who is an associate project scientist in the Department of Pediatrics of the David Geffen School of Medicine at UCLA reports that their NIH research grant funding was suspended on July 30, 2025. The research project involved developing specific T cells to target solid cancers. The project had four UC employees who drew their salaries from that funding grant before it was suspended, the member as well as a postdoctoral scholar and two staff research associates. The suspension has effectively halted new development of the project, including proposed animal model experiments. Due to other grants the four employees remain employed for now, but if funds remain frozen there will have to be layoffs, and the supervising Faculty member might depart for another university, resulting in the whole laboratory where this research project resides being shut down.

385.    Another UAW Local 4811 member who is an Assistant Project Scientist II in the Division of Cardiology of the School of Medicine at UCLA had his grant funding suspended. The suspended NIH grant, for which this member was the Principal Investigator, was a K99/R00 MOSAIC award to investigate wildfire smoke toxicology and effects on atherosclerosis, which is a type of cardiovascular

disease. The grant termination has caused the suspension of the research project and the member's salary being reduced by 50%. The member has had to devote his time to finding new funding sources to support his salary and research. The participation of two undergraduate student research volunteers, who previously assisted on the project but were not financially supported by it, has ceased, causing them to lose invaluable experience and training.

386.    A UAW Local 4811 member who is a graduate student researcher in the Division of Pulmonary and Critical Care of the School of Medicine at UCLA reports that his research supported by an NIH grant was frozen on or about July 31, 2025. Under the supervision of a Principal Investigator, his research focuses on sex differences in lung cancer prevention, with an emphasis on metabolism, epigenetics, and tumor progression, and he previously received assistance from five undergraduate researchers and one project scientist. The grant freeze has forced the graduate student researcher to pause in vivo experiments, which are essential to studying sex differences in lung cancer. As a result, the laboratory's capacity has been significantly reduced; four of the five undergraduates have left the laboratory, and the project scientist's position has been terminated. This has directly stalled progress on his research project, limited his training opportunities as a graduate student, which could harm his future career prospects.

### (7)    Teamsters Local 2010 and Its Members Have Been and Will Continue to Be Irreparably Harmed.

387.    The Trump administration's federal funding cuts have harmed Teamsters Local 2010 and its members, and the administration's ongoing course of conduct threatens further harm. The University of California instituted a hiring freeze that has reduced the membership of Teamsters Local 2010 and overburdened current members. It has laid off Teamsters Local 2010 members and has threatened additional layoffs due to losses of federal funding. The University has threatened to lay off a large number of Teamsters Local 10-represented positions at the Lawrence Berkeley National Laboratory, which will damage Teamsters Local 2010's members and decimate critical research and development in National defense.

388.    Teamsters Local 2010 is scheduled to begin collective bargaining negotiations in September 2025 for its largest bargaining unit comprising over 18,000 employees. The collective

bargaining negotiations and the ability of Teamsters Local 2010 to win needed cost-of-living increases for its members will be severely hampered by these funding cuts.

389.    Due to the Defendants' statements and actions concerning UC, Teamsters Local 2010 members have expressed fear in participating in protests or taking collective action or posting on social media. Teamsters Local 2010 members have engaged in self-censorship in what they wear and say.

## CAUSES OF ACTION

### COUNT I
**Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions;**
**Violation of First Amendment Freedom of Speech**
**(Unconstitutional Coercion; Retaliation; Content and Viewpoint Discrimination)**
**(Against All Defendants)**

390.    Plaintiffs incorporate and reallege all of the above paragraphs as if fully set forth herein.

391.    The First Amendment secures Plaintiffs' and Plaintiffs' members' right to free speech and academic freedom, including the right to pursue research and express different viewpoints and political beliefs without retaliation, punishment, or deterrence based on the subject matter of that research or those viewpoints and beliefs.

392.    "[A]cademic freedom ... is of transcendent value to all of us and ... is therefore a special concern of the First Amendment." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967); *accord Demers v. Austin*, 746 F.3d 402, 411 (9th Cir. 2014) ("[T]eaching and academic writing are at the core of the official duties of teachers and professors. Such teaching and writing are 'a special concern of the First Amendment.'") (quoting *Keyishian*, 385 U.S. at 603); *Meriwether v. Hartop*, 992 F.3d 492, 505 (6th Cir. 2021) ("[T]he First Amendment protects the free-speech rights of professors when they are teaching.") (citing *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 249-50 (1957) (plurality op.); *Keyishian*, 385 U.S. at 603; *Healy v. James*, 408 U.S. 169, 180-81 (1972)).

393.    Students have the First Amendment rights to engage in protest on a public university campus, including in public fora and limited public fora. *See Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981) ("[S]tudents enjoy First Amendment rights of speech and association on the campus[.]"). That includes the right to engage in anonymous protest. *See Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) ("[C]ompelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action"); *Buckley v.*

*Am. Const. Law Found.*, 525 U.S. 182, 199 (1999) ("The injury to speech is heightened for the petition circulator because the badge requirement compels personal name identification at the precise moment when the circulator's interest in anonymity is greatest.").

394.    The First Amendment prohibits the government from using threats of legal sanction and other means of coercion to achieve the suppression of disfavored speech or academic freedom. Nor may the government coerce a third party to punish, suppress, or control speech on the government's behalf. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024). "[F]or decades it has been clearly established that the First Amendment tolerates neither laws nor other means of coercion, persuasion or intimidation 'that cast a pall of orthodoxy' over the free exchange of ideas in the classroom." *Dube v. State Univ. of N.Y.*, 900 F.2d 587, 598 (2d Cir. 1990) (quoting *Keyishian*, 385 U.S. at 603).

395.    The First Amendment likewise precludes the government from attempting to control academic thought and discourse on university campuses, and from interfering with a university's curriculum or decisions concerning who may teach or areas of research.

396.    Defendants' actions alleged herein violate the First Amendment because they constitute coercion and/or intimidation that is intended to and has the effect of inhibiting the free exchange of ideas and promoting a government orthodoxy. Defendants' actions alleged herein have the purpose and effect of establishing a system of both direct and indirect censorship and content-based viewpoint discrimination against faculty, students, academic employees, and staff employees at the UC. Defendants undertook such unlawful conduct with the intent to obstruct, chill, deter, and retaliate against Plaintiffs' members' core speech and academic freedom rights.

397.    Defendants' actions alleged herein further violate the First Amendment by targeting for retaliation and suppression specific areas or topics of research, scholarship, and other forms of expression based on content and viewpoint, and by seeking to punish the UC, its faculty, students, academic employees, and staff employees for engaging in speech disfavored by the federal government.

398.    Defendants' actions alleged herein further violate the First Amendment by infringing upon Plaintiffs' and their members' right to make expressive choices about what third-party speech to host and to provide a forum for the pursuit of intellectual and academic inquiry and debate.

399.    Defendants' actions alleged herein further violate the First Amendment because they constitute threats of legal and financial sanctions and conditions on federal funding with the purpose and effect of infringing on the free speech and academic freedom rights of UC faculty, students, academic employees, and staff employees, including Plaintiffs' members. Each of these actions standing alone constitutes an independent First Amendment violation.

400.    Defendants have terminated hundreds of millions of dollars in funding, including for Plaintiffs' members' research, without any hearing or process in violation of Title VI and Title IX and without any other statutory or other legal authority. The First Amendment protects an academic's ability to pursue research and scholarship free from arbitrary interference by the government. Independent of any other action, the unjustified halting of Plaintiffs' members' research and scholarship on an unlawful basis violates the First Amendment.

401.    Defendants' concerted efforts to suppress disfavored expression on the UC's campuses has already resulted in a sweeping chilling effect on the speech of Plaintiffs' members as well as other faculty and students.

402.    Defendants' unlawful and intentional actions are not justified by a substantial or compelling government interest and are not narrowly tailored to serve any such interest.

403.    Federal courts have the equitable power to enjoin unlawful actions by executive officials. *See, e.g.*, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). This Court can and should exercise its equitable power to enter appropriate declaratory and injunctive relief.

### COUNT II

**Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions; Separation of Powers (Against All Defendants)**

404.    Plaintiffs incorporate and reallege all of the above paragraphs as if fully set forth herein.

405.    The Constitution vests the legislative power, including the spending power and the authority to place conditions on federal spending, in Congress. U.S. Const., art. I. Federal legislation must be passed by both chambers of Congress before it may be presented to the President, and, if signed, become law. *Id.*; *I.N.S. v. Chadha*, 462 U.S. 919, 951 (1983).

406.     The Constitution vests executive power in the President, U.S. Const., art. II, and imposes on the President a duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, §3.

407.     The President and Executive Branch have no constitutional power to unilaterally enact, amend, or repeal parts of duly enacted statutes. *Clinton v. City of New York*, 524 U.S. 417, 438–39 (1998). The declared purpose of separating and dividing the powers of government was to "diffuse[] power the better to secure liberty." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring); *see also Bowsher v. Synar*, 478 U.S. 714, 721–22 (1986) ("Justice Jackson's words echo the famous warning of Montesquieu, quoted by James Madison in The Federalist No. 47, that 'there can be no liberty where the legislative and executive powers are united in the same person, or body of magistrates'...." The Federalist No. 47, p. 325 (J. Cooke ed. 1961).").

408.     Congress exercised its Article I legislative and spending authority to authorize the federal grants and contracts that Defendants have awarded to the UC, including the federal grants and contracts that Defendants canceled on July 30-August 1.

409.     Congress also exercised its authority to adopt the carefully defined rules and procedures set forth in Title VI and Title IX that set forth the procedural requirements for termination of federal financial assistance. Defendants did not comply with these statutory requirements before summarily terminating $584 million in federal funding.

410.     None of the funds received by the UC have a congressionally authorized condition requiring the UC to comply with any of the demands in the August 8 Demand Letter or subjecting the UC to review in the manner Defendants have undertaken as alleged herein.

411.     No Article II constitutional power authorizes Defendants to cancel or withhold duly authorized federal funding on grounds not authorized by statute.

412.     No law or statute, including Title VI, Title VII, and Title IX, requires the UC to comply with the demands in the August 8 Demand Letter. The demands in the August 8 Demand Letter are not necessary to ensure compliance with Title VI, Title VII, or Title IX, or any other federal civil rights law, and Defendants lack authority to impose those demands or to take actions to enforce compliance with them.

413.    Neither Title VI, Title VII, Title IX, nor any other statutory provision authorized the Executive Branch to condition the UC's restoration of the $584 million in canceled grant funds or to condition the UC's further receipt of federal funds on the payment of $1 billion, or on UC's agreement to take actions not necessary to achieve compliance with Title VI, Title VII, or Title IX.

414.    No provision of the Constitution authorizes the Executive Branch to enact, amend, or repeal statutes, including Title VI, Title VII, and Title IX and appropriations approved and signed into law.

415.    Defendants' immediate cancellation of federal grants and contracts was not authorized by statute, overrode the direct Congressional authorization of federal funding, and overrode the express statutory limitations in Title VI and Title IX that Congress has placed on the cancellation of duly authorized federal funding.

416.    Defendants' imposition of additional conditions on the UC's federal funds beyond those set forth in Title VI, Title IX, and the authorizing funding statutes was not authorized by statute, overrode the direct Congressional authorization of federal funding, and overrode the express statutory limits in Title VI and Title IX that Congress has placed on the termination or refusal to grant of duly authorized federal funding.

417.    Defendants' actions as alleged herein are not authorized by any Article II Executive power but rather are an unconstitutional usurpation of Congress's spending power, an unconstitutional effort to amend congressional appropriations by attaching conditions not imposed by Congress, and a violation of the separation of powers. Defendants' actions are therefore *ultra vires*.

418.    Federal courts have the equitable power to enjoin unlawful actions by executive officials. *See, e.g.*, *Armstrong*, 575 U.S. at 326-27. This Court can and should exercise its equitable power to enter appropriate declaratory and injunctive relief.

## COUNT III

### Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions; Unconstitutional Conditions / Spending Clause (Against All Defendants)

419.    Plaintiffs incorporate and reallege all of the above paragraphs as if fully set forth herein.

420.    The "unconstitutional conditions" doctrine prohibits the federal government from using Congress' spending power "to induce the States to engage in activities that would themselves be unconstitutional." *South Dakota v. Dole*, 483 U.S. 203, 210-11 (1987). "Thus, for example, a grant of federal funds conditioned on invidiously discriminatory state action or the infliction of cruel and unusual punishment would be an illegitimate exercise of the Congress' broad spending power." *Id.*

421.    The doctrine also prohibits the government from "requir[ing] a person to give up a constitutional right … in exchange for a discretionary benefit[.]" *Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994). Thus, a funding condition is unconstitutional if it "unconstitutional[ly] burden[s] … First Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013).

422.    Defendants' actions as alleged herein have infringed and impermissibly burdened the First Amendment and other constitutional rights of UC faculty, students, academic employees, and staff employees, including Plaintiffs' members, by imposing unconstitutional conditions on the UC's receipt of federal funds.

423.    Defendants' course of conduct as alleged herein, including its August 8 Demand Letter, unconstitutionally conditions restoration of the unlawfully terminated $584 million and conditions UC's eligibility for all federal funding on UC's agreement to censor and suppress speech and academic freedom and engage in viewpoint discrimination in violation of the First Amendment, including but not limited to through restrictions on protests and expressive activities, sharing information about such expressive activity by faculty, academic employees, staff employees, and students with Defendants, and ceding control over certain curriculum and faculty hiring and promotion decisions to an external monitor.

424.    Defendants' conditions do not just "define the limits of the government spending program" by "specify[ing] the activities [the government] wants to subsidize"; rather, they seek to "leverage funding" to regulate unrelated aspects of campus life, including activities protected by the First Amendment, "outside the contours" of any discrete federal program. *See Agency for Int'l Dev.*, 570 U.S. at 214–15.

425.    Plaintiffs and Plaintiffs' members have been, and are being, harmed by Defendants' actual and threatened imposition of unconstitutional conditions on the receipt of federal funding.

426.    Federal courts have the equitable power to enjoin unlawful actions by executive officials. *See, e.g.*, *Armstrong*, 575 U.S. at 326-27. This Court can and should exercise its equitable power to enter appropriate declaratory and injunctive relief.

### COUNT IV

### Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions; Violation of Tenth Amendment / Spending Clause (Against All Defendants)

427.    Plaintiffs incorporate and reallege all of the above paragraphs as if fully set forth herein.

428.    The Tenth Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

429.    As the text of the Tenth Amendment makes clear, the Constitution created a federal government of limited and enumerated powers. *See NFIB v. Sebelius*, 567 U.S. 519, 533-34 (2012) (opinion of Roberts, C.J.) ("In our federal system, the National Government possesses only limited powers; the States and the people retain the remainder.").

430.    No provision of the Constitution delegates to the federal government the power to take over day-to-day management of a private or state university or to control core aspects of its academic mission.

431.    "The Spending Clause of the Federal Constitution … provides Congress broad discretion to tax and spend for the 'general Welfare,' including by funding particular state or private programs or activities." *Agency for Int'l Dev.*, 570 U.S. at 213. "That power includes the authority to impose limits on the use of such funds to ensure they are used in the manner Congress intends." *Id.* However, the federal government cannot use funding limits to circumvent constitutional constraints on the scope of federal power, such as those imposed by the Tenth Amendment. *See id.* at 214; *NFIB*, 567 U.S. at 575-81 (opinion of Roberts, C.J.).

432.    The anti-commandeering doctrine reflects a "fundamental structural decision" in the Constitution, "the decision to withhold from Congress the power to issue orders directly to the States." *Murphy v. NCAA*, 138 S. Ct. 1461, 1475 (2018). The doctrine prohibits the federal government from commanding states to legislate or regulate on the federal government's behalf. *See New York v. United*

*States*, 505 U.S. 144 (1992); *Printz v. United States*, 521 U.S. 898, 925 (1997) ("[T]he Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs.").

433. Federal attempts to regulate via purported funding inducements raise heightened constitutional concerns when, as here, the amount of funding at issue is so large as to be coercive, purported funding conditions are not tied to particular programs directly utilizing those funds, and program recipients are unfairly surprised by post-acceptance or "retroactive" conditions. *See NFIB*, 567 U.S. at 580-81, 584 (explaining that a purported "financial inducement" to participate in a federal program exceeds the scope of the federal government's Spending Clause power where it is "so coercive as to pass the point at which 'pressure turns into compulsion,'" and concluding that the inducement there at issue was unconstitutionally coercive because, as a practical matter, it resembled "a gun to the head" instead of offering "relatively mild encouragement" to adopt and implement a federal regulatory program).

434. Federal funding constitutes nearly one-third of the UC's entire operating budget. Federal grant funding accounts for 52 percent of all UC research funding sources and is the University's single most important source of research funding. Federal student aid programs represent the largest source of financial aid for UC students. Defendants' threat to withhold potentially billions more in federal funding from the UC unless it accedes to the unlawful demands set forth in its August 8 Demand Letter thus constitutes a proverbial "gun to the head" and crosses the line from mere financial inducement to impermissible coercion, in violation of the Tenth Amendment.

435. The August 8 Demand Letter imposes a series of demands that usurp the UC's regulation of core state functions and coerce the UC to instead carry out the Trump administration's federal policies in these areas, in violation of the Tenth Amendment.

436. For example, the August 8 Demand Letter commands that the UC adopt policies that would impinge on the free speech and academic freedom rights of UC faculty, students, academic employees, and staff employees under the California Constitution.

437. The August 8 Demand Letter also commands that the UC adopt policies aimed at ending UCLA's diversity, equity, and inclusion efforts, including a review of policies and programs related to

such efforts in faculty, hiring, retention, and promotion. Such policies are not required under federal law and are inconsistent with California policy. *See SFFA*, 600 U.S. at 230.

438.　　The August 8 Demand Letter also commands that the UC adopt a number of policy changes that infringe on the rights of transgender faculty, students, academic employees, staff employees, and other individuals interacting with the UC System secured under California law and not in conflict with federal law, and which policy changes are not necessary to achieve compliance with Title VI, Title VII, Title IX, or any other federal law. For example, the August 8 Demand Letter demands that UCLA make a public statement adopting and stating that it agrees with the Trump administration's definitions of "male," "female," and "sex," bar gender-inclusive and gender-appropriate use of locker rooms and restrooms, and refuse to provide gender-affirming medical care to individuals under the age of 18. These demands require the UC to violate California laws that are not in conflict with federal law, including but not limited to the Unruh Civil Rights Act, Civil Code §51, and Government Code §11135, which prohibit discrimination on the basis of sexual orientation or gender identity.

439.　　Defendants' course of conduct as alleged herein has crossed the line from financial inducement to impermissible coercion, in violation of the Tenth Amendment.

440.　　Thus, even if Congress had authorized Defendants' ongoing attempt to effectively seize control of the UC, backed up by overt threats to summarily and indiscriminately terminate billions of dollars in funding en masse, any such coercion contravenes the principle of federalism embodied in the Tenth Amendment and exceeds the scope of the federal government's authority under the Spending Clause.

441.　　Federal courts have the equitable power to enjoin unlawful actions by executive officials. *See, e.g.*, *Armstrong*, 575 U.S. at 326-27. This Court can and should exercise its equitable power to enter appropriate declaratory and injunctive relief.

## COUNT V

**Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions;**
**Violation of Fifth Amendment (Due Process; Void for Vagueness)**
**(Against All Defendants)**

442.　　Plaintiffs incorporate and reallege all of the above paragraphs as if fully set forth herein.

443.   The Due Process Clause of the Fifth Amendment to the United States Constitution requires due process of law before the deprivation of a constitutionally protected interest.

444.   Plaintiffs' members have constitutionally protected property interests in funding that supports their salaries and stipends, as well as in their ongoing research. Plaintiffs' members have relied on this funding, and the protections of federal law governing this funding, in pursuing their research, hiring staff, making commitments to research partners, and in many other ways. Plaintiffs' members also have constitutionally protected liberty interests in their freedom of speech and expression, including academic freedom, and in pursuing their livelihoods.

445.   Defendants' termination of federal funding as set forth in this Complaint does not provide the UC or Plaintiffs' members fair notice or a reasonable opportunity to be heard.

446.   The Due Process Clause also prohibits government actions that fail to give fair notice of what conduct is forbidden or required.

447.   Defendants' actions alleged herein establish unconstitutionally vague standards for determining whether federal funding will be terminated and do not tie the cancellation of grants and contracts to specific alleged acts or omissions, much less specific conduct reasonably related to the grants and contracts at issue. Nor have Defendants provided any adequate notice to Plaintiffs' members or to the UC regarding what conduct was forbidden or required to avoid such consequences.

448.   Federal courts have the equitable power to enjoin unlawful actions by executive officials. *See, e.g.*, *Armstrong*, 575 U.S. at 326-27. This Court can and should exercise its equitable power to enter appropriate declaratory and injunctive relief.

## COUNT VI

### Violation of Administrative Procedure Act, 5 U.S.C. §706(2)(A), (C), (D)
### (Contrary to Title VI; Without Observance of Required Procedure)
### (Against Defendants DOJ, Bondi, Terrell, and Funding Agency Defendants)

449.   Plaintiffs incorporate and reallege all of the above paragraphs as if fully set forth herein.

450.   Defendants' July 30-August 1 funding withdrawal and August 8 Demand Letter constitute "[a]gency action made reviewable by statute" under 5 U.S.C. §704 and 42 U.S.C. §2000d-2, as well as "final agency action for which there is no other adequate remedy in a court" under 5 U.S.C. §704, and are therefore subject to judicial review. 5 U.S.C. §§702, 704. The cancellation of grants and

contracts is the ultimate step in the Title VI enforcement process and alters the rights and obligations of the parties with respect to the terms of those grants and contracts, with legal and concrete consequences for Columbia, Plaintiffs, and Plaintiffs' members.

451. The APA directs courts to hold unlawful and set aside agency actions that are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. §706(2)(A).

452. The APA further directs courts to hold unlawful and set aside agency actions that are without observance of procedure required by law. *Id.* §706(2)(D).

453. No lawful grant or contract condition authorized the July 30-August 1 funding withdrawal or August 8 Demand Letter. Nothing in Title VI, Title VII, Title IX, or any other law authorized the funding withdrawal or the conditioning of federal funds on the payment of money or other terms not necessary to achieve compliance with those statutes.

454. Section 602 and applicable, binding regulations with the force of law set forth procedural requirements that must be followed in order to terminate or refuse to grant federal funding for alleged noncompliance with Title VI's substantive requirements. *See, e.g.*, 42 U.S.C. §2000d-1; 28 C.F.R. §§42.106–111 (DOJ); 45 C.F.R. §§611.1–13 (NSF); 45 C.F.R. §§80.6–80.11 (HHS); NIH Grants Policy Statement 4.1.2.1; 10 C.F.R. §§1040.101–131 (DOE).

455. Because Defendants failed to follow these requirements before terminating funding to the University on July 30-August 1 and before demanding compliance with the August 8 Demand Letter as a condition of future funding, Defendants' actions were contrary to law, arbitrary and capricious, and without observance of procedure required by law.

456. Prior to the July 30-August 1 funding withdrawal and August 8 Demand Letter, Defendants did not attempt to achieve voluntary compliance with Title VI or determine that such voluntary compliance could not be achieved. Nor did Defendants provide an opportunity for a hearing or make an express finding on the record as to the University's alleged noncompliance with Title VI. Nor did any "responsible Department official" determine that the University's compliance could not be secured by voluntary means. Moreover, no head of any Federal department or agency filed with any committees of the House and Senate a "full report of the circumstances and the grounds" for the action

terminating or refusing to grant or continue federal assistance to the University because of a failure to comply with Title VI. Nor did thirty days elapse after the filing of any such report. *See, e.g.*, 42 U.S.C. §2000d-1; 28 C.F.R. §42.108(c) (DOJ); 45 C.F.R. §611.8(c) (NSF); 45 C.F.R. §80.8(c) (HHS); NIH Grants Policy Statement 4.1.2.1; 10 C.F.R. §1040.114 (DOE).

457.    Prior to the July 30-August 1 funding withdrawal and August 8 Demand Letter, Defendants did not provide notice of a hearing or conduct any hearing, much less conduct a hearing that conforms with their own regulations or sections 5–8 of the APA. *See, e.g.*, 28 C.F.R. §42.109(a) (DOJ); 45 C.F.R. §611.9(a) (NSF); 45 C.F.R. §80.9(a) (HHS); NIH Grants Policy Statement 4.1.2.1; *cf.* 10 C.F.R. §1040.121 (DOE).

458.    Prior to the July 30-August 1 funding withdrawal and August 8 Demand Letter, Defendants failed to provide the University with a reasonable opportunity to file briefs or other written statements of its contentions and further failed to issue a decision consistent with the applicable regulations before terminating funding on March 7. *See, e.g.*, 28 C.F.R. §42.110(d) (DOJ); 45 C.F.R. §611.10(d) (NSF); 45 C.F.R. §80.10(d) (HHS); NIH Grants Policy Statement 4.1.2.1; *cf.* 10 C.F.R. §1040.121(b) (DOE).

459.    Defendants did not limit the July 30-August 1 funding withdrawal or August 8 Demand Letter to any particular program, or part thereof, in which noncompliance has been found. Nor was such withdrawal limited in its effect to any particular program, or part thereof, in which noncompliance has been found. *See, e.g.*, 42 U.S.C. §2000d-1; 28 C.F.R. §42.108(c) (DOJ); 45 C.F.R. §611.8 (NSF); 45 C.F.R. §80.8(c) (HHS); NIH Grants Policy Statement 4.1.2.1; 10 C.F.R. §1040.114(e) (DOE).

460.    Defendants' July 30-August 1 funding withdrawal and August 8 Demand Letter are not authorized by any law, and no department or agency determined that compliance could not be secured by voluntary means prior to initiating those actions.

461.    Plaintiffs and their members are persons who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by, Defendants' July 30-August 1 withdrawal of funds for purposes of 5 U.S.C. §702 and 42 U.S.C. §2000d-2.

## COUNT VII

**Violation of Administrative Procedure Act, 5 U.S.C. §706(2)(A), (C), (D)**
**(Contrary to Title IX; Without Observance of Required Procedure)**
**(Against Defendants DOJ, Bondi, Terrell, and Funding Agency Defendants)**

462.     Plaintiffs incorporate and reallege all of the above paragraphs as if fully set forth herein.

463.     Defendants' July 30-August 1 funding withdrawal and August 8 Demand Letter constitute "[a]gency action made reviewable by statute" under 5 U.S.C. §704 and 42 U.S.C. §2000d-2, as well as "final agency action for which there is no other adequate remedy in a court" under 5 U.S.C. §704, and are therefore subject to judicial review. 5 U.S.C. §§702, 704. The cancellation of grants and contracts is the ultimate step in the Title IX enforcement process and alters the rights and obligations of the parties with respect to the terms of those grants and contracts, with legal and concrete consequences for Columbia, Plaintiffs, and Plaintiffs' members.

464.     The APA directs courts to hold unlawful and set aside agency actions that are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. §706(2)(A).

465.     The APA further directs courts to hold unlawful and set aside agency actions that are without observance of procedure required by law. *Id.* §706(2)(D).

466.     No lawful grant or contract condition authorized the July 30-August 1 funding withdrawal. Nothing in Title VI, Title VII, Title IX or any other law authorized the funding withdrawal.

467.     Section 902 of Title IX and applicable, binding regulations with the force of law set forth procedural requirements that must be followed in order to terminate federal funding for alleged noncompliance with Title IX's substantive requirements. 20 U.S.C. §1682; 28 C.F.R. §54.605 (DOJ) (applying the Title VI procedural provisions "found at 28 CFR 42.106 through 42.111"); 45 C.F.R. §618.605 (NSF) (applying the Title VI procedural provisions "found at 45 CFR part 611"); 45 C.F.R. §86.71 (HHS) (applying the Title VI procedural provisions "found at 45 CFR 80.6 through 80.11 and 45 CFR part 81"); NIH Grants Policy Statement 4.1.2.2 (applying the HHS implementing regulations for Title IX); 10 C.F.R. §1042.605 (DOE) (applying the Title VI procedural provisions "found at 10 CFR part 1040, subparts G and H").

468.    Because Defendants failed to follow these requirements before terminating funding to the University on July 30-August 1 and before demanding compliance with the August 8 Demand Letter as a condition of future funding, Defendants' actions were contrary to law, arbitrary and capricious, and without observance of procedure required by law.

469.    Prior to the July 30-August 1 funding withdrawal and August 8 Demand Letter, Defendants did not issue to the UC a notice of findings of any alleged violations of Title IX. Defendants did not attempt to achieve voluntary compliance with Title IX or determine that such voluntary compliance could not be achieved. Defendants did not provide an opportunity for a hearing or make an express finding on the record as to the University's alleged noncompliance with Title IX. Nor did any "responsible Department official" determine that the University's compliance could not be secured by voluntary means. Moreover, no head of any Federal department or agency filed with any committees of the House and Senate a "full report of the circumstances and the grounds" for the action terminating or refusing to grant or continue federal assistance to the University because of a failure to comply with Title IX. Nor did thirty days elapse after the filing of any such report. *See* 28 C.F.R. §54.605 (DOJ); 45 C.F.R. §618.605 (NSF); 45 C.F.R. §86.71 (HHS); NIH Grants Policy Statement 4.1.2.2; 10 C.F.R. §1042.605 (DOE).

470.    Prior to the July 30-August 1 funding withdrawal and August 8 Demand Letter, Defendants did not provide notice of a hearing or conduct any hearing, much less conduct a hearing that conforms with their own regulations or sections 5–8 of the APA. *See* 28 C.F.R. §54.605 (DOJ); 45 C.F.R. §618.605 (NSF); 45 C.F.R. §86.71 (HHS); NIH Grants Policy Statement 4.1.2.2; *cf.* 10 C.F.R. §1042.605 (DOE).

471.    Prior to the July 30-August 1 funding withdrawal and August 8 Demand Letter, Defendants failed to provide the University with a reasonable opportunity to file briefs or other written statements of its contentions and further failed to issue a decision consistent with the applicable regulations before terminating funding on March 7. *See* 28 C.F.R. §54.605 (DOJ); 45 C.F.R. §618.605 (NSF); 45 C.F.R. §86.71 (HHS); NIH Grants Policy Statement 4.1.2.2; 10 C.F.R. §1042.605 (DOE).

472.    Defendants did not limit the July 30-August 1 funding withdrawal or August 8 Demand Letter to any particular program, or part thereof, in which noncompliance has been found. Nor was such

withdrawal limited in its effect to any particular program, or part thereof, in which noncompliance has been found. *See* 20 U.S.C. §1682; 28 C.F.R. §54.605 (DOJ); 45 C.F.R. §618.605 (NSF); 45 C.F.R. §86.71 (HHS); NIH Grants Policy Statement 4.1.2.2; 10 C.F.R. §1042.605 (DOE).

473.    Defendants' July 30-August 1 funding withdrawal and August 8 Demand Letter are not authorized by any law, and no department or agency determined that compliance could not be secured by voluntary means prior to initiating those actions.

474.    Plaintiffs and their members are persons who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by, Defendants' July 30-August 1 withdrawal of funds for purposes of 5 U.S.C. §702 and 20 U.S.C. §1683.

## COUNT VIII

### Violation of Administrative Procedure Act, 5 U.S.C. §706(A)
### (Arbitrary and Capricious)
### (Against Defendants DOJ, Bondi, Terrell, and Funding Agency Defendants)

475.    Plaintiffs incorporate and reallege all of the above paragraphs as if fully set forth herein.

476.    Defendants' July 30-August 1 funding withdrawal and August 8 Demand Letter constitute "[a]gency action made reviewable by statute" under 5 U.S.C. §704 and 42 U.S.C. §2000d-2, as well as "final agency action for which there is no other adequate remedy in a court" under 5 U.S.C. §704, and are therefore subject to judicial review. 5 U.S.C. §§702, 704. The cancellation of grants and contracts is the ultimate step in the Title VI and Title IX enforcement processes and alters the rights and obligations of the parties with respect to the terms of those grants and contracts, with legal and concrete consequences for the UC, Plaintiffs, and Plaintiffs' members.

477.    The APA directs courts to hold unlawful and set aside agency actions that are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. §706(2)(A).

478.    Agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024). This standard requires that agencies provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29,

43 (1983) (quotation omitted). An action is also arbitrary and capricious if the agency "failed to consider ... important aspect[s] of the problem." *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 25 (2020).

479.    Defendants' action of immediate cancellation of $584 million in federal grants and contracts to UCLA was arbitrary and capricious because that decision was not objectively reasonable and Defendants failed to provide a reasoned explanation for that decision.

480.    Defendants' stated reasons for cancellation of federal grants and contracts to UCLA are not reasonable, are arbitrary and capricious, and are not rationally related to the breadth of the cancellations, as described in Part IV.C above. Defendants DOJ, NIH, and NSF, and, on information and belief, DOE, rely solely on complaints of antisemitism that stem from events from late April and early May 2024 surrounding an encampment on UCLA's campus, failing to address or acknowledge the existence of a resolution agreement that dealt with the same events, and without considering or assessing the adequacy of steps UC and UCLA have taken since May 2024 to address antisemitism. Defendants NIH and NSF and, on information and belief, DOE also acted arbitrarily by basing the termination of federal grants and contracts on unsubstantiated and unreasonable findings of unlawful, race-based admissions practice and sex discrimination.

## COUNT IX

**Violation of Administrative Procedure Act, 5 U.S.C. §706(2)(A), (B): Contrary to Constitution (First Amendment)**
**(Against Defendants DOJ, Bondi, Terrell, and Funding Agency Defendants)**

481.    Plaintiffs incorporate and reallege all of the above paragraphs as if fully set forth herein.

482.    Defendants' July 30-August 1 funding withdrawal and August 8 Demand Letter constitute "[a]gency action made reviewable by statute," 5 U.S.C. §704, as well as "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. §704, and are therefore subject to judicial review. 5 U.S.C. §§702, 704.

483.    The APA directs courts to hold unlawful and set aside agency actions that are found to be "not in accordance with law." 5 U.S.C. §706(2)(A). The APA also directs courts to hold unlawful and set aside agency actions that are contrary to constitutional rights or power. 5 U.S.C. §706(2)(B).

484.    Defendants' actions alleged herein are contrary to constitutional rights or power for the reasons set forth in Count I of this Complaint.

485.    Plaintiffs and their members have suffered a legal wrong as a result of, and have been adversely affected or aggrieved by, Defendants' actions alleged herein for purposes of 5 U.S.C. §702.

## COUNT X

**Violation of Administrative Procedure Act, 5 U.S.C. §706(2)(A), (B): Contrary to Constitution (Separation of Powers)**
**(Against Defendants DOJ, Bondi, Terrell, and Funding Agency Defendants)**

486.    Plaintiffs incorporate and reallege all of the above paragraphs as if fully set forth herein.

487.    Defendants' July 30-August 1 funding withdrawal and August 8 Demand Letter constitute "[a]gency action made reviewable by statute," 5 U.S.C. §704, as well as "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. §704, and are therefore subject to judicial review. 5 U.S.C. §§702, 704

488.    The APA directs courts to hold unlawful and set aside agency actions that are found to be "not in accordance with law." 5 U.S.C. §706(2)(A). The APA also directs courts to hold unlawful and set aside agency actions that are contrary to constitutional rights or power. 5 U.S.C. §706(2)(B).

489.    Defendants' actions alleged herein are contrary to constitutional rights or power for the reasons set forth in Count II of this Complaint.

490.    Plaintiffs and their members have suffered a legal wrong as a result of, and have been adversely affected or aggrieved by, Defendants' actions alleged herein for purposes of 5 U.S.C. §702.

## COUNT XI

**Violation of Administrative Procedure Act, 5 U.S.C. §706(2)(A), (B): Contrary to Constitution (Unconstitutional Conditions / Spending Clause)**
**(Against Defendants DOJ, Bondi, Terrell, and Funding Agency Defendants)**

491.    Plaintiffs incorporate and reallege all of the above paragraphs as if fully set forth.

492.    Defendants' July 30-August 1 funding withdrawal and August 8 Demand Letter constitute "[a]gency action made reviewable by statute," 5 U.S.C. §704, as well as "final agency action

for which there is no other adequate remedy in a court," 5 U.S.C. §704, and are therefore subject to judicial review. 5 U.S.C. §§702, 704.

493.    The APA directs courts to hold unlawful and set aside agency actions that are found to be "not in accordance with law." 5 U.S.C. §706(2)(A). The APA also directs courts to hold unlawful and set aside agency actions that are contrary to constitutional rights or power. 5 U.S.C. §706(2)(B).

494.    Defendants' actions alleged herein are contrary to constitutional rights or power for the reasons set forth in Count III of this Complaint.

495.    Plaintiffs and their members have suffered a legal wrong as a result of, and have been adversely affected or aggrieved by, Defendants' actions alleged herein for purposes of 5 U.S.C. §702.

## COUNT XII

**Violation of Administrative Procedure Act, 5 U.S.C. §706(2)(A), (B): Contrary to Constitution**
**(Tenth Amendment / Spending Clause)**
**(Against Defendants DOJ, Bondi, Terrell, and Funding Agency Defendants)**

496.    Plaintiffs incorporate and reallege all of the above paragraphs as if fully set forth herein.

497.    Defendants' July 30-August 1 funding withdrawal and August 8 Demand Letter constitute "[a]gency action made reviewable by statute," 5 U.S.C. §704, as well as "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. §704, and are therefore subject to judicial review. 5 U.S.C. §§702, 704

498.    The APA directs courts to hold unlawful and set aside agency actions that are found to be "not in accordance with law." 5 U.S.C. §706(2)(A). The APA also directs courts to hold unlawful and set aside agency actions that are contrary to constitutional rights or power. 5 U.S.C. §706(2)(B).

499.    Defendants' actions alleged herein are contrary to constitutional rights or power for the reasons set forth in Count IV of this Complaint.

500.    Plaintiffs and their members have suffered a legal wrong as a result of, and have been adversely affected or aggrieved by, Defendants' actions alleged herein for purposes of 5 U.S.C. §702.

**COUNT XIII**

**Violation of Administrative Procedure Act, 5 U.S.C. §706(2)(A), (B): Contrary to Constitution (Fifth Amendment))**
**(Against Defendants DOJ, Bondi, Terrell, and Funding Agency Defendants)**

501.    Plaintiffs incorporate and reallege all of the above paragraphs as if fully set forth herein.

502.    Defendants' July 30-August 1 funding withdrawal and August 8 Demand Letter constitute "[a]gency action made reviewable by statute," 5 U.S.C. §704, as well as "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. §704, and are therefore subject to judicial review. 5 U.S.C. §§702, 704.

503.    The APA directs courts to hold unlawful and set aside agency actions that are found to be "not in accordance with law." 5 U.S.C. §706(2)(A). The APA also directs courts to hold unlawful and set aside agency actions that are contrary to constitutional rights or power. 5 U.S.C. §706(2)(B).

504.    Defendants' actions alleged herein are contrary to constitutional rights or power for the reasons set forth in Count V of this Complaint.

505.    Plaintiffs and their members have suffered a legal wrong as a result of, and have been adversely affected or aggrieved by, Defendants' actions alleged herein for purposes of 5 U.S.C. §702.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that this Court:

A.  Declare that Defendants have exceeded constitutional and statutory authority by using the threat of legal and financial sanctions in retaliation for the exercise of free speech rights by UC faculty, students, academic employees, and staff employees, and in an unlawful attempt to coerce the UC into engaging in viewpoint discrimination or otherwise burdening academic freedom and free speech rights of UC faculty, students, academic employees, and staff employees;

B.  Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from using the threat of legal and financial sanctions in retaliation for the exercise of free speech rights by UC faculty, students, academic employees, and staff employees, or in attempt to coerce the UC

into engaging in viewpoint discrimination or otherwise burdening academic freedom and free speech rights of UC faculty, students, academic employees, and staff employees;

C.  Declare that Defendants have exceeded constitutional and statutory authority by conditioning the restoration, grant, and continuation of federal funding on the UC's agreement to actions that would violate the constitutional rights of UC faculty, students, academic employees, and staff employees;

D.  Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from conditioning federal funding on UC's agreement to any conduct that would violate the First, Fourth, Fifth, or Sixth Amendment rights of any UC faculty, students, academic employees or staff employees, including but not limited to through restrictions on protests and expressive activities, sharing information about such expressive activity by faculty, academic employees, staff employees, and students with Defendants; and ceding control over curriculum and faculty hiring and promotion decisions to an external monitor, and declare such conduct unlawful;

E.  Declare that Defendants have exceeded constitutional and statutory authority by conditioning the restoration, grant, and continuation of federal funding on UC's agreement to actions that are not necessary to achieve compliance with Title VI, Title VII, or Title IX, including but not limited to by demanding the payment of $1 billion and demanding that the UC take actions in violation of California law not in conflict with federal law;

F.  Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from conditioning federal funding on UC's agreement to any actions not necessary to achieve compliance with Title VI, Title VII, or Title IX, including but not limited to the payment of any money not authorized under those statutes;

G.  Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from conditioning federal funding on UC's agreement to any actions not necessary to achieve compliance with Title VI, Title VII, or Title IX, including but not limited to the following: demand any commitments that cede control over curriculum, faculty hiring and promotion, and programs to the federal government or any third party; curtail the UC's diversity, equity, and inclusion programs and other efforts; limit protest rights and expressive activities; chill those rights by sharing with Defendants information about faculty, academic employees, staff employees, and students; eliminate rights or benefits bargained by the UC with any of the Plaintiff unions; announce the cessation of recognition of transgender identity and end gender-inclusive access to restrooms and other private facilities; refuse to provide gender-affirming medical care to any medical center patients; cooperate with federal immigration officials in a manner that contravenes state or local law; and cede control to an external monitor over these subjects, including by giving that monitor broad access to the UC's and individual campuses' records;

H.  Declare that Defendants have exceeded constitutional and statutory authority by canceling and refusing to grant federal funds on the purported basis of discrimination on the basis of race, color, national origin, or sex without having complied with the terms of Title VI and Title IX;

I.  Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from issuing any termination, suspension, fund freeze, or stop work order, or otherwise withholding payment on existing grants or other federal funding, or refusing to award future grants, contracts, or other federal funding to UC on any purported grounds of discrimination on the basis of race, color, or national origin without complying with the terms of Title VI;

J.   Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from issuing any termination, suspension, fund freeze, or stop work order, or otherwise withholding payment on existing grants or other federal funding, or refusing to award future grants, contracts, or other federal funding to UC on any purported grounds of discrimination on the basis of sex without complying with the terms of Title IX;

K.   Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from issuing any termination, suspension, fund freeze, or stop work order, or otherwise withholding payment on existing grants or other federal funding, or refusing to award future grants, contracts, or other federal funding to UC based on any purported violation of Title VII;

L.   Vacate and set aside Defendants' termination of federal funds pursuant to the July 30 and August 1 letters;

M.   Vacate and set aside Defendants' August 8 Demand Letter;

N.   Award Plaintiffs reasonable attorneys' fees and costs in accordance with law; and

O.   Grant such other relief as the Court deems just and proper.

Respectfully submitted,

Dated:  September 16, 2025          By: */s/ Connie K. Chan*
STACEY M. LEYTON, SBN 203827
sleyton@altber.com
BARBARA J. CHISHOLM, SBN 224656
bchisholm@altber.com
CONNIE K. CHAN, SBN 284230
cchan@altber.com
AMANDA C. LYNCH, SBN 318022
alynch@altber.com
JUHYUNG H. LEE, SBN 315738
hlee@altber.com
SANDY PECHT, SBN 355877
specht@altber.com
**ALTSHULER BERZON LLP**
177 Post St., Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151

- 113 -
COMPLAINT

*Counsel for Plaintiffs AAUP, AFT,*
*UC-AFT, CNA/NNU, and UAW*

By: */s/ Victoria S. Nugent*

SKYE L. PERRYMAN
*Pro hac vie application forthcoming*
sperryman@democracyforward.org
VICTORIA S. NUGENT
*Pro hac vice application forthcoming*
vnugent@democracyforward.org
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 448-9090

*Counsel for Plaintiffs AAUP, AFT,*
*CNA/NNU, UC-AFT, and UAW*

By: */s/ Veena Dubal*

VEENA DUBAL, SBN 249268
vdubal@aaup.org
*Pro hac vice application forthcoming*
vdubal@aaup.org
**AMERICAN ASSOCIATION OF**
**UNIVERSITY PROFESSORS**
555 New Jersey Avenue NW, Suite 600
Washington DC 20001

*Counsel for Plaintiff AAUP*

By: */s/ Eleanor Morton*

ELEANOR MORTON
emorton@leonardcarder.com
KATE HALLWARD
khallward@leonardcarder.com
ARTHUR LIOU
Aliou@leonardcarder.com
HUGH SCHLESSINGER
Hschlessinger@leonardcarder.com
**LEONARD CARDER LLP**
1999 Harrison Street, Suite 2700
Oakland, CA 94612
(510) 272-0169

*Counsel for Plaintiffs UPTE , AFSCME Local 3299,*
*UC- AFT, CUCFA, and each of the UC Campus*
*Faculty Associations*

By: */s/ Margo A. Feinberg*
MARGO A. FEINBERG
margo@ssdslaw.com
DANIEL E. CURRY
dec@ssdslaw.com
**SCHWARTZ, STEINSAPIR,**
**DOHRMANN & SOMMERS LLP**
888 W. 6th Street, 12th Floor
Los Angeles, California 90017-2738
(323) 655-4700

*Counsel for Plaintiff UAW Local 4811*

By: */s/ Nicole J. Daro*
NICOLE J. DARO, SBN 276948
Ndaro@calnurses.org
California Nurses Association/National Nurses United
155 Grand Ave.
Oakland, CA 94612
(510) 207-8291

*Counsel for Plaintiff CNA/NNU*

By: */s/ Susan K. Garea*
SUSAN K. GAREA
SGarea@beesontayer.com
BEESON, TAYER & BODINE
492 Ninth Street, Suite 350
Oakland, CA 94607
(510) 625 9700

*Counsel for Teamsters Local 2010*