# EXHIBIT 1



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*　　　　　　*950 Pennsylvania Avenue, N.W.*
　　　　　　　　　　　　　　　　　　　　　　　　　　*Washington, D.C. 20530*

July 29, 2025

***Via Electronic Mail Only***

Dr. Michael V. Drake - President
UNIVERSITY OF CALIFORNIA
C/O Charles F. Robinson – General Counsel
UNIVERSITY OF CALIFORNIA
1111 Franklin Street, 12th Floor
Oakland, CA 94607
charles.robinson@ucop.edu

  **Re: U.S. Department of Justice Notice of Findings Regarding the University of California, Los Angeles**

Dear Dr. Drake:

  We write to notify you of the findings of the U.S. Department of Justice (the Department) investigation concerning the University of California, Los Angeles's (UCLA or the University) response to allegations of discrimination against Jewish and Israeli students on the basis of race, religion and national origin.[1] Based on our investigation, we have found that UCLA's response to its students' complaints of antisemitism on UCLA's campus violated its obligations under the Equal Protection Clause of the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (Title VI).

  On May 9, 2025, the Department, through the Educational Opportunities Section of the Civil Rights Division, informed you that it had opened an investigation into the University of California System's (UC or UC System) response to incidents of antisemitic discrimination, harassment, abuse, and retaliation against students that occurred within the educational environment of the UC System. The Department's investigation of the greater UC System remains ongoing. However, for the reasons discussed below, the Department has concluded that UCLA's response to the protest encampment on its campus in the spring of 2024 was deliberately indifferent to a hostile environment for Jewish and Israeli students in violation of the Equal Protection Clause and Title VI. The Department has not yet reached a conclusion regarding whether any other UC System school has violated the Equal Protection Clause or Title VI, as those investigations are still ongoing.

---

[1] This investigation is separate and distinct from the Department's investigations related to the University of California's admissions practices and allegations of employment discrimination.

## Procedural Background

The Department enforces federal civil rights laws that protect students from discrimination, including Title IV of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000c, *et seq.* (Title IV), which authorizes the Department to address certain equal protection violations in public colleges based on, among other bases, religion and national origin, and Title VI, which prohibits discrimination based on, among other bases, national origin, including shared ancestry, by recipients of federal financial assistance.

Title IV authorizes the Department to address complaints that a student "has been denied admission to or not permitted to continue in attendance at a public college by reason of race, color, religion, sex or national origin," in violation of their constitutional rights. 42 U.S.C. § 2000c-6(a)(2); *see also* Pub. L. No. 88-352, 78 Stat. 241 (1964). Upon receipt of such a complaint, and if the Attorney General or their designee "believes the complaint is meritorious," the Attorney General must provide the college authority with notice of such complaint and "a reasonable time to adjust the conditions alleged in such complaint." 42 U.S.C. § 2000c-6(a). If the public college or university does not adjust the conditions at issue, the Department is authorized "to institute for or in the name of the United States a civil action in any appropriate district court of the United States against parties and for such relief as may be appropriate . . . ." *Id.*

The Department currently provides direct federal financial assistance to UCLA. Enforcement under Title VI requires funding agencies to advise recipients of their failure to comply and to determine that compliance cannot be obtained by voluntary means before initiating judicial proceedings to compel compliance. 42 U.S.C. § 2000d-1. When the Department finds evidence of a recipient's failure to comply with antidiscrimination provisions, it will notify the recipient and resolve the matter by informal means. 28 C.F.R. § 42.107(d)(1). If the Department determines that the noncompliance with Title VI cannot be corrected by informal means, the Department may seek to compel compliance through judicial enforcement. *See* 28 C.F.R. § 42.108(c)(I)(B)(1).

The Department's May 9th notice of investigation letter included a request for information about UCLA's antidiscrimination policies and practices, and documentation of complaints of discrimination on the basis of religion, national origin, race, shared ancestry, and color received by UCLA since October 7, 2023 (10/7). UCLA produced responsive documents on May 30 and June 30, 2025. In addition to these documents, the Department reviewed other publicly available reports and information about UCLA's response to the spring 2024 protest encampment, including the pleadings and other materials referenced in the private Title VI litigation involving UCLA, *Frankel, et al. v. Regents of the University of California, et al.*, No. 2:24-cv-4702 (C.D. Cal.), and the U.S. Department of Education Office for Civil Rights' (OCR) December 20, 2024, resolution notification to UCLA and other UC schools.[2] The

---

[2] *Available at* https://ocrcas.ed.gov/sites/default/files/ocr-letters-and-agreements/09222257-a.pdf (last accessed July 22, 2024). OCR's December 20, 2024, letter to the UC System documents several compliance concerns at UCLA related to the spring 2024 protest encampment. OCR identified concerns that it appeared that Jewish students were subjected to different treatment when their access to parts of the campus or University programs was limited. OCR faulted UCLA for effectively allowing the encampment to occur and to persist on campus. OCR also raised the concern that "UCLA appears to have failed to respond promptly or effectively to notice of pro-Palestinian demonstrators being forcefully attacked in the night by counter-protestors." *Id.* at 30. OCR detailed several campus-wide statements by UCLA leadership that, while "well-intentioned, did not appear to have been effective at stopping the violence or other physical and verbal harassment." *Id.*

Department also interviewed individuals who submitted discrimination complaints with the Department directly.

## UCLA's Spring 2024 Unlawful Encampment

On April 25, 2024, demonstrators formed an encampment on UCLA's Royce Quad to protest Israel's military actions in Gaza following the 10/7 Hamas terrorist attack on Israeli civilians and military personnel. Participants in the encampment included UCLA students, faculty, and staff, and non-affiliated parties. According to The Task Force to Combat Antisemitism and Anti-Israeli Bias at UCLA's October 16, 2024, report *Antisemitism and Anti-Israeli Bias at UCLA* (*Task Force Report*), "[s]hortly after establishing the encampment, the demonstrators built a barrier around it, fashioned with sheets of plywood, some of which were affixed to metal bicycle racks that were UCLA property and had been placed by the University on the periphery of the encampment" to separate the demonstrators from others on campus. *Task Force Report* at 52. That same day, UCLA Vice Chancellor for Strategic Communications Mary Osako issued a statement on the encampment, noting that "[w]e're actively monitoring the situation to support a peaceful campus environment that respects our community's right to free expression while minimizing disruption to our teaching and learning mission." UCLA-TVI-DOJ00000279.

On April 26, 2024, Vice Chancellor Osako issued another statement on the encampment, stating that "UCLA's approach to the encampment is guided by several equally important principles: the need to support the safety and wellbeing of Bruins, the need to support the free expression rights of our community, and the need to minimize disruption to our teaching and learning mission." UCLA-TVI-DOJ00000278. Vice Chancellor Osako also stated that "[i]t's also important to note that we are following University of California systemwide policy guidance, which directs us not to request law enforcement involvement preemptively, and only if absolutely necessary to protect the physical safety of our campus community." *Id.* Vice Chancellor Osako was referring to UC System policy guidance adopted pursuant to the September 13, 2012, Robinson-Edley *Response to Protests on UC Campuses* report and implementation plans (*Robinson-Edley Report*).[3] *Robinson-Edley Report* established a tiered, de-escalation strategy for responding to expressive activities on UC campuses that violate applicable UC System and campus-specific policies. *See* UCI-00000428–29. Notably, an August 19, 2024, letter to UC chancellors from your office included guidance stating that "consistent with [UC]'s established tiered response," if an expressive activity that violates UC policy or law "poses an immediate threat to life safety or critical University functions, the University will act accordingly and mobilize appropriate resources, which may include UC [Police Department], Campus Fire Marshal, and/or other resources to respond." *Id.* at 29. However, UCLA did not follow this established guidance in regard to the encampment.

The Department interviewed a Jewish man who was told by members of the encampment that "Hitler missed one." This man was also physically assaulted by members of the encampment, which the man reported to the UC Police Department. UCLA's *Task Force Report* also documents instances in which students were assaulted or prevented access to parts of the campus on the basis of their religion and/or national origin by members of the encampment. For example, "[a] Jewish student and her mom shared how the student was knocked to the ground and kicked by encampment participants. The student

---

[3] *Available at* https://campusprotestreport.universityofcalifornia.edu/documents/protest-report-091312.pdf (last accessed July 15, 2025).

3

was initially unconscious with an open wound on her head, and she was taken to the hospital for treatment." *Task Force Report* at 57-58. Additionally, "[a] Native American Jewish woman described being assaulted by a stick." *Id.* at 57. The report also notes that "[o]n April 29, 2024, the encampment protesters began using human phalanxes (with protesters shouting, 'human chain') to block certain persons from moving freely through public areas of Royce Quad, and surrounded some other individuals to forcibly move them from areas in or adjacent to the encampment." *Id.* at 53. "By April 30, students wearing a Star of David or a kippah, or those refusing to denounce their Zionism (which for many Jews, but not all, is akin to renouncing their Jewish faith), were physically blocked by the protesters' phalanxes from entering or passing through the occupied area of Royce Quad, entering Royce Hall, or entering Powell Library." *Id.* at 53–54.

The *Task Force Report* also documents survey responses from a number of Jewish students about the encampment. One responded that they were "denied entry through it because I'm a Jew." *Id.* at 27. Another responded that "I was assaulted, threatened, and harassed during the encampment. I had an Israeli flag and a man ran towards me in order to push me. I was blocked for being Jewish," that the encampment "prevented me from getting to class on time and utilizing campus resources," and that demonstrators "were told not to talk to me because I'm from Israel." *Id.* at 35. The report also states that "[s]everal students, Task Force members, and survey respondents reported that complaints of antisemitism and discrimination were ignored, minimized, or were not taken seriously by faculty or staff." *Id.* at 66.

On April 28, 2024, counter-demonstrators gathered adjacent to the encampment. That day, Vice Chancellor Osako issued a statement that "[t]his morning, a group of demonstrators breached a barrier that the university had established separating two groups of protestors on our campus, resulting in physical altercations." UCLA-TVI-DOJ00000278. Later that same day, the Vice Chancellor issued another statement that "we are heartbroken to report that today, some physical altercations broke out among demonstrators on Royce Quad." *Id.*

On April 30, 2024, UCLA informed demonstrators that the encampment "is unlawful and violates university policy." UCLA-TVI-DOJ00000011. That same day, UCLA Chancellor Gene Block issued a statement in which he characterized the protest as "an unauthorized physical encampment." UCLA-TVI-DOJ00000273. In that same message, Chancellor Block stated that while many of the encampment's demonstrators and counter-demonstrators had acted peacefully, "the tactics of others have frankly been shocking and shameful. We have seen instances of violence completely at odds with our values as an institution dedicated to respect and mutual understanding. In other cases, students on their way to class have been physically blocked from accessing parts of the campus." *Id.* Chancellor Block also acknowledged that "[t]hese incidents have put many on our campus, especially our Jewish students, in a state of anxiety and fear." *Id.* In another statement also issued on April 30th, Vice Chancellor Osako stated that "[t]here was also a report of a student's access to class being blocked by demonstrators yesterday. This kind of disruption to our teaching and learning mission is abhorrent, plain and simple."

### UCLA Failed to Properly Stop the Unlawful Encampment

Despite admissions by senior administrators that the encampment was unlawful and periodically violent, that demonstrators had physically prevented Jewish and Israeli students from accessing parts of campus, and that these events had placed Jewish students "in a state of anxiety and fear," UCLA refused to request law enforcement support to disband the encampment on April 30th. Late that night, counter-

demonstrators violently attacked the encampment, resulting in dozens of injuries and requiring law enforcement in riot gear to restore order.

Only at 6 p.m. on May 1, 2024, did UCLA permit law enforcement to issue an unlawful assembly order and order members of the encampment to leave. After several hours of clashes between law enforcement and demonstrators, the encampment was finally disbanded in the early hours of May 2, 2024, resulting in the arrest of more than 200 people. Later that day, Chancellor Block publicly acknowledged that:

> Several days of violent clashes between demonstrators and counter-demonstrators put too many Bruins in harm's way and created an environment that was completely unsafe for learning. Demonstrators directly interfered with instruction by blocking students' pathways to classrooms. Indirectly, violence related to the encampment led to the closure of academic buildings and the cancellation of classes. And frankly, hostilities were only continuing to escalate.

UCLA-TVI-DOJ00000261.

The encampment was in clear violation of a number of existing content-neutral time, place, and manner rules issued by UCLA and the greater UC System regarding the use of campus spaces for expressive activities. These include UC Office of the President regulations prohibiting non-affiliated parties from erecting or occupying tents on university property without university approval, and UCLA Group Code of Conduct prohibitions on the placement of temporary structures on campus property. *Task Force Report* at 51. The encampment also violated UCLA Policy 860, which prohibits using University facilities for extracurricular purposes that "unreasonably interfere with the University's instructional or research programs, official University functions and activities, or relations with its neighboring community." *Id.* at 52 n.91.

### UCLA's Student Discrimination Complaints

During the April 25 to May 1, 2024, period before the encampment was disbanded, UCLA received at least **eleven** complaints alleging that demonstrators were discriminating against students because they were Jewish or Israeli. *See generally* UCLA-TVI-DOJ00000321–416. One complainant alleged that her Jewish friend was "pushed around, punched, and beaten with a stick" by encampment "marshals" on April 25th. *Id.* at 414. Another alleged that on the same day a demonstrator perceived them to be Jewish and told them to "go back to Poland" with their "people." *Id.* at 383.

Several complainants reported that members of the encampment prevented them from accessing parts of the campus. One reported that, on April 26th, they were barred by demonstrators from entering the area of Royce Quad and Royce Hall because they are Jewish, and that demonstrators requested to see certain wristbands in order to access this area. *Id.* at 382. A different complainant reported that a student was unable to access the library because demonstrators would not give them a wristband because they "[knew them] to be Jewish." *Id.* at 409. Another reported that a group of masked demonstrators and two unmasked faculty members "surrounded and detained" them and prevented them from accessing Royce Quad on April 27th. *Id.* at 362. Another reported that on that same day demonstrators prevented them accessing a ramp because they did not "have someone to vouch for me." *Id.* at 382. Additionally,

one complainant noted on April 27th that the encampment violated UCLA policy prohibiting overnight structures, and that some demonstrators were "intimidating Jewish students." *Id.* at 402. The Department also interviewed a Jewish UCLA student who was blocked by demonstrators from accessing Royce Quad. This student did not file a complaint with UCLA because a friend of theirs previously filed a similar complaint and no action was taken by the University.

## Legal Standard

A school may violate students' equal protection rights either by intentionally discriminating against them as members of an identifiable class or by acting with deliberate indifference to known harassment based on a protected characteristic. *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1134 (9th Cir. 2003) (Equal Protection claim for sex-based harassment); *Mosavi v. Mt. San Antonio Coll.*, 805 F. App'x 502, 505 (9th Cir. 2020) ("Public school administrators who fail to take protective measures against religious harassment may be held liable for religious discrimination in violation of the equal protection guarantees of the . . . federal constitution if a plaintiff can show that the defendants either intentionally discriminated against the plaintiff or acted with deliberate indifference."). "Deliberate indifference is found if the school administrator responds to known peer harassment in a manner that is clearly unreasonable." *Id.* at 1135 (citing *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 649 (1999) (internal quotation marks and alterations omitted);[4] *see also Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 666 (2d Cir. 2012) ("A finding of deliberate indifference depends on the adequacy of a school district's response to the harassment.") (Title VI claim for race-based harassment).

To establish a hostile educational environment, a school must "have actual knowledge" of peer harassment that is "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650. "Whether a hostile educational environment exists is a question of fact, determined with reference to the totality of the circumstances . . . ." *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1034 (9th Cir. 1998). This framework applies to both Equal Protection Clause and Title VI hostile environment claims. *See Zeno*, 702 F.3d at 665 n.10; *see also Mosavi v. Mt. San Antonio Coll.*, No. CV15-4147, 2018 WL 6016939, at *2 (C.D. Cal. June 1, 2018), *aff'd*, No. 18-56321, 2020 WL 1320952 (9th Cir. Mar. 20, 2020).

Courts have found that when students are routinely subjected to antisemitic epithets, threats of violence, or physical assault by their peers, that harassment is sufficiently severe, pervasive, and objectively offensive to create a hostile environment. For example, one court found "severe and discriminatory harassment" where plaintiffs "had anti-Semitic slurs repeatedly directed at them, witnessed swastika graffiti, and were subjected to anti-Semitic 'jokes.' [Plaintiffs] were also called 'crispy' or told that they should have been burned in the Holocaust. In addition, [Plaintiffs] claim to have suffered physical harassment, including being slapped, physically restrained, and having coins thrown at them." *T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332, 357 (S.D.N.Y. 2014). Another court found that a hostile environment was sufficiently alleged where "students were giving Nazi salutes,

---

[4] Although *Davis* dealt with sexual harassment under Title IX of the Education Amendments of 1972, circuit courts, including the Ninth Circuit, have applied the same analysis to find a violation of the Equal Protection Clause when a school district is deliberately indifferent to known student-on-student harassment. *See, e.g., Flores*, 324 F.3d at 1135. Because the Ninth Circuit applies the *Davis* deliberate indifference standard to Equal Protection claims, the Department cites generally to cases applying the *Davis* standard.

6

saying 'Heil Hitler,' wearing swastikas, and referencing gas chambers used to kill Jews during the Holocaust." *I.G. v. Jefferson Cnty. Sch. Dist. through Bd. of Educ.*, 452 F. Supp. 3d 989, 1002 (D. Colo. 2020). *See also Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245, at 272–73 (S.D.N.Y. 2025) (finding "physically threatening or humiliating conduct that the Complaint alleges Jewish students in the library experienced is entirely outside the ambit of the free speech clause and was objectively severe") (internal quotation marks and citation omitted); *Kestenbaum v. President & Fellows of Harvard Coll.*, 743 F. Supp. 3d 297, 304 (D. Mass. 2024) (finding a plausibly hostile environment based on, *inter alia*, "[d]uring one of the protest rallies, demonstrators blockaded Jewish students in a study room, and during another, protestors 'surrounded and intimidated' Jewish students") (internal citations omitted).

Finally, the Equal Protection Clause and Title VI require that when a school is made aware of alleged harassment, it must respond reasonably by taking timely and appropriate action to investigate or otherwise determine what occurred. If an investigation reveals that discriminatory harassment has occurred, the school must act reasonably to investigate and address the harassment and hostile environment. *See, e.g., Flores*, 324 F.3d at 1135 (failure to investigate, stop harassment, or discipline all students who engaged in harassment was evidence of deliberate indifference); *see also G.D.S. v. Northport-East Northport Union Free Sch. Dist.*, 915 F. Supp. 2d 268, 279 (E.D.N.Y. 2012) ("Given the severe and shockingly offensive nature of the anti-Semitic slurs allegedly being made to the Plaintiff by other students, it appears to this Court that the supposed lack of action by the Defendants to either educate students about the harms of such religious discrimination or investigate and discipline the harassers was an inadequate response and thus, clearly unreasonable."). Furthermore, "[w]here a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances." *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 261 (6th Cir. 2000) (Title IX); *see also Flores*, 324 F.3d at 1135–36 (citing *Vance*, 231 F.3d at 261).

## Findings

First, the Department finds, based on the totality of the circumstances, that Jewish and Israeli students at UCLA were subjected to severe, pervasive, and objectively offensive harassment that created a hostile environment by members of the encampment. Jewish and Israeli students were assaulted, verbally harassed, and physically prevented from accessing parts of the UCLA campus on the basis of their actual or perceived race, religion, and/or national origin.

Second, the Department finds that UCLA had actual notice that Jewish and Israeli students were subjected to severe, pervasive, and objectively offensive harassment that created a hostile environment by members of the encampment. UCLA received at least **eleven** complaints alleging that demonstrators were discriminating against students on the basis of their race, religion and/or national origin during the time the encampment sat on Royce Quad. Additionally, public statements by senior UCLA administrators during the encampment demonstrate that UCLA had notice that Jewish and Israeli students were being assaulted and physically prevented from accessing parts of campus by demonstrators, and that "incidents have put many on our campus, especially our Jewish students, in a state of anxiety and fear." UCLA-TVI-DOJ00000273.

Third, the Department finds that UCLA was deliberately indifferent to the hostile environment for Jewish and Israeli students caused by the encampment. With respect to the student discrimination

complaints submitted during the encampment, UCLA's documentation establishes that it did not outright ignore these complaints; however, the University took no *meaningful* action to eliminate the hostile environment for Jewish and Israeli students caused by the encampment until it was disbanded on the morning of May 2nd. The clearest way for UCLA to have eliminated the hostile environment is to have disbanded the encampment as soon as it became aware that Jewish and Israeli students were being physically assaulted and prevented from accessing parts of campus.

UCLA declined to disband the encampment for nearly a week because of its consideration of what Chancellor Block described as "several equally important principles: the need to support the safety and wellbeing of Bruins, the need to support the free expression rights of our community, and the need to minimize disruption to our teaching and learning mission." UCLA-TVI-DOJ00000261. Given the especial importance of First Amendment free speech rights on public university campuses, "it will usually be difficult—if not impossible—to show that a college or university acted in a clearly unreasonable manner under Title VI where its acts of alleged deliberate indifference consist of its refusal to punish political speech directed at the college community *through reasonable means*." *Gartenberg*, 765 F. Supp. 3d at 267 (emphasis added). Here, however, the Department finds that UCLA's free speech concerns were misplaced for two reasons.

First, even if the protest encampment had initially complied with applicable time, place, and manner restrictions and was approved by UCLA as a lawful expressive activity, as early as April 26th, the second day of the encampment, the University was on notice that Jewish students had been physically assaulted by members of the encampment. TVI-DOJ00000414. On April 28th, Vice Chancellor Osako acknowledged that "physical altercations" had erupted at the encampment. UCLA-TVI-DOJ00000278. And on April 30th, Chancellor Block acknowledged that "students on their way to class have been physically blocked from accessing parts of the campus," and that "[t]hese incidents have put many on our campus, especially our Jewish students, in a state of anxiety and fear." UCLA-TVI-DOJ00000273. Therefore, for days before the encampment was declared unlawful, UCLA was on notice that encampment demonstrators were engaging in non-expressive conduct unprotected by the First Amendment, and which violated UC policy and denied Jewish and Israeli students access to campus resources.[5]

Consequently, on August 13, 2024, the *Frankel* court found in its preliminary injunction order that "Jewish students were excluded from portions of the UCLA campus because they refused to denounce their faith," and the protest encampment "led UCLA to effectively make certain of its programs, activities, and campus areas available to other students when UCLA knew that some Jewish students, including Plaintiffs, were excluded based o[n] their genuinely held religious beliefs." *Frankel, et al. v. Regents of the University of California, et al.*, No. 2:24-cv-4702 (C.D. Cal.) (Prelim. Inj., ECF No. 89 at 1, 5). Essentially, a federal court has already found that the Jewish exclusionary zones on UCLA's campus were not merely the exercise of speech protected by the First Amendment.

Second, from the encampment's inception, the University was authorized to enforce its reasonable, existing time, place, and manner restrictions consistent with the First Amendment. Even in traditional public fora like UCLA's Royce Quad, "the government may impose reasonable time, place, and manner restrictions on speech" and "nothing in the Constitution requires the Government to freely

---

[5] As the *Task Force Report* found, "until April 30, 2024, instead of ordering enforcement of state laws, or UC and campus rules, or fulfilling their legal obligation to protect the Constitutional rights of Jews at UCLA, campus leadership allowed the encampment and related denial of campus access to continue." *Task Force Report* at 60.

8

grant access to all who wish to exercise their right to free speech on every type of Government property." *Camenzind v. Cal. Exposition & State Fair*, 84 F.4th 1102, 1109 (9th Cir. 2023) (internal quotation marks omitted). Thus, UCLA had at its disposal a valid and content-neutral legal basis to disband the protest encampment soon after it was assembled that would have eliminated the hostile environment that the encampment created.

For these reasons, the Department concludes that UCLA was deliberately indifferent by responding to complaints about the encampment by Jewish and Israeli students in a clearly inadequate manner in violation of the Equal Protection Clause and Title VI.

### Voluntary Resolution

Having determined that UCLA was deliberately indifferent to the hostile environment for Jewish and Israeli students created by the protest encampment, the Department now seeks to enter into a voluntary resolution agreement with the University to ensure that the hostile environment is eliminated and reasonable steps are taken to prevent its recurrence.

If you are interested in resolving this matter along these lines, please contact please reach out to Senior Counsel Jeffrey Morrison (jeffrey.morrison@usdoj.gov and (202) 598-515) by August 5, 2025. Unless there is reasonable certainty that we can reach an agreement in this matter, the United States is prepared to file a complaint in federal district court by September 2, 2025.

Thank you for your attention to this important civil rights matter.

Sincerely,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division
U.S. DEPARTMENT OF JUSTICE

Gregory W. Brown
Deputy Assistant Attorney General
Civil Rights Division
U.S. DEPARTMENT OF JUSTICE

cc:    David Harris
Civil Chief
United States Attorney
Central District of California

Pamela Johann
Civil Chief
United States Attorney
Northern District of California

Matthew R. Cowan
O'Melveny & Myers LLP
mcowan@omm.com

Natasha W. Teleanu
O'Melveny & Myers LLP
nteleanu@omm.com

Mia N. Gonzalez
O'Melveny & Myers LLP
mgonzalez@omm.com