# EXHIBIT 43

On April 24, 2025, a federal court enjoined the Department from "enforcing and/or implementing" the following: Dear Colleague Letter: Title VI of the Civil Rights Act in Light of Students for Fair Admissions v. Harvard (Feb. 14, 2025), Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act (first issued on Feb. 28, 2025), End DEI Portal, and Reminder of Legal Obligations Undertaken in Exchange for Receiving Federal Financial Assistance and Request for Certification Under Title VI and SFFA v. Harvard (April 3, 2025) (certification requirement) against the plaintiff National Education Association, et al., its members, and any entity that employs, contracts with, or works with its members. See, Nat'l Educ. Ass'n v. United States Dep't of Educ., No. 25-CV-091-LM (D.N.H. Apr. 24, 2025). As a result, the Department of Education's Office for Civil Rights will not take any enforcement action, or otherwise implement, the February 28, 2025, Dear Colleague Letter, associated FAQs, the End DEI Portal, or the certification requirement until further notice.

UNITED STATES DEPARTMENT OF EDUCATION
OFFICE FOR CIVIL RIGHTS

# Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act

This frequently asked questions document is intended to anticipate and answer questions that may be raised in response to the *Dear Colleague Letter: Title VI of the Civil Rights Act in Light of Students for Fair Admissions v. Harvard* issued by the U.S. Department of Education's Office for Civil Rights (OCR)[1] on February 14, 2025. This document seeks to provide helpful information about how the decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023) ("*Students v. Harvard*" or "*SFFA*"), applies to racial classifications, racial preferences, and racial stereotypes[2] as well as how OCR interprets the ruling in its enforcement of Title VI of the Civil Rights Act of 1964 and its implementing regulations.[3]

**Question 1: Where can I report discriminatory conduct?**

**Answer 1:** Anyone who believes that a school has engaged in discrimination may file a complaint with the Department of Education's Office for Civil Rights. Information about filing a complaint with OCR, including a link to the online complaint form, is available at *How to File a Discrimination Complaint with the Office for Civil Rights* on the OCR website.

**Question 2: What did the U.S. Supreme Court decide in *Students for Fair Admissions v. Harvard*?**

**Answer 2:** The U.S. Supreme Court held that the admissions programs of the University of North Carolina and Harvard College violated the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and, coextensive with the Equal Protection Clause, Title VI of the Civil Rights Act, by impermissibly considering students' race when making admissions decisions. The Court

---

[1] OCR is responsible for determining whether entities that receive federal financial assistance from the U.S. Department of Education comply with Title VI of the Civil Rights Act of 1964, which prohibits race, color, or national origin discrimination; Title IX of the Education Amendments of 1972, which prohibits sex discrimination; Section 504 of the Rehabilitation Act of 1973, which prohibits disability discrimination; and the Age Discrimination Act of 1975, which prohibits age discrimination. OCR also shares in the enforcement of Title II of the Americans with Disabilities Act of 1990 (Title II) with the U.S. Department of Justice. Title II prohibits discrimination against individuals with disabilities by public entities, regardless of whether they receive federal financial assistance. Throughout this FAQ, "school" is used generally to refer to recipients of federal financial assistance and public entities, including elementary, secondary, and postsecondary institutions.

[2] Racial classifications, racial stereotypes, racial preferences, and policies that distinguish among individuals based on race are all forms of discrimination in that they intentionally treat people as members of racial groups, rather than as individuals. For the purpose of this document, these terms refer to policies and conduct that are motivated by racial considerations.

[3] The contents of this Q&A document do not have the force and effect of law and do not bind the public or impose new legal requirements, nor do they bind the Department of Education in the exercise of its discretionary enforcement authority. The purpose of this document is to provide clarity about existing law for the benefit of the public.

400 MARYLAND AVE. S.W., WASHINGTON, DC 20202-1100
www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

articulated a broad principle: "Eliminating racial discrimination means eliminating all of it."[4] The Court emphasized that students must be treated based on their experiences as individuals and not based on their race.[5] It declared the admissions programs were unlawful because they employed racial stereotypes, disadvantaged members of particular races, were not sufficiently measurable, and lacked a logical endpoint.[6]

**Question 3: What did the Supreme Court say about racial preferences in *Students for Fair Admissions v. Harvard*?**

**Answer 3:** While the facts of the case before the Supreme Court were specifically about racial preferences in university admissions, the Court applied broad reasoning to its decision, which has implications for race-based policies in education generally. Citing several of its previous rulings, the Court articulated two rules about school policies or programs that use race:

First, a school may never use a student's race as a "stereotype or negative."[7] This means schools cannot assume that a person's race necessarily implies something about that person, including something about that person's perspective, background, experiences, or socioeconomic status. It also means that, in any competitive admissions process, (and by the same logic any other competitive process for a benefit at an educational institution) a school cannot legally treat membership in any racial group as a plus factor. This is because a plus factor for one racial group is necessarily a negative factor for those not in that racial group. As the Court stated: "College admissions are zero-sum, and a benefit provided to some applicants but not to others necessarily advantages the former at the expense of the latter."[8]

> The Supreme Court has held that Title VI is coextensive with the Equal Protection Clause of the Fourteenth Amendment. In other words, discrimination based on race, color, or national origin by a public institution that violates the Equal Protection Clause of the Fourteenth Amendment also violates Title VI if committed by a private institution that accepts federal funds.
>
> You can find more information about OCR's enforcement of Title VI on the Department's [website](website).

Second, in quoting an earlier ruling, the Court stated: "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality."[9] Therefore, even when racial classifications or distinctions do not necessarily involve making conscious stereotypes about members of a particular race or placing members of a particular race at a disadvantage in a zero-sum process by treating their race as a

---

[4] *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023).
[5] *Id*. at 206.
[6] *Id*. at 230.
[7] *Id*. at 218.
[8] *Id*. at 27.
[9] *Id*. at 208 (quoting *Rice v. Cayetano*, 528 U.S. 495, 517 (2000)).

"negative" consideration, they still raise constitutional concerns under the Fourteenth Amendment, triggering the highest level of judicial review known as "strict scrutiny."[10]

Strict scrutiny is a "daunting" two-part test.[11] First, the racial classification must serve a "compelling government interest."[12] Second, it must be "narrowly tailored" to achieve that interest.[13] Satisfying both parts of the test is very difficult. The *SFFA* Court recognized one interest as sufficiently compelling in the educational context to justify race-based preferences: "remediating specific, identified instances of past discrimination that violated the Constitution or a statute"[14] committed by the specific educational institution in question.[15] Finally, to satisfy strict scrutiny, an interest must be "sufficiently measurable to permit judicial review," rather than amorphous, general, or intrinsically unmeasurable.[16]

For these reasons, the asserted compelling interest in "diversity" at issue in *Students v. Harvard* failed strict scrutiny because "the question whether a particular mix of minority students produces 'engaged and productive citizens,' sufficiently 'enhance[s] appreciation, respect, and empathy,' or effectively 'train[s] future leaders' is standardless."[17] Equally, schools may not grant preferential benefits to members of certain races for the purpose of achieving a student-body composition that mirrors the racial makeup of the country, remedying general societal discrimination, or otherwise rectifying societal injustice.[18]

Even if a racial classification furthers a compelling government interest, it must pass the second part of the strict scrutiny test: the method used to achieve the compelling interest must be "narrowly tailored" or "necessary" to achieve that compelling objective.[19] This requires that, even if a school's goal qualifies as compelling, the school must have engaged in a "serious, good faith consideration of workable race-neutral alternatives" to achieve that goal without using race and found that none were available.[20] In addition, a policy "is not narrowly tailored if it is either overbroad or underinclusive

---

[10] *Id*. at 206.
[11] *Id*.
[12] *Id*. at 207.
[13] *Id*.
[14] *Id*.
[15] In *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 301 (1978), the Supreme Court plurality recognized that "various types of racial preferences" might remedy "past discrimination," where those preferences would "rectify th[at] discrimination"; and applying *Bakke*'s logic in *Grutter v. Bollinger*, 539 U.S. 306, 328 (2003), the Court explained that Michigan Law School might justify race-based admissions based on an effort to "remedy[] past discrimination." *See also id.* at 329 (concluding that the Law School had "a compelling interest in a diverse student body"). But in *SFFA*, the Court cabined *Grutter*'s holding, explaining that "race-based admissions" are permitted "only within the confines of narrow restrictions"—any such admissions policy "must comply with strict scrutiny," it can "never use race as a stereotype or negative," and "at some point [it] must end." *SFFA*, 600 U.S. at 213. But in each of those cases, the Supreme Court made clear that it evaluated all race-based preferences under the rubric of strict scrutiny. *See also Vitolo v. Guzman*, 999 F.3d 353, 361 (6th Cir. 2021) (summarizing the Supreme Court's criteria for satisfying a compelling remedial interest as held in *City of Richmond v. J. A. Croson Co.*, 488 U.S. 469 (1989) and *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995)).
[16] *Students for Fair Admissions, Inc.*, 600 U.S. at 214 (internal quotations and brackets omitted).
[17] *Id*. at 215.
[18] *Id.* at 226.
[19] *Id*. at 207.
[20] *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003).

in its use of racial classifications."[21] In *SFFA*, the Court held that the policies were not narrowly tailored because they were overbroad in grouping together all Asian students, underinclusive in not accounting for students from Middle Eastern countries, and arbitrary or undefined in using "Hispanic" to refer to different nationalities that were cobbled together in a classification that changed over time.[22] As a result, race cannot be used as a proxy for socioeconomic disadvantage. Even if there is a correlation between race and socioeconomic status, there are race-neutral alternatives by which to assess socioeconomic status.

Finally, the *SFFA* Court stated that policies based on racial classifications must be time-bound.[23] Schools may not engage in race-based policies in perpetuity. This means that a school's use of racial preferences, even if narrowly tailored to serve a compelling governmental interest, must come with a concrete "logical endpoint."[24]

**Question 4**: **What does the Supreme Court's decision regarding the Equal Protection Clause mean for Title VI?**

**Answer 4:** Title VI prohibits recipients of federal funding from discriminating on the basis of race, color, or national origin. In *Students v. Harvard*, the Supreme Court reiterated that "discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI."[25] This generally means that public institutions, which are directly subject to the Equal Protection Clause, and private institutions that accept federal financial assistance, which are subject to Title VI, are subject to the same legal standard. All educational institutions, including pre-K, elementary, and secondary public schools and school districts, and public and private colleges, universities, and other postsecondary institutions that receive federal financial assistance, are required to comply with Title VI.[26]

**Question 5**: **What did the Supreme Court mean by using a student's race as a stereotype?**

**Answer 5:** In its *SFFA* decision, the Court referred to *race qua race*, or "race for race's sake"—that is, the belief that a person's race necessarily implies that an individual has a certain personality trait, viewpoint, characteristic, or value simply by virtue of being a member of that race.[27] That can involve treating members of a racial classification as fungible, assuming that a member of a particular racial classification will think the same way, reflect a particular culture, or contribute to

---

[21] *Vitolo v. Guzman*, 999 F.3d 353, 362–63 (6th Cir. 2021) (*citing J.A. Croson Co.*, 488 U.S. at 507–08 and *Gratz v. Bollinger*, 539 U.S. 244, 273–75 (2003)).
[22] *Students for Fair Admissions, Inc.*, 600 U.S. at 207.
[23] *Id*. at 212.
[24] *Id.* at 221–25.
[25] *Id.* at 198 n.2.
[26] Title VI provides that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 42 U.S.C. § 2000d, *et seq*.; 34 C.F.R. § 100, *et seq*. Throughout this document, "race" is used generally to refer to all three protected bases, race, color, and national origin.
[27] *Students for Fair Admissions, Inc.*, 600 U.S. at 220.

diversity in the same predictable manner as another member of that race. And, as discussed above, racial classifications further risk devolving into unlawful racial stereotypes when they lump students into categories that are overbroad, underinclusive, or arbitrary and undefined.

**Question 6: What did the Supreme Court mean by using a student's race as a negative?**

**Answer 6:** The *SFFA* Court meant that when there is a limited number or finite amount of educational benefits or resources—such as, *inter alia*, admissions spots in an incoming class, financial aid, scholarships, prizes, administrative support, or job opportunities—a school may not take account of a student's race in distributing those benefits or resources, even if race is only being considered as a positive or plus factor, because to advantage members of one race in a competitive or zero-sum process would necessarily disadvantage those of a different race. As the Court reasoned: "College admissions are zero-sum, and a benefit provided to some applicants but not to others necessarily advantages the former at the expense of the latter."[28] Likewise, schools may not administer scholarships, prizes, or other opportunities offered by third parties based on race.

**Question 7: Can schools separate students by race if they treat all students equally?**

**Answer 7:** Racial segregation is illegal. As the Supreme Court held in *Brown v. Board of Education*, a school cannot engage in any programming, graduation ceremonies, housing, or any other aspect of school life that allows one race but not another or otherwise separates students, faculty, or staff based on race.[29] Intentional segregation or exclusion based on race remains legally indefensible if the programming, graduation ceremonies, housing, or other aspects of campus life are putatively equal or intended for a putatively beneficent purpose: that is simply an updated version of the "separate but equal" rationale of *Plessy v. Ferguson*[30] that the Court overruled in *Brown*.

> OCR has previously issued guidance explaining how racially segregated extracurricular activities, proms, honors, awards, and superlatives are inconsistent with Title VI:
>
> *Joint DOJ/OCR Guidance on Segregated Proms*

Therefore, school-sponsored or school-endorsed racially segregated aspects of student, academic, and campus life, such as programming, graduation ceremonies and housing, are legally indefensible under the same "separate but equal" rationale that the Court rejected in *Brown*. In other words, these segregationist activities violate Title VI.

---

[28] *Id.* at 218–19.
[29] *Id.* at 204 (*citing Brown v. Brown v. Bd. of Ed. of Topeka*, 347 U.S. 483, 494 (1954)).
[30] 163 U.S. 537 (1896).

**Question 8: Are Diversity, Equity, and Inclusion (DEI) programs unlawful under *SFFA*?**

**Answer 8:** Schools may not intentionally discriminate on the basis of race, color, or national origin in their programs or activities. Many schools have advanced racially discriminatory policies and practices under the banner of "DEI" initiatives. Other schools have sought to veil racially discriminatory policies with terms like "social-emotional learning" or "culturally responsive" teaching. But whether an initiative constitutes unlawful discrimination does not turn solely on whether it is labeled "DEI" or uses terminology such as "diversity," "equity," or "inclusion." OCR's assessment of school policies and programs depends on the facts and circumstances of each case.

Schools may not operate policies or programs under any name that intentionally treat students differently based on race, engage in racial stereotyping, or create hostile environments for students of particular races. For example, schools with programs focused on interests in particular cultures, heritages, and areas of the world would not in and of themselves violate Title VI, assuming they are open to all students regardless of race. Nor would educational, cultural, or historical observances—such as Black History Month, International Holocaust Remembrance Day, or similar events—that celebrate or recognize historical events and contributions, and promote awareness, so long as they do not engage in racial exclusion or discrimination. However, schools may not sponsor programming that creates a hostile environment based on race for students who do participate.

**Question 9: The February 14, 2025, Dear Colleague Letter states that many DEI programs "deny students the ability to participate fully in the life of a school" when they "stigmatize students that belong to particular racial groups" based on "crude racial stereotypes," and teach that students of those racial groups "bear unique moral burdens that others do not." Does this mean that students, teachers, and school employees may not discuss topics related to race or DEI under Title VI?**

**Answer 9:** OCR enforces federal civil rights law consistent with the First Amendment of the U.S. Constitution. Nothing in Title VI or its implementing regulations, authorizes a school to restrict any rights otherwise protected by the First Amendment, nor does the Dear Colleague Letter indicate as much.

Additionally, the Department of Education Organization Act, 20 U.S.C. § 3403(b), and the Elementary and Secondary Education Act, 20 U.S.C. § 7907(a), prohibit the Department from exercising control over the content of school curricula. However, the First Amendment rights of students, faculty, and staff, and the curricular prerogatives of states and local school agencies do not relieve schools of their Title VI obligations to refrain from creating hostile environments through race-based policies and stereotypes; nor does it relieve them of their duty to respond to racial harassment that creates a hostile environment.

In determining whether a racially hostile environment exists, OCR will examine the facts and circumstances of each case, including the nature of the educational institution, the age of the students, and the relationships of the individuals involved. For example, an elementary school that sponsors programming that acts to shame students of a particular race or ethnicity, accuse them of

being oppressors in a racial hierarchy, ascribe to them less value as contributors to class discussions because of their race, or deliberately assign them intrinsic guilt based on the actions of their presumed ancestors or relatives in other areas of the world could create a racially hostile environment, by interfering with or limiting the students' ability to participate in or benefit from the school's program or activity. But exploration of similar themes in a class discussion at a university or other college-level programs or activities would be less likely to create a racially hostile environment. In all cases, the facts and circumstances of the discussion or activity will dictate the answer to that inquiry.

However, the more extreme practices at a university—such as requiring students to participate in "privilege walks" that are designed to make them feel guilty about being part of a certain race, segregating them by race for presentations and discussions with guest speakers, pressuring them to participate in protests or take certain positions on racially charged issues, investigating or sanctioning them for dissenting on racially charged issues through DEI or similar university offices, mandating courses, orientation programs, or trainings that are designed to emphasize and focus on racial stereotypes, and assigning them coursework that requires them to identify by race and then complete tasks differentiated by race—are all potential forms of school-on-student harassment that could create a hostile environment under Title VI. Specifically, such conduct could be deemed to create a hostile environment if, viewed by a reasonable person, of the same race and age, under similar circumstances, it is sufficiently severe, pervasive, or persistent so as to interfere with or limit the ability of an individual to participate in or benefit from the school's program or activity.[31]

Moreover, schools must not discriminate against students based on race in how they discipline or sanction students in response to complaints or allegations of harassment, or in response to speech that would be protected under the First Amendment, whether through use of "bias response teams," mandatory trainings, or compelled statements. Nor can schools use race as a reason not to discipline or sanction a student for conduct that would otherwise warrant these corrective measures if applied to members of another race.

> For more information about these topics:
>
> OCR, Dear Colleague Letter: First Amendment (July 2003)
>
> OCR, Racial Incidents and Harassment against Students at Educational Institutions: Investigative Guidance (Mar. 1994)

---

[31] *See* OCR, Racial Incidents and Harassment against Students at Educational Institutions: Investigative Guidance, 59 Fed. Reg. 11,448, 11,449 (Mar. 1994).

Page 8

**Question 10**: **As part of their admissions process, may schools include application essay prompts that invite discussions of race?**

**Answer 10**: In *Students v. Harvard*, the Court held that race-based admissions policies that fail strict scrutiny are illegal but added that "nothing prohibits universities from considering an applicant's discussion of how race affected the applicant's life, so long as that discussion is concretely tied to a quality of character or unique ability that the particular applicant can contribute to the university."[32] However, the Court cautioned in the same paragraph that schools "may not simply establish through application essays or other means the regime we hold unlawful today[,]" adding that "[w]hat cannot be done directly cannot be done indirectly."[33]

Schools that craft essay prompts in a way that require applicants to disclose their race are likely illegally attempting to do indirectly what cannot be done directly, as with admissions policies that hold brief interviews in order to visually assess an applicant's race. It is ultimately racial preferences that are illegal, however accomplished. OCR is aware that certain schools and universities are attempting to circumvent *SFFA*'s holding by engaging in what some commentators call the "essay loophole." Schools can credit what is unique about the individual in overcoming adversity or hardship but may never make an admissions decision based on the person's race.

**Question 11**: **The February 14, 2025, Dear Colleague Letter advises schools to take steps to ensure compliance with Title VI, including by reviewing their policies and by "ceas[ing] all reliance on third-party contractors, clearinghouses, or aggregators that are being used by institutions in an effort to circumvent prohibited uses of race." What is the scope of Title VI coverage as it applies to schools?**

**Answer 11**: Title VI applies to "any program or activity receiving Federal financial assistance from the Department of Education,"[34] and a school's responsibility not to discriminate against students applies to the conduct of everyone over whom the school exercises some control, whether through a contract or other arrangement.[35] A school may not engage in racial preferences by laundering those preferences through third parties.

---

[32] *Students for Fair Admissions, Inc.*, 600 U.S. at 230.
[33] *Id*.
[34] 34 C.F.R. § 100.1.
[35] The nondiscrimination requirements of Title VI extend to conduct undertaken by entities that carry out some or all of the schools' functions through "contractual or other arrangements." 34 C.F.R. § 100.3(b)(1), (2).

Page 9

**Question 12: How does Title VI apply to a school's procurement of goods and services?**

**Answer 12:** A school that receives federal financial assistance is subject to Title VI's nondiscrimination mandate in how it selects contractors to carry out its many functions. In other words, a school may not discriminate based on race, color, or national origin in choosing its provision of after-school programs, substitute teachers, cafeteria services, and special education service providers.

**Question 13: Aside from express racial classifications**, **the February 14, 2025, Dear Colleague Letter refers to policies that appear neutral on their face but are made with a racially discriminatory purpose. How will OCR investigate allegations of covert discrimination?**

**Answer 13:** To determine whether a school acted with a racially discriminatory purpose, OCR may analyze different types of circumstantial evidence that, taken together, raise an inference of discriminatory intent. A non-exhaustive list may include (1) whether members of a particular race were treated differently than similarly situated students of other races; (2) the historical background or administrative history of the policy or decision; (3) whether there was a departure from normal procedures in making the policy or decision; (4) whether there was a pattern regarding policies or decisions towards members of a particular race; (5) statistics demonstrating a pattern of the policy or decision having a greater impact on members of a particular race; and (6) whether the school was aware of or could foresee the effect of the policy or decision on members of a particular race.[36] A school's history and stated policy of using racial classifications and race-based policies to further DEI objectives, "equity," a racially-oriented vision of social justice, or similar goals will be probative in OCR's analysis of the facts and circumstances of an individual case.

OCR may also apply a three-step test to assess indirect evidence of intentional discrimination.[37] First, did a school treat a student or group of students of a particular race differently from a similarly situated student or group of students of other races? Then, if so, can the school provide a legitimate, nondiscriminatory reason for the different treatment that isn't pretextual? Finally, if the school is unable to offer a legitimate, nondiscriminatory reason, or if the offered reason is found to be a pretext or cover for discrimination, OCR may conclude that unlawful discrimination has occurred.

---

[36] *See Village of Arlington Heights v. Metro Housing Development Corp.*, 429 U.S. 252, 266–68 (1977).
[37] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Page 10

**Question 14:** How will OCR proceed with schools that it determines are out of compliance with Title VI?

**Answer 14:** If OCR determines that a school failed to comply with the civil rights laws that it enforces, OCR will contact the school and will attempt to secure its willingness to negotiate a voluntary resolution agreement. If the school agrees to resolve the complaint, OCR and the school will negotiate a written resolution agreement to be signed by the school that describes the specific remedial actions it will take to address the area(s) of noncompliance identified by OCR. OCR will monitor implementation of the resolution agreement's terms. If a school is unwilling to negotiate a resolution agreement, OCR will inform the school of the consequences, which may result in OCR initiating enforcement through administrative proceedings or referring the case to the Department of Justice for judicial proceedings.

> You can learn more about OCR's process by reviewing its updated Case Processing Manual:
>
> 2025 Case Processing Manual

**Question 15:** Where can I learn more about this topic?

**Answer 15:** To learn more, you can visit OCR's website or contact the OCR regional enforcement office serving your area, by phone or email, to request technical assistance about the laws OCR enforces and about OCR's complaint process. You can find contact information for local OCR regional offices on OCR's Contact OCR website.