# EXHIBIT 63

## RESOLUTION AGREEMENT BETWEEN
## THE UNITED STATES OF AMERICA AND
## COLUMBIA UNIVERSITY

### I.    DEFINITIONS

The terms used in this Agreement shall have the following meaning:

a.  "Assistant Attorney General" means the Assistant Attorney General for the Office of Civil Rights within the United States Department of Justice.

b.  "Columbia" or "University" means Columbia University, the legal name of which is The Trustees of Columbia University in the City of New York.

c.  "Ed." means the United States Department of Education.

d.  "Ed. OCR" means the United States Department of Education's Office of Civil Rights.

e.  "EEOC" means the United States Equal Employment Opportunity Commission.

f.  "GSA" means the General Services Administration.

g.  "HHS" means the United States Department of Health and Human Services.

h.  "HHS OCR" means United States Department of Health and Human Services' Office for Civil Rights.

i.  "Investigations" means those inquiries opened by HHS OCR, Ed. OCR, and the United States Department of Justice.

j.  "Parties" means Columbia and the United States of America.

k.  "NIH" means the National Institutes of Health.

l.  "Non-Terminated Grants" means those grants awarded to Columbia or its researchers and faculty which were not enumerated in the United States' March 7,

1

10, or 14, 2025 correspondence notifying Columbia of certain grant and contract terminations but upon which Columbia has nevertheless not received payment.

m. "SIPA" means Columbia's School for International and Public Affairs.

n. "Released Claims" means any claim or liability under any statute or at common law related to the allegations in the March 7, 10, and 14, 2025 grant and contract termination letters, the May 22, 2025 Notice of Violation, or the facts and events under review in the Investigations arising under Title VI, Title VII, Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116, or the False Claims Act, 31 U.S.C. § 3729 *et seq.* "Released Claims" also incorporates by reference the separate agreement between Columbia and the U.S. Equal Employment Opportunity Commission ("EEOC") regarding Columbia's potential liabilities for violation of Title VII (attached and incorporated herein as Exhibit A) ("EEOC Agreement").

o. "Title VI" means Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*

p. "Title VII" means Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

q. "Title IX" means Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681, *et seq.*

r. "Terminated Grants" means awards made to Columbia or its faculty and researchers and enumerated in or covered by the United States' March 7, 10, and 14, 2025 correspondence notifying Columbia of certain award terminations.

s. "UJB" means the University Judicial Board, a disciplinary body comprised of

2

faculty and administrative staff members, housed within Columbia's Office of the Provost.

t.   "United States" means the United States of America.

## II.   INTRODUCTION

1.   The United States and Columbia (collectively, the "Parties") desire to avoid the burdens and risks of protracted litigation. This Agreement is not an admission in whole or in part by either party, and Columbia expressly denies liability regarding the United States' allegations or findings.

2.   This Agreement shall become effective upon execution by all the Parties (the "Effective Date").

3.   The duration of this Agreement will be three years to the day from the Effective Date.

## III.   RELIEF

4.   This Agreement applies to the relationship between the United States and Columbia and does not bind Columbia or the United States with regard to any other person or entity.

5.   No provision of this Agreement, individually or taken together, shall be construed as giving the United States authority to dictate faculty hiring, University hiring, admission decisions, or the content of academic speech.

6.   This Agreement represents the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and understanding of the Parties with respect to the subject matter hereof. Nothing in this Agreement prohibits the United States from bringing actions against Columbia for future violations of Title VI or Columbia's violations of any other provision of federal law on the same basis it would bring similar actions against other institutions.

7.   In consideration for entering into this Agreement the United States shall restore to Columbia those Terminated Grants by HHS or NIH upon the Effective Date of this Agreement. The Terminated Grants by Ed. and any other terminated contracts are excluded from this provision.

3

8.    The United States shall further:

    a.  In the ordinary course, and as soon as reasonably practicable, enable the drawdown of overdue payments on Non-Terminated Grants, timely process payments for Non-Terminated and Terminated Grants as submitted in the ordinary course, timely renew relevant non-competitive grants in the ordinary course and consistent with past practice, and confirm that Non-Terminated Grants will not be withheld or terminated in the future in relation to the conduct covered under this Agreement;

    b.  Treat Columbia as eligible for further grants, contracts, and awards in the ordinary course, without disfavored treatment;

    c.  Close pending Investigations or compliance reviews regarding Columbia's compliance with Title VI, Section 1557 of the Affordable Care Act, or other statutes, pending as of the Effective Date of this Agreement, including those related to the Released Claims. This provision incorporates by reference the separate EEOC Agreement attached as Exhibit A regarding any investigation or alleged violation of Title VII. Nothing in this Agreement prevents the United States (even during the period of the Agreement) from conducting subsequent compliance reviews, investigations, defunding or litigation related to Columbia's actions occurring after the Effective Date of this Agreement. Nothing in this Agreement or the EEOC Agreement affects in any way EEOC's right to bring, process, investigate, litigate, or otherwise seek relief in any charge filed by individual charging parties or third parties that may later be filed against Columbia, in accordance with standard EEOC procedures; and

4

    d.  Within 14 days of the Effective Date, notify Middle States Commission on Higher Education of the United States' release of liability in relation to the Released Claims.

IV.    <u>AGREEMENT BETWEEN THE PARTIES</u>

9.    With the exception of actions to enforce this Agreement, the United States agrees not to institute any civil action or other adverse agency action against Columbia, its officers, Trustees, directors, and employees (the "Columbia Releasees") related to the Released Claims. The United States releases the Columbia Releasees from any liability related to the Released Claims. The United States is not releasing Columbia or the Columbia Releasees from any other liability.

10.    In settlement and compromise of the Released Claims in this Agreement Columbia shall pay the United States the sum of Two Hundred Million Dollars ($200,000,000), payable in equal installments. The first payment shall be made within five (5) business days of the Effective Date, and each subsequent installment payment shall be made on the anniversary of the Effective Date for each year of the term of this Agreement. In addition, pursuant to the terms of the EEOC Agreement, incorporated by reference herein and attached as Exhibit A, Columbia will pay Twenty-One Million Dollars ($21,000,000) into a claims fund and undertake the obligations as outlined in the EEOC Agreement.

11.    No later than 30 days after the Effective Date of this Agreement, Columbia shall designate an Administrator who shall be answerable to Columbia's President and who shall be principally responsible for coordinating and overseeing compliance with this Agreement and shall be given sufficient supervisory authority and access to resources within Columbia to direct implementation of this Agreement. Once selected, this Administrator shall be responsible for making regular reports to a Resolution Monitor to be described in Section VI of this Agreement

(hereinafter "Resolution Monitor"), as well as Columbia's submissions and its public reports described in Section VII of this Agreement. This role shall be maintained and staffed throughout the duration of this Agreement. Columbia may change this Administrator during the term of the Agreement and shall provide the United States with notice that the Administrator has changed within 14 days of the new Administrator's taking office. In the event the Administrator resigns, Columbia shall not permit the position to remain open for an unreasonable amount of time. In the event of a vacancy in the Administrator position, the President of Columbia will be responsible for exercising the duties of the Administrator.

12.    Consistent with Columbia's announcement on March 21, 2025, Columbia shall maintain its Senior Vice Provost focused on promoting excellence in regional studies. As part of this role, the Senior Vice Provost, acting with the authority of the Office of the Provost, will conduct a thorough review of the portfolio of programs in regional areas across the University, starting with the Middle East. This review includes the Center for Palestine Studies; the Institute for Israel and Jewish Studies; Middle Eastern, South Asian, and African Studies; the Middle East Institute; the Tel Aviv and Amman global hubs; the School of International and Public Affairs Middle East Policy major; and other University programs focused on the Middle East. In this role, the Senior Vice Provost will:

      a.  Review the educational programs to ensure the educational offerings are comprehensive and balanced;

      b.  Review all aspects of leadership and curriculum;

      c.  Steward the creation of new programs to address the full range of fields;

      d.  Partner with the Vice Provost for Faculty Affairs and the schools to create a standard review process for the hiring of non-tenured faculty across the University;

6

e.  Review the processes for approving curricular changes; and

f.  Make recommendations to the President and Provost, in accordance with academic procedures, about any necessary changes, academic restructuring, or investments that will ensure academic excellence and complementarity across all programs in the given academic areas.

13.    Columbia shall, consistent with its announcement on March 21, 2025, appoint new faculty members with joint positions in both the Institute for Israel and Jewish Studies and the departments or fields of economics, political science, or SIPA. These faculty members will contribute to a robust and intellectually diverse academic environment.

14.    To further support Jewish life and the wellbeing of Jewish students on campus, Columbia will add an additional administrator ("Student Liaison"), reporting to the head of University Life, who will serve as a liaison to students concerning antisemitism issues, advise the University's agreement Administrator and other University leaders and make recommendations to University leaders about ways to improve and to support Jewish students.

15.    Columbia shall not maintain programs that promote unlawful efforts to achieve race-based outcomes, quotas, diversity targets, or similar efforts. For example, Columbia will not provide benefits or advantages to individuals on the basis of protected characteristics in any school, component, division, department, foundation, association or element within the entire Columbia University system. Columbia and each of its schools, components, divisions, and departments, including but not limited to professional and graduate schools, will comply with and follow antidiscrimination laws, including Title VI and Title IX of the Education Amendments of 1972. Columbia agrees to comply with all applicable laws, including Title VI, Title VII, and Title IX, and Section 1557 of the Affordable Care Act, regarding the treatment of individuals. Accordingly, Columbia will provide a timely report to the Resolution Monitor

summarizing its compliance with this obligation, including an assurance that Columbia has acted responsibly to ensure its programs do not promote unlawful DEI goals.

16.    Columbia shall maintain merit-based admissions policies. Columbia may not, by any means, unlawfully preference applicants based on race, color, or national origin in admissions throughout its programs. No proxy for racial admission will be implemented or maintained. Columbia may not use personal statements, diversity narratives, or any applicant reference to racial identity as a means to introduce or justify discrimination.

17.    Nothing in this Agreement prevents the United States (even during the period of the Agreement) from conducting subsequent compliance reviews, investigations, or litigation into Columbia's future admissions practices to ensure that those practices are in full compliance with all applicable laws and not a proxy for prohibited discrimination.

18.    Columbia shall provide the Resolution Monitor and the United States with admissions data consistent with 34 C.F.R. § 100.6 and similar regulations showing both rejected and admitted students broken down by race, color, grade point average, and performance on standardized tests, in a form permitting appropriate statistical analyses by October 1 of each year of the Agreement. Admissions data will also be subjected to a comprehensive audit by the Resolution Monitor. Non-individualized, statistical information regarding enrolled students shall be made available to the public each year for the Term of the Agreement, including the composition of the class broken down by race, color, national origin, grade point average, and performance on standardized tests.

19.    Columbia shall provide that all hiring and promotion practices for faculty and administrative roles are grounded solely in individual qualifications and academic and professional merit, and shall not use of race, color, sex, or national origin as a factor—implicit or explicit—in hiring decisions across all schools, departments, and programs. The use of

indirect methods or criteria that serve as a substitute for race conscious hiring or promotion practices is also prohibited. Nor may Columbia use personal statements, diversity narratives, or any applicant reference to racial identity as a means to introduce or justify discriminatory practices in hiring or promotion. All data related to faculty and administrative staff hiring and promotion practices shall be shared with the Resolution Monitor by July 15 every year for the term of the Agreement. Hiring data will also be subjected to a comprehensive audit by the Resolution Monitor.

20.    Columbia will uphold its commitment to Title IX of the Education Amendments of 1972 by providing safe and fair opportunities for women including single-sex housing for women who request such housing and all-female sports, locker rooms, and showering facilities.

21.    Columbia will undertake a comprehensive review of its international admissions processes and policies and will ensure that international student-applicants are asked questions designed to elicit their reasons for wishing to study in the United States.

22.    Processes will be established to provide that all students, international and domestic, are committed to the longstanding traditions of American universities, including civil discourse, free inquiry, open debate, and the fundamental values of equality and respect. Students will also agree not to engage in discrimination, harassment, and other violations of Columbia policy. Columbia will also develop training materials to socialize all students to campus norms and values more broadly. The Resolution Monitor shall review such processes by October 1, 2025, and regularly thereafter. Moreover, Columbia will examine its business model and take steps to decrease financial dependence on international student enrollment. The reforms should be made durable by adoption of any necessary organizational and personnel changes.

23.    Columbia will comply with all legal requirements related to the Student and

Exchange Visitor Program ("SEVIS" Program) and comply with all requests for immigration information consistent with the requirements of the program. Columbia will promptly provide the United States, upon request, with all disciplinary actions involving student visa-holders resulting in expulsions or suspensions, and arrest records that Columbia is aware of for criminal activity, including trespass or other violation of law, to the extent permitted by FERPA. Disciplinary actions will be determined without regard to immigration status. The University will provide the Resolution Monitor with anonymized statistical data sufficient to evaluate compliance with the foregoing sentence.

24.    Columbia will comply with all foreign gift and contract reporting obligations, including under Section 117 of the Higher Education Act. Columbia will comply with reasonable and lawful requests from the United States for information related to foreign funding sources.

25.    Columbia will, as needed, engage experts on laws and regulations regarding sanctions enforcement, anti-money laundering, and prevention of terrorist financing (including laws and regulations applicable to sanctioned countries and individuals) and will adopt, modify and enforce policies and procedures designed to ensure compliance with such laws and regulations applicable to Columbia.

26.    As Columbia understands the critical importance of the effectiveness and impartiality of its disciplinary processes outlined in Columbia's announcement on March 21, 2025, to ensure an efficient and fair process for student discipline and the right to a safe and nondiscriminatory educational environment, Columbia's UJB and rules process will be housed in and administered by the Office of the Provost. Each UJB panel will be comprised solely of faculty and administrative staff members. All panel members will undergo a rigorous vetting and conflict review process to ensure objectivity, impartiality, and a commitment to following

10

and enforcing Columbia's rules and policies. The Provost will have final approval of all panel members and appellate Deans. Final determination of appeals of disciplinary decisions will remain with the University President. The University will not provide the UJB panel members with information about respondents' immigration status and the UJB will not consider respondents' immigration status in its deliberation or sanctioning.

27.    Consistent with Columbia's March 21, 2025 commitments, Columbia shall maintain the following University policies and rules:

    a.  Demonstrations and other protest activities that occur inside academic buildings and places where academic activities take place present a direct impediment to maintaining Columbia's core academic mission. Such protests in academic buildings, and other places necessary for the conduct of University activities, are not acceptable under the Rules of University Conduct  because of the likelihood of disrupting academic activities.

    b.  All demonstration activity is subject to the University's anti- discrimination and anti-harassment policies.

    c.  All individuals who engage in protests or demonstrations, including those who wear face masks or face coverings must, when asked, present their University identification to the satisfaction of a University delegate or Public Safety Officer. Individuals who fail to comply with these policies will be subject to discipline, being escorted off campus, and detention for trespass where appropriate.

    d.  Face masks or face coverings are not allowed for the purpose of concealing one's identity in the commission of violations of University policies or state, municipal, or federal laws. Face masks or face coverings are always allowed

11

for religious or medical reasons.

e.  Student groups are subject to discipline for discriminatory conduct or other violations of University policy. Columbia's Office of Institutional Equity will enforce existing policy and processes for discipline of all student groups stemming from discriminatory conduct and retains the ability to sanction student groups for discriminatory conduct including by defunding, suspending, or de-recognizing them. The Office of University Life will enforce existing policy and processes for discipline of student groups unrelated to claims of discriminatory conduct, and retains the ability to defund, suspend, or de-recognize groups in the event of a violation.

28.    Columbia will impartially implement and apply University rules and policies, including prompt and consistent enforcement of disciplinary rules and policies without regard to identity or ideology.

29.    Columbia will evenly implement its institution-wide policies on harassment and discrimination under Title VI.

30.    Columbia shall ensure that its trainings for employees covers Columbia's relevant obligations under this Agreement.

31.    Columbia's recent enhancement to campus safety will be maintained for the duration of the Agreement:

a.  Columbia will maintain for the duration of the Agreement at least 36 trained and certified special officers, directly and through service providers, with the ability to remove individuals from campus and/or arrest them when appropriate. Columbia's existing 2015 Memorandum of Understanding with the New York Police Department ("NYPD") or similar successor Agreement will remain in full

12

force and effect, ensuring that the NYPD can provide additional security assistance when needed.

b. Nothing in this Agreement shall be construed to prevent Columbia from adopting at its discretion additional safety and security measures that go beyond these terms.

32.    Columbia will maintain retaliation reporting procedures and protections, in accordance with federal, state, and local laws. Columbia will ensure that these procedures and protections will apply to those reporting noncompliance with this Agreement.

33.    No later than 30 days after the Effective Date of this Agreement, Columbia shall establish procedures by which any member of the Columbia community can report allegations of noncompliance with the reforms detailed in this Agreement to the Administrator and the Resolution Monitor. Any such reporter shall be fully protected from any adverse actions for so reporting.

V.    DISPUTE RESOLUTION

33.    If either Party reasonably believes that the other is in violation of the terms of this Agreement, including those reporting obligations outlined in Section VII, it shall provide prompt written notice to the other Party and identify with specificity the portion or portions of this Agreement about which it has concerns, with a copy of such notice to be provided to the Resolution Monitor.

34.    Following receipt of such notice, Columbia or the United States shall respond in writing within 5 business days of receipt, and a copy of such response provided to the Resolution Monitor.

35.    Within 10 business days of receipt of the written response identified in the preceding paragraph, the Parties shall attempt to resolve informally the disputes identified in

13

the notices and response materials, including by affording the notified party a reasonable opportunity to cure. The Parties shall engage in good faith efforts to resolve the issue before seeking further action.

36.    If after the expiration of the 10 business days following the deadline to produce the response as set forth above resolution of the issue(s) has not been achieved, the United States or Columbia may commence, initiate, or institute a non-binding Arbitration before a single Arbitrator, selected from a panel of six arbitrators denoted in the attached Exhibit B to be selected and chosen by the Parties. Within 60 days of the commencement of the Arbitration, the Arbitrator shall issue a non-binding, advisory only, Reasoned Decision, which shall be confidential and entirely inadmissible in any subsequent legal proceedings. The non-binding, advisory only, Reasoned Decision shall have no evidentiary weight whatsoever, shall be inadmissible in any proceeding, including civil claims in a court of competent jurisdiction or any appeals or appellate proceedings, and shall have no preclusive effect of any kind. The Parties agree that in the Reasoned Decision, the Arbitrator may (1) address whether or not the Agreement has been breached; (2) address questions regarding the interpretation and meaning of the Agreement or any provision thereof; and (3) may recommend appropriate remedies, if any. Neither party shall have any right or entitlement to appeal or seek further relief or remedies from the non-binding, advisory only, Reasoned Decision or any part thereof.

37.    Subject only to the non-binding alternative dispute resolution mechanisms set forth in this section, nothing about or contained in this Agreement shall limit, impair, or prevent either party to this Agreement from initiating any proceeding in any court of competent jurisdiction to enforce this Agreement or seek remedies for the breach thereof, including injunctive relief. All rights of the parties to pursue any applicable remedy in law or equity in a court of competent jurisdiction shall be preserved to the maximum extent permitted by

14

applicable law. Additionally, nothing about or contained in this Agreement shall limit, impair, or prevent any party to this Agreement from pursuing appellate rights and remedies of any order, judgment, ruling, verdict, or outcome of proceedings initiated or commenced in a court of competent jurisdiction.

38.     After the issuance of the non-binding, advisory only, Reasoned Decision, or the expiration of 60 days following initiation or commencement of the non-binding Arbitration, whichever is earlier, either Party shall be entitled to commence a civil action in a court of competent jurisdiction.

39.     The Assistant Attorney General shall have discretion and authority to initiate and conduct reasonable compliance audits, reviews, inquiries, or investigations to the maximum extent ordinarily permitted by Title VI. If the Assistant Attorney General determines that Columbia has breached any term or provision of this Agreement, the Assistant Attorney General shall issue a written notice to Columbia identifying any breach or deficiencies pursuant to Paragraph 33. Upon receipt of notice from the Assistant Attorney General, the dispute resolution mechanisms and provisions in this Agreement shall apply. Subject to the dispute resolution provisions above, nothing about this Agreement shall limit or preclude either party from initiating a civil action sounding in law or equity for any appropriate measure of damages or relief, including injunctive relief, in a court of competent jurisdiction and nothing about this Agreement shall limit, impair, or preclude either party's appellate rights or rights of appeal.

VI.    MONITORING

40.     The Parties agree to the selection of Bart M. Schwartz of Guidepost Solutions as a Resolution Monitor for this Agreement.  If it becomes necessary for the Parties to select a different Resolution Monitor, Columbia and the United States will together select a Resolution

15

Monitor, acceptable to both Parties, to assess and report on Columbia's compliance with the obligations contained in this Agreement. The Parties have agreed to use a direct contracting process in selecting the Resolution Monitor. This process will be implemented in a manner consistent with this Agreement, including the requirement that the Resolution Monitor be jointly selected and acceptable to both United States and Columbia. The Resolution Monitor, and any team members employed by the Resolution Monitor, will be comprised of individuals of the highest ethics. In the event the Parties cannot agree on a Resolution Monitor within 60 days after a good faith effort, an arbitrator selected by the Parties from the list in Exhibit B shall select the Resolution Monitor.

41.    The Resolution Monitor will be appointed for the duration of this Agreement. The Resolution Monitor's responsibility is to monitor Columbia's compliance with this Agreement, in accordance with its terms, limited to the period beginning on the Effective Date of the Agreement and ending upon the Agreement's termination. The Parties may change the identity of the Resolution Monitor during this term by mutual Agreement.

42.    Columbia will bear all reasonable fees and costs of the Resolution Monitor. The United States and Columbia recognize the importance of ensuring that the fees and costs borne by Columbia are reasonable, and accordingly fees and costs will be one factor to be considered in selecting the Resolution Monitor. If any dispute arises regarding the reasonableness or payment of the Resolution Monitor's fees and costs, the Parties and the Resolution Monitor shall adhere to the dispute resolution mechanisms of this Agreement. The same provisions above regarding the inadmissibility and non-binding, non-preclusive effect of any decision by the Arbitrator and the rights of the parties to pursue all available claims and remedies before a court of competent jurisdiction, including rights of appeal, shall apply to disputes regarding reasonableness or payment of the Resolution Monitor's fees and costs.

43.     The Resolution Monitor, at any time after its initial selection, may request to hire, employ, or contract with such additional persons or entities as are reasonably necessary to perform the tasks assigned to the Resolution Monitor by this Agreement. Any person or entity hired or otherwise retained by the Resolution Monitor to assist in furthering any provision of this Agreement will be subject to the provisions of this Agreement. The Resolution Monitor will notify the Parties in writing if the Resolution Monitor wishes to select such additional persons or entities. The notice will identify and describe the qualifications of the person or entity to be hired or employed and the monitoring task to be performed. If the Parties agree with the Resolution Monitor's proposal, the Resolution Monitor will be authorized to hire or employ such additional persons or entities. The Parties have ten (10) business days to disagree with any such proposal. If the Parties are unable to reach agreement within ten business days of receiving notice of the disagreement, the disagreement shall be resolved through the dispute resolution provisions of this Agreement.

44.     Should the United States or Columbia determine that the Resolution Monitor's individual members, agents, employees, or independent contractors failed to satisfactorily perform the duties required by this Agreement, the United States or Columbia may propose replacement of the Resolution Monitor, and/or any individual members, agents, employees, or independent contractors.

45.     As described in Paragraph 11, the Administrator shall make semi-annual reports to the Resolution Monitor sufficient to evidence Columbia's compliance with the obligations contained in this Agreement. Columbia shall propose a format for reports within a reasonable time following the Effective Date, subject to the Resolution Monitor and the United States' reasonable approval. The Resolution Monitor will review the reports and may request additional information and/or conduct reviews or audits as necessary to determine whether the

17

information in the reports is accurate and whether Columbia has complied with the obligations in this Agreement. Compliance reviews and audits will contain the elements necessary for reliability and comprehensiveness. Compliance reviews and audits may be conducted using sampling and compilation data where appropriate. The Resolution Monitor will produce to the Parties a draft report concerning each compliance assessment within fifteen (15) business days after the end of each assessment.

46.    The Resolution Monitor may make recommendations to the Parties regarding actions necessary to ensure timely substantial and effective compliance with the obligations of this Agreement. Such recommendations may include a recommendation to change, modify, or amend a provision of this Agreement, a recommendation for additional training in any area related to this Agreement, or a recommendation to seek technical assistance. In addition to such recommendations, the Resolution Monitor may also, at the agreement of the Parties and based on the Resolution Monitor's reviews, provide technical assistance consistent with the Resolution Monitor's responsibilities under this Agreement. For the avoidance of doubt, and notwithstanding any other provision in this Agreement, neither the Resolution Monitor nor the Arbitrators utilized as part of the dispute resolution mechanism described in Section V have the authority, on behalf of the United States or its agencies, to make a final determination regarding Columbia's compliance with the relevant law or to initiate any enforcement action for a violation of Title VI or any federal statute.

47.    The Resolution Monitor will maintain regular contact with the Parties to ensure effective and timely communication regarding the status of Columbia's compliance with its obligations under this Agreement. The Resolution Monitor will not be liable for any claim, lawsuit, or demand arising out of the Resolution Monitor's performance pursuant to this Agreement brought by non-parties to this Agreement.

18

48.     To facilitate its work, the Resolution Monitor may conduct on-site visits and assessments upon reasonable prior notice to Columbia.

49.     Subject to applicable confidentiality laws (*i.e.*, the Federal Educational Rights & Privacy Act ("FERPA"), 20 U.S.C. § 1232g) and all applicable privileges, the Resolution Monitor will have timely access to interview all Agreement-related individuals, and visit all Agreement-related facilities, trainings, transcripts of Agreement-related meetings and disciplinary hearings, and reviews, and the scene of any occurrence that the Resolution Monitor in consultation with the Parties reasonably deems necessary to carry out the duties assigned to the Resolution Monitor by this Agreement. The Resolution Monitor will cooperate with Columbia to access people, scenes, and facilities in a reasonable manner that, consistent with the Resolution Monitor's responsibilities, minimizes interference with daily operations.

50.     Columbia will ensure that the Resolution Monitor will have access to all Columbia documents and data related to the Agreement that the Resolution Monitor, in consultation with the Parties, reasonably deems necessary to carry out the duties assigned to the Resolution Monitor by this Agreement, except any documents or data protected by work product, the attorney-client privilege or other applicable privilege (together "privilege"). Any disputes about privilege that the Resolution Monitor cannot resolve shall be resolved through the dispute resolution provisions of this Agreement.

51.     The United States and its consultants and agents will have access to all Columbia staff, employees, facilities, documents, and data related to the Agreement, to the extent not unreasonable and upon reasonable advance notice and in coordination with legal counsel for Columbia, except any documents or data protected by work product, the attorney-client privilege or other applicable privilege (together "privilege"). If the United States objects to Columbia's privilege classifications, the United States may seek resolution of the propriety of

19

the assertion from the Resolution Monitor. Any disputes about privilege that the Resolution Monitor cannot resolve shall be resolved through the dispute resolution provisions of this Agreement.

52.    The Resolution Monitor and the United States will provide Columbia with reasonable notice of a request for copies of documents. Upon such request, Columbia will provide copies in a timely manner (electronic, where readily available) of the requested documents to the Resolution Monitor and the United States, unless withheld as privileged or otherwise withheld pursuant to law as described above.

53.    Further, nothing in this Agreement shall be interpreted to conflict with Columbia's obligations regarding student records pursuant to FERPA, 20 U.S.C. § 1232g. The Resolution Monitor and the United States will maintain all confidential or non-public information provided by Columbia in a confidential manner. This Agreement will not be deemed a waiver of any privilege or right Columbia may assert, including those recognized at common law or created by statute, rule, or regulation, against any other person or entity with respect to the disclosure of any document.

## VII.    REPORTING

54.    During the pendency of this Agreement, beginning in October 2025, Columbia shall issue public semi-annual reports comprehensively documenting its progress and activities in implementing this Agreement in a format to be agreed upon with the Resolution Monitor and the United States. On the date that Columbia publicizes such reports, it shall furnish a copy of the same to the Resolution Monitor and the United States specifically including, but not limited to, the Assistant Attorney General.

## VIII.    GENERAL PROVISIONS

55.    Columbia shall bear all costs associated with implementing the terms of this

Agreement. The Parties shall bear their own costs, expenses, and attorney's fees in this litigation and in connection with this Agreement, except that the Parties shall retain the right to seek costs for any matter which in the future may arise from this Agreement.

56.     If any provision of this Agreement is found to be unlawful, only the specific provision in question will be affected and the other provisions will remain in full force and effect.

57.     This Agreement may be executed in multiple counterparts, each of which together shall be considered an original but all of which shall constitute one Agreement. The Parties agree to be bound by electronic and facsimile signatures.

58.     This Agreement is enforceable only by the Parties and those released herein, the Columbia Releasees. No other person or entity is, or is intended to be, a third-party beneficiary of the provisions of this Agreement for purposes of any civil, criminal, or administrative action, and accordingly, no other person or entity may assert any claim or right as a beneficiary or protected class under this Agreement. The Agreement does not create a private right for action for any non-party. The Parties agree to defend the terms of this Agreement should they be challenged in this or any other forum.

Done this 23rd Day of July, 2025, IN WITNESS WHEREOF, we have caused our signatures to be

hereunto affixed:

Attorney General Pamela Bondi
For: The Department of Justice

Secretary Linda E. McMahon
For: The Department of Education

For: The Trustees of Columbia
University in the City of New York

Secretary Robert F. Kennedy, Jr.
For: The Department of Health and Human
Services

22