# EXHIBIT 70

# RESOLUTION AGREEMENT

## I. DEFINITIONS

The terms used in this Agreement shall have the following meaning:

    a. "Brown" or "University" means Brown University based in the City of Providence, Rhode Island.
    b. "Ed." means the United States Department of Education.
    c. "Ed. OCR" means the United States Department of Education's Office for Civil Rights.
    d. "HHS" means the United States Department of Health and Human Services.
    e. "HHS OCR" means United States Department of Health and Human Services' Office for Civil Rights.
    f. "Investigations" means those inquiries opened by HHS OCR and Ed. OCR.
    g. "Parties" means Brown and the United States of America.
    h. "NIH" means the National Institutes of Health.
    i. "Terminated Grants" means all awards made to Brown or its faculty and researchers that have been terminated by the United States after January 20, 2025.
    j. "Non-Terminated Grants" means those grants awarded to Brown or its researchers and faculty other than the Terminated Grants.
    k. "Released Claims" means any claim or liability arising from the facts and events under review by HHS, Ed., and the United States Department of Justice, under any statute, regulation, or at common law, including but, not limited to Title VI and Title IX of the Civil Rights Act of 1964 and Section 1557 of the Affordable Care Act. "Released Claims" also incorporates by reference the separate agreement between Brown and Ed. regarding Brown's potential liabilities for violations of Title VI (attached and incorporated herein as Appendix A) ("Ed. Agreement"). Nothing in this Agreement prevents the United States from conducting subsequent compliance reviews or investigations related to Brown's actions occurring after the Effective Date of this Agreement, other than claims for breach of this Agreement subject to the dispute resolution provisions contained in Section V.
    l. "Title VI" means Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*
    m. "Title IX" means Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681, *et seq.*
    n. "Section 1557" means Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116.
    o. "United States" means the United States of America and all of its constituent agencies, offices, and entities.

## II. INTRODUCTION

1.     The United States and Brown (collectively, the "Parties") desire to avoid the burdens and risks of protracted litigation. This Agreement is not an admission in whole or in part by either

party, and Brown expressly denies liability regarding the United States' allegations or findings, including those of HHS or Ed.

2. This Agreement shall become effective upon execution by all the Parties (the "Effective Date").

3. The duration of this Agreement will be three (3) years to the day from the Effective Date.

III. RELIEF

4. This Agreement applies to the relationship between the United States and Brown and does not bind the Parties with regard to any other person or entity.

5. No provision of this Agreement, individually or taken together, shall be construed as giving the United States authority to dictate Brown's curriculum or the content of academic speech.

6. This Agreement represents the entire Agreement of the Parties with respect to the subject matter hereof and supersedes all prior Agreements and understanding of the Parties with respect to the subject matter hereof. Nothing in this Agreement prohibits the United States from bringing actions against Brown for future violations of Title VI, Title IX, Section 1557, or any other provision of federal law occurring entirely after the Effective Date, on the same basis it would bring similar actions against other institutions.

7. In consideration for entering into this Agreement, all Terminated Grants to Brown from HHS, including the United States Public Health Service and its constituent agency, NIH, are hereby restored by the United States (the Restored Grants), effective as of the date of termination of each Restored Grant, and the communication attached as Appendix B shall be sent to the NIH Office of Extramural Research, as well as to corresponding offices in each cognizant HHS agency or NIH Institute or Center, conveying this decision.

8. The United States shall further:
    a. In the ordinary course, and as soon as reasonably practicable, but no later than thirty (30) days after the Effective Date, enable Brown to draw-down all payments consistent with the approved budgets for each grant, including but not limited to overdue payments, on the Restored Grants and the Non-Terminated Grants, including the timely renewal of relevant non-competing grants in the ordinary course and consistent with past practice, and confirm that, in relation to the conduct covered and released under this Agreement, no grant funding will be withheld and no grants will be terminated in the future.

      b.      Fairly consider all applications for federal funding submitted by Brown, whether for grants, contracts, or cooperative agreements, in the ordinary course, without disfavored treatment.

      c.      Permanently close any and all pending Investigations or compliance reviews by HHS and Ed. regarding Brown's compliance with anti-discrimination laws, including Title VI's prohibition against discrimination based on race in undergraduate admissions, and Title VI's and/or Section 1557's prohibition against discrimination based on national origin, including shared ancestry; and permanently close any and all pending Investigations, compliance reviews, or inquiries by the United States Department of Justice regarding Brown's compliance with Title VI's prohibition against discrimination based on race in undergraduate admissions. This provision incorporates by reference and supersedes the separate Ed. Agreement attached as Appendix A that was entered into under the prior Administration. Should Brown fail to honor the terms of this Agreement, nothing in this Agreement prevents the United States (even during the period of the Agreement) from conducting subsequent compliance reviews or investigations, defunding or litigation related to Brown's actions occurring entirely after the Effective Date.

## IV.    AGREEMENT BETWEEN THE PARTIES

9.      Advancing Brown's longstanding commitment, shared with the United States, to ensuring that campus development serves as a regional economic engine and career catalyst for local workers, Brown agrees to pay the sum of Fifty Million Dollars ($50,000,000) to state workforce development organizations operating in compliance with anti-discrimination laws, over the ten years following the Effective Date.

10.     With the exception of actions to enforce this Agreement, the United States agrees not to institute any civil action or other adverse agency action against Brown, its officers, Corporation members, directors, agents, and employees (the "Brown Releasees") based on the Released Claims. The United States releases the Brown Releasees from any liability related to the Released Claims. The United States is not releasing Brown or the Brown Releasees from any other liability.

11.     The University will take the following steps to ensure compliance with Title IX and its implementing regulations, by providing safe and equitable opportunities and spaces for women:

a.      In Brown Athletics facilities, the University will provide female student-athletes with intimate facilities such as locker rooms and bathrooms strictly separated on the basis of sex.

b.      The University will define "male" and "female," for the purpose of all practices, policies, and procedures adopted and implemented by the University for any athletic opportunity, event, competition, category, program, or activity designated for women, consistent with the definitions

adopted in Executive Order 14168, Defending Women from Gender Ideology Extremism and restoring Biological Truth to the Federal Government (Jan. 20, 2025), and Executive Order 14201, Keeping Men out of Women's Sports (Feb. 5, 2025).

c.      The University will offer women the option of female-only housing, restrooms, and showering facilities, and for these purposes will adopt the abovementioned definitions of "male" and "female."

d.      The University will ensure students have access to single-sex floors in on-campus housing, using the above-mentioned definition.

12.     The University will not perform gender reassignment surgery or prescribe puberty blockers or hormones to any minor child for the purpose of aligning the child's appearance with an identity that differs from his or her sex.

13.     The University will take the following steps to ensure compliance with Title VI and Section 1557 and their implementing regulations, by providing Jewish students an equal opportunity to participate and enjoy the benefits of its education programs and activities as required by this Agreement and Title VI and Section 1557:

a.      Brown is committed to taking significant, proactive, effective steps to combat antisemitism and ensure a campus environment free from harassment and discrimination. These shall include actions to support a thriving Jewish community, research and education about Israel, and a robust Program in Judaic Studies, through outreach to Jewish Day School students to provide information about applying to Brown, resources for religiously observant Jewish community members, renewed partnerships with Israeli academics and national Jewish organizations, support for enhanced security at the Brown-RISD Hillel, and a convening of alumni, students, and faculty to celebrate 130 years of Jewish life at Brown in the 2025-2026 academic year.

b.      Brown shall not retaliate against or coerce any person who made, or is making, a complaint; exercised, or is exercising, their rights under Title VI or Section 1557; or who has assisted or participated in the investigation of any matter covered by this Agreement. Brown will maintain retaliation reporting procedures and protections, in accordance with federal state, and local laws. Brown will ensure that these procedures and protections will apply to those reporting noncompliance with this Agreement.

c.      Brown will engage an external party to conduct a survey in 2025 to evaluate the campus climate for Brown students, including the climate for students with shared Jewish ancestry, and to evaluate social media harassment. The United States and Brown shall jointly choose this

external party. These surveys shall be developed by October 31, 2025 and administered by December 31, 2025:

      i.    The surveys shall, among other questions deemed appropriate by Brown, ask students whether they feel welcome at Brown; whether they feel safe reporting antisemitism at Brown; whether they believe Brown has responded appropriately to reports of alleged antisemitic conduct; whether they believe the changes Brown has made since October of 2023, including changes to policies and standard operating procedures, changes to nondiscrimination training, and previous climate surveys, have benefited the Brown community; whether they have experienced harassment on social media by Brown students, faculty, or staff while at Brown based on their national origin, including shared Jewish ancestry; how any social media harassment has affected their experience at Brown; how the Brown University Online and Social Media harassment webpage has affected them; and whether they believe Brown could take any further measures to reduce any social media harassment.

      ii.    Within 45 days of the conclusion of each survey, Brown will provide to HHS OCR and Ed OCR a report to HHS OCR and Ed. OCR that includes, at a minimum: (1) the results of the survey; (2) Brown's analysis of the survey; and (3) any appropriate action(s) Brown intends to take to improve the campus climate and/or to improve Brown's response to social media harassment. Within fifty (50) days of HHS OCR and Ed. OCR's approval of Brown's proposed action(s), Brown will provide documentation sufficient to show its implementation of any action, including a description of each action and how it was implemented.

d.    By September 30, 2025, and September 30, 2026, Brown will provide a confidential electronic sortable spreadsheet or other comparable file, indicating all complaints and reports received by the Office of Equity Compliance and Reporting (OECR) alleging discrimination, including harassment, on the basis of national origin, including shared ancestry or ethnic characteristics, and Brown's response, from the preceding academic year:

      i.    This spreadsheet will contain the same categories of information as the spreadsheet Brown provided to the U.S. Department of Education on October 31, 2024, including: (i) Report number; (ii) Report method; (iii) Office reported to; (iv) Office taking lead; (v) Date of incident; (vi) Date reported; (vii) Location; (viii) Reporting party; (ix) Accused party; (x) Summary of allegations; (xi) University response; (xii) Supportive, interim, and remedial measures; (xiii) Formal resolution process status; (xiv) Rationale (if investigation not commenced/completed); (xv) Steps taken to eliminate and/or prevent recurrence of any possible hostile environment; (xvi) Staff who received and processed complaint/report.

      ii.    The spreadsheet will also indicate instances where a Complainant did not wish to proceed with the Formal Resolution Process, and as a result, Brown initiated a Complaint or continued to investigate the allegations raised in the original Complaint as outlined in Section 2.5 of the Brown University Discrimination and Harassment Standard Operating Procedure for Addressing and Responding to Reports and Complaints.

      iii.    Brown may use a unique identifier for each individual in place of their name or other personally identifiable information (PII) and maintain a key/log, with the understanding that either OCR may ultimately request the individual's PII if either OCR deems it necessary to complete its monitoring of Brown's compliance with this Agreement.

      iv.    Upon request, Brown will provide to either OCR within thirty (30) business days, a copy of the complete investigative file(s), including all records (e.g., the complaint/report, investigative records, determination records, student disciplinary records, employee disciplinary records, and human resources/personnel files), subject to any requirements of applicable privacy or confidentiality laws, including but not limited to the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g. Brown will produce to either OCR electronically the complete investigative files in a mutually agreed format and will separately organize the files for each investigation, including organizing and labeling all documents for each investigation as individual files.

e.    Unless otherwise provided, all notices, reports, or other such documents required by this Agreement shall be submitted electronically to the relevant OCR.

f.    Student course evaluations that are collected on an anonymous basis at the end of each semester will be regularly reviewed to identify any reports of antisemitism, which will be promptly referred to OECR for appropriate action.

14.    Brown shall not maintain programs that promote unlawful efforts to achieve race-based outcomes, quotas, diversity targets, or similar efforts. Brown will cease any provision of benefits or advantages to individuals on the basis of protected characteristics in any school, component, division, department, foundation, association, or element within the entire Brown University system. Brown and each of its schools, components, divisions, and departments will comply with and follow anti-discrimination laws, including Title VI and Title IX. Brown agrees to comply with all applicable laws regarding the treatment of individuals. Accordingly, Brown will provide a timely report to the United States summarizing its compliance with this obligation, including an assurance that Brown has acted responsibly to ensure its programs do not promote unlawful DEI goals.

15.    Brown shall maintain merit-based admissions policies. Brown may not, by any means, preference applicants based on race, color, or national origin in admissions throughout its programs. No proxy for racial admission will be tolerated. Brown may not use personal statements, diversity narratives, or any applicant reference to racial identity as a means to introduce or justify discrimination.

16.    Nothing in this Agreement prevents the United States (even during the period of the Agreement) from conducting subsequent compliance reviews, investigations, or litigation into

Brown's future admissions practices occurring entirely after the Effective Date of this Agreement to ensure that those practices are in full compliance with all applicable laws and not a proxy for prohibited discrimination.

17.     Brown shall provide the United States with admissions data consistent with 34 C.F.R. § 100.6 and similar regulations showing applicants, admitted students, and enrolled students broken down by race, color, grade point average, and performance on standardized tests, in a form permitting appropriate statistical analyses by October 1 of each year of the Agreement. Admissions data will also be subjected to a comprehensive audit by the United States. Non-individualized statistical information regarding admissions shall be made available to the public each year for the Term of the Agreement, including information about rejected and admitted students broken down by race, color, country of residence, grade point average, and performance on standardized tests.

## V.      DISPUTE RESOLUTION, MONITORING, AND REPORTING

19.     If either party reasonably believes that the other is in violation of the terms of this Agreement, it shall provide prompt written notice to the other party and a reasonable opportunity to cure the alleged violation. The Parties shall engage in good-faith efforts to resolve the issue(s) before seeking further action.

20.     Brown understands that by signing the Agreement, it agrees to provide data and other information in a timely manner in accordance with the reporting requirements of the Agreement. Brown shall maintain records to document the information required by this Agreement and shall make them available to the relevant OCR within thirty (30) business days of a written request throughout the duration of this Agreement. Further, Brown understands that during the monitoring of the Agreement during its term, if necessary, either OCR may visit Brown, interview staff, and request such additional reports or data as are necessary for OCR to determine whether the University has fulfilled the terms and obligations of the Agreement.

## VI.     GENERAL PROVISIONS

21.     Brown shall bear all costs associated with implementing the terms of this Agreement. The Parties shall bear their own costs, expenses, and attorney's fees in connection with this Agreement, except that the Parties shall retain the right to seek costs for any matter which in the future may arise from this Agreement.

22.     If any provision of this Agreement is found to be unlawful, only the specific provision in question will be affected and the other provisions will remain in full force and effect.

23. This Agreement may be executed in multiple counterparts, each of which together shall be considered an original but all of which shall constitute one Agreement. The Parties agree to be bound by electronic and facsimile signatures.

24. This Agreement is enforceable only by the Parties. No other person or entity is, or is intended to be, a third-party beneficiary of the provisions of this Agreement for purposes of any civil, criminal, or administrative action, and accordingly, no other person or entity may assert any claim or right as a beneficiary or protected class under this Agreement. The Agreement does not create a private right for action for any non-party. The Parties agree to defend the terms of this Agreement should they be challenged in this or any other forum.

25. This Agreement constitutes the entire agreement between the Parties on the matters raised herein, and no prior or contemporaneous statement, promise, or agreement, either written or oral, made by either party or agents of either party, that is not contained in this written agreement is enforceable. This Agreement can only be modified by mutual written agreement of the Parties.

26. This Agreement is final and binding on the Parties, including all principals, agents, executors, administrators, representatives, successors in interest, beneficiaries, assigns, heirs, and legal representatives thereof. Each party has a duty to so inform any such successor in interest.

27. The signatories represent that they have the authority to bind the respective Parties identified below to the terms of this Agreement.

28. Failure by any party to seek enforcement of this Agreement pursuant to its terms with respect to any instance or provision shall not be construed as a waiver to such enforcement with regard to other instances or provisions.

29. There is no restriction on the publication of the Agreement upon its finalization. In addition, the United States may be required to disclose material related to this Agreement to any person pursuant to the requirements of the Freedom of Information Act, 5 U.S.C. § 522, and its implementing regulations.

Done this 30th Day of July, 2025, IN WITNESS WHEREOF, we have caused our signatures to be hereunto affixed.

_____
Attorney General Pamela Bondi
For: Department of Justice

_____
Secretary Linda E. McMahon
For: Department of Education

_____
For: Brown University

_____
Secretary Robert F. Kennedy, Jr.
For: Department of Health and Human Services