# EXHIBIT 97



# Congressional Record

**United States of America** — PROCEEDINGS AND DEBATES OF THE 88th CONGRESS, SECOND SESSION

## SENATE

### TUESDAY, APRIL 7, 1964

*(Legislative day of Monday, March 30, 1964)*

The Senate met at 10 o'clock a.m., on the expiration of the recess, and was called to order by Hon. CLAIBORNE PELL, a Senator from the State of Rhode Island.

Cardinal Franz Koenig, of the Roman Catholic Church, Vienna, Austria, offered the following prayer:

In the words of President George Washington:

"Almighty God:

"We make our earnest prayer that Thou wilt keep the United States in Thy holy protection; that Thou wilt incline the hearts of the citizens to cultivate a spirit of subordination and obedience to government; and entertain a brotherly love and affection for one another and for their fellow citizens of the United States at large. And, finally, that Thou wilt most graciously be pleased to dispose us all to do justice, to love mercy, and to demean ourselves with that charity, humility, and pacific temper of mind which were the characteristics of the Divine Author of our blessed religion, and without a humble imitation of whose example in these things we can never hope to be a happy nation.

"Grant our supplication, we beseech Thee, through Jesus Christ our Lord. Amen."

### THE JOURNAL

On request by Mr. HUMPHREY, and by unanimous consent, the reading of the Journal of the proceedings of Monday, April 6, 1964, was dispensed with.

### ORDER OF BUSINESS

Mr. HUMPHREY. Mr. President, I ask unanimous consent that there may be a morning hour, with statements therein limited to 3 minutes.

Mr. MORSE. Mr. President, I object.

The PRESIDING OFFICER. Objection is heard.

### CALL OF THE ROLL

Mr. HUMPHREY. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The Chief Clerk called the roll, and the following Senators answered to their names:

[No. 118 Leg.]

| | | |
|---|---|---|
| Aiken | Hickenlooper | Mundt |
| Allott | Holland | Muskie |
| Anderson | Hruska | Nelson |
| Bartlett | Humphrey | Neuberger |
| Bayh | Inouye | Pastore |
| Bible | Jackson | Pell |
| Boggs | Johnston | Proxmire |
| Brewster | Jordan, N.C. | Ribicoff |
| Burdick | Jordan, Idaho | Robertson |
| Cannon | Keating | Saltonstall |
| Carlson | Kennedy | Scott |
| Case | Kuchel | Smith |
| Church | Lausche | Sparkman |
| Clark | Long, Mo. | Stennis |
| Cotton | Magnuson | Symington |
| Curtis | Mansfield | Talmadge |
| Dirksen | McGovern | Thurmond |
| Dominick | McIntyre | Walters |
| Douglas | McNamara | Williams, N.J. |
| Ellender | Metcalf | Williams, Del. |
| Gore | Miller | Yarborough |
| Gruening | Monroney | Young, Ohio |
| Hart | Morse | |
| Hayden | Morton | |

Mr. HUMPHREY. I announce that the Senator from Connecticut [Mr. DODD], the Senator from Arkansas [Mr. FULBRIGHT], the Senator from Louisiana [Mr. LONG], the Senator from Minnesota [Mr. MCCARTHY], the Senator from Arkansas [Mr. MCCLELLAN], the Senator from Wyoming [Mr. MCGEE], the Senator from Utah [Mr. MOSS], the Senator from Georgia [Mr. RUSSELL], and the Senator from North Carolina [Mr. ERVIN] are absent on official business.

I also announce that the Senator from Virginia [Mr. BYRD], the Senator from West Virginia [Mr. BYRD], the Senator from Mississippi [Mr. EASTLAND], the Senator from Oklahoma [Mr. EDMONDSON], the Senator from California [Mr. ENGLE], the Senator from Indiana [Mr. HARTKE], the Senator from Alabama [Mr. HILL], and the Senator from Florida [Mr. SMATHERS] are necessarily absent.

I further announce that the Senator from West Virginia [Mr. RANDOLPH] is absent because of illness.

Mr. KUCHEL. I announce that the Senator from Utah [Mr. BENNETT], the Senator from Arizona [Mr. GOLDWATER], and the Senator from North Dakota [Mr. YOUNG] are necessarily absent.

The Senator from Maryland [Mr. BEALL] and the Senator from Vermont [Mr. PROUTY] are detained on official business.

I also announce that the Senator from Kentucky [Mr. COOPER], the Senator from Hawaii [Mr. FONG], the Senator from New York [Mr. JAVITS], the Senator from New Mexico [Mr. MECHEM], the Senator from Kansas [Mr. PEARSON], the Senator from Wyoming [Mr. SIMPSON], and the Senator from Texas [Mr. TOWER] are detained on official business.

The PRESIDING OFFICER (Mr. KENNEDY in the chair). A quorum is present.

### CIVIL RIGHTS ACT OF 1963

The PRESIDING OFFICER. The Chair lays before the Senate the unfinished business.

The Senate resumed the consideration of the bill (H.R. 7152) to enforce the constitutional right to vote, to confer jurisdiction upon the district courts of the United States to provide injunctive relief against discrimination in public accommodations, to authorize the Attorney General to institute suits to protect constitutional rights in public facilities and public education, to extend the Commission on Civil Rights, to prevent discrimination in federally assisted programs, to establish a Commission on Equal Employment Opportunity, and for other purposes.

Mr. PASTORE obtained the floor.

Mr. HUMPHREY. Mr. President, will the Senator from Rhode Island yield to me without in any way jeopardizing his rights to the floor?

Mr. PASTORE. And with the understanding that it will not be counted as a second speech; I yield.

The PRESIDING OFFICER. Without objection, it is so ordered.

### RECESS OF THE SENATE FROM 2 P.M. TO 4 P.M. TOMORROW

Mr. HUMPHREY. Mr. President, I should like to make an announcement.

I ask unanimous consent that tomorrow the Senate stand in recess from 2 o'clock to 4 o'clock, in order that the Senate may pay its respects to the late General MacArthur, and also in order that the members of the Armed Services Committee and the Senate leadership may participate in the ceremonies.

The PRESIDING OFFICER. Is there objection? Without objection, it is so ordered.

### ORDER FOR RECESS TO 10 A.M. TOMORROW

Mr. HUMPHREY. I also ask unanimous consent that when the Senate completes its business today, it stand in recess until 10 a.m. tomorrow.

The PRESIDING OFFICER. Without objection, it is so ordered.



confer freedom to effectuate section 602 in any other way.

The reason I emphasize it is that this was the question raised by the Senator from Tennessee [Mr. GORE].

Failure of a recipient to comply with a rule, regulation, or order issued by an agency may ultimately lead to a termination or refusal of Federal assistance. Cutoff of assistance is not the object of title VI, however.

I wish to repeat: Cutoff of assistance is not the objective of title VI.

Fund cutoff is a last resort, to be used only if all else fails to achieve the real objective—the elimination of discrimination in the use and receipt of Federal funds.

The rule or regulation issued by the particular Federal agency would vary, depending on the nature and method of administration of the particular assistance program. There might be rules, for example, governing the conduct of recipients of assistance, or orders specifying a standard form of written assurance or understanding to be given by each applicant for assistance, or perhaps a standard provision-of-assistance contract.

One important thing must be kept in mind. Title VI is not a device to terminate all Federal aid to a State or community because there has been discrimination in one specific program. Therefore, the nondiscrimination requirements must relate directly to the particular program or activity against which they are imposed. Participation in one program would not justify the exaction of a nondiscrimination assurance concerning some other program. Similarly, any fund cutoff, or similar action, can be taken only concerning a program or activity in which discrimination has been practiced. Only the program in which discrimination has been practiced would be affected by title VI.

Mr. RIBICOFF. Mr. President, will the Senator from Rhode Island yield?

Mr. PASTORE. I yield.

Mr. RIBICOFF. I believe the Senator makes an important point. One could cut off any other program, and the cutoff would be confined to the jurisdiction where discrimination was found. In other words, if there were 100 school districts and discrimination was found in 1 school district, the funds would be cut off for only that one school district, but not the funds for the other 99.

Mr. PASTORE. The Senator is absolutely correct. It is not the intention of the framers, the sponsors, or the supporters of title VI of H.R. 7152 to enact punitive statutes. We do not wish to be vindictive. We do not wish to be punitive. We do not wish to be unreasonable. So the section provides that when Federal funds are used, they must be used in the American way—in a constitutional manner. That is its purpose.

With reference to the particular cutoff of Federal funds, as the Senator from Connecticut has brought out, it must be confined to the particular program that is involved. Let us assume that we are considering aid to dependent children. We could not cut off funds for the building of a road because that is another program, although it is a Federal grant. The action must be confined to the specific program in which discrimination exists, and then only within the particular jurisdiction where the discrimination takes place. There is no intent, no motive, no idea of spreading the tentacles of the Federal Government to choke off all State activity. Not at all.

Mr. RIBICOFF. What we are seeking to accomplish, as the Senator from Rhode Island has so ably pointed out, is to obtain compliance and eliminate discrimination. We do not wish to use punitive measures against any individual, any State, or any part of any State.

Mr. PASTORE. The Senator is absolutely correct. I shall discuss the procedures that must be followed to effectuate that end.

Mr. RIBICOFF. In other words, great safeguards have been built up even to protect an individual or a jurisdiction?

Mr. PASTORE. Frankly, I do not see how we could have gone any further, to be fair. Without title VI—accepting the fact that the President himself, under Presidential powers, has the right to issue directives, which he already has—such directives are much more stringent than the proposed title VI. Section 602 of title VI not only requires the agency to promulgate rules and regulations but all procedure must be in accord with these rules and regulations. They must have broad scope. They must be national. They must apply to all 50 States. We could not draw one rule to apply to the State of Mississippi, another rule to apply to the State of Alabama, and another rule to apply to the State of Rhode Island. There must be only one rule, to apply to every State.

Further, the President must approve the rule. Then, before there can be a cutoff of Federal funds, there must be a hearing. After the hearing, there may be a judicial review. In the meantime, before the agency can stop the money, it must submit a written report giving all the reasons why it wishes to cut off the money. This report must go to the appropriate committees of the Congress. Thereafter, the cutoff would not take effect for 30 days. If any unfairness existed, one can imagine what the repercussions would be on the floor of the Senate within those 30 days. Talk about a filibuster—it would be a Roman holiday.

Mr. RIBICOFF. More safeguards are provided in title VI than many executive agencies now have or have acted upon in the past; in other words, the rights and privileges of those affected would be fully safeguarded.

Mr. PASTORE. The Senator is absolutely correct.

Mr. STENNIS. Mr. President, before the Senator from Rhode Island returns to his text, will he yield to me for a few questions?

Mr. PASTORE. I am glad to yield to the Senator from Mississippi.

Mr. STENNIS. The Senator addressed himself to the powers in title VI. He was clear in his explanation of the extent of those powers, as he sees it. Will the Senator inform me just what words in title VI confer the power to cut off funds?

Mr. PASTORE. To cut them off?

Mr. STENNIS. Where is the power to cut off funds covered in title VI?

Mr. PASTORE. We start with section 601, which reads:

Notwithstanding any inconsistent provision of any other law, no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

Section 602 provides:

Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, shall take action to effectuate the provisions of section 601 with respect to such program or activity. Such action may be taken by or pursuant to rule, regulation, or order of general applicability and shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation or order shall become effective unless and until approved by the President. After a hearing, compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding of a failure to comply with such requirement.

It is right there.

Mr. STENNIS. Does the power to cut off the Federal assistance relate only to the agency which is administering the program? How far does it extend? I know the Senator wishes to be helpful.

Mr. PASTORE. This is its extent. Many community schools are controlled by county school districts. Let us assume that in one particular State only one school district has been guilty of discrimination. Aid would be cut off as to that one school district only. In other words, funds could not be used in that particular school district. However, the funds of the other school districts would not be cut off.

Mr. STENNIS. That is a good illustration, but suppose a statewide agency was found to be guilty of discrimination.

Mr. PASTORE. Then all assistance would be cut off.

Mr. STENNIS. In the entire State?

Mr. PASTORE. Yes, if discrimination reached that point, the Senator is correct.

Mr. STENNIS. That would, of course, work an injustice on many people.

Mr. PASTORE. If a statewide agency, as the Senator suggests, is guilty of discrimination, it might well be said that there would be an injury to many people if cutoff is applied. That is the cost of State-sponsored discrimination.

Mr. STENNIS. I ask the Senator if he has any suggestions as to how the situation could be handled so as to apply only to a limited area, where they were not all transgressors?

Mr. PASTORE. That would be quite impossible, if it were a program administered statewide, because, after all, I

assume that the funds would be appropriated on a statewide basis. I do not know how we could particularize in a case like that. I realize that there is a serious problem. It is a problem that we recognize. However, where it is possible and feasible to particularize or fragmentize, the power to do so is in the bill. There might be situations with respect to statewide programs in which that might be difficult. However, that is the reason why there are other safeguards in the bill, as to what must be done before the point of cut off of funds is reached.

Mr. STENNIS. I have one additional question on that point. The section, after all, is rather broad. I refer to line 14 on page 26 of the bill. The only thing that would limit that expression would be the arguments that are made on the Senate floor. I am sure the Senator from Rhode Island wants it to be clear. The language itself is very broad.

In line 18 on page 26 there is the statement:

(2) by any other means authorized by law.

What does the Senator believe that phrase means?

Mr. PASTORE. There is existing law which sets out certain restrictions and certain conditions. This language means that there shall be no repeal of laws which Congress has already enacted.

Mr. STENNIS. Is the only purpose of that phrase to show that there is no repeal of existing law?

Mr. PASTORE. Yes. I except, of course, the "separate but equal" laws. It is clear that when there is a condition in the law that permits separate but equal accommodations— as in the case of Hill-Burton funds—such a provision is repealed.

Mr. RIBICOFF. Mr. President, will the Senator yield?

Mr. PASTORE. I yield.

Mr. RIBICOFF. By way of further amplification of the question raised by the distinguished Senator from Mississippi, may I ask the distinguished Senator from Rhode Island whether it is not correct to say that if a State was administering a program and there was discrimination in one part of that program, under appropriate rules and regulations it would be possible to disallow the expenses and the allotment that would go to that section of the program where the discrimination was taking place, but to allow the expenses and allotments to areas where there was no discrimination.

Mr. PASTORE. Under the broadness of the statute, that would be correct. It would depend upon the rule or regulation in that case.

Mr. RIBICOFF. That is correct.

Mr. PASTORE. The Senator from Mississippi was referring to a statewide program.

Mr. RIBICOFF. But even with a statewide program, funds used in a nondiscriminatory way need not be disallowed.

Of course, the easiest answer would be for the State, which has control of the program, to make it unnecessary to cut off any funds simply by complying and not discriminating.

Mr. PASTORE. For example, it is the purpose of the Agriculture Adjustment Act in authorizing benefit payments to producers of agricultural commodities to "establish and maintain orderly marketing conditions for agricultural commodities in interstate commerce"—7 United States Code 602.

Congress was not concerned, in that act, with extending assistance to farm labor. As applied to this program, therefore, while title VI would authorize the imposition of a requirement, to preclude racial discrimination in the payment of benefit payments to farmers, it would not authorize any requirement or action affecting employment policies of such farmers. It is therefore false to view title VI—as some of its critics have claimed—as a device for regulating employment on the farms of this country.

Let me now turn to the procedures required by the title as a prerequisite to any action by any agency of Government. These procedures are spelled out in considerable detail in the bill. Indeed, there is an emphasis on safeguards against precipitious action.

At this juncture we should emphasize what we shall repeat again and again— the aim of title VI is to end discrimination in Federal programs. Only as a last resort would title VI seek to terminate Federal assistance.

Before any formal compliance action may be taken, the agency must advise the offending party of his failure to comply and must seek to obtain compliance by voluntary means. This is a positive requirement in the law which must be met before any further action can be taken. If voluntary means fail, then the agency has a choice. On the one hand, it can terminate the grant, loan, or contract, refuse further payment under it, refuse to make a new grant or loan, or refuse to enter into a new contract.

Alternatively, the agency may use "any other means authorized by law." This phrase does not confer any new authority. It simply makes it clear that Federal departments and agencies may carry out the purposes of title VI by using the powers they now have under the laws creating them or authorizing particular assistance programs.

This alternative is designed to permit the agency to avoid a fund cutoff if some other means of ending discrimination is available. This will enable the agency to achieve compliance without jeopardizing, even in limited fashion, its basic program objective by terminating or refusing aid. Perhaps the best example of this relates to school lunches or other assistance to segregated schools. Cutoff of the lunches or other assistance will obviously impose a severe hardship upon students who are intended to be benefited. The way to avoid such a hardship will be for the Attorney General to institute a desegregation suit under title IV, rather than to terminate the assistance.

Again, if an agency's nondiscrimination requirement is embodied in a contractual commitment, the agency may be able to bring suit to enforce its contract. An agency with power to approve or disapprove construction plans or standards could refuse to approve for aid any facilities which would be segregated.

Any such action, however, would have to be based on powers conferred on the agency by some other law than title VI. But, as I have said, the basic point is that title VI is designed to end discrimination in Federal programs—not to terminate Federal assistance except as a last resort.

There are some other procedural safeguards. Action under section 602 is not possible until there has been a hearing. The degree of formality of the hearing would, of course, depend both on the nature of the particular program and the nature of the proposed compliance action. For example, if the proposed action is to refer the matter to the Attorney General for institution of a suit, the requirement of a hearing would be satisfied by an informal conference at which the noncomplying party was advised of the proposed referral, and given a further opportunity to avoid litigation by voluntary agreement to comply. On the other hand, if the proposed compliance action is to terminate or withhold payments under an approved grant, the hearing would have to enable the recipient of the funds to challenge the agency's evidence, and to present his own evidence on the issue of compliance. A written record would have to be made which could serve as an adequate basis for judicial review.

I call attention to the fact that the provision for hearing was added by amendment from the floor of the House. The House debate makes it clear that this was indeed the primary purpose of adding the hearing provision.

It was to insure that a complete written record would be available for purposes of judicial review in those cases which would be subject to such review under section 603.

Section 602 contains further safeguards against arbitrary action. Thus, if an agency proposes to terminate or to refuse to make a grant, loan, or assistance contract, it must file a full written report of the circumstances and the grounds for such action with the committees of the House and Senate having legislative jurisdiction over the program or activity involved. No cutoff of funds can become effective until 30 days have elapsed after the filing of such a report. This provision provides further incentive to voluntary compliance. Presumably, while the matter is pending before the congressional committees involved, there will be further opportunity to end the discrimination without the necessity of cutting off Federal funds or in other ways curtailing the particular assistance program in question.

Additional safeguards against arbitrary action are provided in section 603. Under that section any agency action taken pursuant to section 602 would be subject to judicial review to the extent and in the manner provided by existing law applicable to similar action taken by the agency on other grounds. Thus, where special statutory review procedures are available under certain statutes, those procedures should be followed.

For example, Public Law 815 and the Hill-Burton Act—20 United States Code

641(b), 42 United States Code 291(j)—provide for special review procedures for denial of a grant and for withholding of funds thereunder. The same procedures would be followed under title VI. If no review is provided by existing law, agency action cutting off financial assistance would be subject to judicial review in "any applicable form of legal action" as authorized by the Administrative Procedure Act, 5 United States Code 1009. What that means in practical terms is that a suit for injunction or declaratory judgment could be brought in the U.S. District Court. Under recent amendment to the Judicial Code, the suit could be maintained either in the district where the plaintiff resides or where the cause of action arose—20 United States Code supplement 1963 1391(e). If the agency's finding was not supported by substantial evidence, or if its action was otherwise arbitrary, capricious, or contrary to law, the court could set the action aside. Furthermore, the court could grant relief pending review to avoid irreparable injury.

I have dwelt at some length on the detailed procedural safeguards contained in title VI because I think this feature of the bill has been widely misunderstood. Title VI does not vest arbitrary or dictatorial powers in Federal agencies. Actually, it is a moderate provision, carefully tailored to the objective of getting the Federal Government out of the business of subsidizing discrimination.

It is designed to achieve that objective in a manner which puts a premium on voluntary action and is as procedurally fair as it could possibly be. Let me consider now some of the reasons why I think title VI is necessary.

Title VI is necessary to end any confusion as to the survival of "separate but equal" conditions which have been declared unconstitutional. It is needed to confirm and clarify antidiscrimination directives of the President and individual agencies. While it is believed that they have acted within adequate authority, title VI would support them with statutory approval.

Title VI would avoid the reccurence of acrimonious debate in the Congress as to discrimination in discussing individual Federal aid programs.

Time and time again such proposed legislation has come before this body. Amendments have been sponsored to make clear in a particular program that separate but equal provisions would not do.

The distinguished Senator from Michigan [Mr. HART] once became somewhat irked at the traditional motion to lay on the table. The argument that is customarily made is that if the provision prevailed, the Senate might become involved in prolonged or protracted debate, or even a filibuster, and the result might be no legislation whatever.

It is to avoid such a situation that title VI would constitute as permanent policy of the U.S. Government the principle that discrimination will not be tolerated. This would eliminate all the confusion and discussion that arise every time a grant bill comes before the Senate.

Mr. HART. Mr. President, will the Senator yield?

Mr. PASTORE. I yield.

Mr. HART. In my opinion, the point the Senator makes is overwhelmingly persuasive to those who have shared this concern. We ought not to blink the fact that there may be occasions when the extreme and distasteful decision will have to be made, notwithstanding the enactment of title VI, that will result in the shutting off of an entire State's flow of money.

The Senator from Rhode Island may recall that the problem many of us have had, as proposals are made to amend a particular grant or aid program, is really a conflict of principle. If it is a program that would support education at State and local levels, the argument is very persuasive that education will result in the elimination of discrimination; and what principle could possibly justify withholding action which might raise the level of educational opportunity anywhere in the country? Therefore, it is said we should not vote for so-called Powell amendments.

There is another principle involved. The Senator from Rhode Island has voiced it eloquently. It is this: The money comes from everyone. How can we possibly justify spending money to create a program or establish a facility, admission to which is denied to some people?

Mr. PASTORE. People who are paying for it.

Mr. HART. People who are paying for it. I had reached the conclusion that the latter principle has higher priority. But admittedly it is not an easy decision. The point I should like to make is that if title VI is enacted, we will avoid, as the Senator has said, the difficult, perennial debate or decision, but we might not avoid, in some isolated cases, the withholding of funds across a whole State merely because some isolated corner of the State refused to comply.

If at the end of all the effort, at the end of all the procedural steps that the Senator from Rhode Island has outlined, there were a hard core of resistance, and if the grant were to the State itself, I would suspect that the administrator of the program again would be faced with the ultimate and difficult decision, which we now propose to make a matter of law; namely, that if it is a State grant, and there is one corner of the State where refusal to apply the moneys nondiscriminatorily continues, withholding nonetheless will occur. But the decision would be made across the board, without any particular State involved, without any particular program involved, and would represent the adoption by Congress of what I have felt to be the higher principle; namely, that we do not take money from everybody to build something, admission to which is denied to some.

Mr. PASTORE. That point was covered very ably by the distinguished Senator from Connecticut. A situation might occur in which there might be a hard core, pinpoint condition in a State which could not possibly be tolerated, but the situation in the remainder of the State might be good; the program in the remainder of the State might be administered on a nondiscriminatory basis. However, as the Senator from Connecticut said, not only could the rules and regulations that are promulgated by a nondiscriminatory agency cover that kind of situation, but I suppose that once title VI was enacted, in that particular case it would still be proper for the Attorney General under other titles of this bill, if he were asked to do so, to step in. He might go before the court and obtain some kind of injunctive relief or some kind of mandatory relief which would compel compliance subject to a citation for contempt of court. We would not have to cut off assistance to 100 people because 1 person was being discriminatory in the administration of the money.

Once the policy is set, there are many, many ways in which intervention could be had, so as not to do an injustice to a great multitude because of the instance of only one offender.

We ought to make that very clear in the history we are making here today. We are not seeking to penalize people by way of pressure and saying that we can cure this one case if we twist the arms of 99 people. That is not the purpose of the section. We are not trying to bring compliance through pressure. We are trying to bring voluntary compliance. We are leaving the law broad enough with the provision of rules and regulations with other general means so that there can be a promulgation of rules to take care of the situations that have been mentioned by the distinguished Senator from Michigan and the distinguished Senator from Connecticut.

I thank them for their interest. I think it is very important to make this point. This is not strangulation legislation. We want to make that clear. We are not trying to strangle Federal programs. We are not trying to cut off funds from States. All we are saying is that there is a duty on the part of the Government to see to it that all of our citizens are treated in conformity with the inscription on the wall above the doorway: "E Pluribus Unum." We want unity. Equity begets unity. We want one and the same treatment for all.

Mr. RIBICOFF. Mr. President, will the distinguished Senator from Rhode Island yield?

Mr. PASTORE. I yield.

Mr. RIBICOFF. With respect to the language on page 26, section 602, subsection (2), the distinguished Senator from Mississippi raised the question, "What is meant by the phrase 'or by any other means authorized by law'?"

It is important to emphasize, as the distinguished Senator from Rhode Island has just stated, that this phrase has significance and meaning. Without this phrase, there would only be the remedy of a cutoff of funds. But the words "by any other means authorized by law" give flexibility to permit the agency or the department of the Government to use alternative remedies, under the regulations, just as the distinguished Senator from Rhode Island has pointed out.

Mr. PASTORE. I thank the Senator from Connecticut.

Title VI is necessary, first of all, because the Federal Government simply

cannot be expected to continue to pay out tax dollars contributed by all the people to just some of them and to exclude others because of the color of their skin. As I shall develop, there are some statutes now on the books which contemplate Federal assistance to racially segregated institutions.

For example, the Hill-Burton Act which provides for grants for hospital *construction*, the second Morrill Act which provides for grants to land-grant colleges, and Public Law 815 which authorizes grants for school construction in federally "impacted areas," all contain clauses authorizing—directly or by implication—that Federal aid be furnished under the obsolete separate-but-equal formula. But the Court has already declared that to be unconstitutional.

I ask unanimous consent that excerpts from these two acts to be printed at this point in the RECORD.

There being no objection, the excerpts were ordered to be printed in the RECORD, as follows:

PROVISIONS OF EXISTING FEDERAL ASSISTANCE STATUTES RELATING TO RACIAL DISCRIMINATION

The Hill-Burton Act of August 13, 1946 (60 Stat. 1041; 42 U.S.C. 291 et seq.), authorizes construction grants for public and non-profit hospitals. Section 622(f), 42 United States Code 291e(f), provides that the Surgeon General shall by regulation prescribe, inter alia:

"That the State plan shall provide for adequate hospital facilities for the people residing in a State, without discrimination on account of race, creed, or color. * * * Such regulation may require that before approval of any application for a hospital or addition to a hospital is recommended by a State agency, assurance shall be received by the State from the applicant that (1) such hospital or addition to a hospital will be made available to all persons residing in the territorial area of the applicant, without discrimination on account of race, creed, or color, but an exception shall be made in cases where separate hospital facilities are provided for separate population groups, if the plan makes equitable provision on the basis of need for facilities and services of like quality for each such group."[1]

The Second Morrill Act of August 30, 1890 (26 Stat. 418, 7 U.S.C. 321 et seq.), provides for annual grants to land-grant colleges. Section 1, 7 United States Code 323, provides in part:

"No money shall be paid out under sections 321–326 and 328 of this title to any State or Territory for the support or maintenance of a college where a distinction of race or color is made in the admission of students, but the establishment and maintenance of such colleges separately for white and colored students shall be held to be a compliance with the provisions of said sections if the funds received in such State or Territory be equitably divided as hereinafter set forth."

Public Law 815 of September 23, 1950 (64 Stat. 973 (reenacted as permanent legislation by the Act of August 12, 1958, 72 Stat. 551) 20 U.S.C. 631 et seq.), provides for grants for school construction in federally impacted areas. Section 205(b)(1)(f) of the 1950 act (Sec. 6(b)(1)(f) of the 1958 act), 20 U.S.C. 636 (b)(1)(f), provides that each application for grant shall include—

[1] The provision beginning "but an exception" was held invalid and severable in *Simkins* v. *Moses H. Cone Hospital* (C.A. 4, No. 8908) decided November 1, 1963.

"Assurance that the school facilities of such agency will be available to the children for whose education contributions are provided in this chapter on the same terms, in accordance with the laws of the State in which the school district of such agency is situated, as they are available to other children in such school district;".

Mr. PASTORE. Mr. President, as I have already noted, the separate-but-equal provision of the Hill-Burton Act was involved in litigation before the Court of Appeals for the Fourth Circuit and that court held that the provision was unconstitutional. The court enjoined hospitals involved upon excluding Negro patients and doctors. There has also been litigation involving Public Law 815. There, the Court of Appeals for the Fifth Circuit dismissed suits by the United States to enjoin pupil segregation at schools which received Public Law 815 funds, *United States* v. *Madison County Board of Education*, 326 F. 2d 237.

Enactment of title VI would eliminate that kind of confusion and override all such separate-but-equal provisions for the future regardless of the ultimate outcome of the pending litigation.

It is, of course, by no means true that in all instances payments to segregated institutions are required by positive command of present law.

Actually—and I want this to be well understood—in many respects title VI would merely clarify and support authority which now exists. For example, President Kennedy issued Executive Order No. 11063—November 20, 1962, F.R. 11527—which requires the appropriate agencies to "take all action necessary and appropriate to prevent discrimination because of race, color, creed, or national origin" in the sale, lease, rental disposition, use or occupancy of housing which is provided in whole or in part with the aid of Federal grants, loans, contributions, guarantees, or insurance.

Similarly racial discrimination in employment on construction in the programs supported by Federal financial assistance is prohibited by Executive Order No. 11114—June 25, 1963, 28 F.R. 6485.

Individual agencies have also taken action to preclude racial discrimination in connection with assistance programs administered by them. For example, the regulations of the Department of Agriculture prohibit schools or other institutions receiving donated agricultural commodities from discriminating against any person receiving food because of his race, creed, or color—6 CFR, section 503.8 (a) and (b).

Mr. President, title VI would serve to provide express statutory approval for this kind of action taken by the executive branch. The executive officers, from the President on down, are sworn to uphold the Constitution. They must see to it that the laws are faithfully executed. Certainly such officers must not engage in any conduct which they believe to be unconstitutional.

In many instances, existing Federal programs have been interpreted by the agencies administering those programs to preclude discrimination. While the executive branch is believed in most cases to have adequate authority to preclude discrimination or segregation by recipients of Federal assistance, enactment of title VI would clarify and confirm that authority. It would require agencies to act to eliminate racial discrimination, rather than to leave the matter, as now, to individual agency discretion. It would give the nondiscrimination policy express statutory sanction, and thus would tend to insure that the policy would be continued in future years as a permanent part of our national policy.

Another advantage of enactment of title VI would be to remove from the area of legislative debate the question of nondiscrimination every time a Federal assistance program is under consideration by Congress. Repeatedly, in recent years, nondiscrimination amendments have been proposed in Congress to bills providing for, or extending, Federal assistance to education, housing, and other matters. Such amendments have often been opposed by some Members of Congress who favored the principle of nondiscrimination, but feared that to raise the issue of discrimination in the particular legislative context might well result in the defeat of the particular bill.

Title VI enables the Congress to consider the overall issue of racial discrimination separately from the issue of desirability of any particular Federal assistance program. The enactment of this title would avoid for the future the occasion for legislative dilemmas of the type described above. It would also avoid any basis for argument that the failure of Congress to adopt such nondiscrimination amendments in connection with the particular program implied congressional approval of racial discrimination in that program.

Speaking of congressional debate, I should now like to consider a number of objections which have been offered to title VI.

In the House, a concerted attack was made on title VI as "punitive" or "vindictive." These charges are undeserved. These characterizations appear to result from the belief that title VI is intended to deny the South the benefit of social-welfare programs—that it would punish entire States for any act of discrimination committed within them. This argument merely befogs the issues. It ignores both the purpose of title VI and all of the limitations that have carefully been written into its language.

As is clear, the purpose of title VI is to make sure that funds of the United States are not used to support racial discrimination. In many instances, the practices of segregation and discrimination, which title VI seeks to end, are unconstitutional.

This is clearly so wherever Federal funds go to a State agency which engages in racial discrimination. It may also be so where Federal funds go to support private, segregated institutions, as the decision in the Simkins case teaches. In all cases, racial discrimination is contrary to the national policy and to the moral sensibilities of the people of this Nation. Thus, title VI is simply designed to insure that Federal funds are spent in accordance with the Constitution and our public policy.

Speaking of private institutions, the original draft of title VI referred to religious discrimination. Since there is no history of discrimination on the basis of religion in the administration of Federal aid programs, the reference was eliminated—and wisely so, I believe.

Moreover, as cannot be too often emphasized, the purpose of title VI is not to cut off funds, but to end racial discrimination. This requirement is reflected throughout the act. It is reflected in section 602, which provides that any action taken by the Federal department or agency must be "consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken." As a general rule, cutoff of funds would not be consistent with the objective of the Federal assistance statutes if other effective means of ending discrimination are available.

Section 602, by authorizing the agency to achieve compliance "by any other means authorized by law," encourages agencies to find ways to end discrimination without refusing or terminating assistance. These careful safeguards certainly demonstrate that the proposed statute is not intended to be vindictive or punitive.

Nor does title VI vest any broad authority to cut off all Federal aid to a State just because there are instances of discrimination within that State. Any nondiscrimination requirement an agency adopts must be supportable as tending to end racial discrimination with respect to the particular program or activity to which it applies. Funds can be cut off only on an express finding that the particular recipient has failed to comply with that requirement. Thus, title VI does not authorize any cutoff or limitation of highway funds, for example, by reasons of school segregation.

Nor does it authorize the cutoff or other compliance action on a statewide basis merely because there is discrimination in a particular program. For example, in the case of grants to impacted area schools, separate compliance action would have to be taken with respect to each school district receiving a grant.

There is, finally, one additional feature of title VI which demonstrates beyond doubt that it is not intended to be vindictive or punitive. I am referring to the fact that the authority contained in the title to cut off funds is hedged about with a number of procedural restrictions and requirements. These would hardly be necessary or appropriate if the bill were designed as a punitive or vindictive measure. These restrictions have already been briefly described but let me here again summarize what must be done before funds can be cut off. The following would have to occur:

First. The agency must first adopt a general nondiscrimination rule, regulation, or order.

Second. The President must give his approval.

Third. The agency must seek to secure compliance by voluntary means.

Fourth. A hearing must be held before any formal compliance action is taken.

Fifth. The agency may, and in many cases will, seek to secure compliance by means not involving a cutoff of funds.

Sixth. If the agency determines that a refusal or termination of funds is appropriate, it must make an express finding that the particular person from whom funds are to be cut off is still discriminating.

Seventh. The agency must file a written report with the appropriate congressional committee and 30 days must elapse before further action can be taken.

Eighth. The aid recipient can obtain judicial review and may apply for a stay pending such review.

Let me recount those eight safeguards to show that action under title VI is neither precipitous nor punitive.

Certainly, a piece of legislation that contains this multitude of protections cannot be said to be arbitrary, vindictive, or punitive.

Another objection that has been lodged against title VI is that it would give to the executive branch broad and sweeping powers that it has not heretofore known. This is totally inaccurate. Most Federal agencies extending assistance now have authority to refuse or terminate assistance for failure to comply with a variety of requirements imposed by statute or by administrative action. The difference is that this existing statutory authority is not surrounded by the procedural safeguards provided for in title VI.

For example, the Hill-Burton Act provides that an application for a grant for hospital construction must meet a number of requirements, and if the application fails to meet any of them, the Surgeon General may simply disapprove.

In case of disapproval, the State agency involved in hospital control is entitled to a hearing prior to final disapproval; the hospital applying for a grant is not (42 U.S.C. 291(h)). Likewise, the State agency can obtain judicial review (42 U.S.C. 291(j)).

After a grant-in-aid under the Hill-Burton Act has been approved, the Surgeon General may terminate payments if he makes any one of a number of findings. Again, the State has a right to judicial review (42 U.S.C. 291(j)).

How would title VI affect this procedure? It would, of course, have the effect of a repeal of the substantive provision which authorizes payments for separate-but-equal facilities—a provision which the court of appeals has already held unconstitutional. Thus, there would be no new authority to refuse a grant or terminate payments thereunder. But title VI would first afford the hospital, in addition to the State, a hearing in connection with a refusal or termination of a grant and judicial review under the Hill-Burton Act would, of course, continue to be available; second, require a report of any such refusal or termination to be made to Congress; third, require efforts to achieve voluntary compliance; and fourth, require Presidential approval of the Surgeon General's regulations relating to nondiscrimination.

There are numerous other Federal statutes that are similar in these respects to the Hill-Burton Act. This is true, for example, of the School Construction Act—Public Law 815—and the Library Services Act of 1956 (20 U.S.C. 351).

In most statutes of this type, considerable discretion is lodged in the administrator. When title VI is compared with these enactments, it is evident that the kind and degree of discretion granted here is far narrower and more carefully limited by procedural safeguards than that which Congress has frequently provided in other Federal assistance statutes.

There is another objection to title VI which has been advanced which is designed to foster public fear. It is alleged that title VI will interfere with private business. But title VI is not intended to regulate business. It is merely an exercise of an unquestioned power of the Federal Government. Under Federal assistance programs, the Federal Government is giving something away. Clearly, it should be able to fix the conditions under which money and goods are distributed. In fact, the Supreme Court has confirmed this power in the case of *Oklahoma* v. *Civil Service Commission*, 330 U.S. 127, 143 (1947), where the Court said that the Federal Government may "fix the terms on which—Federal funds—shall be disbursed."

No one is required to accept Federal assistance or Federal funds. If anyone does so voluntarily he must take it on the conditions on which it is offered. Certainly no one can claim that it is arbitrary for the Federal Government to insist that its funds not be put to a use which is unconstitutional or contrary to public policy.

A California court put it graphically but accurately when it said:

> When one dips one's hands into the Federal Treasury, a little democracy clings to whatever is withdrawn, *Ming* v. *Horgan*, 3 R.R.L.R. 693, Superior Court, Sacramento 1958.

The basic fairness of title VI is so clear that I find it difficult to understand why it should create any opposition. When new Federal programs are devised or when Congress is concerned with the appropriation of Federal funds, there is always a clamor to insure that no funds be expended unless adequate safeguards are adopted to prevent their improper use. Certainly, if—to use again the Hill-Burton Act as an example—the Surgeon General can say that he will not authorize money for a particular hospital unless that hospital has a particular type of lavatory facility or a particular type of kitchen, it is hard to believe that private rights are being infringed if the hospital is also that it must serve all of the people in the community without regard to the color of the skin. It seems to me that Congress should be at least as concerned with the latter as with the former.

The principles of our Government are an example for the entire world. This country knows no castes and no classes. The tenet of the Declaration of Independence that all men are created equal has its counterpart in the constitutional