# EXHIBIT 100

**RESOLUTION AGREEMENT**

**The University of California (the University)**

**Case Numbers 09-22-2257, 09-24-2336, 09-24-2352, (University of California, Los Angeles (UCLA));
09-24-2228 (University of California, Santa Barbara (UCSB));
09-24-2092 (University of California, San Diego (UCSD))
09-24-2283, 09-24-2312 and 09-24-2038 (University of California, Davis (UCD)); and
09-24-2224 (University of California, Santa Cruz (UCSC))**

The University enters into this resolution agreement (the Agreement) to resolve the compliance concerns the United States Department of Education, Office for Civil Rights ("OCR") identified for the above-referenced complaints of discrimination based on actual or perceived national origin, including shared Jewish, Israeli, Palestinian, Arab, and Muslim ancestry and/or the association with these actual or perceived national origins/ancestries under Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000d-2000d-7, and its implementing regulations at 34 C.F.R. Part 100 (Title VI). The University enters into this Agreement without making any admission of wrongdoing, liability, or noncompliance with Title VI or any other applicable law. The University assures OCR that it will implement and/or continue to implement the following actions to voluntarily resolve the above-referenced complaints and to ensure compliance with Title VI.

I.    **Nondiscrimination Policies and Procedures**

   A.  The University agrees to provide for OCR's review and approval any proposed revisions to the University's systemwide anti-discrimination policies, procedures, and guidelines that it uses to address its compliance with Title VI.

   B.  Any proposed revisions to the University's policies, procedures, and guidelines will include a statement addressing University law enforcement responses related to protests and demonstrations and ensuring that such responses are applied equitably and in a manner that complies with the Title VI prohibition on discrimination based on actual or perceived national origin, including actual or perceived shared ancestry or ethnic characteristics. The University will ensure these policies and procedures include a description of the nondiscriminatory factor(s) the University will consider prior to making each decision: (1) requesting that the University's law enforcement respond to a protest or demonstration, whether ongoing or anticipated; (2) inviting members of non-University law enforcement onto University property in response to a protest or demonstration, whether ongoing or anticipated; and (3) as applicable, submitting proposed charges to prosecutor's offices.

   C.  Reporting Requirements:

       For the duration of this Agreement, the University agrees to provide for OCR's

review and approval any proposed revisions to its nondiscrimination policies and procedures that affect the enforcement of Title VI at least 60 calendar days before the University seeks to make such revisions. The University will respond to any feedback from OCR about those proposed revisions within 15 calendar days and secure OCR's approval before adopting them.

## II.    Annual Investigator Training

A.  The University will provide training to its employees responsible for investigating complaints and other reports of discrimination, including harassment, based on actual or perceived shared ancestry or ethnic characteristics, including shared Jewish, Palestinian, Muslim, and/or Arab ancestry, or association with these national origins/ancestries, to ensure a thorough and impartial investigation of alleged violations of the University's nondiscrimination policies, including that the investigators know how to identify relevant witnesses to interview, how to conduct interviews about such harassment, and whether it created a hostile educational environment. The training will address, at a minimum:

1.  the University's obligations under Title VI to respond promptly and effectively to alleged discrimination, including harassment, of its students and employees in its programs or activities by other students, employees, and/or third parties based on actual or perceived national origin, including shared Jewish, Palestinian, Muslim, and/or Arab ancestry or association with these national origins/ancestries;

2.  a reminder that when the University refers to law enforcement an incident of alleged discrimination, including harassment, of its students or employees based on actual or perceived national origin, including shared ancestry, the University still has obligations under Title VI to respond promptly and effectively to the alleged discrimination, including harassment;

3.  the University's policies and procedures that focus on the investigation and resolution of reports and complaints of discrimination, including harassment, based on actual or perceived national origin, including shared Jewish, Palestinian, Muslim, and/or Arab ancestry or association with these national origins/ancestries, including instructions on how to conduct and document thorough and impartial investigations of such alleged discrimination;

4.  a statement that an individual who has reported or complained of alleged discrimination, including harassment, based on actual or perceived national origin, including shared Jewish, Palestinian, Muslim, and/or Arab ancestry or association with these national origins/ancestries, will be notified by the University of the outcome of that report or complaint, including where appropriate the prompt and effective steps that the University and/or the individual University campus has taken and/or is taking in response to the report or complaint and any identified hostile environment created in a University program or activity;

5. University guidance to its employees on how and when to provide the notification required in Term II.A.4 to individuals who make such reports or complaints;

6. a description of the steps the University and/or the individual University campus will take in response to notice of alleged discrimination, including harassment, based on actual or perceived national origin, including shared ancestry, such as: (a) offering supports (e.g., counseling or academic adjustments) to students who are subjected to such discrimination, including harassment that creates a hostile environment for the student(s) in a University program or activity; (b) following up with students to ensure their access to offered supports and the University's provision of such supports where appropriate; and (c) taking remedial measures to ensure that any hostile environment created by the harassment is eliminated; and

7. a statement that the University's policies prohibit retaliation against individuals who report or complain of alleged discrimination, including harassment, based on national origin, including shared ancestry, or who participate in proceedings investigating such alleged discrimination, and an explanation of how University students and employees can identify possible retaliation, including examples of it, and how to report it to the University.

B. **Reporting Requirements:**

By December 31, 2025, and prior to the beginning of the fall 2026 academic year, the University will provide documentation to OCR about any planned trainings or protocols as described in Term II.A above for the University and/or each individual University campus. In accordance with Term II, the University and/or each individual campus will provide the dates for when the new trainings will begin. The University and/or each individual University campus also will provide the name(s) and credentials of the trainer(s); copies of any training materials distributed; the agenda and/or a short summary of the material covered; and documentation that the trainings were provided.

III. **Public Safety and Campus Police Officer Training**

A. For Public Safety and Campus Police Officers (the Officers) who will respond to and/or investigate incidents at the University, the University will provide annual training on the University's nondiscrimination obligations under Title VI, the University's revised nondiscrimination policies, procedures, and guidelines as they apply to the enforcement of Title VI, how to work with the University's students and employees in a manner consistent with the requirements of Title VI addressed in this Agreement; and how to ensure accurate collection and reporting of data or information, including complaints, regarding interactions between public safety officers and University students or employees. The University will ensure that this training to the Officers will address, at a minimum:

1.  the University's obligations under Title VI to respond promptly and effectively to alleged discrimination, including harassment, of University students and employees by other students, employees, or third parties based on actual or perceived national origin, including shared Jewish, Palestinian, Muslim, and or Arab ancestry or association with these national origins/ancestries;

2.  the University's policies and procedures that focus on the investigation and resolution of reports and complaints of discrimination, including harassment, based on actual or perceived national origin, including shared Jewish, Palestinian, Muslim, and/or Arab ancestry or association with these national origins/ancestries, including instructions on how to conduct and document thorough and impartial investigations of such alleged discrimination;

3.  a statement that an individual who has reported or complained of alleged discrimination, including harassment, based on actual or perceived national origin, including shared Jewish, Palestinian, Muslim, and/or Arab ancestry or association with these national origins/ancestries, will be notified by the University of the outcome of that report or complaint, including where appropriate the prompt and effective must steps that the University and/or the individual University campus has taken or is taking in response to the report or complaint and any identified hostile environment created in a University program or activity;

4.  University guidance to employees on how and when to provide this notification required in Term III.A.4 to individuals who make such reports or complaints;

5.  a statement that if an Officer receives a report or allegation of discrimination, including harassment, of University students or employees based on actual or perceived national origin, including shared Jewish, Palestinian, Muslim, and/or Arab ancestry or association with these national origins/ancestries, during the course of addressing an incident within the Officer's jurisdiction, the Officer will share the report or allegation with the appropriate University office responsible for overseeing the University campus response, including sharing a copy of any written report or allegation the Officer received;

6.  a statement that Officers who have authority and responsibility to respond to a protest or demonstration on a University campus pursuant to applicable University policies and procedures must respond in a manner that is prompt, effective, and nondiscriminatory under Title VI;

7.  a description of the steps the University and/or the individual University campus will take in response to notice of alleged discrimination, including harassment, based on actual or perceived national origin, including shared ancestry, such as (a) offering supports to students who are subjected to such discrimination, including harassment that creates a hostile environment for the student (s) in a University program or activity; (b) following up with students to ensure their access to

offered supports and the University's provision of such support where appropriate; and (c) taking remedial measures to ensure that any hostile environment created by the harassment is eliminated; and

8. a statement that the University's policies prohibit retaliation against individuals who report or complain of alleged discrimination, including harassment, based on national origin, including shared ancestry, or who participate in proceedings investigating such alleged discrimination, and an explanation of how University students and employees can identify possible retaliation, including examples of it, and how to report it to the University.

### B. Reporting Requirements:

By December 31, 2025, and prior to the beginning of the fall 2026 academic year, the University will provide documentation to OCR about any planned trainings or protocols as described in Term III.A above for the University and/or each individual University campus. In accordance with Term III, the University and/or each individual University campus will provide the dates for when the new trainings will begin. The University and/or each individual University campus also will provide the name(s) and credentials of the trainer(s); copies of any training materials distributed; the agenda and/or a short summary of the material covered; and a list of attendees, by name and job title.

IV. **Audit for Academic Years 2023-2024 (July 1, 2023 – June 30, 2024) and 2024-2025 (July 1, 2024 – June 30, 2025) for UCLA, UCSB, UCSD, UCD, and UCSC**

A. By September 30, 2025 , the University will provide to OCR an electronic sortable spreadsheet or other file of the responses by the University or the individual University campuses to all complaints and reports alleging discrimination, including harassment and disparate treatment, on the basis of actual or perceived national origin, including shared Jewish, Palestinian, Muslim, and/or Arab ancestry, or association with these national origins/ancestries, during the preceding academic year at UCLA, UCSB, UCSD, UCD, and UCSC (the named campuses). At a minimum, the spreadsheet will include, to the extent such information is known and available, separate fields for:

1. the date(s) of receipt of the written complaint or oral report;
2. the name of the person who provided notice to the University and/or individual University campus ("the reporter");
3. the status of the reporter (e.g., professor, student, friend);
4. the name of the individual who was allegedly discriminated against/harassed ("the complainant");
5. the status of the complainant (e.g., student, professor, parent, advocate);
6. the name(s) of the individual(s) who engaged in discrimination/harassment ("the respondent(s)");

7. the status of the respondent (e.g., student, professor, employee or staff member), including if applicable, the respondent's job title (if an employee);
8. the nature of the alleged discrimination (e.g., disparate treatment by a professor of students perceived as Palestinian or Arab, blocking portions of a campus for students perceived as Jewish, verbal harassment by students using antisemitic or anti-Muslim slurs);
9. the date(s) of the alleged discrimination;
10. the location(s) of the alleged discrimination (e.g., campus, in a particular class, in the library, in an electronic forum, etc.);
11. the names of any witnesses to the alleged discrimination;
12. the name(s) and job title(s) of the individual(s) who received and processed the complaint or oral report;
13. the date the investigation commenced;
14. any supportive measures offered to the complainant, respondent, and/or other person;
15. whether the complainant, respondent, and/or other person accessed the supportive measures offered;
16. the status of the investigation of the complaint or oral report (e.g., completed, ongoing);
17. the outcome of all completed investigations (*i.e.*, the determination regarding whether or not discrimination, including harassment and disparate treatment, on the basis of actual or perceived national origin, including shared Jewish, Palestinian, Muslim, and/or Arab ancestry, or association with these national origins/ancestries, took place; and if so, whether the harassment created a hostile environment);
18. a description of any corrective actions taken, including any disciplinary sanctions against students or referrals to a faculty committee for further action, if any, and the date imposed;
19. a description of the remedial measures taken, including the remedies offered and provided to the complainant and/or other individual(s);
20. a description of any steps the University and/or the individually named campus took to eliminate and/or prevent the recurrence of a hostile environment created by the incident(s) of harassment;
21. the date(s) the University and/or named campus provided written notice of the outcome of the investigation to the parties;
22. the date of any appeal; and
23. the outcome of any appeal.

B. Upon request, for any University campus, the University will provide to OCR within 30 calendar days a copy of the complete investigative file(s), including all records of the University and the applicable named campuses (e.g., the complaint/report, investigative records, determination records, student disciplinary records, employee disciplinary records, and human resources/personnel files). The University will produce to OCR electronically the complete investigative files in a mutually agreed format and will separately organize the files for each investigation, including organizing and labeling all documents for each investigation as individual files. The

University will promptly address any OCR feedback until OCR notifies the
University that no further reporting is required for Term IV of this agreement.

V.    **Climate Assessment and Analysis**

A.  The University will create a plan to work with its respective campuses to develop
climate surveys for distribution to students at each of its University campuses to
evaluate the climate at each campus and the University more broadly with respect to
actual or perceived national origin/shared Jewish, Palestinian, Muslim, and/or Arab
ancestry or association with these national origins/ancestries, and the extent to which
students are subjected to or witness discrimination, including harassment, based on
actual or perceived race, color, and/or national origin, including shared Jewish,
Palestinian, Muslim, and/or Arab ancestry or association with these national
origins/ancestries. The University will ensure that any survey used will contain
questions about the student's knowledge of discrimination against students or
employees based on shared ancestry (Jewish, Palestinian, Muslim, and/or Arab or
association with these national origins/ancestries), any experiences with such
discrimination while attending the University campus, and the student's awareness of
the University's and/or the University campus complaint procedures for reporting
such discrimination. Participation in the survey by students will be entirely voluntary,
and the survey will be conducted in a manner consistent with applicable law. The
University may administer the climate survey through a written or electronic survey,
provided that students receiving the survey also are notified of a contact person, such
as a counselor, should they wish to discuss the survey in person.

B.  The University will analyze the results of the climate survey(s) within 90 calendar
days of its completion to identify appropriate action(s) that the University and/or the
individual University campuses will take to improve the climate at the campus and
the University more broadly with respect to nondiscrimination based on national
origin, including shared Jewish, Palestinian, Muslim, and/or Arab ancestry. The
University will provide to OCR a report summarizing the results of the survey(s) for
each University campus; and, for OCR's review and approval, a description of further
action(s), if any, that the University and/or the University campus proposes to take in
response to the survey results. Within 60 calendar days of OCR's approval of the
University and/or the campus' proposed action(s), the University will provide
documentation sufficient to show its implementation of those actions, including a
description of the actions and how they were implemented.

C.  **Reporting Requirements**

1.  By August 31, 2025, the University will provide OCR for its review and approval
the University's plan for the development of climate surveys at its campuses.

2.  By August 31, 2026, the University will provide OCR, a description of the tools
to be used for conducting the climate survey(s). The description of the survey
tools will include the University's strategy for implementing the climate survey

and analyzing the results. The University will use the information gathered during the climate survey(s) to inform future proactive steps the University and/or individual University campuses takes to provide an environment that is safe and supportive to all students and in compliance with Title VI. Finally, part of the University ongoing climate survey will include informing students about to whom they can report concerns of discrimination on the bases of actual or perceived race, color, and/or national origin (including discrimination on the basis of shared ancestry (Jewish, Palestinian, Muslim, and/or Arab, or association with these national origins/ancestries).

3. Within 90 calendar days of OCR's approval of the climate survey, the University and/or the University campus will administer the climate survey.

4. Within 90 calendar days of the completion of the analysis of the climate survey results, the University will provide a report to OCR (the Report) that includes, at a minimum:

   a. documentation demonstrating that the approved survey was conducted as planned;

   b. the analysis of the survey responses and any recommended steps that the University and/or the University campus could take to improve the climate at each campus and across the University's campuses;

   c. conclusions about the climate at each University campus and the University more broadly, separately addressing the climate for students of shared Jewish, Palestinian, Muslim, and/or Arab ancestry, or students associated with these national origins/ancestries, among other student groups at the campus/school; and

   d. for OCR's review and approval, the University's and/or each University campus' recommended reforms, if any, to its policies, practices, employee training, and education programs regarding harassment based on actual or perceived national origin, including shared ancestry.

## VI.    Commitments to Address Discrimination, Including Harassment

A. Within 30 calendar days of the signing of the Agreement, the University President will issue a statement to all University students and employees. This statement, and all of the University's annual nondiscrimination notices, will state that the University does not tolerate acts of discrimination, including harassment, on the basis of actual or perceived national origin, including shared ancestry and ethnic characteristics, and that the University will take all necessary actions promptly and effectively to address such discrimination in its programs and activities and remedy its effects as appropriate. The statement and annual notices will encourage any student or employee who believes they have been subjected to, or have information about,

such discrimination to report it to the University campus with instructions regarding how to do so.

**B. Reporting Requirements:**

Within 30 calendar days of the issuance of the President's statement, and within 30 calendar days of the issuance of the annual nondiscrimination notice for the 2025-2026 academic year, the University will provide OCR with documentation demonstrating that the University issued and disseminated the statement or notice referenced in Term VI.A, as applicable, to the University's students and employees.

**VII. Investigations of and Remedies for Individual Allegations of Harassment and Disparate Treatment**

**A. Open Individual Investigations - Students 3, 4, and 6**

1. To the extent not already investigated and reported to OCR through Term IV of this Agreement, by June 30, 2025, UCSB will contact Students 3, 4, and 6 (UC Santa Barbara, OCR Case Number 09-24-2228) to offer to open an investigation of the alleged incidents of harassment based on national origin, including shared ancestry, described in OCR's Resolution Letter to the University in Case Number 09-24-2228.

2. For the students who agree to have the UCSB investigate their allegations, UCSB will ensure that its investigations: provide notice to the parties regarding the issue to be investigated, identify witnesses to be interviewed, document witness interviews and/or written statements, identify other relevant evidence to obtain and review, analyze evidence in a thorough and impartial way, and document UCSB's determination regarding whether (a) harassment of a UCSB student or employee occurred based on actual or perceived national origin that created a hostile environment for the student(s) and/or (b) UCSB engaged in disparate treatment of the student based on national origin, including shared ancestry.  As appropriate, UCSB will offer and provide promptly to the students remedies to redress any national origin discrimination they experienced.

3. UCSB will notify the parties involved in the investigations conducted under Term VII.A.2 of this Agreement of UCSB's determination, the rationale for its determination, the standards used in making the determination, and as appropriate, the prompt and effective steps taken to stop the discrimination, including any hostile environment, prevent its recurrence, and remedy its effects.

**B. Individual Allegations of UCLA's Disparate Treatment Based on Shared Ancestry in Connection with the Encampment**

1. To the extent not already investigated and reported to OCR through Term IV of the Agreement, UCLA will ensure that it promptly investigates as applicable: (i)

whether UCLA students were blocked from accessing parts of campus based on their actual or perceived Jewish and/or Israeli shared ancestry and/or the association with these national origins/shared ancestries as a result of the Encampment between April 25, 2024 and May 2, 2024; (ii) whether UCLA faculty/instructors held classes or office hours in the Encampment between April 25, 2024 and May 2, 2024; and (iii) whether UCLA, including its police, public safety officers, and security contractors, engaged in disparate treatment or harassment of UCLA students and employees based on their actual or perceived national origin/shared ancestry, including the association with these national origins/shared ancestries, when responding to the UCLA Encampment on April 30, 2024, and May 1, 2024, including when responding to the actions of protestors, counter-protestors, and non-UCLA law enforcement. UCLA will ensure that its investigations required by Term VII.B.1 above comply with the requirements of Title VI.

2. If UCLA's investigations reveal that students and/or employees were harassed or treated differently and adversely based on their national origin, including their actual or perceived shared ancestry and/or the association with these national origins/shared ancestries, UCLA will offer and provide individual remedies to the affected students and/or employees to redress any harm(s) identified, including remedies such as counseling, academic adjustments, opportunities to make up any missed classes or coursework, tuition reimbursement, and removal of any academic or disciplinary consequences related to the harassment or disparate treatment.

3. Within 30 calendar days of the signing of the Agreement, the UCLA Chancellor will issue a campus-wide communication to provide UCLA students with the opportunity to report the types of disparate treatment outlined in Term VII.B.1 above. The communication will include a telephone number and an email address to report the incidents.

C. **New Allegations of Discrimination Based on Shared Ancestry**

For the duration of this Agreement, OCR will notify the University of new allegations of harassment and/or disparate treatment based on shared ancestry at any University campus, and within 30 calendar days of receiving OCR's notice, the University campus will assess whether to open an investigation of these allegations, if the University campus has not already opened one. For cases in which the University campus determines not to open an investigation, the University campus will provide OCR with its rationale for that determination. For cases in which the University campus opens an investigation, it will ensure that the investigations provide notice to the parties regarding the issue to be investigated, identify witnesses to be interviewed, document witness interviews and/or written statements, identify other relevant evidence to obtain and review, analyze evidence thoroughly and impartially, and document the University's determination regarding whether there was harassment of a student or employee based on actual or perceived national origin that created a

hostile environment for the student in a University campus program or activity and/or the University campus engaged in disparate treatment of the student based on national origin.  As appropriate, the University campus will offer and provide promptly to students remedies to redress any national origin discrimination they experienced.

### D. Reporting Requirements:

1. By August 31, 2025, the University will submit to OCR the report of its investigations for the incidents identified in Term VII.A.2 above.  The report will include, at a minimum: (i) a description of the evidence collected and witness statements obtained; (ii) factual findings and legal determinations; (iii) any proposed corrective or remedial actions deemed necessary (including remedies for specific students); and (iv) a proposed timeline for implementation of the actions, if necessary. The University also will identify, by name and job title, the individuals who conducted the investigation and made any determinations.

2. By August 31, 2025, the University will submit to OCR the report of its investigations outlined in Term VII.B.1 above, including a description of the individual remedies offered and provided to the affected students.

3. Within 30 calendar days of the issuance of the communication required by Term VII.B.3 above, the University will provide OCR with documentation showing that it has fulfilled this Term.

4. Within 90 calendar days of receiving notice from OCR of new allegations of discrimination based on shared ancestry under Term VII.C above, the University will submit to OCR the rationale for its determination to not open an investigation or a report of its investigations for these new allegations. The report will include, at a minimum, the requirements of Term VII.D.1 above.

5. If OCR has any concerns about the adequacy of the University's rationale to not open an investigation or its investigations or any of its proposed remedial or corrective actions, OCR will communicate those concerns to the University in writing. Within 30 calendar days of receiving notice of any such concerns from OCR, the University will respond to address OCR's concerns with proposed revised corrective action(s). Within 30 calendar days of OCR approval of such revised corrective action(s), the University will provide OCR with documentation demonstrating that the University implemented those corrective actions and completed the requirements set forth in Terms VII.A, VII.B, and VII.C above.

## VIII.  OCR Monitoring

By signing this Agreement, the University understands and agrees to provide data and other information in a timely manner in accordance with the reporting requirements of the Agreement. Further, the University understands that during the monitoring of the Agreement, if necessary, OCR may visit the University, interview staff and students; and request such additional reports

Page 12 of 12

or data as are necessary for OCR to determine whether the University has fulfilled the terms of the Agreement.

The University understands that OCR will not close the monitoring of this Agreement until OCR determines that the University has demonstrated compliance with all the terms of this Agreement and is in compliance with Title VI and its implementing regulation at 34 C.F.R. Part 100, which were at issue in this case.[1]

The University understands that OCR may initiate administrative enforcement proceedings or refer the case to the Department of Justice ("DOJ") for judicial proceedings in the event of breach to enforce the specific terms and obligations of this Agreement and/or the applicable statute(s) and regulation(s). Before initiating such proceedings, OCR will give the University written notice of the alleged breach and 60 calendar days to cure the alleged breach.
This Agreement will become effective immediately upon the signature of the University's authorized representative below.


__12/18/24__                              _____/s/_____
Date                                       Authorized Representative for all UC Campuses

---

[1] To the extent that the University and/or University campus is subject to court orders or settlement agreements that address the subject matter of this Agreement, including but not limited to, shared ancestry discrimination or harassment and protest activities on campus, nothing in this Agreement shall prevent the University from meeting its obligations under those orders and agreements. Should the University conclude it cannot comply with the terms of such orders and agreements and one or more terms of this Agreement, the University shall notify OCR within 15 days of this conclusion in writing, identify the term(s) with which the University believes it cannot comply, and propose modification of the term(s) for OCR's review and approval that would permit the University's compliance. Within 10 days of sending this notice, the University will discuss with OCR how the University and OCR plan to proceed to resolve the conflict among the University's obligations. Upon OCR's approval, the University will implement the modified portions of the Agreement within OCR-approved timeframes.