1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**NORTHERN DISTRICT OF CALIFORNIA**

10

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS, et al.,

11

Case No. 3:25-cv-07864-RFL

**DECLARATION OF CARRIE BEARDEN
IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION**

12

Plaintiffs,

13

v.

14

DONALD J. TRUMP, in his official capacity
as President of the United States, et al.,

15
16

Defendants.

17
18
19
20
21
22
23
24
25
26
27
28

I, Carrie Bearden, hereby declare as follows:

1. I am over the age of 18, of sound mind, and in all respects competent to testify. I make this declaration of my own personal knowledge and would testify to the facts set forth below if called on to do so.

2. I am a faculty member at the University of California, Los Angeles ("UCLA") David Geffen School of Medicine in the Department of Psychiatry and Biobehavioral Sciences and at the UCLA Department of Psychology. I am the Director of the UCLA Center for the Assessment and Prevention of Prodromal States ("CAPPS"). I am also a member of the UCLA Faculty Association ("UCLA FA") and the Council of UC Faculty Associations ("CUCFA").

3. I received my B.A. in psychology from the University of California, Berkeley, and my Ph.D. in Clinical Psychology from the University of Pennsylvania. After completing my clinical training at the Veterans Affairs Medical Center in San Diego and UC San Diego in 2001 and a postdoctoral fellowship at the University of Pennsylvania / Children's Hospital of Philadelphia in 2002, I joined the UCLA faculty in 2003. I have been a professor at UCLA for the past 22 years. I currently teach a graduate neuroscience seminar on current topics in neurobehavioral genetics.

4. I am the principal investigator ("PI") at the UCLA Bearden Lab in the Semel Institute for Neuroscience and Human Behavior. My research focuses primarily on understanding genetic, neurobiological, and cognitive risk factors for the development of serious mental illnesses and neuropsychiatric disorders in adolescents. I oversee several projects as PI, including an ongoing, 15-year longitudinal study of risk factors for psychiatric disorders in youth with a particular genetic disorder that put people at a high risk for psychosis.

5. To date, I have been an author on over 350 published research papers in my field. I have received numerous awards and honors for my research achievements, and for teaching and mentorship, including awards from the Society of Biological Psychiatry, International Congress for Schizophrenia Research; the National Alliance for Research on Schizophrenia and Affective Disorders (NARSAD); and the American College of Neuropsychopharmacology.

6. I am the co-director of the Training Program in Neurobehavioral Genetics ("Training Program"), a pre- and postdoctoral program that supports graduate student trainees interested in

1

research related to the genetics of psychiatric and neurological brain disorders. This program has been funded primarily by the National Institutes of Health ("NIH") through its Institutional National Research Services Award ("T32") since the program's inception in around 2006. To date, the program has trained about 119 students who have gone on to work in academia, research-related industry, and as faculty at various well-regarded universities. Trainees in this program are selected based on prior research accomplishments and are provided with rigorous practical and academic training in neurobehavioral genetics during the one-to-two years they are part of the program.

7.    I am aware that on or around July 30-August 1, the Trump administration suspended more than $500 million in federal funding for UCLA with instructions that UCLA cease all activities supported by those funds and immediately discontinue withdrawing from those funds. It is my understanding that the Trump administration is investigating the University of California ("UC") for alleged antisemitism and other alleged violations of Title VI, Title VII, Title IX, and has cited these pending investigations and/or UC's alleged policies regarding race and transgender people, as the basis for the suspension of federal funds from UCLA.

8.    I am concerned about the irreparable harm that has resulted and will continue to flow from the Trump administration's funding cuts targeting UCLA. On August 1, 2025, I was informed that the NIH T32 grant funding the Training Program had been suspended. This is a five-year grant that awards over $ 500,000 per year, totaling over $2 million dollars in funding. Roger Wakimoto, UCLA Vice Chancellor for Research, emailed a list of hundreds of grants that had been suspended effective immediately, and the Training Program grant was on this list. I was given no explanation for why the funding for the Training Program was cut and whether it would be restored in the future. Considering about seven graduate trainees and 40 faculty mentors participate in the Training Program, loss of funding to the program has a widespread impact not only on the students themselves, but also on the labs in which they are placed. For example, one Training Program student works in a lab that uses genetically engineered mice to study severe neurological disorders such as Huntington's Disease and Alzheimer's Disease. Recently, that lab made significant breakthroughs in Huntington's and Alzheimer's research when it successfully genetically engineered mice to restore certain neurological

DECLARATION OF CARRIE BEARDEN IN SUPPORT OF                    Case No. 3:25-cv-07864-RFL
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

functions. Suspension of funding for the student who works in that lab translates to delays in the student's research and interruptions to the important work being done in the lab.

9.      Following the suspension of the T32 grant, several faculty members, including myself, had to refocus our time and labor toward trying to find alternative funding sources for the graduate student trainees who were being funded through the Training Program. Some trainees had to find alternate sources of funding that diverted their time and resources away from their research. At least one student was considering taking on a job as a Teaching Assistant, which would have significantly impacted the trainee's ability to focus on substantive research that could contribute to the discovery of life-changing treatment and medication down the road. Postdoctoral students are the next generation of principal investigators, and significant interruptions to their research translate to interruptions in their career trajectories, placing them at a competitive disadvantage when it comes time for career advancement. We were eventually able to secure temporary funding through UCLA to cover the salaries of the trainees whose funding was suspended, but we had no information about how long that funding would last and no guarantee of future funding to replace it.

10.     I am aware that Judge Rita Lin has ordered the Trump administration to restore the NIH grants it suspended at UCLA in July 2025 in connection with a different lawsuit. This restoration of funding has allowed students like the one who was considering taking a Teaching Assistant position to refocus on their research.

11.     However, I am also aware that on August 8, 2025, the Trump administration made a series of demands to UC ("August 8 Demands") that include a $1.2 billion fine and a series of harmful policy changes that would severely limit free speech and academic freedom. I am further aware that there is a serious risk that Defendants will terminate some or all UC federal research funding if UC does not capitulate to the August 8 Demands. I am aware that the Trump administration has similarly threatened other universities and has followed through on its threats by pulling federal funds from Harvard University, Columbia University, Brown University, and University of Pennsylvania and demanding suppression of disfavored views on campus. The actions that the Trump administration has taken against other universities give further credibility to Defendants' threats against UC and reinforce my belief that those threats will be acted upon.

DECLARATION OF CARRIE BEARDEN IN SUPPORT OF                    Case No. 3:25-cv-07864-RFL
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

12. I am deeply concerned about the Trump administration's August 8 Demands that include threats to pull federal research funding and the imminent harm to me, my colleagues, and our students should the Trump administration follow through on these threats. My concerns are informed by the actual harms I experienced and witnessed due to the Trump administration's actions on and after July 31, as described above. I am also aware of several colleagues whose primary source of funding for their research labs was suspended. As a result of these funding cuts, PIs have been forced to sacrifice reagents, animals, cells, and other research-related resources. Animal research, for example, usually involves experimental intervention at specific stages of animal development. Without materials and people to continue the research process, the experiments cannot continue, leading to an egregious and unethical waste of resources. At least four out of seven trainees in the Training Program are placed in labs that work with cells and animals: A future loss of funding to the Training Program would result in severe, long-lasting consequences for each of these research labs.

13. I am aware that UC has not shared the exact contents of the August 8 Demands from the Trump administration, which contributes to the atmosphere of fear and uncertainty for faculty members. I am aware that the August 8th Demands made of the UC system are vaguely defined but include mandates restricting certain protest activities, sharing personal data with the federal government, denying access to gender affirming care, implementing policies that discriminate against transgender individuals, potentially eliminating programs that promote DEI, and appointing an outside monitor to ensure that these demands are met. I am concerned about the harms that would befall the students and colleagues I work with should the UC capitulate to these demands.

14. Recently, I spoke to various staff and faculty at Columbia University, where the Trump administration successfully imposed similar demands. They described the significant ways that Columbia University's decision to capitulate to the Trump administration's demands has forced their faculty and educational staff to compromise their academic principles. For example, they described having to sign something like a "pledge" to not "engage in illegal DEI" or participate in boycotts of Israel in order to have their funding restored. I am concerned that similar harms will befall the faculty, staff, and students at UCLA should the Trump administration prevail in imposing their August 8 Demands.

DECLARATION OF CARRIE BEARDEN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION                    Case No. 3:25-cv-07864-RFL

1    I declare under penalty of perjury under the laws of the United States of America that the

2    foregoing is true and correct.

3

4    Executed on October____5____, 2025, in ___Los Angeles___, California.

5

6

7

8                                              _____
                                               Carrie Bearden, Ph.D.
9                                              Professor, Psychiatry and Biobehavioral Sciences
                                               & Psychology
10                                             Semel Institute for Neuroscience and Human
                                               Behavior
11                                             Director, Center for the Assessment and
                                               Prevention of Prodromal States (CAPPS)
12                                             University of California, Los Angeles

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27