1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS, et al.,

        Plaintiffs,

   v.

DONALD J. TRUMP, in his official capacity
as President of the United States, et al.,

        Defendants.

Case No. 3:25-cv-07864-RFL

**DECLARATION OF LEIGH KIMBERG
IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION**

Docusign Envelope ID: 48991766-67CF-419F-AB6C-22FB9DBEC979

I, Leigh Kimberg, declare as follows:

1.      I am a Professor of Medicine in the Division of General Internal Medicine at San Francisco General Hospital in the Department of Medicine at the University of California San Francisco ("UCSF").

2.      This declaration is submitted in support of Plaintiffs' Motion for a Preliminary Injunction.

3.      I am over the age of 18 and competent to testify as to the matters set forth in this declaration based on my own personal knowledge.

4.      I received my B.A. in Engligh literature from the University of Pennsylvania and my M.D. from Harvard University.  I completed my residency in primary care/ internal medicine at San Francisco General Hospital at UCSF.  I have been a member of UCSF's faculty since 2014.  From about 2014 to 2022, I served as the Director for the Program in Medical Education for the Urban Underserved ("PRIME-US").   PRIME-US is a program at the UCSF School of Medicine and the UC Berkeley-UCSF Joint Medical Program that educates medical students committed to working with urban underserved communities.

5.      I am a member of the UCSF Faculty Association ("UCSF FA") and I sit on the UCSF FA Executive Board.  I am also a member of the Executive Board of the Council of University of California Faculty Associations, which is an umbrella organization for all the faculty associations at the UC campuses including UCSF FA.  I am a member of the American Association of University Professors and a delegate of the UC Assembly of the Academic Senate.

6.      UCSF FA is a voluntary, dues-supported organization comprised of UCSF faculty members across all the UCSF health professions schools and the Graduate Division. The UCSF FA is dedicated to the protection and improvement of the UCSF faculty's working conditions and rights through advocacy for basic employment rights, including salary and benefits, academic freedom, shared governance, and ability to fulfill our academic mission and provide high quality patient care. In partnership with the UCSF Academic Senate, the UCSF FA advocates on behalf of the UCSF faculty with the UCSF Administration. The UCSF FA also addresses policy and regulatory issues of concern to the UCSF faculty through state and federal legislative advocacy.

7.      UCSF focuses on graduate-level health and life sciences education, research, and patient care and offers professional degrees in medicine, nursing, dentistry, pharmacy, and physical therapy,

DECLARATION OF LEIGH KIMBERG IN SUPPORT OF                                 Case No. 3:25-cv-07864-RFL
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1    along with graduate programs in various scientific disciplines. Therefore, in addition to being faculty

2    members, professors, and researchers, most UCSF FA members are health professionals who provide

3    clinical care in hospitals and/or clinics and teach and mentor medical, nursing, pharmacy, dental students

4    and trainees.

5        8.    In my role as member of the UCSF FA Executive Board, I am knowledgeable of and have

6    been involved in UCSF FA's efforts to respond to the Trump Administration's attacks on and threats

7    against the University of California system ("UC" or the "University").

8                            **Awareness of the Trump Administration's Actions**

9        9.    I am aware that President Trump has pledged "to reclaim our once great educational

10   institutions from the radical Left and Marxist maniacs," and that since taking office, President Trump

11   and his administration have taken a series of actions to try to remove from university campuses diversity,

12   equity, and inclusion ("DEI") programs and other topics and viewpoints they disfavor, such as "woke

13   gender ideology" and "the green new deal," among others.

14       10.   I am aware that on or around July 30-August 1, the Trump Administration suspended

15   more than $500 million in federal funding for UCLA. It is my understanding that the Trump

16   Administration is investigating UC for alleged antisemitism and other alleged violations of Title VI,

17   Title VII, Title IX, and has cited these pending investigations and/or UC's alleged policies regarding

18   race and transgender people, as the basis for the suspension of federal funds from UCLA.

19       11.   I understand that the Trump Administration made a series of demands to UCLA on

20   August 8th ("August 8th Demands"). UC has not shared the exact contents of the August 8th Demands

21   from the Trump Administration, which contributes to the atmosphere of fear and uncertainty for UCSF-

22   FA members.

23       12.   Based on reporting on the August 8 Demands, I understand that they include

24   approximately $1.2 billion in fines and other financial penalties. I am also aware that the Demands

25   include a series of harmful policy changes, which I understand to include:

26           -    Greater cooperation between UCLA and federal law enforcement, which I

27                understand to include expanded collaboration with Immigration and Customs

28                Enforcement ("ICE");

2

DECLARATION OF LEIGH KIMBERG IN SUPPORT OF              Case No. 3:25-cv-07864-RFL
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1          -     Granting the government access to all UCLA documents, records, and data not
2                  protected by attorney-client privilege;

3          -     Stricter restrictions on protests on UCLA's campus;

4          -     Rescinding UCLA's recognition of transgender identities and restrictions on
5                  transgender individuals' access to bathrooms and other campus facilities;

6          -     Prohibiting the provision of gender-affirming care for minors by UCLA Health;

7          -     Appointing a senior administrator to review all of UCLA's 'diversity, equity, and
8                  inclusion' related policies in admissions and employment;

9          -     Ending all race- and ethnicity-based UCLA scholarships and prohibiting UCLA
10               from using criteria that serve as a proxy for race-conscious hiring, promotion,
11               tenure, or other employment policies or practices;

12         -     Prohibiting the admission of international students "likely to engage in anti-
13               Western, anti-American" and instituting "trainings to 'socialize' international
14               students to campus norms"; and

15         -     Appointing an outside monitor with significant authority over campus affairs to
16               oversee UCLA's compliance with the demands.

13.    I understand that the August 8 Demands do not provide any clear definition of either "diversity, equity, and inclusion" or "anti-Western" for the purposes of implementing those demands.

14.    I understand that the UC is negotiating with the federal government to try to settle pending charges and investigations.

15.    I am also aware that, in what seems to me like an effort to appease the Trump Administration, UC has already taken steps that are inconsistent with past practices, and those actions are harming me and my colleagues. For example, I am aware that, in September 2025, UC Berkeley disclosed the names of 160 faculty and staff who had been named in complaints about anti-Semitism to Defendants. Their names were in response to a U.S. Department of Education request for documents relating to alleged Title VI violations and investigations.

16.    In another example of apparent appeasement of the Trump Administration, UCSF instituted what I have heard described by many colleagues as a "compliance process" in early August.

DECLARATION OF LEIGH KIMBERG IN SUPPORT OF         Case No. 3:25-cv-07864-RFL
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

In meetings with faculty and staff, colleagues have discussed their responsibility to rapidly review and alter their websites, descriptions of programs, titles and program names to avoid certain terms like "DEI" and to preferentially use other words and phrases. In fact, the longstanding name of the "UCSF Office of Diversity and Outreach" was officially changed to be the "UCSF Office of Opportunity and Outreach" on August 1, 2025.

17.    I also understand that the Trump Administration has threatened to cut more federal funds from UC if it does not comply with the Administration's demands.

18.    I understand the Trump Administration is engaging in other investigations targeting the UC system and has indicated that if UC does not agree to implement the Administration's demands throughout the UC system as a whole, all of UC's federal funding will be at risk.

19.    I am aware that the Trump Administration has previously targeted other universities with similar threats and demands. I understand the administration cut hundreds of millions and in some cases billions of dollars in federal funding at other universities, including Harvard University, Columbia University, Brown University, and the University of Pennsylvania, based on alleged violations of Title VI, Title VII, and/or Title IX, and then similarly conditioned restoration of those terminated funds on the universities' capitulation to monetary and ideological demands that extend far beyond correcting any alleged civil rights violations.

20.    I am aware that the Administration's demands to targeted universities have included significant financial payouts to the federal government, as well as various restrictions on academic freedom and other forms of campus speech. For example, I am aware that the Trump Administration demanded that Columbia place the Department of Middle Eastern, South Asian, and African Studies (MESAAS) under receivership. I am also aware that the Trump Administration demanded that Harvard provide for "viewpoint diversity" among its faculty members, take away "power" from faculty members who may be perceived as "activists," and discontinue any practices that the Trump Administration perceives to be connected to DEI principles.

21.    I am aware the Trump Administration has announced that it will tie federal funding for colleges and universities to its perception of recipient institutions' responses to alleged antisemitism. I am not aware of the administration providing any comprehensive definition of what views or actions it

DECLARATION OF LEIGH KIMBERG IN SUPPORT OF          Case No. 3:25-cv-07864-RFL
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

classifies as antisemitic. Nonetheless, I understand that the Administration considers support for or solidarity with the Palestinian people or of opposition to the State of Israel, the Israeli occupation of Palestinian territories, or the War in Gaza to be antisemitic views. This understanding is based on actions and public statements of Trump Administration officials, especially those of the Department of Education's Task Force to Combat Anti-Semitism, which has characterized such expressions as antisemitic on numerous occasions.

22.     I understand that Columbia, Brown, and the University of Pennsylvania have entered into agreements with the Trump Administration to resolve the administration's investigations against them, and that these agreements contain some of the terms that the Trump Administration demanded.  For example, I am aware that Columbia agreed to pay $200 million to the federal government, conduct a review of the MESAAS Department, hire faculty in certain subject areas that the Trump Administration deems favorable, and place certain restrictions on campus speech.

23.     It appears that the Trump Administration's recent funding cuts and demands targeting the UC system are following the same path as its efforts to exert control over these other universities.

24.     The demands the Trump Administration has made to the Regents with respect to UCLA and other universities undercut academic freedom and free-speech principles and undermine UCSF faculty members' ability to treat our patients, conduct life-saving research, and educate our students and trainees to become the highly skilled healthcare workforce we need to address serious health problems locally, nationally, and internationally.

**Impacts of the Trump Administration's Actions UCSF FA's Members**

25.     Defendants' actions cancelling UCLA research grant funding on July 30 and issuing the August 8 Demands to UC threaten imminent harm to UCLA FA members and limit their ability to collaborate with UCSF FA members and other UC FA members on research projects.

26.     I and other UCSF FA members are aware that the Trump Administration has stated its intention to investigate allegations of antisemitism and potentially pursue enforcement action against at least four other UC campuses: UC Berkeley; University of California, Davis; University of California, San Diego; and University of California, Santa Barbara. I and other UCSF FA members are also aware that in September 2025 UC Berkeley has provided the Trump Administration with the names of at least

DECLARATION OF LEIGH KIMBERG IN SUPPORT OF                Case No. 3:25-cv-07864-RFL
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

160 faculty and staff named in complaints of antisemitism.

27.    Further, many of the August 8 Demands conflict with systemwide UC policy and compliance with those demands would require the University to either change or ignore those systemwide policies. For instance, the Presidential Policy on Gender Recognition and Lived Name requires campuses to recognize the gender with which an individual identifies and use individuals' self-chosen names. This policy directly conflicts with the Trump Administration's demand that UCLA cease to recognize transgender identities. In order to comply with this demand, the University would either have to ignore the fact that its largest campus was out of compliance with a systemwide Presidential Policy or revise that policy to accommodate the administration's demand, which would impact all other UC campuses. In fact, since the Trump Administration began its attacks on UC, the University has already revised its systemwide policy on financial aid to prohibit financial aid, scholarships, fellowships, grants, loans, and other awards that take into account a student's race, sex, color, ethnicity, or national origin, thus partially complying with the August 8 Demands as a matter of systemwide policy. At UCSF in particular, this has included instructions to faculty and staff to remove words and phrases disfavored by the Trump Administration from program descriptions and other materials, as I described above.

28.    These factors lead me and other UCSF FA members to believe that Defendants intend to impose terms similar to the August 8 Demands on other UC campuses and that the University is willing to capitulate to such terms systemwide.

29.    The compliance process that UCSF initiated in early August which I described above is another example of what appears to be UC conforming to the Demands on a systemwide basis. As I explained above, UCSF faculty and staff are altering their program descriptions and other materials to remove words or phrases disfavored by the Trump Administration. Many UCSF FA members have expressed that this process restricts their speech both by instilling a fear of speaking on particular disfavored topics and/or by limiting their ability to accurately describe systemic and structural racism and other forms of oppression that affect health while adhering to UCSF guidance to emphasize individual opportunity over structures and systems. This process is harming me and my colleagues by restricting our speech with detrimental impacts on our work and on our students, as I discuss more below.

30.    As a result of these recent instructions from the UCSF which appear to be spurred by the

DECLARATION OF LEIGH KIMBERG IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Case No. 3:25-cv-07864-RFL

Trump Administration, UCSF FA members report that they are considering altering or have already altered their language when they teach because they fear being reported by students or colleagues for using these now disfavored words or phrases. Members report that this fear and self-censorship have eroded their relationships with colleagues and students and undermined their teaching. Rather than speak extemporaneously as they teach and answer students' questions, members have reported being afraid to deviate too far from a pre-planned script so as to limit the risk of using a now disfavored words or venturing into a now disfavored subject.

31. One UCSF FA member offers a concrete example of how the recent instructions are impairing members' academic freedom and thus denying students important information. Ordinarily in a lecture on treating pain, this member shares two scientific studies relating to pain and racism. One study demonstrates that healthcare professionals disproportionately fail to treat pain in patients who are perceived to be Black. The other study demonstrates that medical students hold scientifically false beliefs about pain thresholds in White versus Black patients. Including these research studies in the lecture is important to helping future medical professionals learn how to achieve adequate pain treatment for all patients. Even though this faculty member reported that UCSF did not tell faculty to stop discussing interpersonal racism, going through the UCSF 'compliance process' and being aware of the threats from the Trump Administration over "DEI" is making the member consider removing discussion of these two studies from this lecture, especially when speaking to larger groups of learners and/or faculty, out of fear of being reported to the UCSF administration and/or to the federal government.

32. In these ways and others, the August 8 Demands and the environment of repression they have fostered are undermining UCSF faculty members' ability to train a new generation of healthcare professionals who are equipped to provide high-quality care and make meaningful contributions to improving health for all. If faculty need to avoid exposing students to now disapproved topics out of concern that we will be reported or fear that UCSF will lose funding, then we cannot ensure that our students learn these topics which are critical to improving health outcomes. For example, health equity focuses on eliminating health disparities not only by promoting equal access to high quality medical care but by altering societal policies and programs that determine whether people have access to healthy and equitable living conditions. If UCSF faculty cannot or are too fearful to teach students about concepts like

DECLARATION OF LEIGH KIMBERG IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Case No. 3:25-cv-07864-RFL

structural racism, the relationship between structural racism and exposures to toxic environmental factors, oppression of gender minorities and immigrants, and/or harmful economic policies and systems because those topics are now disfavored by the Trump Administration, then students will be unequipped to recognize and address these issues in their research and in clinical settings. The result will be lower quality care, especially for patients from marginalized communities, and poorer health outcomes overall.

33.    The research shows that centering health and healthcare equity is essential. In 2019, the California Future Health Workforce Commission chaired by University of California President Janet Napolitano and Dignity Health President and CEO Lloyd Dean issued a strategic plan which followed two years of study. The goal of the study was to determine how to improve the ability of California's healthcare workforce to meet the healthcare needs of Californians by the year 2030. The study concluded that "California must find ways to recruit, educate, and sustain a more diverse health workforce" and ensure that they have "skills in assessing and addressing social factors that impact health, knowledge of effective prevention strategies, and the ability to communicate to an increasingly diverse state population."[1] The Trump Administration and UC in acceding to the Administration's demands are discouraging if not prohibiting exactly these necessary steps.

34.    UCSF FA members also face the loss or risk of loss of federal funding which supports life-saving research. Prior to the July 30 cancellation of federal research funding to UCLA, at least five UCSF FA's members' grant funding had been cancelled or suspended. Other members have received funding notices or other communications indicating that their grant funding could be at risk of cancellation due to their research focus and imposing stipulations limiting the scope of their research. Many other members have seen federal agencies close open calls for applications for future grant funding before the application period was opened and applications were accepted and considered. Other members have decided to forego applying for grants that they would have previously applied for because they highly doubt that they will be awarded the grant despite having a track record of previous successful applications.

35.    Loss of or disruption to research funding can irreparably harm a researcher's research projects and career trajectory. Researchers who lose grant funding are forced to either secure alternative

---

[1] *See* Cal. Future Heath Workforce Commission, https://futurehealthworkforce.org/about/ (last visited Oct. 5, 2025).

DECLARATION OF LEIGH KIMBERG IN SUPPORT OF                    Case No. 3:25-cv-07864-RFL
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1    funding for their research or, if no such funding is available, abandon or suspend the impacted research

2    projects. Where researchers are unable to find alternative funding, they are often forced to lay off research

3    staff and may be unable to support their graduate student workers' salary and research. Loss of grant

4    funding can also negatively impact a researcher's own income. For some UCSF FA members, most of

5    their salaries are funded by grants that they garner and if they are unable to garner sufficient grant funding

6    they fear they will lose their employment.

7        36.    Even when faculty do not lose their jobs, loss of or disruption to research funding can

8    negatively impact faculty members' career trajectories and ability to secure tenure. Among other factors,

9    faculty are assessed for promotion and tenure based on their ability to secure independent grant funding

10   and to conduct and publish on research using that funding. Loss of or disruption to grant funding harms

11   faculty members' career trajectory and progress towards tenure both by diminishing the research

12   resources they bring to UCSF and stymying their ability to conduct research and publish. This issue is

13   particularly acute for UCSF FA members who are junior faculty, and, thus, our country's future

14   generation of researchers. One UCSF FA member described that they are aware of multiple Assistant

15   Professors who are leaving academia due to the defunding of research, in general, and DEI or sex/gender

16   research, in particular.

17       37.    As stated above, I and many other UCSF FA members believe that if the University

18   capitulates to the August 8 Demands, those demands will be applied systemwide. If this occurs, I and

19   other UCSF FA members believe that grant funding for research that involved DEI topics or other topics

20   that are disfavored by the Defendants will be at increased risk of cancellation. This belief is based both

21   on Defendants' prior actions, the actions of UCSF specifically, and the content of the August 8 Demands.

22   In its prior cancellation of grants to UCSF researchers, Defendants appear to have targeted grants that

23   funded research that they perceived as involving DEI or other disfavored topics. Similarly, Defendants'

24   August 8 Demands includes a demand that UC appoint a senior administrator to conduct an extensive

25   review of UCLA's DEI related admission and employment policies. The Trump Administration has also

26   taken actions to try to remove DEI related programs, curriculum, and research form other university

27   campuses. These factors lead me and other UCSF FA members to believe the Defendants intend to

28   eliminate DEI related programs, curriculum, and research at UC, as well. Given this intention, I and other

9

1    UCSF FA members believe that funding for research involving DEI related topics will be at significant

2    risk of cancellation if UC capitulates to the August 8 Demands and applies those demands systemwide.

3        38.    Given this risk to continued research fundings and the significant harm that loss of or

4    disruption to research funding can cause researchers, many UCSF FA members have altered their research

5    agenda in an attempt to ensure future research funding should UC capitulate to the August 8 Demands.

6    Members have changed their research descriptions to avoid use of terms like "diverse," "equity,"

7    "inclusion," and "justice" they understand to be disfavored by the Trump Administration. Other members

8    have changed the focus of their research to avoid DEI related topics or other topics disfavored by

9    Defendants. Yet other members have accepted the potentiality that they will lose some portion of their

10   research funding if UC capitulates to Defendants' demands and begun to adjust their research and personal

11   finances to account for the likelihood not be able to secure grant funding in the future.

12       39.    Some UCSF FA members' fear of grant funding loss is compounded by concern for the

13   impact that such losses could have on the graduate student workers whose research is supported by their

14   grants. In many cases, this concern has made those members more reticent to risk grant cancellations or

15   disruptions and more likely to alter their research agenda to avoid such disruption or cancellation.

16       40.    Given Defendants' demand for access to UCLA documents and records, many members

17   believe that Defendants may have access to their course materials and use those materials as a basis for

18   retaliation against them or their students.  Further, many members have expressed concerns about having

19   their classes recorded out of concern that this could allow for surveillance which, in turn, could lead to

20   retaliation from the Trump Administration or UC.

21       41.    UCSF FA members who do disfavored research or have spoken publicly about disfavored

22   topics, including myself, have expressed being fearful to travel, especially internationally, whether for

23   personal reasons or in connection with their research.  If UC capitulates to the August 8 Demands and

24   Defendants are granted access to UCSF's documents and records, this hesitancy is likely to increase and

25   non-citizen members are likely to forgo international travel to avoid potential issues reentering the

26   country.

27       42.    The August 8 Demands that UCLA provide access to UCLA records and cooperate with

28   federal law enforcement would also harm UCSF FA members if applied systemwide by restricting their

DECLARATION OF LEIGH KIMBERG IN SUPPORT OF                    Case No. 3:25-cv-07864-RFL
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

options for research.  For example, our members who research immigrant health are currently contemplating whether they can ethically continue their research.  They are concerned that if UC accedes to the August 8 Demands systemwide, their study participants could be endangered by federal law enforcement, such as ICE agents coming to clinics or hospitals where the study is being conducted or through the release of patient and/or study participant identifying information to federal law enforcement. These members are questioning whether they can design and conduct clinical trials with immigrant populations at all without endangering them and their families.

43.    The August 8 Demand that UC cooperate with federal law enforcement would irreparably harm UCSF FA members who work in patient care settings if applied systemwide.  The presence of federal law enforcement, such as ICE agents, in these settings is extremely detrimental to our ability to care for patients.  As medical professionals, we are bound by our oath and by the law to protect patients' privacy and confidentiality.  Therefore, we cannot ethically obtain medical information from or share medical information with patients while ICE agents are in the room.  In addition, other patients and staff are fearful of ICE, which results in patients foregoing care and staff being afraid to come to work.  All of this impedes our ability to provide care patients need.  Already, the presence of ICE agents in patient care settings has impacted care; increased ICE access to those settings would only increase the impact on care.

44.    Defendants' August 8 Demands are likely to increase UCSF FA's members' workloads and degrade their working conditions if UC capitulates to them.

45.    UCSF already faces a hiring freeze and significant financial pressures and has been slow to fill vacancies caused by faculty retirements or departures. This has resulted in increased workloads for many UCSF members in departments that have been left short-staffed by the hiring freeze. Should UC capitulate to the Trump Administration's demands and pay the federal government more than $1 billion, this will almost certainly lead to cutbacks across the UC system and aggravate UCSF's financial difficulties and lead the UCSF administration to extend, and possibly intensify, the campus hiring freeze, which will, in turn, further increase UCSF FA members' workloads and limit their opportunity to take sabbatical for research and career advancement purposes.

46.    Federal demands that UCLA pay the federal government $1 billion and any similar demands of other UC's including UCSF will adversely impact the health of Californians, especially those

11

from the most economically disadvantaged communities. The significance of UC when it comes to providing healthcare for Californians cannot be understated.  UC reports that in fiscal year 2022-2023, UC's academic health centers invested $2 billion in net community benefits, including $69 million for community health improvement services. Additionally, UC academic health centers provided $1.3 billion in uncompensated hospital care for Medi-Cal enrollees and $2.4 billion for Medicare enrollees.  UC faculty practice groups also supported patient care by delivering $881 million in uncompensated professional service fees for Medi-Cal and Medicare enrollees as well as direct patient financial assistance. UC's health centers are a leading provider of inpatient services for Medi-Cal enrollees.  In 2021, UC reported that it provides half of all transplants and one-fourth of extensive burn care in California as well as operating or staffing five Level 1 trauma centers — often providing the only trauma care in the region. University of California Health is the largest health sciences educational program in the United States. Across our 21 health schools, UC enrolls approximately 15,000 health sciences students, trainees and residents at seven academic campuses including UCSF (which does not enroll undergraduate students).[2]  Degrading these institutions means degrading the healthcare on which Californians rely.

47.    Prohibiting gender affirming care for minors, as the Trump Administration has demanded, would also irreparably UCSF FA members.  Gender affirming care is medical care; it is evidence-based medicine.  As doctors, UCSF FA members have taken an oath to care for the sick, promote good health, alleviate pain and suffering, and never intentionally harm our patients.  If our members are categorically prohibited from providing or facilitating the provision of gender affirming care for minors, our members could be unable to fill their ethical obligations as doctors and other health professionals.  Faced with a minor child in need of this care, our members would find themselves in the impossible position of having to choose between disobeying the dictates of the Trump Administration or disobeying their oaths and medical licensure requirements.

48.    In addition, a UCSF FA member has a minor child who the member anticipates will need

---

[2] *See* https://nursing.ucla.edu/news/ucs-academic-health-system-is-investing-in-addressing; https://www.ucop.edu/uc-health/_files/uchealth-at-a-glance.pdf; https://www.ucop.edu/uc-health/reports-resources/professional-training.html; https://health.universityofcalifornia.edu/education (last visited, Oct. 6, 2025).

DECLARATION OF LEIGH KIMBERG IN SUPPORT OF                    Case No. 3:25-cv-07864-RFL
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

gender affirming care in the near future.  Until recently, this member has been secure in knowing that the care would be available to the child when the child needs it.  If UC succumbs to pressure and accedes to the August 8 Demands, this member and their family do not know how they will support the healthcare needs of this child.

### Impacts of the Trump Administration's Actions on UCSF FA

49.     UCSF FA has dedicated significant time and energy to responding to the Trump Administration's actions, diverting those resources from other campaigns and organizational priorities. Consistent with this past practice, UCSF FA anticipates it will divert additional resources away from other projects in the future if the administration imposes further funding cuts on UC or if UC accedes to the Administration's demands.

50.     Since March 2025, UCSF FA has made significant efforts to respond and protect members' interests. UCSF FA has conducted a member survey about grant terminations and participated in research-related Town Halls to gather information and discuss members' concerns about the impact of nationwide grant suspensions and cancellations that occurred early in 2025. UCSF FA has used this information to advocate for the UCSF administration to take greater steps to protect faculty from the impacts of Defendants' actions.

51.     UCSF FA members are delegates of the UC Assembly of the in the Academic Senate.  They have attended a UCSF Academic Senate Leadership Retreat to raise faculty concerns about the impact of the Trump Administration's actions and advocate for measures to address and mitigate the threats to faculty career progression, academic freedom, and research independence and to non-citizen faculty members.

52.     Together, these efforts to respond to the Trump Administration's actions have required hundreds of hours of work from UCSF FA members.

53.     UCSF FA has been forced to divert time and energy from other organizational priorities in order to respond to the Trump Administration's attacks.  UCSF budgetary transparency and austerity and its impact on faculty workload are core issues for UCSF FA and our members.  Nevertheless, in order to respond to the Trump Administration's actions, UCSF FA has been forced to deprioritize these issues and have been unable to dedicate meaningful resources towards organizing to address funding and

workload concerns.

54.    The August 8 Demands that UCLA place stricter restrictions on on-campus protests and demonstrations will also harm UCSF FA and its members if applied systemwide. If this demand applies to UCSF, it will limit UCSF FA members' ability to engage in political speech and expression on campus, impinging on their First Amendment rights and academic freedom. It will also restrict UCSF FA's use of a crucial advocacy method—public demonstration and protests—undermining the Faculty Association's ability to pursue its core mission. UCSF Faculty Association members have spoken out in multiple public demonstrations about a large number of public health issues including ending Israel's genocide against the Palestinian people and its attacks on healthcare facilities and healthcare professionals, criticizing U.S., state, and local government as well as UC for complicity in genocide, protecting immigrants and LGBTQ+ communities as well as other marginalized communities, defending academic freedom and other key issues. I and members of UCSF FA intend to continue to engage in protest activities of these kinds in the future. If UC accedes to the limitations on protest activity in the August 8 Demands and applies them systemwide, I and members of UCSF FA will have to weigh the markedly escalated risk of threatening our careers and physical safety when we participate in public protest activities in the future.

55.    UCSF FA fears that if UC capitulates to the August 8 Demands, its members may be subject to federal investigations and punishment merely for exercising their rights to protest and to speak freely. There is also reporting suggesting that the Trump Administration is demanding that the UC delegate the monitoring campus speech to the Department of Education. UCSF FA fears that this could expose members who engage in speech or protest that Defendants disfavor to federal prosecution. In this scenario, UCSF FA will have to become extremely careful when planning public speech and protests and will likely have to limit its on-campus speech, protest, and advocacy, to the detriment of its core mission.

56.    UCSF FA also fears that any acquiescence to the Trump Administration's demands will undermine the systems of co-governance that regulate academic affairs at UCSF and across the UC system. The UC Regents' bylaws dictate that UC is managed through a system of shared governance where administrators and faculty through the Academic Senate jointly govern the university. But in the current moment, UC leadership has largely circumvented the Academic Senate. For example, while the administration is in possession of the Trump Administration demand letter sent in August, it has not

14

shared that letter with the Academic Senate. The Academic Senate has also been left out of discussions on hiring freezes or the sharing of faculty names with federal officials, topics that may impact the job security of UCSF FA members.

57.    UCSF FA's concerns about the risk of imminent, irreparable harm posed by the August 8 Demands are based on the material harms that the organization and its members have already experienced due to the Trump Administration's actions.  Absent a court injunction, UCSF FA and our members will continue to be harmed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this  6       day of October, 2025, in  San Francisco      , California.

Leigh Kimberg
Leigh Kimberg

DECLARATION OF LEIGH KIMBERG IN SUPPORT OF          Case No. 3:25-cv-07864-RFL
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION