UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, et al.,<br><br>Defendants. | Case No. 3:25-cv-07864-RFL<br><br>**DECLARATION OF SETH NEWTON PATEL IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

I, Seth Newton Patel, declare as follows:

1. I serve as the Deputy Director of Strategy & Collective Bargaining for the American Federation of State, County, and Municipal Employees, Local 3299 ("AFSCME")

2. I am over the age of 18 and competent to testify as to the matters set forth in this affidavit based on my own personal knowledge.

3. AFSCME is a labor organization and the exclusive collective bargaining representative of more than 40,000 service workers, patient care technical workers, skilled craft workers, and more at UC's ten campuses, five medical centers, numerous clinics, research laboratories, and UC College of the Law, San Francisco.

4. Since 1948, AFSCME has prided itself on effectively representing UC workers while fighting for social justice and economic opportunity not just for UC workers, but for the greater public. AFSCME has fought against racial discrimination in the workplace and has advocated for immigrant workers, among others. Approximately seventy nine percent (79%) of AFSCME's diverse membership includes are people of color. A substantial number of our members are immigrants. We also have members who are transgender or have transgender children.

5. I am aware that in or around late July or early August 2025, the Trump Administration suspended approximately $584 million in federal funding for the University of California, Los Angeles ("UCLA"). It is my understanding that the Trump Administration suspended these funds claiming that it was doing so in connection with its investigation of UCLA and/or the University of California ("UC") for alleged antisemitism and other alleged violations of Title VI, Title VII, Title IX, and has cited these pending investigations and/or UC's alleged policies regarding race and transgender people, as the basis for the suspension of federal funds from UCLA.

6. I understand that in late July or early August, the Trump Administration made a series of demands to UCLA that were memorialized in a letter dated August 8th ("Demands"). UC has not shared the exact contents of the Demands from the Trump Administration, which contributes to an atmosphere of fear and uncertainty for AFSCME's members.

7. Based on reporting in the press about the Demands, I understand that the Trump

---

1

DECLARATION OF SETH NEWTON PATEL IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Case No. 3:25-cv-07864-RFL

Administration is threatening to impose approximately $1.2 billion in fines and other financial penalties if UCLA does not accede to its Demands. I am also aware that the Demands include a series of harmful policy changes, which I understand to include:

a. Cooperation between UCLA and federal law enforcement, which I understand to include expanded collaboration with Immigration and Customs Enforcement ("ICE"), without safeguards for UC employees or patients' privacy, physical safety, or psychological well-being;

b. Granting the government access to UCLA documents, records, and data not protected by attorney-client privilege, including confidential personnel files for our members;

c. Rescinding UCLA's recognition of transgender identities and imposing restrictions on transgender individuals' access to campus facilities and ability to participate in collegiate sports consistent with their gender identity;

d. Prohibiting the provision of gender-affirming care for minors by UCLA Health; and

e. Appointing an outside monitor to report on UCLA's compliance with the demands.

8. Since late July, while the UC has been under pressure from the Trump administration, I have seen UCLA make new and harmful changes to its policies that appear to align with the Trump administration's priorities. On August 6, 2025, UC Labor Relations Manager Uriel Ramirez sent an email to AFSCME with an attached pending policy titled Patients in Law Enforcement Custody – Medical, Surgical, and Psychiatric Care HS 8114. This new UCLA policy expands the ability of federal law enforcement, including ICE, to access all UCLA medical facilities where our members work and where many of our members receive healthcare for themselves and their families. The policy also limits workers' ability to enforce their own rights and protect the privacy rights of patients. The revised policy does not require federal agents to produce a judicial warrant or court order or consistently demonstrate that they have legal custody of a detained patient to a hospital administrator before they may enter patient care areas of the facility. Nor does the policy require administrators to insist that ICE officers identify themselves, remove their masks, or defer to the clinical decisions of health care providers. The policy instructs staff to permit ICE to enter patient care areas in numbers greater than are necessary to maintain

custody of a detainee and places no express limits on what ICE agents may do or ask of employees or other patients once inside these private patient care areas of the medical center. The policy also requires staff to defer to ICE agents' demands to discharge a patient on their orders, even if it is Against Medical Advice as determined by their Attending Physician, and to do nothing more than document the concern. Attached as **Exhibit A** to this declaration is a true and accurate copy of the August 6, 2025 email I received with its attachment.

9. I have serious concerns about the policy's foreseeable impact on the health and safety of our members who work at UCLA medical centers and the patients that they care for, and any further capitulation in response to the August 8 Demands would only exacerbate these concerns. The Trump Administration's widely reported immigration enforcement actions to date give me and my colleagues reason for these concerns. Our members serve in numerous roles in UCLA medical facilities. They register patients when they arrive, transport those unable to walk, take vital statistics, provide food services, and perform janitorial and security services to ensure that patient care can proceed in as clean, safe, and calm environment as possible. This work is necessary for UC patients' wellbeing. Our members also work as Emergency Room Technicians, Surgical Technicians, and provide imaging services, respiratory therapy, and other life-saving care. In these critical roles, our members are on the front line when it comes to interactions between the medical facilities and the public. To the extent that UCLA Medical Center is being compelled to provide an indeterminate number of armed, masked ICE agents with greater access to UCLA medical facilities, including to patient care areas, our members will have to interact with ICE agents while continuing to try to provide time-sensitive care to hospital patients who are often very fragile. This puts many of our members and the patients they care for in an impossible situation. More than forty percent (40%) of AFSCME's members are Latino and a substantial number are immigrant workers or have immigrant family members. Many are living in acute fear that they or their family members will be racially profiled, rounded up, interrogated, hand-cuffed, and driven away to undisclosed locations by armed secret police, only to be detained (or worse) by ICE. These fears arise in the context of widespread reports that ICE has harassed and/or detained Latino people who are U.S. citizens or are otherwise authorized to be in the United States, simply because of their perceived race or

ethnicity and the fact that they work for a living. Workers fear for themselves, their families, and their patients – many of whom are also of immigrant descent. Those patients are also afraid for themselves, for the same reasons.

10. Members' and patients' concerns are well-founded, as on June 24, 2025, ICE demanded entry to the UCLA Medical Center with a detainee. A masked ICE agent in full military-style gear stood guard in the patient care areas of the Emergency Room, causing alarm to both workers and patients alike. Several more ICE agents waited outside the entrance to the hospital. Our members reported feeling scared to stay at work and scared to return to their jobs. And they reported that patients were scared to come to the hospital given the risk that armed ICE agents could be inside. After this incident, I expected the University to devise a policy that would make it clear to ICE agents that they could not enter patient care areas except that one agent could accompany a detainee, so long as the agent identified themself, removed their mask, holstered their weapons, agreed to honor the patient's ability to speak in private with their care team about their private personal health information, and refrain from asking questions of any other individuals in the medical center. I was dismayed when I saw the University's August 6 pending policy changes, as it is apparent that the University is concerned, first and foremost with appeasing the Trump Administration over protecting its own patients and employees.

11. UCLA's revised policy on law enforcement access is consistent with and may even go farther than the Trump Administration's Demands which include insistence that UCLA cooperate with federal law enforcement. I am concerned that UCLA in particular is already going out of their way to not only cooperate but facilitate ICE agents' access into historically protected areas, under financial pressure from the Administration, even though the University and the Trump Administration are still "negotiating" over the Administration's Demands. I am concerned that we are likely to see this kind of effort to placate the Trump Administration spread throughout the UC system given the federal government's financial pressure campaign represented in the Demands. Some AFSCME members have expressed concerns about going to work or about receiving medical care at UCLA medical facilities if the University is being pressured to give ICE access to these highly sensitive areas. AFSCME and its members have been and will continue to be irreparably harmed by the Trump Administration's pressure

campaign against UCLA and the UC system more broadly.

12. The Administration's Demands, made in the context of intentionally frightening ICE enforcement actions, are requiring AFSCME to spend resources counseling members about immigration-related issues and educating them about their legal rights. AFSCME and its members are also being irreparably harmed because UC cites federal funding cuts, uncertainty about federal funding, and federal demands for financial penalties as reasons to impose financial hardship on AFSCME-represented employees. Indeed, the University has been preparing for the Trump Administration's August 8 Demands for months, long before they were distilled to writing, and doing so in a way that costs its employees and patients dearly. For example, on March 5, 2025, the U.S. Department of Justice announced that it had opened an investigation into alleged antisemitism, targeting the whole University of California system. Two weeks later, on March 19, 2025, citing uncertainty amid threats to federal funding, the University imposed a systemwide hiring freeze. Due to the hiring freeze, as workers leave and are not replaced, those who remain have to work harder and faster without additional compensation. Patients also suffer. AFSCME employees who are also patients of the UC system now report that they have to wait months longer than normal to receive the care that they need. In June of 2025, the University also cited federal funding cuts and uncertainty in order to justify its imposition of mass layoffs and reductions in time at UCSF and UCSD. The layoffs affected hundreds of UC employees including 140 AFSCME members who lost their jobs. And on or about August 1, 2025, UC advised AFSCME that due to the federal government's suspension of research funding to UCLA, it would be "assessing potential impacts on University operations, including potential employment impacts," meaning additional layoffs and/or other takeaways from AFSCME members.

13. AFSCME also has members who identify as transgender. These members work at multiple UC locations, including at UCLA. AFSCME's transgender members would be substantially harmed if, in response to the federal demands and threats, UC were to announce that it would no longer recognize its own students, employees and patients' transgender identity or if UC were to impose new restrictions on transgender people, including employees, such restricting access to campus facilities that correspond with their gender identify.

14. In addition to working for UC, AFSCME's members and their families are consumers and patients of UC healthcare services. The University encourages AFSCME members to participate in UC-affiliated healthcare benefit plans and more than 10,000 of AFSCME's members have access to UC healthcare as part of their employee benefits. Eliminating access to necessary medical care at UC medical centers such as access to gender-affirming care for minors would harm AFSCME members who need or may need such care for their families and would substantially degrade the quality of their healthcare benefit, which AFSCME has fought for them to have.

15. UC's anticipatory compliance with the Trump Administration's demands is also harming and threatening to irreparably harm AFSCME itself as an organization. As a union, AFSCME fought for and won protections for all our members to be free from discrimination in the workplace. For example, in our collective bargaining agreements with UC, AFSCME won contract terms prohibiting UC from discriminating against our bargaining unit members based on "gender ... gender identity, sexual orientation, and gender expression."  If UC were to succumb to the Demands by ceasing to recognize transgender employees and denying our members' access to facilities consistent with their gender identity, UC would be undermining the rights AFSCME fought for and won in bargaining, in addition to undermining the rights of our members.

16. As a labor organization, AFSCME has a long and proud history of exercising our rights to advocate for better working conditions for our members by engaging in peaceful public gatherings on University grounds, including peaceful demonstrations and protests at UCLA. As part of our current campaign to win a strong contract for our members, we have regular demonstrations when hundreds to thousands of our members gather, including at UCLA, to advocate for their positions. These demonstrations take place frequently, often more than once a month. The Demands' restrictions on demonstrations at UCLA could impede AFSCME and our members from engaging in these activities and deny us our rights to free speech and association.

17. California law requires the University to bargain with its unions, including AFSCME, over time, place, and manner regulations affecting protests and other forms of speech on University property, including policies governing the location of union picket lines and protests. The Trump

6
DECLARATION OF SETH NEWTON PATEL IN SUPPORT OF                     Case No. 3:25-cv-07864-RFL
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Administration's Demands that UC unilaterally impose new restrictions on access and protest activity would deny these unions their rights to negotiate directly with UC over issues such as the Union's right to access UC property to communicate with employees it represents, distribute literature, investigate workplace conditions, assess contractual and statutory compliance, meet with managers and supervisors to resolve grievances and workplace disputes, and voice the union's and its members' concerns about working conditions. If acceded to, the Trump Administration's Demands would directly interfere with AFSCME's legal right to bargain over these matters and would undermine the Union's and its members' ability to speak up and protest against injustice. These concerns are all too real. Indeed, on or about September 22, 2025, the University announced significant changes to its time, place, and manner regulations of speech and protest activity at UCLA, formalizing changes to policies so as to largely align those policies with the Trump Administration's Demands. An article discussing these policy changes first appeared in the LA Times on September 19, 2025.[1]

18. Fundamentally, the Trump Administration's Demands are aiming to have the University bargain away not only its own rights but also our union's rights and the rights of our members even though our rights are not the Administration's to take nor the University's to give away. The Trump Administration's Demands are nonetheless causing UC to make policy changes that we will need to dispute, causing AFSCME to divert still more resources from its representational work and advocacy campaigns to protect its members' rights from being eroded by the federal government and an increasingly cowed University administration that is trying to appease the Trump Administration. But as Winston Churchill famously said, "An appeaser is one who feeds a crocodile, hoping it will eat him last."

19. Having seen how the Trump Administration has treated other prominent universities, I am deeply concerned that the Trump Administration will make good on its threats to impose fines and other penalties on the University or devise additional ways to try to coerce the University into acceding to the Administration's August 8 Demands at university employees, students and patients' expense, just

---

[1] https://www.latimes.com/california/story/2025-09-19/ucla-protest-tpm-new-policies (last accessed October 2, 2025)

as it has done with Harvard, Columbia, Brown, and other universities unless the Administration is enjoined by a court from doing so.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this ___3RD___ day of October, 2025.

*[signature]*

Seth Newton Patel

Deputy Director of Strategy & Collective Bargaining
American Federation of State, County, and Municipal Employees, Local 3299 ("AFSCME")

# EXHIBIT A

---------- Forwarded message ---------
From: **Ricardo Lopez** <rlopez@afscme3299.org>
Date: Wed, Aug 6, 2025 at 10:22 AM
Subject: Fwd: Revised Policy
To: Seth Patel <spatel@afscme3299.org>


---------- Forwarded message ---------
From: **Ramirez, Uriel** <URamirez@mednet.ucla.edu>
Date: Wed, Aug 6, 2025 at 8:01 AM
Subject: Revised Policy
To: Ricardo Lopez <rlopez@afscme3299.org>


RE:       Patients in Law Enforcement Custody – Medical, Surgical, and Psychiatric Care HS 8114

Good morning Ricardo,

Please see the attached policy.

**Uriel Ramirez, Esq.**
**Labor Relations Manager**
**UCLA Health**

10920 Wilshire Blvd., Suite 390
Los Angeles, CA 90095
(424) 440-0458 (cell)
URamirez@mednet.ucla.edu



**Our People: Best Principles | Best Practices | Best Performance**

---

UCLA HEALTH SCIENCES IMPORTANT WARNING: This email (and any attachments) is only intended for the use of

the person or entity to which it is addressed, and may contain information that is privileged and confidential. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Unauthorized redisclosure or failure to maintain confidentiality may subject you to federal and state penalties. If you are not the intended recipient, please immediately notify us by return email, and delete this message from your computer.

--
Ricardo Lopez
Lead Organizer
AFSCME LOCAL 3299
310-338-1299

Status **Pending**   PolicyStat ID **18208192**



| | |
|---|---|
| Effective Date | 09/2020 |
| Approved Date | N/A |
| Revised Date | 07/2025 |
| Next Review | 3 years after approval |
| Owner | Norman Lantz: Fac Project Mgr 4 Hc |
| Policy Area | Care of Patients |
| Applicability | Ronald Reagan-Resnick-Santa Monica-West Valley |
| Reference Tags | Lippincott |

# Patients in Law Enforcement Custody – Medical, Surgical, and Psychiatric Care HS 8114

## ~~PURPOSE~~

## PURPOSE

To provide guidance for UCLA Health System staff in providing healthcare services to patients who are brought to the Health System in the custody of law enforcement ~~officers~~ personnel (LEP), or who are subsequently placed in their custody.

## SCOPE

This Health System Policy applies to all faculty, staff, employees, students, trainees, and volunteers of the Ronald Reagan UCLA Medical Center, the Santa Monica UCLA Medical Center, the ~~Orthopaedic~~ Orthopedic Hospital, ~~and the~~ Resnick Neuropsychiatric Hospital at UCLA, and UCLA West Valley Medical Center.

## DEFINITIONS

 I. Law Enforcement Personnel (LEP) include:

   a. ~~Police officers~~

   b. ~~Sheriff's department officers~~

   c. ~~Correctional officers~~

      A. Police officers

      B. Sheriff's department officers

      C. Correctional officers

      D. Federal agents

II. Detainee/prisoner is defined as:

    a. ~~A person who is brought to the Hospital System in law enforcement custody~~

    b. ~~A patient in the Hospital System who is subsequently placed in law enforcement custody~~

    c. ~~These include people under initial arrest for an alleged crime, pre-trial detainees, and prisoners from correctional facilities.~~

    A. A person who is brought to the Hospital System in law enforcement custody.

    B. A patient in the Hospital System who is subsequently placed in law enforcement custody

    C. These include people under initial arrest for an alleged crime, pre-trial detainees, and prisoners from correctional facilities.

III. Watch commander is defined as a senior ranking law enforcement officer with supervisory duties over all personnel assigned to a major law enforcement division

# POLICY

The Health System responds to detainee/prisoner/patients by providing services to meet their healthcare needs, and by recognizing the responsibilities of the ~~law enforcement personnel~~LEP accompanying them.

Important Note: This policy supplements HS 7311, *Direction for Care and Security of Prisoner/Patient Forensic Staff Orientation Education*, and HS 9473, *Release of Protected Health Information to Law Enforcement Officers.*

I. Communication

    a. ~~Upon identifying that a detainee/prisoner/patient (hereafter referred to as "patient") is in law enforcement custody, the Hospital System staff (hereafter referred to as "Staff") shall request essential arrest information from law enforcement personnel (LEP), including, but not limited to, a description of alleged charge and intent for custody, and information on behaviors, symptoms, or medical/psychiatric complaints known to LEP.~~

    b. ~~Concerns, questions, or conflicts may be escalated as necessary to the UCLA Health Administrator on Call (AOC), the Director of UCLA Health Security, UCLA Health Chief Medical and/or Chief Nursing Officers, and/or legal and risk management departments. Additionally, Staff may contact the on-duty watch commander for LEP.~~

    A. **Except in the case of patients in the custody of federal agents,** upon identifying that a detainee/prisoner/patient (hereafter referred to as "patient") is in law enforcement

  custody, the Hospital System staff (hereafter referred to as "Staff") shall request essential arrest information from LEP, including, but not limited to, a description of alleged charge and intent for custody, and information on behaviors, symptoms, or medical/psychiatric complaints known to LEP.

 B. **In the case of** patients in the custody of federal agents:

  i. Allow the federal agent to escort the patient into the facility for medical care.

  ii. Staff should confirm with the federal agent whether the patient is currently in their legal custody

  iii. Notify the UCLA Health Administrator on Call (Pager 91222). The AOC will determine whether to involve UCLA Health Legal Counsel and/or UCLA Health Security/UCPD.

  iv. Legal Counsel, Security, or AOC may request the documentation from the Federal Agent verifying their legal custody of the patient

 C. In all other cases, concerns, questions, or conflicts may be escalated as necessary to the UCLA Health Administrator on Call (AOC), the Director of UCLA Health Security, UCLA Health Chief Medical and/or Chief Nursing Officers, and/or legal and risk management departments. Additionally, Staff may request the LEP contact their onduty watch commander.

II. Principles of care

 a. ~~Staff shall provide all necessary medical/surgical/psychiatric emergency and inpatient services within the Health System's capacity and capability, without regard to the patient's incarceration or arrest status, crimes, or alleged crimes.~~

 b. ~~Staffs' clinical decision-making shall not be directed by law enforcement personnel.~~

 A. Staff shall provide all necessary medical/surgical/psychiatric emergency and inpatient services within the Health System's capacity and capability, without regard to the patient's incarceration or arrest status, crimes, or alleged crimes.

 B. Staffs' clinical decision-making shall not be directed by law enforcement personnel.

 C. Staff may ask LEP to step outside of the patient's room to ensure patient privacy while providing counseling involving PHI and medical care. See HS 7311 for more information.

III. Determination of medical appropriateness for discharge to LEP

 a. ~~Clinical determinations regarding a patient's medical appropriateness for discharge (to law enforcement custody, jail, or other disposition) shall be made by Staff based on the patient's clinical status.~~

 b. ~~Staff shall not discharge a patient to LEP until Staff determines a patient does not require inpatient-level of care due to their medical, surgical and/or psychiatric condition, or they are stable enough for transfer to a facility where they will receive inpatient-level of care (see Appendix A).~~

  i. ~~The Attending Physician from the primary team shall be the final authority~~

<p style="text-decoration: line-through; color: red">regarding the decision to discharge a patient to LEP.</p>

- A. Clinical determinations regarding a patient's medical appropriateness for discharge (to law enforcement custody, jail, or other disposition) shall be made by Staff based on the patient's clinical status.

- B. For patients brought for medical clearance, Staff will conduct a medical screening exam. Documentation shall reflect whether the patient was determined to be medically safe for discharge, and relevant return precautions. Staff are not obligated to document "ok to book" or other related instructions in the medical record.

- C. If patient is not medically safe for discharge per physician evaluation but declining further care, physician will proceed as per policy HS 0311 "AMA – Discharge Against Medical Advice." For patients who decline further care and who lack the capacity to make healthcare decisions, physician will proceed as per policy HS 1491 "Medical Incapacity Hold."

- D. Staff shall not discharge a patient to LEP until Staff determines a patient does not require inpatient-level of care due to their medical, surgical and/or psychiatric condition, or they are stable enough for transfer to a facility where they will receive inpatient-level of care (see Appendix A).
    - i. The Attending Physician from the primary team shall be the final authority regarding the decision to discharge a patient to LEP.

IV. Addressing disagreement or conflict

- ~~a. If there is a conflict or disagreement, Staff and LEP should engage their respective chains of command to seek resolution, in accordance with section I.b. of this policy.~~
- ~~b. In cases where LEP does not agree with medical recommendations (such as opposing a treatment or disposition), Staff should document their recommendations.~~
- ~~c. In cases where LEP insist on removing a patient under their custody from the medical facility, Staff are not permitted to physically prevent LEP removal of the patient from UCLA facilities.~~
    - ~~i. Staff shall request completion of AMA documentation by law enforcement (Reference UCLA HS 0311, ED 375)~~
    - ~~ii. Staff should record the name and badge number of relevant LEP in the UCLA medical record.~~

- A. If there is a conflict or disagreement, Staff and LEP should engage their respective chains of command to seek resolution, in accordance with section I.c. of this policy.
- B. In cases where LEP does not agree with medical recommendations (such as opposing a treatment or disposition), Staff should document their recommendations.
- C. In cases where LEP insist on removing a patient under their custody from the medical facility, Staff are not permitted to physically prevent LEP removal of the patient from UCLA facilities.
    - i. Speak directly with the law enforcement officer to discuss the risks of

<div style="color:green;text-decoration:underline">

      leaving AMA as per HS policy

    ii. Staff shall request completion of AMA documentation by law enforcement (Reference UCLA HS 0311, ED 375)

    iii. Staff should record the name and badge number of relevant LEP in the UCLA medical record.

    iv. Inform health system administration (AOC, Legal, and Risk Management)

</div>

  Patients who are detained under CA Welfare and Institutions Code (WIC) 5150 et seq.

<div style="color:green;text-decoration:underline">

   A. A valid psychiatric involuntary hold (as authorized under CA WIC 5150 et seq.) placed by an authorized health system clinician (e.g. Lanterman-Petris- Short, or "LPS", authority is granted by the County to specific clinicians) shall remain in effect so long as the patient continues to meet the appropriate criteria (e.g. this hold will be discontinued only if the Attending Psychiatrist directly responsible for the person's care agrees that the person is not a danger to others, or to himself or herself, or gravely disabled).

    i. An LPS-authorized health system clinician is not required to discontinue a psychiatric involuntary hold solely at the request of LEP.

    ii. In accordance with section IV.c. of this policy, a psychiatric involuntary hold does not prevent LEP from removing a patient from the medical facility.

</div>

<div style="color:red;text-decoration:line-through">

V. Patients who are detained under CA Welfare and Institutions Code (WIC) 5150 et seq.

  a. A valid psychiatric involuntary hold (as authorized under CA WIC 5150 et seq.) placed by an authorized health system clinician (e.g. Lanterman-Petris- Short, or "LPS", authority is granted by the County to specific clinicians) shall remain in effect so long as the patient continues to meet the appropriate criteria (e.g. this hold will be discontinued only if the Attending Psychiatrist directly responsible for the person's care agrees that the person is not a danger to others, or to himself or herself, or gravely disabled.).

    i. An LPS-authorized health system clinician is not required to discontinue a psychiatric involuntary hold solely at the request of LEP.

    ii. In accordance with section IV.c. of this policy, a psychiatric involuntary hold does not prevent LEP from removing a patient from the medical facility (however a hold may discourage them from doing so).

</div>

VI. Discharges and transfers

<div style="color:red;text-decoration:line-through">

  a. Discharge planning shall be conducted whenever possible in collaboration with LEP in accordance with HS 7311 (see Procedure section II.e. "Discharge Planning") and HS 9473 (see Procedure section VII. "Discharge Information Provided to Officers")

    i. For transfers of care, Staff will request the contact information of receiving clinical personnel, and document their attempt to communicate necessary medical information to the receiving clinicians regarding the patient's current condition and treatment (i.e. attempt to provide a warm handoff).

    ii. Disclosure of discharge medical information to law enforcement officials

</div>

~~shall be conducted in accordance with HS 7311 and 9473. Also refer to Appendix A. Correctional Facility Medical / Psychiatric Care.~~

<ol type="A">
<li>Discharge planning shall be conducted whenever possible in collaboration with LEP in accordance with HS 7311 (see Procedure section II.e. "Discharge Planning") and HS 9473 (see Procedure section VII. "Discharge Information Provided to Officers")
<ol type="i">
<li>For transfers of care, Staff will request the contact information of receiving clinical personnel, and document their attempt to communicate necessary medical information to the receiving clinicians regarding the patient's current condition and treatment (e.g., attempt to provide a warm handoff).</li>
<li>Disclosure of discharge medical information to LEP shall be conducted in accordance with HS 7311 and 9473 and shall follow Standard and Transmission Based Precautions, as per HS IC 002. Also refer to Appendix A. Correctional Facility Medical / Psychiatric Care.</li>
<li>Discharge information is considered to be PHI under HIPAA and thus must meet HIPAA requirements for release. Discharge instructions shall be provided in a sealed envelope to be opened by the receiving facility medical team when indicated.</li>
</ol>
</li>
</ol>

# ~~REFERENCES:~~REFERENCES:

HS 9473 "Release of Protected Health Information to Law Enforcement Officers"

HS 7311 "Direction for Care and Security of Prisoner/Patient Forensic Staff Orientation Education"

HS 0311 "AMA – Leaving The Hospital Against Medical Advice ("AMA")"

ED 375 Leaving the Emergency Department Against Medical Advice or Prior to the Medical Screening Examination,

# APPENDIX A. CORRECTIONAL FACILITY MEDICAL / PSYCHIATRIC CARE

When a patient requires transfer to another healthcare facility for ongoing medical stabilization (including involuntary psychiatric hospitalization), the receiving facility should be capable of providing a level of ~~services~~service that is appropriate to the care of the patient. For example:

<ol type="I">
<li>Medical / Surgical needs: For detainees/prisoners/patients who are being transferred to a correctional facility and who have ongoing medical/surgical needs requiring inpatient level of treatment, the person may preferentially be transferred to a hospital-level medical unit within the Los Angeles County correctional system (e.g., Medical Correction Treatment Center, Los Angeles County-University of Southern California Hospital Jail Ward)</li>
<li>Psychiatric needs: For detainees/prisoners/patients who are being transferred to a correctional facility and who have ongoing psychiatric needs requiring inpatient level of treatment (e.g., on a 5150/5250 or other involuntary hold), the person may preferentially be transferred to a designated LPS facility within the Los Angeles County correctional system (e.g., Forensic Inpatient Program in Twin Towers Correctional Facility). N.B. Other mental</li>
</ol>

health units within the Twin Towers Correctional Facility units and jail "general population" units are not LPS designated facilities and do not provide hospital level mental health services.

Contact information for LA County Jail - Twin Towers / Correctional Health Services Medical Command Center

~~Medical Command Center~~

Business hours: (213) 893-5505

Weekends/holidays/after hours: (213) 893-5543

~~Dr. Joe Simpson~~

~~Dr. Arastou Aminzadeh~~

~~Psychiatrist, Correctional Health Services~~

~~Los Angeles County Dept. of Health Services~~

~~(213) 680-6907~~

## All Revision Dates
07/2025, 09/2020

## Approval Signatures

| Step Description | Approver | Date |
| --- | --- | --- |
| Hospital System Policy Committee Chair | Jeffrey Bergen: Regl And Cmplnc Hc Mgr 2 | Pending |
| Policy Owner | Norman Lantz: Fac Project Mgr 4 Hc | 07/2025 |

## Applicability

Resnick Neuropsychiatric Hospital, Ronald Reagan UCLA Medical Center, Santa Monica UCLA Medical & Orthopaedic, UCLA Health, UCLA West Valley Medical Center