1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**NORTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, et al., | Case No. 3:25-cv-07864-RFL |
| Plaintiffs, | |
| v. | **DECLARATION OF IVY QUICHO-CHENG ON BEHALF OF PLAINTIFF CIR** |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**DECLARATION OF IVY QUICHO-CHENG ON BEHALF OF PLAINTIFF CIR**

I, Ivy Quicho-Cheng, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      My name is Ivy Quicho-Cheng.  I am employed by the Committee of Interns and Residents, SEIU ("CIR") as the University of California ("UC") Regional Director.   My job duties include implementing CIR's national agenda at the regional level throughout the UC system; developing the field program and collaborating with other CIR departments on political and values-based programming; increasing membership engagement and leadership development within the UC region; contract enforcement and implementation; organizing around issues and directing contract campaigns in collaboration with CIR's research and collective bargaining department as well as development of strategic relationships within the UC system and the community.  I supervise a team of worksite organizers and support their contract organizing and membership growth campaigns at each UC worksite.

2.      I currently reside in the State of California.  I have personal knowledge of the facts contained in this declaration.  If called as a witness, I am competent to testify to these facts.

3.      CIR is a labor organization and an affiliate of the two million-member Service Employees International Union ("SEIU").  CIR was founded in 1957 and is headquartered in Long Island City, New York.

4.      CIR is both the oldest and largest union of interns, residents, and fellows (collectively, "resident physicians") in the United States.

5.      CIR currently represents more than 40,000 resident physicians across the United States. This includes approximately 6,600 resident physicians employed across the University of California Health System, at all University of California Health locations with residency and/or fellowship programs – that is, (1) UC Davis, (2) UC Irvine, (3) UCLA, (4) UCLA-Olive View, (5) UC Riverside, (6) UC San Diego, (7) UCSF, and (8) UCSF-Fresno.

6.      As set forth in its Constitution, CIR's mission is to represent its doctor-members and the interests of patients and communities they serve through the use of collective bargaining and resident advocacy.  CIR envisions and works to achieve better working and training conditions for residents,

and a more humane, effective and accessible quality healthcare system for all.  A true and correct copy of CIR's Constitution is attached as **Exhibit A**.

7.      CIR members, including those employed by the UC, have organized around a variety of issues related to the healthcare system and public health, including raising standards for medical education, improving resident well being, ensuring patient and worker safety, and fighting for access to quality healthcare for all.

8.      Protecting the rights and interests of members being adversely impacted is at the core of CIR's purpose.  CIR regularly works to protect the free speech rights, bargaining rights and economic interests of its members, in addition to its members' rights to a safe and non-discriminatory workplace. Providing quality patient care to immigrants and patients of all gender identities are key CIR priorities.

9.      CIR's members are experiencing irreparable harm as a result of the Trump administration's threats to the UC system and face the imminent risk of being further irreparably harmed if the Trump administration imposes additional funding cuts or if the UC accedes to the administration's demands. I understand those demands include cooperation with local and federal law enforcement, which includes immigration enforcement, as well as providing the government access to a variety of records.  I also understand the demands include changes to policies affecting transgender individuals, including public statements refusing to recognize transgender people's gender identities, barring gender-inclusive and gender-appropriate use of UC facilities, and ending access to gender-affirming care for transgender minors.

10.     CIR members include immigrants and visa-holders whose rights CIR also works to protect.

11.     In their work as resident physicians, CIR members provide care to immigrants and visa-holders.  CIR works to protect and empower CIR members in their roles as healthcare providers to immigrants and visa-holders.

12.     CIR members employed by the UC have organized and spoken out against the presence of ICE agents in or around UC hospitals and clinics.  For example, on July 15, 2025, CIR released a statement that demanded specific patient and workplace protections at UC hospitals and clinics.  In

part, the statement explained the negative impact that ICE's presence was already having on the provision of healthcare:

> We have personally witnessed a marked decrease in patient volumes at certain sites since ICE raids and kidnappings began. Patients who fear they could be deemed deportable and detainable right now — regardless of their immigration status — have expressed fear and uncertainty regarding the safety of clinical settings. Across UC sites, patients we care for have reported deliberately missing outpatient visits for serious medical conditions for fear of interactions with immigration authorities at the hospital.
>
> The reports of multiple masked, non-uniformed ICE officials moving outside and inside hospitals has created a hostile and unsafe environment for our patients and staff. Every patient deserves the right to privacy and HIPAA-compliant care during their clinical visit, regardless of whether or not they are in ICE custody. Thus, having ICE agents accompany patients during medical visits inhibits our ability to provide the same quality care that we would provide to any patient that walks through the doors – regardless of their immigration status.

This negative impact, which directly affects our members, will be exacerbated if the UC agrees to the Trump administration's demand to cooperate with federal law enforcement.

13.    CIR members include transgender and gender-diverse physicians whose rights CIR works to protect.

14.    In their work as resident physicians, CIR members provide care to transgender and gender-diverse patients, including minors. CIR works to protect and empower CIR members in their roles as healthcare providers to transgender and gender-diverse patients. CIR members are trained physicians who understand the importance of providing their patients with the highest standard of care, in compliance with leading evidence-based recommendations and in alignment with recommendations of the major medical associations and professional societies of physicians. As residents, CIR members provide care under the supervision and review of other physicians, who evaluate CIR members for

their ability to meet "core competencies" related to (1) providing patient care that is appropriate and effective and (2) demonstrating knowledge of established and evolving medical, clinical, and other sciences, and being able to apply such knowledge to patient care. It is therefore important to CIR members, both because they will be evaluated for being able to do so *and* because it is their obligation as physicians, that they be able to provide the medical care that their independent medical judgment deems to be medically appropriate and effective, and that aligns with medical knowledge.

15. CIR members, including those employed by the UC, have organized and spoken out in support of transgender rights. For example, on June 4, 2025, the CIR Executive Committee released a statement stating in part that CIR "strongly condemn[s] the Trump administration's attacks against our transgender and gender-diverse community members. . . . We remain steadfast in our commitment to advocating for dignity, equality, and the fundamental right to access inclusive, life-saving healthcare for all." A true and correct copy of the June 4, 2025 CIR Executive Committee Statement is attached as **Exhibit B**.

16. CIR's transgender members would be substantially harmed if the UC accedes to the Trump administration's demands to deny the existence of transgender individuals and dictate which facilities they can use.

17. CIR is currently in the midst of system-wide negotiations with the UC for a collective bargaining agreement covering all of the approximately 6,600 resident physician employees across the state. This round of negotiations is the first time CIR has negotiated with the UC since combining all of its campus-specific bargaining units into one, system-wide unit. The negotiations demand a significant amount of the Union's staff time and financial resources.

18. Defendants' coercive threats to the UC frustrate the CIR's mission both in bargaining and in representing and protecting its members.

19. CIR has not yet received economic counterproposals from the UC. However, the UC's lead negotiator has already referenced federal funding cuts in initial bargaining sessions. CIR expects the UC to continue to refer to such cuts, and/or any impact of future settlement payments to the Trump administration, throughout bargaining as a justification for any inordinately low economic bargaining proposals.

20.     CIR has already been forced to divert staff and financial resources from its current bargaining work to address increased inquiries from members regarding the effect of the Trump administration's actions and demands targeting the UC with respect to funding, free expression, gender-affirming care, transgender rights, and immigration enforcement.  For example, CIR members have reported and requested the Union's support related to:

- the UC, on or around the start of the new academic year on July 1, 2025, enforcing policies that bar the wearing of "political" pins and buttons in the workplace, including Union-branded pins, which had previously not been enforced;

- threats and rumors about the UC being forced to stop providing gender-affirming care to patients;

- the UC's policies regarding cooperation with ICE agents and other law enforcement agencies, including the August 2025 UCLA policy changes regarding ICE access to UCLA hospitals and clinics in which CIR members work, and the impact of such policies on the safety and well-being of members as well as their patients;

- increased fear of speaking out with views contrary to the Trump administration, including but not limited to ICE presence at hospitals and clinics, Palestine, and gender-affirming care;

- the UC making various changes to working terms and conditions since the start of the 2025 Academic Year on July 1, 2025, including but not limited to cuts to conference funding, departmental allowances, late night meals, citing new budget constraints in the face of federal funding cuts; and

- the UC unilaterally enacting new time, place, and manner speech restrictions at all CIR member worksites.

21.     CIR has also had to divert staff and financial resources in response to the UC's sharing of member names and contact information with the Trump administration.  In March 2025, the UC notified CIR that it had shared member information with the Trump administration in response to a subpoena from the U.S. Equal Employment Opportunity Commission ("EEOC") related to the EEOC's investigation into allegations of antisemitism on UC campuses since October 7, 2023.  CIR has not

been provided with a copy nor has otherwise seen the subpoena, but it purportedly requested the personal contact and demographic information for approximately 860 UC faculty, other academic appointees, and staff who signed onto two publicly posted letters, which included CIR members. CIR has demanded to bargain over the effects of this decision to share member information. CIR has also made proposals as part of its system-wide negotiations over the issue of future disclosure of CIR member information to third parties.

22.    CIR has current contract language that guarantees its members a non-discriminatory workplace including one that does not discriminate based on a person's sex, sexual orientation, gender identity, or gender expression. Those protections would be eroded if the UC were to agree to the settlement terms that are purportedly being demanded by the Trump administration.

23.    CIR members provide gender-affirming care to transgender and gender-diverse patients, including transgender minors, at UC hospitals and clinics, and under the instruction and supervision of the UC. Providing such care is life-affirming and life-saving. CIR members view the provision of such care as part of their duty of care owed to their patients. If the UC agrees to the Trump administration's demand to cease providing this care to minors, CIR members will be irreparably harmed, because they will no longer be able to act on their ethical and medical judgment.

24.    CIR is a plaintiff in this lawsuit to protect CIR-represented workers' terms and conditions of employment, as well as their right to provide the quality healthcare that their patients deserve, free of the restrictions and prohibitions that would be included within any settlement agreement between the UC and the Trump Administration. In addition, CIR has a long-standing history of supporting health justice for all and free expression on issues of public importance, meaning that CIR recognizes the significance for its members that they not only be able to be healers but also advocates.

//
//
//
//
//

DECL. OF IVY QUICHO-CHENG                                              Case No. 3:25-cv-07864-RFL

1    I declare under penalty of perjury that the foregoing is true and correct. Executed on October 7 , 2025

2    in Pasadena_____ , California.

Signed: _____

Ivy Quicho-Cheng

UC Director, CIR

DECL. OF IVY QUICHO-CHENG                                              Case No. 3:25-cv-07864-RFL

# Exhibit A

# CONSTITUTION AND BY-LAWS AND SEIU CODE OF ETHICS



As amended May 3, 2025

### CIR Mission Statement

The Committee of Interns and Residents (CIR) brings together interns, residents, and fellows in a chapter-based organization whose purpose is to represent its doctor-members and the interests of the patients and communities they serve through the use of collective bargaining and resident advocacy.

CIR envisions and works to achieve: 1) better working and training conditions for residents, and 2) a more humane, effective and accessible quality healthcare system for all. Toward those ends, CIR engages in organizing, contract negotiations and enforcement, patient advocacy, and legis-lative and political action.

To advance common goals, CIR builds cooperation among housestaff from all departments and specialties and also works in coalition with other unions and healthcare em-ployees; with community and patient groups; and with medical student and professional organizations.

Elected officers at chapter, regional, and national levels represent the diversity of CIR's members and the range of institutions and regions in which they work. CIR pools resi-dent resources nationally to provide staff, technical support, and organizational continuity to enable housestaff to have an effective voice on the issues they and their patients face.

While maintaining its unique identity and special strengths, CIR achieves its mission as an affiliate of Service Employees International Union working with other doctors and other healthcare employees.

## CONSTITUTION AND BY-LAWS
## COMMITTEE OF INTERNS AND RESIDENTS

## TABLE OF CONTENTS

Article 1 – Name...................................................... 2

Article 2 – Purpose................................................. 2

Article 3 – Membership and Organization ............... 2

Article 4 – House of Delegates................................ 6

Article 5 – Executive Committee ............................. 9

Article 6 – Election of Officers.................................15

Article 7 – Dues..................................................... 22

Article 8 – Finances............................................... 22

Article 9 – Executive Director ................................. 23

Article 10 – Amendments ........................................ 25

By-Laws.................................................................. 26

SEIU Code of Ethics ...............................................28

## CONSTITUTION AND BY-LAWS OF THE COMMITTEE OF INTERNS AND RESIDENTS

(As amended May 3, 2025)

### Article 1 – Name

**1.0**   The name of this union is the "Committee of Interns and Residents" (hereinafter "CIR").

### Article 2 – Purpose

**2.0**   CIR was formed and is perpetuated for the purpose of organizing and representing housestaff officers, which shall include interns, residents, fellows and such other persons in comparable and related titles at hospitals and health care and other similar facilities, in their collective efforts pertaining to compensation, benefits, hours, working conditions, and such other matters affecting their employment, education and training, including, but not limited to, the provision and quality of health care services, delivery and programs. All persons who are supervisors as defined in the National Labor Relations Act shall be excluded from all leadership positions in CIR at national, regional and chapter levels.

### Article 3 – Membership and Organization

**3.0**   Housestaff officers shall be eligible for membership in CIR without regard to race, sex, sexual orientation, national origin, age, religion, disability, political beliefs, or place of professional education.

**3.1**   CIR shall be comprised of housestaff officers in (a) chapters with collective bargaining agreements

and (b) chapters without collective bargaining agreements (non-collective bargaining chapters) which may be chapters seeking collective bargaining or chapters not seeking collective bargaining. Chapters shall be established when an existing housestaff organization affiliates with CIR or when CIR organizes a new housestaff organization or when CIR creates a non-collective bargaining chapter by action of the Executive Committee per 3.10 below.

**3.1.1**  A person eligible for membership in CIR shall become a member of CIR upon application and, either the submission of a valid dues deduction authorization to CIR, a valid automatic payment authorization, or the tender of two months dues. Every member shall pay to CIR the dues established pursuant to this Constitution. A member is in good standing if s/he is current in his or her payment of dues.

**3.2**  Membership in CIR shall be a prerequisite to membership in a chapter.

**3.3**  All CIR officers and delegates shall, during the term of their office, remain members in good standing of CIR, and shall pay the member- ship dues. Where dues are not deducted by the employer, the members shall forward them directly to CIR.

**3.4**  Each chapter shall elect from its membership one delegate to the CIR House of Delegates for each 100 housestaff officers or any fraction thereof. In no case shall there be fewer than two (2) delegates from each chapter.

**3.4.1** For the purposes of Section 3.4, the number of housestaff officers in a chapter shall be the number of housestaff officers in said chapter as determined by using an average of the three (3) most recent reports CIR has in hand on January 15 of each year.

**3.4.2** In addition to the delegates, each chapter shall elect a first alternate delegate and a second alternate delegate.

**3.5** Members shall be given a reasonable opportunity to nominate their chapter delegates and alternate delegates. The members of each chapter shall be given notice of the means of nominating delegates and alternate delegates.

**3.6** Delegates and alternate delegates shall be elected by secret ballot at an annual election in each chapter, and shall take office on May 1, or at the convention, whichever date comes first. Each chapter member shall have the right to vote for delegates of the chapter. The chapter shall decide the date, place and time of the election of its delegates. Not less than fifteen (15) days prior to the election, notice shall be provided to each chapter member in a reasonable manner, of the date, time, place and manner of the election of chapter delegates and alternate delegates.

**3.7** Members in continuous good standing for at least six (6) months prior to the deadline for nominations who will be serving as housestaff officers at a member institution for the next residency year shall be eligible

to stand for election as delegate of a collective bargaining chapter. Members in continuous good standing for at least six (6) months prior to the deadline for nominations who will be serving as housestaff officers for the next residency year shall be eligible to stand for election as delegate of a non-collective bargaining chapter. Should any delegate cease his or her employment, other than by rotation, as a housestaff officer at a member institution, then his/her tenure of office shall be deemed terminated. Should any delegate of a non-collective bargaining chapter cease payment of dues, or cease working as an intern, resident or fellow, then his/her tenure of office shall be deemed terminated.

**3.8**   The duly-elected delegates to the House of Delegates shall serve a concurrent term as the officers of their local chapter. In addition, the local chapter may elect members to other positions as the chapter deems fit.

**3.9**   The business of the local chapter may be conducted pursuant to a constitution which must be consistent with the terms hereof and approved by the Executive Committee. When an existing housestaff organization affiliates with CIR and so requests, the President, with the approval of the Executive Committee, may approve retaining provisions in the affiliate's constitution that may differ from the CIR constitution.

**3.10**  No chapter shall be enabled or authorized to act as a labor organization and/or collective bargaining representative of its constituent membership

without express authorization from the Executive Committee, which shall establish the procedures for any such representation undertaken by the chapter, including but not limited to the participation of CIR officers, delegates, staff and counsel, as the Executive Committee shall deem appropriate. Non-collective bargaining chapters shall be created only upon express authorization from the Executive Committee pursuant to standards and procedures they establish. Because non-collective bargaining chapters do not have the benefits of collective bargaining, the Executive Committee is authorized to set dues for non-collective bargaining chapter members at an appropriate level, but in no case less than two-hundred (200) dollars per year.

**3.11**  Any issue as to the credentials of a delegate shall be submitted to and resolved by the House of Delegates.

**3.12**  In any matter in which a delegate is unable to act, the delegate shall be replaced by the first alternate delegate, and if the first alternate is unable to act, the delegate shall be replaced by the second alternate.

## Article 4 – House of Delegates

**4.0**  The delegates, elected annually by the members as aforesaid, and the officers, as set forth in Article 5, shall comprise the House of Delegates of CIR. Each delegate or officer present at a House of Delegates meeting shall be equally entitled to one vote on all matters before the House of Delegates.

**4.1**    The House of Delegates shall be the governing body of CIR and shall have the power to:

**4.1.1**    Set the policies of CIR;

**4.1.2**    Require reports of the Executive Committee on its activities;

**4.1.3**    Approve the annual budget for CIR pursuant to Section 8.2;

**4.1.4**    Fix dues pursuant to Article 7;

**4.1.5**    Approve the appointment of the Executive Director, upon recommendation of the Executive Committee pursuant to Section 5.1.5;

**4.1.6**    Amend this Constitution or modify its Bylaws pursuant to Article 10;

**4.1.7**    Resolve any issue regarding the credentials of a delegate pursuant to Section 3.11;

**4.1.8**    Hear and decide appeals from the delegates, officers or the Executive Director that the Executive Committee has removed or otherwise disciplined pursuant to Section 5.1.6. If a delegate, officer or the Executive Director wishes to appeal a disciplinary decision by the Executive Committee, he or she must, within 30 days of receiving the Executive Committee's written decision, submit to the House of Delegates a written statement of no more than 1,000 words providing the reasons for the appeal. In the event a delegate, officer or Executive Director submits a written appeal statement, the House of Delegates shall rule on the appeal by

voting by referendum or at the annual convention, as decided by the Executive Committee. CIR shall distribute the Executive Committee's decision and the written appeal statement to the delegates prior to the vote on the appeal. In the event the House of Delegates votes while assembled, the delegate, officer or Executive Director shall have the opportunity to address the House of Delegates in person prior to the vote.

**4.1.9** Determine, pursuant to Section 5.4, the compensation of members of the Executive Committee;

**4.1.10** Decide whether CIR will join, affiliate, or merge with a national labor organization or interunion federation; and

**4.1.11** Exercise any power of the House of Delegates described elsewhere in this Constitution.

**4.2** The House of Delegates shall meet annually in convention, on a designated date(s) between April 1 and June 30. In addition, a special meeting or referendum may be called for by a two thirds (2/3) majority of the Executive Committee, pursuant to Sections 4.3 and 5.1.9.

**4.2.1** Notice of all House of Delegates meetings, including special meetings, shall be sent at least 30 days prior to the date of the meeting.

**4.2.2** The President shall fix the date, time and place of all meetings.

**4.2.3** Twenty percent (20%) of the delegates shall constitute a quorum at each meeting of the House of Delegates, unless an amendment to this Constitution is to be voted on at the meeting in which case thirty percent (30%) of the delegates shall constitute a quorum.

**4.3** A referendum may be called by a two-thirds (2/3) majority of the Executive Committee, to vote on issues covered under Section 4.1 et seq., except for Section 4.1.6 (Amend Constitution or Bylaws). A quorum for any referendum shall be 40% of the delegates. Two-thirds (2/3) of the votes cast shall be necessary for the referendum to pass.

## Article 5 – Executive Committee

**5.0** The officers of CIR shall be the President, Executive Vice President, Secretary-Treasurer, and other Vice Presidents, apportioned by regions as provided in the Bylaws. The number of Vice Presidents per region shall be determined as follows:

| Number of House Officers In Region | Number of Vice Presidents |
|---|---|
| 500 - 1,500 | 1 |
| 1,501 - 2,500 | 2 |
| 2,501 - 3,500 | 3 |
| 3,501 - 4,500 | 4 |
| 4,501 - 5,500 | 5 |
| 5,501 - 6,500 | 6 |
| 6,501 - 7,500 | 7 |
| 7,501 - 8,500 | 8 |
| 8,501 - 9,500 | 9 |
| 9,501 -10,500 | 10 |

**5.0.1** Each officer shall be bound by and be obligated to carry out the decisions of the House of Delegates and the Executive Committee. Each officer present at a meeting of the Executive Committee shall be equally entitled to one vote on all matters before the Committee. A majority of the Executive Committee shall constitute a quorum of the Committee.

**5.1** The Executive Committee shall be the steering committee of CIR and shall have the power to:

**5.1.1** Exercise all of the powers vested in the House of Delegates pursuant to Section 4.1 et seq. hereof between meetings of the House of Delegates, provided however, that the Executive Committee shall not exercise the powers vested in the House of Delegates pursuant to Section 8.2 (Budget), Article 7 (Dues), Article 10 (Amendments), and Section 4.1.10 (Affiliation);

**5.1.2** Exercise any power delegated to the Executive Committee by the House of Delegates;

**5.1.3** Implement the policies of CIR;

**5.1.4** Advise and direct the Executive Director and, through the Executive Director, advise and direct the CIR staff;

**5.1.5** Appoint an Executive Director, subject to approval by the House of Delegates pursuant to Section 4.1.5.

---

**5.1.6**  Remove or otherwise discipline for just cause a delegate or an officer, or remove with or without cause the Executive Director. The delegate, officer or Executive Director shall be advised of the reasons(s) the Executive Committee is considering removal or other discipline and shall have the right to address the Executive Committee before the Executive Committee votes as to whether he or she should be removed or otherwise disciplined. In the event the Executive Committee votes to remove or otherwise discipline a delegate or officer, or remove the Executive Director, he or she shall receive a written decision stating the reasons the action was taken. A decision by the Executive Committee to remove or otherwise discipline a delegate or officer, or remove the Executive Director shall take effect immediately. A delegate, officer, or Executive Director removed or otherwise disciplined shall have the right to file an appeal to the House of Delegates pursuant to Section 4.1.8.

**5.1.7**  Recommend approval of an annual budget to the House of Delegates pursuant to Section 8.2;

**5.1.8**  Modify the approved annual budget pursuant to Section 8.2;

**5.1.9**  Call for a referendum or special meeting of the delegates upon two-thirds (2/3) majority of the Executive Committee, pursuant to Sections 4.2.and 4.3;

**5.1.10** Upon the appeal of a local chapter pursuant to Section 5.5.2, direct the President and/ or Executive Director to execute a collective bargaining agreement; and

**5.1.11** Authorize, in exceptional circumstances, the phase-in of dues for residents in new CIR chapters with a collective bargaining agreement, provided that said residents shall pay full dues at the rate fixed by the House of Delegates in a specified period of time not to exceed two years. Phased in dues shall start at no less than 50% of full dues. The Executive Committee will establish guidelines for phasing in of dues. Residents whose dues are being phased in shall be considered full members.

**5.1.12** Exercise any power of the Executive Committee described elsewhere in this Constitution.

**5.2** The Executive Committee shall meet at least three times each year.

**5.3** Should the office of President become vacant, that office shall be filled by the Executive Vice-President or the Secretary-Treasurer, in order. A vacancy in any other office shall be filled by a member in good standing who is appointed by the President and confirmed by the Executive Committee for the duration of the unexpired term.

**5.4** Officers who render services other than attendance at meetings of the Executive Committee or House of Delegates may receive a reasonable salary or payment for their services as determined from time to time by the House of Delegates.

**5.5** The President shall be the chief spokesperson for CIR. The President shall preside at all meetings of the House of Delegates and the Executive Committee. The President shall cause reasonable notice of all meetings of the House of Delegates and the Executive Committee to be provided. The President shall fix the date, time and place of all meetings of the Executive Committee, except that, upon the written request of forty percent (40%) of its members, the President shall convene a meeting of the Executive Committee at such date, time and place as is specified.

**5.5.1** The President shall appoint members to all CIR committees and Trust Funds except where the trust document provides otherwise. Appointments to Trust Funds shall be approved by the Executive Committee. The President shall be an ex-officio member of each committee or Trust Fund.

**5.5.2** The President or the Executive Director shall sign all collective bargaining agreements approved by the local chapter unless the contract violates the Constitution or undermines CIR standards. The local chapter may appeal any adverse decision to the Executive Committee.

**5.5.3**   The President shall have the authority to inter-pret the Constitution, subject to review by the Executive Committee, or in the final instance, by the House of Delegates.

**5.6**   The Secretary-Treasurer shall:

**5.6.1**   Cause to be recorded all votes and the minutes of meetings of the Executive Committee, and the House of Delegates;

**5.6.2**   Be responsible for collection of all monies of CIR from all persons from whom they shall be due;

**5.6.3**   Be responsible for the custody of the funds of CIR;

**5.6.4**   Cause to be maintained a correct and accurate account of all monies received and disbursed, and of the financial condition of CIR; and

**5.6.5**   Upon the request of the House of Delegates, cause to be submitted a statement of the finan-cial condition of CIR, his/her books and records being at all reasonable times open and acces-sible to inspection and audit upon request by the House of Delegates, the Executive Committee or by such person or persons as either body may designate.

**5.7**   The President, Secretary Treasurer and Executive Director, and such other person as appointed by the Executive Committee from time to time, may sign checks on behalf of CIR pursuant to Section 8.1.

---

5.8      The Executive Committee shall also include one advisory member and one alternate advisory member who shall not be officers of CIR. Any former CIR officer is qualified to serve as an advisory member. The advisory member and alternate will be elected, by vote of the Executive Committee members with whom they will serve. They will be elected for a one-year term commencing and ending on dates chosen by the Executive Committee. They can be elected for additional terms. The advisory member will have voice, but not vote on the Executive Committee and will not be counted for quorum purposes. The Executive Committee is authorized to adopt policies and procedures with respect to the advisory member position.

## Article 6 – Election of Officers

6.0      The President, Executive Vice President, Secretary-Treasurer, and Regional Vice Presidents shall be elected directly by the CIR membership.

     (a)   Elections for President, Executive Vice President, and Secretary-Treasurer shall be held on even numbered years (e.g. 2040, 2060, 3000) at places, dates, and times, and in a manner designated by the Election Board (See Section 6.1).

         Starting in 2026, to the extent possible, one half of CIR's Regional Vice Presidents shall be elected on even numbered years (e.g. 2040, 2060, 3000) and one half shall be elected on odd numbered years (e.g. 2041, 2061, 3001) at places, dates, and times, and in a manner designated by the Election Board (See Section 6.1). The CIR Executive Committee shall decide which

Regional Vice Presidents are elected on even numbered years, and which are elected on odd numbered years.

Each member who is (1) elected as Regional Vice President in calendar year 2025 or (2) appointed as Regional Vice President pursuant to Section 5.3 in calendar year 2025, shall be elected/appointed for a term ending when candidates for those offices have been properly elected in accordance with Nomination and Election Rules adopted by the 2027 Election Board as per Section 6.1(b).  Moving forward, these Regional Vice President offices shall be elected in odd years unless otherwise determined by the CIR Executive Committee.

(b) The President, Executive Vice President and Secretary-Treasurer shall be elected by the entire membership. Regional Vice Presidents shall be elected by the membership of their respective regions.

**6.1**   (a) The Executive Committee shall appoint an Election Board. There shall be three Election Board members and one (1) alternate. The Executive Committee shall designate one member as chair of the Board. No Election Board member can be a candidate for any office in the election.

(b) The Election Board shall conduct and supervise the nomination and election of candidates in accordance with the provisions of this Constitution. The Election Board shall adopt rules for the nomination and election process. The Election Board may recommend to the Executive Committee that a professional organization be hired to conduct the election.

(c) The Election Board shall decide the eligibility of candidates. The Election Board's decision is appealable as described in Section 6.4.

(d) In the event of a contested election, the Election Board shall provide for secret ballot election preceded by a notice of election mailed to each member at his or her last known home address not less than fifteen (15) days prior to the election.

(e) The Election Board shall meet promptly after the election and announce the results.

(f) The Election Board shall hear and decide all objections to the conduct of the elections. All such objections must be received by the Board in writing within three (3) days after the election has been conducted. The Election Board's decision is appealable

---

as described in Section 6.4.

(g) The Election Board shall preserve the ballots and all other records pertaining to the election for a period of no less than a year.

6.2 (a) The Election Board will determine the date that petitions are available. The Election Board will provide for timely notice of nominations in a reasonable manner to inform members of the offices to be filled and the time, place, and form for submitting nominations. Petitions will be provided promptly to any member in good standing who contacts the Election Board and requests a petition. Petitions must be returned to the Election Board on a date set by the Election Board. Only petitions distributed by the Election Board or exact copies thereof will be considered valid.

(b) Members in continuous good standing for at least six (6) months prior to the deadline for nominations who (i) will be serving as housestaff officers for the next residency year; (ii) are serving as housestaff officers for the current residency year; or (iii) are serving as CIR officers during the current residency year, shall be eligible to stand for election as a CIR officer. However, in no event shall their term of office extend more than three (3) years after the conclusion of their residency or fellowship program, and the candidate, if they are serving as an attending physician, cannot concurrently hold a role that involves residency program leadership, excluding chief residents who are still within their prescribed residency training period, and/or hospital leadership.

If a person eligible to stand for election under the preceding paragraph is running for Regional Vice President, they must run for said Vice President position in the CIR Region in which they will be working in the next residency year. If said person will not be working in a specific CIR Region, they are only eligible to run for Vice President from the New York Region.

(c) Nominating petitions of candidates for President, Executive Vice President, or Secretary-Treasurer shall require the signatures, printed names and identification by hospital of no less than 200 members in good standing from a minimum of four regions, with at least ten signatures from each of four regions.

(d) A nominating petition for a candidate for Regional Vice President shall require the signatures, printed names and identification by hospital of no less than 25 members in good standing of the appropriate region. In a region with two (2) or more hospitals, a petition must have at least two (2) signatures from a hospital in the region other than the hospital in which the candidate is employed.

(e) No individual may be a candidate for more than one office.

**6.3** (a) Any group of candidates may appear on the ballot as a slate. The group of candidates shall submit a written request to the Election Board

> to appear on the ballot as a slate on a date set by the Election Board. The request shall include the proposed name of the slate, the names of the slate members and identification of the office for which each is running. The name of the slate may not be so similar to a name selected by another slate as to mislead. Candidates may not be on more than one slate. An Election Board decision on slates is appealable as described in Section 6.4.

(b) The ballot shall provide a space or box so that one vote may be cast for all candidates appearing under an approved slate. In addition, each slate candidate shall have printed opposite his or her name, a space or box in which an individual vote for him or her may be cast and recorded. In the event of a conflict, a vote cast for a slate shall override a vote for an individual candidate.

**6.4** Any and all appeals from decisions of the Election Board shall be deemed waived unless made in writing and filed with the CIR President within three (3) days of service of the decision. All timely appeals shall be considered and decided by the Executive Committee and its decision shall be final and binding.

**6.5** (a) Elections shall be conducted by secret ballot.

(b) The candidate for the position of President, Executive Vice President, or Secretary-Treasurer who receives the highest number of votes cast shall be declared elected.

(c) The candidates for the positions of Regional Vice President who receive the highest number of votes cast in that Region shall be declared elected.

**6.5.1** After the nominations period is closed, if there is only one candidate for an office, the chairperson of the Election Board shall cast one ballot for the unopposed candidate. The candidate shall then be declared duly elected. If an entire slate is unopposed the chairperson of the Election Board shall cast one ballot for the unopposed slate.

**6.6** The newly elected President, Executive Vice President, Secretary-Treasurer, and Regional Vice Presidents shall be installed and immediately assume office after the Election Board certifies that they have been properly elected.

**6.7** (a) CIR Officers shall not in any official capacity discriminate in favor of any candidate. They shall not advocate the election or defeat of any candidate in any printed statement purporting to be the official or authorized views of the organization. They shall not use the monies or other property of CIR for any such purpose.

(b) This section shall not preclude any member holding office from exercising his or her democratic right to participate as an individual in any election in which he or she is a candidate or in any other election campaign.

(c) This section shall not preclude CIR, in contested elections, from distributing to the membership statements submitted by nominated candidates for office. Each nominated candidate will have the opportunity to have a one-page communication sent by CIR to members eligible to vote for the candidate. Nominated candidates who are part of a slate may pool their space (i.e., a 12 candidate slate is entitled to a 12 page communication). Such campaign communication must be received by the Election Board on a date set by the Election Board.

(d) In addition to the distribution provided for in section (c) above, each candidate shall be permitted a reasonable opportunity to have campaign literature distributed to the membership by CIR at the candidate's expense. CIR need not distribute any candidate's campaign literature unless the candidate is willing to pay in advance for the costs of such distribution. CIR shall exercise all reasonable efforts to insure that each candidate's campaign literature is processed and distributed in a complete and prompt manner. CIR may not censor, regulate, or alter the contents of any candidate's campaign literature. The Election Board shall be responsible for adopting procedures for complying with candidate requests for distribution of literature.

**6.8** No candidate shall accept or use any contributions or other things of value received from any employers, or representative of an employer. An employer includes any entity which employs individuals, whether or not they are members of CIR. Nothing herein shall be interpreted to prohibit receipt of contributions from members of CIR.

**6.9** No write-in votes shall be permitted or counted in any election under Article 6 of this Constitution.

## Article 7 – Dues

**7.0** CIR dues may not be raised unless all members in good standing are provided with the opportunity to vote on the proposed raise in dues in a secret ballot election, and a majority of members in good standing voting, cast ballots in favor of the proposed raise in dues. Written notice of the proposed raise and the secret ballot election must be provided to the membership of CIR at least thirty (30) days prior to the vote.

## Article 8 – Finances

**8.0** All monies and instruments of value of CIR shall be deposited in the name of and to the credit of CIR.

**8.1** All checks on any bank or depository shall be paid in the name of CIR and checks shall be signed by the President, Secretary-Treasurer, and Executive Director, and such other person as appointed by the Executive Committee from time to time, pursuant to Section 5.7.

**8.2** In advance of the fiscal year, the Executive Director shall submit a proposed annual budget to the Executive Committee for approval. If approved, the Executive Committee shall submit the proposed budget to the House of Delegates for approval. The Executive Committee may from time to time make such modifications in the budget as it deems necessary, subject to review by the House of Delegates.

## Article 9 – Executive Director

**9.0** The Executive Director is in charge of the administration of CIR including the responsibility to manage its affairs, represent CIR, and carry out the decisions of the House of Delegates and Executive Committee.

**9.1** The Executive Director has the authority to hire, fire, promote, set salaries and other terms and conditions of work, discipline, supervise, assign, and direct staff as well as retain professional and consultant services. No individual Executive Committee member or delegate may assign or direct staff.

**9.2** The Executive Director shall give reports to the Executive Committee and House of Delegates on his/her activities. In advance of each fiscal year, the Executive Director shall prepare and submit a budget pursuant to Section 8.2.

**9.3** The President or the Executive Director shall sign all collective bargaining agreements approved by the local chapter unless the contract violates the

Constitution or undermines CIR standards. The local chapter may appeal any adverse decision to the Executive Committee.

**9.4** The Executive Director shall be an ex-officio member with voice but without vote at all meetings of the House of Delegates and Executive Committee. S/he may serve as trustee for any funds associated with CIR. S/he shall have the authority to sign checks, contracts, approvals for expenditures, and other official documents of CIR. The Executive Director shall carry out other duties and acts as the Executive Committee or House of Delegates may direct.

**9.5** The Executive Director's term of service, compensation, benefits and conditions shall be set by the Executive Committee in an employment contract which shall also include the method and conditions of reappointment or non-renewal at the end of the specified period.  The Executive Director shall be selected and appointed pursuant to Sections 4.1.5 and 5.1.5. The process for removal of an Executive Director prior to the end of a contract term shall be pursuant to the terms of the Executive Director's employment contract, and any recommendation for removal by the Executive Committee or vote to remove by the House of Delegates shall be pursuant to Sections 4.1.8 and 5.1.6.

**9.6** Notwithstanding anything in Article 3, the Executive Director shall be eligible for membership in CIR, as an Administrative Member, which

position shall be without voting privileges or
eligibility to run for CIR office, and may serve as
delegate and represent CIR in such other bodies
as the Executive Committee may designate.
Dues shall be submitted in accordance with any
applicable minimum requirements.

## Article 10 – Amendments

**10.0** Every amendment to this Constitution or modi-
fication to its Bylaws shall be initiated by the
Executive Committee or, by submission to the
Executive Committee of a proposition in writing
signed by ten percent (10%) of the delegates.
Notice shall be sent to the delegates of the
substance of the proposed amendment, the
Executive Committee's recommendation, and
the date of the meeting at which the House of
Delegates shall vote on the proposed amend-
ment. The notice shall be sent at least thirty (30)
days prior to such meeting. Two-thirds (2/3) of
the votes cast at such meeting shall be neces-
sary for the adoption of any amendment to the
Constitution, and a majority of the votes shall be
necessary to modify the Bylaws. At the meeting
where there will be a vote on an amendment to
this Constitution, a quorum shall be thirty percent
(30%) of the delegates.

## By-Laws

1. A President of CIR who works full-time for CIR shall receive the same salary and benefits as received by the CIR Executive Director plus $1.00.

2. The CIR President shall determine, subject to review by the House of Delegates, the rules of procedure and the agenda of meetings of the House of Delegates, Executive Committee, and CIR.

3. The CIR President shall have the authority to convene such regional or statewide meetings as may be necessary to conduct the affairs of CIR.

4. If a chapter decides to elect a Chapter President, then this office shall be filled, consistent with Section 3.8 of the Constitution, by either (i) designating, prior to delegate elections, one of the delegate positions as "Delegate/ Chapter President"; (ii) after voting for delegates, voting again to select from among the delegates, the Chapter President; or (iii) any other method approved by the Executive Committee.

5. Regions are as follows:

> Florida
> Great Lakes
> Mid-Atlantic
> New England
> New Mexico
> New York – Private
> New York – Public
> Northern California
> Northern California – UC
> Northwest
> Southern California
> Southern California – UC

(a) New regions may be established by the Executive Committee, subject to approval by the House of Delegates.

(b) Every chapter shall be part of a region.

(c) For the purpose of regional Vice-President apportionment, a region with fewer than 500 housestaff officers shall be combined with another region, as determined by the Executive Committee.

6. The Executive Committee may adopt policies, procedures and regulations to implement the establishment of the associate member classification of membership subject to the guidelines of the International Union. The Executive Committee may create or terminate Chapters of Associate Members.

(a) An associate member must not be employed by an employer for which CIR is the recognized bargaining agent.

(b) Associate members shall have those rights granted to them by the Executive Committee

(c) Associate members shall pay dues at a rate set by the Executive Committee.

(d) An associate member shall not be eligible to hold office or vote in officer elections.

## SEIU CODE OF ETHICS
## AND CONFLICT OF INTEREST POLICY
### PART A: PREAMBLE

The Service Employees International Union (SEIU) believes in the dignity and worth of all workers. We have dedicated ourselves to improving the lives of workers and their families and to creating a more just and humane society. We are committed to pursuing justice for all, and in particular to bringing economic and social justice to those most exploited in our community. To achieve our mission, we must develop highly trained and motivated leaders at every level of the Union who reflect the membership in all of its diversity.

Union members place tremendous trust in their leaders. SEIU elected officers and managers owe not just fiduciary obligations to union members; given the moral purpose of our mission, SEIU leaders owe members the highest level of ethical behavior in the exercise of all leadership decisions and financial dealings on members' behalf. Members have a right to proper stewardship over union funds and transparency in the expenditure of union dues. Misuse and inappropriate use of resources or leadership authority undermine the confidence members have in the Union and weaken it. Corruption in all forms will not be tolerated in SEIU. This *Code of Ethics and Conflict of Interest Policy* (the "Code" or "SEIU Code") strengthens the Union's ethics rules of conduct, organizational practices and enforcement standards and thus enhances the Union's ability to accomplish its important mission.

We recognize that no code of ethics can prevent some individuals from violating ethical standards of behavior. We also know that the SEIU Code is not sufficient in itself to sustain an ethical culture throughout the Union. To accomplish the goals for which this Code has been created, we must establish systems of accountability for all elected leaders and staff. These systems must include appropriate checks and balances and internal operating procedures that minimize the opportunity for misuse or abuse, as well as the perception of either, in spending union funds and exercising decision-making authority. The systems also must include adequate provision for training on understanding and implementing this Code. More broadly, we emphasize the importance of the range of standards, practices, and values described in "A Strong Ethical Culture," Section A of the *SEIU Policies on Ethics and Standards* that were enacted with the Code in 2009.

In particular, SEIU is committed to providing meaningful paths for member involvement and participation in our Union. The SEIU Member Bill of Rights and Responsibilities in the Union is a significant source of SEIU members' rights and obligations. Its exclusive enforcement through the procedures set forth in Article XVII of the SEIU Constitution and Bylaws reflects a commitment to the democratic principles that have always governed SEIU. Article XVII's numerous protections against arbitrary or unlawful discipline of members also form an essential ingredient of the democratic life of the Union.

Similarly, the requirement that Affiliates provide for regular meetings of the membership, set forth in Article XV, Section 5 of the Constitution, is another important element in the democratic functioning of SEIU. Finally, the provisions against discrimination and harassment on the basis of race, creed, color, religion, sex, gender expression, sexual orientation, national origin, citizenship status, marital status, ancestry, age and disability contained in Article III, Section 4 of the SEIU Constitution and in the Constitutions and Bylaws of Affiliates, the SEIU Anti-discrimination and Anti-Harassment Policy and Procedure, and similar policies of Affiliates forbid conduct in violation of SEIU's historic belief that our strength comes from our unity and diversity and that we must not be divided by forces of discrimination.

Individuals subject to this Code are expected to comply with State and Federal laws, the Constitution and Bylaws of SEIU and Affiliates, and the anti-discrimination and anti-harassment policies of SEIU and Affiliates as part and parcel of our commitment to sustaining an ethical culture and the highest standards of conduct throughout the Union. Violations of these laws and policies are ethical breaches; however, these violations should be addressed through avenues provided by the applicable laws and policies and not through the Code unless they also allege violations of this Code. In particular, the sole enforcement mechanism for matters covered by the SEIU or Affiliate Constitutions and Bylaws is that which is set forth in those documents, unless violations of this Code are also alleged. Finally, grievances that arise under collective bargaining agreements are

excluded from enforcement under this Code unless they also allege violations of this Code.

The scope and standards of this Code are set forth in the following Sections.

### SECTION 1. *Applicability to International Union.*

The SEIU Code is henceforth applicable in its entirety to all officers, executive board members and employees of SEIU. These individuals are referred to herein as "covered individuals." SEIU shall append or attach the Code in its entirety to its Constitution and Bylaws in its next and all future publications.

### SECTION 2. *Applicability to SEIU Affiliates.*

By enactment of the SEIU International Executive Board, the SEIU Code is applicable in its entirety to all officers, executive board members and employees of all affiliated bodies and local unions chartered by SEIU ("Affiliates" herein). These individuals are referred to herein as "covered individuals."

(a) Each Affiliate shall ensure that the Code extends to all employees as soon as practicable but in no event later than the end of 2020.

(b) Each Affiliate shall append or attach the Code in its entirety to its Constitution and Bylaws at its next and all future publications.

(c) Wherever reference herein is made to SEIU or an SEIU program, department or position, the corresponding reference is to the particular Affiliate or its equivalent program, department or position.

(d) Each Affiliate is responsible for enforcing the Code and educating its covered individuals on the Code in a manner consistent with the Code's terms, subject to assistance and oversight from SEIU.

(e) The Code is not intended to restrain any Affiliate from adopting higher standards and best practices, subject to the approval of the SEIU Ethics Ombudsperson.

## PART B: GENERAL OBLIGATIONS

### SECTION 3. *Obligations of Covered Individuals.*

(a) *Commitment to the Code*. SEIU and each Affiliate shall provide a copy of the Code to each covered individual. It is the duty and obligation of covered individuals to acknowledge annually that they have received a copy of this Code, that they have reviewed and understand it, and that they agree to comply with it.

(b) *Duty of disclosure*. Covered individuals shall disclose to the SEIU Ethics Ombudsperson or the Affiliate Ethics Liaison, described in PART F of this Code, any conflict of interest or appearance of a conflict, which arises when their paramount duty to the interest of members is potentially compromised by a competing interest, including but not limited to an interest, relationship or transaction referenced in this Code. Actual, perceived and potential conflicts should be disclosed at the time that covered individuals become aware of them.

---

(c) *Disqualification from service to SEIU or Affiliate*. No person shall serve as an officer or managerial employee of SEIU or any Affiliate who has been convicted of any felony involving the infliction of grievous bodily injury, or the abuse or misuse of such person's position or employment in a labor organization to seek or obtain illegal gain at the expense of the members, except for the limited exceptions set forth in applicable federal law.

### PART C: BUSINESS AND FINANCIAL ACTIVITIES

### SECTION 4. *General Duty to Protect Members' Funds; Members' Right to Examine Records.*

(a) The assets and funds of a labor organization are held in trust for the benefit of the membership. Members are entitled to assurance that those assets and funds are expended for proper and appropriate purposes. The Union shall conduct its proprietary functions, including all contracts for purchase or sale or for the provision of significant services, in a manner consistent with this Code. All officers, executive board members and employees of SEIU and SEIU Affiliates, whether elected or appointed, have a trust and high fiduciary duty to honestly and faithfully serve the best interests of the membership.

(b) Consistent with Section 201 of the Labor-Management Reporting and Disclosure Act, SEIU shall permit a member for just cause to examine any books, records and accounts necessary to verify SEIU's annual financial report under that section to the U.S. Department of Labor.

(c) Affiliates comprised solely of members employed by government bodies shall permit a member to examine its financial report submitted to a state agency and, consistent with state law and for just cause, to examine any books, records and accounts necessary to verify the Affiliate's financial report.

### SECTION 5. *Prohibited Financial Interests and Transactions.*

Covered individuals shall not, to the best of their knowledge, have a substantial ownership or financial interest that conflicts with their fiduciary duty.

(a) For purposes of these rules, a "substantial ownership or financial interest" is one which either contributes significantly to the individual's financial well-being or which enables the individual to significantly affect or influence the course of the business entity's decision-making.

(b) A "substantial ownership or financial interest" does not include stock in a purchase plan, profit-sharing plan, employee stock ownership plan (ESOP) or blind trust. Nor does it prohibit covered individuals from owning, through a mutual fund or other similar investment vehicle, the publicly traded shares of any employer with which SEIU or an Affiliate engages in collective bargaining or does business or which SEIU or an Affiliate seeks to organize, provided that all transactions affecting such interests are consistent with rates and terms established by the open market.

---

(c) It is not permissible for any covered individual to:

    (1) Knowingly have a substantial ownership or financial interest in any entity that engages in collective bargaining with SEIU or any of its Affiliates;

    (2) Make or attempt to influence or participate in any way in a decision concerning the relations of SEIU or an Affiliate with a vendor, firm or other entity or individual in which the covered individual or his or her relative, spouse or business partner has a substantial ownership or financial interest; or

    (3) Engage in any self-dealing transactions with SEIU or any of its Affiliates, such as buying property from or selling property to SEIU, without the informed approval of the International Secretary-Treasurer (or Affiliate Secretary-Treasurer, as applicable), obtained after full disclosure, including an independent appraisal of the fair market value of the property to be bought or sold.

(d) To ensure compliance with this Section, covered individuals are required to disclose any interests, transactions or interests covered by this Section in accordance with Section 3(b) of this Code.

---

### SECTION 6. *Payments and Gifts from Employers, Vendors and Members.*

- (a) Covered individuals shall not knowingly accept any payments, benefits or gifts of more than minimal financial value under the circumstances presented from any employer that engages or seeks to engage in collective bargaining with SEIU or an Affiliate, or from any business or professional firm that does business or seeks to do business with SEIU or an Affiliate.

  - (1) This Section does not extend to payments and benefits that are provided to covered individuals by prohibited employers as compensation for their primary and regular employment.

  - (2) This Section does not extend to work and services that covered individuals perform for prohibited employers or businesses on a part-time basis, through an arm's length transaction and for normal and customary pay for such work or services.

  - (3) This Section does not extend to participation in events hosted by public officials involving discussion of public policy matters.

  - (4) With respect to perishable items that are more than minimal but that are impracticable to return, such as food, it shall be considered compliance with this Section to discard such an item or place it in a common area for members and office staff to enjoy. If the gift is discarded or enjoyed

communally, it is recommended that the giver should be advised of this disposition to dispel the appearance of any conflict of interest on the part of any covered individual and to discourage recurrence.

(b) Covered individuals shall not knowingly accept personal payments or gifts from any member, absent a personal relationship independent of the relationship between the Union and the member, other than a gift of minimal financial value. This provision does not apply to contributions to campaigns for union office made in accordance with the SEIU Constitution and Bylaws.

### SECTION 7. *Conversion of Union Funds and Property*

Covered individuals shall not use, convert or divert any funds or other property belonging to SEIU to such individual's personal benefit or advantage.

### SECTION 8. *Applicability to Third Parties.*

The principles of this Code apply to those investments and activities of third parties that amount to a subterfuge to conceal the financial interests of SEIU officers or employees or to circumvent the standards of this Code.

### SECTION 9. *Certain Loans Prohibited.*

SEIU shall not make loans to any officer or employee, or to any of their family members, that at any time exceed $2,000 in total indebtedness on the part of such officer, employee or family member.

---

#### PART D: BENEFIT FUNDS AND RELATED ORGANIZATIONS

#### SECTION 10. *Obligations of Covered Individuals.*

- (a) *Benefit Funds.*

    - (1) For purposes of this Section:

        - a. A "benefit fund or plan" means a retirement, health or welfare benefit fund or plan sponsored by SEIU or an Affiliate, or in which SEIU or an Affiliate participates.

        - b. The definition of "substantial ownership or financial interest" provided in Section 5 applies.

    - (2) Covered individuals who serve in a fiduciary position with respect to or exercise responsibilities or influence in the administration of a benefit fund or plan shall not:

        - a. Have any substantial financial interest in, or any compromising personal ties to, any investment manager, insurance carrier, broker, consultant or other firm or individual doing business or seeking to do business with the fund or plan;

        - b. Accept any personal payment from any business or professional firm that does business or seeks to do business with the fund or plan, other than contractual payment for work performed; or

---

        c.  Receive compensation of any kind for service as an employee representative or labor-designated trustee for a fund or plan, except for reimbursement of reasonable expenses properly and actually incurred and provided uniformly to such representatives or trustees, with the proviso that it is not a violation of this provision for an officer or managerial employee who is not a full-time employee of SEIU or an Affiliate to be a lawfully paid employee of a fund or plan if such employment is consistent with applicable legal restrictions and fully disclosed through appropriate reports.

(3)  To ensure compliance with this Section, all covered individuals shall disclose any interests, transactions or relationships covered by this Section in accordance with Section 3(b) of this Code.

(4)  No person shall serve in a fiduciary capacity or exercise responsibilities in the administration of a benefit fund or plan who has been convicted of any felony involving the infliction of grievous bodily injury or the abuse or misuse of such person's position or employment in an employee benefit plan to seek or obtain an illegal gain at the expense of the beneficiaries of the employee benefit fund or plan, except for the limited exceptions set forth in applicable federal law.

(b) *Related Organizations.*

    (1) For purposes of this Section, an organization "related to" SEIU or an Affiliate means an organization

        • in which 25 percent or more of the members of the governing board are officers or employees of SEIU or an Affiliate, or

        • for which 50 percent or more of its funding is provided by SEIU or an Affiliate.

    (2) Covered individuals who serve in a fiduciary position with respect to or exercise responsibilities or influence in the administration of an organization related to SEIU shall comply with the provisions and shall hold themselves to the standards of the SEIU Code while they are acting for or on behalf of the related organization.

## PART E: FAMILY AND PERSONAL RELATIONSHIPS

### SECTION 11. *Purpose of Rules Governing Family and Personal Relationships.*

SEIU does not prohibit the employment of qualified relatives of current officers or employees, or of individuals with whom an officer or employee has a romantic or intimate personal relationship. SEIU also does not prohibit the retention of qualified vendors that employ relatives of current SEIU officers or employees or individuals with whom an officer or employee has a personal relationship.

However, SEIU recognizes that the existence of such relationships can lead to problems, including favoritism or the appearance of favoritism toward relatives or those who are involved in a personal relationship. Giving these individuals special treatment – or creating the impression that they receive special treatment – is inconsistent with our principles of stewardship and accountability and with our duty to responsibly conduct the business of SEIU. The provisions of this PART are designed to ensure that family or personal relationships do not influence professional inter-actions between the employees involved and other officers, employees and third parties.

### SECTION 12. *Definitions.*

For purposes of this PART:

(a) "Relative" means parent, spouse, spousal equivalent, daughter, son, grandparent, grand-child, brother, sister, aunt, uncle, niece, nephew, first or second cousin, corresponding in-law, "step" relation, foster parent, foster child, and any member of the employee's household. Domestic partner relatives are covered to the same extent as spousal relatives.

(b) "Personal relationship" means an ongoing romantic or intimate personal relationship that can include, but is not limited to, dating, living together or being a partner or significant other. This definition applies regardless of gender, gender identification, or sexual orientation of the individuals in the relationship. This restric-tion does not extend to friends, acquaintances

or former colleagues who are not otherwise encompassed in the scope of "personal relationships."

### SECTION 13. *Prohibited Conduct.*

The following general principles will apply:

(a) Applications for employment by relatives and those who have a personal relationship with a covered individual will be evaluated on the same qualification standards used to assess other applicants. Transmission to the appropriate hiring authority of applications on behalf of individuals who have a family or personal relationship shall not in itself constitute an attempt to influence hiring decisions. Further input into the application process, however, may be deemed improper.

(b) Covered individuals will not make hiring decisions about their relatives or persons with whom they have a personal relationship, or attempt to influence hiring decisions made by others.

(c) Supervisory employees shall not directly supervise a relative or a person with whom they have a personal relationship. In the absence of a direct reporting or supervisor-to-subordinate relationship, relatives or employees who have a family or personal relationship generally are permitted to work in the same department, provided that there are no particular operational difficulties.

---

(d) Covered individuals shall not make work-related decisions, or participate in or provide input into work-related decisions made by others, involving relatives or employees with whom they have a personal relationship, even if they do not directly supervise that individual. Prohibited decisions include, but are not limited to, decisions about hiring, wages, hours, benefits, assignments, evaluations, training, discipline, promotions, and transfers.

(e) To ensure compliance with this Section, all covered individuals must disclose to the Ethics Ombudsperson or the Affiliate Ethics Liaison, as appropriate, any relationships covered by this Section in accordance with Section 3(b) of this Code.

### PART F: ENFORCEMENT

### SECTION 14. *Ethics Officer.*

The office of the Ethics Officer is established to provide independent assistance to SEIU in the implementation and enforcement of the Code. The Ethics Officer shall be an individual of unimpeachable integrity and reputation, preferably with experience in ethics, law enforcement and the workings of the labor movement. The Ethics Officer shall provide his or her services under contract and shall not be an employee of the International Union or any of its Affiliates. The Ethics Officer shall be appointed by the International President and confirmed by the International Executive Board. The International President, the International Secretary-

Treasurer, and the SEIU International Executive Board may refer matters concerning the Code to the Ethics Officer for review and/or advice, consistent with Sections 22 and 23.

### SECTION 15. *Ethics Ombudsperson.*

The office of SEIU Ethics Ombudsperson is established to oversee implementation and enforcement of the Code and ongoing efforts to strengthen the ethical culture throughout the Union. The Ethics Ombudsperson is responsible for providing assistance to the International Union and Affiliates on questions and concerns relating to the Code and ethical culture; directing the training of SEIU and Affiliate officers and staff concerning the Code and ethical culture; responding to ethics concerns and complaints consistent with Sections 17-23; receiving and resolving disclosures of conflicts of interest; assisting the Ethics Officer; and providing other support as necessary to the overall SEIU ethics program. The Ethics Ombudsperson, in consultation with the Ethics Officer, shall issue a report to the SEIU International Executive Board annually, summarizing compliance, training, enforcement, culture building and related activities, and making recommendations for modifications to the ethics program that he or she believes would enhance the program's effectiveness. The Ethics Ombudsperson may also conduct periodic reviews for the purposes of monitoring compliance with this Code and determining whether partnerships, joint ventures, and arrangements with management organizations conform to this Code, are properly recorded, reflect

reasonable investment or payment for goods and services, further SEIU's tax-exempt purposes, and do not result in inurement, impermissible private benefit, or excess benefit transactions. The Ethics Ombudsperson shall be employed in the SEIU Legal Department.

### SECTION 16. *Affiliate Ethics Liaison.*

Each Affiliate shall appoint an Ethics Liaison who will be available for ethics advice or guidance, will serve as an Affiliate's key contact with the International's Ethics Ombudsperson, will assist in enforcement of the Code, will oversee the delivery of ethics-related training, will assist the Affiliate in strengthening its ethical culture, and will serve as an ethical leader in the Affiliate.

(a) Presidents, chief executive officers, secretary-treasurers, chief financial officers, chiefs of staff, and the equivalent of any of the foregoing are not eligible to serve as Ethics Liaisons.

(b) Affiliates are encouraged to consider rotating the Ethics Liaison position periodically, barring operational difficulties, to develop ethical leadership broadly in the Affiliate. Affiliates shall advise the SEIU Ethics Ombudsperson as soon as practicable of the appointment of Ethics Liaisons and of any vacancy that occurs in the position.

(c) Ethics Liaisons will regularly receive training from the International Union specific to the role. Affiliates should make every effort to ensure the participation of their Ethics Liaisons.

### SECTION 17. *Complaints.*

(a) Any covered individual or member may file a written complaint concerning alleged violations of the Code. Oral concerns and complaints shall be reduced to writing for further processing as a complaint. Complaints should be signed or contain the name of the complainant(s), and shall be kept confidential pursuant to Section 24. Complaints alleging violation of the Code shall not be enforced under SEIU or Affiliate constitutions and bylaws unless they also allege violations of the constitutions and bylaws.

(b) The International Union shall post contact information for submission of ethics complaints on the SEIU website and shall provide that information on request.

(c) Each Affiliate shall provide its staff and membership with contact information for its Ethics Liaison.

### SECTION 18. *Complaints Handled by the International Union.*

Complaints alleging violation of the Code that are submitted to the International Union or the Ethics Officer shall be referred initially to the SEIU Ethics Ombudsperson. The Ethics Ombudsperson shall review ethics complaints submitted to the International Union and shall respond to them in his or her discretion, including but not limited to providing advice or guidance, resolving them informally, directing them to resources outside the ethics office, and referring them to the Ethics Officer

or Affiliate for further processing. The individual submitting the complaint shall be notified of the status of the complaint as appropriate in the discretion of the Ethics Ombudsperson but in all events upon its conclusion.

### SECTION 19. *Complaints Handled by Affiliate; Notice to Ethics Ombudsperson.*

Ethics complaints that are raised with or referred to an Affiliate shall be investigated by the affected Affiliate and, where appropriate, may form the basis of employee discipline or formal internal union charges to be processed before a trial body in accordance with the requirements set forth in the Affiliate's constitution and bylaws and/or the SEIU Constitution and Bylaws. The Ethics Ombudsperson may advise an Affiliate concerning matters related to the investigation and processing of complaints and charges alleging violation of the Code. Where a complaint involves an Affiliate's president, chief executive officer, chief of staff, secretary-treasurer, chief financial officer, or the equivalent, the Affiliate shall notify the Ethics Ombudsperson as soon as practicable. The Ethics Ombudsperson may consult with the Ethics Officer concerning any question referred by an Affiliate.

### SECTION 20. *Failure to Cooperate; Bad Faith Complaints.*

Unreasonable failure by a covered individual to fully cooperate with a proceeding or investigation involving an ethics complaint or alleged violation of this Code shall constitute an independent violation of this Code. SEIU reserves the right, subject to notice,

investigation and due process, to discipline persons who make bad faith, knowingly false, harassing or malicious complaints, reports or inquiries.

### SECTION 21. *Original Jurisdiction.*

(a) *Requests for Original Jurisdiction.* If an Affiliate or an Affiliate executive board member, officer, or member believes that formal internal union charges against a covered individual that also allege violations of this Code involve a situation which may seriously jeopardize the interests of the Affiliate or the International Union, or that the hearing procedure of the Affiliate will not completely protect the interests of the Affiliate, an officer or member, that individual may request that the International President assume original jurisdiction under Article XVII, Section 2(f) of the SEIU Constitution and Bylaws.

*(b) Assumption of Original Jurisdiction by International President.* In accordance with Article XVII, Section 2(f) of the SEIU Constitution and Bylaws, the International President may in his or her discretion assume original jurisdiction of formal internal union charges also alleging violation of this Code if as a result of an investigation he or she believes that the charges filed against a covered individual involve a situation which may seriously jeopardize the interests of the Affiliate or the International Union. In his or her discretion, the International President may refer the matter to the Ethics Officer for a recommendation concerning the possible assumption of original jurisdiction.

### SECTION 22. *Referral of Formal Charges to Ethics Officer.*

If formal internal union charges filed with the International Union under Article XVII, Section 3 of the SEIU Constitution and Bylaws also allege violation of the Code by an officer or executive board member of the International Union or an Affiliate, such charges may be referred to the Ethics Officer for review and recommendations.

### SECTION 23. *Review of Claims by Ethics Officer.*

(a) If after review of the allegations of violations of the Code in a complaint or formal charge, the Ethics Officer finds that the allegations have merit and/or warrant further investigation, he shall recommend a response or course of action for the International Union to respond to the complaint or changes, including but not limited to the following:

  (1) Further investigation by SEIU personnel and/or outside investigator(s);

  (2) Filing of formal charges under Article XVII of the SEIU Constitution and Bylaws;

  (3) Assumption of original jurisdiction by International President pursuant to Article XVII, Section 2(f) of the SEIU Constitution and Bylaws;

  (4) Appointment of an outside hearing officer to conduct a trial under Article XVII, Section 3 of the SEIU Constitution and Bylaws;

  (5) Discipline of covered employees;

(6) Sanction of covered officers or members accused in formal proceedings, and

(7) Other action deemed appropriate in the discretion of the Ethics Officer.

(b) If the Ethics Officer concludes, after review of allegations of violations of the Code, that the allegations are without merit or that further investigation is not necessary, he or she shall advise the International Union of his or her findings.

### PART G: PROTECTION OF WHISTLEBLOWERS

### SECTION 24. *Confidentiality.*

SEIU will make all reasonable efforts to keep confidential the identity of any person(s) raising an ethics concern, inquiry, report or complaint under the Code unless disclosure is authorized by the complainant or is required for SEIU to carry out its fiduciary or legal duties. SEIU will also treat communications concerning ethics complaints or concerns with as much confidentiality and discretion as possible, provided that it remains able to conduct a complete and fair investigation, carry out its fiduciary and legal duties, and review its operations as necessary.

### SECTION 25. *No Retaliation.*

SEIU encourages all officers and employees to bring ethics concerns and complaints that the Code has been violated to the attention of the Union, as set forth more fully in PART F above.

(a) SEIU expressly prohibits retaliation against covered individuals and members for:

(1) Making good faith complaints, reports or inquiries pursuant to this Code;

(2) Opposing any practice prohibited by the Code;

(3) Providing evidence, testimony or information relative to, or otherwise cooperating with, any investigation or enforcement process of the Code; and

(4) Otherwise participating in the enforcement process set forth in PART F above.

(b) In particular, SEIU will not tolerate any form of retaliation against Affiliate Ethics Liaisons for performing their responsibilities.

(c) Any act of alleged retaliation should be reported to the SEIU Ethics Ombudsperson or the Affiliate Ethics Liaison immediately and will be responded to promptly.

**Approved by the SEIU International Executive Board, June 13, 2009**

**Approved by the SEIU International Executive Board as revised, January 21, 2016**



**National Office**
10-27 46th Avenue, Suite 300-2
Long Island City, NY 11101
**(212) 356-8100**
e-mail: info@cirseiu.org

# Exhibit B





# TRANS RIGHTS ARE UNDER ATTACK—WE'RE STANDING UP.

This Pride Month, we reaffirm our commitment to trans rights, gender-affirming care, and inclusive healthcare for all.



**cirseiu** • Follow

**cirseiu** 17w
🏳️‍⚧️ Trans rights are under attack—and CIR is standing up.

This Pride Month, we reaffirm our unwavering support for our transgender and gender-diverse members, patients, and communities.

The Trump administration's recent efforts to roll back gender-affirming care are dangerous, unscientific, and in direct violation of our values as healthcare providers. These attacks not only harm patients—they threaten the physicians who care for them.

CIR is committed to defending access to inclusive, evidence-based, life-saving healthcare for all. We will continue to fight for dignity, equality, and the right to gender-affirming care.

   

**176 likes**
June 4

Log in to like or comment.



# CIR EC STATEMENT IN SUPPORT OF TRANSGENDER RIGHTS

We are the Committee of Interns and Residents, the largest union of resident and fellow physicians in the country, and we strongly condemn the Trump administration's attacks against our transgender and gender-diverse community members. Recent federal actions have directed hospitals and providers to abandon established medical standards of care for transgender patients in favor of guidance that explicitly states it should not be used as clinical guidelines. These coordinated efforts represent an irresponsible, dangerous escalation in withholding resources and support to the people who need it most. It is also targeting healthcare providers directly and discrediting fact-based medical information, underscoring the need for collective support and solidarity within the medical community.

From Day 1, this administration has marginalized transgender and gender-diverse individuals in a concerted campaign. This began with an <u>executive order</u> signed on Inauguration Day, falsely recognizing the existence of only two sexes as assigned at birth and directing a wide swath of government agencies to deny transgender and nonbinary individuals' existence.

 **cirseiu** · Follow    •••

**cirseiu**  17w

🏳️‍⚧️ Trans rights are under attack—and CIR is standing up.

This Pride Month, we reaffirm our unwavering support for our transgender and gender-diverse members, patients, and communities.

The Trump administration's recent efforts to roll back gender-affirming care are dangerous, unscientific, and in direct violation of our values as healthcare providers. These attacks not only harm patients—they threaten the physicians who care for them.

CIR is committed to defending access to inclusive, evidence-based, life-saving healthcare for all. We will continue to fight for dignity, equality, and the right to gender-affirming care

   

**176 likes**

June 4

Log in to like or comment.



Failing to recognize intersex and gender-diverse individuals is not only discriminatory, but is entirely inconsistent with the scientific consensus on sex and gender. A subsequent executive order signed by President Trump intends to withhold federal funds for healthcare agencies providing gender-affirming care to adolescent patients. These actions together seriously threaten our ability to provide inclusive and evidence-based care to our patients.

The Trump administration's policies have already had devastating impacts on patients and families, with some hospitals suspending their programs providing gender-affirming care for transgender youth. In response, a broad coalition of medical societies has voiced support for gender-diverse adolescents' right to receive gender-affirming care without interference, acknowledging it as part of the standard of care for this population. This standard of care is based on a widely available body of evidence showing the benefits of gender-affirming interventions in improving psychological well-being, reducing depression and anxiety, mitigating body dissatisfaction, and decreasing suicidality.



---

cirseiu · Follow

 cirseiu 17w

🏳️‍⚧️ Trans rights are under attack—and CIR is standing up.

This Pride Month, we reaffirm our unwavering support for our transgender and gender-diverse members, patients, and communities.

The Trump administration's recent efforts to roll back gender-affirming care are dangerous, unscientific, and in direct violation of our values as healthcare providers. These attacks not only harm patients—they threaten the physicians who care for them.

CIR is committed to defending access to inclusive, evidence-based, life-saving healthcare for all. We will continue to fight for dignity, equality, and the right to gender-affirming care.

     

176 likes

June 4

Log in to like or comment.



 cirseiu · **Follow**  ···

 **cirseiu** 17w

CIR is committed to supporting access to gender-affirming care on the legislative and healthcare institutional levels. We remain steadfast in only endorsing political candidates who share these values and pledge to defend gender-affirming care from attacks by the Trump administration and other lawmakers. We reaffirm our commitment to providing representation to residents and fellows who are subject to discipline for providing evidence-based gender-affirming care.

🏳️‍⚧️ Trans rights are under attack—and CIR is standing up.

This Pride Month, we reaffirm our unwavering support for our transgender and gender-diverse members, patients, and communities.

The Trump administration's recent efforts to roll back gender-affirming care are dangerous, unscientific, and in direct violation of our values as healthcare providers. These attacks not only harm patients—they threaten the physicians who care for them.

CIR supports patients' and their families' access to the full range of evidence-based gender-affirming care options, including hormone therapy, puberty blockade, fertility preservation, and gender-affirming surgeries. We stand in solidarity with our transgender and gender-diverse members, friends, family, neighbors, and patients who have been affected by this administration's actions, as well as our many member physicians and colleagues who continue to provide this life-saving care to our communities. We remain steadfast in our commitment to advocating for dignity, equality, and the fundamental right to access inclusive, life-saving healthcare for all.

CIR is committed to defending access to inclusive, evidence-based, life-saving healthcare for all. We will continue to fight for dignity, equality, and the right to gender-affirming care

*XXX*

     

**176 likes**

June 4

Log in to like or comment.