UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, et al., <br><br> Defendants. | Case No. 3:25-cv-07864-RFL <br><br> **DECLARATION OF DR. JOSEPH SHEMUEL** |

# DECLARATION OF JOSEPH SHEMUEL

I, Dr. Joseph Shemuel, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Joseph Shemuel, M.D., and I currently reside in the State of California. I am currently employed as a resident physician in Internal Medicine, Primary Care at the University of California, Davis Health ("UC Davis"). I have personal knowledge of the facts contained in this declaration. If called as a witness, I am competent to testify to these facts.

2. I am submitting this declaration in support of Plaintiffs' Motion for a Preliminary Injunction. I am submitting this declaration in my individual capacity and not on behalf of my employer.

3. I am a physician by training. I received my M.D. from the University of California, San Francisco in 2024.

4. I am a member in good standing of the Committee of Interns and Residents, SEIU ("CIR"). Last year, I was an elected delegate to the CIR House of Delegates. This year, I am a CIR departmental representative for Internal Medicine at UC Davis.

5. I am aware that President Trump and his administration have taken a series of actions to try to remove from university campuses diversity, equity, and inclusion ("DEI") programs and other topics and viewpoints they disfavor, including what the administration has described as "woke gender ideology," but which I understand to include the provision of gender-affirming care.

6. I am aware that on or around July 30-August 1, the Trump administration suspended more than $500 million in federal funding for the University of California, Los Angeles ("UCLA"). It is my understanding that the Trump administration is investigating the University of California ("UC") for alleged antisemitism and other alleged violations of Title VI, Title VII, and Title IX, and has cited these pending investigations and/or the UC's alleged policies regarding race and transgender people, as the basis for the suspension of federal funds from UCLA.

7. It is also my understanding that the Trump administration is demanding, as a condition of restoring the suspended federal funds, that the UC Regents pay at least $1 billion to the federal government and agree to a host of programmatic demands that would harm transgender and other members of the UC community. Specifically, I am aware that the Trump administration issued a

demand letter to the UC that reportedly includes demands that the UC stop providing gender-affirming care to transgender minors, although a copy of the demand letter has not been publicly shared.

8. I understand that the Trump administration has threatened to cut more federal funds from the UC if it does not comply with the administration's demands. I am also aware that the Trump administration has previously targeted other universities with similar threats and demands.

9. I currently provide gender-affirming care to my patients. My patients are typically aged 18 and older. However, my practice could include providing gender-affirming care to patients younger than 18 if, for example, a 17-year old patient was living independently from their parents or guardians and no longer wanted to see a pediatrician. I am not a surgeon and therefore do not provide gender-affirming surgeries. In my practice, I prescribe various medical treatments, including hormones and other pharmaceuticals (collectively, "gender-affirming medical therapy") which are considered non-exhaustive components of a broader range of gender-affirming medical care. These pharmaceutical treatments are typically prescribed to help patients achieve what we call their phenotypic goals; that is, to align their outward appearance with their internal gender identity, among other purposes.

10. If I was not able to prescribe gender-affirming medical therapy, including hormones, to some or all of my patients, I would be irreparably harmed. My patients would suffer, and my practice would fail to comply with relevant standards of care.

11. It is my understanding that all major medical associations and professional societies of physicians promote and support gender-affirming medical therapy as the accepted treatment for transgender patients, including transgender minors. Proper treatment and evidence-based care is proven to improve the mental health and wellbeing of transgender people and increase their trust in the medical profession in a way that encourages them to access medical care more generally. For example, in addition to receiving gender-affirming medical therapy, transgender patients should feel comfortable and supported seeking out primary care for prevention and treatment of chronic conditions such as high cholesterol, diabetes, high blood pressure, liver disease, kidney disease, heart disease, etc. In my professional experience, transgender people who have negative experiences with the medical industry around their gender identity often avoid otherwise necessary health care. If the UC were to acquiesce to the Trump administration's demands and disavow the existence of transgender people, I

would be immediately concerned that transgender patients would feel ostracized and engage in healthcare avoidance, which is associated with worse outcomes across the board, especially for patients already living with chronic conditions.

12. If some or all of my patients were unable to access gender-affirming medical therapy as a result of UC's acquiescence in the Trump administration's demands, there would be immediate and long-term harms to them and to my ability to practice my profession. It could quickly put my patients in danger in the community if, as a result of being unable to obtain their gender-affirming treatment, they were to fail "to pass" in their gender identity. The changes that would result from the withdrawal of gender affirming care could also put them in danger of facing discrimination, for example, loss of employment or housing. These effects would be even more devastating for members of the transgender community who are already homeless, living in poverty, chronically ill, disabled, or otherwise marginalized. We know from states that have recently banned gender-affirming care that when patients are abruptly cut off from these life-saving treatments their risk of suicidality increases. I would also be concerned that, if my patients were unable to get medicine from me or other UC physicians in our area of California, they might be forced to seek out hormone treatments through non-prescribed means, the risks of which are three-fold: 1) illicitly purchased hormones may contain contaminants or be diluted, 2) without ongoing care and lab monitoring, blood concentrations of hormones may become too low to be effective or so high that they are unsafe, and 3) restricted access to the sterile injection equipment necessary to administer certain hormones may lead to needle sharing and non-sterile injection practices, which increase the risk of hepatitis B, hepatitis C, HIV, and bacterial and fungal bloodstream infections, which can be fatal.

//
//
//
//
//
//
//

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 4, 2025 in Sacramento, California.

Signed: _____

Dr. Joseph Shemuel, M.D.

Resident Physician

DECL. OF JOSEPH SHEMUEL

5

Case No. 3:25-cv-07864-RFL