1
2
3
4
5
6
7

8  UNITED STATES DISTRICT COURT

9  NORTHERN DISTRICT OF CALIFORNIA

10
11  AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS, et al.,
12
             Plaintiffs,
13
         v.
14
DONALD J. TRUMP, in his official capacity
15  as President of the United States, et al.,

16            Defendants.

Case No. 3:25-cv-07864-RFL

**DECLARATION OF SANGHYUK SHIN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Sanghyuk Shin, declare as follows:

1. I am a Professor at the University of California, Irvine ("UC Irvine" or "UCI") Sue & Bill Gross School of Nursing.

2. I received my Bachelor of Science from the University of California, Los Angeles ("UCLA") California, my Master of Science in Epidemiology from the Harvard School of Public Health, and my Doctor of Philosophy in Public Health through the Joint Doctoral Program at the University of California, San Diego and San Diego State University.

3. I am over the age of 18 and competent to testify as to the matters set forth in this affidavit based on my personal knowledge.

4. My research focuses on infectious disease epidemiology, genomic epidemiology, social determinants of health, and global health. My work involves critical applications of social and structural frameworks to understand population health, including concepts such as health and human rights, settler colonialism, and structural racism. I have regularly taught these topics in my classes at UCI.

5. As part of my research, I have been conducting tuberculosis (TB) and HIV epidemiology research in Botswana, India, and the United States for over 10 years. Currently, I serve as Principal Investigator of two epidemiology research studies. These projects examine TB and SARS-CoV-2 among individuals and communities affected by HIV.

6. The studies are funded by grants from the National Institutes of Health ("NIH"). These grants have totaled over $5.7 million over five years. The NIH awards have been invaluable for advancing the science of infectious disease epidemiology among marginalized populations. My NIH-funded research has expanded the understanding of using and leveraging tuberculosis and infectious disease genetics and geo-spatial data to identify transmission and disease outbreaks. Moreover, multiple students rely on these grants for their employment and education. As of October 2025, I have seven students on the grants.

7. I also serve as lead statistician for multiple studies at the UCI Sue & Bill Gross School of Nursing.

8. More recently, I have collaborated with Palestinian scholars on public health research projects related to Palestine.

1

9. I am a member of the Irvine Faculty Association ("IFA"), an independent organization that represents faculty members at UCI and that belongs to the Council of UC Faculty Associations ("CUCFA").

10. I am aware that the current Trump Administration has taken a series of actions targeting the UC system and its member institutions. These include (1) an investigation into alleged antisemitism across the UC system and that the investigation opened this spring, (2) $584 million worth of arbitrary funding cuts at the University of California, Los Angeles ("UCLA"), and (3) a Demand Letter issued on August 8th seeking $1.2 billion in fines and a series of harmful policy changes.

11. I am aware that the Demands made of the UC system are vaguely defined but stem from a months-long probe into allegations of antisemitism at multiple campuses across the UC system. Furthermore, I am aware that the Demands include mandates against UCLA requiring the review of admissions and employment policies relating to Diversity, Equity, and Inclusion ("DEI"), time/place/manner restrictions on forums for protesting, the prohibition of overnight demonstrations, and the enforcement of a vaguely defined mask ban against protestors. The Demands also include measures that would require international students to confirm that they are not "anti-Western" prior to admission to UCLA. The letter also stated that UC would have to pay for an outside monitor to ensure that the entire system has met the Demands. While I am aware that some of the Demands focused on UCLA, I know that any changes to the freedom of expression policies must be implemented across the entire UC system.

12. I am aware that the Trump Administration has similarly threatened other universities and has followed through on its threats by pulling federal funds from Harvard, Columbia, Brown, and the University of Pennsylvania and demanding suppression of disfavored views on those campuses.

13. I am aware that members of Trump Administration have called upon private citizens to "report" on faculty, students, co-workers expressing disfavored views.

14. I am aware that UC is already taking actions to accede to the Trump Administration's Demands. This includes UC Berkeley's decision to release the names of 160 faculty and staff members who were mentioned in documents concerning complaints of antisemitism. Their names were shared with the U.S. Department of Education after the Department made a documents request relating to

DECLARATION OF SANGHYUK SHIN IN SUPPORT OF                                                   Case No. 3:25-cv-07864-RFL
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

alleged Title VI violations and investigations. UC Berkeley informed the individuals whose names were provided to the government. I am deeply concerned about the intimidation of faculty and staff who support activism on campus. I am nervous that—given the Trump Administration's current targeting of the UC system—other campuses have already disclosed or will disclose the names of faculty and staff who have participated in protests and political speech in support of Palestinian rights.

15. As someone who has engaged in research on public health issues relating to Palestine and who has participated in peaceful protests in support of Palestinian rights, the prospect UCI divulging my name and contact information to the federal government is nerve-wracking. Because of the pressure on UC campuses, my own students have asked me if I am safe.

16. The Trump Administration's funding cuts at UCLA and its August 8th Demand Letter have created a chilling environment and a climate of fear at UCI, restricting my ability to fully exercise my academic freedom and right to free speech. This quarter, I have been experiencing significant mental and physical distress when teaching on Palestine, settler colonialism, structural racism, and critical public health concepts because these are topics disfavored by the Trump Administration. These are core aspects of my scholarship and important topics for my students to learn about and grapple with systems and policies that can result in public health crises, illness, and disease. If I cannot fully discuss these factors, students will not be exposed to these concepts and will not be fully trained to analyze public health issues. Before the Administration's targeting of UC, I did not feel stress teaching these topics and frequently discussed them in class. But now, I am changing the language that I use to teach these subjects because I do not want to be reported to the federal government or investigated by an outside monitor if the Trump Administration implements the policies in its Demand Letter. These forced changes to my speech and language diminish the quality of my teaching and of our classroom discussions.

17. Because of the Trump Administration's pressure on the UC, I have stopped publicizing my students' work on Palestine. Prior to the Administration's targeting of UC, I would celebrate my students and publicize their work whenever their research papers were accepted at public health conferences. This would include social media posts and other media outreach. However, considering the Administration's investigation of UC campuses for complaints relating to alleged antisemitism and the Administration's emboldening of third parties to attack students for working on issues related to

Palestine, I now refrain from sharing or promoting their Palestine-related scholarly work. This means my students who research Palestine do not have the same opportunities to have their work seen and recognized by others in the field and, as a result, these students miss out on opportunities to connect with scholars who are also engaging with these critical public health challenges. This chilling of my speech irreparably harms me as their professor and irreparably harms students seeking careers in the field. My fear has intensified since the August 8th Demand Letter was issued. Now, the prospect of acquiescence to the Administration's Demands makes me think twice about where I can publish my work. For example, in mid-September 2025, my students, my Palestinian colleague, and I were discussing where we could publish a public health paper relating to Palestine. We had to consider which outlet would reduce the risk of doxxing and retaliation. The students are concerned about being harassed by third party organizations that have been emboldened by the Trump Administration to target people for any work relating to Palestine. These concerns have only been heightened because of the Administration's pressure on UC.

18. The Trump Administration's pressure on UC has also caused me to self-censor out of fear that we may be the people who cause the Administration to defund UC. At a protest in early September against UC's collaboration with Israeli institutions, a faculty member asked me and other protestors to stop protesting because our speech might upset the Trump Administration and result in funding cuts for UC. I am afraid that we will be blamed for Trump's attacks, and nobody wants to be blamed for costing the University $1 billion. The pressure on UC will continue to negatively affect my Palestine-related speech and research.

19. UCI's recent actions that align with the Administration's Demands have further chilled my speech on campus. In late August, following the Demand Letter and the specific Demand that UCLA review its DEI programs, my department changed the name of their "DEI" office (Diversity, Equity, Inclusion, and Belonging). No faculty had any input in the decision. Now, the office is called "Culture and Community Engagement." On August 31, after hearing about the name change, I questioned department administrators about why that change was made and why faculty did not have any voice in the decision. They did not answer the question. That change has dissuaded me from using certain terminology and language based on whether it would be accepted by UCI and the broader UC system. It

seems like UCI is acquiescing to the Demands with these changes, which creates an environment in which I need to carefully consider what language I can use to teach my areas of study and expertise without attracting unwanted attention from the Administration.

20. I am also nervous that because of the Trump Administration's pressure on the UC system, UCI will not protect me if the Administration retaliates against me for my research and advocacy on Palestine. I have several grants that are funded by the federal government. I believe that the Trump Administration could foreseeably try to cancel or suspend my grants because of my advocacy for Palestine. If my grants are cancelled, it will harm student workers who rely on my projects for income and scientific training. At the same time, I fear that the Administration's pressure on UC will cause the University to be too afraid to protect me and my research when it would. This fear is leading me to self-censor in the ways I described above.

21. Because of the Trump Administration's pressure to target those who seemingly possess anti-Western bias, I fear for the safety of my students. I teach and work with international students. While the Demands concern students at UCLA, I believe that it is foreseeable that UC would have to adopt any policy that changes admissions criteria systemwide. And if students could be punished for violating this pledge, I would hesitate to work with international students on public health research relating to Palestine and other topics that could be seen as "anti-Western."

22. Furthermore, the payment of a billion-dollar fine would result in wide-ranging effects on UC's budget that could harm my ability to teach. The payment of a billion-dollar fine would also increase faculty workloads because UC would likely have to eliminate teaching assistant positions to afford it. Acquiescing to this Demand would also deplete other resources for teaching and mentorship across the UC system.

23. The pressure on UC to accept appointment of an outside monitor is further causing me to self-censor my speech. The prospect of an outside monitor makes me very careful about the language I use in the classroom, which in turn prevents me from using the correct terminology to discuss public health problems and my field of study. For example, "settler colonialism" and "racialization" are critical terms for describing the full scope of health problems facing indigenous communities and the scholarship on these issues. If I cannot use these terms because of the threat of retaliation by the federal government,

5

then my teaching of the scholarship and of these concepts is harmed. And the appointment of a monitor would increase my self-censorship. It would make me pick and choose projects based on the risk of interference from the monitor or a federal government official.

24. The actions that the Administration has taken against other universities gives credibility to the Administration's threats against UC and causes me to expect that those threats will be carried out against UC campuses systemwide unless enjoined.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 6th day of October, 2025.

Sanghyuk Shin
Professor
University of California, Irvine Sue & Bill Gross School of Nursing