1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9                   NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, et al., | Case No. 3:25-cv-07864-RFL |
| Plaintiffs, | **DECLARATION OF TODD WOLFSON** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |

Docusign Envelope ID: A21945C4-B4D6-4DD1-9CC6-BCDA81BFD406

I, Todd Wolfson, hereby declare as follows:

1. I currently serve as President of the American Association of University Professors ("AAUP"), a plaintiff in this action. I have served in that position since June 2024. I also previously held various leadership roles for the Rutgers University chapter of AAUP, including as the chapter's President and Vice President.

2. I am also a trained anthropologist and an Associate Professor of Journalism and Media Studies at Rutgers. I received my Ph.D. in Anthropology and Social and Cultural Foundations of Education from the University of Pennsylvania.

3. I have personal knowledge of the facts set forth in this declaration in support of Plaintiff's Motion for Preliminary Injunction, and if called as a witness in this action, I could and would testify competently to these facts.

4. The AAUP is a membership association and labor union of faculty and academic professionals with chapters at colleges and universities throughout the country.

5. The AAUP is a 501(c)(6) organization headquartered in Washington, D.C.

6. The AAUP became an affiliated national regional council of the American Federation of Teachers ("AFT") on August 1, 2022. As a result of that affiliation, all AAUP members are also AFT members, with the full rights and privileges of all AFT members.

7. The primary mission of the AAUP is to advance academic freedom and shared governance in higher education, define fundamental professional values and standards for higher education, promote the economic security of academic workers, and ensure higher education's contribution to the common good.

8. The AAUP was founded by John Dewey and other preeminent scholars in 1915 to defend the ability of scholars, researchers, and educators to teach, write, and research without political and economic retaliation based on their viewpoints. Since its founding, the AAUP has helped to shape American higher education by developing the standards and procedures that maintain quality in education and academic freedom in this country's colleges and universities.

**Harms to AAUP's Members**

9. The AAUP has approximately 50,000 members on college and university campuses across the country, including approximately 550 members across the ten campuses of the University of California ("UC"). Many of these members, including members at the UC, rely on federal grants to support their research, scholarship, and teaching activities.

10. I am aware of and can identify AAUP members who have been irreparably harmed by the Trump administration's campaign to coerce the UC into agreeing to a host of demands affecting the rights of faculty members, including by unlawfully suspending federal grant funds and threatening further funding suspensions.

11. Specifically, I am aware of and can identify AAUP members who have been irreparably harmed by the Trump administration's abrupt and indefinite suspension of $584 million in federal grants issued to UCLA by the National Institutes of Health ("NIH"), National Science Foundation ("NSF"), and Department of Energy ("DOE") on or around July 30, 2025, and who face ongoing irreparable harms to their research, work, reputation, and ability to pursue their careers and work as a result of the suspension of that funding. Although at least some of the July 30, 2025 suspensions have been reversed as a result of orders issued by a federal court on August 12, 2025 and September 22, 2025, I am aware that the ongoing effects of the pause in funding and the continuing uncertainty about the long-term viability of essential grant funding are continuing to irreparably harm many AAUP members.

12. I am also aware of and can identify AAUP members who are being irreparably harmed by the Trump administration's threat to terminate or suspend additional federal funding unless the UC agrees to its demands. Many of these AAUP members are suffering irreparable harm as a direct result of the Trump administration's credible threats to cut additional federal funds, including because their ability to continue their work is now uncertain, making it difficult to plan, maintain professional relationships, and recruit potential staff to work on their projects. These AAUP members will suffer irreparable harm to their research, work, reputation, and ability to pursue their careers and work if the federal government cancels their federal grant funding.

13. I am aware of and can identify AAUP members at the UC who are restricting their own speech, both inside and outside the classroom, as well as members who have modified the substantive

content of their research, as a result of the Trump administration's coercive campaign against the UC. AAUP has members who understand, based on comments and official actions by members of the Trump administration, that certain perspectives on topics like environmental justice, gender, race, immigration, and Israel-Palestine relations are disfavored by the administration. There are AAUP members who are worried that any discussion of these topics that could arguably be deemed not to align with the administration's position risks serious personal and professional harm—either directly at the hands of the Trump administration as part of its campaign to coerce the UC system or by the UC, in an effort to preserve the UC's federal funding in the face of the Trump administration's threats. AAUP has members who are self-censoring both their professional speech and their personal contributions to public discourse because they fear that, if they do not, they are imperiling their own livelihoods and academic careers and those of their colleagues.

14. AAUP also has members who would be directly and irreparably harmed if the UC capitulates to the demands articulated by the Trump administration in its August 8, 2025 demand letter. For example, AAUP has members who wish to engage in demonstrations on campus and would be restricted by the changes to protest rights sought by the administration. Further, AAUP has members whose teaching and research address topics from perspectives the Trump administration disfavors, including environmental justice, Israel-Palestine relations, and ethnic studies, and these members' free speech and academic freedom would be adversely impacted by the presence of a monitor imposed under a settlement with the Trump administration. Based on the subject matter of their scholarship, teaching, or other work, some of these AAUP members would also likely be harmed by the demanded review of policies and programs related to diversity, equity, and inclusion efforts.

### Harms to AAUP as an Organization

15. The Trump administration's coercion campaign against the UC—including the unlawful cancellation of $584 million in NIH, NSF, and DOE funding to UCLA and the demand to pay $1.2 billion and implement a host of measures that would impact the rights of UC faculty to forestall further federal funding cuts—has harmed and is continuing to harm AAUP as an organization.

16. As noted above, the primary mission of the AAUP is to advance academic freedom and shared governance in higher education, define fundamental professional values and standards for higher

1  education, promote the economic security of academic workers, and ensure higher education's
2  contribution to the common good. The Trump administration's sudden, unlawful cancellation of $584
3  million dollars at UCLA and threats to cancel more federal funding at UC and other universities and
4  colleges are directly impairing the AAUP's mission.

5    17. As part of its core activities, the AAUP regularly consults, works with, and provides
6  guidance to local chapters and individual members regarding academic freedom, shared governance, and
7  other issues involving the employment relationship between AAUP members and their university
8  employers, including but not limited to collective bargaining.

9    18. For example, the AAUP maintains a standing committee, known as Committee A on
10 Academic Freedom and Tenure, which "[p]romotes principles of academic freedom, tenure, and due
11 process in higher education through the development of policy documents and reports relating to these
12 subjects and the application of those principles to particular situations that are brought to its attention."

13   19. The AAUP also conducts investigations of individual complaints of institutions violating
14 academic freedom principles in relationship to AAUP members, issues reports of the results of some of
15 those investigations, and advocates with those institutions to seek to remedy such violations and prevent
16 future violations from occurring. Such investigations are authorized by the AAUP Executive Director
17 and conducted by a subcommittee appointed by the Executive Director.

18   20. Through its local chapters, the AAUP also advocates for the representation of individual
19 members regarding academic freedom, shared governance, and due process issues in proceedings before
20 their university employers.

21   21. Recently, for example, AAUP prepared a letter to the UC Office of the President urging
22 the University not to release the personally identifiable information of faculty, students, and staff in
23 response to the Trump administration's information requests directed to UC and to implement harm-
24 reduction measures to protect those at UC Berkeley whose information UC recently released. A true and
25 correct copy of that letter is attached hereto as **Exhibit A**.

26   22. I understand that Titles VI and IX and their implementing regulations require the
27 government to provide notice and a hearing, followed by a finding on the record, before terminating
28 federal funding to any program or part thereof based on a violation of Title VI or IX. I understand that

the government did not provide adequate notice, or hold any hearing or provide any opportunity to be heard, before terminating $584 million in federal funding to the UC. If the government had provided adequate notice and held a hearing as required, both the AAUP and individual AAUP members would have sought to participate in that hearing directly or as amici curiae, as permitted by the applicable regulations, to protect the federal funding supporting the work of AAUP members at the UC and to protect the principles of academic freedom, due process, and shared governance that are at the core of the AAUP's mission.

23. The Trump administration's suspension of NIH, NSF, and DOE grant funds to UCLA on or around July 30, 2025, its threats to suspend additional federal funds directed to the UC, and its demand to pay $1.2 billion and implement a host of programmatic demands, disrupt and frustrate the AAUP's efforts to secure principles of academic freedom, shared governance, and due process at the UC and elsewhere.

24. The government's actions and statements have made it more difficult and resource-intensive for the AAUP to carry out its work for chapters and individual members, in particular on issues of academic freedom. Because of government pressure on the UC and other universities to abandon their commitment to academic freedom, shared governance, and due process principles, the AAUP must now expend more time and money to ensure that its members' rights in these regards are protected.

25. The Trump Administration's indefinite funding suspension at UCLA and threats to cancel more funding at the UC, as well as other universities and colleges, also make it harder for the AAUP to achieve its goals of promoting academic freedom, shared governance, and due process principles in part because the UC has taken steps in direct response to the Trump administration's actions to undermine those principles, and the UC and other higher educational institutions are less willing now to protect those principles in the face of threatened funding cuts from the federal government. The Trump administration has directly impaired the AAUP's mission by pressuring the UC to curtail speech and academic freedom on campus.

26. For example, in response to the significant influx of inquiries from chapter leaders and members regarding the effect of the government's actions on members' academic freedom, shared governance, and due process rights, and to ensure that individual members are adequately represented

before their university employers, AAUP staff have had to conduct nationwide calls and virtual meetings with chapter leaders regarding the government's actions and how to represent individual members in the face of such actions.

27. The AAUP has sent staff who would otherwise be performing other duties to UCLA to support the UCLA Faculty Association. And AAUP leadership has diverted a great deal of time and resources to supporting faculty across the UCs who are facing the challenges posed by the Trump administration's threats and funding cuts, and the UC's actions in response to those threats and funding cuts.

28. AAUP also anticipates that it will need to make significantly greater expenditures from its Defense Fund to provide for the legal representation of individual members as a direct result of the Trump administration's actions against UC.

29. The government's actions and statements have also caused a pervasive sense of fear and intimidation among AAUP members. Because of the government's conduct and the threats of further cuts to research funding, I am aware that some AAUP members no longer feel comfortable participating in and supporting the AAUP's activities, or asserting their academic freedom, shared governance, and due process rights. As just some examples, in direct response to the government's cuts of federal funding to the UC and threats to cut additional federal funding to UC and to other universities, some AAUP members at universities across the country have cancelled conferences, pulled papers set for publication, decided not to teach classes or certain topics within those classes that may be perceived as being at odds with the Trump administration's preferred viewpoints, stopped attending talks, refrained from attending lawful protests, and stepped down from their AAUP chapter board.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 9 day of October, 2025.

*Todd Wolfson*

Todd Wolfson

# EXHIBIT A



555 New Jersey Ave., NW, Suite 600, Washington, DC 20001
**PHONE:** 202.737.5900 • www.aaup.org

September 25, 2025

James Milliken
President, University of California
1111 Franklin Street, 12th Floor, Oakland, CA 94607

Charles Robinson
General Counsel, University of California
1111 Franklin Street, 8th Floor
Oakland, CA 94607

Dear President Milliken and General Counsel Robinson:

We understand that your office has instructed the UC campuses to provide the U.S. Department of Education's Office for Civil Rights (OCR) with personally identifiable information (PII) of numerous UC faculty, students, and staff by September 30. That information will include the names of all of those about whom a complaint of discrimination has been made by any individual, even if the University has investigated the complaint and found it to be unfounded, and even absent any particular reason to believe the University was incorrect in its determination of a particular case.

This broad release of personal information places members of the University community at great risk of government and private harassment, and it is not necessary to meet the University's obligations under federal law. **We urge the University not to engage in such a broad release of information. And where the University has already done so, or intends to do so in the future, it must immediately implement harm-reduction measures to protect faculty, staff, and students from unwarranted consequences.**

On September 15, the Berkeley Faculty Association and the American Association of University Professors [wrote](#) to protest the Berkeley campus's sharing of PII with OCR. By writing directly to you today, we wish to emphasize that the system-wide release of this personal information across multiple UC campuses will risk gratuitous, serious harm to members of the University community.

First, as an earlier AAUP letter [explained](#) in detail, there is nothing in Title VI that requires higher education institutions generally to provide OCR with the names either of those who filed complaints of discrimination with the schools or those who are identified in such complaints. OCR's role is to ensure that recipients of federal financial assistance–that is, the schools themselves–are taking appropriate action to prevent, detect, and respond to discrimination within their programs. OCR's role is *not* to

determine whether an individual employee of a school engaged in discrimination. OCR may seek records from universities to determine whether they have complied with their obligations, but the agency's own procedures have long required it to seek de-identified data where possible, in order to protect legitimate privacy concerns. Only where there is some particular reason to think that a university failed to comply with its obligations in investigating a specific complaint should the school provide personally identifiable information–and it should then do so only as appropriate to allow OCR to assess its handling of that specific complaint.

The broad-scale release of the names of everyone who has filed, or been identified in, a complaint of discrimination–no matter how unfounded the complaint has proved to be– goes significantly beyond any legitimate inquiry. And it threatens serious harm to those who were named, putting them at risk of adverse immigration action, doxxing, and harassment–all of which will significantly chill the exercise of First Amendment rights by members of the University community.

We understand that the University takes the position that it is bound to provide PII by the terms of a voluntary resolution agreement it entered into with OCR in December 2024. That agreement purports to require the University to provide OCR with a spreadsheet covering the time period of July 1, 2024, to June 30, 2025, across five campuses (UCLA, UCSB, UCSD, UCD, and UCSC) and providing the names of all complainants and all individuals named in complaints.

The University should never have entered into such an agreement, and it should not extend that agreement to cover any year beyond its current terms. And, given the bad faith that the Trump Administration has exhibited in weaponizing OCR's enforcement tools–a significant new development since the University signed its voluntary resolution agreement–UC should not consider itself bound to provide PII under its auspices.

We note that other major universities that entered into similar agreements with OCR have refused to provide individual names in a spreadsheet because of the risk to privacy and the likelihood of abuse. When Brown (7/8/2024), Harvard (1/17/2025), Emory (1/16/2025), and Muhlenberg (9/30/2024) agreed to share spreadsheets of Title VI complaint details with OCR, in situations with comparable fact patterns, these institutions did not agree to name names. Harvard agreed only to give the government "a unique identifier" in place of a name (Harvard Voluntary Resolution, OCR Complaint No. 01-24-2155); Brown agreed to "use a unique identifier for each individual in place of their name" (2024 Brown Resolution Agreement, OCR Complaint No. 01-24-2116); Emory agreed only to provide "a unique identifier or the name" (Emory Resolution Agreement, OCR Complaint Number 04-24-2178); and Muhlenberg agreed to provide a "name or identifier" (Muhlenberg Resolution Agreement, OCR Complaint Number 03-24-2071). Last month, Brown agreed to unprecedented and unwarranted intrusions into their institutional autonomy, including granting the federal government access to admissions data and student teaching evaluations. But even so, the university agreed

only to use "a unique identifier for each individual in place of their name" on the spreadsheet of complaint details (2025 Brown Resolution Agreement).

These various negotiated agreements establish that OCR has already recognized that they do not need particular details of individual faculty, staff, or students in the majority of cases. Because there is no justifiable reason for UC to voluntarily release these personalized details, the University should not do so.

That is especially true given the Trump Administration's pattern of abuse in the past eight months. Federal courts have ruled that the Administration, including OCR, has: [failed to heed the procedures](#) Congress set forth for enforcing Title VI; invoked assertions of campus antisemitism as a [pretext](#) for punishing dissenting speech; and improperly sought to arrest and [deport members of](#) campus communities for engaging in protected speech. **These rulings, based on conduct that occurred after UC entered into its 2024 voluntary resolution agreement, highlight a significant change of facts that would make providing OCR a broad list of names especially dangerous–and especially chilling of First Amendment rights–in a way that it was not at the time the University signed the agreement.** Especially in light of that significant change–and the significant threat to those individuals who are named in unverified and unsustained complaints–the University must redact any information it provides OCR in the relevant spreadsheet, just as other institutions have.

If, despite all this, UC proceeds in providing unredacted PII to OCR, we believe it is imperative that the University immediately take a number of steps to mitigate the harms the disclosure will cause to members of our community. These steps should include:

- Ensuring all personal information is clearly and repeatedly designated as "personally identifiable information protected under Exemption 6 and not to be disclosed under the Freedom of Information Act," so that OCR does not disclose the names to the public and put individuals at risk of private doxxing and harassment.
- Disclosing only the information specifically identified in the voluntary resolution agreement with the federal government. Notably, that agreement does not purport to require proactive disclosures of personnel files or information related to immigration status.
- In any future submissions to OCR, following the model of Brown, Harvard, Emory, and Muhlenberg and using unique identifiers instead of names, or other redaction strategies, to fulfill legal obligations without compromising personal data.
- Working with CUCFA to develop a set of resources and policies under which the University will provide protection and support for community members to protect them against harassment or doxxing resulting from the (intentional or unintentional) release of personal information.

- Providing referrals to free legal consultations for international community members who may experience retaliation, coercion, or infringement on their rights by the federal government due to their speech.  Additional steps might include emergency funds and more extensive legal aid for these community members.

We would appreciate your immediate attention to this urgent matter.  If the University provides this broad set of personally identifiable information to OCR, it will place members of our community at great risk.  We look forward to working with you to ensure that UC can meet its legal obligations while also adhering to its responsibility to protect members of our community.

      Please direct correspondence to Veena Dubal, General Counsel, AAUP.


Sincerely,


The American Association of University Professors

The Council of UC Faculty Associations