1  STACEY M. LEYTON, SBN 203827
   sleyton@altber.com
2  BARBARA J. CHISHOLM, SBN 224656
   bchisholm@altber.com
3  CONNIE K. CHAN, SBN 284230
   cchan@altber.com
4  AMANDA C. LYNCH, SBN 318022
   alynch@altber.com
5  JUHYUNG H. LEE, SBN 315738
   hlee@altber.com
6  ALEXANDER PECHT, SBN 355877
   specht@altber.com
7  **ALTSHULER BERZON LLP**
   177 Post St., Suite 300
8  San Francisco, CA 94108
   Tel: (415) 421-7151
9
   *Counsel for Plaintiffs AAUP, AFT,*
10 *UC-AFT, CNA/NNU, UAW, and CIR*

11 [Additional counsel on signature page]

12              **UNITED STATES DISTRICT COURT**

13              **NORTHERN DISTRICT OF CALIFORNIA**

14                  **SAN FRANCISCO DIVISION**

15

16 AMERICAN ASSOCIATION OF           Case No. 3:25-cv-07864-RFL
   UNIVERSITY PROFESSORS, et al.,
17                                   **MEMORANDUM OF POINTS AND**
                Plaintiffs,          **AUTHORITIES IN SUPPORT OF**
18                                   **PLAINTIFFS' MOTION FOR**
        v.                           **PRELIMINARY INJUNCTION**
19
   DONALD J. TRUMP, in his official capacity   **REDACTED**
20 as President of the United States, et al.,

21              Defendants.          Judge:   Hon. Rita F. Lin
                                     Ctrm:    15, 18th Floor
22                                   Date:    December 16, 2025
                                     Time:    10:00 a.m.
23

24

25

26

27

28

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................... 1

FACTUAL BACKGROUND ...................................................................................................... 2

I.    Under the Pretext of Civil Rights Enforcement, Defendants Are Using Legal and Financial Threats to Chill the Free Exercise of Speech Rights on Campus and to Coerce the UC into Enforcing the Trump Administration's Ideological Agenda. ........................................ 2

    A.    Defendants Summarily Suspended $584 Million in Grant Funding Without Notice or Opportunity to be Heard, in Blatant Disregard of Title VI's and Title IX's Procedural Requirements. ........................................................................................................ 2

    B.    Defendants Are Conditioning Return of Those Funds and Further Funding on Payment of More than $1 Billion and Acquiescence to Far-Reaching Demands to Restrict Speech, Deny Recognition of Transgender Individuals' Identities, and Cede Control Over University Policies. ................................................................................................... 3

    C.    Defendants' Threats Are Highly Coercive. ......................................................... 4

    D.    Defendants' Coercive Actions Are Foreseeably Chilling the Exercise of Free Speech and Academic Inquiry, as Defendants Intended. .............................................................. 5

II.    Defendants' Coercive Use of Legal and Financial Threats Against the UC Reflects Their Broader Campaign to Purge "Left" and "Woke" Viewpoints from America's Universities. ...... 7

    A.    Defendants Have Made Clear Their Intent to Silence Dissenting "Woke" Viewpoints on University Campuses. ............................................................................................. 7

    B.    The Legal and Financial Threats to the UC Follow the Same "Task Force Policy" Playbook Used by Defendants at Other Universities. .......................................... 10

III.    Defendants Have Coercively Presented a Hobson's Choice that Will Irreparably Harm All of the UC's Constituents, Whichever Path the UC Chooses. ......................................... 14

    A.    The Loss of Federal Funding and Payment of a $1 Billion Penalty Would Wreak Catastrophic and Irreparable Harm on All of the UC's Constituents, Including Plaintiffs and Their Members. .......................................................................................... 14

    B.    Capitulation by the UC to Defendants' Coercive Demands Would Likewise Cause Irreparable Harm and Violate the Rights of Plaintiffs and Their Members. ..................... 17

LEGAL STANDARD ............................................................................................................... 20

ARGUMENT .......................................................................................................................... 20

I.    This Court Has Jurisdiction to Order the Requested Relief. .......................................... 20

    A.    Plaintiffs Have Standing to Seek Injunctive Relief on Each of Their Claims Against Defendants. ...................................................................................................... 20

B.   Plaintiffs' Claims Belong in District Court. ............................................................ 22

II.   Plaintiffs Are Likely to Succeed on the Merits of Their Claims, or at Minimum Have Raised
      Serious Merits Questions. ........................................................................................... 24

      A.   Defendants' Conduct Violates the First Amendment .......................................... 24

           1.   Defendants' Actions Are Unconstitutional Government Coercion. ............. 24

           2.   Defendants' Actions Are Retaliation and Viewpoint Discrimination. ........ 28

      B.   Defendants' Conduct Is *Ultra Vires* in Excess of Their Constitutional Authority. .......... 29

           1.   Defendants' Coercion of a State University Violates the Tenth Amendment. ........... 29

           2.   Defendants' Demands Seek to Impose Unconstitutional Conditions. ........ 30

           3.   Defendants' Actions Violate the Separation of Powers ............................. 31

      C.   Defendants' Conduct Violates the APA. ............................................................. 32

           1.   Defendants' Actions Are Final Agency Action. ......................................... 32

           2.   Defendants' Actions Are Contrary to Law ................................................ 32

                a.   Defendants' Actions Violate the Constitution ................................. 32

                b.   Defendants' Actions Are Contrary to Title VI and Title IX Law and
                     Procedure and Exceed Statutory Authority .................................... 32

           3.   Defendants' Actions Are Arbitrary and Capricious ................................... 38

III.  Plaintiffs and Their Members Are Suffering and Will Continue to Suffer Increasingly
      Irreparable Harms Absent Prompt Injunctive Relief. ................................................. 41

IV.   The Balance of Equities and the Public Interest Weigh in Favor of an Injunction. .......... 43

V.    The Scope of Requested Relief Is Appropriate ........................................................... 44

CONCLUSION ....................................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Ass'n of Univ. Professors v. Rubio,*
  2025 WL 2777659 (D. Mass. Sept. 30, 2025) ...................................................... 34, 35

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
  570 U.S. 205 (2013)...........................................................................................30, 31

*In re Aiken Cnty.,*
  725 F.3d 255 (D.C. Cir. 2013)...................................................................................31

*Alexander v. Sandoval,*
  532 U.S. 275 (2001)..................................................................................................36

*All. for the Wild Rockies v. Pena,*
  865 F.3d 1211 (9th Cir. 2017) ..................................................................................20

*Am. Council of Learned Soc'ys v. McDonald,*
  2025 WL 2097738 (S.D.N.Y. July 25, 2025) ...........................................................42

*Am. Fed'n of Teachers v. Dep't of Educ.,*
  2025 WL 2374697 (D. Md. Aug. 14, 2025) ........................................................8, 41

*Am. Trucking Ass'ns v. City of Los Angeles,*
  559 F.3d 1046 (9th Cir. 2009) ..................................................................................42

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents,*
  824 F.3d 858 (9th Cir. 2016) ....................................................................................28

*Backpage.com LLC v. Dart,*
  807 F.3d 229 (7th Cir. 2015) ....................................................................................26

*Bantam Books, Inc. v. Sullivan,*
  372 U.S. 58 (1963)........................................................................................24, 26, 28

*Batalla Vidal v. Nielsen,*
  279 F.Supp.3d 401 (E.D.N.Y. 2018), *vacated and remanded on other grounds* ............................44

*Bd. of Cnty. Comm'rs, Wabaunsee Cnty. v. Umbehr,*
  518 U.S. 668 (1996) ..................................................................................................30

*Bd. of Pub. Instruction of Taylor Cnty. v. Finch,*
  414 F.2d 1068 (5th Cir. 1969)...................................................................................37

*Bennett v. Spear,*
  520 U.S. 154 (1997)........................................................................................32, 33, 34

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988).................................................................................24

*Burlington Truck Lines, Inc. v. United States*,
    371 U.S. 156 (1962).................................................................................39

*California v. HHS*,
    390 F.Supp.3d 1061 (N.D. Cal. 2019) .....................................................44

*Carson v. Am. Brands, Inc.*,
    450 U.S. 79 (1981)...................................................................................42

*Chamber of Com. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996).................................................................23

*City & Cnty. of San Francisco v. USCIS*,
    944 F.3d 773 (9th Cir. 2019)....................................................................20

*Clinton v. City of New York*,
    524 U.S. 417 (1998) .................................................................................31

*Cmty. Legal Servs. in E. Palo Alto v. HHS*,
    137 F.4th 932 (9th Cir. 2025) .............................................................22, 23

*Cnty. of Santa Clara v. Trump*,
    250 F.Supp.3d 497 (N.D. Cal. 2017)........................................................42

*Colorado v. HHS*,
    2025 WL 1426226 (D.R.I. May 16, 2025) ...............................................31

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
    38 F.4th 1099 (D.C. Cir. 2022).................................................................23

*Cuviello v. City of Vallejo*,
    944 F.3d 816 (9th Cir. 2019) ....................................................................41

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019)..................................................................................39

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) ................................................................................39, 44

*Dep't of Educ. v. California*,
    604 U.S. 650 (2025) .................................................................................22

*Doe v. Horne*,
    115 F.4th 1083 (9th Cir. 2024) .................................................................43

*Dolan v. City of Tigard*,
    512 U.S. 374 (1994)..................................................................................30

*Dugan v. Rank*,
  372 U.S. 609 (1963) ........................................................................... 23

*E. Bay Sanctuary Covenant v. Garland*,
  994 F.3d 962 (9th Cir. 2020) ........................................................... 43

*Elev8 Balt., Inc. v. Corp. for Nat'l & Cmty. Serv.*,
  2025 WL 1865971 (D. Md. July 7, 2025) ....................................... 45

*Elrod v. Burns*,
  427 U.S. 347 (1976) ........................................................................... 41

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) ........................................................................... 39

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Ed.*,
  82 F.4th 664 (9th Cir. 2023) (en banc) ...................................... 21, 42

*Food & Drug Admin. v. All. for Hippocratic Med.*,
  602 U.S. 367, 395 (2024) .................................................................. 22

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ........................................................................... 21

*Health Care Auth. v. Azar*,
  2020 WL 7049324 (W.D. Wash. July 27, 2020) ............................. 33

*Her Majesty the Queen in Right of Ont. v. EPA*,
  912 F.2d 1525 (D.C. Cir. 1990) ....................................................... 33

*Joseph v. Bd. of Regents of the Univ. Sys. of Ga.*,
  121 F.4th 855 (11th Cir. 2024) ......................................................... 38

*Kennedy v. Warren*,
  66 F.4th 1199 (9th Cir. 2023) ..................................................... 25, 27

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
  385 U.S. 589 (1967) ........................................................................... 25

*Klein v. City of San Clemente*,
  584 F.3d 1196 (9th Cir. 2009) ......................................................... 41

*League of Women Voters v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ............................................................. 43

*Me. Cmty. Health Options v. United States*,
  590 U.S. 296 (2020) ........................................................................... 24

*Maine v. U.S. Dep't of Agric.*,
  778 F.Supp.3d 200 (D. Me. 2025) ................................................... 37

*Manuel v. United States,*
   115 Fed. Cl. 105 (2014) ........................................................................... 23

*Maryland v. Corp. for Nat'l & Cmty. Serv.,*
   785 F.Supp.3d 68 (D. Md. 2025) ............................................................. 45

*Mayor of Baltimore v. Azar,*
   392 F.Supp.3d 602 (D. Md. 2019) ........................................................... 44

*Megapulse, Inc. v. Lewis,*
   672 F.2d 959 (D.C. Cir. 1982) ................................................................ 23

*Melendres v. Arpaio,*
   695 F.3d 990 (9th Cir. 2012) .................................................................. 43

*Morton v. Ruiz,*
   415 U.S. 199 (1974) ................................................................................ 36

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ............................................................................ 38, 39

*Murphy v. Nat'l Collegiate Athletic Ass'n,*
   584 U.S. 453 (2018) ........................................................................... 29, 30

*Nat. Council of Nonprofits v. Off. of Mgmt. & Budget,*
   775 F.Supp.3d 100 (D.D.C. 2025) .......................................................... 45

*NAACP v. Dep't of Educ.,*
   779 F.Supp.3d 53 (D.D.C. 2025) .............................................................. 8

*Nat'l Educ. Ass'n v. U.S. Dep't of Educ.,*
   779 F.Supp.3d 149 (D.N.H. 2025) ....................................................... 8, 26

*Nat'l Endowment for the Arts v. Finley,*
   524 U.S. 569 (1998) ................................................................................ 24

*Nat'l Fed'n of Indep. Bus. v. OSHA,*
   595 U.S. 109 (2022) ................................................................................ 31

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
   567 U.S. 519 (2012) ................................................................................ 29

*Nat'l Rifle Ass'n of Am. v. Vullo,*
   602 U.S. 175 (2024) ........................................................... 24, 25, 26, 44

*Nat'l Treasury Emps. Union v. Cornelius,*
   617 F.Supp. 365 (D.D.C. 1985) ............................................................. 38

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n,*
   145 S. Ct. 2658 (2025) ...................................................................... 22, 23

*New York v. Trump,*
  764 F.Supp.3d 46 (D.R.I. 2025)................................................................45

*New York v. United States,*
  505 U.S. 144 (1992)................................................................................30

*Ohio v. EPA,*
  603 U.S. 279 (2024)................................................................................38

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.,*
  465 F.3d 977 (9th Cir. 2006) .............................................................32, 34

*Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.,*
  512 F.Supp.3d 966 (N.D. Cal. 2021)........................................................43

*People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency,*
  766 F.2d 1319 (9th Cir. 1985) .................................................................44

*Perry v. Sindermann,*
  408 U.S. 593 (1972) ...............................................................................30

*Portland Audubon Soc. v. Endangered Species Comm.,*
  984 F.2d 1534 (9th Cir. 1993) .................................................................36

*President & Fellows of Harvard Coll. v. HHS,*
  __F.Supp.3d__, 2025 WL 2528380 (D. Mass. Sept. 3, 2025)................. *passim*

*Printz v. United States,*
  521 U.S. 898 (1997)................................................................................29

*Radio Free Asia v. United States,*
  2025 WL 1291342 (D.D.C. Apr. 25, 2025)................................................45

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
  515 U.S. 819 (1995)...........................................................................24, 28

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,*
  102 F.3d 12 (1st Cir. 1996)......................................................................42

*Sackett v. EPA,*
  566 U.S. 120 (2012)................................................................................35

*S.F. Herring Ass'n v. Dep't of the Interior,*
  946 F.3d 564 (9th Cir. 2019)...........................................................32, 33, 34

*San Francisco v. Trump,*
  897 F.3d 1225 (9th Cir. 2018) .................................................................31

*Schlafly v. Volpe,*
  495 F.2d 273 (7th Cir. 1974) ...................................................................38

*Sierra Club v. Trump,*
  929 F.3d 670 (9th Cir. 2019) ......................................................................35

*Somerville Pub. Schs. v. Trump,*
  784 F.Supp.3d 311 (D. Mass. 2025) ...........................................................45

*Stephens v. United States,*
  165 Fed. Cl. 341 (2003) ..............................................................................23

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
  600 U.S. 181 (2023).....................................................................................20

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014).....................................................................................21

*Sweezy v. State of N.H. by Wyman,*
  354 U.S. 234 (1957).......................................................................................2

*Thakur v. Trump,*
  __ F. Supp. 3d __, 2025 WL 1734471 (N.D. Cal. Jun. 23, 2025) .......... *passim*

*Thakur v. Trump,*
  148 F.4th 1096 (9th Cir. 2025) ............................................................... *passim*

*Thakur v. Trump,*
  2025 WL 2325390 (N.D. Cal. Aug. 12, 2025) ..............................................8

*Thakur v. Trump,*
  2025 WL 2696424 (N.D. Cal. Sep. 22, 2025) .............................8, 22, 23, 45

*Tootle v. Sec'y of Navy,*
  446 F.3d 167 (D.C. Cir. 2006) ....................................................................23

*United Aeronautical Corp. v. U.S. Air Force,*
  80 F.4th 1017 (9th Cir. 2023) .....................................................................23

*U.S. Army Corps. of Eng'rs v. Hawkes Co.,*
  578 U.S. 590 (2016).....................................................................................32

*Victim Rights Law Ctr. v. U.S. Dep't of Educ.,*
  2025 WL 1704311 (D. Mass. April 21, 2025).........................................44, 45

*Washington v. Trump,*
  847 F.3d 1151 (9th Cir. 2017) ....................................................................42

*Welch v. Brown,*
  935 F.Supp.2d 875 (E.D. Mich. 2013), *aff'd*, 551 F. App'x 804 (6th Cir. 2014)............................43

*Whitman-Walker Clinic, Inc. v. HHS,*
  485 F.Supp.3d 1 (D.D.C. 2020) ..................................................................44

*Widakuswara v. Lake*,
    779 F.Supp.3d 10 (D.D.C. 2025) .................................................................................45

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ......................................................................................................20

*Wisconsin Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ..................................................................................43

*Wolford v. Lopez*,
    116 F.4th 959 (9th Cir. 2024) ...................................................................................43

**Statutes**

5 U.S.C. §554 ...................................................................................................................36

5 U.S.C. §§554–557 ..........................................................................................................36

5 U.S.C. §§702, 704 ..........................................................................................................24

5 U.S.C. §706(2)(A) ..........................................................................................................35

5 U.S.C. §706(2)(B) ..........................................................................................................35

20 U.S.C. §1682 ......................................................................................................3, 26, 31

20 U.S.C. §1683 ................................................................................................................24

20 U.S.C. §1962 ................................................................................................................37

42 U.S.C. §2000d ..............................................................................................................36

42 U.S.C. §2000d-1 ..................................................................................................*passim*

42 U.S.C. §2000d-2 ...........................................................................................................23

42 U.S.C. §2000e-5(g)(1) ..................................................................................................31

42 U.S.C. §2000e-6 ...........................................................................................................26

**Regulations**

7 C.F.R. §15.1 et seq. ........................................................................................................36

7 C.F.R. §15a.100 et seq. ..................................................................................................37

10 C.F.R. §1040.1 et seq. ..................................................................................................36

10 C.F.R. §1040.114 ...........................................................................................................3

10 C.F.R. §1042.605 ...........................................................................................................3

14 C.F.R. §1250.100 et seq. .................................................................................. 36

14 C.F.R. §1253.100 et seq. .................................................................................. 37

15 C.F.R. §8.1 et seq. .......................................................................................... 36

15 C.F.R. §8a.100 et seq. ..................................................................................... 37

22 C.F.R. §141.1 et seq. ...................................................................................... 36

22 C.F.R. §146.100 et seq. ................................................................................... 37

28 C.F.R §42.101 et seq. ..................................................................................... 36

28 C.F.R. §42.107 ............................................................................................. 26

28 C.F.R. §42.108(c) ............................................................................................ 3

28 C.F.R. §54.100 et seq. ..................................................................................... 37

28 C.F.R. §54.605 ........................................................................................... 3, 26

32 C.F.R. §195.1 et seq. ...................................................................................... 36

32 C.F.R. §195.10 .............................................................................................. 36

32 C.F.R. §196.100 et seq. ................................................................................... 37

34 C.F.R. §100.1 et seq. ...................................................................................... 36

34 C.F.R. §§101.1-101.131 .................................................................................. 36

34 C.F.R. §101.2 ................................................................................................ 36

34 C.F.R. §101.22(a) ........................................................................................... 36

34 C.F.R. §106.1 et seq. ...................................................................................... 37

40 C.F.R. §5.100 et seq. ...................................................................................... 37

40 C.F.R. §7.10 et seq. ........................................................................................ 36

43 C.F.R. 17.1 et seq. .......................................................................................... 36

43 C.F.R. 41.100 et seq. ....................................................................................... 37

45 C.F.R. §80.1 et seq. ........................................................................................ 36

45 C.F.R. §80.8(c) ........................................................................................... 3, 37

45 C.F.R. §§81.1-81.131 ..................................................................................... 36

45 C.F.R. §81.2 .................................................................................................................36

45 C.F.R. §81.22(a) ..........................................................................................................36

45 C.F.R. §86.1 et seq. ......................................................................................................37

45 C.F.R. §86.71 ...............................................................................................................3

45 C.F.R. §611.1 et seq. ....................................................................................................36

45 C.F.R. §611.8(c) ...........................................................................................................3

45 C.F.R. §618.100 et seq. ................................................................................................37

45 C.F.R. §618.605 ...........................................................................................................3

88 Cong. Rec. 7059 (1964) ...............................................................................................37

88 Cong. Rec. 7063 (1964) ...............................................................................................37

90 Fed. Reg. 29445 ...........................................................................................................31

**Other Authorities**

Cal. Const. art. I, §32 .......................................................................................................41

Catherine E. Lhamon, Seth M. Galanter, *Commander-in-Thief: President Trump's Withholding of Federal Funds from Universities Based on Alleged Discrimination Unlawfully Disregards the Procedures and Limits Adopted by Congress in the Civil Rights Statutes* ......................................37

Exec. Order No. 12250 (1980) ..........................................................................................26

Fed. R. Civ. P. 65 (b)(1), (c) .............................................................................................20

1

**INTRODUCTION**

2      In February 2025, the Donald J. Trump administration launched a months-long campaign of

3 bullying and unlawful actions targeting institutions of higher education across the country, most recently

4 aimed at the nation's preeminent public university system: the University of California ("UC"). In a

5 coercive attempt to, in President Trump's words, "reclaim our once great educational institutions from

6 the radical Left and Marxist maniacs," Defendants have unlawfully held hostage hundreds of millions

7 of dollars and threatened to cancel billions more. They have done so by invoking the nation's civil rights

8 laws, while disregarding the very procedures Congress mandated for enforcing those laws and defying

9 the substantive reach of those civil rights statutes.

10     As part of that campaign, the Trump administration initiated numerous investigations of the UC

11 and then, without completing those investigations, in late July 2025 abruptly terminated $584 million in

12 UC research grants. A week later, Defendants sent demands that the UC pay over $1 billion and surrender

13 control over myriad subjects including rules for expressive activity, admissions, educational and

14 employment records, recruitment and treatment of international students, curriculum, policies to achieve

15 diversity, recognition of transgender identity, and treatment at the UC's affiliated medical centers.

16     Defendants cannot lawfully use legal and financial threats to impose their ideological agenda on

17 the UC or to coerce the UC into surrendering the rights and freedoms of faculty, students, staff, and

18 members of the public who depend on the University's services. Their efforts to do so violate both the

19 federal Constitution and applicable statutes. Without preliminary injunctive relief, Plaintiffs will face

20 severe irreparable harm in the form of lost research, employment, and professional opportunities; injuries

21 to their academic freedom, speech, and other interests; and—if the UC surrenders to Defendants'

22 demands—violation of numerous rights and interests under state and federal law. Unless enjoined,

23 Defendants' conduct will also cause grave harm to the public, who will be deprived of the benefits of

24 critical academic research and inquiry that will be suspended or lost due to Defendants' unlawful

25 termination of funding and unlawful government censorship.

26     In a democracy, institutions of higher education exist not only as places for research, teaching

27 and learning, but as core civic spaces in which ideas—about science, literature, politics, and society—

28 are formed, tested, and debated. By contrast, autocratic governments consider independent inquiry and

thought to be a threat. "To impose any strait jacket upon the intellectual leaders in our colleges and

1  universities would imperil the future of our Nation." *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234,

2  250 (1957). This Court should grant preliminary injunctive relief to thwart Defendants' attempt to

3  eliminate what makes the UC and other American institutions of higher education the world leaders they

4  are, and to protect Plaintiffs and their members from the ongoing irreparable harm caused by Defendants'

5  unlawful actions.

**FACTUAL BACKGROUND**

I.  **Under the Pretext of Civil Rights Enforcement, Defendants Are Using Legal and Financial Threats to Chill the Free Exercise of Speech Rights on Campus and to Coerce the UC into Enforcing the Trump Administration's Ideological Agenda.**

A.  **Defendants Summarily Suspended $584 Million in Grant Funding Without Notice or Opportunity to be Heard, in Blatant Disregard of Title VI's and Title IX's Procedural Requirements.**

11  On May 9, 2025, the Department of Justice (DOJ) notified the UC that it had opened an

12  investigation into the UC's "response to incidents of antisemitic discrimination, harassment, abuse, and

13  retaliation against students." Ex. 1 at 1.[1] Shortly thereafter, on July 29, 2025, DOJ issued a "Notice of

14  Findings Regarding the University of California, Los Angeles" ("Notice of Findings"), which concluded

15  that UCLA had "violated its obligations under the Equal Protection Clause of the Fourteenth Amendment

16  and Title VI[.]" *Id*. The Notice of Findings' conclusion related specifically and only to "UCLA's

17  response to the protest encampment on its campus in the spring of 2024." *Id*. The Notice of Findings

18  stated that "[t]he Department's investigation of the greater UC System remains ongoing." *Id*.

19  The next day, the National Institutes of Health (NIH), National Science Foundation (NSF), and

20  Department of Energy (DOE) (collectively, "Terminating Defendants") summarily cut off a combined

21  $584 million in research funds from UCLA. Ex. 2; *see* Exs. 3, 7, 8. NSF's letter stated that, "[e]ffective

22  immediately," approximately 300 awards worth approximately $170 million, with $90 million remaining

23  unspent, "are suspended until further notice," Exs. 3, 5, and that it reflected "the final agency decision."

24  Ex. 3; *see* Ex. 4. On August 1, 2025, NSF sent an "Updated Notice of Award Suspensions" to UCLA,

25  indefinitely suspending the specified grants on grounds that UCLA (1) "engages in racism, in the form

26  of illegal race-based preferences in admissions practices"; (2) "fails to promote a research environment

27  free of antisemitism and bias"; and (3) "discriminates against and endangers women by allowing men in

28  women's sports and private women-only spaces." Ex. 6. DOE and NIH sent virtually identical letters to

---

[1] All "Ex." citations refer to exhibits attached to the accompanying Declaration of Drew Mammel.

1    UCLA on July 30 and July 31 (collectively, with the NSF letter, "Termination Letters"). Exs. 7, 8.

2          In suspending hundreds of grants worth $584 million within a mere day or two of issuing a notice

3    of findings purportedly based on UCLA's alleged discrimination, Terminating Defendants plainly made

4    no effort to comply with Title VI or Title IX's procedural requirements for civil rights enforcement. *See*

5    *infra* Arg. §II.C.2.b. They did not seek to secure the UC's "compliance" by "voluntary means"; make

6    "an express finding on the record, after opportunity for hearing, of a failure to comply with" Title VI or

7    Title IX; file "a full written report" with the relevant House and Senate committees; or wait 30 days after

8    filing that report before terminating funds. *See* 42 U.S.C. §2000d-1; 20 U.S.C. §1682.[2]

9          **B. Defendants Are Conditioning Return of Those Funds and Further Funding on**
10             **Payment of More than $1 Billion and Acquiescence to Far-Reaching Demands**
                **to Restrict Speech, Deny Recognition of Transgender Individuals' Identities, and**
11             **Cede Control Over University Policies.**

12         On or about August 8, 2025, UC received a document ("August 8 Demand Letter") from DOJ

13    demanding that UCLA pay $1.2 billion as part of a settlement to restore the $584 million in lost funds

14    (but specifies that the federal government could still take further legal actions or assert new claims

15    against UCLA). Exs. 9, 10. The August 8 Demand Letter further requires the UC to impinge on the free

16    speech and academic freedom rights of faculty, students, academic employees, and staff employees. For

17    example, it demands that UCLA: prohibit demonstrations, displays, and other expressive activities in

18    specified locations on campus; prohibit overnight demonstrations in any location; prohibit wearing

19    masks in order to protest anonymously; share international students' disciplinary records with the federal

20    government and implement policies to avoid recruiting or admitting international students who are

21    "likely to engage in anti-Western, anti-American, or antisemitic disruptions or harassment," and

22    implement trainings to "socialize" international students to campus norms; and appoint a resolution

23    monitor with significant authority over campus affairs, with the administration having authority to select

24    the monitor if UCLA and the administration cannot agree on who should be appointed. Ex. 10.

25         The August 8 Demand Letter further demands that UCLA limit diversity, equity, and inclusion

26    _____

27    [2] The Funding Agency Defendants (*see infra* n.4 for definition) have promulgated essentially identical
      regulations, which in some cases prescribe even more detailed procedural requirements, *see* 28 C.F.R.
      §42.108(c) (DOJ); 45 C.F.R. §611.8(c) (NSF); 45 C.F.R. §80.8(c) (HHS); NIH Grants Policy Statement
28    4.1.2.1 (applying the HHS implementing regulations for Title VI); 10 C.F.R. §1040.114 (DOE), and
      have all incorporated and applied their respective Title VI procedures to their Title IX investigations,
      hearing, and enforcement, *see* 28 C.F.R. §54.605 (DOJ); 45 C.F.R. §618.605 (NSF); 45 C.F.R. §86.71
      (HHS); NIH Grants Policy Statement 4.1.2.2; 10 C.F.R. §1042.605 (DOE).

("DEI") programs, including prohibitions on "indirect methods or criteria that serve as a substitute for race-conscious hiring, promotion, tenure, compensation, and other employment practices"; "personal statements, diversity narratives, or an applicant's reference to racial identity" as a means to "justify discriminatory practices" in employment; and any race- or ethnicity-based scholarships. Ex. 10.

Finally, the August 8 Demand Letter demands UCLA ban gender-affirming care for transgender minors; prohibit gender-appropriate locker rooms, restrooms, and dorms rooms for transgender students; and declare that the University does not recognize transgender people's gender identities. Ex. 10.

### C. Defendants' Threats Are Highly Coercive.

The summary termination of $584 million in research grants, demand of a $1.2 billion payment, and threat to withhold even more funds is extortionary. $1.2 billion represents over 10% of UCLA's annual $11 billion budget. Ex. 19. The UCLA Chancellor wrote that acceding to the demand would "damage[e] our ability to carry out our public mission, harm[] the work and careers of our scholars and staff, and put[] great strain on the budgets of departments and units across our institution." Ex. 20.

While the August 8 Demands are facially directed only at UCLA, Defendants' conduct shows that the same threat of funding cuts and extortionate demands are also aimed at the rest of the UC, all of which is currently subject to other ongoing investigations. In February and March 2025, the Department of Education's ("ED") Office for Civil Rights ("OCR") opened two Title VI investigations into UC Berkeley, which remain pending, regarding antisemitism and the use of race in campus policies. Exs. 11, 12. On or about March 10, 2025, OCR separately warned four UC campuses of potential Title VI enforcement actions regarding antisemitism. Ex. 13. DOJ opened a still-pending Title VII investigation into the entire UC system in March 2025, also regarding antisemitism. Ex. 14. On March 27, 2025, Defendant Bondi directed DOJ "to begin compliance review investigations into admissions policies" at UC Berkeley, UCLA, and UC Irvine. Ex. 15. And in June 2025, DOJ opened a new Title VII investigation into the UC system's alleged race- and sex-based employment discrimination, which also remains pending. Ex. 16. As Defendant Terrell plainly threatened in a May 27, 2025 interview, "***Expect massive lawsuits against UC system*** ... expect hate crime charges filed by the federal government. Expect Title VII lawsuits ... We have a full front of activity in the courtroom. We're going to meet them in court. And one other fact, which I cannot disclose. ***We are going to go after them where it hurts them financially. And … I hope you can read between the lines. There's numerous ways to hurt them***

*financially***.**" Ex. 108 (emphases added).

UC President James Milliken's statements further make clear that the federal government is targeting the entire UC system. On September 3, 2025, Milliken wrote to California state legislators that "[r]ecent actions by the federal government, with the distinct possibility of more to come, place the entire [UC] system at risk[.]" Ex. 17. On September 15, Milliken confirmed "the federal government is also pursuing investigations and actions in various stages against all 10 UC campuses" and that the UC was "consider[ing] the implications of expanded federal action." Ex. 18. Milliken clarified that "what's at stake" is "more than $17 billion each year in federal support" for the entire UC system.[3]

The critical scientific, medical, and other research conducted by the UC's vast network of researchers (often in collaboration with partners around the world) depends on federal funding. Federal funds accounted for *52 percent* of all UC research expenditures in 2023-24, Ex. 21 at 21, and a similar percentage for decades. Ex. 22 at 68. In fiscal year 2024, the UC received $4.069 billion in federal research awards covering 10,256 distinct awards. Ex. 89.[4]

### D. Defendants' Coercive Actions Are Foreseeably Chilling the Exercise of Free Speech and Academic Inquiry, as Defendants Intended.

Defendants' threats are interfering in an ongoing manner with the free speech and academic freedom of Plaintiffs' members across the UC system. These threats have had a chilling effect on academic freedom, leading faculty members to censor what and how they teach. For example, a UC Berkeley law professor whose work focuses on moral, political, and legal philosophy removed from his syllabus topics that he understands to be disfavored by the administration, including the Israel-Palestine conflict and transgender rights, which has "significantly limited [his] ability to use current events for in-class discussions" and "degraded the quality of instruction." Kutz Dec. ¶¶6, 33-34. This professor was

---

[3] *Id.* The $17 billion figure includes federal research funds, $1.7 billion in federal student aid (the largest source of financial aid for UC students), and approximately $5.3 billion that UC Health receives from the federal Medicare program and $4.6 billion from the federal portion of Medicaid. Ex. 23. "UC Health" is comprised of six academic health centers, 21 health professional schools, four children's hospital campuses, a global health institute, and systemwide support services for UC employees and students. Ex. 110. UC's operating revenue totaled approximately $53 billion in 2024-2025. Ex. 24.

[4] This includes $2.54 billion from NIH; $525 million from NSF; $326 million from DOD; $160 million from DOE; $122 million from other HHS agencies, including CDC; $104 million from NASA; $86 million from USDA; $68 million from Commerce; $39 million from Interior; $27 million from ED; $20 million from State; and $47 million from other agencies including FDA, General Services Administration (GSA), National Endowment for the Humanities (NEH), EPA, Department of Housing and Urban Development (HUD), Institute of Museum and Library Services (IMLS), Department of Transportation (DOT), DOJ, and AmeriCorps (collectively, "Funding Agency Defendants"). *Id.*

motivated to change his syllabus and place stricter guardrails on in-class discussions to protect his international and non-citizen students, whose records would be accessible by the Trump administration if the UC capitulates to the pending demands. *Id.* ¶32. Many of Plaintiffs' members, across a range of disciplines, report similar self-censorship in their classroom materials and speech.[5] The threats have also affected the content of Plaintiffs' members' research. As one professor explained, "we understand that we can only pursue projects that the Trump administration favors, and take extra care to not even mention a word that it disfavors." Hill Dec. ¶17.[6]

Defendants' coercive campaign against the UC has also predictably induced Plaintiffs' members to censor their participation in professional and public discourse, including professional conferences.[7] Plaintiffs' members have withdrawn from opportunities to educate the public and even sought to erase their prior contributions from their professional or public records.[8] As one resident physician explained, "[b]ecause the Trump administration's threats to the UC have made me fear that my prior writing will put me and/or my employer at risk, I have requested that some of my writings be removed from various online platforms and I intend to avoid speaking on certain topics while these threats are pending." CIR Doe Dec. ¶15. Further, Plaintiffs' members also now fear exercising their First Amendment rights to participate in demonstrations on campus.[9]

Plaintiffs' members have also ceased promoting students' work in an effort to protect them, but at a cost to their academic and professional opportunities. One faculty member refrained from attaching

---

[5] *See also*, *e.g.*, Clark Dec. ¶14 ("I have stopped talking about the molecular science behind care for transgender people."); Appel Dec. ¶23 ("Although I wish to continue teaching the most important and most rigorous scholarly content in my courses, because of the recent credible threats targeting the UC, I will change my course curriculum to include more readings and teaching regarding conservative social movements."); Witness H Dec. ¶ 21 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Kimberg Dec. ¶¶30-31 (considering removing from medical school class scientific studies relating to pain and racism); Witness G Dec. ¶16 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Shin Dec. ¶¶16, 23; Nicolazzo Dec. ¶17; Rodger Dec. ¶16.b; Young Dec. ¶33; Witness D Dec. ¶¶13.

[6] *See also* McClanahan Dec. ¶25; Kimberg Dec. ¶38; Kutz Dec. ¶¶36-38; Witness C Dec. ¶20; Clark Dec. ¶¶14-15; Witness F Dec. ¶¶12-13.

[7] *See* Goyal Dec. ¶¶16-17 (declined to invite a scholar to an academic conference); Lee Dec. ¶¶23, 25-33.

[8] Witness A Dec. ¶20; Witness C Dec. ¶¶16, 24; Fielding-Miller Dec. ¶¶19-21; Russell Dec. ¶14; Kutz Dec. ¶36.

[9] UPTE Doe Dec. ¶9 ("[A]lthough I wish to continue speaking with colleagues about Palestine and attending protests against the genocide in Gaza, because of the recent credible threats targeting the UC and UC Berkeley's recent capitulation to such threats, I have refrained from such activities."); Witness G Dec. ¶20; Hill Dec. ¶13; Fahrenthold Dec. ¶¶19, 31; Shin Dec. ¶18; Rodger Dec. ¶16.f.

PLAINTIFFS' MPA ISO MOTION FOR PRELIMINARY INJUNCTION          Case No. 3:25-cv-07864-RFL

students' names to topics the Trump administration disfavors, to protect them from being targets of ongoing investigations, causing "these students [to] miss out on opportunities to connect with scholars who are also engaging with these critical public health challenges." Shin Dec. ¶17.[10]

████████████████████████████████████████████████████████

Witness H Dec. ¶¶20-21; *see also* Blair Dec. ¶24. Defendants' threats have predictably chilled core First Amendment activity across UC; Plaintiffs' members attest to the climate of fear that has displaced free speech among faculty, students, researchers and other workers.[11]

## II. Defendants' Coercive Use of Legal and Financial Threats Against the UC Reflects Their Broader Campaign to Purge "Left" and "Woke" Viewpoints from America's Universities.

Defendants' coercive tactics against the UC are not an isolated incident, but rather part of their long-planned and coordinated campaign to commandeer America's universities and reshape them in conformity with the Trump administration's preferred ideology.

### A. Defendants Have Made Clear Their Intent to Silence Dissenting "Woke" Viewpoints on University Campuses.

President Trump expressly campaigned on a promise "to reclaim our once great educational institutions from the radical Left and Marxist maniacs." Ex. 25. His campaign website made clear his intention to curtail academic freedom and control the viewpoints expressed on campuses, pledging, "we will take the billions and billions of dollars that we will collect by taxing, fining, and suing excessively large private university endowments, and we will then use that money to endow a new institution called the American Academy." Ex. 26. In particular, he has targeted "woke" or "left-wing" thought, as well as pro-Palestinian speech by equating it with antisemitism. Ex. 27. President Trump's campaign website promised such viewpoints would be prohibited at the American Academy, stating that "there will be no wokeness or jihadism allowed—none of that's going to be allowed." Ex. 26.

The Trump administration's expressly stated campaign goals to purge "left" and "woke" viewpoints from university campuses have materialized in several different forms. The first policy

---

[10] *See also* Witness B Dec. ¶24 (████████████████████████████████████).

[11] *See, e.g.*, Shin Dec. ¶18 ("At a protest in early September against UC's collaboration with Israeli institutions, faculty members asked me and other protestors to stop protesting because our speech might upset the Trump Administration and result in funding cuts for UC. I am afraid that we will be blamed for Trump's attacks, and nobody wants to be blamed for costing the University $1 billion."); Kutz Dec. ¶¶35, 39; Hill Dec. ¶14; Fahrenthold Dec. ¶¶26-27; Witness B Dec. ¶24; Nicolazzo Dec. ¶10; Witness F Dec. ¶9; Blair Dec. ¶¶22-23; Witness C Dec. ¶¶12-13, 17; CIR Doe Dec. ¶15; Blackwood Dec. ¶¶15-17; Weissman Dec. ¶12; Rabinowitz Dec. ¶11; Orozco-Poore Dec. ¶16; Witness D Dec. ¶¶13-14.

involved targeting for cancellation specific federal grants involving "DEI" and "woke" viewpoints that the Trump administration has deemed forbidden ("Grant Termination Policy").[12] Likewise, the Office of Management and Budget issued a memorandum directing all agencies to "pause ... disbursement of all Federal financial assistance" relating to, *inter alia*, "DEI" or "woke gender ideology." Ex. 41 at 2. Pursuant to this policy, the Trump administration terminated over $324 million in grants to the UC.[13]

A second policy involved ED's issuance of a "Dear Colleague" Letter dated February 14, 2025, requiring all educational institutions to "cease all efforts to circumvent prohibitions on the use of race by relying on proxies or other indirect means to accomplish such ends," upon threat of losing all federal funding ("Dear Colleague Policy"). Ex. 42 at 3.[14] Pursuant to this policy, on March 14, 2025, OCR opened investigations into UC Berkeley and 44 other universities "for allegedly engaging in race-exclusionary practices in their graduate programs" by partnering with "The Ph.D. Project," Ex. 12, a nonprofit mentorship organization that seeks to diversify America's business leaders.[15]

A third, related policy—which is the subject of this lawsuit—has involved the use of legal and financial threats against targeted universities under the guise of purported "civil rights enforcement," led by DOJ and/or OCR, and facilitated by the multi-agency "Task Force to Combat Anti-Semitism," to coerce universities into abandoning lawful policies and surrendering control of curricula and campus culture to the federal government ("Task Force Policy"). On January 29, 2025, President Trump issued Executive Order No. 14188, "Additional Measures to Combat Antisemitism." Ex. 46. Pursuant to that Executive Order, DOJ days later announced creation of the "multi-agency Task Force," led by Defendant

---

[12] Upon taking office, President Trump signed a series of Executive Orders "blacklisting research on 'diversity,' 'equity,' 'inclusion,' and other forbidden topics, and directed the termination of previously issued research grants in those areas." *Thakur v. Trump*, __ F. Supp. 3d __, 2025 WL 1734471 at *1 (N.D. Cal. Jun. 23, 2025); *see* Exs. 38, 39, 40.

[13] *See Thakur*, 2025 WL 1734471, at *1. In *Thakur*, this Court enjoined EPA, NEH, and NSF from giving effect to any grant terminations that were arbitrary (in violation of the APA) and/or based on viewpoint (in violation of the First Amendment). *Id.* at *32-33. This Court further enjoined "suspensions" of NSF grants (*Thakur v. Trump*, 2025 WL 2325390 (N.D. Cal. Aug. 12, 2025)), and "suspensions" or terminations of grants from NIH, DOT, and DOD, on similar bases, *Thakur v. Trump*, 2025 WL 2696424 (N.D. Cal. Sep. 22, 2025).

[14] *See also* Exs. 43, 44, 45.

[15] One district court granted summary judgment and vacated the Dear Colleague Letter as unlawful pursuant to the APA. *Am. Fed'n of Teachers v. Dep't of Educ.*, 2025 WL 2374697 (D. Md. Aug. 14, 2025). Two others have preliminarily enjoined Defendants DOE, McMahon, and Trainor from enforcing and/or implementing the Dear Colleague Letter, including on grounds that the defendants are likely "target[ing] speech based on viewpoint" and "attempting to coerce third parties 'to punish or suppress disfavored speech on [their] behalf.'" *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, 779 F.Supp.3d 149, 193-96 (D.N.H. 2025) (quotations omitted); *see NAACP v. Dep't of Educ.*, 779 F.Supp.3d 53 (D.D.C. 2025).

Terrell and comprised of representatives from DOJ, ED, HHS, "and other agencies as it develops." Ex. 47. As head of the Task Force, Terrell has repeatedly confirmed the Trump administration's policy to use the threat of federal funding losses under the guise of civil rights enforcement to coerce universities into adopting the Trump administration's preferred viewpoints. On February 26, he stated, "When you see universities start losing millions of dollars in federal funding, you're going to see a change in their behavior." Ex. 34. A few days later, Defendant Terrell warned, in a clip he later shared on X, "I targeted ten schools. Columbia, Harvard, Michigan, UCLA, USC. Let me tell you what we're going to do. We're going to take away your funding." Ex. 35. On or about March 9, 2025, he described Defendants' funding coercion strategy in stark terms: "We're taking away their money. *We're going to bankrupt these universities. We're going to take away every single federal dollar.* … The academic system in this country has been *hijacked by the left, has been hijacked by the Marxists*. They have controlled the mindset of our young people … and *we have to put an end to it*. … *If these universities do not play ball, lawyer up, because the federal government is coming after you*." Ex. 36 (emphases added); *see* Ex. 34 (threatening to "financially attack" targeted universities and "make sure they don't get a penny").[16] As described more fully in Facts §II.B, *infra*, Defendants have implemented this Task Force Policy at Columbia, Brown, Penn, Harvard, and now the UC.[17]

On September 30, the administration announced yet a fourth policy that similarly employs the threat of financial ruin to coerce universities into preemptive compliance ("Compact Policy"). Pursuant to this policy, the Trump administration sent demand letters to nine universities, Ex. 52, warning them to accede to the demands "and values" therein or else "forego federal benefits," including "(i) access to student loans, grant programs, and federal contracts; (ii) funding for research directly or indirectly; (iii) approval of student and other visas ...; and (iv) preferential treatment under the tax code."[18] Mirroring the Task Force Policy's pretextual reliance on civil rights laws, the Compact acts as an "assurance to the

---

[16] Vice President JD Vance has been urging this course of conduct for years. In October 2021, he proposed: "[W]e go to the universities, we use the hundreds of billions of dollars that we send to them as leverage and we say: 'Unless you stop indoctrinating our children, unless you stop indoctrinating our entire society, you don't get another dime of our money.'" Ex. 28; *see also* Exs. 29, 30, 31, 32, 33. Defendant McMahon has made similar statements. *See, e.g.*, Ex. 37.

[17] Building on this policy, in recent weeks, administration officials have expressly threatened to defund universities based on speech by staff and faculty clearly protected by the First Amendment, including a specific threat to the UC. *See, e.g.*, Exs. 48, 49, 50, 51.

[18] Ex. 53. Universities that accept the terms will receive "positive benefits," including priority in receiving federal funds. Ex. 52.

government that schools are complying with civil rights laws." Ex. 52. Universities found by DOJ to violate the Compact after agreeing to it will lose all federal funding listed above for "no less than 1 year" and be required to return all federal funding received during the year of the violation. Ex. 53.

The Compact's demands plainly seek to dictate what viewpoints can be expressed on university campuses. For instance, universities must foster "a broad spectrum of ideological viewpoints" and ensure no ideology is "dominant," and "abolish[] institutional units that purposefully ... belittle ... conservative ideas." Ex. 53. Many are virtually identical to those in the August 8 Demand Letter. For example, universities must "publicly report" specified admissions data broken down by race, national origin, and sex; eliminate any consideration of race, "explicitly or implicitly," in any admissions, hiring, or promotion decision; restrict protests, purportedly to reduce disruptions of class; adopt the government's definitions of "male" and "female"; prohibit transgender individuals from using bathrooms, locker rooms, and sports teams aligning with their gender identity; "screen out students who demonstrate hostility to the United States, its allies, or its values"; share international students' disciplinary records with the government; and conduct an anonymous campus survey regarding compliance. *Id.*

Although Defendants have not yet sought to impose this Compact Policy on the UC, it (like the Grant Termination and Dear Colleague Policies) is further evidence that Defendants' unambiguous intent in implementing the Task Force Policy is to commandeer America's universities, impose the Trump administration's ideological agenda, and extinguish politically disfavored viewpoints.

### B. The Legal and Financial Threats to the UC Follow the Same "Task Force Policy" Playbook Used by Defendants at Other Universities.

Since taking office, the Trump administration has implemented its Task Force Policy, targeting universities where faculty, students, and employees have expressed viewpoints with which the Trump administration disagrees and consistently executing the playbook described by Vance, Terrell, and others to bring universities under the Executive's control: cite alleged but unproven civil rights violations as a basis for summarily terminating hundreds of millions of dollars of critical research grants (in violation of statutory requirements), then threaten to withhold more, if not all, federal funding from the university unless it accedes to demands that include the payment of large fines (not authorized by law) and sweeping controls that strike at the core of free speech, academic freedom, independent governance, and a host of other faculty, student, and employee rights.

Defendants have lauded Columbia, Brown, and Penn for acquiescing to the Trump administration's demands, celebrating them as examples of obedience. In stark contrast, Defendants have made an example of Harvard, punishing its independence in resisting the administration's demands with unrelenting and increasingly punitive sanctions. The examples that Defendants have made of these other universities is designed to send an unambiguous message to UC and others: "we can do this the easy way or the hard way." *See* Ex. 54; Ex. 55 (Secretary Kristi Noem: "We tried to do things the easy way with Harvard. Now, through their refusal to cooperate, we have to do things the hard way.").

### 1. *Praising the Obedient*

*Columbia.* On March 3, 2025, Defendants HHS, ED, and GSA announced a "comprehensive review of Columbia's federal contracts and grants" in light of potential Title VI violations regarding antisemitism. Ex. 56. The next day, President Trump announced that "All Federal Funding will STOP" for universities permitting "illegal protests." Ex. 57. Three days later, DOJ, HHS, ED, and GSA announced the "immediate cancellation of approximately $400 million in federal grants and contracts to Columbia," threatening that this was only "the first round of action" and that "additional cancellations are expected to follow." Ex. 58. On March 13, HHS, ED, and GSA "outlin[ed] immediate next steps that we regard as a precondition for formal negotiations regarding [Columbia's] continued financial relationship with the United States government." Ex. 59. The letter's nine demands included that Columbia discipline students involved in particular protests, restructure its student disciplinary system, institute a "mask ban," place a disfavored department into receivership, and overhaul "undergraduate admissions, international recruiting, and graduate admissions practices." *Id*. Columbia announced new policies on March 21, conceding to nearly all of Defendants' demands, Ex. 61, yet the Trump administration escalated: NIH alone terminated or froze approximately $1.2 billion in funding to Columbia, and other federal agencies including NSF terminated or froze additional funding. Ex. 62.

Columbia was forced to enter into a settlement agreement on July 23, requiring it to pay $200 million to the United States and to make demanded changes to its curriculum, admissions, international student programs, and other matters. Ex. 63.[19] On July 25, Defendant McMahon posted, "The deal with

---

[19] Specifically, it required Columbia to review its programs in regional areas, "starting with the Middle East"; "ensure the educational offerings are comprehensive and balanced"; establish "new programs to address the full range of fields"; create a new process for hiring non-tenured faculty across the university; appoint new faculty members with joint positions in the Institute for Israel and Jewish Studies and

Columbia should serve as a roadmap for institutions across the country," and stated, "I'm hoping that this negotiation ... will become a template for the other universities around the country that have these same kind of practices." Ex. 66. A week later, NSF, NIH, and DOE terminated all grants to UCLA. Exs. 2, 5. The next week, the Trump administration issued the August 8 Demand Letter to the UC. Ex. 10.

*Brown.* Defendants followed the same playbook in coercing Brown University to cave to their demands. On March 10, 2025, Brown received the same OCR letter warning of potential Title VI enforcement that four UC campuses received regarding antisemitism. Ex. 13. On April 3, the New York Times reported that the Trump administration intended to block $510 million in federal contracts and grants to Brown. Ex. 67. On or about April 10, 2025, HHS expanded an existing Title VI investigation to include incidents occurring at the entire university from October 7, 2023 to the present. Ex. 68. In April 2025, NIH ceased reimbursing Brown for expenses incurred on existing grants, and the Trump administration terminated additional federal grants and contracts. Ex. 69 at 4.

One week after Columbia entered into its settlement agreement, Brown entered into its own. As a condition of regaining access to the frozen funds and having its future applications for federal funding "[f]airly consider[ed] … without disfavored treatment," Brown agreed to: pay a $50 million fine; adopt the administration's definitions of "male," "female," and "sex"; refuse to provide gender-affirming care to transgender minors; and, pursuant to provisions virtually identical to those in the Columbia agreement, prohibit "DEI" initiatives and the use of any "proxy" for race in admissions, including personal statements. Ex. 70.[20] That same day, Defendant McMahon posted, "The Trump Administration is successfully reversing the decades-long woke-capture of our nation's higher education institutions." Ex. 71. The next, President Trump posted, "Woke is officially DEAD at Brown." Ex. 72.

---

the departments of economics, political science, or the School of International and Public Affairs, who must contribute to an "intellectually diverse academic environment"; "ensure its programs do not promote unlawful DEI goals"; provide the federal government with detailed admissions data; prohibit the use of any "proxy for racial admission," such as "personal statements, diversity narratives, or any applicant reference to racial identity"; ensure international students are "asked questions designed to elicit their reasons for wishing to study in the United States"; ensure "all students, international and domestic, are committed to the longstanding traditions of American universities"; "comply with all requests for immigration information" relating to the Student and Exchange Visitor Program to the extent permitted by FERPA; and impose new protest restrictions. *Id.*

[20] The DEI and admissions provisions are virtually identical to those in the Columbia agreement. Brown also agreed to "support ... research and education about Israel, and a robust Program in Judaic Studies" and to engage in "renewed partnerships with Israeli academics and national Jewish organizations … and a convening of alumni, students, and faculty to celebrate 130 years of Jewish life at Brown in the 2025-2026 academic year." Ex. 70.

*Penn.* The Trump administration used similar tactics against the University of Pennsylvania. On February 6, OCR notified Penn of a Title IX investigation arising from a transgender woman competing on the Penn women's swimming and diving team. Ex. 73. On or about March 19 (mere days after freezing $400 million of Columbia's federal funds), the Trump administration announced it was freezing $175 million in federal funding to Penn. Exs. 74, 75. To restore that funding, Penn capitulated to the administration's demands and "entered into a Resolution Agreement to comply with Title IX," announced by ED on July 1. The Resolution Agreement requires Penn to, *inter alia*, strip transgender women of any athletic recognitions, announce that Penn will not permit such athletes to compete for Penn women's sports teams, and adopt the administration's definitions of "male" and "female." Ex. 73.

In a July 31, 2025 post, Defendant McMahon directly connected the pattern of threats pursuant to the Task Force Policy described above with the Trump administration's goal of purging disfavored "woke" views from universities, stating, "The Trump Administration is dismantling decades of woke control over America's universities. Major wins at Brown, Columbia, and UPenn are restoring higher education as a place to learn—not to indoctrinate." Ex. 76; *see also* Exs. 64, 65, 66.

### 2. *Punishing the Noncompliant*

On March 31, 2025, the Trump administration announced "a comprehensive review of federal contracts and grants at Harvard" as "part of the ongoing efforts of the Joint Task Force to Combat Anti-Semitism," Ex. 77, and criticized Harvard for "promoting divisive ideologies" (without explanation). *Id.*

On April 3, 2025, the DOJ Task Force sent Harvard a letter listing nine demands as conditions of continuing to receive federal funding, including that Harvard: review and make "necessary changes" to unspecified "[p]rograms and departments that fuel antisemitic harassment"; make unspecified programmatic changes "to address bias, improve viewpoint diversity, and end ideological capture"; overhaul student discipline, among other things to ensure that "senior administrative leaders are responsible for final decisions"; enact a "mask ban"; adopt unspecified "merit-based admissions policies" and "hiring reform[s]"; "cease all preferences based on race, color, or national origin" and thereby "shutter" all "DEI programs." Ex. 78. On April 11, 2025, the Trump administration sent Harvard another letter, listing conditions for "maintain[ing] Harvard's financial relationship with the federal government," including: forcing "viewpoint diversity" onto every department in the university by hiring new faculty and admitting students with the government's preferred views; reducing the "power held by

faculty ... more committed to activism than scholarship"; and "shutter[ing]" all DEI programs. Ex. 79.

Harvard rejected these terms on April 14. Within hours, DOJ froze over $2.2 billion in grants to Harvard. Ex. 80. Over the following two days, President Trump plainly stated the loss of funding was due to viewpoint discrimination, stating Harvard was "pushing political, ideological, and terrorist inspired/supporting 'Sickness,'" Ex. 81, "hiring almost all woke, Radical Left" faculty, and "should no longer receive Federal Funds." Ex. 82; *see* Ex. 83. On May 5, Defendant McMahon sent Harvard a letter objecting to its management's political composition. Ex. 84. In May, various government agencies terminated additional grants related to medical, scientific, technological, and other projects. Ex. 85.

On April 11, 2025, AAUP and its Harvard chapter, joined later by UAW, filed suit against the Trump administration; ten days later, Harvard filed its own. *See President & Fellows of Harvard Coll. v. HHS*, No. 25-cv-11048-ADB (D. Mass.). The President responded by threatening to retaliate against Harvard for refusing to accede to his demands: "every time [Harvard] fight[s], they lose another $250 million." Ex. 86. The court enjoined the government, finding that "a review of the administrative record makes it difficult to conclude anything other than that Defendants used antisemitism as a smokescreen for a targeted, ideologically-motivated assault on this country's premier universities, and did so in a way that runs afoul of the APA, the First Amendment and Title VI." *President & Fellows of Harvard Coll. v. HHS*, ___F.Supp.3d___, 2025 WL 2528380, at *36 (D. Mass. Sept. 3, 2025).

### III. Defendants Have Coercively Presented a Hobson's Choice that Will Irreparably Harm All of the UC's Constituents, Whichever Path the UC Chooses.

#### A. The Loss of Federal Funding and Payment of a $1 Billion Penalty Would Wreak Catastrophic and Irreparable Harm on All of the UC's Constituents, Including Plaintiffs and Their Members.

The UC, comprised of ten campuses, three affiliate national laboratories, six academic health center systems, and numerous institutes, centers, and research laboratories across the state, is a leading academic institution in the United States and the world. Ex. 87. Nearly one-tenth of all U.S. academic research is conducted by UC researchers, whose work has laid the groundwork for critical advances in technology, health care, and other fields. Exs. 88, 89, 90, 91, 92, 93, 94, 95, 96. Defendants' threat to pull federal funding from the UC jeopardizes these crucial scientific and intellectual contributions.

Defendants' summary termination of $584 million in UCLA research grants has caused lasting irreparable damage to Plaintiffs' members that cannot be fully remedied even with the restoration of

funds pursuant to the *Thakur* preliminary injunctions. Experiments were interrupted and delayed,[21] lab personnel laid off,[22] the scope of research curtailed,[23] and professional opportunities compromised.[24] In the words of one graduate student researcher whose NIH-funded research on cancer progression was abruptly halted, requiring him to abandon the more detailed mechanistic studies he had planned: "Importantly, knowledge that could improve human health has been lost." Local 4811 Doe ¶¶10-12.

Defendants' words and actions (including the example they have made of Harvard) make clear that if the UC does not acquiesce to their demands, Defendants will not stop at the $584 million but will unceasingly escalate their pressure tactics until the UC relents. The threat is real and imminent. When Harvard did not capitulate, the Trump administration immediately responded by cutting $2.2 billion in research grants, followed by additional cuts, from HHS, NIH, NSF, DOD, OPM, DOJ, USDA, ED, Energy, NASA, HUD, NEA, and Commerce. *See Harvard*, 2025 WL 2528380, at *2, 5, 7-9. As noted above, Defendant Terrell threatened, "Expect massive lawsuits against UC system ... *We are going to go after them where it hurts them financially. And ... I hope you can read between the lines. There's numerous ways to hurt them financially.*" Ex. 108 (emphasis added).

The loss of additional research grant funding would cause irreparable harm to all those who rely on those grants to conduct crucial scientific, medical, and other academic research. The work of many of Plaintiffs' members is supported by grant funding from Defendant federal agencies.[25] If Defendants were to terminate or suspend these funds, these professors, postdoctoral scholars, graduate student researchers, and other academic staff would experience a similar wave of irreparable harms: interrupted

---

[21] *See, e.g.*, Peters Dec. ¶12; Local 4811 Doe Dec. ¶10; Witness E Dec. ¶9; Huk Dec. ¶8; Bearden Dec. ¶12; Dann Dec. ¶¶11-12; Weissmann Dec. ¶¶8-10.

[22] Local 4811 Doe Dec. ¶9 ("As a result of the suspension, my colleague who is a project scientist was terminated, and four of the five undergraduate researchers also had to stop working in the lab.").

[23] *See, e.g.*, Weissmann Dec. ¶8 (following the suspensions, "stopped working on important subprojects"); Witness E Dec. ¶7 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛); Local 4811 Doe Dec. ¶¶11-12 ("[T]he scope of my research is narrower than intended, and opportunities to develop expertise in advanced tumor immunology and metabolism approaches have been lost."); Clark Dec. ¶23; Huk Dec. ¶8; Gonzalez Dec. ¶18.

[24] Gonzalez Dec. ¶¶13-14, 16, 18, 19 ("I now doubt that I will be able to pursue my dream of having an independent research career."); Russell Dec. ¶15; Schmid Dec. ¶8; Clark Dec. ¶23; Bearden Dec. ¶9; Peters Dec. ¶15; Dann Dec. ¶¶10, 12; Local 4811 Doe Dec. ¶¶10-11.

[25] *See, e.g.*, Jaime Dec. ¶4 (listing federal agencies); Paredes Dec. ¶¶7, 14; Russell Dec. ¶5.

research,[26] threats to employment and livelihoods,[27] wasted resources funded by taxpayer dollars,[28] undermined career prospects and reputations,[29] a crippled training pipeline,[30] harms to longstanding partner organizations and universities,[31] and curtailment of the production of knowledge that promises to benefit their fields, patients, and society at large.[32] Indeed, the uncertainty caused by Defendants' campaign is already impairing scientific progress, leading some of Plaintiffs' members to refrain from hiring staff[33] and to limit their research scope to minimize the damage if further cuts target the UC.[34]

Losing any significant additional portion of federal funds would wreak catastrophic harm across

---

[26] Parks Dec. ¶8 (lab would "almost immediately lose the ability to function"); Witness H Dec. ¶16 (██████████████████████████████████████████████); Witness I Dec. ¶15 (████████████████████████████████████████); Witness E Dec. ¶¶7, 9, 11; Shover-Darling Dec. ¶26; Huk Dec. ¶¶14-15; Peters Dec. ¶15; Campbell Dec. ¶16; Dann Dec. ¶15; UAW Doe Dec. ¶13; Weissman Dec. ¶13; Witness B Dec. ¶¶30-31.

[27] Witness E Dec. ¶13 (███████████████████████████████████████████████████████████████); Huk Dec. ¶16 ("[M]y staff would be forced to find jobs elsewhere."); Parks Dec. ¶8 (most of the twelve scientists and rover operators in the lab would be laid off); Weissman Dec. ¶13 ("[M]y colleagues and I will lose our jobs."); Campbell Dec. ¶16; Witness C Dec. ¶23; Shover-Darling Dec. ¶¶26-27; Witness H Dec. ¶16; Peters Dec. ¶15; Witness B Dec. ¶¶30-31.

[28] Witness E Dec. ¶9 (███████████████████████████████████████████); Campbell Dec. ¶17 ("If we lose funding mid-way through a mouse experiment, and it must be halted, the experiment has to be restarted from scratch at the breeding phase. Months of research would be wasted."); Weissman Dec. ¶13 ("We conduct multi-year experiments, and if they are halted, all our progress would go to waste. We also use sensitive materials, like reagents, that would have to be thrown away."); Gonzalez Dec. ¶18; Parks Dec. ¶11.

[29] Huk Dec. ¶16 (future funding cuts would "severely impact my career trajectory"); Peters Dec. ¶15 (unable to produce new data needed to advance his career while research is slowed or paused due to uncertainty); Campbell Dec. ¶18; Witness E Dec. ¶14; Dann Dec. ¶15; Gonzalez Dec. ¶18; Parks Dec. ¶11; Weissman Dec. ¶11; Kimberg Dec. ¶¶35-36; Witness B Dec. ¶30.

[30] Huk Dec. ¶16 ("The postdoctoral students and senior trainees in my lab, who comprise the next generation of principal investigators, will be hamstrung and at a competitive disadvantage[.]"); Witness H Dec. ¶16 (████████████████████████████████████████████████████████████████████████████████████████████████████████); Clark Dec. ¶24 (graduate students and postdoctoral fellows "will not have the opportunity to work on issues relevant to their professional development").

[31] Witness H Dec. ¶17 (████████████████████████████████████████████████████); Shover-Darling Dec. ¶29 (harm to community organizations and local government partners); Parks Dec. ¶9 (entire Mars rover project would be disrupted); Weissman Dec. ¶13.

[32] Witness E Dec. ¶12 (████████████████████████████████████████████████████████████████████); Huk Dec. ¶¶4, 15 (research on "how working memory functions in the brain" would scale down and slow); Peters Dec. ¶8 (research on T cell therapy to treat cancers, such as childhood sarcoma, without side effects of chemotherapy); Campbell Dec. ¶19 (life-saving research into "why people get cancer at all" cannot be easily and quickly monetized and is therefore "not likely to be funded by private industry"); Dann Dec. ¶15 ("[T]he promising cancer treatment we are developing would be at risk."); Gonzalez Dec. ¶¶4, 8 (study of "inhalation of biomass burning aerosol" to better protect human health against wildfires); Parks Dec. ¶¶6, 10 ("RIMFAX data that our lab helps produce provide unique and irreplaceable context for the discovery … [of] the most significant evidence of life on Mars."); Weissman Dec. ¶13 (public "would be deprived of cutting-edge research related to the gut microbiome and will be unable to benefit from the potential clinical applications of our work"); Local 4811 Doe Dec. ¶13.

[33] Witness I Dec. ¶19; Shover-Darling Dec. ¶28; Clark Dec. ¶24; Schmid Dec. ¶9.

[34] Witness I Dec. ¶19; *see also* Peters Dec. ¶14; Campbell Dec. ¶17; Dann Dec. ¶13.

PLAINTIFFS' MPA ISO MOTION FOR PRELIMINARY INJUNCTION          Case No. 3:25-cv-07864-RFL

the UC and those who depend on it. President Milliken called Defendants' threatened funding cuts "one of the gravest threats to the [UC] in our 157-year history. Losses of significant research and other federal funding would devastate UC and inflict real, long-term harm on our students, our faculty and staff, our patients, and all Californians." Ex. 18. He wrote that "[c]lasses and student services would be reduced, patients would be turned away, tens of thousands of jobs would be lost, and we would see UC's world-renowned researchers leaving our state for other more seemingly stable opportunities in the US or abroad. It is hard to conceive of a more damaging consequence[.]" Ex. 17. Such devastating financial impacts would inevitably harm Plaintiffs, whose efforts to protect and improve the working conditions of their members would be severely impaired by cuts on the scale Defendants are threatening.[35]

### B. Capitulation by the UC to Defendants' Coercive Demands Would Likewise Cause Irreparable Harm and Violate the Rights of Plaintiffs and Their Members.

The financial stakes of Defendants' threats increase the likelihood that the UC will capitulate to the administration's coercive demands. This would have devastating consequences for Plaintiffs and their members, as well as other UC community members, whose dissenting voices will be silenced, their rights directly and irrevocably trampled, and their safety and well-being irreparably endangered.

A ban on providing gender-affirming care to transgender minor patients, for example, would cause healthcare providers serious injury by requiring them to withhold care that, in their professional judgment, is best for their patients.[36] Plaintiffs' members whose transgender children receive care through the UC System will likewise suffer devastating impacts if their medical care is interrupted, along with their children who are denied care.[37] And capitulating to the Trump administration's demand to endorse a definition of gender that rejects the existence of transgender identities and excludes transgender people from using campus facilities that conform with their gender identities would cause

---

[35] *See, e.g.*, Jaime Dec. ¶¶6-7, 10, 14; Quicho-Cheng Dec. ¶¶17-19; Hamstead Dec. ¶¶13-15; Rabinowitz Dec. ¶14.

[36] Kimberg Dec. ¶¶47-48 ("Faced with a minor child in need of this care, our members would find themselves in the impossible position of having to choose between disobeying the dictates of the Trump Administration or disobeying their oaths and medical licensure requirements."); Grooms Dec. ¶¶7-10 (would be unable "to provide the full spectrum of appropriate care to my patients, as required by my medical judgment and ethical obligations," if unable to provide gender-affirming care to minors); Elliott Dec. ¶18; CIR Doe Dec. ¶¶9, 12; Shemuel Dec. ¶¶10-12; Orozco-Poore Dec. ¶¶12-13.

[37] UCLA-FA Doe Dec. ¶¶12-18 ("If UCLA capitulates to the … demand that UCLA stop providing gender affirming medical care for minors, the impact on my daughter would be devastating. As a parent, I would also be irreparably harmed by UC—my employer and my daughter's healthcare provider—refusing to provide the care that my daughter's doctor has determined is appropriate for her."); Patel Dec. ¶14; Quicho-Cheng Dec. ¶¶14-16; Rodger Dec. ¶16.c; Kimberg Dec. ¶48.

immediate injury to Plaintiffs' transgender members, including by forcibly relocating them to spaces where their gender presentation may put them at risk.[38]

Committing to cooperate with federal law enforcement, which includes ICE, would exacerbate the harms to patient trust, treatment, and confidentiality that Plaintiffs' medical provider members have already experienced as a result of UC permitting ICE's presence at UCLA's Ronald Reagan Medical Center.[39] The academic pursuits of faculty members who rely on the diverse experiences and perspectives of international students would be impoverished by a vague proscription against admitting international applicants "likely to engage in anti-Western, anti-American, or antisemitic disruptions or harassment" and a requirement that the international students who are admitted be "socialized" to campus norms.[40] Similarly, interference with UC's admissions, hiring, and promotion practices— including by prohibiting the use of any undefined "proxies" for race, eliminating certain scholarships, and precluding the consideration of personal statements or diversity narratives—would interfere with Plaintiffs' members' ability to holistically evaluate students and their peers.[41]

The free speech and assembly rights of Plaintiffs' members who intend to engage in demonstrations but would reconsider because of the additional restrictions on protest rights demanded by Defendants would suffer.[42] The current climate of self-censorship and fear would be institutionalized by the presence of an outside monitor with the obligation to report to and share records with the federal government. And whole areas of study, some of which Plaintiffs' members research and teach,[43] face

---

[38] Nicolazzo Dec. ¶¶12, 18-22 (fears they "will be harassed or face physical violence" if forced to use the women's restroom); CIR Doe Dec. ¶¶8-12; UPTE Doe Dec. ¶¶10-12; Blackwood Dec. ¶¶12-13; Shover-Darling Dec. ¶¶19-20; Patel Dec. ¶13; Quicho-Cheng Dec. ¶¶13; Rodger Dec. ¶16.c; Markowitz Dec. ¶29; Orozco-Poore Dec. ¶¶9-11.

[39] Blackwood Dec. ¶¶7-11; Elliott Dec. ¶17; Quicho-Cheng Dec. ¶¶10-12; Kimberg Dec. ¶43; Martinez Dec. ¶¶14-19.

[40] Fahrenthold Dec. ¶28; Appel Dec. ¶46; *see also* Miller Dec. ¶13; Shin Dec. ¶21; Fielding-Miller Dec. ¶34; Shover-Darling Dec. ¶14; Hanssmann Dec. ¶17.

[41] Appel Dec. ¶48 (explaining why discussions of one's racial identity can be relevant to admissions decisions in the field of anthropology and the harm that would follow from constraining admissions evaluations); McClanahan Dec. ¶31; Goyal Dec. ¶22; Witness A Dec. ¶31.

[42] Witness C Dec. ¶15 ( ███████████████████████████████████████████████████████████ ); Goyal Dec. ¶24; Fahrenthold Dec. ¶¶11, 23, 24, 31; Hanssmann Dec. ¶ 15; Appel Dec. ¶45; Miller Dec. ¶12; Witness A Dec. ¶31.

[43] *See, e.g.*, Goyal Dec. ¶23; Lee Dec. ¶30; Appel Dec. ¶47; Fahrenthold Dec. ¶13; Witness G Dec. ¶18; Shin Dec. ¶23; Fielding-Miller Dec. ¶34; Witness A Dec. ¶31; Witness C Dec. ¶¶4, 11; Shover-Darling Dec. ¶17; Miller Dec. ¶14; Blair Dec. ¶22.

risk of extinction if the UC accedes to a demand to review all policies and programs that address DEI.[44]

In addition, many of the Trump administration's demands require UC to adopt positions that contravene the commitments of Plaintiff organizations, including to antidiscrimination and diversity principles—some of which Plaintiffs previously negotiated with UC.[45] The Trump administration's effort to unilaterally impose its demands harms Plaintiffs' collective bargaining and shared governance interests.[46] And the chilling effects resulting from Defendants' conduct have compromised not only academic speech but also speech and conduct that directly impacts' Plaintiffs' missions.[47]

Importantly, the UC—coerced by the Trump administration's threats of crippling funding cuts— has already taken steps to appease the Trump administration that impair Plaintiffs' members' constitutional interests. For example, following the August 8 demand letter, senior administrators at UCLA pulled institutional support for an interdisciplinary project concerning academic freedom, despite having previously endorsed the project and committed more than $140,000 in matching funds to support it. Blair Dec. ¶¶41-42. As a result, the interdisciplinary team lost the opportunity to obtain private grant funding for the project, which absorbed months of faculty time that could have been spent on other projects, and was ultimately forced to abandon the project. *Id.* ¶¶41, 43. In addition, after the administration announced its investigations into UC, UC ended the practice of considering "diversity statements" in faculty hiring, purportedly because UC "needed to show signs it was listening to the Trump administration." McClanahan Dec. ¶31 & Ex. A. Further, at least one UC administrator has cited the threat of funding cuts in a campus-wide message promising strict enforcement of campus policies in the context of demonstrations,[48] and a department at UCI changed the name of the Diversity, Equity, Inclusion, and Belonging office without any input from faculty, leading faculty to fear that these topics are already off-limits in their work. Shin Dec. ¶19. In early August, UCLA promulgated a policy expanding the access of federal law enforcement, including ICE, to UCLA medical facilities, thereby foreseeably subjecting workers and patients to intimidating confrontations that could lead to arrest and

---

[44] Witness C Dec. ¶¶ 12, 20, 21 (███████████████); Goyal Dec. ¶23 (Department of African American Studies); Lee Dec. ¶¶1, 5, 25, 26 (Ethnic Studies Certificate Program); Witness B Dec. ¶35.
[45] *See, e.g.*, Patel Dec. ¶15; Elliott Dec. ¶¶10-17; Rodger Dec. ¶11.a.
[46] *See infra* Arg. §I.A..
[47] Witness C Dec. ¶18; Rabinowitz Dec. ¶¶11-13.
[48] Fahrenthold Dec. Ex. A ("The federal government has recently tied federal funding to expressions of antisemitism on college campuses. Considering this very serious situation, I want to address the campus even more directly on this topic….").

deportation and that undermine patient-provider relationships. Patel Dec. ¶¶8-11. In important respects, the Trump administration has already succeeded in conscripting UC to advance its agenda in efforts to forestall further devastating funding cuts.[49]

## LEGAL STANDARD

A preliminary injunction is granted when the moving party (1) is likely to succeed on the merits; (2) irreparable harm is likely without preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. Fed. R. Civ. P. 65 (b)(1), (c); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Alternatively, if there are 'serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied." *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017) (cleaned up).

## ARGUMENT

### I.    This Court Has Jurisdiction to Order the Requested Relief.

#### A.  Plaintiffs Have Standing to Seek Injunctive Relief on Each of Their Claims Against Defendants.

Plaintiff associations may show standing in two ways: by showing "the organization … suffered an injury in its own right or … as the representative of its members." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) ("*SFFA*"). Under either theory, Plaintiffs "need only establish a risk or threat of injury to satisfy the actual injury requirement." *City & Cnty. of S.F. v. USCIS*, 944 F.3d 773, 786-87 (9th Cir. 2019).

First, Plaintiffs have representational standing through their members because a) their members would "otherwise have standing to sue in their own right," b) the interests Plaintiffs seek to protect are germane to their organizational purposes, and c) "neither the claim[s] asserted nor the relief requested requires the participation of individual members in the lawsuit." *SFFA*, 600 U.S. at 199. Plaintiffs'

---

[49] *See also* Blair Dec. ¶23 (additional restrictions on protests at UCLA and placing staff member on leave due to speech); Jaime Dec. ¶¶8-9 (September 22, 2025 email asserting various prohibitions on political speech, with receipt of public funds as the basis for the prohibitions); Kimberg Dec. ¶16 (UCSF implemented "compliance process" requiring revisions of public-facing descriptions of programs and changed longstanding name of UCSF Office of Diversity and Outreach); *id.* ¶27 (UCSF revised policy on financial aid to prohibit awards that account for student's race, sex, color, ethnicity, or national origin); Weissman Dec. ¶12 ("We have been advised not to say anything that could draw the ire of the current administration"); Fielding-Miller Dec. ¶21 ("I have received communications from University administrators requesting faculty to refrain from speaking to media without direct oversight.").

members have faced concrete injury and continue to face a "substantial risk" of future injury from Defendants' actions, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014),[50] and their injuries would be redressed by the requested injunction. *See* Facts §§I.D, III.A-.B.[51] The interests Plaintiffs seek to protect are also germane to their organizational purposes, which include protecting academic freedom,[52] improving professional opportunities and working conditions on UC campuses,[53] and protecting members against discrimination and supporting diversity and inclusivity.[54] Adjudicating Plaintiffs' challenges to the Task Force Policy, and crafting effective relief, do not require the participation of Plaintiffs' members.

Second, Defendants' actions have had a substantial impact on Plaintiffs' core organizational activities by "frustrat[ing their] mission and caus[ing them] to divert resources in response to that frustration of purpose." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Ed.*, 82 F.4th 664, 682-83 (9th Cir. 2023) (en banc) (cleaned up); *see also Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79

---

[50] Plaintiffs' UC members include approximately 550 professors (AAUP); 48,000 graduate student researchers, academic student employees, postdoctoral scholars, and academic researchers (UAW Local 4811); 7,200 lecturers, instructors, librarians, and other employees (UC-AFT); 20,000 healthcare professionals, research professionals, and technical employees (UPTE); 6,600 resident physicians (CIR); 40,000 service workers, patient care technical workers, and skilled craft workers (AFSCME); 23,500 Registered Nurses (CNA/NNU); 20,000 administrative, skilled trades, and healthcare workers (Teamsters Local 2010); and research and public service professionals and student services and advising professionals (UAW). Wolfson Dec. ¶9; Jaime Dec. ¶2; Rodger Dec. ¶3; Russell Dec. ¶3; Quicho-Cheng Dec. ¶5; Patel Dec. ¶3; Sweeney Dec. ¶6; Rabinowitz Dec. ¶2. CUCFA serves as the umbrella organization for all individual Faculty Association Plaintiffs. McClanahan Dec. ¶4. Plaintiffs' members work across all ten UC campuses, five medical centers, related labs, and Lawrence Berkeley National Lab. Jaime Dec. ¶2; Russell Dec. ¶3; Patel Dec. ¶3; Elliott Dec. ¶7 (ten campuses and student health centers); Schmid Dec. ¶5 (ten campuses); Quicho-Cheng Dec. ¶5 (all UC Health locations with residency or fellowship programs); Wolfson Dec. ¶9 (ten campuses); McClanahan Dec. ¶4.

[51] Plaintiffs seek preliminary relief as to all Defendant agencies except GSA, NEH, HUD, IMLS, DOT, and AmeriCorps. Plaintiffs have established standing as to each of the Defendant agencies subject to this motion, which provide grant funding that supports the work of Plaintiffs' members. *See* Jaime Dec. ¶4 (UAW Local 4811's members directly receive funding through fellowships or grants from, or work on projects directly funded by, NSF, DOE, HHS, NIH, CDC, FDA, DOD, NASA, USDA, ED, Commerce, DOJ, State, Interior, and EPA); *see also, e.g.*, Huk Dec. ¶¶2, 6 (UCLA-FA, CUCFA, and AFT member with NIH funding); Witness C Dec. ¶¶1, 4 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛); Witness H Dec. ¶¶5, 14 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛); Parks Dec. ¶¶3-4 (UAW Local 4811 member with NASA funding).

[52] Schmid Dec. ¶¶13-14; Russell Dec. ¶6; Quicho-Cheng Dec. ¶8; Blair Dec. ¶6; Gould Dec. ¶5; Young Dec. ¶6; McClanahan Dec. ¶¶5, 9; Kimberg Dec. ¶6; Wolfson Dec. ¶7; Vijay Dec. ¶6; Palmer Decl. ¶9.

[53] Elliott Dec. ¶3; Patel Dec. ¶4; Quicho-Cheng Dec. ¶6; Gould Dec. ¶5; Sweeney Dec. ¶16; Jaime Dec. ¶3; Young Dec. ¶6; Rabinowitz Dec. ¶3; McClanahan Dec. ¶5; Kimberg Dec. ¶6; Wolfson Dec. ¶7; Palmer Dec. ¶11.

[54] Russell Dec. ¶¶6, 18; Elliott Dec. ¶¶12-17; Patel Dec. ¶4; Quicho-Cheng Dec. ¶¶8, 15; Gould Dec. ¶5; Rodger Dec. ¶17.a; Rabinowitz Dec. ¶3; McClanahan Dec. ¶10; Palmer Dec. ¶12.

PLAINTIFFS' MPA ISO MOTION FOR PRELIMINARY INJUNCTION                    Case No. 3:25-cv-07864-RFL

(1982). Defendants' actions have frustrated Plaintiffs' core activities and missions, as would implementation of the August 8 demands.[55] Responding to these threats has required Plaintiffs to divert resources and compromised their ability to continue fulfilling their missions and engaging in their core activities.[56] Defendants' conduct has also directly harmed Plaintiffs' own First Amendment rights and undermined Plaintiffs' roles as their members' collective bargaining representatives or shared governance advocates.[57]

## B. Plaintiffs' Claims Belong in District Court.

Any argument that the Tucker Act requires sending Plaintiffs' claims to the Court of Federal Claims is foreclosed by Ninth Circuit authority holding that where "plaintiffs seek to enforce compliance with statutes and regulations" and "no contract exists between plaintiffs and the government," the "matter [is] beyond the scope of the Tucker Act's exclusive jurisdiction." *Cmty. Legal Servs. in E. Palo Alto v. HHS*, 137 F.4th 932, 938 (9th Cir. 2025); *see Thakur v. Trump*, 148 F.4th 1096, 1104 (9th Cir. 2025); *see also Thakur*, 2025 WL 2696424, at *8-9 (Tucker Act did not bar researchers' APA claims); *Harvard*, 2025 WL 2528380, at *13-14 (Tucker Act did not bar AAUP and UAW's APA claims based on constitutional and Title VI violations, nor prospective relief under their APA arbitrary and capricious claim). The Ninth Circuit's holdings are undisturbed by *Department of Education v. California*, 604 U.S. 650 (2025), and *National Institutes of Health v. American Public Health Association*, 145 S. Ct. 2658 (2025) ("*APHA*"), neither of which addressed district courts' jurisdiction over claims based on the

---

[55] *See, e.g.*, Wolfson Dec. ¶24 ("The government's actions and statements have made it more difficult and resource-intensive for the AAUP to carry out its work for chapters and individual members, in particular on issues of academic freedom. Because of government pressure on the UC and other universities to abandon their commitment to academic freedom, shared governance, and due process principles, the AAUP must now expend more time and money to ensure that its members' rights in these regards are protected."); Patel Dec. ¶¶12, 16; Schmid Dec. ¶21; Blair Dec. ¶¶29-34 ; Gould Dec. ¶¶14-17, 26; Sweeney Dec. ¶¶10-12; Jaime Dec. ¶¶7, 10; Young Dec. ¶¶39-43; Markowitz Dec. ¶¶33-35 ; McClanahan Dec. ¶21; Elliott Dec. ¶¶10-16; Kimberg Dec. ¶¶53-57; Palmer Dec. ¶¶24-25; Quicho-Cheng Dec. ¶¶8, 17-22; Rabinowitz Dec. ¶¶12, 14; Rodger Dec. ¶17; Russell Dec. ¶6, 16, 20-21; Vijay Dec. ¶¶19-20.

[56] *See, e.g.*, Kimberg Dec. ¶¶49-53 (deprioritizing advocacy on funding and workload concerns to address attacks on UC, including conducting surveys, participating in town halls, and advocating at Academic Senate Leadership Retreat); Russell Dec. ¶27; Patel Dec. ¶18; Schmid Dec. ¶¶16-20, 22; Blair Dec. ¶¶35-36; Gould Dec. ¶¶12-13, 21-22; Rodger Dec. ¶17.c; Sweeney Dec. ¶12; Jaime Dec. ¶10; Young Dec. ¶42-43; Markowitz Dec. ¶¶36-37; Rabinowitz Dec. ¶15; McClanahan Dec. ¶20; Hamstead Dec. ¶¶11-15; Palmer Dec. ¶¶27-31; Wolfson Dec. ¶27; Quicho-Cheng Dec. ¶¶20-21; Schmid Dec. ¶22.

[57] Russell Dec. ¶¶17-19, 21-23 (administration's demands regarding protest activity and transgender individuals would undercut UPTE's authority to bargain these issues; threatened funding cuts are contributing to bargaining paralysis and would harm members' employment); Patel Dec. ¶¶12, 17-18; Elliott Dec. ¶¶12-17; Blair Dec. ¶38; Gould Dec. ¶¶18-20, 23-25; Rodger Dec. ¶¶16.c, 17.b; Young Dec. ¶¶44-46; Markowitz Dec. ¶39; McClanahan Dec. ¶26; Kimberg Dec. ¶56; Martinez Dec. ¶¶20-23.

Constitution or statutes such as Title VI or IX, or claims brought by non-parties to the federal contracts that cannot be brought in the Court of Federal Claims. *See Thakur*, 2025 WL 2696424, at *9.

Plaintiffs' constitutional and statutory claims for equitable relief are not "'disguised' breach-of-contract claim[s]." *Thakur*, 148 F.4th at 1103 (quoting *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982))). Rather, Plaintiffs' claims are rooted in the First Amendment and other constitutional provisions and in the substantive and procedural protections of Title VI, Title IX, and the APA; and the relief they seek is purely equitable in nature. *See id.* (describing two-part *Megapulse* test). Thus, the "rights and remedies" Plaintiffs seek to enforce "are statutorily or constitutionally based," not "contractually based." *See CLSEPA*, 137 F.4th at 938. The Court of Federal Claims lacks jurisdiction over such claims. *See, e.g.*, *Stephens v. United States*, 165 Fed. Cl. 341, 348 (2003) (no jurisdiction over First Amendment claims); *Manuel v. United States*, 115 Fed. Cl. 105, 114 (2014) (same, over Title VI claims). Federal courts "'can[not] be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims.'" *CLSEPA*, 137 F.4th at 939 (quoting *Tootle v. Sec'y of Navy*, 446 F.3d 167, 177 (D.C. Cir. 2006)); *see Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1109 (D.C. Cir. 2022). Moreover, because Plaintiffs and their members are not parties to the grants and contracts at issue, denying district court jurisdiction over their claims would leave them nowhere to bring their claims at all, a result not considered by the Supreme Court in *California* or *APHA*, and which this Court should "'categorically reject[.]'" *CLSEPA*, 137 F.4th at 939 (quoting *Tootle*, 446 F.3d at 176); *see also Thakur*, 148 F.4th at 1104; *Thakur*, 2025 WL 2696424, at *9-10; *Thakur*, 2025 WL 1734471, at *19-20.

There are additional reasons why this Court has jurisdiction over Plaintiffs' constitutional and statutory claims. First, the Tucker Act's limitation on the APA's waiver of sovereign immunity is altogether inapplicable to Plaintiffs' *ultra vires* claims, which do not rely on the APA's cause of action or waiver of sovereign immunity. Where a plaintiff challenges a federal officer's conduct as unconstitutional, "sovereign immunity does not bar a suit," because "there is no sovereign immunity to waive—it never attached in the first place." *Chamber of Com. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996); *see Dugan v. Rank*, 372 U.S. 609, 621-22 (1963).

Second, both Title VI and Title IX contain an explicit jurisdiction-granting provision, providing that any aggrieved person "may obtain judicial review … in accordance with [the APA]" of any action

"terminating or refusing to grant or to continue financial assistance" based on a purported Title VI or IX violation. *See* 42 U.S.C. §2000d-2 (Title VI); 20 U.S.C. §1683 (Title IX); *see also* 5 U.S.C. §§702, 704 (authorizing judicial review of "[a]gency action made reviewable by statute"). Congress thus expressly waived sovereign immunity and granted district courts jurisdiction over APA claims for equitable relief to enjoin federal agencies from "terminating or refusing to grant or to continue financial assistance" without complying with Title VI and IX requirements. *See Harvard*, 2025 WL 2528380, at *13. The Tucker Act, which is to be "narrow[ly]" construed, *Bowen v. Massachusetts*, 487 U.S. 879, 908 n.46 (1988), cannot impliedly divest this Court's expressly conferred jurisdiction. *See Maine Cmty. Health Options v. United States*, 590 U.S. 296, 323-24 (2020) ("Tucker Act yields" to APA).

## II.   Plaintiffs Are Likely to Succeed on the Merits of Their Claims, or at Minimum Have Raised Serious Merits Questions.

### A. Defendants' Conduct Violates the First Amendment.

"At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024). Defendants have violated the First Amendment by using the threat of legal and economic sanctions in attempt to coerce the UC into suppressing "left" and "woke" viewpoints that the Trump administration disfavors and instead endorsing the Trump administration's preferred ideology. Moreover, Defendants have made these threats in retaliation for the expression of those disfavored viewpoints by UC faculty, students, academic employees, and staff, in further violation of the First Amendment. Defendants' unlawfully coercive acts have predictably had their intended effect of chilling speech across the UC System and must be enjoined.

### 1. Defendants' Actions Are Unconstitutional Government Coercion.

"[A] government official cannot do indirectly what she is barred from doing directly: A government official cannot coerce a private party to punish or suppress disfavored speech on her behalf." *Vullo*, 602 U.S. at 190; *id.* at 187-88. "[A] government entity's 'threat of invoking legal sanctions and other means of coercion' against a third party 'to achieve the suppression' of disfavored speech violates the First Amendment." *Id.* (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)).[58]

---

[58] *See also Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) ("[E]ven in the provision of subsidies, the Government may not 'ai[m] at the suppression of dangerous ideas.'"); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995) (denial of funding based on speaker's particular viewpoint violated First Amendment).

That is precisely what Defendants have done. Defendants are using the threat of investigations and economic sanctions—including suspension of $584 million in research grants without due process, demand of an arbitrary $1 billion payment, and threats to withhold potentially billions of dollars more in federal funding—to attempt to coerce the UC into circumscribing the academic freedom of UC faculty and suppressing "left" and "woke" viewpoints that the Trump administration disfavors. *See* Facts §§I, II, III; *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) ("academic freedom" is "a special concern of the First Amendment"). Defendants' coercive threats have foreseeably had their intended effect of chilling Plaintiffs' members' speech. *See* Facts §I.D; *e.g.*, Shin Dec. ¶18 (restricting protest speech because "I am afraid that we will be blamed for Trump's attacks, and nobody wants to be blamed for costing the University $1 billion."); Facts §III.B; *e.g.* Blair Dec. ¶¶41-43.

While the line between permissible persuasion and unlawful coercion can sometimes be blurry, this is not a close case. The government "violate[s] the First Amendment through coercion of a third party" by engaging in "conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress … speech." *Vullo*, 602 U.S. at 191. In determining whether government conduct crosses the line, the Ninth Circuit considers four non-exhaustive factors: (1) "the government official's word choice and tone" and "the tenor of the overall interaction"; (2) whether the official has regulatory authority over the conduct at issue; (3) "whether the recipient perceived the message as a threat"; and (4) "whether the communication refers to any adverse consequences if the recipient refuses to comply." *Kennedy v. Warren*, 66 F.4th 1199, 1207-09 (9th Cir. 2023); *see also Vullo*, 602 U.S. at 189-90. All four factors overwhelmingly establish that Defendants' actions have crossed far beyond the line from permissible persuasion to unlawful coercion.

First, the word choice, tone, and tenor of the interactions between Defendants and the UC (or other targeted universities) clearly convey a threat of an unrelenting deluge of legal and economic sanctions if the UC does not "play ball" and conform its speech and that of its faculty, students, and staff to the Trump administration's wishes and suppress any dissenting viewpoints. *See* Facts §§I.A-C, II; *e.g.*, Exs. 34, 35, 36 (Terrell threat to "bankrupt these universities" and "take away every single dollar" if they do not "play ball"). Defendant Terrell has specifically warned the UC to "expect massive lawsuits against UC system" and threatened to "go after them where it hurts them financially, … —I hope you can read between the lines—there's numerous ways to hurt them financially." Ex. 108. The stark contrast

between Defendants' praise of Columbia, Brown, and Penn (after they acquiesced) and reproach of Harvard (which resisted) further confirms the coercive nature of the threats. *See, e.g.*, Exs. 64, 65, 66, 86 (Trump: Columbia "[taken] off that hot seat" since they are "working with us," whereas "Harvard wants to fight," and "[e]very time they fight, they lose another $250 million"); *see Backpage.com LLC v. Dart*, 807 F.3d 229, 232 (7th Cir. 2015) (sheriff's "triumphant press release" celebrating results of threats was evidence of coercion). Defendants' message is "loud and clear," *Vullo*, 602 U.S. at 192: universities must "play ball," or "the federal government is coming after you." Ex. 36.

That the object of these express threats is suppression of "left" and "woke" viewpoints is even clearer when Terrell's statements are considered alongside similar comments by President Trump, Secretary McMahon, and other federal officials. *See, e.g.*, Facts §II.A; Ex. 25 (President Trump's campaign promise "to reclaim our once great educational institutions from the radical Left and Marxist maniacs"). While the Task Force Policy purports to address "post-October 7, 2023, campus anti-Semitism" (Ex. 46), McMahon and others have celebrated the settlements at Columbia, Brown, and Penn as representing a "seismic shift" in reversing "decades" of "watch[ing] in horror as our elite campuses have been overrun by anti-western teachings and a leftist groupthink." Ex. 64; *see* Exs. 65, 66.

Second, "[j]ust like the commission in *Bantam Books*" and the insurance commissioner in *Vullo*, Defendants have "direct … enforcement authority" over the UC and can "initiate investigations and refer cases for prosecution." *Vullo*, 602 U.S. at 192. "[T]he greater and more direct the government official's authority, the less likely a person will feel free to disregard a directive from the official." *Id.* at 191-92. Here, the Attorney General has regulatory authority to oversee and coordinate enforcement of Titles VI and IX among federal agencies,[59] DOJ has regulatory authority to bring enforcement actions under Titles VI, VII, and IX,[60] and the Funding Agency Defendants possess statutory authority to terminate federal funding for violations of Title VI and Title IX.[61] *See NEA*, 779 F.Supp.3d at 195-96 (ED's "Dear Colleague" policy threatening loss of federal funds likely coercive; irrelevant that "Title VI does not permit the immediate termination of federal funding" where "there is evidence in this record that the Department is not adhering to these requirements"). As Columbia and Harvard discovered, anything less than total, immediate capitulation to the initial unlawful demands and funding freezes results in even

---

[59] Exec. Order No. 12250 (1980) at §§1–2.
[60] *See* 28 C.F.R. §42.107 (Title VI); 42 U.S.C. §2000e-6 (Title VII); 28 C.F.R. §54.605 (Title IX).
[61] *See* 42 U.S.C. §2000d-1 (Title VI); 20 U.S.C. §1682 (Title IX).

more expansive unlawful funding freezes and other punitive enforcement measures. *See* Facts §II.B.

Third, the UC Regents plainly understand Defendants' demands as a threat. *See Kennedy*, 66 F.4th at 1210-11. Governor Newsom, an ex officio member of the Regents, called the August 8 demands "extortion" and "ransom." Ex. 109. UC President Milliken emphasized that "the stakes are high, and the risks are very real," given UC's dependence on federal funding. *Id.* UCLA Chancellor Frenk called "this … one of the most significant threats UC has faced in its history." Ex. 99. On September 15, 2025, after the LA Times published a story summarizing some of the administration's August 8 demands, President Milliken wrote: "As we consider the unprecedented action against UCLA, it is important to keep in mind that the federal government is also pursuing investigations and actions in various stages against all 10 UC campuses. So, while we are first focused on the direct action involving UCLA, we must also consider the implications of expanded federal action. This represents one of the gravest threats to the University of California in our 157-year history. Losses of significant research and other federal funding would devastate UC and inflict real, long-term harm on our students, our faculty and staff, our patients, and all Californians." Ex. 18; *see* Ex. 17. These statements clearly reflect coercion.[62]

Finally, "whether the communication refers to any adverse consequences if the recipient refuses to comply" is "perhaps [the] most important consideration." *Kennedy*, 66 F.4th at 1211. "The most obvious cases of coercion occur when an official explicitly refers to adverse consequences" "that will follow if the recipient does not accede to the request." *Id.* Here, Defendants have not only "refer[red]" to adverse consequences, but have *already imposed* them, summarily suspending $584 million (in contravention of statutorily mandated procedures, *see infra* Arg. §II.C.2.b), demanding a $1 billion payment not authorized by law, and threatening to deny millions and potentially billions more in federal funds if the UC does not accede to their demands to censor and suppress speech and academic freedom, including but not limited to through restrictions on protests and expressive activities; sharing information about such expressive activity by faculty, academic and staff employees, and students with Defendants; admitting international students only with certain viewpoints; and ceding control over certain curriculum and faculty hiring and promotion decisions to an external monitor. *See* Facts §§I.A-B.

---

[62] To establish coercion, the intermediary need not "admit that it bowed to government pressure for the plaintiff to state a First Amendment claim. … After all, the recipient may wish to conceal why it agreed to the official's request. Indeed, it is not even necessary for the recipient to have complied with the official's request because a credible threat may violate the First Amendment even if 'the victim ignores it, and the threatener folds his tent.'" *Kennedy*, 66 F.4th at 1210.

27

1    The evidence overwhelmingly establishes that, as in *Bantam Books*, Defendants are carrying out

2    "a scheme of state censorship effectuated by extralegal sanctions." 372 U.S. at 72.[63]

3                    **2.   Defendants' Actions Are Retaliation and Viewpoint Discrimination.**

4          The First Amendment prohibits the government from "regulating speech when the specific

5    motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."

6    *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). "To bring a First

7    Amendment retaliation claim, the plaintiff must allege that (1) it engaged in constitutionally protected

8    activity; (2) the defendant's actions would 'chill a person of ordinary firmness' from continuing to

9    engage in the protected activity; and (3) the protected activity was a substantial motivating factor in the

10   defendant's conduct—i.e., that there was a nexus between the defendant's actions and an intent to chill

11   speech." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016).

12         Plaintiffs establish all three elements. First, there is no question that Plaintiffs' members have

13   engaged in constitutionally protected activity and expressed views that the Trump administration

14   disfavors.[64] Second, Defendants' coercive actions targeting the UC "would 'chill a person of ordinary

15   firmness' from continuing to engage in the protected activity." *Ariz. Students Ass'n*, 824 F.3d at 867; *see*

16   Facts §I.D. Finally, evidence of Defendants' true motives—to purge "woke" viewpoints from the UC

17   and remake it in the mold of President Trump's favored ideology—is overwhelming. *See, e.g.*, Exs. 25,

18   28, 36,72, 76, 82; *see Harvard*, 2025 WL 2528380, at *24-26; *Ariz. Students Ass'n*, 824 F.3d at 870

19   (motive may be established through direct or circumstantial evidence). Plaintiffs are likely to establish

20   that "Defendants used antisemitism as a smokescreen for a targeted, ideologically motivated assault on

21   this country's premier universities, and did so in a way that runs afoul of the APA, the First Amendment

22

---

23   [63] It does not matter that Defendants' professed motive is to enforce civil rights laws: *Bantam Books*
     found that a commission's threats to booksellers for distributing what it believed to be obscenity violated
24   the First Amendment, even though "obscenity is not within the area of constitutionally protected
     speech[.]" 372 U.S. at 65. The Court found that booksellers would likely self-censor out of fear, cutting
25   courts out of determining whether targeted material was actually unprotected. *Id.* at 69-71; *see id.* at 66
     (government "is not free to adopt whatever procedures it pleases for dealing with obscenity … without
26   regard to the possible consequences for constitutionally protected speech"). Likewise here, even if
     Defendants sought to target only unlawful conduct, coercing the UC and bypassing the congressionally
27   mandated procedures for enforcing federal civil rights statutes in service of that goal is unconstitutional
     and has a sprawling chilling effect on constitutionally protected speech. The enormous pressure
28   Defendants' financial leverage exerts on the UC exemplifies the "hazards to protected freedoms" caused
     by systems of "informal censorship." *Id.* at 70-71.
     [64] *See, e.g.*, Goyal Dec. ¶¶12-14; Chemers Dec. ¶¶16-17; Witness H Dec. ¶¶19-20; Kutz Dec. ¶¶29-
     30; Lee Dec. ¶25.

and Title VI." *Harvard*, 2025 WL 2528380, at *36.

### B. Defendants' Conduct Is *Ultra Vires* in Excess of Their Constitutional Authority.

#### 1. Defendants' Coercion of a State University Violates the Tenth Amendment.

The federal government's coercion also violates the Tenth Amendment. The UC is a state entity, and "the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz v. United States*, 521 U.S. 898, 925 (1997); U.S. Const. amend. X (powers not given to federal government are "reserved to the States"). "That is true whether Congress directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own" by conditioning federal funding on a State's compliance. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578 (2012) ("*NFIB*") (holding that Affordable Care Act provision that threatened to strip Medicaid funds from states that refused to expand Medicaid violated Tenth Amendment).

Here, as in *NFIB*, the federal government is holding "a gun to [UC's] head." *Id.* at 581. Federal funds account for more than half of UC's research funding and nearly one-third of its operating budget. *See supra* at n.3; *NFIB*, 567 U.S. at 581-82 (federal government's threat to cut over 10% of a state's overall budget was "economic dragooning" that left state "no real option but to acquiesce"). Congress may not use its Spending Clause authority to "induce the States to adopt policies the Federal Government itself could not impose" in a manner "so coercive" that the "pressure turns into compulsion." *Id.* at 537, 580 (quotations omitted). Here, Defendants have gone far beyond what is permitted by using the threat to withhold federal funding to coerce UC into surrendering control of curricula and campus culture to the federal government. The August 8 Demands "unequivocally dictate[] what [the UC] may and may not do" vis-à-vis, *inter alia*, protest restrictions, curricular oversight, international student admissions, lawful DEI promotion, transgender policies, and cooperation with federal law enforcement; "[i]t is as if federal officers were installed in [the Regents'] chambers and were armed with the authority to stop [the Regents] from voting on any offending proposals." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 474 (2018). They further demand that the UC pay over $1 billion despite the absence of any statutory authority for such a demand. "A more direct affront to state sovereignty is not easy to imagine." *Id.* To bring the federal government back into alignment with the Constitution, the Court must provide relief by "limit[ing] the financial pressure the [federal government] may apply to induce States to accept the terms" of what the federal government demands. *NFIB*, 567 U.S. at 587.

Defendants' coercion of the UC violates the Tenth Amendment even if the UC succumbs to the pressure. The "Constitution does not protect the sovereignty of States for the benefit of the States … as abstract political entities" but rather "for the protection of individuals." *New York v. United States*, 505 U.S. 144, 181 (1992) (quotations omitted). "State sovereignty is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power." *Id.*; *accord Murphy*, 584 U.S. at 473. When the federal government "exceeds its authority relative to the States," that "cannot be ratified by the 'consent' of state officials." *New York*, 505 U.S. at 182.

### 2. Defendants' Demands Seek to Impose Unconstitutional Conditions.

The government may not "requir[e] a person to give up a constitutional right … in exchange for a discretionary benefit," *Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994), even if the government has no obligation to offer the benefit in the first instance. *See Bd. of Comm'rs Wabaunsee Cnty. v. Umbehr*, 518 U.S. 668, 674 (1996); *see also Perry v. Sidermann*, 408 U.S. 593 (1972). While the government may "define the limits of [a] government spending program," it cannot impose "conditions that seek to leverage funding to regulate speech outside the contours of the program." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15 (2013).

Defendants have imposed unconstitutional conditions on the UC's receipt of federal funds in several ways. The August 8 Demand Letter unconstitutionally conditions restoration of unlawfully terminated funds on UC's agreement to suppress speech and academic freedom, including through restrictions on protests and expressive activities; sharing information about such expressive activity by faculty, academic employees, staff employees, and students with Defendants; admitting international students only with certain viewpoints; and ceding control over certain curriculum and faculty hiring and promotion decisions to an external monitor. *See* Facts §§I.B, III.B; Arg. §II.A.1. Moreover, Defendants have demanded that the UC adopt the Trump administration's definition of "male," "female," and "sex," and publicize that adoption, whereas the government may not "compel[] a grant recipient to adopt a particular belief as a condition of funding"—such conditions by their "very nature affect protected conduct outside the scope of the federally funded program." *Open Soc'y*, 570 U.S. at 218 (cleaned up).

There can be no argument that Defendants' conditions merely "define the limits of the government spending program" by "specify[ing] the activities [the government] wants to subsidize"; rather, they seek to "leverage funding" to regulate unrelated aspects of campus life, including activities

1   protected by the First Amendment, "outside the contours" of any discrete federal program. *Agency for*

2   *Int'l Dev.*, 570 U.S. at 214-15. Defendants are not seeking to impose restrictions on the uses of federal

3   research funds, or even solely on the operations of research that the federal government funds. Instead,

4   they are terminating federal research grant funds generally, raising the prospect of terminating other

5   federal funds, and seeking to extract concessions from the UC as an institution.

6              **3.  Defendants' Actions Violate the Separation of Powers.**

7        Not only do Defendants' coercive conditions on federal funding violate the First and Tenth

8   Amendments, but they also constitute an impermissible exercise of Congress's Spending Clause power.

9   The Constitution vests the spending power, including the authority to place conditions on federal

10   spending, exclusively in Congress. U.S. Const., art. I. The executive branch has no power to unilaterally

11   enact, amend, or repeal parts of duly enacted statutes, including spending statutes. *See Clinton v. City of*

12   *N.Y.*, 524 U.S. 417, 438-39 (1998); *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022)

13   ("Administrative agencies ... possess only the authority that Congress has provided."); *Colorado v. HHS*,

14   2025 WL 1426226, at *18 (D.R.I. May 16, 2025). Nor can it terminate appropriations authorized by

15   Congress, except as Congress has specifically provided. *See, e.g.*, *In re Aiken Cnty.*, 725 F.3d 255, 261

16   n.1 (D.C. Cir. 2013); *San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) ("Absent

17   congressional authorization, [an agency] may not redistribute or withhold properly appropriated funds

18   in order to effectuate its own policy goals … [without] violat[ing] the constitutional principle of the

19   Separation of Powers."). Where the executive branch exercises power that belongs to Congress, it

20   violates the separation of powers. *See Clinton*, 524 U.S. at 451 (Kennedy, J., concurring).

21        Here, the Trump administration has "claimed for itself Congress's exclusive spending power"

22   and "attempted to coopt Congress's power to legislate." *San Francisco*, 879 F.3d at 1234. Defendants

23   have terminated funding without following statutory procedures. *See* Arg. §II.C.2.b. Defendants have

24   conditioned restoration of funding on the UC paying $1 billion even though monetary penalties are not

25   authorized under Titles VI, VII, and IX.[65] And Defendants have demanded that the UC agree to a host

26

---

27   [65] *See* 42 U.S.C. §2000d-1 (termination of federal assistance as ultimate remedy for noncompliance under Title VI; no mention of civil monetary penalties or fines); 20 U.S.C. § 1682 (termination of federal assistance as ultimate remedy for noncompliance under Title IX; no mention of civil monetary penalties

28   or fines); 42 U.S.C. §2000e-5(g)(1) (discussion of available relief under Title VII; no mention of civil monetary penalties or fines); *see also* Civil Monetary Penalties Inflation Adjustments for 2025, 90 Fed. Reg. 29445, July 3, 2025 (no mention of Title VI, Title VII, or Title IX in final rule implementing annual inflation adjustments to civil monetary penalties assessed or enforced by Department of Justice).

of funding conditions that reach far beyond what Title VI, Title IX, or the appropriating statutes require, including, *inter alia*, that UCLA: prohibit expressive activities in specified locations on campus; prohibit overnight demonstrations in any location; prohibit wearing masks to protest anonymously; share international students' disciplinary records and implement policies to ensure it does not recruit or admit "likely ... anti-Western" or "anti-American" international students, and implement trainings to "socialize" international students to campus norms; ban gender-affirming care for transgender minors; prohibit gender-appropriate locker rooms, restrooms, and dorms rooms for transgender students; and declare non-recognition of transgender people's gender identities.

### C. Defendants' Conduct Violates the APA.

Plaintiffs are also likely to succeed on their claims that Defendants have violated the APA.

### 1. Defendants' Actions Are Final Agency Action.

Plaintiffs challenge the Termination Letters as well as Defendants' Task Force Policy as final agency action. Agency action is final if it (1) "mark[s] the consummation of the agency's decisionmaking process" and (2) determines "rights and obligations" or if "legal consequences will flow" from it. *Bennett v. Spear,* 520 U.S. 154, 178 (1997) (internal quotations omitted); *see S.F. Herring Ass'n v. DOI*, 946 F.3d 564, 577-78 (9th Cir. 2019). Finality is evaluated "in a pragmatic and flexible manner." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006); *U.S. Army Corps. of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016).

The Termination Letters clearly constitute final agency action reviewable under the APA. *See Thakur*, 2025 WL 1734471, at *16 ("The form grant termination letters represent final agency actions consistent with *Bennett.*"); *Thakur*, 148 F.4th at 1106 (finding likelihood of success on APA claim).

Further, the Termination Letters are part of a broader Task Force Policy adopted by Defendants that also qualifies as final agency action. Defendants have adopted a new Task Force Policy that leverages the federal government's enforcement authority over federal civil rights laws and federal grant program rules to impose and threaten legal and financial sanctions on universities for alleged but unproven civil rights violations. Defendants' policy is to do this *without* complying with those laws' procedural requirements, and to impose financial sanctions not authorized under those laws, to coerce universities into implementing unrelated, ideological changes, including suppression of free speech, rights of association and academic freedom, diversity initiatives, transgender recognition, equity efforts,

1    and whatever else the administration finds distasteful. A critical component of the Task Force Policy is

2    that Defendants are sanctioning schools after cursory or nonexistent investigations, a marked change

3    from Defendants' previous rules governing Titles VI, VII, and IX investigations and federal funding.

4           That this policy exists and is being coordinated and implemented by Defendants, including DOJ,

5    ED, and Funding Agency Defendants, is made clear by Defendants' track record across multiple

6    universities. Defendants' termination of UCLA's grants, followed by demands for payment and

7    ideological concessions, mirrors their treatment of other universities—including Columbia, Harvard,

8    Brown, and Penn—and is evidence of an underlying policy. *See* Facts §II.B. Four days after announcing

9    a review of Columbia's federal funding "in light of ongoing investigations under Title VI," Defendants

10   HHS, ED, GSA, and DOJ announced plans to cancel $400 million in grants and assist "all agencies" in

11   issuing stop-work orders and contract terminations. Ex. 58. Within ten days, the administration made

12   ideological demands of Columbia. *See* Facts §II.B.1. Similarly, four days after Defendants ED, HHS,

13   and GSA announced a review of Harvard's federal contracts and grants, the DOJ Task Force invoked

14   Title VI and demanded broad changes including to "shutter" all DEI programs and "end ideological

15   capture." Ex. 78. Within two weeks, federal agencies froze $2.2 billion in grants. *See* Facts §II.B.2. The

16   same playbook was used at Brown, Penn, and now UC.

17          The Task Force Policy meets the first *Bennett* prong because it is a "definitive position" and not

18   "merely tentative." *S.F. Herring Ass'n*, 946 F.3d at 578. Defendants have not merely announced that

19   they are considering disregarding Title VI and IX procedural requirements, or merely proposing to

20   terminate grants based on alleged violations of those laws—they have already dropped protocols,

21   cancelled grants, and made threats to multiple universities. Defendants have already carried out the

22   policy at Brown, Penn, Columbia, and Harvard and are now targeting the UC. This pattern of consistent

23   conduct is evidence of the policy's finality. *See Health Care Auth. v. Azar*, 2020 WL 7049324, at *10

24   (W.D. Wash. July 27, 2020), *report and recommendation adopted,* 2020 WL 6336456 (W.D. Wash. Oct.

25   29, 2020) ("Requiring compliance with an agency action and the enforcement of agency action indicate

26   that the agency position is a final agency action.").

27          The "absence of a formal statement of" the agencies' Task Force Policy "is not dispositive" and

28   does not make the policy any less definite. *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d

1525, 1531 (D.C. Cir. 1990). The government, for instance, "may not in effect regulate speech by means

1  of an unwritten enforcement procedure ... as if speech codes were permissible so long as they were not

2  written down." *AAUP v. Rubio*, 2025 WL 2777659, *50 (D. Mass. Sept. 30, 2025) (finding "discrete

3  enforcement initiative that targeted speech in an unprecedented way, making new use of the invoked

4  statutes to dramatic legal effect" was final agency action; rejecting "insistence that this was a mere matter

5  of shifting enforcement priorities, not a final agency action"). Defendants' remarkably similar actions

6  against targeted universities over a short time demonstrates that they have a playbook and are following

7  it. The playbook's existence is further corroborated by the nearly identical language in the Termination

8  Letters UC received from DOE, NIH, and NSF within 48 hours. Exs. 3, 7, 8. *See Thakur*, 2025 WL

9  1734471, at *16 (inferring policy of executing grant terminations via form letters where "the agencies

10  began sending termination letters with the same type of language within weeks of each other").

11       The Task Force Policy also meets the second *Bennett* prong, because it has a "direct and

12  immediate effect on the day-to-day operations of the subject party." *Oregon Nat. Desert Ass'n*, 465 F.3d

13  at 987 (cleaned up). "[T]he [action] has the status of law or comparable legal force, and … immediate

14  compliance with its terms is expected." *Id.* The Policy has already had a "direct and immediate effect on

15  the day-to-day operations" of those employed at the UC, and it is apparent that "immediate compliance"

16  is "expected." *Id.* at 987 (collecting cases regarding features of finality) (cleaned up). Already, the entire

17  UC system and its campuses have been subjected to Title VI and Title VII investigations. UCLA grants

18  were cut off before the Title VI process was completed. And Defendants have issued a demand letter,

19  pressuring the UCs to accede to their demands. *See* Facts §I.A-.B. Given Defendants' known practice of

20  using Title VI investigations as cover for cutting off grants without process and then employing financial

21  coercion to exert ideological control over universities, a chill has fallen over UC campuses as the future

22  of the institution and the careers of academic inquiry it fosters are threatened. Facts §I.D.

23       In *San Francisco Herring Association*, 946 F.3d at 564, the Ninth Circuit held that a series of

24  threats by National Park Service employees and state park workers acting at their direction to enforce

25  commercial fishing laws and impose penalties constituted final agency action. The court explained that

26  when an agency asserts its authority, refuses to change its position, and then threatens enforcement,

27  "potentially subjecting [fishermen] to serious penalties," it would "raise[] questions of basic fairness" to

28  require them to risk those penalties by denying that these threats are reviewable final agency action. *Id.*

at 575 ("The APA's judicial review provisions prevent precisely this 'heads I win, tails you lose'

approach."). When the Park Service had made clear through "agency pronouncements" that its position was not merely tentative or preliminary, its "*application and enforcement* of [a] rule against commercial herring fishermen" in a certain park counted as final agency action. *Id.* at 577. Despite the absence of a formal rule, the government was not "still in the middle of trying to figure out its position"—it had decided there was a violation, and when it "went out … to implement the commercial fishing prohibition," its "position was a fait accompli." *Id.* at 578-79; *see also id.* at 582 ("The APA's final agency action requirement prevents this 'strong-arming of regulated parties into 'voluntary compliance' without the opportunity for judicial review—even judicial review of the question whether the regulated party is within the [agency's] jurisdiction.'") (quoting *Sackett v. EPA*, 566 U.S. 120, 131 (2012)).

The same is true here. As in *Thakur*, the repeated termination of grants using similar language shows the existence of an overall policy that qualifies as final agency action: "[i]n the face of that lockstep action, a court is 'not required to exhibit a naiveté from which ordinary citizens are free,' and may infer that [Defendants] likely adopted a categorical policy." 2025 WL 1734471, at *16. Defendants have implemented a "discrete and novel enforcement initiative" "that target[s] speech in an unprecedented way, making new use of the invoked statutes to dramatic legal effect." *AAUP*, 2025 WL 2777659, at *52 (finding coordinated campaign across multiple agencies of misusing agency authority to suppress speech constituted final agency action). The "Task Force Policy" is final agency action.[66]

### 2. Defendants' Actions Are Contrary to Law.

#### a. Defendants' Actions Violate the Constitution.

The APA directs courts to hold unlawful and set aside agency actions found to be "not in accordance with law," 5 U.S.C. §706(2)(A), including actions that are contrary to constitutional rights or power, *id.* §706(2)(B). For the same reasons Defendants' conduct violates the First Amendment, the Tenth Amendment, the Spending Clause, and Separation of Powers, *see* Arg. §§II.A-B, Defendants' conduct should be held unlawful and set aside under the APA.

#### b. Defendants' Actions Are Contrary to Title VI and Title IX Law and Procedure and Exceed Statutory Authority.

Defendants' Task Force Policy and termination of funds in furtherance thereof is also unlawful

---

[66] If this Court disagrees and concludes that the Task Force Policy is not final agency action, it still may be enjoined based on Plaintiffs' *ultra vires* claims. *See* Arg. §§II.A-B; *Sierra Club v. Trump*, 929 F.3d 670, 699 (9th Cir. 2019) (parties may pursue both APA and ultra vires claims).

35

because it is contrary to requirements governing enforcement of Title VI and Title IX.

Title VI of the Civil Rights Act of 1964 prohibits discrimination on the basis of race, color, or national origin in "any program or activity receiving Federal financial assistance." 42 U.S.C. §2000d. And it places "elaborate restrictions" on agency enforcement. *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001). Federal agencies may not "terminat[e] or refus[e] to grant or to continue assistance" for alleged violations without first complying with the detailed procedural requirements set forth in Title VI and its implementing regulations. 42 U.S.C. §2000d-1; *Sandoval*, 532 U.S. at 290 (Title VI places "elaborate restrictions" on agency enforcement); *Harvard*, 2025 WL 2528380, at *28 (termination of federal funds without following Title VI procedures is unlawful); *Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.").[67] Thus, a series of procedural steps are required:

Initially, no action terminating federal funding "shall be taken until the department or agency concerned [(1)] has advised the appropriate person or persons of the failure to comply with [Title VI], and [(2)] has determined that compliance cannot be secured by voluntary means." 42 U.S.C. §2000d-1; Dec. of Catherine E. Lhamon ¶¶13, 17. After a notice of compliance has been sent and the agency has determined that voluntary compliance "cannot be secured," it must then (3) give the recipient an "opportunity for hearing," followed, if supported by the record, by (4) an "express finding on the record … of a failure to comply" with Title VI. 42 U.S.C. §2000d-1. The statute's reference to a finding "on the record" after a hearing triggers the agency's obligation to comply with the formal adjudication requirements of the APA. 5 U.S.C. §554; *Portland Audubon Soc. v. Endangered Species Comm.*, 984 F.2d 1534, 1540 (9th Cir. 1993); *see* 5 U.S.C. §§554–557 (requirements for formal adjudication under APA).[68] After that hearing and finding, (5) "the head of the Federal department or agency shall file with

---

[67] Funding Agency Defendants have promulgated additional detailed regulations governing their own Title VI procedures. These regulations are largely consistent across agencies. *See, e.g.*, 45 C.F.R. §80.1 et seq. (HHS); 34 C.F.R. §100.1 et seq. (ED); 28 C.F.R §42.101 et seq. (DOJ); 32 C.F.R. §195.1 et seq. (DOD); 7 C.F.R. §15.1 et seq. (USDA); 10 C.F.R. §1040.1 et seq. (DOE); 14 C.F.R. §1250.100 et seq. (NASA); 15 C.F.R. §8.1 et seq. (Commerce); 22 C.F.R. §141.1 et seq. (State); 40 C.F.R. §7.10 et seq. (EPA); 43 C.F.R. 17.1 et seq. (Interior); 45 C.F.R. §611.1 et seq. (NSF);. Due to space limitations, Plaintiffs do not subsequently cite each agency's parallel regulations for each point made in this section.
[68] Defendants' regulations impose detailed requirements on the hearings to which funding recipients are entitled, including procedures for notice, procedure, access to documents, and cross-examination. *See, e.g.*, 32 C.F.R. §195.10. *See, e.g.*. 45 C.F.R. §§81.1-81.131 (HHS); 34 C.F.R. §§101.1-101.131 (ED). These regulations provide that all records in a hearing shall be public, 45 C.F.R. §81.2; 34 C.F.R. §101.2, and that "[a]ny interested person or organization" may seek to participate in the proceeding as an amicus curiae, 45 C.F.R. §81.22(a); 34 C.F.R. §101.22(a).

the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action." 42 U.S.C. §2000d-1. And then, (6) "[n]o such action shall become effective until thirty days have elapsed after the filing of such report." *Id.*; *see also, e.g.*, 45 C.F.R. §80.8(c).

Besides these procedural steps, Title VI places substantive limits on an agency's authority to terminate or refuse to grant federal funding: Any action to terminate or refuse to grant or continue assistance must be "limited to the particular political entity, or part thereof, or other recipient as to whom such a finding [of noncompliance] has been made," and "limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found." 42 U.S.C. §2000d-1; *accord, e.g.*, 45 C.F.R. §80.8(c); *see also Bd. of Pub. Instruction of Taylor Cnty., Fla. v. Finch*, 414 F.2d 1068, 1076–77 (5th Cir. 1969) (Defendants bear burden of showing nexus between misconduct and scope of funding termination); *Maine v. USDA*, 778 F.Supp.3d 200, 230 (D. Me. 2025) (where student athletics programs allegedly violated Title IX, USDA could only restrict funding to that "particular program, or part thereof," and not to food assistance programs). And there is no authority under Title VI, Title VII, or Title IX to pursue civil monetary penalties or fines. *See supra* at n.65.[69]

Title IX's procedural requirements, which an agency must satisfy *before* taking the drastic step of terminating or refusing to grant or continue financial assistance, and its pinpoint termination requirements, are substantively identical to those of Title VI. *See* 20 U.S.C. §1962.[70]

In implementing Defendants' Task Force Policy and issuing the Termination Letters, Defendants cited alleged discrimination based on race, national origin, and sex as the purported basis for their grant terminations, but entirely ignored Title VI's and IX's statutory enforcement procedures. Aside from DOJ issuing a notice of findings of anti-Semitism to UCLA, Defendants followed *none* of Title VI's required

[69] Congress imposed these stringent procedural requirements and scope limitations on the termination or refusal to grant or continue assistance to safeguard against federal agencies' potential exploitation of Title VI funding leverage as a "vindictive or punitive" measure against federal funding recipients. Ex. 97 (88 Cong. Rec. 7063 (1964) (statement of Senator Pastore)). A funding cutoff is to be "a last resort, to be used only if all else fails to achieve the real objective—the elimination of discrimination in the use and receipt of Federal funds." *Id.* (88 Cong. Rec. 7059 (1964) (Sen. Pastore)); *see* Catherine E. Lhamon, Seth M. Galanter, *Commander-in-Thief: President Trump's Withholding of Federal Funds from Universities Based on Alleged Discrimination Unlawfully Disregards the Procedures and Limits Adopted by Congress in the Civil Rights Statutes*, August 2025 at 2-6.

[70] *See also* 45 C.F.R. §86.1 et seq. (HHS); 34 C.F.R. §106.1 et seq. (ED); 28 C.F.R. §54.100 et seq. (DOJ); 32 C.F.R. §196.100 et seq. (DOD); 7 C.F.R. §15a.100 et seq. (USDA); 14 C.F.R. §1253.100 et seq. (NASA); 15 C.F.R. §8a.100 et seq. (Commerce); 22 C.F.R. §146.100 et seq. (State); 40 C.F.R. §5.100 et seq. (EPA); 43 C.F.R. 41.100 et seq. (Interior); 45 C.F.R. §618.100 et seq. (NSF).

procedural steps; in fact, there was no notice of *any* findings related to race or sex discrimination. Further, Defendants provided no notice of or opportunity for a hearing, made no express finding on the record as to UCLA's noncompliance, filed no written report with the appropriate House or Senate committee, failed to wait 30 days after filing such a report, and did not provide UCLA or other interested parties an opportunity to file briefs. Nor did Defendants limit the July and August funding terminations to any particular program, or part thereof, in which noncompliance had been found. Rather, the terminations— and effect thereof—are widespread and reach departments and individuals, including Plaintiffs' members, as to whom there has been no finding of noncompliance at all, let alone one that complies with statutory and regulatory procedural requirements. Defendants' summary termination of funds, and threats to withhold more, are clearly unlawful and so violate the APA. *See Harvard*, 2025 WL 2528380, at *28 & n.25 (so holding); *Schlafly v. Volpe*, 495 F.2d 273, 276–77 & n.3 (7th Cir. 1974) (plaintiff stated APA claim challenging agency funding freeze under Title VI without following §2000d-1 procedures); *Nat'l Treasury Emps. Union v. Cornelius*, 617 F.Supp. 365, 371 (D.D.C. 1985) (agency may not "regulate away" procedures "granted by Congress"); Lhamon Dec. ¶17.

Defendants' actions cannot be justified under Title VII, either, as Title VII was not enacted pursuant to the Spending Clause and does not authorize agencies to terminate federal funding for noncompliance.[71]

### 3. Defendants' Actions Are Arbitrary and Capricious.

Agency action is "'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 280 (2024) (citations omitted); *see also id.* (reviewing court "must ensure, among other things, that agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made'") (citation omitted). An agency also acts arbitrarily and capriciously when it "entirely failed to consider … important aspect[s] of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Defendants adopted the Task Force Policy and issued the Termination Letters—pursuing ideological goals through unlawful funding terminations without setting forth reasonable grounds—without

---

[71] *See, e.g.*, *Joseph v. Bd of Regents of the Univ. Sys. of Ga.*, 121 F.4th 855, 868 (11th Cir. 2024) ("Title VII creates an administrative process that requires claimants [follow certain steps] … before filing a complaint in a federal court. Title IX, in contrast, empowers administrative agencies to condition federal funding on compliance with its anti-sex-discrimination mandate.") (citations omitted).

1  engaging in any reasoned decisionmaking, in violation of the APA.

2          First, there is no evidence that any of the Terminating Defendants considered the reliance

3  interests of the public in ongoing research that was catastrophically suspended. *See Harvard*, 2025 WL

4  2528380, at *25; *Thakur*, 2025 WL 1734471, at *15. The Termination Letters' boilerplate statements

5  that each agency "considered reliance interests" are insufficient, containing no actual explanation or

6  reasoning. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 32 (2020)

7  (agency "was required to assess whether there were reliance interests, determine whether they were

8  significant, and weigh any such interests against competing policy concerns") (emphasis omitted);

9  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016) ("conclusory statements" insufficient).

10         Second, the majority of Defendants' demands in the August 8 letter, and other demands on

11  universities, have nothing to do with remedying antisemitism (or race or sex discrimination). *See* Facts

12  §I.B. The claimed civil rights justification for the demands of $1.2 billion, immigration enforcement,

13  and restrictions on speech and academic freedom, among others, is pretextual. Defendants cannot show

14  any "rational connection between the facts found and the choice made" because there is no relationship

15  between the claimed violations and the blanket termination of grants; nor between the claimed violations

16  and the concessions demanded. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *see Dep't of Com. v. New*

17  *York*, 588 U.S. 752, 783–85 (2019) (invalidating agency action upon finding that the agency's proffered

18  explanation was contrived).

19         Third, Defendants provide no reasoned explanation of their grounds for terminating funds. DOJ's

20  July 29 Findings and the near-identical Termination Letters offer three reasons for applying the Task

21  Force Policy to UC: that UC has engaged in antisemitic discrimination, maintains race-based admissions

22  practices, and maintains unsafe conditions for women because of its policies regarding transgender

23  individuals. Exs. 1, 3, 7, 8. None of these are reasonably explained, nor do they bear a rational connection

24  to the facts before the agencies. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167

25  (1962) (APA violation where "[t]here are no findings and no analysis []to justify the choice made").

26         *Antisemitism.* Defendants' sole factual claim is that UCLA engaged in antisemitic discrimination

27  in responding to the protest encampments occurring April 25 to May 1, 2024. Exs. 1, 3, 7, 8. But

28  Defendants fail entirely to address *an existing voluntary agreement between UC and OCR*, executed

December 20, 2024 *and currently in effect*, resolving Title VI complaints of antisemitism at UCLA and

four other UC campuses in connection with the same encampments, during the same time period. Ex. 100 at 1.[72] That agreement established reporting and review frameworks between the UC and OCR regarding anti-discrimination policy and campus safety, including responses to protests on a University campus.[73] The Termination Letters, and Defendants' implementation of the Task Force Policy at UC, completely ignore this negotiated agreement and its measures for addressing discrimination.

Further, while Defendants relied on the UCLA Task Force Report from October 2024 for their assertions related to antisemitism at UCLA, they failed to address or even acknowledge UCLA's March 2025 Initiative to Combat Antisemitism, an initiative designed specifically to implement the UCLA Task Force Report recommendations.[74] *See Harvard.*, 2025 WL 2528380, at *31 (cancelling grants to Harvard was arbitrary and capricious where "no evidence that Defendants considered any of the steps Harvard had taken to research or address antisemitism on campus before declaring that funding would be frozen"). Nor do Defendants' stated reasons include any acknowledgment of the July 29, 2025 Consent Judgment and injunction entered in civil litigation, which requires UCLA to ensure that all programs and activities are fully accessible to Jewish members of the UC community and provides for a monetary contribution to UCLA's Initiative to Combat Antisemitism. Exs. 101, 102, 103, 104.

*Race-Based Discrimination.* Defendants' actions are not saved by the Termination Letters' allegations that "UCLA engages in racism, in the form of illegal race-based preferences in admissions

---

[72] Exs. 1, 3, 7, 8, 100. The Findings and the Termination Letters do not cite any specific instances of antisemitism beyond those relating to the Spring 2024 encampment, but even if they had, the agencies fail to explain why the procedures required by the December 2024 voluntary agreement are insufficient to address the alleged civil rights violations that the agencies claim are the basis for their actions. *See* Exs. 1, 3, 7, 8, 100.

[73] For example, pursuant to the voluntary agreement, UC agreed to provide any proposed revision to its systemwide anti-discrimination policies and procedures to OCR for its review and approval; to provide annual investigator training related to discrimination and harassment based on actual or perceived national origin, including shared Jewish, Palestinian, Muslim, and/or Arab ancestry. Ex. 100 at 1-2. And under the agreement, "[i]f OCR has any concerns about the adequacy of the University's rationale to not open an investigation or its investigations or any of its proposed remedial or corrective actions, OCR will communicate those concerns to the University in writing[,]" and "the University will respond to address OCR's concerns with proposed revised corrective action(s)" "[w]ithin 30 calendar days of receiving notice of any such concerns." *Id.* at 11.

[74] NSF's suspension of awards on July 30, 2025 cited no factual or legal basis, Ex. 3; its August 1 updated notice cited solely to the UCLA Task Force Report as the evidence of "noncompliance" with "applicable Federal statutes and regulations" "[w]ith respect to antisemitism." Ex. 6. NIH and DOE also cited to the UCLA Task Force Report from October 2024. Exs. 7, 8. None of the agencies acknowledged the UCLA Initiative designed to implement the recommendations of that Report. The only other evidence cited by any of the agencies is a Republican Staff Report related to antisemitism on 11 university campuses, but that report discusses events at UCLA in late April and early May 2024, without considering any subsequent events or measures. Exs. 8, 111.

practices."[75] UCLA "expressly disclaims reliance on race," as NIH and NSF acknowledge.[76] The sole factual basis for Defendants' conclusion is the university's consideration of applicants' zip codes, family income, and school profiles, and that applicants are not forbidden to reference their race in personal statements. This is in no way a reasonable basis for concluding that UCLA has engaged in unlawful practices.[77] Another federal court recently struck down the administration's efforts to require compliance with its new statement of the law governing college admissions as a significant and impermissible change of position not in conformity with controlling Supreme Court precedent. *See Am. Fed'n of Teachers v. Dep't of Educ.*, 2025 WL 2374697, *21-22 (D. Md. Aug. 14, 2025). Moreover, as with the agencies' unreasoned conclusions regarding antisemitism, the agencies fail to account for the actions and policies that UCLA has adopted to ensure compliance with federal law on admissions policy. *See* Ex. 6 at n.1 (citing, but not assessing, UCLA guidance).

  *Women's Safety.* The Termination Letters also assert that UCLA's policy with respect to transgender individuals "has created an unsafe environment for women that further threatens the integrity of the research environment on its campuses."[78] In what is quintessentially unreasoned decision-making, the agencies rely on nothing to support that assertion, yet purport to base their actions on this finding.

## III. Plaintiffs and Their Members Are Suffering and Will Continue to Suffer Increasingly Irreparable Harms Absent Prompt Injunctive Relief.

  The serious harms documented by Plaintiffs are irreparable under the law. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *accord Klein v. City of San Clemente*, 584 F.3d 1196, 1207-08 (9th Cir. 2009); *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019). "In a First Amendment case[,] … the party seeking [an] injunction need only demonstrate the existence of a colorable First

---

[75] Ex. 6 (NSF); *see also* Ex. 8 (NIH) ("UCLA engages in racism, in the form of illegal affirmative action"); Ex. 7 (DOE) (same and citing "understand[ing]" that UCLA "engage[s] in race discrimination including in its admissions process").

[76] Exs. 6, 8; *see also* Cal. Const. art. I, §32.

[77] Exs. 6, 7, 8. NIH's and DOE's termination letters also cite, as evidence that race is surreptitiously prioritized in a way that "significantly disadvantage[s] white, Jewish, and Asian applicants[,]" allegations in a June 2025 federal court complaint, and a law review article by Richard Sander. *See* Ex. 7 at 1 (citing *Students Against Racial Discrimination v. Regents of the Univ. of Cal.*, C.D. Cal. Case No. 8:25-cv-00192); *see also* Ex. 8 at 2. But allegations and legal opinion are not evidence, and it is unreasonable for NIH to rely on them as a basis for agency decisionmaking.

[78] Ex. 7 at 2. *See also* Exs. 6, 8. NIH's termination letter cites a UCLA bathroom map, but the mere existence of gender-inclusive bathrooms is not a reasoned basis for the agency's conclusion that a safety risks exists (and therefore all its funding to UCLA should be suspended). *See* Ex. 105.

Amendment claim." *Fellowship of Christian Athletes*, 82 F.4th at 694-95 (cleaned up). More broadly, where executive action causes constitutional injuries, injunctive relief is appropriate. *See Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017).[79] As Plaintiffs have demonstrated with examples from across academic disciplines and in a variety of contexts, Defendants' conduct is interfering with the free speech and academic freedom of Plaintiffs' members and violates the First and Tenth Amendments and constitutional separation of powers; absent an immediate injunction, these constitutional violations will continue. *See* Facts §§I.D, III.B.

Defendants' sudden termination of $584 million also continues to cause irreparable harm and implementing the threatened further cuts will expand and intensify those harms. *See* Facts §III.A. Besides monetary losses that affect the livelihoods of the professors, researchers, and staff who are funded by these grants, a sudden cutoff in federal funds interrupts and may require abandoning multi-year academic and scientific projects with important public benefits—resulting in an unconscionable waste of resources paid for by taxpayers and the delayed or lost acquisition of knowledge. Facts §III.A; *see Thakur*, 148 F.4th at 1110 (acknowledging harms flowing from lost taxpayer-funded research projects). Faculty, staff, and students have lost and will lose access to professional opportunities, and reputations and relationships with partner institutions have been and will be compromised. *See* Facts §III.A; *see, e.g.*, *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 89 n.16 (1981) (irreparable harm based on being "denied specific job opportunities and the training and competitive advantages that would come with those opportunities"); *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996) (discussing irreparable nature of reputational harms). And the uncertainty caused by Defendants' threats is already reducing opportunities for the next generation of researchers and constraining scientific and other academic research. *See* Facts §III.A. These harms are irreparable, and injunctive relief is necessary to ameliorate them. *See, e.g.*, *Thakur*, 2025 WL 1734471, at *24; *Am. Council of Learned Societies v. McDonald*, 2025 WL 2097738, *35 (S.D.N.Y. July 25, 2025).

If UC seeks to avoid the catastrophic harms that would follow from Defendants' threatened funding cuts by capitulating further to the administration's demands, Plaintiffs and their members face different but comparably irreparable harms. *See* Facts §III.B. These harms will include, among others,

---

[79] These principles apply to structural separation of powers violations. *See Cnty. of Santa Clara v. Trump*, 250 F.Supp.3d 497, 537-38 (N.D. Cal. 2017); *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1058-59 (9th Cir. 2009).

interference with the medical care of members' families and patients, dignitary and other harms flowing from UC's refusing to recognize transgender people and excluding them from campus spaces, and additional constraints on academic speech. *Id.*; *see, e.g.*, *Welch v. Brown*, 935 F.Supp.2d 875, 888 (E.D. Mich. 2013), *aff'd*, 551 F. App'x 804 (6th Cir. 2014) (threat to "access to necessary health care" was irreparable harm); *Doe v. Horne*, 115 F.4th 1083, 1112 n.18 (9th Cir. 2024) (denial of opportunity to play in volleyball games was irreparable harm). Irreparable harm thus cannot be avoided absent an injunction.[80]

## IV.    The Balance of Equities and the Public Interest Weigh in Favor of an Injunction.

The balance of equities and public interest, which merge when the government is a party, *Wolford v. Lopez*, 116 F.4th 959, 976 (9th Cir. 2024), strongly favor preliminary relief. Preserving constitutional and statutory rights "is always in the public interest." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). "There is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Further, the public also has a strong interest in the continuance of robust scientific and medical research at the nation's preeminent public university system, including an especially strong interest in seeing to fruition the investments of public monies already committed to multi-year projects that will now not be completed absent injunctive relief.[81] As in *Thakur*,

> … the termination of grants will result in layoffs, interruptions to graduate programs, destruction of research projects, and injury to Plaintiffs' professional reputations. Further, if research projects are lost due to grant funding being halted midstream, the public will obtain no benefit from research in which substantial funds have already been invested—a significant waste of taxpayer dollars.

148 F.4th at 1110. The public also has a paramount interest in the continued financial health of the UC, which is an engine for both California's economic growth as well as the economic mobility of low and middle income and first-generation college students. *See* Exs. 17, 106, 107.

---

[80] Even if monetary relief could repair the harm to Plaintiffs' members, damages are unavailable in APA cases, *see Pangea Legal Servs. v. U.S. Dep't of Homeland Security*, 512 F.Supp.3d 966, 976 (N.D. Cal. 2021); *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 984 (9th Cir. 2020), and monetary loss can support an injunction "where the loss threatens the very existence" of the affected program, *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

[81] *See* Weissman Dec. ¶13; Witness E Dec. ¶9; Campbell Dec. ¶17; Gonzalez Dec. ¶18; Parks Dec. ¶11.

## V.    The Scope of Requested Relief Is Appropriate.

The Court should grant Plaintiffs' requested relief as set forth in Plaintiffs' proposed order. In addition to vacating and enjoining the Termination Letters (Proposed Order ¶5), the Court should enjoin Defendants from: terminating, non-renewing, conditioning, or otherwise withholding any federal funds from the UC based on alleged discrimination unless Defendants comply with *all* of Title VI and IX's procedural and substantive requirements and the APA's requirements; seeking payment of penalties or fines from the UC under Title VI, VII, or IX; terminating, non-renewing, or otherwise withholding any federal funds from the UC, or threatening to do so, to coerce the UC in violation of the First or Tenth Amendments; or conditioning any funding on UC's agreement to measures that would violate the rights of Plaintiffs' members. *Id.* ¶¶1-4. Further, to relieve the coercive pressure that Defendants have publicly exerted upon UC and to enable Plaintiffs to monitor and enforce a preliminary injunction enjoining Defendants from further coercing the UC to the detriment of Plaintiffs' rights, the Court should order production of the August 8 Demand Letter and subsequent proposals and counter-proposals. *Id.* ¶6; *cf. Vullo*, 602 U.S. at 198 (First Amendment prohibits "a government official mak[ing] coercive threats in a private meeting behind closed doors").[82]

This requested relief is broader than the preliminary injunctive relief entered in *Thakur*. To the extent the relief would overlap, the *Thakur* preliminary injunctions do not obviate Plaintiffs' need for relief: the *Thakur* defendants have appealed the first preliminary injunction and may appeal the second; Plaintiffs are not parties to that case; and Plaintiffs would be irreparably harmed if the earlier injunction were modified or lifted. *See*, *e.g.*, *California v. HHS*, 390 F.Supp.3d 1061, 1065–66 (N.D. Cal. 2019) (existence of other injunction that could be overturned or limited does not preclude entry of overlapping injunction). "[C]ourts routinely grant follow-on injunctions against the Government, even in instances when an earlier nationwide injunction has already provided plaintiffs in the later action with their desired relief." *Whitman-Walker Clinic, Inc. v. HHS*, 485 F.Supp.3d 1, 60 (D.D.C. 2020).[83] Relief is particularly

---

[82] This injunction is sought to protect the public interest and ensure compliance with federal law. The Court should not require any bond. *See People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985) (courts may waive or require nominal bond).

[83] *See also*, *e.g.*, *Mayor & City Council of Baltimore v. Azar*, 392 F.Supp.3d 602, 618 (D. Md. 2019) (later-filing plaintiff at risk from enjoined rule, because injunction could be stayed or reversed); *Batalla Vidal v. Nielsen*, 279 F.Supp.3d 401, 435 (E.D.N.Y. 2018), *vacated and remanded on other grounds*, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020) (injunction of "same challenged action" could be lifted so does not counsel against overlapping injunction); *Victim Rights*

appropriate here, where Plaintiffs seek injunctive relief on different legal grounds from those resolved

by this Court in *Thakur* (including constitutional claims) and based on a different factual record.[84]

### CONCLUSION

For the reasons discussed, Plaintiffs' motion should be granted.

Respectfully submitted,

Dated:  October 9, 2025         By: */s/ Connie K. Chan*
                                    STACEY M. LEYTON, SBN 203827
                                    sleyton@altber.com
                                    BARBARA J. CHISHOLM, SBN 224656
                                    bchisholm@altber.com
                                    CONNIE K. CHAN, SBN 284230
                                    cchan@altber.com
                                    AMANDA C. LYNCH, SBN 318022
                                    alynch@altber.com
                                    JUHYUNG H. LEE, SBN 315738
                                    hlee@altber.com
                                    SANDY PECHT, SBN 355877
                                    specht@altber.com
                                    **ALTSHULER BERZON LLP**
                                    177 Post St., Suite 300
                                    San Francisco, CA 94108
                                    (415) 421-7151

                                    *Counsel for Plaintiffs AAUP, AFT,*
                                    *UC-AFT, CNA/NNU, UAW, and CIR*

                                By: */s/ Victoria S. Nugent*
                                    SKYE L. PERRYMAN*
                                    sperryman@democracyforward.org
                                    VICTORIA S. NUGENT*
                                    vnugent@democracyforward.org
                                    CYNTHIA LIAO, SBN 301818**

---

*Law Ctr. v. U.S. Dep't of Educ.*, 2025 WL 1704311 (D. Mass. April 21, 2025) (granting PI despite existing PI in *Somerville Public Schs. v. Trump*, 784 F.Supp.3d 311 (D. Mass. 2025)); *Radio Free Asia v. United States*, 2025 WL 1291342 (D.D.C. Apr. 25, 2025) (granting PI despite existing PI in *Widakuswara v. Lake*, 779 F.Supp.3d 10 (D.D.C. 2025)); *Nat. Council of Nonprofits v. Office of Mgmt. & Budget*, 775 F.Supp.3d 100 (D.D.C. 2025) (granting PI despite existing TRO in *New York v. Trump*, 764 F.Supp.3d 46 (D.R.I. 2025)); *Elev8 Baltimore, Inc. v. Corp. for Nat'l & Cmty. Serv.*, 2025 WL 1865971 (D. Md. July 7, 2025) (granting PI despite existing PI in *Maryland v. Corp. for Nat'l & Cmty. Serv.*, 785 F.Supp.3d 68 (D. Md. 2025)).

[84] Plaintiffs' motion rests on grounds that are not the bases for either *Thakur* injunction, including (1) First Amendment challenges to the policy of coercion that underlies the funding withdrawals and will likely lead to future funding withdrawals; (2) Tenth Amendment and separation of powers challenges to that same policy; and (3) an APA challenge based on failure to follow Title VI and IX procedures before terminating funding purportedly on findings of discrimination. Plaintiffs also seek relief applying to additional Defendant agencies not covered by *Thakur*: USDA, Commerce, ED, DOE, Interior, DOJ, HHS, State, CDC, FDA, and NASA. *See, e.g.*, Jaime Dec. ¶¶4, 6. Plaintiffs' proposed relief would not require any modification of the preliminary injunctive relief granted in *Thakur*; the cases are complementary and address different types of unlawful conduct. *Cf. Thakur*, 2025 WL 2696424, at *18.

PLAINTIFFS' MPA ISO MOTION FOR PRELIMINARY INJUNCTION          Case No. 3:25-cv-07864-RFL

cliao@democracyforward.org
ORLANDO ECONOMOS, *admitted pro hac vice*
oeconomos@democracyforward.org
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 448-9090

*Counsel for Plaintiffs AAUP, AFT,*
*CNA/NNU, UC-AFT, UAW, and CIR*

By: */s/ Veena Dubal*
VEENA DUBAL, SBN 249268*
vdubal@aaup.org
**AMERICAN ASSOCIATION OF**
**UNIVERSITY PROFESSORS**
555 New Jersey Avenue NW, Suite 600
Washington DC 20001
(202) 737-5900

*Counsel for Plaintiff AAUP*

By: */s/ Eleanor Morton*
ELEANOR MORTON, SBN 220407
emorton@leonardcarder.com
KATE HALLWARD, SBN 233419
khallward@leonardcarder.com
ARTHUR LIOU, SBN 252690
aliou@leonardcarder.com
HUGH SCHLESINGER, SBN 353569
hschlesinger@leonardcarder.com
**LEONARD CARDER LLP**
1999 Harrison Street, Suite 2700
Oakland, CA 94612
(510) 272-0169

*Counsel for Plaintiffs UPTE, AFSCME Local 3299,*
*UC-AFT, CUCFA, and each of the UC Campus*
*Faculty Associations*

By: */s/ Margo A. Feinberg*
MARGO A. FEINBERG, SBN 100655
margo@ssdslaw.com
DANIEL E. CURRY, SBN 297412
dec@ssdslaw.com
**SCHWARTZ, STEINSAPIR,**
**DOHRMANN & SOMMERS LLP**
888 W. 6th Street, 12th Floor
Los Angeles, California 90017-2738
(323) 655-4700

*Counsel for Plaintiff UAW Local 4811*

By: /s/ Nicole J. Daro

NICOLE J. DARO, SBN 276948
ndaro@calnurses.org
**CALIFORNIA NURSES ASSOCIATION/NATIONAL NURSES UNITED**
155 Grand Ave.
Oakland, CA 94612
(510) 207-8291

*Counsel for Plaintiff CNA/NNU*

By: /s/ Susan K. Garea

SUSAN K. GAREA, SBN 260407
sgarea@beesontayer.com
**BEESON, TAYER & BODINE**
492 Ninth Street, Suite 350
Oakland, CA 94607
(510) 625 9700

*Counsel for Plaintiff Teamsters Local 2010*

By: /s/ Hannah M. Shirey

HANNAH M. SHIREY, SBN 332187
hshirey@cirseiu.org
**COMMITTEE OF INTERNS AND RESIDENTS/SEIU**
10-27 46th Avenue, Suite 300-2
Long Island City, NY 11101
(212) 356-8100

*Counsel for Plaintiff CIR*

\*  *Pro hac vice application forthcoming*
\*\* *Pro hac vice application pending*