BRETT A. SHUMATE
Assistant Attorney General
JOSEPH BORSON
Assistant Branch Director
HEIDY L. GONZALEZ (FL Bar #1025003)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel: (202) 598-7409
Email: heidy.gonzalez@usdoj.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, et al., | ) Case No. 3:25-cv-07864-RFL |
| | ) |
| Plaintiffs, | ) DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION |
| | ) AND SUPPORTING MEMORANDUM OF POINTS |
| v. | ) AND AUTHORITIES |
| | ) |
| DONALD J. TRUMP, in his official capacity As President of the United States, et al., | ) Hearing Date: November 6, 2025 |
| | ) Time: 10:00 AM |
| | ) Judge: Hon. Rita F. Lin |
| Defendants. | ) Place: San Francisco Courthouse |
| | ) Courtroom 15 |

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................................ iii

INTRODUCTION ......................................................................................................................... 1

STATEMENT OF THE ISSUES TO BE DECIDED .................................................................... 2

BACKGROUND ........................................................................................................................... 3

   I.   The Conduct at Issue ........................................................................................................ 3

   II.  The Plaintiffs .................................................................................................................... 5

   III. This Lawsuit ..................................................................................................................... 7

ARGUMENT ................................................................................................................................. 8

   I.   This Court Lacks Subject-Matter Jurisdiction Over Plaintiffs' Claims............................ 8

      A.   Plaintiffs Lack Article III Standing.......................................................................... 8

          i.    Plaintiffs Cannot Establish Associational Standing. ...................................... 9

          ii.   Plaintiffs Lack Organizational Standing. ..................................................... 11

      B.   Plaintiffs' Claims Are Not Ripe. ............................................................................ 13

      C.   Plaintiffs' Claims Related to Contract Suspensions or Terminations Must be Heard by the Court of Federal Claims........................................................................................ 16

      D.   Plaintiffs Failed to Join UC, an Indispensable Party Under Rule 19..................... 19

   II.  Plaintiffs' APA Claims Fail............................................................................................ 22

      A.   The Putative "Task Force Policy" Is Not Discrete, Final Agency Action............... 22

      B.   The Challenged Funding Decisions are Committed to Agency Discretion. ........... 25

      C.   Title VI and Title IX are Inapplicable. .................................................................. 26

      D.   Defendants' Grant Decisions Were Not Arbitrary or Capricious........................... 27

   III. Plaintiffs' Ultra Vires and Constitutional Claims Lack Merit. ....................................... 29

      A.   There Has Been No First Amendment Violation. ................................................... 29

      B.   Defendants Have Not Coerced Non-Party UC in Violation of the Tenth Amendment.......... 33

      C.   Defendants Have Not Imposed Unconstitutional Conditions Upon Non-Party UC.............. 34

      D.   Plaintiffs' Separation of Powers Argument Lacks Merit. ...................................... 35

E.   The Ultra Vires Claims are Not Cognizable. ............................................................. 36

IV.  Plaintiffs Are Not Entitled to Discovery........................................................................ 38

V.   Plaintiffs Have Failed to Establish Irreparable Harm..................................................... 39

VI.  The Balance of the Equities and the Public Interest Tip in Defendants' Favor. ............................ 41

VII. Any Injunctive Relief Should Be Stayed Pending Appeal and Accompanied By a Bond. ........... 42

CONCLUSION............................................................................................................................ 42

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*Abbott Labs. v. Gardner*,
4    387 U.S. 136 (1967) ................................................................................................ 14

5    *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ........................................................................................... 30, 31
6

7    *Allen v. Wright*,
468 U.S. 737 (1984) ................................................................................................ 36
8

*Almaklani v. Trump*,
9    44 F. Supp. 3d 425 (E.D.N.Y. 2020) ...................................................................... 38

10   *Alto v. Black*,
738 F.3d 1111 (9th Cir. 2013) ................................................................................ 20
11

12   *Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*,
No. 25-10276-GAO, 2025 WL 470459 (D. Mass. Feb. 12, 2025) ............... 10, 17, 18
13

14   *Am. Greyhound Racing, Inc. v. Hull*,
305 F.3d 1015 (9th Cir. 2002) ................................................................................ 20
15

16   *Am. Library Ass'n v. Sonderling*,
No. CV 25-1050 (RJL), 2025 WL 1615771 (D.D.C. June 6, 2025) ....................... 19

17   *Am. Med. Ass'n v. Reno*,
57 F.3d 1129 (D.C. Cir. 1995) ................................................................................ 28
18

19   *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
750 F.2d 1470 (9th Cir. 1985) ................................................................................ 40
20

*Am. Sch. of Magnetic Healing v. McAnnulty*,
21   187 U.S. 94 (1902) .................................................................................................. 36

22   *Appalachian Energy Grp. v. EPA*,
33 F.3d 319 (4th Cir. 1994) .................................................................................... 24
23

24   *Armstrong v. Exceptional Child Ctr. Inc.*,
575 U.S. 320 (2015) ................................................................................................ 36
25

26   *Ass'n of Am. Med. Colleges v. United States*,
217 F.3d 770 (9th Cir. 2000) .................................................................................. 24

27

28

DEFS.' OPP'N TO PLS.' MOT. FOR PREL. INJ.
CASE NO. 25-CV-07864-RFL

*Bd. of Cnty. Comm'rs, Wabaunsee Cnty. v. Umbehr*,
518 U.S. 668 (1996) ............................................................................................ 31, 32

*Bd. of Govs. of the Fed. Rsrv. Sys. v. MCorp Fin., Inc.*,
502 U.S. 32 (1991) .................................................................................................... 37

*Bellion Spirits, LLC v. U.S.*,
335 F. Supp. 3d 32 (D.D.C. 2018) ............................................................................ 38

*Bennett v. New Jersey*,
470 U.S. 632 (1985) .................................................................................................. 18

*Bennett v. Spear*,
520 U.S. 154 (1997) .................................................................................................. 22

*Broussard v. Columbia Gulf Transmission Company*,
398 F.2d 885 (5th Cir. 1968) .................................................................................... 21

*California Dept. of Water Res. v. FERC*,
341 F.3d 906 (9th Cir. 2003) .................................................................................... 24

*Cepero–Rivera v. Fagundo*,
414 F.3d 124 (1st Cir. 2005) .................................................................................... 32

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
333 U.S. 103 (1948) .................................................................................................. 24

*Chiropartners, Inc. v. Gravely*,
No. 1:12-cv-00223-CG-C, 2012 WL 4050840 (S.D. Ala. Aug. 24, 2012) ............... 21

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) .................................................................................................. 27

*City of L.A. v. Lyons*,
461 U.S. 95 (1983) ...................................................................................................... 1

*City of New York v. U.S. Dep't of Def.*,
913 F.3d 423 (4th Cir. 2019) .................................................................................... 24

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........................................................................................ 8, 10, 13

*Climate United Fund v. Citibank, N.A.*,
No. 25-5122, 2025 WL 2502881 (D.C. Cir. Sept. 2, 2025) ...................................... 18

*Clinton v. Acequia, Inc.*,
94 F.3d 568 (9th Cir. 1996) ...................................................................................... 14

*Cobell v. Kempthorne*,
455 F.3d 301 (D.C. Cir. 2006) ............................................................................................ 22

*Dalton v. Specter*,
511 U.S. 462 (1994) ............................................................................................................ 37

*Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*,
276 F.3d 1150 (9th Cir. 2002) ............................................................................................ 20

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ............................................................................................................ 29

*Dep't of Ed. v. California*,
604 U.S. 650 (2025) ........................................................................................... 16, 17, 41, 42

*Domino's Pizza, Inc. v. McDonald*,
546 U.S. 470 (2006) ............................................................................................................ 10

*E. Palo Alto v. United States Department of Health & Human Services*,
137 F.4th 932 (9th Cir. 2025) ............................................................................................. 19

*E. V. v. Robinson*,
906 F.3d 1082 (9th Cir. 2018) ................................................................................. 36, 37, 38

*E.E.O.C. v. Peabody W . Coal Co.*,
400 F.3d 774 (9th Cir. 2005) .............................................................................................. 20

*Edwards v. Aurora Loan Servs., LLC*,
791 F. Supp. 2d 144 (D.D.C. 2011) .................................................................................... 10

*EPA v. Brown*,
431 U.S. 99 (1977) .............................................................................................................. 24

*Faculty Senate of Fla. Int'l Univ. v. Winn*,
477 F. Supp. 2d 1198 (S.D. Fla. 2007) ............................................................................... 40

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ...................................................................................................... 27, 28

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ...................................................................................................... 27, 29

*FDA v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024) ...................................................................................................... 11, 12

*Fortyune v. Am. Multi–Cinema, Inc.*,
364 F.3d 1075 (9th Cir. 2004) ............................................................................................ 40

*G.L. Christian & Assocs. v. United States,*
312 F.2d 418 (Ct. Cl. 1963) ................................................................................................. 32

*Gartenberg v. Cooper Union for the Advancement of Sci. & Art,*
765 F. Supp. 3d 245 (S.D.N.Y 2025) ..................................................................................... 30

*Great-West Life & Annuity Ins. Co. v. Knudson,*
534 U. S. 204 (2002) ............................................................................................................. 17

*Griffith v. FLRA,*
842 F.2d 487 (D.C. Cir. 1988) .............................................................................................. 37

*Haaland v. Brackeen,*
599 U.S. 255 (2023) ................................................................................................................. 8

*Heckler v. Turner,*
468 U.S. 1305 (1984) ............................................................................................................. 41

*Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, NA,*
747 F.3d 44 (2d Cir. 2014) .................................................................................................... 10

*Hi-Tech Pharmacal Co. v. FDA,*
587 F. Supp. 2d 1 (D.D.C. 2008) .......................................................................................... 40

*Hunt v. Washington State Apple Adver. Comm'n,*
432 U.S. 333 (1977) ................................................................................................................. 9

*J.L. v. Cissna,*
No. 18-CV-04914-NC, 2019 WL 2224851 (N.D. Cal. Mar. 8, 2019) ................................... 38

*Koontz v. St. Johns River Water Mgmt. Dist.,*
570 U.S. 595 (2013) ............................................................................................................... 34

*Larson v. Domestic & Foreign Com. Corp.,*
337 U.S. 682 (1949) ..................................................................................................... 36, 37, 38

*Leathers v. Medlock,*
499 U.S. 439 (1991) ............................................................................................................... 31

*Lincoln v. Vigil,*
508 U.S. 182 (1993) ............................................................................................................... 25

*Lomayaktewa v. Hathaway,*
520 F.2d 1324 (9th Cir. 1975) .............................................................................................. 21

*Louisiana v. Biden,*
64 F.4th 674 (5th Cir. 2023) ................................................................................................. 23

*Lujan* v. *Defenders of Wildlife,*
504 U.S. 555 (1992) ............................................................................................. 10

*Lujan v. G & G Fire Sprinklers, Inc.,*
532 U.S. 189 (2001) ............................................................................................. 28

*Lujan v. Nat'l Wildlife Fed'n,*
497 U.S. 871 (1990) ...................................................................................... 22, 23

*Maher v. United States,*
314 F.3d 600 (Fed. Cir. 2002) ............................................................................. 10

*Maryland v. King,*
567 U.S. 1301 (2012) ........................................................................................... 41

*Megapulse, Inc. v. Lewis,*
672 F.2d 959 (D.C. Cir. 1982) ............................................................................. 16

*Mendoza v. Amalgamated Transit Union Int'l,*
30 F.4th 879 (9th Cir. 2022) .................................................................................. 9

*Milk Train, Inc. v. Veneman,*
310 F.3d 747 (D.C. Cir. 2002) ............................................................................. 25

*Miss. Comm'n on Env'tl Quality v. EPA,*
790 F.3d 138 (D.C. Cir. 2015) ............................................................................. 34

*Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.,*
498 U.S. 211 (1991) ............................................................................................. 28

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,*
429 U.S. 274 (1977) ............................................................................................. 32

*Munaf v. Geren,*
553 U.S. 674 (2008) ............................................................................................... 8

*Murthy v. Missouri,*
603 U.S. 43 (2024) ........................................................................................... 8, 15

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
567 U.S. 519 (2012) ............................................................................................. 33

*Nat'l Inst. of Health v. Am. Pub. Health Assoc.,*
606 U.S. ---- , 2025 WL 2415669 (Aug. 21, 2025) ...................................... 17, 18

*Nat'l Park Hosp. Ass'n v. Dep't of Interior,*
538 U.S. 803 (2003) ...................................................................................... 13, 15

*Nat'l Union Fire Ins. Co.*,
210 F.3d .................................................................................................................. 21

*Nken v. Holder*,
556 U.S. 418 (2009) ........................................................................................... 8, 41

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) ................................................................................................ 22

*Nuclear Regulatory Comm'n v. Texas*,
605 U.S. 665 (2025) .............................................................................................. 37

*Palantir USG, Inc. v. United States*,
129 Fed. Cl. 218 (Fed. Cl. 2016) .......................................................................... 28

*Peguero-Moronta v. Santiago*,
464 F.3d 29 (1st Cir. 2006) ............................................................................... 32, 33

*People for the Ethical Treatment of Animals v. U.S. Dept. of Agric.*,
797 F.3d 1087 (D.C. Cir. 2015) ............................................................................ 13

*Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty.*,
391 U.S. 563 (1968) .............................................................................................. 32

*Porter v. Jones*,
319 F.3d 483 (9th Cir. 2003) ................................................................................ 14

*President & Fellows of Harvard Coll. v. United States Dep't of Health & Human Services*,
No. 25-CV-10910-ADB, 2025 WL 2528380 (D. Mass. Sept. 3, 2025) .................... 32

*Pub. Citizen, Inc. v. Trump*,
297 F. Supp. 3d 6 (D.D.C. 2018) .......................................................................... 35

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
102 F.3d 12 (1st Cir. 1996) .................................................................................. 39

*Rust v. Sullivan*,
500 U.S. 173 (1991) .................................................................................. 30, 31, 35

*S. California All. of Publicly Owned Treatment Works v. U.S. Envtl. Prot. Agency*,
8 F.4th 831 (9th Cir. 2021) .................................................................................. 24

*Sampson v. Murray*,
415 U.S. 61 (1974) .............................................................................................. 40

*Savantage Fin. Servs., Inc. v. United States*,
595 F.3d 1282 (Fed. Cir. 2010) ............................................................................ 28

Case 3:25-cv-07864-RFL    Document 61    Filed 10/24/25    Page 10 of 55

*Saxe v. State Coll. Area Sch. Dist.*,
240 F.3d 200 (3d Cir. 2001) ............................................................................................. 30

*Schroer v. Billington*,
525 F. Supp. 2d 58 (D.D.C. 2007) .................................................................................... 37

*Seila L. LLC v. Consumer Fin. Prot. Bureau*,
591 U.S. 197 (2020) ......................................................................................................... 19

*Stanley v. Univ. of S. Cal.*,
13 F.3d 1313 (9th Cir. 1994) ............................................................................................ 40

*Stephens v. Cnty. of Albemarle*,
No. 3:04CV00081, 2005 WL 3533428 (W.D. Va. Dec. 22, 2005) .................................... 34

*Students for Fair Admissions, Inc., v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023) ........................................................................................................... 9

*Summers v. Earth Island Institute*,
555 U.S. 488 (2009) ......................................................................................................... 10

*Sustainability Inst. v. Trump*,
No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025) .................................................. 41

*Tennessee v. Becerra*,
131 F.4th 350 (6th Cir. 2025) ........................................................................................... 29

*Texas v. United States*,
523 U.S. 296 (1998) ......................................................................................................... 14

*Thakur v. Trump*,
787 F. Supp. 3d 955 (N.D. Cal. 2025) ............................................................................ 7, 8

*Thakur v. Trump*,
No. 25-CV-04737-RFL, 2025 WL 2696424 (N.D. Cal. Sept. 22, 2025) ............................. 7

*Trump v. New York*,
529 U.S. 125 (2020) ......................................................................................................... 13

*U.S. Army Corps. of Eng'rs*,
859 F.3d 1306 (11th Cir. 2017) ........................................................................................ 21

*United Aeronautical Corp. v. United States Air Force*,
80 F.4th 1017 (9th Cir. 2023) ........................................................................................... 16

*United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*,
517 U.S. 544 (1996) ........................................................................................................... 9

*United States v. Am. Library Ass'n*,
539 U.S. 194 (2003) ................................................................................................ 31

*United States v. Streich*,
560 F.3d 926 (9th Cir. 2009) ................................................................................... 13

*United States v. Texas*,
599 US 670 (2023) ..................................................................................................... 8

*United States v. Yakima Tribal Ct.*,
806 F.2d 853 (9th Cir. 1986) ................................................................................... 38

*Ward v. Apple Inc.*,
791 F.3d 1041 (9th Cir. 2015) ................................................................................. 20

*Warth v. Seldin*,
422 U.S. 490 (1975) ................................................................................................... 9

*West v. Lynch*,
845 F.3d 1228 (D.C. Cir. 2017) ............................................................................... 11

*West Virginia v. HHS*,
289 F.3d 281 (4th Cir. 2002) ................................................................................... 34

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ....................................................................................... 8, 14, 39, 40

*Wis. Pub. Power, Inc. v. FERC*,
493 F.3d 239 (D.C. Cir. 2007) ................................................................................. 28

*Ysursa v. Pocatello Educ. Ass'n*,
555 U.S. 353 (2009) ................................................................................................. 31

**Statutes**

20 U.S.C. § 1682 ......................................................................................................... 26

28 U.S.C. § 1491 ................................................................................................... 16, 17

42 U.S.C. § 2000d .................................................................................................. 26, 27

5 U.S.C. § 701 ............................................................................................................. 25

5 U.S.C. § 704 ............................................................................................................. 24

5 U.S.C. § 706 ............................................................................................................. 27

**Rules**

Fed. R. Civ. P. 19 ................................................................................................................. 20, 20, 21, 22

Fed. R. Civ. P. 65 ....................................................................................................................... 40, 42

**Regulations**

2 C.F.R. § 200.339 ......................................................................................................................... 26, 27

2 C.F.R. § 200.340 ................................................................................................................ 25, 26, 27, 28

2 C.F.R. § 200.341 ................................................................................................................................ 28

45 C.F.R. § 75.371 ......................................................................................................................... 26, 27

45 C.F.R. § 86.71 .................................................................................................................................. 26

45 C.F.R. § 80.6 et seq. ........................................................................................................................ 26

48 C.F.R. § 2.101 .................................................................................................................................. 32

48 C.F.R. §§ 49.101 .............................................................................................................................. 32

**INTRODUCTION**

Plaintiffs, labor unions and associations that collectively represent tens of thousands of faculty, students, academic employees, and staff employees throughout the University of California ("UC"), seek retrospective and prospective relief relating to grants issued by 15 Executive Branch agencies to UC across ten campuses, three national affiliate laboratories, six academic health centers, and numerous unidentified institutes, centers, and research laboratories across California.  Despite this request for sweeping relief, Plaintiffs' declarations only identify a few specific grants that were suspended by two agencies months ago, in July 2025.  But Plaintiffs concede that all of those grants were re-instated by this Court in *Thakur*— presumably because many of the *Thakur* class members are also members of at least one of the named Plaintiffs in this case.  As to the remaining agencies, Plaintiffs do not sufficiently identify harm stemming from grants that may have been terminated in the past but, nonetheless, request that this Court superintend agency operations to ensure that grants are not improperly suspended in the future.  But these general allegations about the possibility of future harm do not present the type of "real," "substantial," and "immediate" harm that the Supreme Court requires as a condition for Article III standing—let alone enough to warrant preliminary relief.  *City of L.A. v. Lyons*, 461 U.S. 95, 111 (1983).

Notably, Plaintiffs' fears about future grant suspensions and their claims about the likelihood of constitutional violations are entirely based on speculation about an opening settlement offer between the federal government and UC (which is not a party to this case) that the federal government has not publicly released, and which has never had any legal effect.  Earlier this month, the federal government made a settlement offer to UC to resolve an ongoing investigation into UC's response to antisemitic conduct on its campuses.  Settlement negotiations are ongoing, UC has not accepted any terms, and no agreement has been finalized.  Yet, each of the claims in Plaintiffs' 13-count complaint and nearly all of the 62 supporting declarations claim that the government's initial, undisclosed offer constitutes a violation of the Administrative Procedure Act ("APA") and the Constitution and has somehow resulted in harm to Plaintiffs.  And Plaintiffs—who seemingly have not seen the government's initial offer—demand its production as part of their request for preliminary relief, despite identifying no legal entitlement to this document.

For the reasons set forth herein, Plaintiffs' claim suffers from insurmountable procedural and substantive defects. The Court should therefore deny their motion.

### STATEMENT OF THE ISSUES TO BE DECIDED

1. Do Plaintiffs have standing to enforce contracts between the United States and a non-party educational institution when Plaintiffs have no rights under those contracts and any asserted harm must flow from independent decisions of those institutions?

2. Is this case, which seeks to enforce the continued payment of contracts with the United States pursuant to the terms of those contracts, outside the jurisdiction of the federal district courts?

3. Are Plaintiffs' claims regarding the result of ongoing settlement negotiations between the United States and a non-party, and for which no terms have been agreed upon or implemented, ripe for review?

4. Can Plaintiffs seek to block ongoing settlement negotiations between the United States and a non-party, or nullify any of the terms to be potentially implemented as a result of those negotiations, in the absence of the only party capable of assenting to or implementing any terms, and from whom Plaintiffs' rights and obligations derive?

5. Are some or all of Plaintiffs' APA claims foreclosed by the lack of final discrete agency action and, if not, are these decisions committed to agency discretion or otherwise lawful and permissible?

6. Do Title VI and Title IX procedures govern suspension of grants pursuant to independent authorities merely because the justification for those suspensions could potentially also support suspensions under Title VI and Title IX?

7. Can Plaintiffs bring ultra vires claims that are in substance for breach of contract, when the challenge is ultimately to whether an officer properly exercised authority within a range of reasoned decision-making, and a statutory scheme already provides for review?

8. Do Plaintiffs' constitutional challenges, which variously seek to forbid the United States from exercising discretion over its contracting decisions, succeed under the doctrines Plaintiffs cite?

**BACKGROUND**

Plaintiffs—21 labor unions and associations—seek preliminary injunctive relief against the President and 15 Executive Branch agencies ("Defendant Agencies").[1]  *See* ECF Nos. 26, 31.  Plaintiffs seek three categories of relief:

1. Retrospective grant relief:  an order vacating the grant suspension letters issued by Defendants National Science Foundation ("NSF"), National Institutes of Health ("NIH"), and Department of Energy ("DOE") to non-party UC in July 2025;

2. Prospective grant relief:  an order enjoining the Defendant Agencies "from refusing to grant, non-renewing, withholding, freezing, suspending, terminating, conditioning, or otherwise restricting use of federal funds, or threatening to do so" to non-party UC "based on alleged discrimination on the basis of race, color, national origin, or sex" until after compliance with various statutory and constitutional provisions; and

3. Document discovery:  (1) "[a]ny and all findings related to investigation of [non-party] UC or any of its campuses or medical centers under Title VI, VII, or IX since January 20, 2025"; (2) a copy of an August 8, 2025 letter sent by the Department of Justice to non-party UC as part of settlement negotiations between the government and UC, "and any counter-proposals or further proposals"; and (3) "[a]ll communications between the UC and any Defendant or agent of any Defendant concerning the August 8, 2025 Demand Letter."

ECF No. 26 at 1-4.

**I.      The Conduct at Issue**

On February 3, 2025, the Department of Justice, Civil Rights Division ("DOJ"), announced "the formation of a multi-agency Task Force to Combat Anti-Semitism."  ECF No. 27-47 at 1.  The Task Force is coordinated by DOJ and includes representatives from the "U.S. Department of Education, U.S. Department of Health and Human Services, and other agencies."  *Id*.  The Task Force's "first priority [is] to root out anti-Semitic harassment in schools and on college campuses."  *Id*.  The Task Force itself is not

---

[1] Plaintiffs do not seek preliminary injunctive relief as to the General Services Administration, National Endowment for the Humanities, Department of Housing and Urban Development, Institute of Museum and Library Services, Department of Transportation, or AmeriCorps.  *See* ECF No. 31 at 21 n.51.

FED. DEFS.' OPP'N TO PLS.' MOT. FOR PRELIMINARY INJUNCTION
CASE NO. 25-CV-07864-RFL

3

embodied with any independent legal authority to act under its own name.

On July 29, 2025, DOJ notified non-party UC of its findings following an investigation concerning UC's "response to allegations of discrimination against Jewish and Israeli students on the basis of race, religion and national origin." ECF No. 27-1 at 2. DOJ found that: (1) "Jewish and Israeli students at UCLA were subjected to severe, pervasive, and objectively offensive harassment that created a hostile environment by members of the encampment"; (2) "UCLA had actual notice that Jewish and Israeli students were subjected to severe, pervasive, and objectively offensive harassment that created a hostile environment by members of the encampment"; and (3) "UCLA was deliberately indifferent to the hostile environment for Jewish and Israeli students caused by the encampment." *Id*. at 8.

Between July 29, 2025, and July 31, 2025, Defendants NSF, NIH, and DOE notified non-party UC of their decisions to suspend certain grants issued to non-party UC. *See* ECF Nos 27-3, 27-6, 27-7, 27-8. Each agency cited non-party UC's "racism, in the form of illegal race-based preferences in admissions practices," non-party UC's failure "to promote a research environment free of antisemitism and bias," and non-party UC's "discriminat[ion] against and endanger[ing] [of] women by allowing men in women's sports and private women-only spaces." ECF No. 27-6 at 2; *see also* ECF Nos. 27-7, 27-8. The NSF and NIH suspensions were separately enjoined in the *Thakur* litigation, and all covered grants to UC institutions are currently in effect.

The government and non-party UC are currently engaged in confidential settlement negotiations regarding various federal investigations of UC. On August 8, 2025, DOJ issued an opening settlement offer to non-party UC (the "August 8 Initial Offer"). *See* ECF No. 27-9. DOJ's August 8 communication was not a "demand letter," *see* ECF No. 31 at 3, but instead was an initial offer subject to Federal Rule of Evidence 408. DOJ did not publicly disclose the August 8 Initial Offer, *see* ECF No. 27-10 at 3, and given their demand for production of the communication, it appears that Plaintiffs have not seen the offer, are not in possession of a copy of the offer, or both. Non-party UC has not accepted the August 8 Initial Offer. *See* ECF No. 31 at 27. Defendants are aware of a recent California Superior Court order compelling disclosure of the August 8 Initial Offer under the California Public Records Act and the California Constitution. *See* Order and Judgment Granting Petition for Writ of Mandate, *UCLA Faculty Association*

*v. Regents of the University of California*, No. 25-cv-143076 (Cal. Super. Ct. Oct. 14, 2025).

On October 1, 2025, the government issued its "Compact for Academic Excellence in Higher Education," which "represents the priorities of the U.S. government in its engagements with universities that benefit from the relationship" with the government (the "Compact"). ECF No. 27-53 at 2. The Compact calls for, among other things, equality in admissions, institutional neutrality, and financial responsibility. *Id*. at 2-9. Acceptance of the Compact is voluntary, and the Compact itself acknowledges that universities "are free to develop models and values other than those below." *Id*. at 2. Indeed, Massachusetts Institute of Technology, Brown University, University of Pennsylvania, University of Southern California, Dartmouth, University of Virginia, and University of Arizona have rejected the Compact.[2]

## II.    The Plaintiffs

Plaintiffs claim that they represent "professors, researchers, and staff" that are funded by grants issued by Defendants to non-party UC across "ten campuses, three affiliate national laboratories, six academic health center systems, and numerous [unidentified] institutes, centers, and research laboratories" across California. ECF No. 31 at 14, 42. Plaintiffs demand that grant suspension letters issued by the NSF, NIH, and DOE in July 2025 to non-party UC be vacated, and that the Defendant Agencies be prospectively enjoined from "refusing to grant, non-renewing, withholding, freezing suspending, terminating, conditioning, or otherwise restricting use of federal funds" from non-party UC based on alleged discrimination, unless Defendants comply with certain enumerated statutory and constitutional provisions. ECF No. 26 at 2.

Although Plaintiffs seek grant-based relief across 15 agencies, only a few declarations speak to specific past grant suspensions, all by NSF and NIH. *See* ECF Nos. 29-2, 29-5, 29-7, 29-8, 29-10, 29-16, 29-22, 29-35, 29-37, 29-45, 29-48, 40-2; Sealed Decl. of Wit. B, E, H, I. All those declarations recognize that the NSF and NIH grants identified were restored by this Court in *Thakur* prior to the filing of the instant Motion. *See, e.g.*, ECF No. 29-2 ¶ 10 ("I am aware that Judge Rita Lin has ordered the Trump

---

[2] *See* The New York Times, *All but 2 Universities Decline a Trump Offer of Preferential Funding* (Oct. 20, 2025), nytimes.com/2025/10/20/us/politics/universities-funding-compact.html.

FED. DEFS.' OPP'N TO PLS.' MOT. FOR PRELIMINARY INJUNCTION
CASE NO. 25-CV-07864-RFL

administration to restore the NIH grants it suspended at UCLA in July 2025 in connection with a different lawsuit. This restoration of funding has allowed students like the one who was considering taking on a Teaching Assistant position to refocus on their research."). But they claim that Defendants' "threats to pull federal research funding" in the future presents "imminent harm." *Id*. ¶ 12. None of those declarations identify any additional NSF or NIH grants that were suspended or terminated after July 2025 and certainly not after the Court's decisions in *Thakur*. Two declarations claim that NSF has not awarded certain new grants to non-party UC, which those declarants expected would be awarded, but they do not identify any specific mandate that requires Defendants to award those grants to non-party UC. *See* ECF Nos. 40-2, 40-3. Organizational representatives generally claim that they are "aware of and can identify" members who have been harmed by the grant suspensions issued by DOE to non-party UC, but no specific DOE grant suspension or termination is identified. *See* ECF No. 29-49 ¶ 11. In short, for the first category of relief Plaintiffs seek (retrospective grant relief regarding NSF, NIH, and DOE grants to non-party UC), Plaintiffs have not identified any harm stemming from specific grants that were suspended or terminated at the time of their filing, much less any NSF, NIH, or DOE grant to which they are a party.

As to the second category of relief (prospective grant relief for grants by all Defendant Agencies to non-party UC), none of the declarations identify any specific grants or contains any specific past, present, or future grant suspension or termination allegations. Instead, the declarants describe fear of non-party UC's potential future acceptance of the "demands" they assume were included in DOJ's August 8 Initial Offer to non-party UC. *See, e.g.*, ECF No. 29-3 ¶ 10; ECF No. 29-45 ¶ 14; ECF No. 29-51 ¶ 23. Several declarants state that they "fear being targeted and reprimanded for continuing to teach on topics [they] care about if the Trump administration succeeds in coercing [non-party] UC," as they believe the August 8 Initial Offer dictates. ECF No. 29-21 ¶ 13; *see, e.g.*, ECF No 29-25 ¶ 38. In other words, the declarants' fears are based on the premise that UC—a non-party—will voluntarily take certain actions it has yet to take (and may never take) at some undefined time in the future.

The organizational representatives claim that the Plaintiff organizations have "been forced to spend significant time and resources responding to the repercussions of the administration's actions on its members" and that "[t]he expenditure of time and diversion of resources to respond to the fallout of the

administration's actions has affected [their] ability to do the representational, organizing, and advocacy work that is its core mission." ECF No. 29-23 ¶ 10; *see, e.g.*, ECF No. 29-24 ¶ 49; ECF No. 29-38 ¶ 21. Plaintiffs also speculate about how the terms included in DOJ's August 8 Initial Offer may, if accepted, impact their organizational goals. *See, e.g.*, ECF No. 29-28 ¶ 31. As a result, for the second category of relief, Plaintiffs rely exclusively on speculation regarding terms proposed within the context of confidential settlement negotiations and conjecture about the ultimate impact of any resolution. *See* ECF No. 31 at 3-4. Notably, the third category of relief (document discovery) includes a demand for production of the August 8 Initial Offer. Plaintiffs' lawsuit and demand for extraordinary preliminary relief is thus largely based on a letter they have apparently never seen and for which they have no context, the impact of which must be mediated in speculative ways through a third-party not present in this lawsuit. And the claimed harm is premised on supposed fear regarding settlement terms that have never materialized.

### III.    This Lawsuit

On October 10, 2025, Plaintiffs filed their Motion for a Preliminary Injunction. ECF No. 31. As previously noted, Plaintiffs seek injunctive relief with respect to the July 2025 suspensions of non-party UC's NSF, NIH, and DOE grants and DOJ's August 8 Initial Offer to non-party UC, as well as document discovery regarding DOJ and non-party UC's settlement negotiations. *See* ECF No. 26 at 1-4.

Relatedly, in *Thakur*, UC researchers sued the President and various agencies in connection with grant suspensions or terminations. *See Thakur v. Trump*, 787 F. Supp. 3d 955 (N.D. Cal. 2025); *Thakur v. Trump*, No. 25-CV-04737-RFL, 2025 WL 2696424 (N.D. Cal. Sept. 22, 2025). This Court provisionally certified two classes consisting of UC researchers, including faculty, staff, academic appointees, and employees, who received grant terminations from NSF, the Environmental Protection Agency, and the National Endowment for the Humanities through form terminations and pursuant to various executive orders. *Thakur*, 787 F. Supp. at 1005-06. The Court subsequently entered preliminary injunctive relief and provisional class certification as to NIH, the Department of Defense, and the Department of Transportation. *See Thakur*, 2025 WL 2696424, at *16. The Court declined to extend relief to the other agencies for which the plaintiffs had not demonstrated any specific injury, including any specific funding cuts. *See Thakur*, 787 F. Supp. at 1003. Relevant here, the Court in *Thakur* re-instated the NSF and NIH

grants for which Plaintiffs seek relief.  As a result, Plaintiffs' members who are UC faculty, staff, academic appointees, or employees are class members in *Thakur* and have received relief under the injunctions in that case.  And as in *Thakur*, Plaintiffs here have not identified any specific DOE grant suspensions that have caused them any injury.  *See id*. at 972.

## ARGUMENT

A "preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008).  A district court should enter a preliminary injunction only "upon a clear showing that the [movant] is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008).  To obtain a preliminary injunction, the moving party must demonstrate (1) that it is likely to succeed on the merits of its claims; (2) that it is likely to suffer an irreparable harm in the absence of injunctive relief; (3) that the balance of equities tips in its favor; and (4) that the proposed injunction is in the public interest. *Id*. at 20.  Finally, when "the Government is the opposing party," the assessment of "harm to the opposing party" and "the public interest" merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## I.      This Court Lacks Subject-Matter Jurisdiction Over Plaintiffs' Claims.

### A.  Plaintiffs Lack Article III Standing.

"[P]laintiffs must demonstrate standing for each claim that they press against each defendant, and for each form of relief that they seek."  *Murthy v. Missouri*, 603 U.S. 43, 44 (2024) (internal quotation marks and citation omitted).  To demonstrate Article III standing, a plaintiff must "show that she has suffered an injury in fact that is 'fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'"  *Haaland v. Brackeen*, 599 U.S. 255, 291-292 (2023) (citation omitted).  The asserted injury must be "legally and judicially cognizable," *United States v. Texas*, 599 US 670, 676 (2023) (citation omitted), and "concrete, particularized, and actual or imminent," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted).

Those familiar Article III principles resolve this case.  Plaintiffs have not established associational standing because they have not shown that any identified member faces any imminent, judicially cognizable injury—much less an injury fairly traceable to Defendants' actions.  And Plaintiffs' assertion of organizational standing is likewise meritless because their diversion of resources theory has been

1  rejected by the Supreme Court.

2                    **i.    Plaintiffs Cannot Establish Associational Standing.**

3          Plaintiffs primarily seek an order requiring Executive Branch agencies to pay out money to non-

4  party UC pursuant to grants that were previously awarded to that non-party and to control the terms of

5  future grant negotiations between the Executive and non-party UC.  *See* ECF No. 26 at 1-3.

6          Associational-standing precedents hold that a membership organization can sometimes sue "as the

7  representative of its members."  *Students for Fair Admissions, Inc., v. President & Fellows of Harvard

8  Coll.*, 600 U.S. 181, 199 (2023) (citation omitted).  "The possibility of such representational standing,

9  however, does not eliminate or attenuate the constitutional requirement of a case or controversy."  *Warth

10  v. Seldin*, 422 U.S. 490, 511 (1975).  An organization seeking to represent its members thus must show

11  that those members "would otherwise have standing to sue in their own right."  *Harvard*, 600 U.S. at 199

12  (quoting *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).  Put differently, the

13  organization must identify "at least one member with standing."  *United Food & Commercial Workers

14  Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555 (1996).  The Supreme Court has cautioned that it

15  "would make a mockery" of Article III to find standing whenever, based on an "organization's self-

16  description of the activities of its members, there is a statistical probability that some of those members

17  are threatened with concrete injury."  *Id.* at 497-98.

18          Here, the Court should reject any request to engage in improper claim splitting with respect to

19  specific grant suspensions.  Specifically, those individuals who are plaintiffs in *Thakur* and are also

20  members of the Plaintiff organizations in this case "have no right to maintain two separate actions

21  involving the same subject matter at the same time in the same court and against the same defendant."

22  *Mendoza v. Amalgamated Transit Union Int'l*, 30 F.4th 879, 886 (9th Cir. 2022) (cleaned up).  Indeed,

23  both this case and *Thakur* involve the same set of grants, the same non-party institution, and the same set

24  of researchers and staff.  Because Plaintiffs' members already secured re-instatement of the specific NSF

25  and NIH grants identified, they cannot establish injury in fact in this case.[3]

26          ――――――――――――

27  [3] As articulated in *Thakur*, Defendants maintain that Plaintiffs' members have no individualized standing
    to enforce payment of contracts to which they are non-parties.  "In order to establish standing to enforce

28  FED. DEFS.' OPP'N TO PLS.' MOT. FOR PRELIMINARY INJUNCTION
    CASE NO. 25-CV-07864-RFL
                                              9

Prospectively, Plaintiffs claim that they and their members face a substantial threat of future injury if non-party UC agrees to the terms in the government's August 8 Initial Offer.  But the Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that 'allegations of *possible* future injury' are not sufficient."  *Clapper,* 568 U.S. at 409 (brackets and citation omitted).  Time and again the Court has rejected theories of standing that rest on a "speculative chain of possibilities," *id.* at 414, especially where, as here, those possibilities depend on "unfettered choices made by independent actors," *Lujan* v. *Defenders of Wildlife,* 504 U.S. 555, 562 (1992) (citation omitted); *see also Summers v. Earth Island Institute*, 555 U.S. 488, 495 (2009) (explaining that because the theory of standing depended on a chain of contingencies, it might have demonstrated "a chance" of injury, but "hardly [the] likelihood" necessary to satisfy Article III).

Plaintiffs rely on speculation about the substance of settlement negotiations between the government and non-party UC.  But that potential injury to Plaintiffs' members is premised on the potential future action of a third party, *i.e.*, Plaintiffs speculate about whether and to what extent non-party UC will accept the government's terms.  Plaintiffs also speculate about the impact of non-party UC's implementation and compliance with any hypothetical, future agreed upon terms, and how that conduct could potentially affect campus life, teaching, medical services, and grants.  *See, e.g.*, ECF No. 29-12 ¶ 8; ECF No. 29-14 ¶ 21; ECF No 29-45 ¶ 12.

Standing doctrine does not permit the kind of attenuated chain Plaintiffs seek to assert.  *See Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*, No. 25-10276-GAO, 2025 WL 470459, at *2 (D. Mass. Feb. 12, 2025) (holding that unions lacked standing to challenge an incentive program for resignations because the

---

the terms" of a government contract, non-party plaintiffs must show that the contracting parties "intended to make them third-party beneficiaries of the contract." *Edwards v. Aurora Loan Servs., LLC*, 791 F. Supp. 2d 144, 150 (D.D.C. 2011); *see also Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, NA*, 747 F.3d 44, 49 (2d Cir. 2014) (holding that plaintiff lacked prudential standing because it could not "enforce the terms of" an agreement "as to which it is neither a party nor a third-party beneficiary"); *Maher v. United States*, 314 F.3d 600, 605 (Fed. Cir. 2002) ("The remaining shareholders [who were non-parties to the contract] did not have standing to sue and were not intended third-party beneficiaries."); *cf. Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 479–80 (2006) ("[W]e hold that a plaintiff cannot state a claim under § 1981 unless he has (or would have) rights under the existing (or proposed) contract that he wishes 'to make and enforce.'").

harm from loss of membership dues in the event of resignations was insufficiently "certain" and related harms from "upstream effects" flowing from employees' choice to resign was not cognizable). When this kind of "conjecture is necessary, redressability is lacking." *West v. Lynch*, 845 F.3d 1228, 1237 (D.C. Cir. 2017) (citation omitted). And even demonstrated instances of past injury would not necessarily establish standing to seek prospective relief. *See Lyons*, 461 U.S. at 105-106. But particularly given the lack of any showing of such past incidents here, Plaintiffs cannot satisfy Article III with bare speculation about the potential culmination of third-party settlement negotiations. To the extent Plaintiffs request that the Court require that grants be awarded to non-party UC in the future, *see* ECF No. 26 at 2, such request flouts the rigorous review and award process in place across all agencies by assuming that UC would be entitled to such future grants.

### ii.     Plaintiffs Lack Organizational Standing.

Plaintiffs advance a theory of organizational standing that the Supreme Court expressly rejected in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). In general, organizations may "sue on their own behalf for injuries they have sustained." *Id*. at 393 (quotation omitted). Like all litigants, however, organizations must establish standing to sue by "satisfy[ing] the usual standards for injury in fact, causation, and redressability." *Id*. at 393-94. Here, Plaintiffs have attempted to meet these requirements by relying on pre-*Alliance* case law for the proposition that "Defendants' actions have frustrated Plaintiffs' core activities and missions" and that "[r]esponding to these threats has required Plaintiffs to divert resources and compromised their ability to continue fulfilling their missions and engaging in their core activities." ECF No. 31 at 22.

In *Alliance*, four associations challenged FDA's relaxation of "regulatory requirements for mifepristone, an abortion drug." 602 U.S. at 372-73, 376. Although the associations neither prescribed nor used mifepristone themselves, they asserted that they had standing to challenge FDA's actions because those actions "impaired" the associations' "ability to provide services and achieve their organizational missions." *Id*. at 394 (quotation omitted). Thus, the associations contended that their injuries went beyond "mere disagreement with FDA's policies" because they had "incurr[ed] costs to oppose FDA's actions." *Id*. For example, the associations had "conduct[ed] their own studies on mifepristone so that" they could

"better inform their members and the public about mifepristone's risks." *Id.* And they had "expend[ed] considerable time, energy, and resources drafting citizen petitions to FDA, as well as engaging in public advocacy and public education." *Id*. (quotation omitted). Those activities, the associations claimed, had required them to expend "considerable resources to the detriment of other spending priorities." *Id*. (quotation omitted).

The Supreme Court unanimously held that the associations lacked Article III standing. The Court reasoned that organizations "cannot spend [their] way into standing simply by expending money to gather information and advocate against the defendant's action." *Alliance*, 602 U.S. at 394. To hold otherwise would allow virtually every organization to "manufacture its own standing" by "spend[ing] a single dollar" to counteract any governmental policy it wishes to challenge. *Id*. at 394-95. And the Court squarely rejected the proposition that "standing exists when an organization diverts its resources in response to a defendant's actions," stating "[t]hat is incorrect." *Id*. at 395. Nor did the Court consider sufficient the associations' allegation that FDA had failed to "properly collec[t] and disseminat[e] information about" mifepristone and thereby made "it more difficult" for the plaintiffs "to inform the public about safety risks" of the drug. *Id*. That generic setback to the associations' missions without any actual "impediment to [their] advocacy businesses" did not support Article III standing. *Id*.

Similar to the associations in *Alliance*, Plaintiffs claim that they have been forced to "divert resources [which has] compromised their ability to continue fulfilling their missions and engaging in their core activities." ECF No. 31 at 22. But the Supreme Court made clear that an organization's decision to "divert[] its resources in response to a defendant's actions" does not establish standing. *Alliance*, 602 U.S. at 395. At bottom, Plaintiffs fail to show that anjmy of the claimed retrospective or prospective grant suspensions "directly affect" or "interfere with" their activities. *Alliance*, 602 U.S. at 395. The Supreme Court has left no doubt that plaintiffs' expenditure of resources in response to the challenged conduct does not establish Article III standing. *See id*. at 394-95. And although the Supreme Court has recognized that an organization may— like any other litigant—have standing to sue when the defendant's conduct directly interferes with the organization's "core business activities," *see id*. at 395, Plaintiffs here fail to articulate any such direct interference. And any attempt to fit Plaintiffs' theory of standing in this case into that

framework would allow the exception to swallow the general rule. Plaintiffs, thus, invite reversible error.

Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves"—such as by spending funds—"based on their fears of hypothetical future harm." *Clapper*, 568 U.S. at 416. Thus, "a plaintiff's voluntary expenditure of resources to counteract governmental action that only indirectly affects the plaintiff does not support standing." *PETA v. U.S. Dept. of Agric.*, 797 F.3d 1087, 1099 (D.C. Cir. 2015) (Millett, J., dubitante). This case shows why: Plaintiffs' theory of standing rests on the premise that they can generate injury by voluntarily incurring costs in response to the possibility that UC may accept the government's August 8 Initial Offer at some point in the future. *See, e.g.*, ECF No 29-49 ¶ 24 ("Because of government pressure on the UC and other universities to abandon their commitment to academic freedom, shared governance, and due process principles, the AAUP must now expend more time and money to ensure that its members' rights in these regards are protected."). As *Clapper* makes clear, that theory would be inadequate for an individual, and cannot work for an organization either.

Additionally, Plaintiffs claim that "Defendants' conduct has also directly harmed Plaintiffs' own First Amendment rights and undermined Plaintiffs' roles as their members' collective bargaining representatives or shared governance advocates," ECF No. 31 at 22, hinges on non-party UC's acceptance of the government's August 8 Initial Offer. For the reasons set forth above, this speculative standing theory presents insurmountable obstacles. *See supra* part (I)(A)(i). And any breakdown in the relationship between Plaintiffs and non-party UC is an issue with UC, not the federal government.

### B. Plaintiffs' Claims Are Not Ripe.

Article III requires that the Court only decide ripe claims. Ripeness requires that an alleged injury be "certainly impending." *United States v. Streich*, 560 F.3d 926, 931 (9th Cir. 2009)). A claim is not ripe if it is "dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Trump v. New York*, 529 U.S. 125, 131 (2020) (citation omitted). "Determining whether administrative action is ripe for judicial review requires [courts] to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (citation omitted).

Putting aside Plaintiffs' claims regarding specific NSF and NIH grant suspensions, all of which

have been addressed in *Thakur*, their remaining claims rise and fall on speculation regarding the (1) multi-agency Task Force to Combat Anti-Semitism, (2) August 8 Initial Offer, and (3) Compact.  Plaintiffs claim that each of these pronouncements—none of which has any legal effect—violate their statutory and constitutional rights.  *See* ECF No. 31 at 32 ("Plaintiffs challenge the Termination Letters as well as Defendants' Task Force Policy as final agency action."); *id*. at 30 ("The August 8 Demand Letter unconstitutionally conditions restoration of unlawfully terminated funds on UC's agreement to suppress speech and academic freedom, including through restrictions on protests and expressive activities; sharing information about such expressive activity by faculty, academic employees, staff employees, and students with Defendants; admitting international students only with certain viewpoints; and ceding control over certain curriculum and faculty hiring and promotion decisions to an external monitor."); *id*. at 10 ("The Compact's demands plainly seek to dictate what viewpoints can be expressed on university campuses.").

Although claims regarding specific grant suspensions or terminations stemming from investigations performed by the Task Force may be ripe for review—if presented by an actual party to those grants—generalized allegations regarding the existence of a task force to combat antisemitism are not.  Thus, even if Plaintiffs were correct that the Task Force has adopted a "policy to use the threat of federal funding losses under the guise of civil rights enforcement to coerce universities into adopting the Trump administration's preferred viewpoints," ECF No. 31 at 9, the "basic [ripeness] rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties," *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).  Plaintiffs allege no specific action by the Task Force that has yielded concrete injury; their speculation about potential future implementation is not ripe.  *See Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (citations omitted)); *Porter v. Jones*, 319 F.3d 483, 490 (9th Cir. 2003) ("A case is not ripe where the existence of the dispute itself hangs on future contingencies that may or may not occur." (alterations adopted) (quoting *Clinton v. Acequia,*

*Inc.*, 94 F.3d 568, 572 (9th Cir. 1996)).

Nor are Plaintiffs' alleged potential injuries stemming from the anticipated effects of non-party UC's potential acceptance of the terms Plaintiffs speculate were included in a confidential, initial settlement offer made by the government to non-party UC are also not ripe. *See, e.g.*, ECF No. 31 at 30 ("The August 8 Demand Letter unconstitutionally conditions restoration of unlawfully terminated funds on UC's agreement to suppress speech and academic freedom, including through restrictions on protests and expressive activities; sharing information about such expressive activity by faculty, academic employees, staff employees, and students with Defendants; admitting international students only with certain viewpoints; and ceding control over certain curriculum and faculty hiring and promotion decisions to an external monitor.").  Since UC has not accepted any terms, Plaintiffs must rely on speculation about the harm that UC's acceptance of the August 8 Initial Offer might yield as the basis for their purported injury. *See, e.g.*, ECF No. 29-26 ¶ 35 ("[I]f the University capitulates to the August 8 Demands, I believe that it is highly likely that UCLA will cancel ESCP."); ECF No. 29-28 ¶ 18 ("Should UC capitulate to the August 8 Demand for expanded cooperation with federal law enforcement, I fear that ICE will be a more regular presence at Ronald Reagan Medical Center and other UCLA Health and UCLA campus facilities."); ECF No. 29-51 ¶ 15 ("I am worried that if UC capitulates, I will not be able to exercise my right to free speech.").

Plaintiffs' alleged potential future injuries stemming from the possibility that non-party UC may accept undisclosed terms cannot form the basis for the Court's subject-matter jurisdiction. *See Murthy*, 603 U.S. at 57 (plaintiffs' "one-step-removed, anticipatory" claims of injury that would only result from the independent action of some third party did not support standing against the government).  On their face, these allegations are dependent on contingencies and speculation regarding the content of ongoing settlement negotiations that may end in nothing.  This does not support the Court's jurisdiction and is not a basis for immediate preliminary relief. *See Nat'l Park Hosp. Ass'n*, 538 U.S. at 807-08 ("Ripeness is a justiciability doctrine designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt

in a concrete way by the challenging parties." (cleaned up)).

Finally, Plaintiffs recognize that "Defendants have not yet sought to impose this Compact Policy on the UC," but nonetheless claim that it "is further evidence that Defendants' unambiguous intent in implementing the Task Force Policy is to commandeer America's universities, impose the Trump administration's ideological agenda, and extinguish politically disfavored viewpoints." ECF No. 31 at 10. As with the Task Force and the August 8 Initial Offer, any claims regarding non-party UC's potential acceptance of the Compact are speculative and, therefore, do not pass Article III muster. Plaintiffs draw comparisons to the government's actions at other universities; it is thus worth noting that as of this filing, seven universities have rejected the Compact, and Plaintiffs identify no resulting retribution. At this juncture, Plaintiffs' theories about potential Compact implementation are not ripe.

### C.  Plaintiffs' Claims Related to Contract Suspensions or Terminations Must be Heard by the Court of Federal Claims.

Even if Plaintiffs established Article III standing and ripeness, their claims belong in the Court of Federal Claims because contract terminations are the centerpiece of their request for relief. *See* ECF No. 26 at 1-3.

The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). In determining whether "a particular action" is "at its essence a contract action" subject to the Tucker Act, courts look at "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (quotation omitted); *United Aeronautical Corp. v. United States Air Force*, 80 F.4th 1017, 1025 (9th Cir. 2023) ("We use the *Megapulse* test to determine implied preclusion pursuant to the Tucker Act[.]"). Under that framework, the Supreme Court recently held the government was likely to succeed in showing that similar claims were precluded. *Dep't of Ed. v. California*, 604 U.S. 650 (2025). The Supreme Court in *California* considered a temporary restraining order "enjoining the Government from terminating various education-related grants" and "requir[ing] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue." *Id.* at 968 (2025). The Court held that "the Government is likely to succeed in showing the District Court lacked jurisdiction to

FED. DEFS.' OPP'N TO PLS.' MOT. FOR PRELIMINARY INJUNCTION
CASE NO. 25-CV-07864-RFL

order the payment of money under the APA." *Id.* This is so because "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered." *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U. S. 204, 212 (2002)). "Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U. S. C. § 1491(a)(1))

In *National Institutes of Health v. American Public Health Association*, the Supreme Court reiterated that the APA's "'limited waiver of [sovereign] immunity' does not provide the District Court with jurisdiction to adjudicate claims 'based on' the research-related grants or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants." 606 U.S. ---- , 2025 WL 2415669, at *1 (Aug. 21, 2025) (citing *California*, 604 U.S. at 968). Justice Barrett's concurrence provides that "the District Court likely lacked jurisdiction to hear challenges to the grant terminations, which belong in the Court of Federal Claims (CFC)." *Id*. at *2. And Justice Gorsuch's concurrence explains why *California*, despite being a decision regarding interim relief, should still carry precedential weight with respect to its reasoning. *Id*. at *4. Justice Gorsuch notes that "even probabilistic holdings—such as *California*'s top-line conclusion that 'the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA,' must 'inform how a [lower] court' proceeds 'in like cases.'" *Id*. (internal citations omitted). Moreover, Justice Gorsuch dispensed with the court of appeals' argument that *California* was distinguishable because the district court had only invoked the APA "to vacate the government's decision to terminate respondents' grants," stating that "[a]n order vacating the government's decision to terminate grants under the APA is in every meaningful sense an order requiring the government to pay those grants." *Id*. Justice Gorsuch also disagreed with the court of appeals' assertion that the claims before it did not rely on the grant awards' terms and conditions, noting that "[i]n both cases, respondents' injury and alleged right to payment stem from the government's refusal to pay promised grants according to the terms and conditions that accompany them." *Id*.

Here, Plaintiffs' claims are grounded in the alleged need for undisrupted funding pursuant to grant agreements. *See* ECF No. 31 at 42 ("Besides monetary losses that affect the livelihoods of the professors, researchers, and staff who are funded by these grants, a sudden cutoff in federal funds interrupts and may

require abandoning multi-year academic and scientific projects with important public benefits . . . .").  The

heart of their claims, then, is a request to prevent the termination of those grant agreements or to compel

the enforcement of the government's monetary obligations pursuant to those agreements.  In other words,

Plaintiffs want the government to keep paying up—and what—if anything—is a contract but a

commitment to pay money in exchange for something.  *See Climate United Fund v. Citibank, N.A.*, No.

25-5122, 2025 WL 2502881, at *7 (D.C. Cir. Sept. 2, 2025) ("[T]he grantees seek to set aside their grant

terminations, which means they seek specific performance.  This is a typical contract remedy that indicates

a claim is founded upon a contract for purposes of the Tucker Act." (cleaned up)); *NIH*, 2025 WL 2415669,

at *4 (concurring in the Supreme Court's order to stay district court's judgments vacating grant

terminations because "[a]n order vacating the government's decision to terminate grants under the APA is

in every meaningful sense an order requiring the government to pay those grants.") (Gorsuch, J.,

concurring); *id*. at *5 ("[P]laintiffs' claims challenging NIH grant terminations likely belong in the Court

of Federal Claims, not in federal district court . . . [t]he reason is straightforward:  The core of plaintiffs'

suit alleges that the Government unlawfully terminated their grants.") (Kavanaugh, J., concurring); *see

also Bennett v. New Jersey*, 470 U.S. 632, 638 (1985) (noting that "many federal grant programs" are

"much in the nature of a contract" (quotation omitted)).

Plaintiffs acknowledge "the Tucker Act's limitation on the APA's waiver of sovereign immunity,"

but insist that this jurisdictional bar does not apply, because they assert APA claims based on Defendants'

alleged violations of Title VI and Title IX.  ECF No. 31 at 23.  But Plaintiffs' framing does not alter the

threshold jurisdictional principle that their claims for specific performance—payment of the grants—can

be heard only by the Court of Federal Claims.  To be sure, the source of the rights asserted is the contracts

themselves:  Plaintiffs have not identified any statute or regulation that could plausibly be read to entitle

them—or, more specifically, non-party UC—to federal funds.  Similarly, the remedy Plaintiffs request is

grounded in the contracts into which non-party UC entered, not in any independent statutory or regulatory

mandate.  Because Congress vested the Court of Federal Claims with exclusive jurisdiction over such

claims, this Court lacks jurisdiction over grant terminations.  *See NIH*, 2025 WL 2415669, at *1 (citing

*California*, 604 U.S. at 968 (per curiam)); *Climate United Fund*, 2025 WL 2502881, at *7 (holding that

district court lacked jurisdiction over grantees' APA claims where, "[d]espite the grantees' characterizations, the remedy they seek is specific performance of their contracts, and they have identified no right to relief that is 'truly independent' of the grant agreements."); *Am. Library Ass'n v. Sonderling*, No. CV 25-1050 (RJL), 2025 WL 1615771, at *7 (D.D.C. June 6, 2025) ("The heart of these allegations is that defendants have failed to comply with Congress's statutory mandates for IMLS.  However, the main mechanism through which defendants allegedly violated those mandates is by suspending and terminating grants . . . . [P]laintiffs' framing of their claims for relief under the APA and the Constitution do not necessarily take this case out of the ambit of the Tucker Act.").

In arguing that the Tucker Act does not apply, Plaintiffs rely on *Community Legal Services in E. Palo Alto v. United States Department of Health & Human Service*s, 137 F.4th 932 (9th Cir. 2025).  *See* ECF No. 31 at 22-23.  But the Ninth Circuit's Tucker Act analysis in that case was based on the specific funding structure at issue.  The Court considered the government's withdrawal of funding for a program established through agency regulation and funded through a series of Congressional appropriations.  *Id.* at 936.  The Court concluded that a challenge to the government's decision to withdraw funding for that regulatory program was not a contract claim within the purview of the Tucker Act, because the program could be executed without reinstating any particular contract.  *Id.* at 939.  In contrast, here, Plaintiffs' APA claims are based on the alleged need for uninterrupted funding, which was afforded and is governed only by specific grant agreements.  The government acknowledges that the subject grants are funded via appropriations, but that is true for virtually all government contracts—after all, as a general matter, federal funds cannot be paid absent appropriations.  *See Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 207 (2020) (noting that most agencies rely on the annual appropriations process for funding).  At bottom, jurisdiction for Plaintiffs' grant-based claims lies exclusively in the Court of Federal Claims.[4]

### D.  Plaintiffs Failed to Join UC, an Indispensable Party Under Rule 19.

Even if Plaintiffs satisfy Article III and the Tucker Act does not apply, the Court lacks jurisdiction because Plaintiffs failed to join necessary parties under Federal Rule of Civil Procedure 19, *i.e.*, non-party

---

[4] To the extent that Plaintiffs challenge the August 8 Initial Offer itself, Defendants do not claim that this challenge is committed to the Court of Federal Claims (though it is precluded for other reasons, as discussed elsewhere in this brief).

UC—the actual party to all the challenged contracts, and the entity whose conduct Plaintiffs are concerned would change if it accepts the (currently unaccepted) August 8 Initial Offer.

Rule 19 sets out a three-step process for determining whether a party is indispensable to a lawsuit. *See* Fed. R. Civ. P. 19.  First, a party is "required" if either:

> (1) the court cannot accord "complete relief among existing parties" in the [party's] absence, or (2) proceeding with the suit in its absence will "impair or impede" the [party's] ability to protect a claimed legal interest relating to the subject of the action, or "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest."

*Alto v. Black*, 738 F.3d 1111, 1126 (9th Cir. 2013) (quoting Fed. R. Civ. P. 19(1)(A)-(B)).

Second, a court determines "whether joinder is feasible, or is barred by sovereign immunity." *Id*. Third, a court must decide "whether the case can proceed without the absentee, or whether the absentee is an 'indispensable party' such that the action must be dismissed." *E.E.O.C. v. Peabody W. Coal Co.*, 400 F.3d 774, 779 (9th Cir. 2005); *see also* Fed. R. Civ. P. 19(b).  It is a "fundamental principle that a party to a contract is [required], and if not susceptible to joinder, indispensable to litigation seeking to decimate that contract." *Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*, 276 F.3d 1150, 1157 (9th Cir. 2002); *see also Ward v. Apple Inc.*, 791 F.3d 1041, 1053 (9th Cir. 2015) ("[A]ll parties to a contract are [required] in an action to set aside the contract."); *Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1026 (9th Cir. 2002) (concluding that certain tribes were indispensable parties because "the effect of the district court's injunction [was] not merely to require adherence to certain procedures in entering or extending gaming compacts with the tribes; it is to prevent new compacts or the extension of existing ones").  Here, Plaintiffs challenge decisions under grants between the government and non-party UC, the government and UC's prospective contractual relationships, and the terms derived from potential settlement negotiations between the government and UC.  Plaintiffs thus seek to directly intercede into those contractual relationships, to prosecute cases themselves to determine the validity of those contracts, and to prevent UC from contracting with the government on certain terms.  UC is thus a key party to the contractual relationships that Plaintiffs seek to impair—and it is not a party to the suit.

If a person is a required party under Rule 19(a), but "cannot be joined,"[5] the court must ask "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b). The first factor in determining if the actions should be dismissed is "the extent to which a judgment rendered in [the indispensable] person's absence might prejudice that person or the existing parties." *See* Fed. R. Civ. P. 19(b)(1). Any judgment in this case would prejudice non-party UC because it would impair its contractual rights, namely the right to enforce (or not) its own contract. *See Fla. Wildlife Fed'n. Inc. v. U.S. Army Corps. of Eng'rs*, 859 F.3d 1306, 1318 (11th Cir. 2017) (noting that the Rule 19(b)(1) factor overlaps with the practical impairment requirement of Fed. R. Civ. P. 19(a)). Indeed, "[n]o procedural principle is more deeply imbedded in the common law than that, in an action to set aside a lease or a contract, all parties who may be affected by the determination of the action are indispensable." *Lomayaktewa v. Hathaway*, 520 F.2d 1324, 1325 (9th Cir. 1975) (citing *Broussard v. Columbia Gulf Transmission Company*, 398 F.2d 885 (5th Cir. 1968)).

The second Rule 19(b) factor is whether that prejudice could be "lessened or avoided" in some way. Fed. R. Civ. P. 19(b)(2). Here, it could not, as "any relief in this case would take the form of an injunction with potentially substantial consequences" for the third-party, *Fla. Wildlife Fed'n*, 859 F.3d at 1319, *viz*, the impairment of non-party UC's rights and obligations under its grant agreements and its settlement authority in ongoing negotiations. *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Rite Aid of S.C., Inc.*, 210 F.3d 246, 253 (4th Cir. 2000) (a party was indispensable when the court "could not have avoided addressing the validity" of the provision at issue).

The third factor is whether "a judgment rendered in the person's absence would be adequate." Fed. R. Civ. P. 19(b)(3). This factor reflects "the public stake in settling disputes by wholes, whenever possible." *Fla. Wildlife Fed'n*, 859 F.3d at 1319 (citation omitted). Here, an order impairing non-party UC's contractual relationships and ongoing settlement discussions while UC is not present opens the door

---

[5] Defendants take no position on whether UC is amenable to suit in this Court, but at a minimum, Plaintiffs should be required to attempt to bring UC into this suit via proper service of process. *See, e.g., Chiropartners, Inc. v. Gravely*, No. 1:12-cv-00223-CG-C, 2012 WL 4050840, at *3-4 (S.D. Ala. Aug. 24, 2012) (proper remedy when party was indispensable was to dismiss complaint without prejudice to allow the plaintiff to attempt to add the indispensable party).

to inconsistent or incomplete relief that does not fully account for contracting parties' rights, obligations, and deliberate business decisions.

Finally, courts look to whether "plaintiff would have an adequate remedy if the action were dismissed for nonjoinder." Fed. R. Civ. P. 19(b)(4). Here, Plaintiffs claims are largely based on whether and to what extent non-party UC is amenable to accepting the government's terms as part of ongoing settlement negotiations. Those claims must be adjudicated with UC's participation, and claims regarding specific contracts belong in the Court of Federal Claims. *See supra* part (I)(B). At this juncture, however, the Court lacks jurisdiction over claims that require UC's participation.

## II.    Plaintiffs' APA Claims Fail.

### A.  The Putative "Task Force Policy" Is Not Discrete, Final Agency Action.

Although Plaintiffs' APA claims include allegations regarding the August 8 Initial Offer, *see* ECF No. 24 at 107-17, and their Motion seeks extraordinary relief as to that initial offer—including production of the confidential discussions, *see* ECF No. 26 at 4—Plaintiffs' brief states that they only "challenge the Termination Letters as well as Defendants' Task Force Policy as final agency action," ECF No. 31 at 32.

Under the APA, plaintiffs "must direct [their] attack against some particular 'agency action' that causes [them] harm." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). And that agency action must be "circumscribed" and "discrete[.]" *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 62 (2004). Thus, the APA does not permit Plaintiffs to "seek *wholesale* improvement" of agency management "by court decree"—even in the face of allegations of "rampant" violations of law. *Lujan*, 497 U.S. at 891. "Because 'an on-going program or policy is not, in itself, a final agency action under the APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted). "Consequently, as each case only presents the court with a narrow question to resolve, [the court] can have no occasion to order wholesale reform of an agency program." *Id.* Rather, a court is limited to reviewing final agency action—meaning action that (1) "mark[s] the consummation of the agency's decisionmaking process" and (2) is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up).

Plaintiffs do not identify a putative "Task Force Policy" with the precision required by the APA. Rather, Plaintiffs claim that "Defendants have adopted a new Task Force Policy that leverages the federal government's enforcement authority over federal civil rights laws and federal grant program rules to impose and threaten legal and financial sanctions on universities for alleged but unproven civil rights violations." ECF No. 31 at 32. Notably, except for the discrete NSF and NIH grants identified, Plaintiffs do not challenge specific grant suspensions or terminations or specific payments they claim to be entitled to—they challenge the entire course of conduct of 15 agencies moving forward. While discrete grant suspensions or terminations (directed to non-party UC and only redressable by UC) may represent a final agency action, a plaintiff may not "in a single swipe at the duly elected executive" seek judicial superintendence over the entire grantmaking structure. *See Louisiana v. Biden*, 64 F.4th 674, 684 (5th Cir. 2023). Indeed, the complaint appears to simply be that the Defendants are not following the law as Plaintiffs see it *generally*. *See, e.g.*, ECF No. 24 ¶ 492 ("Defendants' July 30-August 1 funding withdrawal, August 8 Demand Letter, and Task Force Policy are not authorized by any law, and no department or agency determined that compliance could not be secured by voluntary means prior to initiating those actions."). The APA does not permit such challenges.

In *Lujan*, the Supreme Court dispelled any notion that such a programmatic challenge can proceed under the APA:

> [I]t is at least entirely certain that the flaws in the entire "program"—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA, simply because one of them is ripe for review and adversely affects [a plaintiff].

497 U.S. at 892-93 (footnote omitted). Just as in *Lujan*, Plaintiffs' APA claims seek to bring a collective, programmatic, challenge to the possibility that the agencies will "impose and threaten legal and financial sanctions" upon non-party UC. ECF No. 31 at 32. But these are grab-bag challenges to general agency policies, not discrete challenges to concrete agency actions.

Under *Bennett*'s first prong, an agency's promulgation of a general guiding principle or framework marks the initiation, not the consummation, of the agency's decision-making process. It is the application of those general principles that is itself reviewable (as, for example, individual grant terminations may be

in the proper forum).  Even if Plaintiffs were correct about the Task Force's goals, any such principles would be "preliminary" in nature and "not directly reviewable[.]"  *See* 5 U.S.C. § 704.  "[They] may be a step, which if erroneous will mature into a prejudicial result[.]"  *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 112 (1948).  But that does not make those interim principles themselves the "consummation of the administrative process" reevaluating the agency's priorities. *Id.* at 113; *see EPA v. Brown*, 431 U.S. 99, 104 (1977) ("For [courts] to review [agency actions] not yet promulgated, the final form of which has only been hinted at, would be wholly novel."); *Appalachian Energy Grp. v. EPA*, 33 F.3d 319, 322 (4th Cir. 1994) (no final agency action where agency "has not taken any action at this point triggering [the court's] power to review its position").

Nor does the Task Force satisfy the second *Bennett* prong.  Prong two's language requires "determinations based on the concrete consequences an agency action has or does not have." *S. California All. of Publicly Owned Treatment Works v. U.S. Envtl. Prot. Agency*, 8 F.4th 831, 836 (9th Cir. 2021) (citations omitted).  The court must consider the "direct and immediate effect on the day-to-day operations of the party seeking review." *California Dept. of Water Res. v. FERC*, 341 F.3d 906, 909 (9th Cir. 2003); *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) ("This limitation ensures that judicial review does not reach into the internal workings of the government, and is instead properly directed at the effect that agency conduct has on private parties").  Until the Task Force ripens into a discrete agency action, there exists no concrete consequence reviewable under the APA. *S. California All.*, 8 F.4th at 837 ("[A]gency [guidance] is not final when subsequent agency decision making is necessary to create any practical consequences.").  And any ongoing federal investigation of UC would not in and of itself constitute a concrete consequence of the Task Force policy until a final adjudication directly impacting Plaintiffs is promulgated. *See Ass'n of Am. Med. Colleges v. United States*, 217 F.3d 770, 781 (9th Cir. 2000) ("An investigation, even one conducted with an eye to enforcement, is quintessentially non-final as a form of agency action." (citation omitted)).  Apart from the specific grants suspended in July, Plaintiffs have not proffered any evidence that the results or mere existence of a federal investigation have concretely required a change in conduct.  Although Plaintiffs claim that they have unilaterally chosen to alter their conduct, these generalized and manufactured allegations do not support

1    the sweeping relief sought as to all Defendant Agencies, particularly in the absence of any evidence

2    showing that those agencies have taken any adverse action against Plaintiffs.

3                **B.  The Challenged Funding Decisions are Committed to Agency Discretion.**

4            Plaintiffs' APA challenges to the grant funding decisions, including the retrospective grant

5    suspensions and any prospective grant decisions, involve determinations "committed to agency discretion

6    by law." 5 U.S.C. § 701(a)(2).

7            The "allocation of funds from a lump-sum appropriation is" an "administrative decision

8    traditionally regarded as committed to agency discretion" because the point of such appropriations "is to

9    give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in

10   what it sees as the most effective or desirable way." *Lincoln v. Vigil,* 508 U.S. 182, 192 (1993).  In making

11   this allocation, the agency must engage in "a complicated balancing of a number of factors" within "its

12   expertise," including "whether its resources are best spent on one program or another; whether it is likely

13   to succeed in fulfilling its statutory mandate; whether a particular program best fits the agency's overall

14   policies; and, indeed, whether the agency has enough resources to fund a program at all." *Id*. at 193

15   (quotation omitted).  Although the Supreme Court in *Lincoln* addressed lump-sum appropriations, its logic

16   extends to other funding programs that permit the agency to decide "how the moneys" for a particular

17   program "could best be distributed consistent with" the statute. *Milk Train, Inc. v. Veneman*, 310 F.3d 747,

18   751 (D.C. Cir. 2002).

19          Here, the Defendant Agencies have the ability to consider the optimal distribution of funding to

20   achieve statutory goals "in what [each agency] sees as the most effective or desirable way." *Lincoln*, 508

21   U.S. at 192.  And, under 2 C.F.R. § 200.340, the government has the authority to terminate a grant "to the

22   extent authorized by law, if an award no longer effectuates the program goals or agency priorities."  2

23   C.F.R. § 200.340(a)(4).   The APA does not allow for judicial review of those discretionary judgments that

24   implicate agency expertise about allocating limited resources and advancing policy priorities.  *See*

25   *Lincoln*, 508 U.S. at 193 (noting that funding decisions involve "a complicated balancing of a number of

26   factors" (quotation omitted)).

27

28   FED. DEFS.' OPP'N TO PLS.' MOT. FOR PRELIMINARY INJUNCTION
     CASE NO. 25-CV-07864-RFL

1

### C.  Title VI and Title IX are Inapplicable.

2      Plaintiffs claim that the NSF, NIH, and DOE grant suspensions were contrary to law because they

3 did not comply with Title VI and Title IX.  ECF No. 31 at 35-37.  By their terms, however, Title VI and

4 Title IX do not apply to any of the grant suspensions or terminations (past or future) in this case, which

5 were not based on violations of such provisions.

6      Title VI and Title IX's enforcement provisions are materially the same.  *Compare* 42 U.S.C. §

7 2000d-1, *with* 20 U.S.C. § 1682.  The enforcement procedures under both statutes are also governed by

8 the same implementing regulations.  *See* 45 C.F.R. § 86.71 (adopting and incorporating for purposes of

9 Title IX the "procedural provisions applicable to Title VI"); 45 C.F.R. §§ 80.6-80.11 (Title VI).  Both Title

10 VI and Title IX provide procedures for grant terminations *taken pursuant to those Acts*.  *See*

11 42 U.S.C. § 2000d-1 (discussing a contractor's "failure to comply with a requirement imposed pursuant

12 to *this section*") (emphasis added); 20 U.S.C. § 1682 (same).

13      Plaintiffs claim that if the agencies identify inadequate institutional concern for antisemitism at

14 UC as a reason for grant termination, then Title VI and Title IX's procedures are the only mechanism by

15 which the termination can be effectuated.  *See* ECF No. 31 at 37.  That is wrong.  The few contract

16 suspensions that Plaintiffs identify here—which were re-instated in *Thakur*—were not taken pursuant to

17 Title VI or Title IX; they were taken pursuant to the agencies' authority under 2 C.F.R. § 200.339 and 45

18 C.F.R. § 75.371 to terminate for failure to comply with federal law and, generally, under 2 C.F.R. § 200.340

19 to terminate funding agreements that no longer align with agency priorities.  *See, e.g.,* ECF No. 27-6

20 (NSF); ECF No. 27-8 (NIH).  Title VI and Title IX' separate and independent procedures do not preclude

21 or abrogate the agencies' separate contract authorities.  There is no basis in Title VI or Title IX to suggest

22 that facts that are relevant to a finding of a violation of those Acts cannot also be relevant to the

23 government's determination that grantees have failed to comply with other federal laws, or that the grants

24 no longer align with the agencies' policy decisions.

25      Title VI and Title IX contract terminations proceed under different legal authorities and entail

26 different procedures.  For example, Title VI enacted a general requirement for recipients of federal funding

27 that applies to all funding agreements, regardless of whether it is included as a provision of the

28

agreement.  42 U.S.C. § 2000d.  It leaves no discretion to agencies to waive its requirements, as it uses mandatory language stating that each agency is "directed to effectuate the provisions of section 2000d of this title."  *Id.* § 2000d-1.  Agencies are instructed to do so through the implementation of "rules, regulations, or orders of general applicability."  *Id.*  And the remedies under Title VI and Title IX are much broader than just funding terminations and include the prospect of an enforcement action brought by the Attorney General.  In contrast, 2 C.F.R. § 200.339, 45 C.F.R. § 75.371, and 2 C.F.R. § 200.340  were not promulgated under the Title VI or Title IX authority.  These regulations afford the agencies discretion in determining whether and to what extent to pursue remedies, all of which are tied to the agency award.

An agency's decision to suspend or terminate a grant to address antisemitism thus does not depend on the finding of a Title VI or Title IX violation, and there is no reason that Title VI and Title IX procedures would govern these terminations or override the termination framework spelled out by 2 C.F.R. § 200.339, 45 C.F.R. § 75.371, and 2 C.F.R. § 200.340.  Given that the suspensions identified here were not taken pursuant to Title VI or Title IX, there was no obligation for the government to follow any of the procedures prescribed by those Acts.  Accordingly, Plaintiffs are unlikely to succeed on the merits of their contrary to law claims based on Title VI and Title IX.  And for the reasons set forth below, Plaintiffs' "contrary to constitutional right" claims, 5 U.S.C. § 706(2)(B), also fail.  *See infra* part (III).

### D.  Defendants' Grant Decisions Were Not Arbitrary or Capricious.

Under the arbitrary and capricious standard, the agency's decision is presumed valid, and a court reviews only whether that decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).  "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  A court must "uphold [even] a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (quotation marks omitted).  An agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one."  *Id.* at 515.  Rather, "it suffices that the new policy is permissible under the statute, that there are good reasons

for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.*  Moreover, the judiciary affords a particularly lenient standard of review to agency action in the contracting context. *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) ("[D]etermining an agency's minimum needs is a matter within the broad discretion of agency officials . . . and is not for [the] court to second guess." (quotations omitted)); *cf. Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 260-61 (Fed. Cl. 2016) ("Effective contracting demands broad discretion" so contracting decisions are subject to a "highly deferential rational basis review.").

The necessary extent of an agency's explanation for its action varies with context. *Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1134 (D.C. Cir. 1995).  When government contracts provide for the circumstances in which they can be terminated (*i.e.*, when agency priorities change) or the manner in which the termination shall occur (i.e., through a form letter), government action consistent with those contract terms are a fortiori reasonable. *Cf. Lujan v. G & G Fire Sprinklers, Inc.*, 532 U.S. 189, 196 (2001) (holding that a terminated government contractor receives due process through the availability of a breach-of-contract claim without any additional process or pre-termination hearing).  Here, in accordance with 2 C.F.R. § 200.340 and the individual terms and conditions of the NSF, NIH, and DOE awards cited by Plaintiffs, an agency may generally terminate a federal award "if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4).  In addition, 2 C.F.R. § 200.341(a) requires an agency to "provide written notice of termination to the recipient or subrecipient," and include in that notice "the reasons for termination, the effective date, and the portion of the Federal award to be terminated."  Each of the grants Plaintiffs cite were terminated pursuant to recognized termination authorities and in compliance with the terms permitting such terminations.  Given that "reasonableness is a zone, not a pinpoint," *Wis. Pub. Power, Inc. v. FERC*, 493 F.3d 239, 266 (D.C. Cir. 2007) (per curiam), Plaintiffs necessarily lack plausible allegations that the APA required Defendants to simply maintain grants that no longer effectuated their priorities and forego a regulatorily permitted termination pathway.  *See, e.g.*, *Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*, 498 U.S. 211, 230 (1991) ("An agency enjoys broad discretion in determining how best to handle related, yet discrete, issues in terms of procedures, and priorities[.]" (citations omitted)).

Moreover, the decisions to suspend were "reasonable and reasonably explained." *Prometheus Radio Project*, 592 U.S. at 423.  In their notices, NSF, NIH, and DOE explained in sufficient detail the reasons for the suspension.  *See* ECF No. 27-3 at 2 ("NSF understands that the University of California – Los Angeles continues to engage in race discrimination including in its admissions process, and in other areas of student life, as well as failing to promote a research environment free of antisemitism and bias."); ECF No. 27-6 (further describing the reasons for NSF's suspension and indicating that "NSF is willing to work with UCLA to identify corrective actions to bring UCLA into compliance"); ECF No. 27-8 at 2 (NIH letter identifying three examples of UCLA's non-compliance with federal statutes and regulations); ECF No. 27-7 at 2 (same).  It was patently reasonable for the government to refuse to contract with an entity based on findings on discrimination.  The agencies thus effectuated a long-held authority to determine whether grant awards are in conformity with government priorities.  And it is exceedingly unlikely that anyone has a reliance interest in continued discretionary funding.  *Tennessee v. Becerra*, 131 F.4th 350, 370 (6th Cir. 2025) ("Tennessee likely has no legally cognizable reliance interest in the receipt of a discretionary funding award on the conditions that it prefers." (emphasis removed)).  Arbitrary and capricious review of agency policy priorities and reasons is deferential because it "represents a substantial intrusion into the workings of another branch of Government." *See Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019) (quotation marks omitted).  The NSF, NIH, and DOE suspensions satisfy the APA's strictures.

Plaintiffs also suggest that the Task Force and August 8 Initial Offer are arbitrary and capricious. ECF No. 31 at 39-40.  But neither of those constitutes final agency action that could be scrutinized under the arbitrary and capricious standard.  *See supra* part (II)(A).  The Court should accordingly reject Plaintiffs' arbitrary and capricious claim.

### III.    Plaintiffs' Ultra Vires and Constitutional Claims Lack Merit.

#### A.  There Has Been No First Amendment Violation.

Plaintiffs argue that Defendants violated the First Amendment by threatening "legal and economic sanctions in attempt to coerce the UC into suppressing 'left' and 'woke' viewpoints threatening "retaliation for the expression of those disfavored viewpoints by UC faculty, students, academic

employees, and staff," resulting in chilled speech "across the UC System." ECF No. 31 at 24. Even assuming there is final agency action with respect to these claims or they are not subject to the APA's requirements, they fail on the merits.

The agencies' suspensions are explained by a nonretaliatory purpose: opposing antisemitism. Unlawful discrimination finds no safe haven under the First Amendment, even though it may involve speaking or other expressive activity; accordingly, the government's policy against doing business with entities that do not take adequate action against discriminatory acts of antisemitism was a constitutionality valid basis for the agencies' termination decision. Indeed, "preventing discrimination in the workplace—and in the schools—is not only a legitimate, but a compelling, government interest." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 209 (3d Cir. 2001); *see also Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245, 263 (S.D.N.Y 2025) ("there is no question that the elimination of discriminatory harassment in employment and in programs receiving federal funding is a compelling government interest."), *reconsideration denied*, No. 24 CIV. 2669 (JPC), 2025 WL 602945 (S.D.N.Y. Feb. 25, 2025). Plaintiffs have not put forward evidence that the viewpoints expressed by UC faculty, students, academic employees, and staff played a substantial role in any grant suspensions. Rather, it was non-party UC's failure to take adequate actions to respond to antisemitism on its own campus that justified the agency action.

Future funding decisions—whether or not related to any potential settlement with non-party UC—are not subject to traditional First Amendment scrutiny. "The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest . . . In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). Thus, "[a]s a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* ("*AID*"), 570 U.S. 205, 214 (2013) (collecting cases).

While government funding is not free from the First Amendment in all respects, the relevant First

Amendment limitation is the prohibition against an unconstitutional "condition."  *Id.* at 213-15.  Under this limitation, the government may "specify the activities [it] wants to subsidize[,]" but it cannot "leverage funding to regulate speech *outside* the contours of the programs itself."  *Id.* at 214-15 (emphasis added).  For example, limitations on the use of federal funds for a specific purpose—such as "promot[ing] or advocat[ing] [for] the legalization or practice of prostitution or sex trafficking"—is constitutionally permissible, *id.* at 217-18 (citation omitted), but outright conditioning federal funds on a pledge to a policy "explicitly opposing prostitution or sex trafficking" is not, *id.* at 221 (citation omitted).  The latter amounts to an unconstitutional condition because it regulates speech even on the recipients' "own time and dime." *Id.* at 218-19.  In other words, a pledge outside the program is different than the topic of the funds to be used.  "By demanding that funding recipients adopt—as their own—the Government's view on an issue of public concern, [an offending] condition by its very nature affects 'protected conduct outside the scope of the federally funded program.'"  *Id.* at 218 (quoting *Rust*, 500 U.S. at 197).  This critical distinction decides the present case.

Here, as permitted under *Rust* and *AID*, the July 2025 suspensions align the government's sponsorship of activities with its policy priorities.  In so doing, the suspensions do not seek to regulate a grantee's speech "outside the contours of" any such policy initiatives—*i.e.*, they do not prohibit entities from engaging in protected speech on their "own time and dime."  *AID*, 570 U.S. at 218.  The Supreme Court has repeatedly held that the government does not penalize, prohibit, restrict, or otherwise infringe on speech simply because it chooses not to pay for it.  *See, e.g.*, *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (the government "is not required to assist others in funding the expression of particular ideas[]"); *United States v. Am. Library Ass'n*, 539 U.S. 194, 212 (2003) (plurality op.) (a "decision not to subsidize the exercise of a fundamental right does not infringe the right" (quoting *Rust*, 500 U.S. at 193)); *Leathers v. Medlock*, 499 U.S. 439, 450 (1991) ( "[The Government] is not required to subsidize First Amendment rights.").  Simply put, the government is permitted to have policy priorities, and it does not violate the First Amendment by not funding awards that are out of alignment with those policies.

Moreover, the First Amendment rights of government contractors such as those of non-party UC are limited to the same extent as those of government employees.  *See Bd. of Cnty. Comm'rs, Wabaunsee*

*Cnty. v. Umbehr*, 518 U.S. 668, 675 (1996).  Claims alleging retaliation against a contractor for protected speech are governed by the balancing test announced in *Pickering v. Board*, which weighs the "interests of the [contractor], as a citizen, in commenting upon matters of public concern and the interest of the State, as [a contracting entity], in promoting the efficiency of the public services it performs through its [contractors]." *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty.*, 391 U.S. 563, 568 (1968).

But "absent contractual, statutory, or constitutional restriction, the government is entitled to terminate [a contractor] for no reason at all." *Umbehr*, 518 U.S. at 674; *see also* 48 C.F.R. § 2.101 (defining "termination for convenience"); 48 C.F.R. §§ 49.101, 49.501-05, 52.249-1-5 (requiring agencies to include clauses in contracts regarding termination for convenience); *G.L. Christian & Assocs. v. United States*, 312 F.2d 418, 426-27 (Ct. Cl. 1963) (reading termination clause into contract as a matter of law). Thus, a contractor is similarly situated to an at-will employee. *Umbehr*, 518 U.S. at 674.  As with at-will employees, even if a contractor's "protected conduct played a 'substantial part' in the actual decision" to terminate them, it "would [not] necessarily amount to a constitutional violation justifying remedial action." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285 (1977).  Accordingly, "the government can escape liability by showing that it would have taken the same action even in the absence of the protected conduct." *Umbehr*, 518 U.S. at 675; *see also Peguero-Moronta v. Santiago*, 464 F.3d 29, 46 (1st Cir. 2006) (a "'defendant [that] has produced enough evidence to establish that the plaintiff's dismissal would have occurred in any event for nondiscriminatory reasons [will prevail].'" (quoting *Cepero–Rivera v. Fagundo*, 414 F.3d 124, 132 n.1 (1st Cir. 2005)).

Here, Plaintiffs have failed to show that the July 2025 suspensions were retaliatory. *See* ECF No. 31 at 25.  These suspensions were issued because of non-party UC's actions related to antisemitism well before issuance of the August 8 Initial Offer and the Compact.  That is dispositive of Plaintiffs' First Amendment retaliation claim—this is not a situation where UC refused to comply and then grant suspensions followed shortly after, *see, e.g., President & Fellows of Harvard Coll. v. United States Dep't of Health & Human Services*, No. 25-CV-10910-ADB, 2025 WL 2528380, at *24 (D. Mass. Sept. 3, 2025), but rather where terminations predated any such allegedly "coercive" demand.  *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) (a plaintiff bears the burden of showing

that its protected conduct was a "substantial" or "motivating" factor in leading to the retaliatory conduct).

**B. Defendants Have Not Coerced Non-Party UC in Violation of the Tenth Amendment.**

Plaintiffs rely on *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578 (2012) ("*NFIB*"), as support for their argument that the August 8 Initial Offer constitutes an unlawful "threat to withhold federal funding to coerce UC into surrendering control of curricula and campus culture to the federal government." ECF No. 31 at 29. Plaintiffs claim that this alleged "coercion of the UC violates the Tenth Amendment even if the UC succumbs to the pressure." *Id*. at 30.

As previously discussed, the August 8 Initial Offer was merely an opening settlement offer to non-party UC within the context of ongoing discussions. This non-binding initial offer—which UC is free to reject or respond to with a counter-proposal—can hardly be characterized as a threat in violation of the Tenth Amendment. But even if the August 8 Initial Offer were viewed as a final mandate from the Executive, it would suffer no constitutional defect such as that found in *NFIB*.

In *NFIB*, the plurality reasoned that while Congress has "authority to condition the receipt of funds on the States' complying with restrictions on the use of those funds," the ACA tied traditional Medicaid grants, not to compliance with restrictions on their use, but to implementing the expansion, and therefore had to be viewed as "pressuring the States to accept policy changes." 567 U.S. at 580. The plurality concluded that the threatened loss of all Medicaid grants, equivalent to 10% of the typical State's budget— "pass[ed] the point at which pressure turns into compulsion," leaving States "with no real option but to acquiesce" in the expansion. *Id*. at 581-82. In so concluding, the plurality emphasized that the expansion could not be considered merely an adjustment to the existing program that Congress was entitled to make as it evolved. The expansion was "in reality a new program," a transformation of Medicaid from a health-care program for the poor into a health-insurance program for a significant portion of the entire non-elderly population—one that the States could not have anticipated. *Id*. at 583-84.

*NFIB* has no application here. Unlike the situation presented by the ACA, Plaintiffs identify no actions by Defendants that condition non-party UC's receipt of funds on their implementation of an entirely "new program" that it could not have foreseen. At most, the government seeks to ensure that non-party UC comply with federal law, as articulated in the July suspensions. Most certainly, ensuring that

universities are free of antisemitic conduct cannot be considered "new." Plaintiffs thus cannot legitimately claim that non-party UC has been suddenly surprised by dramatically new conditions imposed after a long period during which it accepted and relied upon federal funding free of such conditions, "as was the case in *NFIB*." *Miss. Comm'n on Env'tl Quality v. EPA*, 790 F.3d 138, 179 (D.C. Cir. 2015).

And the hypothetical possibility that non-party could face a loss of all funding if settlement negotiations fail is insufficient to carry Plaintiffs' burden. If Defendants find that non-party UC has failed to comply with its legal obligations or that funding UC grants no longer comports with government priorities, then Defendants may withhold further payments. "This discretion allows the [government] to impose a penalty that is proportionate to the breach," not coercive, and the mere possibility that Defendants might do otherwise in a given case is insufficient to sustain a facial challenge premised on a claim of unconstitutional compulsion. *West Virginia v. HHS*, 289 F.3d 281, 292-93 (4th Cir. 2002).

### C. Defendants Have Not Imposed Unconstitutional Conditions Upon Non-Party UC.

For the same reasons the August 8 Initial Offer does not constitute ripe or final agency action, it does not violate the unconstitutional conditions doctrine. The August 8 Initial Offer is part of ongoing initial negotiations, and if rejected, would be a nullity. The Court should decline Plaintiffs' invitation to analyze it as though the proposed terms were finalized conditions of a binding contract. Plaintiffs' argument that any proposed conditions in a settlement agreement that has never been released to the public (and that presumably Plaintiffs have not seen) calls upon the Judiciary to thrust itself into the Executive's preliminary negotiations with a non-present party and further underscores how Plaintiff is challenging unreviewable, non-final and unripe agency action. *See supra* parts (I)(D), (II)(A).

Indeed, it is an open question whether the unconstitutional conditions doctrine can even be properly applied to settlement negotiations at all: "[T]he unconstitutional conditions doctrine could never apply as an absolute rule [with respect to settlements] because all settlements between the government and citizen litigants involve a waiver of constitutional rights, such as the right to pursue further litigation in court." *Stephens v. Cnty. of Albemarle*, No. 3:04CV00081, 2005 WL 3533428, at *5-7 (W.D. Va. Dec. 22, 2005). The Supreme Court, moreover, has drawn a distinction between unconstitutional conditions that have been "consummated" and those where "the condition is never imposed." *Koontz v. St. Johns*

*River Water Mgmt. Dist.*, 570 U.S. 595, 608 (2013).  Drawing such a distinction makes eminent sense because treating unconsummated conditions the same as consummated ones would similarly transform any contract negotiation or proposal between the government and another party into a series of potential APA challenges and lawsuits.

Even if the unconstitutional conditions doctrine were to apply:

> it is well-established that [t]he Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way. In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other.

*Rust*, 500 U.S. at 193.  The government is entitled to discern between programs of higher education and to fund only those that effectively deal with the problem of antisemitic discrimination.  This is not conditioning funding on viewpoints articulated by a contracting party, but on actions taken by that party— just like how agencies have long imposed a number of substantive requirements on government contractors via those contractual agreements.  2 C.F.R. §§ 200.211(c)(1)(ii), 200.300 (requiring agencies to include terms advancing policies and priorities outlined in statutes and executive orders).

### D.  Plaintiffs' Separation of Powers Argument Lacks Merit.

Plaintiffs do not allege viable constitutional claims merely by invoking the Spending Clause.  This constitutional provision—and even the appropriations statutes that Congress passed pursuant to its Article I powers—does not require that the agencies continue to fund the terminated grant agreements.  While the conduct under those grant agreements may be reviewable in the Court of Federal Claims, the mere fact that grants are funded through Congressional appropriations does not mean that the routine execution or termination of those grant agreements takes on statutory, let alone constitutional, dimensions.  Indeed, Plaintiffs do not point to any appropriations statutes that specifically require funding to any specific grants challenged here.  Again, any entitlement to grant funds comes via contractual agreements (in this case, between the government and non-party UC).

Indeed, it is the relief that Plaintiffs seek that threatens the separation of powers and would undermine the Executive Branch.  It is axiomatic that the President and his officers may make policy decisions as part of their everyday functioning.  *See*, *e.g.*, *Pub. Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6,

25 (D.D.C. 2018) (instructing that "[t]he Court must, of course, avoid any undue intrusion on the discretion of the Executive Branch to set policy priorities[]") (citing *Allen v. Wright*, 468 U.S. 737, 759–61 (1984)). And government-wide regulations promulgated by OMB recognize that an agency may terminate a grant if it "no longer effectuates the program goals or agency priorities." *See* 2 C.F.R. § 200.340(a)(4). Plaintiffs' arguments to the contrary ignore this regulatory framework.

### E.  The Ultra Vires Claims are Not Cognizable.

Plaintiffs generalized "ultra vires" claims fail.  First, such claims can only be brought against individual officers, not agencies, so no ultra vires claims can succeed against the latter. *E. V. v. Robinson*, 906 F.3d 1082, 1090 (9th Cir. 2018) (describing ultra vires as applying to "officers" sued in their official capacity).  Following that principle, the Ninth Circuit has specifically recognized that in the context of "breach of contract" ultra vires cannot succeed because "the relief sought in a suit nominally addressed to the officer is relief against the sovereign." *Id.* (quoting and citing *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 684-87 (1949)).  And because the claims are effectively for breach of contract, *see supra* part (I)(B), that bar applies here. *See Larson*, 337 U.S. at 688 (dismissing due to sovereign immunity because the suit was "in substance, a suit against the Government over which the court, in the absence of consent, has no jurisdiction").

Second, ultra vires relief was developed as an equitable remedy to prevent the government from unlawfully acting upon a person—*i.e.*, to prevent a certain restriction or enforcement action. *See, e.g.*, *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110–11 (1902).  While it can be used by a plaintiff facing direct and immediate action by a government actor, this careful equitable tool is not designed for third parties to an allegedly unlawful action to intervene.

Moreover, ultra vires claims are subject to "implied statutory limitations," such as the Tucker Act. *See Armstrong v. Exceptional Child Ctr. Inc.*, 575 U.S. 320, 324–27 (2015); *see also Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100, at *2 (4th Cir. June 5, 2025) ("[I]t appears unlikely that Plaintiffs' ultra vires claims, which allege the Government violated the Constitution when it terminated or suspended Plaintiffs' grants, would provide a detour around the Tucker Act").  Because the Tucker Act shows "meaningful and adequate opportunity for judicial review," or "clear and convincing evidence that

1    Congress intended to deny . . . District Court jurisdiction," ultra vires review is foreclosed.  *See Bd. of*

2    *Govs. of the Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43-44 (1991).

3         It is well recognized as "a doctrine of last resort," *Schroer v. Billington*, 525 F. Supp. 2d 58, 65

4    (D.D.C. 2007), and the equivalent of "a Hail Mary pass—and in court as in football, the attempt rarely

5    succeeds," *Nuclear Regulatory Comm'n v. Texas*, 605 U.S. 665, 681-82 (2025)."  More specifically, ultra

6    vires review outside the APA is only available when the invocation of authority not granted is "so extreme

7    that one may view it as jurisdictional or nearly so." *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988).

8    It is thus an equitable cause of action, fashioned by courts in the most limited of circumstances, to review

9    whether an executive official is entirely outside the bounds of his authority.

10        In the Ninth Circuit, such an ultra vires claim is only cognizable when the defendant officials act

11   so far outside the bounds of authority that the suit is effectively "not [a] suit[] against the sovereign." *E.*

12   *V.*, 906 F.3d at 1090 (quoting *Larson*, 337 U.S. at 688-89).  For non-constitutional claims, this occurs

13   when the official acts wholly outside the bounds of authority, rather than merely being subject to "[a]

14   claim of error in the exercise of [assigned] power." *Id.* at 1091 (cleaned up).  For constitutional claims,

15   the claims must assert that the officers acted pursuant to unconstitutional authority, or in an

16   unconstitutional manner, such that "the conduct against which specific relief is sought is beyond the

17   officer's powers and is, therefore, not the conduct of the sovereign." *See id.* (cleaned up).

18        In *Dalton v. Specter*, the Supreme Court considered, in the context of an attempt for ultra vires

19   review of Presidential and agency action, whether "whenever the President acts in excess of his statutory

20   authority, he also violates the constitutional separation-of-powers doctrine."  511 U.S. 462, 471 (1994).

21   Specifically, the Court sought to determine whether non-statutory review was applicable when the

22   President and agency actors allegedly "violated the procedural requirements of the [authorizing] Act." *Id.*

23   at 471-72.  The Court rejected that contention.  "Our cases do not support the proposition that every action

24   by the President, or by another executive official, in excess of his statutory authority is ipso facto in

25   violation of the Constitution." *Id.* at 472.  "[C]laims simply alleging that the President [or an executive

26   officer] has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review." *Id.*

27   at 473.  They are simply statutory claims.

28

Thus, Plaintiffs' separation of powers claim is really a non-constitutional ultra vires claim. And because Plaintiffs' challenge merely alleges that Defendants made the wrong decisions within otherwise lawful statutory grant programs and regulatory termination clauses, ultra vires cannot succeed. *See E. V.*, 906 F.3d at 1097 (explaining officers have "discretionary authority to make incorrect as well as correct decisions" (cleaned up)); *United States v. Yakima Tribal Ct.*, 806 F.2d 853, 860 (9th Cir. 1986) ("[T]here is no per se divestiture of sovereign immunity when statutes or regulations are violated while an agent is pursuing his authorized duties."). As to the other constitutional claims, the Ninth Circuit generally recognizes that a claim of unconstitutional action, asserted against an officer, defeats sovereign immunity. *E. V.*, 906 F.3d at 1098. Nonetheless, that should not apply here where, in addition to allegations that officers took actions that should be considered "constitutionally void," Plaintiffs also ask for relief as to actions that have not occurred. *See Larson*, 337 U.S. at 702. At the very least, the Court should reject use of the ultra vires vehicle for such speculative relief regarding future actions.

## IV.   Plaintiffs Are Not Entitled to Discovery.

Plaintiffs demand production of the August 8 Initial Offer, any counter offers, all communications corresponding to those settlement negotiations, and any documents reflecting government investigations of UC since January 20, 2025. *See* ECF No. 26 at 4. This demand fails for numerous reasons. At the outset, Plaintiffs are not entitled to any discovery at this stage—they have not properly commenced discovery under Rule 16, nor have they even sought (much less demonstrated) their entitlement to expedited discovery.

Second, on the merits there is no basis for discovery in what is, at its heart, an APA lawsuit to be determined on an administrative record. Discovery "beyond the administrative record in every case where a plaintiff alleges a constitutional claim, would be inappropriate and render meaningless the APA's restriction of judicial review of the administrative record." *Almaklani v. Trump*, 44 F. Supp. 3d 425, 434 (E.D.N.Y. 2020). "[D]iscovery is generally limited to cases where the constitutional claim does not overlap with the APA claim or the substance of the agency decision." *J.L. v. Cissna*, No. 18-CV-04914-NC, 2019 WL 2224851, at *1 (N.D. Cal. Mar. 8, 2019) (citing *Bellion Spirits, LLC v. U.S.*, 335 F. Supp. 3d 32, 43-44 (D.D.C. 2018)). Here, virtually all claims rest on the supposed conditions imposed by the

government on non-party UC through the August 8 Initial Offer and within the context of ongoing settlement negotiations. To this extent, the APA and constitutional claims entirely overlap and weigh against permitting any discovery prior to the production of the administrative record. This is particularly compelling because the August 8 Initial Offer is not final agency action: the corresponding settlement negotiations are ongoing and non-party UC has not accepted any settlement offer.

Finally, the request for all communications regarding the settlement and all documents regarding government investigations since January 20, 2025, across 15 agencies is overbroad and burdensome, particularly within the 10-day time frame requested. *See* ECF No. 26 at 4. Plaintiffs remain free to submit FOIA requests at the state-level for UC documents and at the federal level with the agencies involved, but seeking discovery as part of relief sought via a preliminary injunction is not proper. Indeed, a California state court recently ordered UC to produce the August 8 Initial Offer.

## V.    Plaintiffs Have Failed to Establish Irreparable Harm.

In order to obtain preliminary injunctive relief, Plaintiffs must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. Here, for the reasons previously described, any harm to the Plaintiffs in this suit is impermissibly speculative and attenuated. *See id.* (explaining that issuing a preliminary injunction "based only on a possibility of irreparable harm" would be "inconsistent" with treating a preliminary injunction as an "extraordinary remedy"); *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996) ("[A] preliminary injunction is not warranted by a tenuous or overly speculative forecast of anticipated harm."). But even putting that to the side, injunctive relief is not warranted because for the specific NSF and NIH grants identified, any UC researchers, including faculty, staff, academic appointees, and employees who are named as principal researchers, investigators, or project leaders on the grant applications are class members in *Thakur* and have already secured relief with respect to those specific grants in *Thakur*. To be clear, this is not just a question of overlapping injunctions; the members that these organizations largely premise their associational standing on are *already parties* to the *Thakur* lawsuit as putative class members. In other words, those members are already protected by an injunction, and the Plaintiffs here cannot bootstrap that existing injunction to seek their own derivative injunction. Therefore, Plaintiffs cannot establish that they

are suffering any "certain, great, actual, and imminent" harm stemming from any of the specific suspensions identified. *Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008).

Moreover, any speculation regarding the *possibility* that additional suspensions will issue in the future if the government and non-party reach a settlement is not sufficient to establish irreparable harm. *See Winter*, 555 U.S. at 22 ("We agree with the Navy that the Ninth Circuit's 'possibility' standard is too lenient. Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." (citations omitted)). Within the context of Plaintiffs' over-broad claims, such request also presents practical challenges because it is unclear which individuals and entities would be members of the Plaintiff organizations and covered by any injunction.

To the extent the Court is inclined to grant any prospective relief, Plaintiffs should be required to provide a comprehensive list of all relevant entity names within UC and their "Unique Entity Identifier,"[6] to ensure that the "act or acts restrained or required" by any injunctive relief can be set out in "reasonable detail." Fed. R. Civ. P. 65(d); *Fortyune v. Am. Multi–Cinema, Inc.*, 364 F.3d 1075, 1086-87 (9th Cir. 2004) ("One basic principle built into Rule 65 is that those against whom an injunction is issued should receive fair and precisely drawn notice of what the injunction actually prohibits." (cleaned up)). Defendants should not be forced to guess what grantees fall within the UC umbrella. *See* Am. Compl. ¶ 90.

Additionally, any claim to ensure that future funds be disbursed to non-party UC does not rise to the level of irreparable harm. *See Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320-21 (9th Cir. 1994). It is only when the harm complained of is like that of "[t]he threat of being driven out of business" that a delay of monetary disbursement "is sufficient to establish irreparable harm." *See Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985). Plaintiffs allege, in many ways, that they believe their members research and certain projects will be hampered upon termination of funding to non-party UC. But these are not the harms that support the extraordinary remedy of injunctive relief. "The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended . . . are not enough." *See Sampson v. Murray*, 415 U.S. 61, 90 (1974); *see also Faculty Senate of Fla. Int'l Univ. v. Winn*, 477 F. Supp. 2d 1198, 1208 (S.D. Fla. 2007) ("There

---

[6] *See* U.S. General Services Administration, *Unique Entity ID is Here*, https://tinyurl.com/4bnnm8af.

1  is no irreparable harm here because the plaintiffs can fund the desired travel themselves and then, if they

2  prevail in this suit, obtain reimbursement. In other words, the harm is financial.").

3        While any grantee could have chosen to bring its own action in an appropriate forum, *i.e.*, the

4  Court of Federal Claims, to litigate whether payment on that grant must be made, there is no authority

5  under which a third-party who performs work under a grant can bootstrap onto any alleged harm an order

6  that all future payments to the direct grantee be made, regardless of the President's or agency's judgment,

7  let alone to numerous other third-parties. *See California*, 604 U.S. at 659. Against that backdrop, the

8  Supreme Court held it was appropriate to stay the temporary restraining order, reasoning that "if [the

9  grantees] ultimately prevail, they can recover any wrongfully withheld funds through suit in an appropriate

10  forum.' *Id.* Just so in this case. Yet that is the expansive relief that Plaintiffs demand.

11  **VI.    The Balance of the Equities and the Public Interest Tip in Defendants' Favor.**

12        An injunction also is not appropriate because the balance of the equities and the public interest tip

13  in Defendants' favor. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (holding that "[t]hese factors merge

14  when the Government is the opposing party").

15        The Supreme Court in *California* squarely explained that the balance of the equities favors the

16  Federal Government in this context. The public interest is harmed when the United States is forced to pay

17  out funds that it may not be able to recover. *California*, 145 S. Ct. at 969. And the grantees have the

18  choice of whether "to keep the programs operating," and if they choose not to, "then any ensuing

19  irreparable harm would be of their own making." *Id.*; *see also Heckler v. Turner*, 468 U.S. 1305, 1307-08

20  (1984) (Rehnquist, J., in chambers) (prospect of the government being forced to make $1.3 million in

21  improper payments per month supported a stay of injunction); *cf. Sustainability Inst.*, 2025 WL 1587100,

22  at *2 ("[T]he Government has demonstrated irreparable harm because it is being forced to disburse funds

23  from a finite appropriation and will not be able to recoup those funds once expended.").

24        And any injunction interfering with the President's priorities is itself a substantial harm in the

25  balance of the equities analysis. For, "[a]ny time [the Government] is enjoined by a court from

26  effectuating [laws], it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012)

27  (Roberts, C.J., in chambers) (citation omitted). To the extent the Court finds the balance of various factors

28

FED. DEFS.' OPP'N TO PLS.' MOT. FOR PRELIMINARY INJUNCTION
CASE NO. 25-CV-07864-RFL

1  close, this equities analysis should tip against an injunction.

2  **VII.    Any Injunctive Relief Should Be Stayed Pending Appeal and Accompanied By a Bond.**

3      To the extent the Court issues any injunctive relief, Defendants respectfully request that such relief

4  be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or at a

5  minimum, administratively stayed for a period of seven days to allow the United States to seek an

6  emergency, expedited stay from the court of appeals if an appeal is authorized.

7      Defendants also respectfully request that any injunctive relief accompany a bond under Fed. R.

8  Civ. P. 65(c), which provides that "[t]he court may issue a preliminary injunction or a temporary

9  restraining order only if the movant gives security in an amount that the court considers proper to pay the

10  costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A bond

11  is appropriate here given that any preliminary relief would potentially mandate that the Executive spend

12  money that may be lost forever once distributed. *California*, 145 S. Ct. at 969.

13  **CONCLUSION**

14      For these reasons, this Court should deny Plaintiffs' Motion for a Preliminary Injunction.

15                  Respectfully submitted,

16                  BRETT A. SHUMATE
17                  Assistant Attorney General
                    Civil Division
18
                    JOSEPH E. BORSON
19                  Assistant Branch Director

20                  */s/ Heidy L. Gonzalez*
21                  HEIDY L. GONZALEZ
                    (FL. Bar No. 1025003)
22                  Trial Attorney
                    U.S. Department of Justice
23                  Civil Division, Federal Programs Branch
                    1100 L Street, N.W.
24                  Washington, D.C. 20005
                    Tel.: (202) 598-7409
25                  Email: heidy.gonzalez@usdoj.gov

26                  *Attorneys for United States*

27

28  FED. DEFS.' OPP'N TO PLS.' MOT. FOR PRELIMINARY INJUNCTION
    CASE NO. 25-CV-07864-RFL

1

**CERTIFICATE OF SERVICE**

2       I hereby certify that on October 24, 2025, I electronically filed this document with the Court by

3 using the CM/ECF system, and that this document was distributed via the Court's CM/ECF system.

4

5                               */s/ Heidy L. Gonzalez*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28