# EXHIBIT 112

**CONFIDENTIAL ATTORNEY WORK PRODUCT AND FRE 408**

RESOLUTION AGREEMENT
BETWEEN THE UNITED
STATES OF AMERICA AND
UCLA

## I. DEFINITIONS

The terms used in this Agreement shall have the following meaning:

a. "Assistant Attorney General" means the Assistant Attorney General for the Civil Rights Division within the United States Department of Justice.

b. "UCLA" or "University" means University of California at Los Angeles, including all undergraduate and graduate schools, components, and systems, including but not limited to the David Geffen School of Medicine and its affiliated hospitals, UCLA School of Law, and the Anderson School of Management.

c. "Ed." means the United States Department of Education.

d. "Ed. OCR" means the United States Department of Education's Office of Civil Rights.

e. "EEOC" means the United States Equal Employment Opportunity Commission.

f. "GSA" means the General Services Administration.

g. "HHS" means the United States Department of Health and Human Services.

h. "HHS OCR" means United States Department of Health and Human Services' Office for Civil Rights.

i. "Investigations" means those inquiries opened by HHS OCR, Ed. OCR, the United States Department of Justice, and the EEOC (the latter pursuant to charges filed with the EEOC).

j. "Parties" means UCLA and the United States of America.

k. "NIH" means the National Institutes of Health.

l. "Non-Terminated Grants" means those grants awarded to UCLA or its researchers and faculty which were not enumerated in the United States' correspondence notifying UCLA

CONFIDENTIAL ATTORNEY WORK PRODUCT AND FRE 408

of certain grant and contract terminations but upon which UCLA has nevertheless not received payment.

m.  "Released Claims" means any claim or liability under any statute or at common law related to the facts and events under review in the Investigations under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*, Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116, or the False Claims Act, 31 U.S.C. § 3729 *et seq.* "Released Claims" also incorporates by reference the separate agreement between UCLA and the Assistant Attorney General and the EEOC regarding UCLA's liabilities for violation of Title VII, 42 U.S.C. § 2000e, *et seq.*, (attached as Exhibit A) ("Title VII Agreement"). Nothing in this Agreement prevents the United States from conducting subsequent compliance reviews, investigations, defunding, or litigation related to UCLA's actions occurring after the Effective Date of this Agreement.

n.  "Sex," "female," "male," "women," and "men" are defined in Executive Order 14168, Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government (Jan. 20, 2025), and related executive orders.

o.  "Terminated Grants" means awards made to UCLA or its faculty and researchers and enumerated in or covered by the United States' correspondence notifying UCLA of certain award terminations.

p.  "United States" means the United States of America.

CONFIDENTIAL ATTORNEY WORK PRODUCT AND FRE 408

## II. <u>INTRODUCTION</u>

1.      The United States and UCLA (collectively, the "Parties") desire to avoid the burdens and risks of protracted litigation. This Agreement is not an admission in whole or in part by either party, and UCLA expressly denies liability regarding the allegations.

2.      This Agreement shall become effective upon execution by all the Parties (the "Effective Date").

3.      The duration of this Agreement will be three years to the day from the Effective Date.

## III. <u>AGREEMENT BETWEEN THE PARTIES</u>

4.      With the exception of actions to enforce this Agreement, the United States agrees not to institute any civil action or other adverse agency action against UCLA, its officers, Trustees, directors, and employees (the "UCLA Releasees") related to the Released Claims. The United States releases the UCLA Releasees from any liability related to the Released Claims. The United States is not releasing UCLA or the UCLA Releasees from any other liability.

5.      In settlement and compromise of the Released Claims in this Agreement, UCLA shall pay the United States the sum of One Billion Dollars ($1,000,000,000.00), payable in equal installments. The first payment shall be made within five (5) business days of the Effective Date, and each subsequent installment payment shall be made on the anniversary of the Effective Date for each year of the term of this Agreement. In addition, pursuant to the terms of the Title VII Agreement, incorporated by reference herein and attached as Exhibit A, UCLA will place One Hundred and Seventy-Two Million Dollars ($172,000,000) into a claims fund which will be distributed to claimants via a claims process outlined in the Title VII Agreement.

CONFIDENTIAL ATTORNEY WORK PRODUCT AND FRE 408

6.    No later than 30 days after the Effective Date of this Agreement, UCLA shall designate an Administrator who shall be answerable to UCLA's President and who shall be principally responsible for coordinating and overseeing compliance with this Agreement, including reforms to hiring, scholarship, athletics, medical practices, and campus climate. The Administrator shall be given sufficient supervisory authority and access to resources within UCLA to direct implementation of this Agreement. Once selected, this Administrator shall be responsible for making regular reports to a Resolution Monitor to be described in Section VI of this Agreement (hereinafter "Resolution Monitor"), as well as UCLA's submissions and its public reports described in Section VII of this Agreement. This role shall be maintained and staffed throughout the duration of the Agreement. UCLA may change this Administrator during the term of the Agreement and shall provide the United States with notice that the Administrator has changed within 14 days of the new Administrator's taking office. In the event the Administrator resigns, UCLA shall not permit the position to remain open for an unreasonable amount of time. In the event of a vacancy in the Administrator position, the President of UCLA will be responsible for exercising the duties of the Administrator.

7.    UCLA shall maintain a senior administrative role focused on promoting academic excellence and ensuring compliance with federal anti-discrimination laws. This role, acting with the full authority of the Office of the Provost, will conduct a thorough review of UCLA's policies and programs related to those discrimination policies often identified as diversity, equity, and inclusion, including but not limited to faculty hiring, retention, promotion, and scholarship programs, to eliminate identity-based preferences and ensure merit-based practices. The review shall include:

    a.    Reviewing the process for approving curricular changes;

CONFIDENTIAL ATTORNEY WORK PRODUCT AND FRE 408

b.  Revising hiring, retention, promotion, and tenure policies to remove explicit or implicit goals for compositional diversity based on race, sex, or ethnicity, including eliminating any secretive or proxy-based "diversity" hiring processes;

c.  Barring the disclosure of information about candidates' race, sex, ethnicity, or other protected characteristics to faculty or other UCLA personnel with decision-making authority over hiring, retention, promotion or tenure;

d.  Eliminating the use of diversity statements or narratives as criteria for faculty hiring, tenure, or promotion;

e.  Ensuring that all academic programs and scholarship opportunities comply with Title VI and Title IX by removing discriminatory eligibility criteria;

f.  Make recommendations to the President and Provost, in accordance with academic procedures, about any necessary changes, academic restructuring, or investments that will ensure academic excellence and complementarity across all programs in the given academic areas; and

g.  Developing policies to protect faculty and students from retaliation for expressing minority opinions or engaging in free expression.

8.    UCLA will impartially enforce and apply its rules and policies, including by promptly and consistently enforcing disciplinary rules and policies.

9.    During the Term of this Agreement, UCLA's Civil Rights Office will include in its annual reports data on complaints alleging antisemitism.

10.    During the Term of this Agreement, a subcommittee of the Board of Regents of the University of California will regularly review the resolution of complaints alleging antisemitism or violations of the University's Demonstration and Display and Solicitation Policies.

CONFIDENTIAL ATTORNEY WORK PRODUCT AND FRE 408

11.    UCLA will maintain, enforce, and revise as appropriate its policies and procedures relating to demonstrations, protests, displays, and other expressive activities, including but not limited to all policies relating to demonstrations displays and solicitation; the student handbook; and student code of conduct; including with respect to the following:

a.  Prohibition on overnight demonstrations in any University locations.

b.  Prohibition on any disruption, prevention, obstruction, or attempt to prevent or obstruct (i) the regularly scheduled University activities; (ii) co-curricular activities; or (iii) University or public events.

c.  Prohibition on demonstrations in Dickson Plaza and Royce Quad that violates University time, place, and manner rules which are designed to limit disruption during times when classes are offered in nearby buildings.

d.  Prohibition on the establishment of any discriminatory exclusion zones that deny access to campus facilities based on race, ethnicity, religion, or national origin, such as the 'Jew Exclusion Zone' enforced by activists in Dickson Plaza during April 2024, which blocked Jewish students and faculty from accessing classroom buildings and Powell Library based on their religious beliefs or refusal to disavow Israel.

e.  Prohibition on requiring wristbands, ideological pledges, or vouching for access to public campus areas, as occurred when activists in Dickson Plaza issued wristbands to those who pledged allegiance to their views and segregated Jewish individuals based on their religious beliefs.

f.  Demonstrations and other protest activities that occur in academic buildings and places where academic activities take place present a direct impediment to

CONFIDENTIAL ATTORNEY WORK PRODUCT AND FRE 408

maintaining UCLA's core academic mission. Such protests in academic buildings, and other places necessary for the conduct of University activities, are not acceptable under the Student Conduct Code because of the likelihood of disrupting academic activities.

g.   All demonstration activity is subject to the University's antidiscrimination and anti-harassment policies.

h.   All individuals who engage in protests or demonstrations, including those who wear face masks or face coverings, must, when asked, present their University identification to the satisfaction of a University delegate or Community Service Officer. When asked by authorized University personnel to present identification, all individuals must briefly unmask to verify their identity. Individuals who fail to comply with these policies will be subject to discipline, being escorted off campus, detained for trespass and referred for prosecution.

i.   Face masks or face coverings are not allowed for the purpose of concealing one's identity in the commission of violations of University policies or state, municipal, or federal laws.

j.   Student groups are subject to discipline for discriminatory conduct or other violations of University policy.

12.   UCLA will maintain a security infrastructure, including UCLA Environment, Health & Safety resources, private security assets, and cooperation arrangements with local, regional, and federal law enforcement, that is sufficiently resourced to prevent and investigate violations of law or UCLA's policies.

CONFIDENTIAL ATTORNEY WORK PRODUCT AND FRE 408

13.    UCLA will engage an external party to conduct a survey to evaluate the campus climate for UCLA students, including the climate for students with shared Jewish ancestry.  The Parties shall jointly choose this external party.  The survey shall be developed within three (3) months of the appointment of the external party and administered within two (2) months thereafter.

     a.   The survey shall, among other questions deemed appropriate by UCLA, ask students whether they feel welcome at UCLA; whether they feel safe reporting antisemitism at UCLA; whether they believe UCLA has responded appropriately to any reports of alleged antisemitic conduct; whether they believe the changes UCLA has made since October of 2023, including changes to policies and standard operating procedures, changes to nondiscrimination training, and previous surveys, have benefitted the UCLA community; whether they have experienced harassment on social media by UCLA students, faculty, or staff while at UCLA based on their race, ethnicity, or national origin, including shared Jewish ancestry; how any social media harassment affected their experience at UCLA; and whether they believe UCLA could take any further measures to reduce any social media harassment.

     b.   Within forty-five (45) days of the conclusion of the survey, UCLA will provide the Resolution Monitor, the Assistant Attorney General, Ed. OCR and HHS OCR with a report that includes: (1) the results of the survey; (2) UCLA's analysis of the survey; and (3) any appropriate action(s) UCLA intends to take to improve the campus climate and/or to improve UCLA's response to social media harassment.  Within fifty (50) days of the provision

CONFIDENTIAL ATTORNEY WORK PRODUCT AND FRE 408

of the report described in the forgoing sentence, UCLA will provide the Resolution Monitor, the Assistant Attorney General, Ed. OCR and HHS OCR with documentation sufficient to show its implementation of any action, including a description of each action and how it was implemented.

14.     UCLA shall eliminate all faculty diversity hiring incentive programs that provide any form of financial bonuses or benefits for race-, sex- or ethnicity-based hiring. Within 60 days of the Effective Date, UCLA shall submit a report to the Resolution Monitor confirming the termination of this program and any similar identity-based hiring incentives in any UCLA school, department, division, component, or subdivision.

15.     UCLA shall discontinue race- and ethnicity-based scholarships. Within 90 days of the Effective Date, UCLA shall submit a report to the Resolution Monitor confirming the revision of eligibility criteria for these scholarships to be merit-based and compliant with Title VI.

16.     UCLA shall review the policies and applications for its Bias Reporting Systems. Within 30 days of the Effective Date, UCLA shall submit a report to the Resolution Monitor confirming the review of this system, including any complaints regarding its misuse or abuse.

17.     UCLA shall eliminate the requirement for diversity statements in faculty hiring and promotion processes across all academic departments and provide new guidance to search committees to ensure all processes and decisions are merit-based. Within 30 days of the Effective Date, UCLA shall submit a report to the Resolution Monitor confirming the complete removal of diversity statement requirements, whether mandatory or optional, and prohibiting search committees from considering race, color, ethnicity, national origin, sex, religion, or shared ancestry, whether implicit or explicit, in recruiting activities, the faculty search process, and hiring decisions. The same guidelines will apply to the hiring process for academic administrators.

CONFIDENTIAL ATTORNEY WORK PRODUCT AND FRE 408

18.    UCLA shall not maintain programs that promote unlawful efforts to achieve race-based outcomes, quotas, diversity targets, or similar efforts. UCLA will cease any provision of any terms, conditions, or privileges of employment, or any other benefits or advantages to individuals (including, but not limited to, applicants and employees) on the basis of protected characteristics in any school, component, division, department, foundation, association, or element within the entire UCLA University system. UCLA and each of its schools, components, divisions, and departments will comply with and follow anti-discrimination laws, including Title VI, Title VII, and Title IX. UCLA agrees to comply with all applicable laws regarding the treatment of individuals. Accordingly, UCLA will provide a timely report to the Resolution Monitor summarizing its compliance with this obligation, including an assurance that UCLA has acted responsibly to ensure its programs do not promote unlawful DEI goals.

19.    UCLA shall maintain merit-based admissions policies. UCLA may not, by any means, preference applicants based on race, color, or national origin in admissions throughout its programs. No proxy for racial admission will be tolerated. UCLA may not use personal statements, diversity narratives, or any applicant reference to racial identity as a means to introduce or justify discrimination.

20.    UCLA shall provide the Resolution Monitor with admissions data consistent with 34 C.F.R. § 100.6 and similar regulations showing applicants, admitted students, and enrolled students broken down by race, color, grade point average, and performance on standardized tests, in a form permitting appropriate statistical analyses by October 1 of each year of the Agreement. Admissions data will also be subjected to a comprehensive audit by the Resolution Monitor. Non-individualized statistical information regarding admissions shall be made available to the public each year for the Term of the Agreement, including information about rejected and admitted

students broken down by race, color, national origin, grade point average, and performance on standardized tests.

21.     UCLA shall provide that all hiring, promotion, tenure, compensation, and other employment practices for faculty and administrative roles are grounded solely in individual qualifications and professional merit. UCLA will discontinue use of race, color, sex, or national origin as a factor, implicit or explicit, in hiring, promotion, tenure, compensation, and other employment decisions across all schools, departments, and programs. The use of indirect methods or criteria that serve as a substitute for race-conscious hiring, promotion, tenure, compensation, and other employment practices is also prohibited. Nor may UCLA use personal statements, diversity narratives, or applicant reference to racial identity as a means to introduce or justify discriminatory practices in hiring, promotion, tenure, compensation, or other employment practices. All data related to faculty and administrative staff hiring, promotion, tenure, and compensation practices shall be shared with the Resolution Monitor every year for the term of the Agreement.

22.     UCLA shall revise the selection criteria and program descriptions for all training programs (including fellowship programs and internship programs) operated by UCLA entities to ensure selection for all such programs is merit-based, including, but not limited to, by removing criteria limiting a program to, or indicating preferences for, candidates of any particular race, sex, ethnicity, or national origin; as well as prohibiting any proxies used to effectuate race-based or sex-based outcomes in selection for such programs.

23.     UCLA will uphold its commitment to Title IX by providing safe and fair opportunities for women, including single-sex housing for any woman, defined on the basis of sex, who requests such accommodations and all-female sports, locker rooms, and showering facilities.

CONFIDENTIAL ATTORNEY WORK PRODUCT AND FRE 408

24.    UCLA will undertake a comprehensive review of its international recruiting processes and policies and will ensure that international student-applicants are asked questions designed to elicit their reasons for wishing to study in the United States.

25.    Processes will be established to provide that foreign students likely to engage in anti-Western, anti-American, or antisemitic disruptions or harassment are not recruited or admitted to UCLA. The Resolution Monitor shall review such processes by September 30, 2025, and regularly thereafter. Moreover, UCLA will ensure that the University is not financially reliant on foreign student admissions or partnerships with foreign entities. The reforms should be made durable by adoption of necessary organizational and personnel changes. UCLA will also develop training materials to socialize international students to the norms of a campus dedicated to free inquiry and open debate.

26.    UCLA will comply with all legal requirements related to the Student and Exchange Visitor Program ("SEVIS" Program) and comply with all requests for immigration information consistent with the requirements of the program. UCLA will promptly provide the United States, upon request, with all disciplinary actions involving student visa holders.

27.    UCLA will comply with all foreign gift and contract reporting obligations, including under Section 117 of the Higher Education Act of 1965 (20 U.S.C. 1011f). UCLA will comply with reasonable and lawful requests from the United States for information related to foreign funding sources. UCLA understands that its foreign funding reports must be submitted in a timely manner, must accurately indicate the true country of origin of the foreign gift or contract, and must accurately identify whether the foreign source is a governmental or nongovernmental entity.

CONFIDENTIAL ATTORNEY WORK PRODUCT AND FRE 408

28.    UCLA will, as needed, engage experts on laws and regulations regarding sanctions enforcement, anti-money laundering, and prevention of terrorist financing (including laws and regulations applicable to sanctioned countries and individuals) and will adopt, modify and enforce policies and procedures designed to ensure compliance with such laws and regulations applicable to UCLA.

29.    UCLA acknowledges that failure to adequately report Section 117 gifts and contracts is a violation of its participation in the HEA programs and Program Participation Agreement under 20 U.S.C. 1094(a)(17). Therefore, in addition to obtaining records and employee interviews under 34 CFR 668.24 in furtherance of any investigation about the sufficiency of UCLA's Section 117 reporting, UCLA acknowledges the Secretary is authorized under 20 U.S.C. 1097a to require by subpoena the production of information, documents, reports, answers, records, accounts, papers, and other documentary evidence pertaining to participation in any program under Title IV of the Higher Education Act. Consistent with applicable law, UCLA understands that the Secretary is also authorized to share such records with other agencies of the U.S. Government for law enforcement and other lawful purposes.

30.    UCLA will evenly implement its institution-wide policies on harassment and discrimination under Title VI.

31.    No later than 30 days after the Effective Date of this Agreement, UCLA shall establish procedures by which any member of the UCLA community can report allegations of noncompliance with the reforms detailed in this Agreement to the Administrator and the Resolution Monitor. Those procedures shall also prohibit UCLA from retaliating against someone for making a report of noncompliance.

CONFIDENTIAL ATTORNEY WORK PRODUCT AND FRE 408

32.    UCLA will issue a public statement to the UCLA community stating that the University will comply with Title IX and Section 1557 of the Affordable Care Act, as interpreted by the Department of Education, in all of its athletics programs. The statement shall:

a.    Specify that Title IX compliance means UCLA will not, on the basis of sex, exclude female students from participation in, deny female students the benefits of, or subject female students to discrimination under its athletics programs.

b.    Specify that Title IX compliance means UCLA will not allow male students to compete in any athletic program restricted to women, ensuring that only female students are eligible to compete as members of women's athletics.

c.    Specify that UCLA will provide in its athletics facilities for student-athletes intimate spaces such as locker rooms and bathrooms strictly separated on the basis of sex and comparably provided to each sex.

d.    Specify that UCLA will not delegate its obligation to comply with Title IX to an external association or other entity and may not contract with, or arrange with, any third-party entity to provide benefits of the University's athletics programs if that third-party entity is acting in violation of Title IX.

e.    State that under Title IX, as interpreted by the Department of Education, the words sex, female, male, women, men as used in the statement and as applicable in all practices, policies, and procedures adopted and implemented by UCLA with respect to women's athletics pursuant to or consistent with Title IX shall be defined consistent with Executive Order 14168, Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government (Jan. 20,

CONFIDENTIAL ATTORNEY WORK PRODUCT AND FRE 408

2025), in keeping with Executive Order 14201, Keeping Men Out of Women's Sports (Feb. 5, 2025).

    f.   UCLA will post this statement in a prominent location on its main website and on each of its websites for women's athletics.

33.    UCLA will rescind or revise any guidance documents or previously issued notices that advised or authorized its women's athletics programs to permit male athletes to compete in women's athletics, to reflect that pursuant to Title IX, as interpreted by the Department of Education, women's athletics must ensure that only female athletes are eligible to compete in women's athletics.

34.    UCLA will review all of its internal and public-facing websites for any statements, links, or documents that are inconsistent with Title IX on the points iterated in this Agreement (namely, eligibility to compete in women's athletics and provision of intimate facilities for women) and remove or revise any such statements, links, or documents to reflect compliance with the Title IX requirements iterated in this Agreement. UCLA will promptly notify all staff and women's athletics programs of all rescissions or revisions undertaken pursuant to this section.

35.    UCLA will:

    a.   Review all UCLA Division I athletics individual records, titles, honors, awards, or similar recognition (herein, "Recognitions") received by male athletes competing in women's athletics at any time up to and including the reporting date indicated below.

    b.   Officially recognize the restoration of all individual Recognitions that female athletes earned and would have been given but for the Recognitions being given to

CONFIDENTIAL ATTORNEY WORK PRODUCT AND FRE 408

male athletes who competed in women's athletics, regardless of whether the female athlete remains currently, or is no longer, a student enrolled at UCLA.

c. Submit to OCR a list of all the reviews and restoration/correction actions described in this section. UCLA will send a personalized letter of apology to each impacted female athlete.

36.    Within five business days after execution of the Agreement, UCLA will provide the Resolution Monitor, the Assistant Attorney General, Ed. and HHS OCR with its proposed Title IX compliance statement for approval. Upon the Resolution Monitor, the Assistant Attorney General, Ed. and HHS OCR approval, UCLA will provide the Resolution Monitor, the Assistant Attorney General, Ed. and HHS OCR with documentation reflecting (i) that the statement was sent to each of its women's athletics programs and posted on the University's websites; and (ii) each notice, if any, and copy thereof described in the prior Paragraph.

37.    Within ten business days after execution of the Agreement, UCLA will submit to the Resolution Monitor, the Assistant Attorney General, Ed. and HHS OCR evidence of (i) its rescission or revision of all prior guidance documents and/or statements, and (ii) revisions to its websites in compliance with the prior Paragraph, including information or documentation showing how such rescissions or revisions were communicated to women's athletics.

38.    Within ten business days after execution of the Agreement, UCLA will submit to the Resolution Monitor, the Assistant Attorney General, Ed. and HHS OCR a list of all reviews conducted (including the underlying findings regarding male athletes competing in women's athletics) and restorations/corrections to Recognitions pursuant to the prior Paragraph.

39.    UCLA, through the David Geffen School of Medicine and its affiliated hospitals, shall cease performing hormonal interventions and "transgender" surgeries, including but not

CONFIDENTIAL ATTORNEY WORK PRODUCT AND FRE 408

limited to gender-affirming surgeries such as mastectomies, phalloplasties, vaginoplasties, and other procedures intended to alter an individual's sex characteristics, on all patients under the age of 18 years old, effective immediately upon the Effective Date of this Agreement.

40.     UCLA shall revise all policies, protocols, and public-facing materials at Feinberg School of Medicine and its affiliated hospitals to reflect the prohibition on hormonal interventions and "transgender" surgeries to patients under the age of 18 years old and ensure compliance with federal laws.

41.     UCLA shall notify all medical staff, administrators, and patients of School of Medicine and its affiliated hospitals of the cessation of transgender surgeries on minors within 30 days of the Effective Date.

42.     UCLA shall submit a report to the Resolution Monitor within 60 days of the Effective Date, confirming the cessation of transgender surgeries on minors, the revision of relevant policies and materials, and the notification of staff and patients. The report shall include documentation of compliance, such as revised policy documents and copies of notifications sent.

43.     In consideration for entering into this Agreement, the United States shall restore to UCLA those Terminated Grants listed in Appendix _____ upon the Effective Date of this Agreement. Any other terminated grants or contracts are excluded from this provision.

44.     The United States shall further:

a.   In the ordinary course, and as soon as reasonably practicable, enable the withdrawal of overdue payments on the specified Non-Terminated Grants listed in Appendix _____, timely renew relevant non-competitive grants in the ordinary course and consistent with past practice, and confirm that Non-Terminated Grants will not be

CONFIDENTIAL ATTORNEY WORK PRODUCT AND FRE 408

withheld or terminated in the future in relation to the Released Claims under this Agreement;

b.  Treat UCLA as eligible for further grants, contracts, and awards in the ordinary course, without disfavored treatment as a consequence of the Released Claims;

c.  Close pending Investigations or compliance reviews regarding the Released Claims as of the Effective Date of this Agreement; and

d.  Nothing in this Agreement prevents the United States (including during the period of the Agreement) from conducting subsequent compliance reviews, investigations, defunding, or litigation related to UCLA's actions occurring after the Effective Date of this Agreement;

e.  Nothing in this Agreement (including during the period of Agreement) or the Title VII Agreement affects in any way EEOC's right to bring, process, investigate, litigate, or otherwise seek relief in any charge that may be filed after the Effective Date of this Agreement against UCLA, related to UCLA's actions occurring after the Effective Date of this Agreement, in accordance with standard EEOC procedures, including charges filed after the Effective Date of the Agreement but which may allege conduct which occurred before the Effective Date of the Agreement.  Subject to the Title VII Agreement, nothing in this Agreement applies to any currently pending EEOC charge brought by an individual charging party or third-party against UCLA.

IV. <u>DISPUTE RESOLUTION</u>

45.    If either Party reasonably believes that the other is in violation of the terms of this Agreement, including those reporting obligations outlined in Section VII, it shall provide prompt

CONFIDENTIAL ATTORNEY WORK PRODUCT AND FRE 408

written notice to the other Party and identify with specificity the portion or portions of this Agreement about which it has concerns, with a copy of such notice to be provided to the Resolution Monitor.

46.    Following receipt of such Notice, UCLA or the United States shall respond in writing within 5 business days with a copy of such response provided to the Resolution Monitor.

47.    Within 10 business days of receipt of the written response identified in the preceding paragraph, the Parties shall attempt to resolve informally the disputes identified in the notices and response materials. The Parties shall engage in good faith efforts to resolve the issue before seeking further action.

48.    If after the expiration of the 10 business days following the deadline to produce the response as set forth above resolution of the issue(s) has not been achieved, the United States or UCLA may commence, initiate, or institute a non-binding Arbitration before a single Arbitrator, selected from a panel of six arbitrators denoted in the attached Exhibit or Appendix _____ to be selected and chosen by the Parties. UCLA shall pay the costs for such arbitration. Within 60 days of the commencement of the Arbitration, the Arbitrator shall issue a non-binding, advisory only, Reasoned Decision, which shall be confidential and entirely inadmissible in any subsequent legal proceedings. The Parties agree that in the non-binding, advisory only, Reasoned Decision, the Arbitrator may (1) address whether or not the Agreement has been breached; (2) address questions regarding the interpretation and meaning of the Agreement or any provision thereof; and (3) may recommend appropriate remedies, if any. The non-binding, advisory only, Reasoned Decision shall have no evidentiary weight whatsoever, shall be inadmissible in any proceeding, including civil claims in a court of competent jurisdiction or any appeals or appellate proceedings. Neither party

CONFIDENTIAL ATTORNEY WORK PRODUCT AND FRE 408

shall have any right or entitlement to appeal or seek further relief or remedies from the non-binding, advisory only, Reasoned Decision or any part thereof.

49.     Subject only to the non-binding alternative dispute resolution mechanisms set forth in this section, nothing about or contained in this Agreement shall limit, impair, or prevent either party to this Agreement from initiating any proceeding in any court of competent jurisdiction to enforce this Agreement or seek remedies for the breach thereof, including injunctive relief. All rights of the parties to pursue any applicable remedy in law or equity in a court of competent jurisdiction shall be preserved to the maximum extent permitted by applicable law. Additionally, nothing about or contained in this Agreement shall limit, impair, or prevent any party to this Agreement from pursuing appellate rights and remedies of any order judgment, ruling, verdict, or outcome of proceedings initiated or commenced in a court of competent jurisdiction.

50.     After the issuance of the non-binding, advisory only, reasoned decision, or the expiration of 60 days following initiation or commencement of the non-binding Arbitration, whichever is earlier, either party shall be entitled to commence a civil action in a court of competent jurisdiction.

51.     The Assistant Attorney General shall have discretion and authority to initiate and conduct reasonable compliance audits, reviews, inquiries, or investigations to the maximum extent ordinarily permitted by Title VI. If the Assistant Attorney General determines that UCLA has breached any term or provision of this Agreement, the Assistant Attorney General shall issue a written notice to UCLA identifying any breach or deficiencies. Upon receipt of notice from the Assistant Attorney General, the dispute resolution mechanisms and provisions in this Agreement shall apply.

CONFIDENTIAL ATTORNEY WORK PRODUCT AND FRE 408

52.     Nothing about this Agreement shall limit or preclude either party from initiating a civil action sounding in law or equity for any appropriate measure of damages or relief, including injunctive relief, in a court of competent jurisdiction, and nothing about this Agreement shall limit, impair, or preclude either party's appellate rights or rights of appeal.

V.  MONITORING

53.     Within 30 days of the Effective Date, or additional time if agreed to by the Parties, UCLA and the United States will together select a Resolution Monitor, acceptable to both Parties, to assess and report on UCLA's compliance with the obligations contained in this Agreement. The parties have agreed to use a direct contracting process in selecting the Resolution Monitor. This process will be implemented in a manner consistent with this Agreement, including the requirement that the Resolution Monitor be jointly selected and acceptable to both United States and UCLA. The Resolution Monitor, and any team members employed by the Resolution Monitor, will be comprised of individuals of the highest ethics. In the event the Parties cannot agree on a Resolution Monitor within 60 days after a good faith effort, the Assistant Attorney General shall select the Resolution Monitor.

54.     The Resolution Monitor will be appointed for the duration of this Agreement. The Parties may change the identity of the Resolution Monitor during this term by mutual Agreement.

55.     UCLA will bear all the reasonable fees and costs of the Resolution Monitor. The United States and UCLA recognize the importance of ensuring that the fees and costs borne by UCLA are reasonable, and accordingly fees and costs will be one factor to be considered in selecting the Resolution Monitor. If any dispute arises regarding the reasonableness or payment of the Resolution Monitor's fees and costs, the Parties and the Resolution Monitor shall adhere to the dispute resolution mechanisms of this Agreement. The same provisions above regarding the

CONFIDENTIAL ATTORNEY WORK PRODUCT AND FRE 408

inadmissibility and non-binding, non-preclusive effect of any decision by the Arbitrator and the rights of the parties to pursue all available claims and remedies before a court of competent jurisdiction, including rights of appeal, shall apply to disputes regarding reasonableness or payment of the Resolution Monitor's fees and costs.

56.    The Resolution Monitor, at any time after its initial selection, may request to hire, employ, or contract with such additional persons or entities as are reasonably necessary to perform the tasks assigned to the Resolution Monitor by this Agreement. Any person or entity hired or otherwise retained by the Resolution Monitor to assist in furthering any provision of this Agreement will be subject to the provisions of this Agreement. The Resolution Monitor will notify the Parties in writing if the Resolution Monitor wishes to select such additional persons or entities. The notice will identify and describe the qualifications of the person or entity to be hired or employed and the monitoring task to be performed. If the Parties agree with the Resolution Monitor's proposal, the Resolution Monitor will be authorized to hire or employ such additional persons or entities. The Parties have ten business days to disagree with any such proposal. If the Parties are unable to reach agreement within ten business days of receiving notice of the disagreement, the disagreement shall be resolved through the dispute resolution provisions of this Agreement.

57.    Should the United States or UCLA determine that the Resolution Monitor's individual members, agents, employees, or independent contractors failed to satisfactorily perform the duties required by this Agreement, the United States or UCLA may propose replacement of the Resolution Monitor, and/or any individual members, agents, employees, or independent contractors.

CONFIDENTIAL ATTORNEY WORK PRODUCT AND FRE 408

58.    The Administrator shall make semi-annual reports to the Resolution Monitor sufficient to evidence UCLA's compliance with the obligations contained in this Agreement, including progress on terminating discriminatory programs and policies, ensuring Title IX compliance in athletics, and ceasing transgender surgeries. UCLA shall propose a format for reports within a reasonable time following the Effective Date, subject to the Resolution Monitor and the United States' reasonable approval. The Resolution Monitor will review the reports and may request additional information and/or conduct reviews or audits as necessary to determine whether the information in the reports is accurate and whether UCLA has complied with the obligations in this Agreement. Compliance reviews and audits will contain the elements necessary for reliability and comprehensiveness. Compliance reviews and audits may be conducted using sampling and compilation data where appropriate. The Resolution Monitor will produce to the Parties a draft report concerning each compliance assessment within 15 business days after the end of each assessment.

59.    The Resolution Monitor may make recommendations to the Parties regarding actions necessary to ensure timely, substantial, and effective compliance with the obligations of this Agreement. Such recommendations may include a recommendation to change, modify, or amend a provision of this Agreement, a recommendation for additional training in any area related to this Agreement, or a recommendation to seek technical assistance. In addition to such recommendations, the Resolution Monitor may also, at the agreement of the Parties and based on the Resolution Monitor's reviews, provide technical assistance consistent with the Resolution Monitor's responsibilities under this Agreement.

60.    The Resolution Monitor will maintain regular contact with the Parties to ensure effective and timely communication regarding the status of UCLA's compliance with its

CONFIDENTIAL ATTORNEY WORK PRODUCT AND FRE 408

obligations under this Agreement. The Resolution Monitor will not be liable for any claim, lawsuit, or demand arising out of the Resolution Monitor's performance pursuant to this Agreement brought by non-parties to this Agreement.

61.     To facilitate its work, the Resolution Monitor may conduct on-site visits and assessments upon reasonable prior notice to UCLA.

62.     Subject to applicable confidentiality laws (e.g., the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g) and all applicable privileges, the Resolution Monitor will have timely access to interview all Agreement-related individuals and visit all Agreement-related facilities, trainings, transcripts of Agreement-related meetings and disciplinary hearings, and reviews, and the scene of any occurrence that the Resolution Monitor in consultation with the Parties reasonably deems necessary to carry out the duties assigned to the Resolution Monitor by this Agreement. The Resolution Monitor will cooperate with UCLA to access people, scenes, and facilities in a reasonable manner that, consistent with the Resolution Monitor's responsibilities, minimizes interference with daily operations.

63.     UCLA will ensure that the Resolution Monitor will have access to UCLA documents and data related to the Agreement that the Resolution Monitor in consultation with the Parties reasonably deems necessary to carry out the duties assigned to the Resolution Monitor by this Agreement, except any documents or data protected by work product or the attorney-client privilege (together "privilege"). Any disputes about privilege that the Resolution Monitor cannot resolve shall be resolved through the dispute resolution provisions of this Agreement.

64.     The United States and its consultants and agents will have full and direct access to all UCLA staff employees, facilities, documents, and data related to the Agreement, in coordination with legal counsel for UCLA, except any documents or data protected by work product or the

CONFIDENTIAL ATTORNEY WORK PRODUCT AND FRE 408

attorney-client privilege ("privilege"). If the United States objects to UCLA's privilege classifications, the United States may seek resolution of the propriety of the assertion from the Resolution Monitor. Any disputes about privilege that the Resolution Monitor cannot resolve shall be resolved through the dispute resolution provisions of this Agreement.

65.    The Resolution Monitor and the United States will provide UCLA with reasonable notice of a request for copies of documents. Upon such request, UCLA will provide copies in a timely manner (electronic, where readily available) of the requested documents to the Resolution Monitor and the United States, unless withheld as privileged or otherwise withheld pursuant to law as described above.

66.    Nothing in this Agreement shall be interpreted to conflict with UCLA's obligations regarding student records pursuant to FERPA, 20 U.S.C. § 1232g. The Resolution Monitor and the United States will maintain all confidential or non-public information provided by UCLA in a confidential manner. This Agreement will not be deemed a waiver of any privilege or right UCLA may assert, including those recognized at common law or created by statute, rule, or regulation, against any other person or entity with respect to the disclosure of any document.

VI.    REPORTING

67.    During the pendency of this Agreement, beginning in September 2025, UCLA shall issue public semi-annual reports comprehensively documenting its progress and activities in implementing this Agreement, including the termination of discriminatory programs and policies, compliance with Title IX in athletics, and cessation of hormonal interventions and "transgender" surgeries for minors, in a format to be agreed upon with the Assistant Attorney General. On the date that UCLA publicizes such reports, it shall furnish a copy of the same to the United States specifically including, but not limited to, the Assistant Attorney General.

CONFIDENTIAL ATTORNEY WORK PRODUCT AND FRE 408

## VII. <u>GENERAL PROVISIONS</u>

68.    UCLA shall bear all costs associated with implementing the terms of this Agreement. The Parties shall bear their own costs, expenses, and attorney's fees in this litigation and in connection with this Agreement, except that the Parties shall retain the right to seek costs for any matter which in the future may arise from this Agreement and require resolution by this Court.

69.    If any provision of this Agreement is found to be unlawful, only the specific provision in question will be affected, and the other provisions will remain in full force and effect.

70.    This Agreement may be executed in multiple counterparts, each of which together shall be considered an original but all of which shall constitute one Agreement. The Parties agree to be bound by electronic and facsimile signatures.

71.    This Agreement is enforceable only by the Parties and those released herein, the UCLA Releasees. No other person or entity is, or is intended to be, a third-party beneficiary of the provisions of this Agreement for purposes of any civil, criminal, or administrative action, and accordingly, no other person or entity may assert any claim or right as a beneficiary or protected class under this Agreement. The Agreement does not create a private right for action for any non-party. The Parties agree to defend the terms of this Agreement should they be challenged in this or any other forum.

72.    This Agreement applies to the relationship between the United States and UCLA and does not bind UCLA or the United States with regard to any other person or entity.

73.    No provision of this Agreement, individually or taken together, shall be construed as giving the United States authority to dictate faculty hiring, University hiring, admission decisions, or the content of academic speech.

CONFIDENTIAL ATTORNEY WORK PRODUCT AND FRE 408

74.     This Agreement represents the entire Agreement of the Parties with respect to the Released Claims and supersedes all prior Agreements and understanding of the Parties with respect to the subject matter hereof. Nothing in this Agreement prohibits the United States from bringing actions against UCLA for future violations of Title VI, Title VII, Title IX, or other provisions of federal law on the same basis it would bring similar actions against other institutions.