# EXHIBIT 113

**FILED**
Superior Court of California
County of Alameda

10/14/2025

Chad Finke, Executive Officer/Clerk of the Court

By: _____ Deputy
A. Rios

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| UCLA FACULTY ASSOCIATION and COUNCIL OF UNIVERSITY OF CALIFORNIA FACULTY ASSOCIATIONS, | No. 25CV143076 |
| Plaintiffs/Petitioners, | ORDER AND JUDGMENT GRANTING PETITION FOR WRIT OF MANDATE |
| v. | Date:    October 10, 2025<br>Time:    9:00 AM<br>Dept.:    24 |
| REGENTS OF THE UNIVERSITY OF CALIFORNIA, | |
| Defendant/Respondent. | |

The Petition of UCLA Faculty Association and Council of University of Faculty Associations (collectively, "Faculty Association") for Writ of Mandate came on for hearing on October 10, 2025, in Department 24, the Honorable Rebekah Evenson presiding.  Counsel appeared on behalf of the Faculty Association and on behalf of the Regents of the University of California ("University").  After consideration of the record herein and the argument of counsel, IT IS ORDERED: The Petition for Writ of Mandate is GRANTED.  The Court enters JUDGMENT in favor of Petitioners.

///

BACKGROUND

On July 29, 2025, the United States Department of Justice ("DOJ") sent a letter to the University at the University's Office of General Counsel stating that the DOJ had completed an investigation and "found that UCLA's response to its students' complaints of antisemitism on UCLA's campus violated its obligations under the Equal Protection Clause of the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (Title VI)."

The DOJ letter regarding antisemitism at UCLA concludes:

> Having determined that UCLA was deliberately indifferent to the hostile environment for Jewish and Israeli students created by the protest encampment, the Department now seeks to enter into a voluntary resolution agreement with the University to ensure that the hostile environment is eliminated and reasonable steps are taken to prevent its recurrence.

> If you are interested in resolving this matter along these lines, please contact please reach out [sic] to [the DOJ] by August 5, 2025. Unless there is reasonable certainty that we can reach an agreement in this matter, the United States is prepared to file a complaint in federal district court by September 2, 2025.

(Woodall Dec., ¶6 [with hyperlink]; Cisneros Dec., Exh. C.)[1]

On August 1, 2025, the United States National Science Foundation (NSF) sent a letter to UCLA stating that NSF is suspending federal grant awards to UCLUA because "NSF has identified the following specific examples of noncompliance: • UCLA engages in racism, in the form of illegal race-based preferences in admissions practices; • UCLA fails to promote a research environment free of antisemitism and bias; • UCLA discriminates against and endangers women by allowing men in women's sports and private women-only spaces."  The letter concludes: "NSF is willing to work with UCLA to identify corrective actions to bring UCLA into compliance. UCLA must acknowledge in writing its willingness to discuss these corrective actions by August 15."  (Petition, Exh. D.)

---

[1] The Court takes judicial notice of the existence of the documents identified in the hyperlinks in the Petition and in the Woodall Declaration, but the Court does not take judicial notice of the truth of the statements made in the various documents.  (*LG Chem, Ltd. v. Superior Court of San Diego County* (2022) 80 Cal.App.5th 348, 362 fn 7.)

Allison Woodall, the Deputy General Counsel for Education Affairs, Employment, and Governance at the University of California, states: "The federal government is currently undertaking investigations of the University and UCLA specifically on multiple subjects, which are broader than the alleged antisemitism-related issues on the UCLA campus that the DOJ identified in its July 29, 2025, Notice of Findings.  Federal government investigations are often confidential, particularly when they are in process.  On the current slate of pending investigations, the federal government has made public the fact of some investigations, but not all."  (Woodall Supp. Dec., ¶3.)

On August 8, 2025, the DOJ sent the document at issue in this case to the University. (Woodall Dec., ¶9.)

On August 11, the University issued a press release stating:

> Earlier today, University of California President James B. Milliken and Board of Regents' Chair Janet Reilly convened an emergency meeting of UC's Board of Regents to discuss a path forward after the federal administration suspended UCLA's lifesaving research funding and demanded a devastating $1 billion settlement payment. UC's leadership spent recent days evaluating the demand, updating the UC community, and engaging with stakeholders. Our focus remains on protecting students' access to a UC education and promoting the academic freedom, excellence, and innovation that have always been at the heart of UC's work.

(Petition, Exh. E.)

On August 12, 2025, the University issued a press release captioned "Join the Movement to Defend UC." (Petition, ¶ 27 and fn 13 [hyperlink].) The release states:

> Last week, the Trump Administration demanded a $1 billion settlement from UCLA after previously freezing $584 million in research grants. It was an unprecedented attack on public higher education.

> The impact of this demand goes far beyond UCLA. It's designed to devastate the entire University and to hinder our ability to carry out our transformative work in education, health care and research across California and the nation.

> The federal government's actions don't just threaten UCLA, they put the entire nation at risk. UC needs your voice to protect our students, staff, faculty and our mission.

> Pledge to Stand Up for UC
>
> For more ways to spread the word, check out and share our new Stand Up for UC website.
>
> This easy-to-share page includes a variety of resources to inspire others to get involved and speak out, including sample social media posts and downloadable graphics.

The University has a "Stand Up for UC" campaign website. (Petition, ¶27 and fn 14 [hyperlink].)  This website states: "Stand Up for UC.  UC's future is at risk.  The federal government's demand of $1 billion from UCLA puts the entire University of California system at risk.  Stand with us to protect UC."  The website later states:

> At stake: Education and innovation
>
> The University of California embodies the ambition of our state and ignites the potential of people. We produce the discoveries, leaders and services that create new opportunities here in California and across the nation. Here's what's at stake:
>
> - Access to education
>
> - Life-changing medical treatments for common diseases
>
> - Technological innovations that grow the U.S. economy
>
> - Research that protects our national security
>
> - Inventions that propel leading industries

The website contains links inviting members of the public to "Take the pledge," to "Tell your story," to "Spread the word," to "Show your UC pride," to Speak Up for Science" and "Join us in asking Congress to reject drastic cuts to research" with another link to "Email your lawmakers," and to "Become a UC advocate." (Petition, ¶27 and fn 14 [hyperlink].)

The University has a website for "Federal updates" that contains various University statements, press releases, and updates regarding federal policy.  (Petition, ¶30 and fn 16 [hyperlink].)  The website states:

The future of the nation's leading public university system is at stake.

The federal government's demand of $1 billion from the University of California, Los Angeles would devastate the nation's best public university, cut off life-saving care, halt tech and economic growth, and reduce educational access.

From medical therapies that save lives to technologies that grow the U.S. economy and research that protects our national security, Americans across the country depend on the University of California.

Right now, we need your help. We must stand together to protect our students, staff, faculty and our mission.

On August 15, 2025, Petitioners submitted separate Public Records Act requests to the UCLA campus and to the University Office of the President ("UCOP") seeking a copy of the document sent by the DOJ that, according to a University of California press release, demanded that the University of California pay $1 billion to the federal government. (Petition, ¶19, Exhs. A & D.)

On August 19, 2025, UCOP's General Counsel denied Petitioner's Public Records Act request in an email, stating that the document was exempt from disclosure pursuant to Government Code sections 7927.200 (pending litigation), 7927.705 (records exempt or prohibited pursuant to federal or state law), 7927.500 (draft settlement demand or response), and 7922.000 (catchall exemption). (Petition, Exh. B.)

On September 2, 2025, the UCLA Director, UCLA Information Practices, separately denied the Public Records Act request in a letter. (Petition, Exh. C.)

On September 15, 2025, the Los Angeles Times ("LA Times") published a story stating that it had obtained a copy of the document. The LA Times story contains information about the document, including what the LA Times represents were direct quotations from the document. (Cisneros Dec., Exh. A.)

On September 15, 2025, the University published a message from University of California President James B. Milliken acknowledging the LA Times story. (Cisneros Dec., Exh. B.) The message states:

I know that many of you are closely following the federal administration's actions against UCLA — including the suspension of critical research funding this summer and a demand that the university pay the federal government over $1 billion. Today, the LA Times published a story summarizing some of the administration's demands.

As we consider the unprecedented action against UCLA, it is important to keep in mind that the federal government is also pursuing investigations and actions in various stages against all 10 UC campuses. So, while we are first focused on the direct action involving UCLA, we must also consider the implications of expanded federal action.

This represents one of the gravest threats to the University of California in our 157-year history. Losses of significant research and other federal funding would devastate UC and inflict real, long-term harm on our students, our faculty and staff, our patients, and all Californians. It would also end life-saving research from which all Americans benefit.

Let me provide a little more context about what's at stake. The University of California receives more than $17 billion each year in federal support. That includes $9.9 billion in Medicare and Medicaid funding, $5.7 billion for research and program support, and $1.7 billion in student financial aid.

The funds at risk support the doctors and nurses who care for millions of Californians each year, the researchers working to find new cures and make important technological discoveries, and the financial aid that keeps UC accessible for students of all backgrounds. A substantial loss of this federal funding would be devastating for our mission and for the people who depend on us most. It will mean fewer classes and student services, reduced access to health care, tens of thousands of lost jobs across the state, and an exodus of world-class faculty and researchers to other states or countries.

Many of our campuses have already experienced layoffs and other negative impacts in recent months because of cuts to federal research funding and other financial pressures. But this is minor in comparison to the threat that looms. As the state's second-largest employer, with a presence in every county in California, these reductions would have a detrimental ripple effect across the entire state economy. The work happening across UC saves lives, drives economic growth and creates opportunity for families in every community. Far too many people depend on us for the University to retreat from its mission. We must do all we can to avoid the harmful possibilities I've outlined. That's why we are working with elected officials in Sacramento and Washington, D.C., to evaluate every option to resolve this conflict to continue serving communities across the state.

The University of California has weathered many challenges since its founding. We will do so again — but it will undoubtedly be a difficult process for our community. The fact is that we are in uncharted waters. Our top priority now is protecting this institution — its resources, its mission and its values — for the sake of everyone we serve.

I ask all of you to come together as a community — in support of our students, our patients and one another — as we navigate what lies ahead. It will take all of us working together to protect UC, the greatest public university in the nation.

On September 17, 2025, Petitioner filed its Verified Petition for Alternative Writ of Mandate Under the Public Records Act.

PROCEDURE.

The Public Records Act requires prompt resolution of disputes regarding public documents. Government Code section 7923.005 states: "the court shall set the times for hearings and responsive pleadings with the object of securing a decision as to the matters at issue at the earliest possible time."

On September 17, 2025, the Faculty Association filed the Petition of Writ of Mandate and an ex parte application.  The University filed an opposition to the ex parte application, and on September 19, 2025, the Court held a hearing.  Counsel for both the Faculty Association and the University were present in the courtroom.  The Court thereafter issued an order on scheduling.

Both parties submitted briefing in response to the September 19, 2025, scheduling order, and both parties appeared and presented argument at the October 10, 2025, hearing.

Counsel for the University informed the Court that the DOJ was aware of this case. The DOJ has not filed a memorandum or appeared or otherwise indicated that it wants to assert the interests of the federal government in this case.

///

///

LEGAL STANDARD

The Public Records Act and the California Constitution provide the public with a broad right of access to government information.  The Public Records Act states: "access to information concerning the conduct of the people's business is a fundamental and necessary right of every person in this state." (Gov. Code § 7921.000.)

The right to access public information is enshrined in the California Constitution.  (Cal. Const., art. I, § 3, subd. (b)(1); *Los Angeles County Bd. of Supervisors v. Superior Court* (2016) 2 Cal.5th 282, 290-291.)  The Constitution directs that "[a] statute . . . shall be broadly construed if it furthers the people's right of access, and narrowly construed if it limits the right of access." (Cal. Const., art. I, § 3, subd. (b)(2).)  "Given the strong public policy of the people's right to information concerning the people's business …, and the constitutional mandate to construe statutes limiting the right of access narrowly … , all public records are subject to disclosure unless the Legislature has *expressly* provided to the contrary."  (*City of San Jose v. Superior Court* (2017) 2 Cal.5th 608, 617 [emphasis in original]; *see also Voice of San Diego v. Superior Court* (2021) 66 Cal.App.5th 669, 683.)

A state agency opposing release of a document has the burden of demonstrating that the document in question is exempt from disclosure.  (Gov. Code §§ 7922.000, 7922.540(c); *ACLU v. Superior Court* (2011) 202 Cal.App.4th 55, 85.)  "Our Constitution requires that these exemptions be narrowly construed."  (*Iloh v. Regents of University of California* (2023) 87 Cal.App.5th 513, 524.)

The Court is mindful of the heightened sensitivity and public concern about the differences in policies and priorities between the State of California and the federal government. The current political tensions play no role in the Court's determination of this matter.

///

///

EXEMPTION FOR PENDING LITIGATION (Government Code section 7927.200)

The University's primary opposition to disclosing the document sought by the Faculty Association rests on the Public Record Act's exemption for documents related to pending litigation, Government Code section 7927.200.  However, the University's invocation of the pending litigation exemption stretches that exemption beyond its plain meaning and beyond any court's application of it.

Government Code section 7927.200 states: "Except as provided in Sections [not applicable in this case], this division does not require disclosure of any of the following records: (a) Records pertaining to pending litigation to which the public agency is a party, until the pending litigation has been finally adjudicated or otherwise settled."

The University seeks to withhold the document at issue in this case even though it was not created by the University, was not created in the course of pending litigation, does not primarily address threatened litigation, and the University has already publicized portions of the document and attempted to rally the public to support the University's opposition to the demands made in the document.  The University cites no authority that would exempt disclosure of such a document under the pending litigation exemption, and the Court is not aware of any.

The pending litigation exemption on its face applies only to records "pertaining to pending litigation."  *Roberts v. City of Palmdale* (1993) 5 Cal.4th 363, 372, states: "it would seem that this [pending litigation exemption] was primarily designed to prevent a litigant opposing the government from using the [Public] Records Act's disclosure provisions to accomplish earlier or greater access to records pertaining to pending litigation or tort claims than would otherwise be allowed under the rules of discovery, rather than being aimed solely at preventing discovery of a limited class of documents falling within the purview of the attorney-client ... privilege[ ]."  Consistent with this purpose, the pending litigation has generally been applied only to documents created by the public entity.  (*County of Los Angeles v. Superior Court (Axelrad)* (2000) 82 Cal.App.4th 819, 832 ["The issue to be resolved by the trial court is

whether the documents sought were specifically prepared by the County for use in litigation"];
*Poway Unified School Dist. v. Superior Court (Copley Press)* (1998) 62 Cal.App.4th 1496, 1504
["exemption was intended "to protect only documents created by the public entity"].)  The
pending litigation exemption therefore has traditionally been applied only to documents "(1) that
the agency prepared; (2) for its own use in litigation; and (3) that it had an interest in not
disclosing until after the litigation has finalized."  (*Board of Trustees of California State
University v. Superior Court* (2005) 132 Cal.App.4th 889, 898 ("*CSU*").)

      Nonetheless, courts subsequently expanded the exemption to include documents prepared
by a state entity not only during active litigation, but also in anticipation of litigation.  *Fairley v.
Superior Court* (1998) 66 Cal.App.4th 1414, 1422, held that the "pending litigation" exemption
can apply to documents prepared by the public entity "in anticipation of litigation."  In so
expanding the litigation exemption, the *Fairly* court cautioned that any determination whether a
state entity prepared the document in anticipation of litigation requires an examination of the
document and the purposes of the state entity.  ""[A] document is protected from disclosure only
if it was specifically prepared for use in litigation. … A document or report prepared for a dual
purpose is privileged, or not privileged, depending on the 'dominant purpose' behind its
preparation.'"  (*Id*. at p. 1420, *quoting City of Hemet v. Superior Court (*1995) 37 Cal.App.4th
1411, 1420 & 1419.)

      In *CSU*, the court extended the scope of the litigation exemption in a different direction.
(*CSU, supra,* 132 Cal.App.4th at p. 898.)  While *Fairly* expanded the exemption to cover pre-
litigation documents, *CSU* expanded the exemption to encompass settlement documents prepared
by third parties and exchanged in confidence as part of negotiations to settle ongoing litigation.
The *CSU* court held the exemption includes settlement communications from litigation
adversaries that are "[1] litigation documents, [2] when sought by persons or entities not party to
the litigation, [3] which the parties do not intend to be revealed outside the litigation."  (*CSU,
supra*, 132 Cal.App.4th at p. 900.)  The *CSU* court reasoned: "If third persons were able to

obtain, through the PRA, all correspondence between opposing attorneys and clients in pending litigation or tort claims, it would eviscerate the parties' ability to vigorously litigate and protect their clients' interests. … If parties outside of the litigation were able to obtain such documents through a PRA request, the ability to communicate openly and freely during litigation would be severely hampered."  (*CSU*, *supra*, at p. 899.)

The *CSU* court did not have occasion to examine whether its expansion of the litigation exemption applies to pre-litigation settlement demands.  Assuming, without deciding, that a pre-litigation settlement demand from a third party could be covered by the Public Records Act's pending litigation exemption, the Faculty Association raises significant arguments that the document at issue in this case is not a "litigation document" and that the parties did not intend to keep its contents confidential.[2]

Litigation Document

To determine whether a document that is prepared outside of any pending litigation is a "litigation document" covered by the litigation exemption, courts must examine the dominant purpose animating the document's preparation.  *Fairley, supra,* 66 Cal.App.4th at pp. 1422, states: "[t]he construction we give to 'pending litigation,' which focuses on the purpose of the document, serves to protect documents created by a public entity for its own use in anticipation of litigation …  In this way, a litigant opposing a public entity is prevented from taking unfair advantage of the public agency status of his or her opponent."  *Fairley, supra,* 66 Cal.App.4th at 1420-1421, adopted the analysis in *City of Hemet v. Superior Court* (1995) 37 Cal.App.4th 1411, 1419, which held that the pending litigation exemption served a purpose similar to the attorney

---

[2] The Faculty Association contends that it is not a "stranger" to the litigation and is "more akin to Real Parties in Interest than non-parties."  (Petition, ¶70.)  The Faculty Association's members may be particularly affected by the outcome of any litigation, but every member of the public has a right to public records under the Public Records Act.  (*Los Angeles Unified School Dist. v. Superior Court* (2014) 228 Cal.App.4th 222, 248 ["What is material is the *public* interest in disclosure, not the private interest of the requesting party...."].)

client privilege.  *Hemet, supra*, 37 Cal.App.4th at 1418-1419, states: "if a report is prepared in the usual course of business for a purpose independent of possible legal consultation, no privilege is created even if the document is later sent to counsel. … A document or report prepared for a dual purpose is privileged, or not privileged, depending on the "dominant purpose" behind its preparation."

The University contends that it would be inappropriate to examine the dominant purpose of the document at issue in this case, pointing out that in *CSU* the court did not examine the dominant purpose of the settlement demand.  But in *CSU* the litigation was already pending at the time the Public Records Act request was submitted, and the request specifically sought communications regarding settlement of pending litigation.  (*CSU, supra*, 132 Cal.App.4th at p. 893.)  There was no dispute about whether the demanded documents might have served a dual purpose, and the *CSU* court did not need to address that question.  Here, in contrast, no litigation is pending.  The Court has reviewed the document at issue in camera.  The document plainly concerns some matters as to which there has been no threat of litigation.

The document addresses a broad range of issues concerning the University.  One of the issues addressed by the document is the subject of DOJ's July 29, 2025, Notice of Findings in which it threatened litigation under Title VI for alleged antisemitism, but the rest of the issues addressed by the document relate to political and economic disputes, including University admissions practices and policies with respect to transgender students, among other matters.

The University contends that it is immaterial whether the document primarily addresses the political and economic disputes between the federal government and the University, because a settlement demand for those disputes is also covered by the litigation exemption.  At the hearing on October 10, 2025, the University asserted that any correspondence from the federal government aimed at resolving any dispute between the federal government and the University is covered by the litigation exemption.  That is because, according to the University, whenever there is a dispute or investigation, there is a potential for future litigation.

The University's position cannot be squared with the narrow reading that this Court must apply to the litigation exemption. (*Iloh, supra,* 87 Cal.App.5th at p. 524.)  If the University were correct, all correspondence it receives from any source about potentially disputed questions of policy or practice would be swept up in the category of documents created "in anticipation of litigation" and exempt from disclosure under the pending litigation exemption.

*Fairley, supra,* 66 Cal.App.4th at p. 1422, which expanded the pending litigation exemption to include documents prepared by a state entity "in anticipation of litigation," does not define that phrase, but does not contemplate such a broad reading.  The *Fairley* petitioner had requested the City disclose police department reports concerning his arrest at a time before petitioner had filed a claim against the City.  *Fairley* did not elaborate on the phrase "in anticipation of litigation" and remanded the case for the trial court to examine the dominant purpose of the police reports.  Although there is no case law under the Public Records Act defining the phrase "in anticipation of litigation," cases in related contexts are instructive. *Nirschl v. Schiller* (2023) 91 Cal.App.5th 386, 401-404, defined the phrase "in anticipation of litigation" in the context of the anti-SLAPP statute (Code Civ. Proc. § 425.16), stating:

> Protection of prelitigation statements only arises at the point in time when litigation is no longer a mere possibility, but has instead ripened into a *proposed proceeding* that is actually contemplated in good faith and under serious consideration as a means of obtaining access to the courts for the purpose of resolving the dispute. … the mere fact that litigation is possible - or even likely - if negotiations fail is not enough.  … The critical point ... is that the mere potential or bare possibility that judicial proceedings might be instituted in the future is insufficient.  …  Thus, when parties negotiate to resolve a dispute that might ultimately result in litigation - but might also be resolved without litigation - statements made in a prelitigation negotiation are not automatically protected … just because they relate to settlement.

*(Nirschl, supra,* 91 Cal.App.5th at pp. 401-404 [cleaned up].)  The *Nirschl* court's analysis of the phrase "in anticipation of litigation" takes an appropriately restrictive view, consistent with the Public Records Act's  mandate to construe exemptions narrowly.

The document sought by the Faculty Association was not created for the dominant purpose of settling litigation or resolving a dispute for which litigation was contemplated in good faith.  Although the University could reasonably anticipate litigation in good faith over the antisemitism complaints raised in the DOJ's July 29, 2025, letter, the University has not demonstrated that DOJ created and transmitted the document for the "dominant purpose" of resolving Title VI litigation.  As Woodall states, the document "includes reference to or proposes settlement terms related to several of the other areas of [federal government] investigation, in addition to proposing settlement of the DOJ's antisemitism-related investigations."  (Woodall Supp. Dec., ¶3.)  The document's dominant purpose was to resolve the myriad other disputes between the executive branch of the United States and the State of California.  The other disputes, including controversies about University policies for admission of students, hiring of faculty, and selection of curriculum, will likely be addressed in the political arena or in the federal and state budgeting processes.  Some of those issues were addressed by the federal government's decision to revoke federal grants, as explained in the NSF's August 1, 2025, letter. (Petition, Exh. D.)  There is no evidence in the record that litigation over those issues is imminent or contemplated in good faith.

A document primarily addressed to resolving political and economic disputes is not covered by the Government Code section 7927.200 litigation exemption.  Only a document primarily addressed to resolving litigation can be covered by the litigation exemption.  The California Constitution and appellate authority state that the Public Records Act's exemptions are to be "narrowly construed."  Courts have no authority to expand the "pending litigation" exemption so that it becomes an exemption for all documents related to a "pending disputed issue of public policy."

Because the dominant purpose of the document is to address non-litigation policy disputes, it is not covered by the Government Code section 7927.200 litigation exemption.  Even

if it were a litigation document, the University fails to show that there was an expectation that the document would be kept confidential.

Expectation of Confidentiality

*CSU* expanded the scope of the litigation exemption to include documents that are exchanged in the litigation context where the state entity and the opposing party have a reasonable expectation of confidentiality. The *CSU* court held: "correspondence from an opposing counsel or party (like correspondence prepared by the defendant public agency or its counsel), that is in the possession of the governmental entity being sued, is also protected under [the litigation exemption] if it was intended that such correspondence not be disclosed outside the litigation." (*CSU, supra,* 132 Cal.App.4th at p. 900.)[3]  In expanding the reach of the litigation exemption to include communications exchanged in the course of litigation, the *CSU* court noted that "parties to the litigation have a strong interest in protecting such communications between counsel from disclosure to third parties while litigation is pending.  In fact, to allow disclosure to the public of such documents would chill the parties' ability in many cases to settle the action before trial." (*CSU*, *supra*, at p. 899.)  That rationale only holds water if the parties to the litigation demonstrate that they do not intend for the information to be revealed outside the litigation.  (*CSU*, *supra*, at p. 900.)

In this respect, it is important to remember that most communications between opposing counsel are exchanged with little expectation of confidentiality.  Trial court records are replete with copies of correspondence between counsel regarding discovery disputes, among other matters.  (*See, e.g.*, *Green Tree Headlands LLC v. Crawford* (2023) 97 Cal.App.5th 1242, 1250-1251 [stating contents of "meet-and-confer correspondence"].)  Thus, the *CSU* court indicated

---

[3] In tying public access to public records to the expectations of third parties, *CSU* did not address Government Code section 7921.005 (formerly Gov. Code § 6253.3), which states: "A state or local agency may not allow another party to control the disclosure of information that is otherwise subject to disclosure pursuant to this division."

that "parties should make clear their intent to keep such correspondence confidential.  Counsel in actions involving governmental entities could place a heading on such correspondence stating that it is confidential, and not to be disclosed to individuals or entities outside the litigation, or, the parties could agree on a protective order as to such documents at the outset of the litigation." (*CSU*, *supra*, 132 Cal.App.4th at p. 901.)

The University has failed to demonstrate that it and the DOJ had a reasonable expectation that the document would be kept confidential.  Although the DOJ affixed a "confidentiality" heading on the document, there is no factual record regarding the DOJ's expectations beyond the headers that the DOJ placed on the document.  The University states: "As far as we are aware, the DOJ has not demonstrated a willingness or desire to have the document disseminated to the public."  (Woodall Dec., ¶12.)  A lack of evidence about willingness to disclose is not evidence of a stated intent or agreement that there will be no disclosure.  (*AirWair International Ltd. v. Pull & Bear Espana SA* (N.D. Cal. 2021) 2021 WL 2914082, at *9 ["The absence of evidence is not evidence of absence"].)

Allison Woodall states: "The University determined that it was important that the confidence indicated by the DOJ not be breached because it could hinder either party in their ability to be candid and forthcoming.  The Draft Settlement Agreement is being treated as a highly confidential document within the University.  The University's leadership has directed that it be shared only with a small number of individuals who have been determined to have a need to know about the contents of the document, such as certain executive leaders of the University and a small number of University attorneys and outside counsel."  (Woodall Dec., ¶¶15-16.)

Woodall asserts that the University has an interest in confidentiality so that the University and the federal government could be "candid and forthcoming" in their discussions.  (Woodall Dec., ¶15.)  Notwithstanding this interest, the University publicized the document through various press releases and launched the "Stand Up for UC" campaign.  The University's press

releases and websites reveal not just the existence of the document, but also some of its contents, including but not limited to the headline $1 billion demand.  In addition, the University sought to rally public support for the University in the face of the demands made in the document, and it urged its constituencies to take actions to advocate for the University.  (Petition, ¶¶27-28, fn 13 ["join-the-movement-to-defend-uc"], fn 14 ["stand-up-for-uc"].)  The University's actions are not consistent with its claim that it intended to keep the contents of the document confidential, and that revealing the contents of the document would chill negotiations that require confidentiality to succeed.

The University contends that as a matter of policy, public agencies should have the freedom to decide whether to disclose certain information to the public about a potential settlement, and to withhold other information, and that requiring public entities to choose between full disclosure and no disclosure would disadvantage public agencies because private litigants are free to make strategic decisions about selective disclosure.  The Court recognizes the sensitive line the University may wish to take as it navigates its very public disputes with the federal government.  Nonetheless, the University is a public entity.  (Cal. Const. art. IX, § 9(a) ["The University of California shall constitute a public trust"]; *Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 320 [discussing "The Regents' constitutional status"].)  The University's status as a public entity provides it with certain benefits, and it also subjects it to the Public Records Act and other responsibilities.  Private entities do not need to disclose demand letters or produce internal documents on request, but public entities do.  (*Fairley, supra,* 66 Cal.App.4th at p. 1422 ["we perceive no grave danger in allowing a litigant or potential litigant to obtain documents from a public agency through the CPRA, rather than waiting to file suit and obtaining the documents through formal discovery. … the whole purpose of the CPRA is to shed public light on the activities of our governmental entities, and it is a small price to pay to require disclosure of public records even to a litigant opposing the government, outside of the rules of

discovery."] The Public Records Act mandates disclosure of documents maintained by public agencies unless specifically exempted.

Any argument that the Public Records Act requires the University to suffer a disadvantage in high-stakes negotiations is a policy argument more appropriately addressed to the Legislature, or at most, resolved in connection with the catchall exemption (see below). It does not provide a basis for expanding the scope of the litigation exemption.

The Court finds that the University has not met its burden of demonstrating that the document was prepared (or received) by the University in anticipation of litigation, or that the parties acted consistently with an expectation that the document would remain confidential. Accordingly, the Government Code section 7927.200 exemption for pending litigation does not exempt the document from disclosure.

CATCHALL EXEMPTION (Government Code section 7922.000)

The University asserts that the document is also exempt from disclosure because the public interest in withholding the record outweighs the interest in disclosure. Government Code section 7922.000 states: "An agency shall justify withholding any record by demonstrating that the record in question is exempt under express provisions of this division, or that on the facts of the particular case the public interest served by not disclosing the record clearly outweighs the public interest served by disclosure of the record." This is commonly known as the catchall exemption.

The catchall exemption requires the Court to apply a three-part test: "(1) We determine if there is a public interest served by nondisclosure of the records; (2) If so, we determine if a public interest is served by disclosure of the records; and (3) If both are found, we determine whether (1) clearly outweighs (2). If it does not, the records are disclosed. In applying this test, we keep in mind the public policy favoring disclosure of records dealing with the public's business, the policy of construing exemptions narrowly, and the fact that the burden is on the

party resisting disclosure to prove an exemption applies." (*Los Angeles Unified School Dist. v. Superior Court* (2014) 228 Cal.App.4th 222, 243.)

The public interest that would be served by nondisclosure of the document is the ability of the University to negotiate with the DOJ in confidence. (Woodall Dec., ¶¶20-24.) That noted, the Faculty Association seeks a single document sent to the University by the DOJ. The disclosure of the document would not prevent counsel for the University from considering the document in a confidential setting. Documents reflecting the University's internal deliberations might be exempt under the preliminary drafts exemption (Gov. Code § 7927.500), the memorandum from legal counsel exemption (Gov. Code § 7927.205), the exemption based on other statutes incorporating the attorney work product exemption (Gov. Code § 7927.705), or the catchall exemption applying the "deliberative process privilege" (Gov. Code § 7922.000; *California First Amendment Coalition v. Superior Court* (1998) 67 Cal.App.4th 159, 170 [deliberative process].) The University also asserts that public disclosure of the document might chill candid negotiations between the University and DOJ. (Woodall Dec., ¶¶15, 20.) However, this contention is difficult to square with the fact that the University itself has disclosed some of the contents of the document and has invited public participation in advocating for the University and against the DOJ concerning the demands made in the document.

On the other hand, disclosure would serve clear public interests. The document concerns issues of public policy and public funding related to the administration of a public entity. "An informed and enlightened electorate is essential to a representative democracy." (*Times Mirror Co. v. Superior Court* (1991) 53 Cal.3d 1325, 1328.) The document was sent by the leadership at the federal DOJ, who are appointed by the President of the United States, to a public university, whose leadership is largely "appointed by the governor or are elected officials." (*U.C. Nuclear Weapons Labs Conversion Project v. Lawrence Livermore Laboratory* (1984) 154 Cal.App.3d 1157, 1163; *see also* Cal. Const. art. IX, § 9(e).)

The University has characterized the demands made in the document as "one of the gravest threats to the University of California in our 157-year history."  The University publicized the document through its press releases and initiated the "Stand Up for UC" campaign to rally students, alumni and members of the public to take action to protect the University's educational mission and to counter demands made by the DOJ in the document.  The Court has reviewed the document in camera and, consistent with the University's public statements, it includes significant demands that, if accepted, would require the University to make substantial changes to its core functions.  The public has an interest in knowing what demands the DOJ is making on the University so that the people of California can form fact-based opinions and provide comments to their public and elected officials, and so that they can participate meaningfully in future elections.  (*CBS, Inc. v. Block* (1986) 42 Cal.3d 646, 651 ["Implicit in the democratic process is the notion that government should be accountable for its actions. In order to verify accountability, individuals must have access to government files. Such access permits checks against the arbitrary exercise of official power and secrecy in the political process."]; *The California Gun Rights Foundation v. Superior Court* (2020) 49 Cal.App.5th 777, 786 ["Public access laws serve a crucial function. Openness in government is essential to the functioning of a democracy."])

The University has not demonstrated an interest in nondisclosure that clearly outweighs the public interest in disclosure.  The University's central argument is that it would be easier for the University to negotiate with the DOJ if the document were not disclosed to the public.  That is not compelling.  The document was sent from one public entity to another public entity, it addresses matters of public concern and the expenditure of public funds, and much of its contents has already been made public in the University's own press releases.

///

///

///

EXEMPTION FOR PRELIMINARY DRAFTS (Government Code section 7927.500)

Government Code section 7927.500 states: "Except as provided in Sections [not applicable in this case], this division does not require disclosure of any preliminary drafts, notes, or interagency or intraagency memoranda that are not retained by a public agency in the ordinary course of business, if the public interest in withholding those records clearly outweighs the public interest in disclosure."

The reference in the statute to "preliminary drafts, notes, or interagency or intraagency memoranda" indicates that it applies to documents created or generated by a state agency and circulated within or among state agencies. The document does not fit within the plain text of the exemption because it was not created by the University. The document was created by the DOJ and then sent to the University. Assuming the preliminary draft exemption could apply to a document received by a state agency, the document at issue in this case is plainly not a preliminary draft. The document contains a "DRAFT" watermark diagonally across every page. (Woodall Dec., ¶11.) However, it is the actual letter that DOJ sent to the University, not an early iteration of a letter that DOJ contemplated sending to the University.

EXEMPTION BASED ON OTHER STATUTES (Government Code section 7927.705)

Government Code section 7927.705 states: "Except as provided in Sections [not applicable in this case], this division does not require disclosure of records, the disclosure of which is exempted or prohibited pursuant to federal or state law, including, but not limited to, provisions of the Evidence Code relating to privilege."

The document was transmitted by the DOJ to the University in an email with the subject line "RULE 408 PROPOSED VOLUNTARY RESOLUTION AGREEMENT" and contains a header on every page referencing Federal Rule of Evidence 408. (*see* Woodall Dec., ¶¶9-10.) The University argues that the Government Code section 7927.705 exemption applies because settlement offers are confidential pursuant to Federal Rule of Evidence 408 and Evidence Code

sections 1152 and 1154.  However, Federal Rule of Evidence 408 and Evidence Code sections 1152 and 1154 do not render a document confidential; they merely limit the circumstances under which a party can introduce evidence of a settlement offer at trial.  (*See Roblox Corporation v. WowWee Group Limited* (N.D. Cal. 2023) 2023 WL 8438808, at \*1 [Federal Rule of Evidence 408 limits the admissibility of settlement offers at trial; it "addresses the admissibility of evidence, not discoverability"]; *Volkswagen of America, Inc. v. Superior Court* (2006) 139 Cal.App.4th 1481, 1491 [Evidence Code sections 1152 and 1154 are "directed at the admissibility of evidence, not its discovery"].)  The fact that the document might not be used as a trial exhibit does not mean it cannot be discovered or disclosed to the public.

Similarly, the fact that the document's header also states: "CONFIDENTIAL ATTORNEY WORK PRODUCT" is not material.  (Woodall Dec., ¶ 10.)  Any privilege held by the drafter of the document (the DOJ) was waived when the document was sent to the University.

The University also relies on Evidence Code section 1040, which is the official information privilege. Evidence Code section 1040 "establishes two different privileges [for "official information"]—an absolute privilege if disclosure is forbidden by a federal or state statute (subd. (b)(1)), and a conditional privilege in all other cases pursuant to which privilege attaches when the court determines ... that disclosure is against the public interest (subd. (b)(2))." (*Los Angeles Unified School Dist. v. Trustees of Southern California IBEW-NECA Pension Plan* (2010) 187 Cal.App.4th 621, 628.)

Because the University fails to demonstrate that disclosure is forbidden by any statute, the University must demonstrate that disclosure is against the public interest.  As explained

above in the discussion on the catchall exemption, the University has failed to make such a showing.[4]

IN CAMERA REVIEW OF THE DOCUMENT

      The Court has reviewed the document in camera pursuant to Government Code section 7923.105.  (Order of October 6, 2025.)  The evaluation of the case as set forth herein takes into consideration the Court's evaluation of the document.

REQUEST FOR STAY

      The University requested a stay of enforcement to permit time to seek a writ from the Court of Appeal.  The Court GRANTS that request and sets an October 24, 2025, deadline for production. The University must seek any further stay from the Court of Appeal.

ORDER

      The Court ORDERS that the Petition of Petitioners UCLA Faculty Association et al for a Writ of Mandate is GRANTED.

1.  The Regents of the University of California is ORDERED to produce the requested document on or before Friday October 24, 2025.

2.  The Faculty Association must submit a Writ of Mandate to the clerk of the court with a $25 filing fee.  (Gov. Code § 70626(a)(1).)  The Faculty Association must serve the

---

[4] The University's September 2, 2025, letter responding to the Faculty Association's Public Records Act request also relies on Federal Privacy Act of 1974.  The University does not mention that law in its memorandum.  That argument is waived.

writ.  The Faculty Association may serve counsel for the University.  The Faculty

Association must file proof of service.   (Code Civ. Proc. § 1096.)

3.   The University must file a return to the writ of mandate within 5 court days of

service of the writ.   The return on the writ must state whether the University has

complied with the writ and, if not, state why not.

JUDGMENT

The Court enters JUDGMENT in favor of Petitioners UCLA Faculty Association et al. and

against Respondent Regents of the University of California.

The Petition of Petitioners UCLA Faculty Association et al for a Writ of Mandate is GRANTED.

The Regents of the University of California is ORDERED to produce the requested document on

or before Friday October 24, 2025.

Any party may file a memorandum of costs at an appropriate time.  (Code Civ. Proc. §§ 1032 &

1033.5; California Rules of Court, rule 3.1700.)

Any party may file a motion for an award of attorney's fees at an appropriate time.  (Code Civ.

Proc. § 1033.5(c)(5); California Rules of Court, rule 3.1702.)

Dated:  U&c à^¦Æ¦Ï £Ç€Ç¦

Rebekah Evenson
Judge of the Superior Court
**Rebekah Evenson / Judge**

| SUPERIOR COURT OF CALIFORNIA COUNTY OF ALAMEDA | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Rene C. Davidson Courthouse<br>1225 Fallon Street, Oakland, CA 94612 | **FILED**<br>Superior Court of California<br>County of Alameda<br>10/14/2025<br>Chad Finke, Executive Officer / Clerk of the Court<br>By: _____ Deputy<br>A. Rios |
| PLAINTIFF/PETITIONER:<br>UCLA Faculty Association  et al | |
| DEFENDANT/RESPONDENT:<br>Regents of the University of California | |
| **CERTIFICATE OF ELECTRONIC SERVICE CODE OF CIVIL PROCEDURE 1010.6** | CASE NUMBER:<br>25CV143076 |

**I, the below named Executive Officer/Clerk of Court of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served one copy of the ORDER AND JUDGMENT GRANTING PETITION FOR WRIT OF MANDATE entered herein upon each party or counsel of record in the above entitled action, by electronically serving the document(s) from my place of business, in accordance with standard court practices.**

Abenicio Cisneros
Law Office of Abenicio Cisneros
acisneros@CApublicrecordslaw.com

Raymond A Cardozo
rcardozo@reedsmith.com

Chad Finke, Executive Officer / Clerk of the Court

Dated: 10/14/2025                By:

A. Rios, Deputy Clerk