# EXHIBIT 116



Illustration by The Chronicle of Higher Education. Source images: Joe Marino, UPI/Alamy, Getty.

## Trump Administration

# The Leader of Trump's Assault on Higher Education Has a Troubled Legal and Financial History

**by Peter Elkind, ProPublica, and Katherine Mangan, The Chronicle of Higher Education**

August 27, 2025, 5:00 am

Co-published with The Chronicle of Higher Education

*ProPublica is a nonprofit newsroom that investigates abuses of power. Sign up to receive our biggest stories as soon as they're published.*

### Reporting Highlights

- **A Mixed Track Record:** Civil rights attorney Leo Terrell, who leads Trump's antisemitism task force, has had a legal career marred by client disputes and scathing judicial rebukes.
- **Unpaid Bills and Tax Debt:** Before his sudden MAGA conversion, Terrell was beset with financial problems.
- **No "Lawyer Talk":** At the Justice Department, current and former attorneys say, he's berated staff who try to follow proper procedures for civil rights complaints.

These highlights were written by the reporters and editors who worked on this story.

When Los Angeles attorney Leo Terrell, a legal commentator, lifelong Democrat and fiery fixture on Fox News, announced on the network's "Hannity" show that he was voting for Donald Trump in 2020, the MAGA universe went wild. Oliver North hailed him on his "Real American Heroes" podcast. Fox News signed him on as a paid contributor, at a six-figure salary.

Terrell, meanwhile, rebranded himself as "Leo 2.0," complete with red Trump-style caps he offered for sale online. Leo 1.0 had slammed Trump for cozying up to white supremacists, blamed him for a surge in violent attacks on Jews and donated to Democrats. Leo 2.0? He attacked "DEI nonsense," compared Black Lives Matter to ISIS and declared the 2020 election was "stolen from President Trump and America!"

In January, Terrell was rewarded for his loyalty when President-elect Trump, praising him as a "highly respected civil rights attorney and political analyst" with an "incredibly successful career," named him senior counsel to the assistant attorney general for civil rights in the Justice Department. Terrell assumed his marquee role a month later: as head of the multiagency Task Force to Combat Anti-Semitism.



Leo Terrell celebrated his appointment as senior counsel to the assistant attorney general of the Department of Justice's Civil Rights Division in an Instagram post on Jan. 23. Screenshot by ProPublica

As a Black, Christian former Democrat with little previous engagement with Jewish causes, Terrell, now 70, seemed an improbable pick to lead the effort to "root out anti-Semitic harassment in schools and on college campuses," as the task force announcement put it. But his zealous conversion and penchant for media bombast made him a perfect bullhorn for the task force's actual mission: to strong-arm colleges into stripping away any vestige of "wokeness" in their hiring, admissions, classes and research.

In service of that goal, the government has abandoned due process in favor of media warfare, preemptive declarations of guilt and freezes on billions in critical federal funding.

Terrell has become an invaluable player in this extraordinary pressure campaign. Before most of the task force's investigations had even launched, he publicly promised "massive lawsuits" against "Jew-hating" universities, including Harvard, the University of California, Los Angeles and dozens of others.

ADVERTISEMENT

Vote YES on Prop 50
THE ELECTION RIGGING RESPONSE ACT
by Nov. 4TH

Ad paid for Committee ID 1380675. Top Funder: HMP for Prop 50

So far, the campaign has been effective. To preserve hundreds of millions of dollars in federal grants and contracts, Columbia and Brown have struck deals with the administration that cost them $220 million and $50 million, respectively, and go far beyond pledging tougher action to combat antisemitism. Columbia agreed to open academic programs and admissions decisions to outside monitoring. Brown pledged to ban transgender women from single-sex spaces and women's sports. Harvard has sued the administration to try to unfreeze $2.6 billion in federal research funds, but it's also trying to negotiate a settlement. Meanwhile, colleges nationwide are eliminating any remaining vestiges of diversity, equity and inclusion programs and shuttering multicultural centers lest the government come after them.

Amid the upheaval Trump's task force has helped to sow, the history, motivations and behavior of its blustery leader have gone largely unexamined. ProPublica and The Chronicle of Higher Education interviewed dozens of people whose paths have intersected with Terrell's and reviewed thousands of pages of court documents and financial records related to his career and life.

The portrait that emerged is dramatically at odds with Trump's description of a "highly respected" and "incredibly successful" attorney. Peers in civil rights law said they always considered Terrell a minor player. Documents reveal a distinctly mixed legal track record, marred by malpractice suits, client disputes and mishandling a criminal case so badly that a federal appeals court lambasted his work as "woeful."

Until his MAGA conversion, Terrell was beset by a litany of financial troubles, including nearly $400,000 in unpaid federal taxes, a personal bankruptcy filing and a trail of court judgments and liens brought by small businesses that worked for his law firm.

Current and former lawyers at the Justice Department say Terrell is less engaged with assessing cases or negotiating settlements than he is with scaring universities into submission. They say he's voiced open disdain for what he calls "lawyer talk," berating career staff who try to follow proper procedures for investigating civil rights complaints.

Despite his appetite for media attention, Terrell has volunteered little about himself. Friends and neighbors recall him walking a dog and bicycling and his fondness for golf. In the "about the author" section for a self-published book, he wrote: "In his spare time, Mr. Terrell likes to work. His hobbies are work and working."

Terrell declined an interview request for this story and did not respond to written questions. In a brief phone conversation with a reporter, he explained, "I don't do interviews with my life." Told some details of our reporting, he added, "I'm not going to comment on anything," and, finally, "I'm going to hang up respectfully."

It is unclear whether Terrell's previous troubles turned up in administration vetting for his current job. Officials at the Justice Department and White House did not respond to questions about Terrell's role or his background.

Jewish activists are divided on Terrell's approach, with some lauding it for rooting out anti-Jewish sentiment that emerged on campuses during pro-Palestinian protests and others bemoaning how he's weaponized antisemitism.

Kenneth Marcus, an Education Department official in the first Trump administration who has spent years agitating for stronger federal action against campus antisemitism, is a fan. "What the president has gotten in Terrell," Marcus said, "is someone with unique skills in delivering public messaging."



Although President Donald Trump has described Terrell as a "highly respected" and "incredibly successful" attorney, peers in civil rights law said they always considered him a minor player. Christian Monterrosa/Bloomberg via Getty Images

That messaging is camouflage, according to Amy Spitalnick, CEO of the Jewish Council for Public Affairs, a national network of Jewish groups. "No one should be under any illusion that this is about keeping Jewish students or faculty safe," she said. "Gutting cancer and Alzheimer's research does nothing to keep them safe."



Terrell speaks at a news conference along with Erma Bryant, left, founder of the Christian Women for Justice, in 1996 in Inglewood, California, where the group held a fundraiser for O.J. Simpson. Terrell was a frequent TV commentator on the Simpson trial. Mark J. Terrill/AP Photo

Terrell grew up in Carson, in south Los Angeles County, the fourth of seven siblings. Law was his second career, following a decade as a history and economics teacher in the Los Angeles public schools. He graduated from UCLA School of Law in 1990 and opened his own civil rights firm in Beverly Hills.

ADVERTISEMENT

Discover up to 5-plex multiplexing with TaqMan™ MGB probes
Order now
ThermoFisher SCIENTIFIC
Applied Biosystems
MGB Probe
6747114-1

Almost immediately, Terrell began making a name for himself as a media personality with a decidedly progressive voice, becoming better known for his TV and radio commentary than for his courtroom achievements.

Starting in 1991, after the police beating of a Black man, Rodney King, Terrell became a regular on local and national TV and radio condemning police brutality and racial injustice. Three years later, he snagged his breakthrough commentating gig: as a friend and supporter of O.J. Simpson. Terrell's role as a Simpson trial analyst produced a green-room friendship with Larry Elder, a conservative Black radio host in Los Angeles, who helped Terrell land his own talk show. "I thought he was smart, feisty, opinionated and entertaining," Elder recalled. "I thought he would be good radio, despite my disagreement with virtually everything he stood for at the time."

Terrell became a prized guest on Fox News. He spoke fast and loud, uttered every view with absolute certainty and was quick to interrupt, shout and attack, accusing one guest of tailoring his views "to make a name for himself" and another of trying to "hustle people to make money." Pressed during one "Hannity" interview to say on air whether Simpson was guilty of murder, Terrell ripped off his ear piece and stormed out of the studio.

Case 3:25-cv-07864-RFL   Document 67-5   Filed 10/31/25   Page 6 of 19

Prominent Los Angeles lawyers said he was never a big player in the city's civil rights community. Carl Douglas, part of the Simpson defense team, said "Leo was always a talker," not "a baller." Connie Rice, former western regional counsel for the NAACP Legal Defense and Educational Fund, said Terrell "was never at the table for the big cases that made impact. He loved holding press conferences."

Terrell represented a Black teenager who'd been expelled from a Los Angeles high school for punching a white referee during a football game after the referee allegedly had directed racial epithets at him. He took up the cause of a mentally ill, homeless Black woman who'd been fatally shot by LA police after she wielded a 12-inch screwdriver at officers wanting to question whether she'd stolen a shopping cart. (No criminal charges were brought against the officers, but Terrell won a $975,000 settlement for her family.)



Terrell, speaking at a forum held by the Congressional Black Caucus in 1999 in downtown Los Angeles, took up the cause of a mentally ill, homeless Black woman who'd been fatally shot by Los Angeles police. Nick Ut/AP Photo

Now scornful of "woke" practices and bias claims, Terrell once represented himself in a race-discrimination case against a parking company after a garage attendant refused to honor his free-parking validation from a shopping mall and told him he owed $10. A supervisor let Terrell leave without paying, but he still sued, saying he was singled out for being Black and demanding damages for "humiliation, mental anguish and severe emotional distress." The suit was later settled for a confidential amount. Reached three decades later, an attorney for the parking company called Terrell's lawsuit "absurd — the worst discrimination case I've ever seen."

Terrell always had side gigs: he self-published a book on workplace rights; he offered business consultations, corporate training seminars and mediations; he had a 900 number that charged $5 for the first minute and $2 for each additional minute for legal consultations.

In 2001, he ran unsuccessfully first for Congress, then two years later for Los Angeles City Council. He routinely promoted himself as "an NAACP attorney," though the group said he'd never been employed there.

William Bloch, a veteran Los Angeles lawyer who brought two malpractice cases against Terrell, said Terrell acted as "the carnival barker" to attract business, then failed to do the necessary legal work. In one sex-discrimination case, according to the resulting malpractice suit brought by Bloch, Terrell accepted a settlement from the city of Beverly Hills for "a pittance" despite explicit instructions from his client, a female police officer, to zealously pursue her claim. Bloch persuaded an appeals court to undo the settlement. After the officer received a $100,000 award, plus money for attorney fees and costs, she dropped the case against Terrell. In the second matter, a jail employee for the city of Beverly Hills said she paid $6,000 to retain Terrell in 2009 after he

"boasted of huge verdicts and settlements," only to have him accept a $1,000 settlement from the city without her permission. According to her claim, Terrell conducted "little or no discovery, including taking no depositions." The case was settled for a confidential amount, with no acknowledgement by Terrell of wrongdoing.

In court filings, Terrell denied any negligence or responsibility for harm to his clients, insisting they had approved all of his actions and saying lawyers are "not a guarantor of the results of any professional services."

"He's a discredit to the legal profession," Bloch said.

A low point in Terrell's legal career began in October 2009, when he was retained by the parents of Emond Logan, a 48-year-old California truck driver alleged to have transported more than a ton of cocaine to western Michigan as part of a multistate drug conspiracy.

ADVERTISEMENT



Terrell rarely took on criminal cases, but he'd played Little League baseball with Logan, whose family approached him after hearing his radio show. Terrell demanded a $100,000 retainer. To pay it, Logan's father sold much of his stock from more than 30 years at Pacific Bell Telephone and borrowed money from his daughter.

Logan faced overwhelming evidence: a leader of the drug gang had testified against him, and the arresting agents had seized five cars (including a Maserati), three Rolex watches and a $125,000 diamond ring, items well beyond his truck-driving income. His court-appointed lawyer had negotiated a plea agreement capping Logan's prison time at 10 years.

Still, Terrell urged Logan to blow up his "bullshit" deal, according to transcripts of their recorded jailhouse calls and Logan's later testimony. Logan followed Terrell's advice, despite prosecution warnings that such relatively generous terms would be off the table. Terrell arranged for Logan's pretrial release on bond. Four months later, Logan was back in custody after a government informant taped him threatening to kill his federal prosecutor. Terrell then urged him to accept a new plea offer, with no cap, and Logan was sentenced to 35 years in prison.

Terrell "didn't do what he was supposed to do for the money," Eugene Logan, Emond's 93-year-old father, said in a telephone interview. "He told us he could get him off. If he'd taken the plea, he'd be out by now."

Two courts denied Emond Logan's attempts to get his sentence overturned based on Terrell's counsel, but they excoriated Terrell's lawyering. U.S. District Judge Paul Maloney wrote in a 2017 decision that Terrell had provided "abysmal advice." A year later, the 6th U.S. Circuit Court of Appeals decried Terrell's "woeful representation" and said his overall conduct reflected "poorly on the profession."



Terrell's troubled legal practice left him with a worsening tangle of financial problems. Between 2004 and 2015, the IRS filed 11 liens against him for nearly $400,000 in unpaid taxes dating back to 1997. In October 2010, Terrell filed for Chapter 7 bankruptcy protection, reporting $736,938 in liabilities, $304,650 in assets and monthly income of just $4,000. Because he stopped appearing for required meetings, his bankruptcy case was dismissed and none of his obligations were legally erased. During this period, Terrell took out six new mortgage loans against his three-bedroom West LA condominium. The property was sold at foreclosure in 2013.

Lorita Seaton was one of Terrell's many unpaid creditors. She'd loaned him $40,000 in 2008 after he said he needed it to help cover his costs for a pending discrimination suit against Costco. In exchange, Terrell had signed a promissory note committing to pay her $60,000 by year-end. By February 2009, court records show, Terrell had won $422,000 at trial for his client and an additional $510,818 in legal fees and costs. Yet Seaton said she never got a penny.

"He had the audacity to tell me 'there's nothing you can do about it,'" she said in an interview. "I want to go stand on the mountain and just holler about this asshole."

Between 2006 and 2014, more than a dozen small vendors for Terrell's law firm went to court seeking to collect more than $170,000 in unpaid bills. A&B Reporting complained that it had prepared more than 30 deposition transcripts for Terrell, billing him more than $40,000 that remained unpaid. According to the company's 2011 lawsuit, Terrell finally sent a $5,000 check — which bounced.

In February 2014, as his private financial straits worsened, Terrell formally updated his law office address: from the Beverly Hills tower where he'd worked for more than two decades to a "suite" on Santa Monica Boulevard, which was actually a mailbox at a UPS store. He has filed just a single case in federal court since that year, according to PACER, a public database of court filings and dockets.

Terrell's financial troubles factored into years of legal warfare among his siblings over their mother's care and modest estate. In a court filing, Terrell's younger brother Zachary accused him of borrowing repeatedly from their mother to save his "flailing" law practice and keep his home. Terrell acknowledged accepting a $30,000 gift from his mother after he'd done free legal work for her. The estate case finally ended in late 2021, but Terrell received little because he had already borrowed against his expected inheritance. (Deborah Terrell-Trimble was the only Terrell sibling to respond to our calls and emails for comment, but she declined to answer questions about her brother or the case, saying the family was "trying to heal.")

Terrell eventually paid off or settled some of his debts, but there's no record of him paying the IRS or many of his other creditors, whose legal claims typically expire after 10 years in California unless they're renewed.

ADVERTISEMENT



According to publicly filed liens, he still owed the IRS $92,000 at the beginning of 2024. Yet on the financial disclosure he filed for his Justice Department job, which covered that period, he listed his liabilities as "none."

Neither Terrell nor the Department of Justice responded to requests for comment about this omission.

---



Terrell speaks at the Conservative Political Action Conference in 2021 in Orlando, Florida. Joe Marino/UPI/Alamy Live News

Amid the financial pressures at home and at work, Terrell underwent a startling political transformation. In 2019 Fox interviews, he had called Trump "a racial divider" and said he sent out "dog whistles" like "no president on this planet in our country's history." Less than a year later, he went all in for Trump. Fox News hired him as a paid contributor soon thereafter, at an annual salary of $250,000.

In interviews on Fox and other conservative outlets, Terrell offered two reasons for his ideological makeover. The first was the growing influence of the Black Lives Matter movement, which he complained had "hijacked" the Democratic Party, citing far-left calls to "defund the police." He also objected to Joe Biden's comment during an interview with a Black radio host that "if you have a problem figuring out whether you're for me or Trump, then you ain't Black," calling it "offensive and insulting to every African American because we don't vote as one group."

Over the next four years, Terrell displayed the fervor of the converted. Biden was an "idiot"; Kamala Harris (whose name he repeatedly mispronounced) was only chosen as his running mate "because she's a woman and because of her race." Democrats were members of the "anti-Israel" and "pro-Hamas party."

Far-right agitator Laura Loomer was "a journalist," while NBC's Kristen Welker was "a DEI hire." In 2023, Terrell made a pilgrimage to Trump's Mar-a-Lago resort, where he posed poolside, making a thumbs-up gesture. Shortly before starting his Justice Department gig, Terrell made sure he was leaving no culture-war stone unturned. "I hate anti-Semitism! I hate attacks on Catholic Families! I hate attacks on parents expressing their First Amendment Rights at School Board Meetings! I hate Sanctuary Cities! I hate DEI! I hate Critical Race Theory!" he declared on X.

"I love this guy," Trump gushed, introducing "Leo 2.0" in February at a White House commemoration of Black History Month. "He was a radical Democrat, he became a radical Republican." Terrell returned the love, telling the audience: "We are in the presence of the greatest president of all time!"



Terrell spoke at a White House commemoration of Black History Month in February. Trump introduced him, saying, "I love this guy." Win McNamee/Getty Images

What motivated him? Larry Elder, who was on air with Terrell as he announced his conversion and coined the nickname "Leo 2.0," declined to speculate: "I really don't care about why Leo did his 180. I'm just glad he finally did!"

Juan Williams, the Fox News senior political analyst, however, called the change in Terrell's views "performative." He said Terrell saw an opportunity to cast himself as "coming out of the liberal matrix, and 'now I've seen the light.' He understood the value in that universe."

If it is a performance, it's one Terrell has continued at the Justice Department, where the effect of his pugnacious style and footloose approach to the law has alarmed career staff accustomed to following strict rules regarding regulatory due process.

"That's lawyer talk!" Terrell regularly thundered to Justice Department lawyers. "I don't want to hear any lawyer talk!"

In the days after his Jan. 23 appointment, several said, Terrell emphatically rejected efforts by agency veterans to explain the legally required steps to bring civil rights complaints against universities.

"Leo did not want to hear our views about how to investigate, how to find a violation, how to proceed in these cases," said a Justice Department veteran who heard Terrell's comments. "No 'lawyer talk' at the Justice Department! It was just incredibly bizarre." The attorney was one of 10 current and former lawyers with the agency's Civil Rights Division interviewed for this story, most of whom asked not to be named for fear of retaliation.

ADVERTISEMENT



At another meeting early in his tenure, Terrell told career Justice Department attorneys he thought they were out to thwart his agenda, according to two attendees. "He immediately came in and openly told us that he did not trust any of us or believe anything we said," one recalled.

The Justice Department antisemitism task force, which includes officials from the Department of Health and Human Services, the Department of Education and the General Services Administration, was announced on Feb. 3. It immediately announced antisemitism investigations of four medical schools regarding "offensive" pro-Palestinian "symbols and messaging" displayed by students during their 2024 commencement ceremonies. Then, over the next five weeks, the task force and Trump administration announced plans to investigate 10 universities; the "immediate" cancellation of hundreds of millions in federal funding for Columbia; an investigation of the entire University of California System; and "potential enforcement actions" against 60 colleges in 24 states.

It's not clear whether Terrell had a hand in choosing the task force's targets, but he took the lead in making the government's case against them publicly.

"We are suing every one of these universities guilty of antisemitism," Terrell told Fox News host Mark Levin on March 9. "We're going to bankrupt these universities. We are going to take away every single federal dollar." Antisemitism, shouted Terrell, waving his arms, "is rampant across the country!" Hate-crime charges, he vowed, would be brought against "these people who hate Jews." Terrell blamed campus antisemitism on the MAGA movement's usual suspects: "the Democrat Party" and "blue cities [that] have turned their back on Jewish Americans."

"The academic system in this country has been hijacked by the left," he declared, "has been hijacked by the Marxists!"

Four days later, the task force announced plans to meet with leaders of four cities "rocked" by campus antisemitism (New York, Los Angeles, Boston and Chicago) to determine whether federal intervention was warranted.

Career civil rights officials, many of whom had served under both Democratic and Republican administrations, were horrified. The Justice Department didn't publicly announce who it was investigating or planned to sue. It didn't reach findings before it had found cause in a completed investigation that typically takes months or even years. And investigating Democratic leaders in "blue cities" in the name of fighting campus antisemitism was far outside the department's charge.

"The process is turned upside down," said Ejaz Baluch, a senior trial attorney in the Civil Rights Division who left in May and is now a lecturer at Columbia Law School. "We were given a conclusion and told to find supporting evidence to justify it. It's basically civil rights enforcement as a political tool. These things don't actually solve antisemitism. It's about silencing political dissent they disagree with." Former civil rights deputy chief Jen Swedish, who worked at the Justice Department for 15 years, called the actions "cover for attacking higher ed."

Back in early February, a division-wide posting seeking attorneys to help staff the antisemitism task force had drawn just three volunteers. Harmeet Dhillon, Trump's appointee as assistant attorney general for civil rights (and one of his former personal lawyers), later told a Federalist Society conference that this revealed the career staff's lack of concern about antisemitism.

Current and former division attorneys interviewed by ProPublica and The Chronicle said the lawyers had misgivings about the administration's tactics and were reluctant to work with Terrell, who already had a reputation for berating staffers. One said he'd repeatedly yelled at her.

A memorable episode came in March, when Terrell loudly berated a revered 82-year-old civil rights attorney, Franz Marshall, over the failure to quickly terminate federal oversight in a Louisiana school desegregation case, a goal of Republican state officials.

Marshall, who had represented the government in hundreds of desegregation cases over five decades, tried to explain that closing the case required a motion by the school district to lift the order, which the Justice Department could support or oppose, and review by a federal judge.

ADVERTISEMENT


"Who told you that you had to do it this way?" Terrell interrupted. "I want to name names!"

"This is the process," Marshall assured him. "I've been doing this for a long time."

"Well, maybe you've been doing it for too long!" Terrell snapped. The tirade, which lasted nearly an hour, was audible to dozens of attorneys waiting outside the conference room for an upcoming meeting.

Marshall (who could not be reached for comment) resigned a short time later, joining a wholesale exodus from resignations, firings and reassignments that has totaled about 70% of the Civil Rights Division's 365 attorneys since January. The Louisiana consent decree was lifted on April 29.

In late April, Terrell had convened a meeting with some of the remaining lawyers to address concerns about working with him. "That crazy guy you see on TV is not here," he insisted, according to one attendee. "The guy before you is a civil rights attorney. There's an urban myth that I scream and yell. I've never yelled in my life."

There's little evidence Terrell has been directly involved in negotiations with campuses under investigation; instead, those appear to have been increasingly steered by the White House. Terrell has voiced distrust of any bargaining, preferring to "lay the hammer on them with lawsuits," as he told Justice Department lawyers in an April meeting. In mid-July, when word leaked that the Trump administration was about to announce an agreement with Columbia to restore its funding, Terrell questioned whether it was tough enough.

"I will not 'SELLOUT' Jewish Americans," he posted on X. "NO DEALS!"

Six days later, the administration announced a $221 million settlement with Columbia, setting the stage for a string of similar deals with other colleges.

The extremism of Terrell's messaging also doesn't bother Dov Hikind, a former New York state Democratic assemblyman representing Brooklyn and the founder of Americans Against Antisemitism. "If Leo Terrell and others are speaking tough, I don't lose any sleep over that."

But the administration's approach alarms other Jewish groups and erstwhile academic allies in the fight against campus antisemitism. The task force is "using legitimate fears of antisemitism in ways that are both dangerous and wrong," said Amy Spitalnick, of the Jewish Council for Public Affairs. When Terrell proclaimed on Fox News that the task force would "bankrupt" targeted universities, "they were saying the quiet part out loud," she added.

Whether Terrell is good for Jews or bad for Jews, his conversion has certainly been good for him. Leo 2.0 now has 2.5 million followers on his personal X account, and his speaking fee runs between $50,000 and $100,000; his government salary is $167,603. Terrell has attained "a rock star persona" in the Trump administration, said Kenneth Marcus, the former Education Department official and antisemitism activist. "People are very much drawn to him in a way that's disproportionate to his rank in the federal government."

There's no sign administration officials, including Terrell, will let up in their campaign against higher education. Since late July, even as negotiations with Harvard dragged on and Brown's settlement was announced, the administration froze $108 million in funding from Duke University's medical system, citing "systemic racial discrimination" in hiring and admissions. It also halted more than $584 million from UCLA as punishment for tolerating a "hostile environment" for Jews and demanded $1 billion to restore the flow of government money. Duke has not publicly responded to the discrimination complaints. The University of California's president, James B. Milliken, has pledged to work with the administration, but he said a $1 billion penalty would "completely devastate our country's greatest public university system."

ADVERTISEMENT


Other colleges are just trying to stay out of the administration's dragnet — and Terrell's sights.

"He's scared schools stiff, so everyone is scrambling," said Brett Sokolow, an attorney and higher education consultant whom college and university leaders have turned to for advice.

Terrell's approach, he said, is "way over the top — and effective as hell."

Case 3:25-cv-07864-RFL    Document 67-5    Filed 10/31/25    Page 12 of 19

Doris Burke of ProPublica contributed research.

**Peter Elkind**

I report on government and business, and the compelling stories behind the intersection of the two.

MORE STORIES    NEED TO GET IN TOUCH?

I'm eager for tips about important stories, and zealously protect whistleblowers and confidential sources. You can reach me by email or securely on Signal.

## What We're Watching

During Donald Trump's second presidency, ProPublica will focus on the areas most in need of scrutiny. Here are some of the issues our reporters will be watching — and how to get in touch with them securely.



**Learn more about our reporting team.** We will continue to share our areas of interest as the news develops.

**Sharon Lerner**

I cover health and the environment and the agencies that govern them, including the Environmental Protection Agency.

Contact me



**Andy Kroll**

I cover justice and the rule of law, including the Justice Department, U.S. attorneys and the courts.

Contact me



**Melissa Sanchez**

I report on immigration and labor, and I am based in Chicago.

Contact me



**Jesse Coburn**

I cover housing and transportation, including the companies working in those fields and the regulators overseeing them.

Contact me





If you don't have a specific tip or story in mind, we could still use your help. Sign up to be a member of our **federal worker source network** to stay in touch.

**Most Read**



1 "Biblical Justice, Equal Justice, for All": How North Carolina's Chief Justice Transformed His State and America



2  **We Found That More Than 170 U.S. Citizens Have Been Held by Immigration Agents. They've Been Kicked, Dragged and Detained for Days.**



3  **Details of DHS Agreement Reveal Risks of Trump Administration's Use of Social Security Data for Voter Citizenship Checks**



4  **Citing Trump Order on "Biological Truth," VA Makes It Harder for Male Veterans With Breast Cancer to Get Coverage**



5  **The EPA Let Companies Estimate Their Own Pollution Levels. We Discovered Real Emissions Are Far Worse.**