STACEY M. LEYTON, SBN 203827
sleyton@altber.com
BARBARA J. CHISHOLM, SBN 224656
bchisholm@altber.com
CONNIE K. CHAN, SBN 284230
cchan@altber.com
AMANDA C. LYNCH, SBN 318022
alynch@altber.com
JUHYUNG H. LEE, SBN 315738
hlee@altber.com
ALEXANDER PECHT, SBN 355877
specht@altber.com
**ALTSHULER BERZON LLP**
177 Post St., Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151

*Counsel for Plaintiffs AAUP, AFT,*
*UC-AFT, CNA/NNU, UAW, and CIR*

[Additional counsel on signature page]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, et al., | Case No. 3:25-cv-07864-RFL |
| Plaintiffs, | **REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | Judge:   Hon. Rita F. Lin<br>Ctrm:    15, 18th Floor<br>Date:    November 6, 2025<br>Time:    10:00 a.m. |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

ADDITIONAL BACKGROUND ...........................................................................1

ARGUMENT ..........................................................................................................2

I.    The Court Has Jurisdiction .............................................................................2

        A.    Plaintiffs Have Standing to Obtain the Preliminary Injunctive
                Relief They Seek ...........................................................................2

                1.  Plaintiffs Have Associational Standing ...............................2

                2.  Plaintiffs Have Organizational Standing ...........................5

        B.  Plaintiffs' Claims Are Ripe .............................................................5

        C.  The Tucker Act Does Not Deprive This Court of Jurisdiction ...................7

        D.  Rule 19 Is No Bar to Plaintiffs' Requested Injunction ......................10

II.    Plaintiffs May Obtain Relief for Defendants' Violations of Law...............12

        A.    Defendants' Task Force Policy and Termination Letters Are
                Final Agency Action Not Committed to Agency Discretion.......................12

        B.    In the Alternative, Plaintiffs Will Likely Prevail on Their *Ultra
                Vires* Claims....................................................................................15

III.    Defendants' Conduct is Unconstitutional, Contrary to Law, and
        Arbitrary and Capricious..................................................................................17

        A.    Defendants' Conduct Violates the First Amendment .....................17

                1.  Defendants Fail to Rebut Plaintiffs' Showing that Defendants
                      Are Coercing UC into Suppressing Plaintiffs' Speech and
                      Academic Freedom ......................................................17

                2.  Defendants Fail to Rebut Plaintiffs' Showing that Their
                      Members' Protected Speech Was a Substantial Cause of
                      Defendants' Retaliatory Conduct....................................19

                3.  Defendants' Demands Unconstitutionally Condition Funding
                      on UC's Agreement to Violate the Constitutional Rights of
                      Plaintiffs' Members .....................................................21

        B.    Defendants' Coercion of UC Violates the Tenth Amendment .....................22

        C.    Defendants' Actions Violate the Separation of Powers.................23

D.    Defendants Failed to Comply with Title VI and Title IX, Which Govern .................................................................................... 24

E.    Defendants' Actions Are Arbitrary and Capricious ......................... 25

IV.    Preliminary Injunctive Relief Is Needed to Prevent Irreparable Harm ................ 27

V.    The Balance of Equities and the Public Interest Weigh in Favor of an Injunction ........................................................................................... 27

VI.    The Scope of Requested Relief Is Appropriate and No Stay or Bond Should Issue ..................................................................................... 28

CONCLUSION ............................................................................................................ 28

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*AAUP v. Rubio,*
2025 WL 2777659 (D. Mass. Sept. 30, 2025) .................................................................14

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
570 U.S. 205 (2013) .............................................................................................8, 19, 21

*All. for Hippocratic Med. v. FDA,*
602 U.S. 367 (2024) ...................................................................................................3, 5

*Altmann v. Republic of Austria,*
317 F.3d 954 (9th Cir. 2002) ...........................................................................................11

*Alto v. Black,*
738 F.3d 1111 (9th Cir. 2013) ...................................................................................10, 11

*Am. Encore v. Fontes,*
152 F.4th 1097 (9th Cir. 2025) .........................................................................................3

*Am. Fed'n of Gov't Emps. v. Trump,*
__ F.4th __, 2025 WL 2716266 (9th Cir. Sept. 19, 2025) ...............................................28

*Am. Fed'n of Tchrs. v. Dep't of Educ.,*
2025 WL 2374697 (D. Md. Aug. 14, 2025) .......................................................................4

*Am. Greyhound Racing, Inc. v. Hull,*
305 F.3d 1015 (9th Cir. 2002) .........................................................................................12

*Am. Med. Ass'n v. Reno,*
57 F.3d 1129 (D.C. Cir. 1995) .........................................................................................26

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.,*
750 F.2d 1470 (9th Cir. 1985) .........................................................................................27

*Am. Textile Mfrs. Inst., Inc. v. Donovan,*
452 U.S. 490 (1981) .........................................................................................................25

*Appalachian Energy Grp. v. EPA,*
33 F.3d 319 (4th Cir. 1994) .............................................................................................14

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents,*
824 F.3d 858 (9th Cir. 2016) ...................................................................................8, 19, 20

*Armstrong v. Exceptional Child Center Inc.,*
575 U.S. 320 (2015) .........................................................................................................16

*Association of American Medical Colleges v. United States,*
217 F.3d 770 (9th Cir. 2000) (cited at Opp. 24) .............................................................15

*Backpage.com LLC v. Dart*,
  807 F.3d 229 (7th Cir. 2015) ................................................................................18

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963)...........................................................................8, 17, 18

*Bd. of Cnty. Cms'rs, Wabunsee Cnty v. Umbehr*,
  518 U.S. 668 (1996).....................................................................................19, 20

*Bd. of Pub. Instruction of Taylor Cnty. v. Finch*,
  414 F.2d 1068 (5th Cir. 1969) ...........................................................................9, 25

*Bennett v. Spear*,
  520 U.S. 154 (1997)...........................................................................................12, 14

*Board of Governors, FRS v. MCorp Financial, Inc.*,
  502 U.S. 32 (1991)....................................................................................................16

*Bond v. U.S.*,
  564 U.S. 211 (2011).....................................................................................................8

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988).....................................................................................................9

*C.P. by and through Pritchard v. Blue Cross Blue Shield of Ill.*,
  536 F.Supp.3d 791 (W.D. Wash. 2021)..................................................................23

*Cachil Dehe Band of Wintun Indians v. California*,
  547 F.3d 962 (9th Cir. 2008) ....................................................................................11

*Califano v. Yamasaki*,
  442 U.S. 682 (1979).................................................................................................28

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
  333 U.S. 103 (1948)................................................................................................14

*City & Cnty. of S.F. v. Trump*,
  779 F.Supp.3d 1077 (N.D. Cal. 2025) ...................................................................22

*City & Cnty. of S.F. v. Trump*,
  897 F.3d 1225 (9th Cir. 2018) ...................................................................................6

*City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*,
  944 F.3d 773 (9th Cir. 2019) .....................................................................................4

*City of Fresno v. Turner*,
  2025 WL 2469330 (N.D. Cal. Aug. 27, 2025) .......................................................22

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983)......................................................................................................4

*Clapper v. Amnesty International USA*,
  568 U.S. 398 (2013).............................................................................................4, 5

*Cmty. Legal Servs. in E. Palo Alto v. HHS*,
   137 F.4th 932 (9th Cir. 2025), *reh'g en banc denied*, __F.4th__, 2025 WL
   2884805 (9th Cir. Oct. 10, 2025) ................................................................7, 9, 10

*Conner v. Burford*,
   848 F.2d 1441 (9th Cir. 1988) ..................................................................12

*Cummings v. Premier Rehab Keller, PLLC*,
   596 U.S. 212 (2022) ..................................................................................22

*Dalton v. Specter*
   511 U.S. at 476 ..........................................................................................16

*Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*,
   276 F.3d 1150 (9th Cir. 2002) ..................................................................11

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019) ........................................................................5, 25, 26

*Department of Education v. California*,
   604 U.S. 650 (2025) ...........................................................................7, 9, 27

*Diamond Alternative Energy, LLC v. Env't Prot. Agency*,
   145 S. Ct. 2121 (2025) ...............................................................................4

*Disabled Rts. Action Comm. v. Las Vegas Events, Inc.*,
   375 F.3d 861 (9th Cir. 2004) ...............................................................10, 11

*Doe ex rel. Doe v. Boyertown Area Sch. Dist.*,
   897 F.3d 518 (3d Cir. 2018) ......................................................................23

*Env't Prot. Info. Ctr. v. Carlson*,
   968 F.3d 985 (9th Cir. 2020) ....................................................................12

*EPA v. Brown*,
   431 U.S. 99 (1977) .....................................................................................14

*E.V. v. Robinson*,
   906 F.3d 1082 (9th Cir. 2018) ..................................................................16

*Fac. Senate of Fla. Int'l Univ. v. Winn*,
   477 F.Supp.2d 1198 (S.D. Fla. 2007) .......................................................27

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ..................................................................................26

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ..................................................................................26

*Federated Indians of Graton Rancheria v. U.S. Dep't of the Interior*,
   2025 WL 2096171 (N.D. Cal. July 18, 2025) ...........................................12

*Flaxman v. Ferguson,*
    151 F.4th 1178 (9th Cir. 2025) ......................................................................6, 7

*Gill v. U.S. Dep't of Just.,*
    913 F.3d 1179 (9th Cir. 2019) .........................................................................14

*Griffith v. Fed. Lab. Rels. Auth.,*
    842 F.2d 487 (D.C. Cir. 1988) ........................................................................16

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ..........................................................................................5

*Illinois v. Fed. Emergency Mgmt. Agency,*
    2025 WL 2716277 (D.R.I. Sept. 24, 2025)................................................22, 23

*Jenner & Block LLP v. U.S. Dep't of Just.,*
    784 F.Supp.3d 76 (D.D.C. 2025) ...............................................................20, 23

*Kennedy v. Bremerton Sch. Dist.,*
    597 U.S. 507 (2022) ........................................................................................20

*Koontz v. St. Johns River Water Mmgt. Dist.,*
    570 U.S. 595 (2013) ........................................................................................22

*La. Pac. Corp. v. Beazer Materials & Servs.,*
    842 F.Supp.1243 (E.D. Cal. 1994) .................................................................22

*Leedom v. Kyne,*
    358 U.S. 184 (1958) ....................................................................................... 16

*Lomayaktewa v. Hathaway,*
    520 F.2d 1324 (9th Cir. 1972) ........................................................................11

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ..........................................................................................5

*Lujan v. G & G Fire Sprinklers, Inc.,*
    532 U.S. 189 (2001) ........................................................................................26

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990) ........................................................................................15

*Mach Mining, LLC v. EEOC,*
    575 U.S. 480 (2015) ........................................................................................10

*Matsumoto v. Labrador,*
    122 F.4th 787 (9th Cir. 2024) ...........................................................................2

*Mendoza v. Amalgamated Transit Union Int'l,*
    30 F.4th 879 (9th Cir. 2022) .............................................................................3

*Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.,*
    498 U.S. 211 (1991) ........................................................................................26

*Murthy v. Missouri,*
  603 U.S. 43 (2024)...................................................................................................6

*NAACP v. Alabama,*
  357 U.S. 44 (1958).................................................................................................28

*Nat'l Educ. Ass'n v. U.S. Dep't of Educ.,*
  779 F.Supp.3d 149 (D.N.H. 2025)...........................................................................4

*Nat'l Endowment for the Arts v. Finley,*
  524 U.S. 569 (1998)...............................................................................................19

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
  567 U.S. 519 (2012)...................................................................................8, 22, 23

*Nat'l Park Hosp. Ass'n v. Dep't of Interior,*
  538 U.S. 803 (2003).................................................................................................6

*Nat'l Rifle Ass'n of Am. v. Vullo,*
  602 U.S. 175 (2024)...................................................................8, 17, 18, 19

*Nat'l Treasury Emps. Union v. Cornelius,*
  617 F.Supp.365 (D.D.C. 1985)...............................................................................25

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n,*
  145 S. Ct. 2658 (2025).................................................................................7, 8, 9, 10

*New York v. Dep't of Just.,*
  2025 WL 2618023 (D.R.I. Sept. 10, 2025).........................................................22, 23

*New York v. Trump,*
  133 F.4th 51 (1st Cir. 2025)...................................................................................15

*Nken v. Holder,*
  556 U.S. 418 (2009)...............................................................................................28

*Normandy Apts., Ltd. v. HUD,*
  554 F.3d 1290 (10th Cir. 2009) ...............................................................................8

*Northrop Corp. v. McDonnell Douglas Corp.,*
  705 F.2d 1030 (9th Cir. 1983) ...............................................................................11

*Norton v. S. Utah Wilderness All.,*
  542 U.S. 55 (2004)..................................................................................................15

*Nuclear Regulatory Comm'n v. Texas,*
  605 U.S. 665 (2025)...............................................................................................16

*Oklevueha Native Am. Church of Haw., Inc. v. Holder,*
  676 F.3d 829 (9th Cir. 2012) ...................................................................................7

*Palantir USG, Inc. v. U.S.,*
  129 Fed. Cl. 218 (2016)...........................................................................................26

REPLY ISO MOT. FOR PRELIMINARY INJUNCTION                    Case No. 3:25-cv-07864-RFL

*Parents for Priv. v. Barr*,
    949 F.3d 1210 (9th Cir. 2020) ...................................................................................23

*Parks v. Watson*,
    716 F.2d 646 (9th Cir. 1983) ....................................................................................21

*Perkins Coie LLP v. U.S. Dep't of Just.*,
    783 F.Supp.3d 105 (D.D.C. 2025) ............................................................................20

*Perry v. Sindermann*,
    408 U.S. 593 (1972).............................................................................................19, 21

*Planned Parenthood of Greater N.Y. v. U.S. Dep't of Health & Hum. Servs.*,
    2025 WL 2840318 (D.D.C. Oct. 7, 2025) ..................................................................4

*President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*,
    2025 WL 2528380 (D. Mass. Sept. 3, 2025) ..................................................... passim

*Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*,
    128 F.4th 1089 (9th Cir. 2025) .................................................................................14

*R.I. Coal. Against Domestic Violence v. Bondi*,
    2025 WL 2271867 (D.R.I. Aug. 8, 2025) ...................................................................9

*R.I. Coal. Against Domestic Violence v. Kennedy*,
    2025 WL 2988075 (D.R.I. Oct. 23, 2025) ..................................................................9

*Roberts v. City of Fairbanks*,
    947 F.3d 1191 (9th Cir. 2020) .................................................................................11

*Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*,
    605 F.3d 703 (9th Cir. 2010).............................................................................18, 19

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995)...................................................................................................19

*Rust v. Sullivan*,
    500 U.S. 173 (1991)...................................................................................................21

*S. Cal. All. of Publicly Owned Treatment Works v. EPA*,
    8 F.4th 831 (9th Cir. 2021) ......................................................................................15

*Sampson v. Murray*,
    415 U.S. 61 (1974).....................................................................................................27

*San Francisco Herring Ass'n v. DOI*,
    946 F.3d 564 (9th Cir. 2019) .............................................................................14, 15

*Savantage Fin. Servs., Inc. v. U.S.*,
    595 F.3d 1282 (Fed. Cir. 2010).................................................................................26

*Schroer v. Billington*,
    525 F.Supp.2d 58 (D.D.C. 2007) ..............................................................................16

*Sierra Club v. Trump*,
   929 F.3d 670 (9th Cir. 2019) .................................................................................16

*Sierra Club v. Trump*,
   963 F.3d 874 (9th Cir. 2020), *judgment vac'd on other grounds, sub nom.*
   *Biden v. Sierra Club*, 142 S. Ct. 46 (2021) .........................................................16

*Stanley v. Univ. of S. Cal.*,
   13 F.3d 1313 (9th Cir. 1994) ................................................................................27

*Stavrianoudakis v. U.S. Fish & Wildlife Serv.*,
   108 F.4th 1128 (9th Cir. 2024) ...............................................................................4

*Stormans, Inc. v. Selecky*,
   586 F.3d 1109 (9th Cir. 2009) .................................................................................7

*Students for Fair Admissions, Inc. v. Presidents & Fellows of Harvard Coll.*,
   600 U.S. 181 (2023) ..............................................................................................23

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ................................................................................................4

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) ................................................................................................4

*Susman Godfrey LLP v. Exec. Off. of President*,
   789 F.Supp.3d 15 (D.D.C. 2025) ....................................................................20, 21

*Texas v. U.S.*,
   523 U.S. 296 (1998) ................................................................................................6

*Thakur v. Trump*,
   148 F.4th 1096 (9th Cir. 2025) ...................................................................... *passim*

*Thakur v. Trump*,
   2025 WL 2325390 (N.D. Cal. Aug. 12, 2025) ........................................................2

*Thakur v. Trump*,
   2025 WL 2696424 (N.D. Cal. Sept. 22, 2025) ...........................................2, 6, 7, 10

*Thakur v. Trump*,
   787 F.Supp.3d 955 (N.D. Cal. 2025) .............................................................. *passim*

*Trump v. New York*,
   592 U.S. 125 (2020) ................................................................................................6

*Tucson Airport Auth. v. Gen. Dynamics Corp.*,
   136 F.3d 641 (9th Cir. 1998) ...................................................................................9

*Twitter, Inc. v. Paxton*,
   56 F.4th 1170 (9th Cir. 2022) ..................................................................................6

*United Aeronautical Corp. v. U.S. Air Force*,
    80 F.4th 1017 (9th Cir. 2023) ...................................................................................8

*United States v. Am. Libr. Ass'n, Inc.*,
    539 U.S. 194 (2003) ...................................................................................21

*United States v. Bowen*,
    172 F.3d 682 (9th Cir. 1999) ...................................................................................11

*Vasquez Perdomo v. Noem*,
    148 F.4th 656 (9th Cir. 2025) ...................................................................................28

*W. Virginia v. U.S. Dep't of Health & Hum. Servs.*,
    289 F.3d 281 (4th Cir. 2002) ...................................................................................22

*Wash. v. Dep't of Ed.*,
    2025 WL 2966255 (W.D. Wash. Oct. 21, 2025) ...................................................................................9

*Washington v. Trump*,
    766 F.Supp.3d 1138 (W.D. Wash. 2025) ...................................................................................24

*Wolfson v. Brammer*,
    616 F.3d 1045 (9th Cir. 2010) ...................................................................................7

**Federal Statutes**

28 U.S.C. §1491(a)(1) ...................................................................................8

42 U.S.C. §2000d-1 ...................................................................................25

**Rules**

Fed. R. Civ. P. 19(a) ...................................................................................10, 11

Fed. R. Civ. P. 19(b) ...................................................................................11, 12

**Regulations**

2 C.F.R. §200.339 ...................................................................................24, 25

2 C.F.R. §200.340 ...................................................................................15, 24, 25, 26

2 C.F.R. §§200.341-45 ...................................................................................15

45 C.F.R. §75.371 ...................................................................................24, 25

89 Fed. Reg. 80055, 80070 (Oct. 2, 2024) ...................................................................................24

**Constitutional Provisions**

First Amendment ................................................................................... *passim*

Fifth Amendment ...................................................................................22

Tenth Amendment ........................................................................................................8, 15, 22

REPLY ISO MOT. FOR PRELIMINARY INJUNCTION                    Case No. 3:25-cv-07864-RFL

# INTRODUCTION

The record establishes that Defendants are deploying their now-familiar Task Force Policy against the University of California ("UC"), using legal and financial sanctions and threats under the guise of civil rights enforcement to coerce America's preeminent public university system into suppressing disfavored speech and academic inquiry and imposing the Trump administration's ideological views. Plaintiffs have shown through more than 60 declarations that Defendants' actions are having their intended effect of chilling speech throughout the UC System and are causing Plaintiffs and their members additional concrete and irreparable harms, which will only compound unless Defendants' coercive campaign is enjoined. Defendants fail to rebut Plaintiffs' evidence and offer none of their own.

Under longstanding precedent, Defendants' coercive and retaliatory conduct violates the First and Tenth Amendments and other constitutional provisions. Titles VI and IX establish clear requirements circumscribing the termination or withholding of federal funding based on purported discrimination—requirements Defendants concede were not followed. The government's discretion to award federal funding or set "agency priorities" does not give it license to disregard the Constitution, Titles VI and IX, or the APA. Defendants offer no credible defense on the merits, and their jurisdictional arguments ignore controlling authority. The Court should grant Plaintiffs' requested relief to enjoin Defendants' unlawful conduct and prevent further irreparable harm to Plaintiffs, their members, and the public.

# ADDITIONAL BACKGROUND

Plaintiffs briefly address two factual developments after the preliminary injunction filing. First, UC was required to publicly disclose the August 8 Demand Letter. Ex. 113 at 14-20 (court reasoning that public has interest in seeing "significant demands that, if accepted, would require the University to make substantial changes to its core functions").[1] The released Demand Letter confirms the public reporting and Plaintiffs' description of its demands. *Compare* ECF 31 ("Mem.") 3-4 *with* Ex. 112.

Second, Plaintiffs' supplemental evidence reveals that Defendants' implementation of the Task Force Policy has frozen further UCLA grants from Defendant National Science Foundation ("NSF"), in addition to the $584 million grant cancellations. The day after DOJ issued the July 29 Notice of Title VI Violations to UCLA, NSF's Acting Chief Science Officer stated: "*[W]e have been instructed* to suspend

---

[1] Exhibits 1-111 refer to exhibits attached to the Mammel Declaration filed at ECF 27, and Exhibits 112-116 refer to exhibits attached to the Supplemental Mammel Dec submitted herewith.

REPLY ISO MOT. FOR PRELIMINARY INJUNCTION                    Case No. 3:25-cv-07864-RFL

all active awards to UCLA … and to not make further awards to [UCLA] until" DOJ's Title VI investigation into UCLA "has been resolved." ECF 40-3, Ex. 1 at 3 (emphasis added); *see also* ECF 40-2 ¶16 (NSF program officer stating "it is beyond my control now"). Based on that instruction, NSF is not renewing or authorizing new awards to UCLA moving forward and is refusing to fund grants that had been preliminarily or informally approved. ECF 40-3 ¶¶7-11, 14-16; ECF 40-2 ¶¶15-18, 20-21; Roper Dec. ¶¶17-18, 21 & Exs. 2, 4; Clarke Dec. ¶¶12-15 & Ex. A.

## ARGUMENT

**I.     The Court Has Jurisdiction.**

    **A.     Plaintiffs Have Standing to Obtain the Preliminary Injunctive Relief They Seek.**

        **1.     Plaintiffs Have Associational Standing.**

Defendants' standing arguments misapprehend Plaintiffs' claims and ignore record evidence.

***Thakur* injunctions.** Defendants initially contend that the *Thakur* injunctions obviate Plaintiffs' members' injuries. *See* ECF 61 ("Opp.") at 9. But that ignores uncontroverted evidence of Defendants' broader attack on UC. <u>First</u>, Defendants ignore Plaintiffs' evidence that NSF has frozen future grants to UCLA, which the *Thakur* injunctions[2] do not address. ECF 40-2 ¶¶13-21; ECF 40-3 ¶¶6-16; Clarke Dec. ¶¶10-17; Roper Dec. ¶¶11-22. That has harmed and is harming Plaintiffs' members. *See* ECF 40-2 ¶19; Clarke Dec. ¶16; Roper Dec. ¶¶23-26; Bartlebaugh Dec. ¶¶5-6. <u>Second</u>, Defendants ignore Plaintiffs' members' harm from Defendants' termination of DOE grants at UCLA, also not addressed by the *Thakur* injunctions. *See* ECF 29-23 ¶6 (UAW Local 4811 members had appointments and salaries reduced); Jaime Supp. Dec. ¶¶7-9; *see Thakur IV*, 2025 WL 2696424, at *2. <u>Third</u>, even as to the enjoined NIH and NSF UCLA grant terminations, which caused serious and often ongoing harms to Plaintiffs' members, Mem. 14-15 (citing evidence), Plaintiffs' requested relief would reduce the uncertainty members face, including by enjoining the terminations on additional grounds. *See Matsumoto v. Labrador*, 122 F.4th 787, 801 (9th Cir. 2024) ("[p]artial amelioration of a harm … suffices for redressability"); Mem. 44-45 (authority for overlapping injunctions).[3] <u>Fourth</u>, as discussed *infra*,

---

[2] *See Thakur v. Trump* ("*Thakur I*"), 787 F.Supp.3d 955, 1004-07 (N.D. Cal. 2025); *Thakur v. Trump* ("*Thakur II*"), 2025 WL 2325390, at *1, 7 (N.D. Cal. Aug. 12, 2025); *Thakur v. Trump* ("*Thakur IV*"), 2025 WL 2696424, at *2 (N.D. Cal. Sept. 22, 2025).

[3] Defendants allude to claim-splitting, citing *Mendoza v. Amalgamated Transit Union Int'l*, 30 F.4th 879, 886 (9th Cir. 2022), but provide no analysis. For good reason. Plaintiffs represent many affected

Defendants' implementation of the Task Force Policy is causing present and imminent harms well beyond the funding terminations to date.

**Present and imminent harms.** Defendants suggest that harms from additional funding cuts and threats to impose financial and ideological conditions on receipt of funds are insufficiently imminent to support standing, Opp. 10-11, but they ignore that many harms to Plaintiffs' members are occurring *now*.

Plaintiffs' evidence of ongoing serious First Amendment harm is uncontroverted: members are suffering and will keep suffering chill to their speech and academic freedom because of Defendants' coercive threats and accompanying demands. Mem. 5-7 (citing evidence); *e.g.*, ECF 29-1 ¶32; ECF 29-6 ¶24; ECF 29-21 ¶20; *see Am. Encore v. Fontes*, 152 F.4th 1097, 1113 (9th Cir. 2025) ("[A] chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury."). And, as discussed *supra* at 1-2, NSF is refusing to renew or award new grants to UCLA—including for world-renowned scientists and mathematicians—because of DOJ's investigation, causing present harm. *See* ECF 40-3 ¶¶3-16 & Exs. 1-2; ECF 40-2 ¶¶3-21 & Exs. A-C; Clarke Dec. ¶¶10-13. Harms from the previous UCLA grant terminations, including those by DOE, also persist in many respects. *See supra* at 1.

The Task Force Policy also subjects Plaintiffs' members to present and ongoing harm caused by Defendants' dual threats of either further crippling terminations of federal grants to UC or imposition of Defendants' financial and ideological demands. The threat of additional funding cuts is causing members serious injuries, including by curtailing research and reducing training opportunities. *See* Mem. 16 (citing evidence). And the threat that Defendants will extract UC concessions portends other harm including to Plaintiffs' transgender members, parents of transgender children, those who depend on the contributions of international students, and members who intend to protest or engage in speech, instruction, or research Defendants disfavor. *See* Mem. 4-5, 17-20 (citing evidence). Enjoining Defendants' coercive conduct, and thereby removing these harmful threats, will redress Plaintiffs' members' injuries. *See All. for Hippocratic Med. v. FDA*, 602 U.S. 367, 381 (2024).[4]

The precision and predictability with which the Task Force Policy has been carried out against

---

UC workers who are not in the *Thakur* classes. Campos Dec. ¶5; Rodger Supp. Dec. ¶5; Ranson Dec. ¶¶4-5; Patel Supp. Dec. ¶4; Jaime Supp. Dec. ¶¶3-6; Rabinowitz Supp. Dec. ¶5. This case also concerns a different "nucleus of facts" regarding the Task Force Policy and different injuries.

[4] Defendants assert that an injunction requiring "that grants be awarded" somehow "flouts the rigorous review and award process," Opp. 11, ignoring that Plaintiffs' requested relief would remove the threat of funding cutoffs without the requisite legal procedures. ECF 26-1.

REPLY ISO MOT. FOR PRELIMINARY INJUNCTION                    Case No. 3:25-cv-07864-RFL

UC and other universities demonstrates the substantial risk that Defendants will implement their threats and further harm Plaintiffs' members. Mem. 10-14; *infra* at 12-13; *see City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (past harms relevant to likelihood of future harm). The record demonstrates a strong likelihood that Defendants will carry out their threats. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur" (cleaned up)); *City & Cnty. of S.F. v. U.S. Citizenship & Immigr. Servs.*, 944 F.3d 773, 787 (9th Cir. 2019) ("risk or threat of injury" is sufficient).[5]

Courts have "recognized an imminent injury-in-fact where administrative action sets up a kind of 'forced choice.'" *Planned Parenthood of Greater N.Y. v. U.S. Dep't of Health & Human Servs.*, 2025 WL 2840318, at *11 (D.D.C. Oct. 7, 2025) (quoting *Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1138 (9th Cir. 2024)). Having forced UC into a Hobson's choice, Defendants cannot defeat justiciability by pretending, contrary to the record, that UC is not being coerced by Defendants. *See Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, 779 F.Supp.3d 149, 178 (D.N.H. 2025) (unions had standing to challenge "Dear Colleague" letter because "threatening demand that schools immediately comply with the Department's interpretation of federal law," and "school districts' rel[iance] upon federal funding," made it "predictable that schools would cease all DEI programming"); *Am. Fed'n of Tchrs. v. Dep't of Educ.*, 2025 WL 2374697, at *15 (D. Md. Aug. 14, 2025) ("It is predictable that states and schools faced with funding cuts, investigations, enforcement actions, or FCA liability will take actions to limit speech by teachers that might expose them to those consequences."); *cf. Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) (standing difficult when injury "depends on the *unfettered choices* made by independent actors") (emphasis added).[6]

---

[5] Injury in *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), turned on "a highly attenuated chain of possibilities" requiring, *inter alia*, the government to target non-U.S. persons with whom the plaintiff organizations communicated and to use a particular intelligence-gathering statute to do so, after obtaining approval from the Foreign Intelligence Surveillance Court. *Id.* at 410-14; *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) (standing depended on multiple contingencies). Here, by contrast, evidence shows the government has made specific demands and coercive threats to UC that are presently affecting Plaintiffs' members *and* substantially likely to inflict future harm. Mem. 2-5.

[6] Defendants argue that some harms depend on how UC responds to the administration's threats. Opp. 10-11. But UC's role does not impede standing given present harms and infliction of this Hobson's choice. *See* Mem. 14-20. When, as here, a third party's response to government intervention "is predictable," "commonsense inferences may be drawn" in assessing causation and redressability. *Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 145 S. Ct. 2121, 2136 (2025); *see also Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) (states had standing to challenge census citizenship

### 2.    Plaintiffs Have Organizational Standing.

*Alliance for Hippocratic Medicine* reaffirmed that organizations may establish "standing 'to sue on their own behalf for injuries they have sustained.'" 602 U.S. at 393 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, n. 19 (1982)); *see also id.* at 395 (acknowledging standing of organization whose counseling and referral services were perceptibly impaired). Plaintiffs are not "simply … expending money to gather information and advocate against" Defendants' conduct. *Id.* (quoted at Opp. 12). Plaintiffs showed that Defendants' acts "directly affected and interfered with [Plaintiff organizations'] core business activities," including advising and representing members vis-à-vis their employers. *Id.*; Mem. 21-22 & nn. 55-57 (citing evidence).[7] Defendants' threats are presently undermining academic freedom and shared governance at UC. *See* Mem. 5-7, 19-20 (citing evidence); *supra* at 1-3. The resulting interference with Plaintiffs' ordinary business is not based on "fears of hypothetical future harm," *Clapper*, 568 U.S. at 416, it is actual and ongoing. *See, e.g.*, ECF 29-38 ¶¶18-22 (threats and demands impacting CIR's collective bargaining activities); ECF 29-47 ¶20 (SDFA harmed by threats' effects on shared governance); ECF 29-17 ¶24 (threatened protest restrictions undermine SCFA's right to bargain access and protest restrictions); ECF 29-39 ¶13 (chilling effect of threats and demands on membership has impaired ability to mount labor demonstrations and strikes).

Plaintiffs also demonstrated standing based on infringement and chilling of their own First Amendment rights. Mem. 22; *see, e.g.*, ECF 29-17 ¶23 ("Subsequent to the Trump administration's targeting of UCLA, SCFA leadership has experienced hesitancy, even self-censorship, in statements it has issued, to protect its members and the campus."); ECF 29-41 ¶16; ECF 29-39 ¶12.

### B.    Plaintiffs' Claims Are Ripe.

There is no basis to delay consideration of the issues presented on ripeness grounds. This is no

---

question, notwithstanding intervening role of noncitizens who might or might not comply with duty to respond to census, where standing theory relied not on "mere speculation about the decisions of third parties" but "on the predictable effect of Government action on the decisions of third parties").

[7] Defendants barely engage with Plaintiffs' evidence, but the one example they identify highlights their oversimplified view of the law and facts. Opp. 11-13 (citing ECF 29-49 ¶24). AAUP President Todd Wolfson explained that Defendants' "pressure on the UC … to abandon [its] commitment to academic freedom, shared governance, and due process principles" has "made it more difficult and resource-intensive for AAUP to carry out its work for chapters and individual members, in particular on issues of academic freedom." ECF 29-49 ¶¶24-25. AAUP's core business activities include consulting with and advising local chapters and individual members regarding academic freedom, shared governance, and other issues relating to members' employment relationships with university employers. *Id.* ¶¶7, 17-19.

REPLY ISO MOT. FOR PRELIMINARY INJUNCTION                    Case No. 3:25-cv-07864-RFL

"abstract disagreement[]," *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1173 (9th Cir. 2022) (citation omitted); preliminary injunctive relief is needed now to enjoin Defendants' presently occurring coercive, retaliatory, and statute-flouting threats against UC.

Defendants' ripeness arguments again misconstrue Plaintiffs' legal theories and the factual record.[8] "Ripeness' constitutional component is "synonymous with the injury-in-fact prong of the standing inquiry." *Id.* Plaintiffs plainly are not advancing "generalized allegations regarding the existence of a task force to combat antisemitism." Opp. 14. The Task Force Policy is currently being applied to UC; under that Policy, Defendants have already enacted devastating funding cuts against UC without following statutory procedures; and the resulting harms—including the withholding of funding on grants previously recommended for approval, the ongoing chilling effect, and the consequences of threatened future grant terminations and capitulation to the August 8 demands—are concrete, particularized, and actual or imminent, not speculative. *See* Mem. 2-19 (citing evidence); *supra* at 2-6; *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1236-38 (9th Cir. 2018) (challenge to executive order withholding funding for sanctuary cities was ripe where, *inter alia*, federal officials communicated specific warnings and threats that they would enforce the policy).[9]

Prudential ripeness considerations also favor adjudication. *See Flaxman v. Ferguson*, 151 F.4th 1178, 1188 (9th Cir. 2025) (prudential ripeness turns on "fitness of the issues for judicial decision" and "hardship to the parties of withholding court consideration"). Plaintiffs ask the Court to address legal issues arising from undisputed facts regarding Defendants' concrete threats and grant suspensions, which are being done pursuant to final agency action. *See* Mem. 32-35; *infra* at 17-21. Plaintiffs raise urgent and specific legal concerns that are fit for decision. *See Wolfson v. Brammer*, 616 F.3d 1045, 1060 (9th

---

[8] Defendants contend that Plaintiffs' members' claims *before* grant termination are not ripe, yet *after* termination are precluded by the Tucker Act. Opp. at 9 n.3, 14. Both arguments are meritless, and Defendants' attempt to foreclose Plaintiffs altogether from obtaining judicial review of their constitutional and statutory claims should be rejected. *Cf. Thakur IV*, 2025 WL 2696424 at *10.

[9] Defendants' cases are not analogous. *See Trump v. New York*, 592 U.S. 125, 131 (2020) (how Executive Branch might eventually implement general policy statement was conjecture); *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 809-11 (2003) (challenged regulation was general policy statement and caused plaintiffs no practical harm); *Texas v. U.S.*, 523 U.S. 296, 300 (1998) (no evidence application of the challenged provision was "currently foreseen or even likely"). In *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (cited at Opp. 15), the evidence showed that the government defendants "issued no directives and threatened no consequences" against the social media platforms that moderated the plaintiffs' content in the months leading up to the lawsuit. *Id.* at 72. Here, by contrast, there is clear evidence of an "ongoing pressure campaign" by Defendants against UC. *Id.* at 69; *see infra* at 12-13.

REPLY ISO MOT. FOR PRELIMINARY INJUNCTION                    Case No. 3:25-cv-07864-RFL

Cir. 2010) (claim is "fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final") (cleaned up); *Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 838 (9th Cir. 2012) ("[F]itness … requires only the existence of a 'concrete factual situation.'") (citation omitted). Consideration of hardship also plainly supports prudential ripeness. Plaintiffs have amply shown "that withholding review would result in direct and immediate hardship and would entail more than possible financial loss," including chilled speech and reputational and professional harms. *Wolfson*, 616 F.3d at 1060 (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126 (9th Cir. 2009)); Mem. 41-43 (citing evidence); *infra* at 26-27.

### C.     The Tucker Act Does Not Deprive This Court of Jurisdiction.

Defendants rely entirely on *Department of Education v. California*, 604 U.S. 650 (2025) and *National Institutes of Health v. American Public Health Association*, 145 S. Ct. 2658 (2025) ("*APHA*"), Opp. 16-19, while ignoring all the reasons that this case is different, and why this Court therefore has jurisdiction under controlling Ninth Circuit authority. Mem. 22-24 (citing *Thakur v. Trump* ("*Thakur III*"), 148 F.4th 1096, 1104 (9th Cir. 2025), and *Cmty. Legal Servs. in E. Palo Alto v. HHS* ("*CLSEPA*"), 137 F.4th 932, 938 (9th Cir. 2025), *reh'g en banc denied*, __F.4th__, 2025 WL 2884805 (9th Cir. Oct. 10, 2025) ("*CLSEPA II*")). As Plaintiffs explained, this Court has jurisdiction for multiple reasons: (1) Title VI and IX have express jurisdiction-granting provisions; (2) *ultra vires* claims are not subject to the Tucker Act; (3) Plaintiffs' claims are rooted in constitutional and statutory provisions, not contractual rights; (4) Plaintiffs seek equitable relief; and (5) Plaintiffs are non-contracting parties with no remedy in the Court of Federal Claims ("CFC"). Mem. 22-24. For these same reasons, this case is unlike *California*, which addressed only APA arbitrary-and-capricious claims brought by grantees seeking to enforce their contractual right to payment, and unlike *APHA*, which likewise did not address constitutional or Title VI and IX claims, and which "did not consider, and thus did not address," the argument that the Tucker Act cannot deprive district courts of jurisdiction over claims of non-contracting parties who "could not obtain *any* relief in the [CFC]." *Thakur IV*, 2025 WL 2696424, at *1.

Defendants fail entirely to address Title VI and IX's express grant of district court jurisdiction under the APA. *See* Mem. 23-24; *see generally* Opp. As to Plaintiffs' remaining claims, Defendants misconstrue the rights asserted and the relief sought in trying to paint this case as a contract dispute in disguise. *See United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1025 (9th Cir. 2023). Plaintiffs

REPLY ISO MOT. FOR PRELIMINARY INJUNCTION                                    Case No. 3:25-cv-07864-RFL

do not claim they are "entitle[d] … to federal funds" and do not seek "specific performance" of any contracts. Opp. 18. Rather, Plaintiffs assert First Amendment rights not to have their speech suppressed through coercion of a third party, and not to be retaliated against for protected speech. Mem. 24-28; *infra* at 12-15. These rights find their source not in any contract, but in the Constitution. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187-90 (2024); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963); *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016). Similarly, Plaintiffs' Tenth Amendment, unconstitutional conditions, and separation of powers claims seek not to enforce UC's contractual rights under any terminated or suspended grants but "to vindicate [their] own constitutional interests." *See Bond v. U.S.*, 564 U.S. 211, 220 (2011); Mem. 29-32 (citing authorities).

Plaintiffs' constitutional claims are not transformed into contractual ones simply because Defendants' chosen tool of coercion and retaliation involves the withholding or threatened withholding of federal funds (in addition to legal sanctions). The government may not suppress or retaliate against protected speech or coerce States by any means, financial or otherwise. *See Vullo*, 602 U.S. at 180 (First Amendment prohibits use of legal sanctions "and *other means* of coercion") (quoting *Bantam Books*, 372 U.S. at 67; emphasis added); *President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, 2025 WL 2528380, at *27 (D. Mass. Sept. 3, 2025); *Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 578 (2012) (Tenth Amendment challenge to Medicaid grants condition); *see also Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* ("*AID*"), 570 U.S. 205, 214-15 (2013) (First Amendment challenge to federal grants condition); *APHA*, 145 S. Ct. at 2661 (Barrett, J., concurring) (that agency guidance is "related to grants does not transform a challenge to that guidance into a claim 'founded … upon' contract") (quoting 28 U.S.C. §1491(a)(1)). Defendants' use of federal funding to accomplish unconstitutional objectives does not place their conduct beyond judicial reach.[10]

Plaintiffs' other claims are likewise rooted in rights secured under Title VI, Title IX, and the APA, which exist independent of any contractual terms. *See Thakur III*, 148 F.4th at 1103 (source of rights was APA's arbitrary and capricious prong); *APHA*, 145 S. Ct. at 2661 (Barrett, J., concurring) (district court likely "had jurisdiction to entertain an APA [arbitrary and capricious] challenge to the [agency] guidance"); *Normandy Apts., Ltd. v. HUD*, 554 F.3d 1290, 1299-1300 (10th Cir. 2009) (source

---

[10] Apart from mischaracterizing Plaintiffs' constitutional claims as contract claims, Defendants offer no response to the additional point (Mem. 23) that the Tucker Act is wholly inapplicable to this Court's jurisdiction over Plaintiffs' *ultra vires* claims.

REPLY ISO MOT. FOR PRELIMINARY INJUNCTION                    Case No. 3:25-cv-07864-RFL

of rights was regulations governing HUD's termination of contracts); *Bd. of Pub. Instruction of Taylor Cnty. v. Finch*, 414 F.2d 1068, 1077 (5th Cir. 1969) (limits on funding termination meant "not primarily for the benefit of the [entity] whose funds are withheld, but for the potential recipients of federal aid"); Mem. 35-41. None of Plaintiffs' claims are "dependent" on establishing their "rights under a government contract," *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 648 (9th Cir. 1998), such that they rise and fall with proving an underlying contract breach. Indeed, resolving their claims requires no reference to the content of any contract at all. *See CLSEPA*, 137 F.4th at 938; *CLSEPA II*, 2025 WL 2884805, at *4-6 (Koh and Fletcher, JJ.).

Nor do Plaintiffs seek money damages or "specific performance" of any contract, Opp. 18, only equitable relief to enforce their constitutional and statutory rights. As in *CLSEPA*, Plaintiffs do not seek to compel Defendants to award funding of any particular grant or contract; they seek only an injunction "to ensure compliance with statutory and regulatory" (and here, also constitutional) "commands," which is "beyond the scope of the Tucker Act's exclusive jurisdiction." 137 F.4th at 938; *see APHA*, 145 S. Ct. at 2661 (Barrett, J., concurring); *California*, 604 U.S. at 650 ("a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds") (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988)); ECF 26-1 (Proposed Order) ¶¶1-5.[11]

Finally, Defendants concede Plaintiffs are not parties to any government contract and the CFC lacks jurisdiction to hear their claims. *See* Mem. 23; Opp. 9 n.3. This is dispositive. "'There cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act.'" *CLSEPA*, 137 F.4th at 939 (citation omitted). Neither *California* nor *APHA* considered Defendants' extreme position: that the Tucker Act precludes plaintiffs with Article III standing from pursuing cognizable constitutional and statutory claims in *any* forum.[12] "Not only is this result contrary to common sense, but it also conflicts with the 'strong presumption favoring judicial review of administration action' that is embodied in the APA." *CLSEPA*, 137 F.4th at 939 (quoting *Mach Mining, LLC v. EEOC*, 575 U.S.

---

[11] With respect to Plaintiffs' request to enjoin Defendants from unlawfully *refusing to grant or continue* federal funding, there is no "contract" that could be enforced. *See, e.g.*, *Wash. v. Dep't of Ed.*, 2025 WL 2966255, at *7-9 (W.D. Wash. Oct. 21, 2025); *R.I. Coal. Against Domestic Violence v. Kennedy*, 2025 WL 2988075, at *2-5 (D.R.I. Oct. 23, 2025) (Tucker Act inapplicable where challenged conditions had "not become ratified terms to any grant agreement/contract"); *R.I. Coal. Against Domestic Violence v. Bondi*, 2025 WL 2271867, at *5 (D.R.I. Aug. 8, 2025) (similar).

[12] Indeed, it was important to Justice Barrett's controlling concurrence in *APHA* that the result there would *not* "leave[] the plaintiffs without any prospect of relief." 145 S. Ct. at 2662 n.1.

REPLY ISO MOT. FOR PRELIMINARY INJUNCTION                    Case No. 3:25-cv-07864-RFL

480, 486 (2015)); *Thakur I*, 787 F.Supp.3d at 989. "There is no reason to conclude that Congress intended for plaintiffs with potentially meritorious statutory and constitutional claims to be deprived of any forum in which to vindicate those alleged wrongs." *Thakur IV*, 2025 WL 2696424, at *10.[13]

### D.     Rule 19 Is No Bar to Plaintiffs' Requested Injunction.

Under Federal Rule 19(a), UC is a "[r]equired [p]arty" only if one of two conditions is met: either (1) "the court cannot accord complete relief among existing parties" in UC's absence, Fed. R. Civ. P. 19(a)(1)(A), or (2) UC has "claim[ed] an interest relating to the subject of the action" and proceeding without it will (a) "impair or impede [UC's] ability to protect" that claimed interest or (b) "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest," *id.* 19(a)(1)(B). UC is not a required party under either prong.[14]

First, Defendants do not argue that the Court cannot award complete relief among the existing parties, nor could they. Instead, they mischaracterize Plaintiffs' claims as seeking to "set aside" or "decimate" contracts. Opp. 20. But Plaintiffs do not seek contract invalidation as relief from Defendants, let alone from UC. Plaintiffs seek to require Defendants (not UC) to comply with the law and to prohibit unlawful penalties and conditions. *See* ECF 26-1; ECF 24 (Prayer for Relief). All of this relief can be obtained from Defendants without UC's involvement. *See Disabled Rts. Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 880 (9th Cir. 2004) (meaningful relief could be granted to plaintiffs bringing ADA claims by enjoining event sponsor from "making … operational decisions regarding conditions over which they have control" without joining entity that owned the venue).

Second, as to Rule 19(a)(1)(B), Defendants ignore the "initial requirement": "that the absent party *claim* a legally protected interest relating to the subject matter of the action." *United States v. Bowen*, 172 F.3d 682, 689 (9th Cir. 1999) (cleaned up); *see also Altmann v. Republic of Austria*, 317 F.3d 954, 971 (9th Cir. 2002) ("[w]here a party is aware of an action and chooses not to claim an interest" failure to join is not error); *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1043-44 (9th

---

[13] Defendants' attempt to distinguish *CLSEPA*, Opp. 19, is unpersuasive. There, as here, the plaintiffs were not parties to the terminated contracts; the source of the plaintiffs' rights was statutory, not contractual; and the relief plaintiffs sought was compliance with statutes, not specific performance. 137 F.4th at 937-39. While the "specific funding structure at issue" in *CLSEPA* may have differed from that here, Opp. 19, the Ninth Circuit did not rest its decision on that ground.

[14] Although Defendants suggest that the "Court lacks jurisdiction" in UC's absence, Opp. at 19, Rule 19 is *not* jurisdictional, *see Alto v. Black*, 738 F.3d 1111, 1125 (9th Cir. 2013), and thus not a factor in Plaintiffs' likelihood of success on the merits.

Cir. 1983) (similar). UC is aware of this case, *see* Ex. 115 at 4; Leyton Decl. ¶2, and has not claimed an interest in it. This precludes invocation of Rule 19(a)(1)(B). *See Roberts v. City of Fairbanks*, 947 F.3d 1191, 1204 (9th Cir. 2020). Moreover, Defendants fail to identify any UC interest that would be "impair[ed] or impede[d]," Fed R. Civ. P. 19(a)(1)(B), if UC is not joined. Defendants point to UC's "contractual rights … to enforce (or not) its own contract." Opp. 21. But Plaintiffs' claims and proposed injunction neither seek to enforce any contracts, nor impair UC's right to do so. *See supra* at 7-10.[15]

Defendants rely on inapposite cases involving relief that would "'set aside a lease or a contract.'" Opp. 20-21 (quoting *Lomayaktewa v. Hathaway*, 520 F.2d 1324, 1325 (9th Cir. 1972); citing *Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*, 276 F.3d 1150 (9th Cir. 2002)). But *Disabled Rights* distinguished these cases by explaining that a suit to require event sponsors to comply with the ADA was not "'litigation seeking to decimate'" the sponsors' contract with the venue owner and would in no way "invalidate[]" the contract. 375 F.3d at 881 (noting "[n]o term of the contract require[d] discrimination on the basis of disability" or preclude[d]" accommodation) (citation omitted). Here, if Plaintiffs obtain their requested relief, Defendants will be prohibited from cutting off funding without complying with Title VI and IX procedures and from imposing unlawful funding conditions. That relief will not undermine, let alone "decimate," any contract between Defendants and UC.[16]

Because UC is not a required party under Rule 19(a)(1), Defendants' argument fails "at step one," and the Court need not reach Rule 19(b). *Alto*, 738 F.3d at 1126; *see Disabled Rts.*, 375 F.3d at 883. In any event, Defendants' Rule 19(b) arguments, Opp. 21-22, fail for largely the same reasons UC is not a necessary party.[17] Further, Defendants fail to acknowledge the public rights exception that applies in the Rule 19(b) analysis when plaintiffs seek to "vindicate a broader public interest." *Federated Indians of Graton Rancheria v. U.S. Dep't of the Interior*, 2025 WL 2096171, at *8 (N.D. Cal. July 18, 2025). Litigation to enforce the government's compliance with the law secures public rights that may be

---

[15] Defendants seem to argue that UC has a legal right to refuse federal funds. But Plaintiffs' requested relief would not prevent UC from doing so. *Cf. Cachil Dehe Band of Wintun Indians v. California*, 547 F.3d 962, 971 (9th Cir. 2008) ("financial consequences" of case not sufficient interest).

[16] Defendants suggest that UC has an interest in a possible settlement and "prospective contractual relationships," *id.* at 20-21, but UC does not have a legal interest in future contracts. *Cf. Disabled Rts.*, 375 F.3d at 881 (no legal interest where contract had expired and there was merely option to extend it).

[17] Judgment in the case would not prejudice UC, *supra* at 10-11; it could be fashioned to avoid impinging on UC's rights, *see* ECF 26-1; and the balance of the equities weighs in favor of permitting Plaintiffs to proceed, *infra* at 27. Defendants' out-of-circuit authorities (Opp. 21) are inapposite.

REPLY ISO MOT. FOR PRELIMINARY INJUNCTION                    Case No. 3:25-cv-07864-RFL

litigated in the absence of impacted persons. *See Conner v. Burford*, 848 F.2d 1441, 1459, 1460 (9th Cir. 1988) (warning of "danger of expanding joinder requirements in the public rights area"); *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 992 (9th Cir. 2020) ("public interest is served by requiring [federal government] to comply with the law").[18] Plaintiffs seek to vindicate a public interest and to secure the federal government's legal compliance, so Rule 19(b) poses no barrier to Plaintiffs' lawsuit or motion.

## II. Plaintiffs May Obtain Relief for Defendants' Violations of Law.

Defendants' Task Force Policy and the Termination Letters are final agency action reviewable under the APA, but even if APA review were not available, the Court could enjoin Defendants' unlawful conduct as *ultra vires* in excess of all constitutional and statutory authority. *See* Mem. 35 n.66.

### A. Defendants' Task Force Policy and Termination Letters Are Final Agency Action Not Committed to Agency Discretion.

Defendants apparently concede the Termination Letters are final agency action. *See* Mem. 32; Opp. 23. The funding terminations represent agency decisions to cut off federal funds based *not* on individual grant considerations, but due to pending civil rights investigations. *See* Mem. 2-3. These decisions are reviewable under the APA. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997); *Thakur I*, 787 F.Supp.3d at 986 (finding final agency action when likely "categorical policy" to terminate funds).

As to the Task Force Policy, Defendants do not deny its existence, and Plaintiffs' uncontroverted evidence reveals a coordinated, multi-agency[19] policy with two key elements: (1) terminating federal funds to universities under the guise of civil rights investigations, without following required processes, followed by (2) demands to inflict financial harm and secure ideological conformity that go beyond the remedies civil rights laws authorize as a condition of avoiding further legal and financial sanctions. Evidence that the policy involves threats of and actual devastating financial sanctions tied to civil rights

---

[18] Under the exception, even if a case could have some adverse impact on contractual rights of absent parties, those parties need not be joined unless the litigation will "destroy the legal entitlements of the absent parties." *Conner*, 848 F.2d at 1459. That is certainly not the case here. *See Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1026 (9th Cir. 2002) (cited in Opp. 20; recognizing in context of public rights exception that "merely … requir[ing] adherence to certain procedures in entering or extending" contracts with tribes was not a direct impact on the tribes' rights).

[19] *See* Ex. 47 (Feb. DOJ announcement of multi-agency endeavor); Ex. 36 at 6:09, 6:39 (Terrell: "President Trump is going after [universities] in every aspect. … This task force, …every agency's involved. Every agency, Homeland Security's involved. The FBI's involved. HHS, the Ed Department, and the Treasury Department."); Ex. 55 (Noem (DHS): "We tried to do things the easy way with Harvard. Now, through their refusal to cooperate, we have to do things the hard way."); Ex. 68 (HHS "is partnering with other federal agencies to conduct a comprehensive review of grants awarded to universities"); Ex. 85 (Task Force announcement of multi-agency effort to cut funds to Harvard); Ex. 58 (same re: Columbia); Exs. 56, 58, 59, 77, 78, 79 (multi-agency announcements of Task Force work).

investigations and lawsuits is overwhelming.[20] So too is the evidence that the Task Force Policy involves imposition of sanctions under the guise of civil rights enforcement without following required processes.[21] As a former DOJ senior trial attorney explained: "'The process is turned upside down…. We were given a conclusion and told to find supporting evidence to justify it.'" Ex. 116 at 9. The Task Force Policy's second prong is also well-documented. Defendants will agree to resolve existing and threatened investigations only on terms that go far beyond remedies available for the alleged civil rights violations, including seeking vast monetary payments, conditions for protests, curriculum oversight, access to student discipline records, and more.[22]

Plaintiffs also established Defendants' implementation of the Task Force Policy against UC. Within days of the Columbia "template" settlement, DOJ, NSF, NIH, and DOE targeted UCLA, terminating funds based on civil rights investigations. Mem. 2-5, 11-12 (citing Ex. 66); *supra* at 1-2.[23] That was followed by the August 8 Demand. Defendants quibble with the word "demand," Opp. 4, but the August 8 Demand sets forth what DOJ wants in return for withdrawing its threats. Ex. 112.[24]

Defendants fail to address *any* of this evidence of a clear and coordinated policy. Instead, they conclusorily apply *Bennett*'s two-part test. First, they argue there has been no "consummation" of agency

---

[20] *See, e.g.*, Ex. 36 at 1:27 (Terrell: "Under Title VI, we're taking away their money…. We're going to bankrupt these universities."); Ex. 35 (Terrell: "I targeted … Columbia, Harvard, Michigan, UCLA, USC…. We're going to take away your funding. We're going to sue you under Title VII. We're going to sue you under Title VI."); Ex. 108 (Terrell: "We're going to meet them in court. …. We are going to go after them where it hurts them financially…. There's numerous ways to hurt them financially."); Ex. 60 at 3 (Terrell: "Title VI is the mechanism to defund Columbia of $400 million dollars.").

[21] The Task Force's "first major action," at Columbia, is illustrative: it announced a "comprehensive review" of all funding, Ex. 56, and four days later—having followed no required procedures—multiple agencies cancelled $400 million in funds, Ex. 58. *See also* Mem. 13-14 (Task Force announced "comprehensive review" of Harvard funding, Ex. 77, and made demands three days later, Ex. 78); Ex. 60 at 3 (Terrell: "[W]hat we did was … gave them notice[], and we stopped providing the funding. ... To Harvard, to NYU, to Michigan, same thing's happening to them.").

[22] *See* Mem. 10-14 (Columbia, Brown, and Penn settlements and Harvard demand); Ex. 112 (Aug. 8 demand to UC); ECF 28 (Lhamon Dec.); *see also* Ex. 36 at 3:52, 4:22 (Terrell: "[W]e're going to stop it immediately. Not just taking away their money, but we have pushed out a strategy to remove these professional agitators…. we are going to make sure these students, hey, you're going to take off those masks. We know who you are and you're going to be expelled."); Ex. 59 (Task Force demand within week of funding cancellation including mask bans, protest rules, and admissions reforms); Ex. 57 (Trump: federal funding should end to universities with "illegal protests"; "NO MASKS!"; protesters should be "imprisoned," "sent back to the country from which they came," or "permanently expelled").

[23] The additional decision to freeze all pending NSF awards as a result of the DOJ investigation is also, on its own, final agency action. *See* ECF 40-3 at 8.

[24] Defendant Terrell has admitted an intent to target and "bankrupt" universities including UC and that this was why a civil rights investigation of "the entire UC system in California" was underway. Ex. 36 at 1:27; *id.* at 2:25; Ex. 60; Ex. 108 ("expect massive lawsuits against UC systems").

---

REPLY ISO MOT. FOR PRELIMINARY INJUNCTION    Case No. 3:25-cv-07864-RFL

decisionmaking, saying the Task Force Policy reflects only "interim principles." Opp. 23-24. But the evidence shows a decision *has* been made as to how to treat targeted universities, making use of civil rights investigations and funding cutoffs to obtain specific concessions. *See supra* at 12. This is a novel and "discrete enforcement initiative" involving multiple agencies, and Defendants' "insistence [it is] a mere matter of shifting … priorities, not a final agency action, is unavailing." *AAUP v. Rubio*, 2025 WL 2777659, at *52 (D. Mass. Sept. 30, 2025) (agencies' enforcement initiative targeting noncitizens' pro-Palestinian speech was reviewable agency action). "[A] federal agency's … decision qualifies as final agency action even if the ultimate impact of that action rests on some other occurrence—for instance, a future site-specific application, a decision by another administrative agency, or conduct by a regulated party." *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*, 128 F.4th 1089, 1110 (9th Cir. 2025); *Gill v. U.S. Dep't of Just.*, 913 F.3d 1179, 1185 (9th Cir. 2019) ("An agency action can be final even if its legal or practical effects are contingent on a future event."). As in *San Francisco Herring Ass'n v. DOI*, 946 F.3d 564, 581-82 (9th Cir. 2019), which Defendants fail to address, Defendants are already implementing their policy at UC and elsewhere. Defendants cannot carry out a policy "only to later claim there is nothing conclusive here for [Plaintiffs] to even challenge." *Id.* at 575.[25]

As to the second *Bennett* factor, Defendants suggest the Task Force Policy can only be challenged if "any ongoing federal investigation of UC" actually "ripens" into a "final adjudication." Opp. 24. But a component of the Task Force Policy is to terminate funds *before* a final adjudication; targeted universities understand that when Defendants launch an investigation or issue minimal findings, funding cutoffs and ideological demands will follow. *Supra* at 13; Mem. 2-4, 7-14; *see S.F. Herring Ass'n*, 946 F.3d at 581-82 ("agency pronouncements" followed by "actual commands" to "engage or refrain from engaging in a particular action" are final agency action). Unlike in *Association of American Medical Colleges v. United States*, 217 F.3d 770 (9th Cir. 2000) (cited at Opp. 24), the Task Force Policy creates

---

[25] The Task Force Policy is not a mere agency recommendation or opinion signaling a potential future position. *See* Opp. 24, citing *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 112 (1948) (agency recommendation had no effect without President's approval); *Appalachian Energy Grp. v. EPA*, 33 F.3d 319, 321-22 (4th Cir. 1994) (one-paragraph memo "not been used to issue or deny a permit" nor "threaten such action"); *EPA v. Brown*, 431 U.S. 99, 103-04 (1977) (agency agreed rule needed revision).

REPLY ISO MOT. FOR PRELIMINARY INJUNCTION                    Case No. 3:25-cv-07864-RFL

1   "an immediate Hobson's choice" because Defendants have loudly made demands and "threatened

2   litigation to obtain settlements." *Id.* at 783.[26] Plaintiffs need not wait for more consequences to accrue.

3   Finally, Defendants argue (Opp. 22) that Plaintiffs mount an impermissible "wholesale" or

4   "programmatic attack," seeking "general judicial review of [agencies'] day-to-day operations." *Lujan v.*

5   *Nat'l Wildlife Fed'n*, 497 U.S. 871, 890-91, 899 (1990) (plaintiffs sought court oversight of all

6   "continuing (and thus constantly changing) [agency] operations" to manage public lands). Plaintiffs do

7   *not* seek "judicial superintendence over the entire grantmaking structure." Opp. 23; *cf.* ECF 26-1 ¶¶1-2.

8   Rather, Plaintiffs challenge the lawfulness of a "circumscribed, discrete" policy. *Norton v. S. Utah*

9   *Wilderness All.*, 542 U.S. 55, 62 (2004). Agency action that is applied "across the board to all individual

10  [agency decisions], … can of course be challenged under the APA"—even if the challenge will have

11  widespread effects. *Lujan*, 497 U.S. at 890 n.2; *see also New York v. Trump*, 133 F.4th 51, 67 (1st Cir.

12  2025) (APA challenge to OMB directive to freeze all federal financial assistance across all agencies).

13  Defendants separately argue that 2 C.F.R. §200.340(a)(4) allows the government to make

14  unreviewable, discretionary judgments to terminate grants based on "agency priorities." Opp. 25. The

15  Ninth Circuit already rejected this argument: "[2 C.F.R. §§200.340-45] provide[s] a meaningful standard

16  by which courts may review the agencies' exercise of discretion. We therefore reject the government's

17  argument that the terminations are not reviewable." *Thakur III*, 148 F.4th at 1105-06.

18  ### B.    In the Alternative, Plaintiffs Will Likely Prevail on Their *Ultra Vires* Claims.

19  Defendants acknowledge constitutional *and* statutory *ultra vires* claims may be brought but argue

20  that Plaintiffs assert run-of-the-mill statutory violations. Opp. 36-37. But Plaintiffs' claims are firmly

21  rooted not only in the First and Tenth Amendments (which Defendants do not contest may be brought

22  as *ultra vires* claims), but in separation of powers. *See infra* at 16-24.

23  Defendants acknowledge *statutory ultra vires* claims may also be brought when a government

24  official acts "wholly outside the bounds of authority, rather than merely being subject to 'a claim of error

25  in the exercise of assigned power.'" Opp. 37 (citation and brackets omitted). That describes this case:

26  the Trump administration has no statutory authority to cancel federal funds without even purporting to

27  follow statutorily required steps nor to compel concession to demands it has no legal right to impose.

28  ---

[26] Defendants' policy is a far cry from the "mild suggestion" that states consider "opening a dialogue with their regulated community" at issue in *S. California All. of Publicly Owned Treatment Works v. EPA*, 8 F.4th 831, 838 (9th Cir. 2021), cited by Defendants. Opp. 24.

Such blatant disregard of statutory constraints is far from a mere assertion that "Defendants made the wrong decision within otherwise lawful" bounds. Opp. 38. Defendants' own authority makes this distinction clear, holding that an *ultra vires* claim could not be asserted to challenge a "colorable" statutory construction but specifying that such claims *are* cognizable "when the agency has disregarded a specific and unambiguous statutory directive … or when the agency has violated some specific command of a statute." *Griffith v. Fed. Lab. Rels. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988). Defendants have done both.[27] Nor does *Dalton v. Specter* support Defendants. "Because" the statute in *Dalton* "authorized unfettered discretion by the President …, the Court had no occasion to consider the constitutional implications of violating statutes" that, as here, "authorize executive action contingent on satisfaction of certain requirements." *Sierra Club v. Trump*, 929 F.3d 670, 696 (9th Cir. 2019) (citing *Dalton*, 511 U.S. 462, 472-76 (1994)), *stayed*, 588 U.S. 930 (Mem.); *see also Dalton*, 511 U.S. at 476. Thus, just as *Dalton* was inapplicable to the statute in *Sierra Club*, which "impose[d] restrictions on when and for what purposes the agency may use … funds," *id.* at 696 n.19, it is inapplicable to Defendants' exercise of authority not granted by statute and violation of specific statutory restrictions.

Finally, it is true that "ultra vires claims are subject to 'implied statutory limitations.'" Opp. 36. But the Tucker Act does not provide Plaintiffs "with a meaningful and adequate opportunity for judicial review" and does not foreclose *ultra vires* review of Plaintiffs' non-contractual claims. *Board of Governors, FRS v. MCorp Financial, Inc.*, 502 U.S. 32, 43 (1991). *See supra* at 7-10. And Defendants do not contend (nor could they) that the APA itself forecloses such review. *See Sierra Club v. Trump*, 963 F.3d 874, 890-91 (9th Cir. 2020), *judgment vac'd on other grounds, sub nom. Biden v. Sierra Club*, 142 S. Ct. 46 (2021).[28]

---

[27] Nor does Defendants' other authority support their argument. In *E.V. v. Robinson*, the military judge made "simple mistakes of fact or law" in exercising "discretionary authority" over discovery. 906 F.3d 1082, 1097-98 (9th Cir. 2018) (cleaned up). *Schroer v. Billington*, 525 F.Supp.2d 58, 65 (D.D.C. 2007), rejected the plaintiff's *ultra vires* claim because Title VII could "fully remed[y]" her injury.

[28] Defendants suggest that *ultra vires* claims require "direct and immediate" injury, Opp. 36, and acts that have already occurred, *id.* 38. But Defendants' cited authority does not support (or even address) these points. The Supreme Court has said that equitable claims may be asserted "to *prevent* injurious act[s] by a public officer" without imposing any additional directness requirement. *Armstrong v. Exceptional Child Center Inc.*, 575 U.S. 320, 327 (2015) (emphasis added); *see also Leedom v. Kyne*, 358 U.S. 184, 188 (1958). Defendants' authority does not support their claim that agencies may not be defendants to *ultra vires* claims. Opp. 36. And *Nuclear Regulatory Comm'n v. Texas* states that *ultra vires* claims are available "when an *agency* has taken action entirely in excess of its delegated powers and contrary to a specific prohibition in a statute." 605 U.S. 665, 681 (2025) (emphases modified). In any event, Plaintiffs could obtain relief from the individual Defendants. *See E.V.*, 906 F.3d at 1094-95.

III. **Defendants' Conduct is Unconstitutional, Contrary to Law, and Arbitrary and Capricious.**

A. **Defendants' Conduct Violates the First Amendment.**

1. **Defendants Fail to Rebut Plaintiffs' Showing that Defendants Are Coercing UC into Suppressing Plaintiffs' Speech and Academic Freedom.**

Defendants do not address Plaintiffs' First Amendment coercion claim. *See* Mem. 24-28; Opp. 29-33. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), and *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024), are **not even cited**. *See* Opp. iv, viii, 29-33. Defendants' failure to respond to Plaintiffs' legal authorities and evidence, which show Plaintiffs are likely to prevail, is fatal.

Defendants offer two general arguments, both meritless.[29] First, Defendants assert—without *any* evidence—that "[t]he agencies' suspensions are explained by a nonretaliatory purpose: opposing antisemitism," and that "UC's failure to take adequate actions to respond to antisemitism … justified the agency action." Opp. 30. This unsubstantiated assertion is belied by the record, which establishes that Defendants' actions targeting UC pursuant to their Task Force Policy are part of an overarching campaign to purge "left" and "woke" viewpoints from universities and to impose the administration's preferred ideological views. *See, e.g.*, Ex. 36 at 4 (Terrell describing UCLA as a university that "has been hijacked by the left, has been hijacked by the Marxists" who "have controlled the mindset of our young people"); *see* Mem. 7-14 (citing evidence); *infra* at 12-13; *Harvard*, 2025 WL 2528380, at *27.

The August 8 Letter reinforces that Defendants' object is to coerce UC into suppressing disfavored speech and to impose ideological views: it demands as a condition of restoring federal funds (and restoring UCLA's "eligib[ility] for further grants," Ex. 112 ¶¶43-44), among other things, "reforms to … scholarship … and campus climate" (¶6); a "thorough review" of, e.g., the approval process for "curricular changes" (¶7.a) and "academic restructuring" to "ensure … complementarity across all programs" (¶7.f); restrictions on "expressive activities," including anonymous protest (¶11); the "complete removal of diversity statement[s]" (¶17) and a related ban on considering "personal statements … or any applicant reference to racial identity" in admissions, hiring, promotion, and tenure decisions (¶¶19, 21); a ban on admission of "foreign students likely to engage in anti-Western, anti-American, or antisemitic disruptions or harassment" (¶24); "socializ[ation]" of international students to campus "norms" (¶25); adoption of the administration's definition of "sex" and related terms (¶¶32.e, 32.f, 34);

---

[29] Indeed, it is unclear if Defendants make these arguments in response to Plaintiffs' coercion claim or only retaliation. If the latter, then Defendants concede Plaintiffs' coercion claim is likely to prevail.

REPLY ISO MOT. FOR PRELIMINARY INJUNCTION                              Case No. 3:25-cv-07864-RFL

and appointment of an external Resolution Monitor (whom the government has final authority to select) empowered to "assess and report on UCLA's compliance" and recommend "actions necessary to ensure … effective compliance" (¶¶6, 51, 53-66).[30]

More fundamentally, Defendants' contention is irrelevant because even if the government's objective is to root out illegal conduct, that is no defense to a First Amendment coercion claim. *See* Mem. 28 n.63 (discussing *Bantam Books,* 372 U.S. at 65); *accord Vullo*, 602 U.S. at 196 ("Nothing in [*Bantam Books*] turned on …. [whether publications] contain[ed] protected speech."); *Backpage.com LLC v. Dart*, 807 F.3d 229, 230-31 (7th Cir. 2015) (sheriff violated First Amendment by "scaring off [website's] payments-service providers" although stated concern was website's promotion of "illegal activities").[31] Thus, even if Defendants sought to target only illegal discriminatory conduct (the record shows they did not), bypassing statutory mandates for enforcing civil rights laws and instead using threats to coerce UC into censoring speech in service of that goal is unconstitutional. Constitutionally protected speech "is often separated from [unprotected speech] only by a dim and uncertain line." *Bantam Books*, 372 U.S. at 66; *see, e.g.*, *Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703, 708 (9th Cir. 2010) (professors' racially charged emails were protected speech, not unlawful harassment; "There is no categorical 'harassment exception' to the First Amendment's free speech clause.") (citation omitted).[32] Coercion doctrine prohibits the government from pressuring intermediaries over where to draw that line, recognizing that those who are "less invested in the speaker's message and thus less likely to risk the

---

[30] The August 8 Demand letter also confirms Defendants' use of legal and financial threats to extort these ideological concessions, expressly stating that as "consideration" for UCLA's agreement the government will "restore to UCLA those Terminated Grants," "enable the withdrawal of overdue payments on [] specified Non-Terminated Grants," "timely renew relevant non-competitive grants in the ordinary course and consistent with past practice," "confirm that Non-Terminated Grants will not be withheld or terminated in the future in relation to the Released Claims," "[t]reat UCLA as eligible for further grants, contracts, and awards in the ordinary course, without disfavored treatment as a consequence of the Released Claims," and "[c]lose pending Investigations or compliance reviews regarding the Released Claims." Ex. 112 ¶¶43-44.

[31] *Bantam Books* explained that while "obscenity is not within the area of constitutionally protected speech," the commission's efforts to coerce distributors into excluding certain publications violated publishers' First Amendment rights because "the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation" against distributors would likely cause them to self-censor, thus denying publishers the due process necessary to determine if their material was actually unprotected. 372 U.S. at 65, 67-70 (informal coercion "provides no safeguards … against the suppression of nonobscene, and therefore constitutionally protected, matter" and "is … regulation that creates hazards to protected freedoms markedly greater than those that attend reliance upon [formal legal process]").

[32] "Harassment law generally targets conduct, and it sweeps in speech as harassment only when consistent with the First Amendment." *Rodriguez*, 605 F.3d at 710.

---

REPLY ISO MOT. FOR PRELIMINARY INJUNCTION                    Case No. 3:25-cv-07864-RFL

[government's] ire" will over-police speech on the government's behalf. *Vullo*, 602 U.S. at 198; *see Rodriguez*, 605 F.3d at 709 ("To afford academic speech the breathing room that it requires, courts must defer to colleges' decisions to err on the side of academic freedom. Otherwise, schools will inevitably reassess whether hiring a lightning rod … is worth the trouble."). Indeed, UC has already begun suppressing protected speech to attempt to appease Defendants. *See, e.g.*, ECF 29-4 ¶¶41-42; ECF 29-29 ¶31 & Ex. A; ECF 29-44 ¶19. An anti-discrimination goal does not justify unconstitutional coercion.

Second, Defendants argue that because federal grants are a discretionary benefit, their ability to withdraw or refuse to grant funding is virtually absolute. Decades of precedent holds otherwise. "[E]ven though a person has no 'right' to a valuable government benefit," the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *accord AID*, 570 U.S. at 206, 214-15. In particular, the government may not "'manipulate[]' [a subsidy] to have a 'coercive effect.'" *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (citations omitted); *see Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995) ("attempts to suppress a particular point of view are presumptively unconstitutional in funding").[33] That is precisely what Defendants are doing here, in blatant violation of the First Amendment.

### 2. Defendants Fail to Rebut Plaintiffs' Showing that Their Members' Protected Speech Was a Substantial Cause of Defendants' Retaliatory Conduct.

Plaintiffs' retaliation claim is also likely to succeed. Defendants do not seriously dispute that Plaintiffs' members have engaged in constitutionally protected speech, or that Defendants' summary grant terminations and accompanying demands constitute adverse actions likely to "'chill a person of ordinary firmness.'" Mem. 28-29 (quoting *Ariz. Students' Ass'n*, 824 F.3d at 867); *e.g.* ECF 29-44 ¶18. Defendants contest only causation, but Plaintiffs amply demonstrate that members' protected expression of disfavored "left" and "woke" viewpoints was a "substantial motivating factor" in Defendants' retaliatory conduct. *See* Mem. 7-14, 28; *Ariz. Students Ass'n*, 824 F.3d at 870 (circumstantial evidence can establish causation). "Viewed in conjunction with the facts and context," Defendants' assault on universities fits the "description of a 'broader campaign[]' … to target" universities and their faculty,

---

[33] Defendants' own authority recognizes that the government's ability "to terminate [a contractor]" is subject to "statutory[ and] constitutional restriction[s]." Opp. 32 (quoting *Bd. of Cnty. Cms'rs, Wabunsee Cnty v. Umbehr*, 518 U.S. 668, 674 (1996)).

REPLY ISO MOT. FOR PRELIMINARY INJUNCTION          Case No. 3:25-cv-07864-RFL

students, and staff "based on personal dislike of their" speech—"in other words, for retribution." *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F.Supp.3d 105, 164 (D.D.C. 2025) (citation omitted). [34]

Defendants have not overcome that strong showing. The unsupported assertion that their actions were motivated by a legitimate desire to address antisemitism is belied by their wholesale disregard of the procedural and substantive requirements Congress prescribed for addressing discrimination. *See id.* at 160-61 ("By not following its own procedures, the EEOC has undermined the legitimacy of its own investigation, revealing this investigation of plaintiff to be a product of the retaliation ordered by EO 14230 rather than any legitimate investigative activity."); *Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F.Supp.3d 76, 108 (D.D.C. 2025) (finding anti-discrimination rationale pretextual where "government has simply decreed that Jenner discriminates without affording any due process"); *Susman Godfrey*, 789 F.Supp.3d 15 at 46 ("government's departure from the well-trodden path of [past practice] … raises red flags and leads the court to believe that the only plausible motivation for Section 2 is retaliation."). [35] It is further belied by the substance of Defendants' August 8 Demands, very few of which have any plausible connection to addressing the alleged antisemitism described in DOJ's Notice of Findings. *See, e.g.*, Ex. 112 (¶7 ("curricular changes" and "academic restructuring" review); ¶¶14-15, 17-22 (diversity); ¶¶23, 32-38 (gender); ¶¶24-26 (international students); ¶¶27-29 (international connections); ¶¶39-42 (gender-affirming medical care)). [36] *See Harvard*, 2025 WL 2528380, at *24 (finding demands targeted

---

[34] While overwhelming evidence showed that the Trump administration terminated funds as retaliation for Harvard's rejection of demands and litigation activity, Opp. 32, those are not the only forms of speech that can give rise to a retaliation claim. Given undisputed evidence that Defendants are targeting UC to extinguish, on an institution-wide basis, "left" and "woke" viewpoints, Plaintiffs need not identify specific statements by individuals to establish the obvious causal nexus. *See, e.g.*, *Susman Godfrey LLP v. Exec. Off. of President*, 789 F.Supp.3d 15, at 42-43 (D.D.C. 2025) (finding Executive Order targeting law firm for purportedly "weaponiz[ing] the American legal system" retaliatory despite order's failure to identify specific statements made by the law firm or its employees).

[35] Defendants contend that UC is a government contractor with limited First Amendment rights. Opp. 31-32 (citing *Umbehr*, 518 U.S. at 675). But UC's "First Amendment rights" are not at issue here. *See also Harvard*, 2025 WL 2528380, at *22 (rejecting argument that university "becomes a government 'contractor' for First Amendment purposes" by applying for accepting federal research grants); *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 528 (2022) (noting "questions of academic freedom … may or may not involve 'additional' First Amendment 'interests' beyond those captured by [*Pickering*] framework"). Even if *Umbehr* applied, Defendants did not establish that they "would have taken the same action even in the absence of the protected conduct," nor that legitimate government interests outweigh Plaintiffs' members' free speech and academic freedom interests and justify abandoning Title VI and IX's limits on terminating funding. *See* 518 U.S. at 675; *Harvard*, 2025 WL 2528380, at *22 n.19; *Susman Godfrey*, 789 F.Supp.3d at 45 n.9.

[36] Many do not even plausibly relate to addressing the race- and sex-discrimination assertions cited in the Termination Letters as additional grounds for the funding suspensions. *See, e.g.*, Ex. 112 (¶¶7, 24-29, 39-42).

---

REPLY ISO MOT. FOR PRELIMINARY INJUNCTION                              Case No. 3:25-cv-07864-RFL

1    protected conduct when they "conditioned funding" on "ten terms, only one of which related to

2    antisemitism"); *Susman Godfrey*, 789 F.Supp.3d at 46 (finding retaliatory intent when government

3    abandoned similar provisions after other law firm agreed to unrelated terms).

4    **3.    Defendants' Demands Unconstitutionally Condition Funding on UC's Agreement to Violate the Constitutional Rights of Plaintiffs' Members.**

5    In *Rust v. Sullivan*, 500 U.S. 173, 196 (1991) (cited Opp. 30-31), the Supreme Court explained

6    the difference between conditions on a grant *project* (which are permitted) and conditions on a *grantee*

7    (which are not). The Court upheld regulations that did "not force the Title X grantee to give up abortion-

8    related speech" but "merely require[d] that the grantee keep such activities separate and distinct from

9    Title X activities," and clarified that an unconstitutional condition is when "the Government has placed

10    a condition on the *recipient* of the subsidy rather than on a particular program or service, thus effectively

11    prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded

12    program." 500 U.S. at 196-97; *see AID*, 570 U.S. at 214-15. Here, Defendants have placed restrictions

13    on the *recipient*. Defendants' August 8 Demand does not impose conditions only on *projects* that receive

14    federal funding, but demands that UC—the *grantee*—adopt Defendants' ideological positions and

15    policies *university-wide* that would infringe the speech and academic freedom rights of faculty, students,

16    and staff. *See* Ex. 112. Defendants' conditions therefore violate the First Amendment. *See United States*

17    *v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 203 (2003) ("Congress may not 'induce' the recipient 'to engage

18    in activities that would themselves be unconstitutional.'" (citation omitted)); *see* Mem. 30-31.

19    Defendants contend that the "unconstitutional conditions doctrine [cannot] be properly applied

20    to settlement negotiations." Opp. 34. But "[w]hile governmental entities may negotiate agreements

21    aggressively, ... they must stop short of imposing unconstitutional conditions." *Parks v. Watson*, 716

22    F.2d 646, 652 (9th Cir. 1983) (citing *Perry*, 408 U.S. at 598). "[T]he 'mere fact that one agrees to the

23    challenged condition, even in a settlement, cannot by itself render the bargain constitutional because the

24    unconstitutional conditions doctrine focuses on the propriety of the condition, not the fact that the

25    claimant agreed to it.'" *Harvard*, 2025 WL 2528380, at *27 (citation omitted). As in *Harvard*, it is

26    unconstitutional to "condition  UC's] federal funding, even as part of settlement negotiations, on [UC's]

27    realigning its campus to better reflect a viewpoint favored by the government." *Id.* at *27.[37]

28

---

[37] S*ee also Koontz v. St. Johns River Water Mmgt. Dist.*, 570 U.S. 595 (2013) (constitutional claim

REPLY ISO MOT. FOR PRELIMINARY INJUNCTION                    Case No. 3:25-cv-07864-RFL

1

**B.    Defendants' Coercion of UC Violates the Tenth Amendment.**

2

Defendants do not contest that freezing $584 million, demanding $1 billion, and threatening to

3

withhold potentially billions more in federal funding is a "gun to the head" of UCLA and the UC System.

4

*See* Mem. 29 (quoting *NFIB*, 567 U.S. at 581). Defendants assert that the August 8 Demand Letter was

5

not a "demand" but "merely an opening settlement offer" (Opp. 33), but submit no evidence that they

6

are *not* insisting on these demands as a condition of restoring and continuing federal grant funding.[38] To

7

the contrary, Defendants' insistence that they "may withhold further payments" at their discretion and

8

that the UC "could face a loss of *all* funding if settlement negotiations fail" (Opp. 34; emphasis added)

9

confirms the coercive threat behind their August 8 Demands. *See also* Ex. 112 ¶¶43-44.[39]

10

Defendants argue that unlike in *NFIB* the Demand Letter's conditions merely "ensure that … UC

11

comply with federal law" and so are not "an entirely 'new program' that [UC] could not have foreseen"

12

when grants were awarded. Opp. 33-34. But courts may not deem fundamental alterations to be "all one

13

program simply because '[the Executive] styled' them as such." *NFIB*, 567 U.S. at 582. UC could not

14

have foreseen that the federal government would condition research funding for stem cells and space

15

exploration on compliance with brand-new—and likely incorrect—interpretations of civil rights laws.

16

*See Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 219 (2022) ("legitimacy of Congress'

17

power to enact Spending Clause legislation rests" on funding recipient's "voluntar[y] and knowing[]"

18

---

19

[38] Even if this is just one in a series of "settlement" communications, it is still subject to the Tenth Amendment and still coercive. *See, e.g.*, *City of Fresno v. Turner*, 2025 WL 2469330, at *1-2, 6 (N.D. Cal. Aug. 27, 2025) (enjoining HUD from conditioning grant funding on HUD's emailed demands that city "agree not to 'promote "gender ideology"'").

20

may rest on "unconstitutionally extortionate demand"); *La. Pac. Corp. v. Beazer Materials & Servs.*, 842 F.Supp.1243, 1251 (E.D. Cal. 1994) (court "must … reject[]" the "Government's contention that offers of settlement are not subject to attack on [unconstitutional conditions] grounds"). Defendants point to *Koontz*'s distinction between "consummated" and never-imposed conditions, but that is exclusive to the Fifth Amendment takings context. 570 U.S. at 608-09. And the threats have been implemented here

21

22

[39] Numerous courts have enjoined Trump administration suspension of or threats to suspend federal funding on Tenth Amendment grounds. *See, e.g.*, *New York v. Dep't of Just.*, 2025 WL 2618023, at *20-21, 25 (D.R.I. Sept. 10, 2025); *Illinois v. Fed. Emergency Mgmt. Agency*, 2025 WL 2716277, at *14 (D.R.I. Sept. 24, 2025) (finding coercion where "states rely on these grants for billions of dollars annually" and had "no meaningful choice" but to comply); *City of Fresno*, 2025 WL 2469330, at *1-2, 6 (enjoining use of " seemingly unauthorized and vague funding conditions to enforce compliance" with executive orders on race discrimination and gender identity); *City & Cnty. of S.F. v. Trump*, 779 F.Supp.3d 1077, 1082 (N.D. Cal. 2025) ("The 2025 Executive Orders' directives to withhold or freeze federal funding to sanctuary jurisdictions also violate the Tenth Amendment[.]"). Defendants rely on an out-of-circuit, pre-*NFIB* decision. *See West Virginia v. U.S. Dep't of Health & Hum. Servs.*, 289 F.3d 281, 291 (4th Cir. 2002) (noting that withholding all Medicaid funds would raise "serious Tenth Amendment questions").

23

24

25

26

27

28

---

REPLY ISO MOT. FOR PRELIMINARY INJUNCTION                    Case No. 3:25-cv-07864-RFL

acceptance of terms) (cleaned up); *NFIB*, 567 U.S. at 584 (spending power "does not include" power to "surpris[e]" funding recipients "with post-acceptance or 'retroactive' conditions"); *New York*, 2025 WL 2618023, at \*20-21 (finding Spending Clause violation where agencies "upset decades of reliance" by "abruptly" changing their interpretations of governing law and "scale of threatened loss leaves States with no real option but to comply").[40] Further, Titles VI and IX establish clear procedures for terminating funds. *See* Mem. 35-38. UC could not have foreseen that Defendants would unlawfully disregard these procedures. In particular, many conditions—such as excluding "foreign students likely to engage in anti-Western, anti-American" conduct (Ex. 112 ¶25) and requiring "cooperation" with "federal law enforcement" (*id.* ¶12)—have no conceivable relation to compliance with federal civil rights law so could not possibly have been foreseen.[41]

## C.    Defendants' Actions Violate the Separation of Powers.

Defendants fail to address (or even acknowledge, Opp. 35) Plaintiffs' on-point Spending Clause authority, *San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018); *see also* Mem. 31. In *San Francisco*, as here, no "appropriations statutes … specifically require[d] funding to any specific grants …." Opp. 35. And there, as here, the executive branch attempted to condition grant funding on requirements that Congress did not authorize. *San Francisco*, 897 F.3d at 1233. The Ninth Circuit held that "under the principle of Separation of Powers and in consideration of the Spending Clause, which vests *exclusive*

---

[40] Defendants provide no authority that Title VI or IX has ever required many of the August 8 demands, such as a ban on considering an applicant's discussion of their racial identity in a personal statement (Ex. 112 ¶19), or on gender-inclusive bathrooms and locker rooms (*id.* ¶32). *See Students for Fair Admissions, Inc. v. Presidents & Fellows of Harvard Coll.* ("*SFFA*"), 600 U.S. 181, 230 (2023) ("[N]othing in this opinion should be construed as prohibiting universities from considering an applicant's discussion of how race affected his or her life, be it through discrimination, inspiration, or otherwise."); *Jenner*, 784 F.Supp.3d at 107 ("The defendants point to no case holding such diversity initiatives illegal. Instead they expand [*SFFA*] beyond its own bounds."); *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 535 (3d Cir. 2018) ("we have found no authority that supports the appellants' claims" that "the mere presence of a transgender student in a locker room or bathroom" violates Title IX); *Parents for Priv. v. Barr*, 949 F.3d 1210, 1227 (9th Cir. 2020) ("[J]ust because Title IX authorizes sex-segregated [locker and bathroom] facilities does not mean that they are required, let alone that they must be segregated based only on biological sex and cannot accommodate gender identity."). Indeed, Defendants' demand that UCLA stop providing gender-affirming care to minors (Ex. 112 ¶¶39-41) is directly contrary to authority that refusal to provide such care *violates* anti-discrimination law. *See, e.g., C.P. by and through Pritchard v. Blue Cross Blue Shield of Ill.*, 536 F.Supp.3d 791 (W.D. Wash. 2021) (holding that ACA Section 1557 prohibits categorical exclusions of gender dysphoria treatment).

[41] *See Illinois*, 2025 WL 2716277, at \*14 (rejecting argument that DHS was "merely 'modifying' its existing grant programs" to serve "its broad homeland security mission" when "grants at issue fund programs such as disaster relief, fire safety, dam safety, and emergency preparedness").

---

*power to Congress to impose conditions on federal grants*, the Executive Branch may not refuse to disperse the federal grants in question without congressional authorization." *Id*. at 1231 (emphasis added); *see also Washington v. Trump*, 766 F.Supp.3d 1138, 1153-54 (W.D. Wash. 2025) (executive action prohibiting grants to medical institutions providing minors gender-affirming care likely violated separation of powers).[42]

The constitutional violation is even more egregious here. Defendants did not simply cancel grants on grounds Congress had not authorized; they did so in direct contravention of Title VI and Title IX. *Infra* at 24-25. Defendants make no argument that Title VI or IX authorizes suspending funds without following statutory procedures, a $1 billion penalty, or most of the August 8 demands. *See* Mem. 31-32.

### D. Defendants Failed to Comply with Title VI and Title IX, Which Govern.

Defendants do not dispute that they did not comply with Title VI and IX procedural requirements governing termination of or refusal to grant federal funding. Instead, they contend they can bypass these procedural constraints by invoking regulations that allow termination when a grant "fails to comply with [federal law]," 2 C.F.R. §200.339; 45 C.F.R. §75.371,[43] or "no longer effectuates the program goals or agency priorities," 2 C.F.R. §200.340(a)(4). Opp. 26. But Defendants identified no "other federal laws" or agency priorities that apply. Opp. 26-27. And they have *repeatedly* identified Title VI as the basis for their Task Force Policy. President Trump's Antisemitism Executive Order specifically calls for the Secretary of Education to conduct "an analysis of all Title VI complaints and administrative actions." Ex. 46.[44] Pursuant to that directive, on May 9, the Government opened an investigation into UC for "antisemitic discrimination, harassment, abuse, and retaliation against students," which led to a July 29 Notice of Findings concluding that UCLA "violated its obligations under ... Title VI." Ex. 1. The next day, NIH, NSF, and DOE mass-terminated UCLA grants, citing "antisemitism," Exs. 6, 7, 8,[45] and NSF's Acting Chief Science Officer expressly cited these July 29 findings as the reason NSF was "instructed to suspend all active awards to UCLA … and to not make further awards to the institution until the issue

---

[42] *See also San Francisco*, 897 F.3d at 1235 ("Absent congressional authorization, the Administration may not … withhold properly appropriated funds in order to effectuate its own policy goals."; doing so "violates the constitutional principle of the Separation of Powers").

[43] 45 C.F.R. §75.371 was repealed effective October 2025. 89 Fed. Reg. 80055, 80070 (Oct. 2, 2024).

[44] *See also* Ex. 60 at 2 (Terrell: "Title VI is the mechanism to defund Columbia of $400 million" and the basis for Task Force's "directive" to "[e]radicate anti-Semitism … at UCLA" and other universities).

[45] The Termination Letters also cite "racism" and "discriminat[ion] and endanger[ment of] women" as additional grounds, which are also governed by Titles VI and IX, respectively. Exs. 6, 7, 8.

has been resolved." ECF 40-3 at 8.[46] The August 8 Demand Letter—which promises restoration of terminated grants, renewal of non-terminated grants, and cessation of disfavored treatment for new grants—refers to released claims under Titles VI, VII, and IX. Ex. 112 at 2, 17-18. Defendants cannot evade the requirements of Title VI (and IX) by now claiming that unspecified "agency priorities" and unidentified federal laws have been the authority for the terminations all along. *Harvard*, 2025 WL 2528380 at *28-29 ("To conclude that 2 C.F.R. §200.340(a)(4) served as the basis for these terminations, rather than Title VI, is simply 'incongruent with what the record reveals about the agenc[ies'] priorities and decisionmaking process.'") (citing *Dep't of Com.*, 588 U.S. at 785); *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981) (no reliance on "post hoc rationalizations").

In any event, the cited regulations do not and could not allow the Government to bypass the procedural requirements of Title VI and IX. Agencies cannot "regulate away" statutory commands. *Nat'l Treasury Emps. Union v. Cornelius*, 617 F.Supp.365, 371 (D.D.C. 1985).[47] "Congress has ... passed a law that explicitly provides for when and how an agency can terminate federal funding to address [the identified] type[s] of discrimination—and that law is Title VI, which dictates that 'no such action shall be taken until the department or agency' has gone through the appropriate procedures." *Harvard*, 2025 WL 2528380, at *29 (quoting 42 U.S.C. §2000d-1); *see* Opp. 26 (conceding Title VI and Title IX enforcement provisions are materially identical). Adopting Defendants' interpretation of the regulations they now cite "would result in wholly nullifying an explicit statutory scheme." *Harvard*, 2025 WL 2528380 at *29; *see Finch*, 414 F.2d at 1075; ECF 28 ¶6 (Lhamon Dec.).

## E.    Defendants' Actions Are Arbitrary and Capricious.

Defendants' only response to Plaintiffs' arbitrary and capricious challenge to the Task Force Policy is that the policy is not final agency action. *See* Opp. 29. They therefore concede that, if final agency action, the Task Force Policy is arbitrary and capricious.

As to the Termination Letters, <u>*first*</u>, Defendants portray the letters as reflecting a "new policy," saying the Court must defer to Defendants' policy judgments if they "'believe[] [the new policy] to be

---

[46] The NIH and NSF letters cite 45 C.F.R. §75.371 and 2 C.F.R. §§200.339 and 200.340, respectively, but nothing in the letters suggests any law or priority besides Title VI or IX was at issue. *See* Exs. 6, 8.

[47] The regulations allow termination only "to the extent authorized by law," 2 C.F.R. §200.340(a)(4), or when a grantee "fails to comply with [federal law]," *id*. §200.339; 45 C.F.R. §75.371.

better.'" Opp. 27-28 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).[48] But *Fox Television* makes clear that "[a]n agency may not … depart from a prior policy *sub silentio* or simply disregard rules that are still on the books," 556 U.S. at 515; and, further, that it is "arbitrary and capricious" to fail to provide a "more detailed justification" when an agency's "prior policy has engendered serious reliance interests that must be taken into account," *id.*; *see also FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) (cited in Opp. 27; recognizing agency obligation to consider "relevant issues and reasonably explain[] the decision"). In short, Defendants' cases do not support their argument that labeling decisions "policy choices" warrants an exception to the standard APA inquiry.

<u>*Second*</u>, Defendants mischaracterize Plaintiffs' APA claims as contract enforcement claims and argue there is a "particularly lenient standard of review" for "agency action in the contracting context." Opp. 28. Even if Plaintiffs had brought contract claims (which they do not, *see supra* at 7-10, 12) Defendants' authorities confirm there is no separate standard for agency action involving contracts. *See Palantir USG, Inc. v. U.S.*, 129 Fed. Cl. 218, 257-60 (2016) (cited in Opp. 28: pre-award bid challenge subject to traditional arbitrary and capricious standard); *Savantage Fin. Servs., Inc. v. U.S.*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (cited in Opp. 28: similar).[49] <u>*Third*</u>, Defendants assert that their actions are "a fortiori reasonable" because they are consistent with 2 C.F.R. §200.340. For the reasons set forth *supra* at 24-25, that is mistaken. <u>*Fourth*</u>, Defendants' assertion that "it is exceedingly unlikely that anyone has a reliance interest in continued discretionary funding," Opp. 29, is purely the argument of counsel and, in any event, is contrary to the Termination Letters' (boilerplate) acknowledgment of reliance interests. *See* Exs. 6, 7, 8. <u>*Finally*</u>, Defendants offer no response to Plaintiffs' arguments that the claimed justification for terminating funding—i.e., a finding of discrimination—is not justified by the evidence before the agencies and, in any event, bears no rational connection to the agency action taken. *See* Mem. 38-41.

---

[48] Defendants also erroneously suggest that *Department of Commerce v. New York* finds deference is owed to "agency policy priorities" because of concerns about intruding on the executive branch, Opp. 29; but the Court cited such concerns as a reason judicial review should be limited to evaluating the agency's "contemporaneous explanation." 588 U.S. at 780-81.

[49] *Lujan v. G & G Fire Sprinklers, Inc.*, 532 U.S. 189, 196 (2001), involving a due process challenge to a state statute, has no bearing on the APA analysis. *Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1134 (D.C. Cir. 1995), and *Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*, 498 U.S. 211 (1991), involve agency rulemaking and are also inapposite. *See* Opp. 28.

**IV.    Preliminary Injunctive Relief Is Needed to Prevent Irreparable Harm.**

Plaintiffs show that irreparable harm is both ongoing and substantially likely. Mem. 41-43; *supra* at 2-6; *contra* Opp. 39-40. These harms include interference with free speech and academic freedom; professional, reputational, and public interest harms caused by grant terminations; and interference with the exercise of medical judgment and exclusion of transgender people from campus spaces. Mem. 41-43 (citing evidence). Defendants' counterarguments that the harms are redressed by the *Thakur* injunctions and that Plaintiffs' harms are speculative are addressed *supra* at 2-5.

Defendants erroneously suggest that grant terminations cannot cause irreparable harm unless they drive Plaintiffs' members out of business. Opp. 40-41. But Defendants do not dispute that constitutional injuries are irreparable or that damages are *unavailable* under the APA, making financial harm irreparable. Mem. 41-42, 43 n.80. Grant terminations also cause lost professional opportunities, reputational harms, and uncertainty and interrupted research that injure Plaintiffs' members, future researchers, and society. Mem. 14-17, 42 (citing evidence); *see, e.g.*, *Thakur I*, 787 F.Supp.3d at 996.[50]

Finally, Defendants reiterate their position that, no matter the irreparable harm suffered by Plaintiffs' members, only UC may challenge Defendants' actions, and only in the Court of Federal Claims. Opp. 41. For reasons discussed *supra* at 7-10, that is wrong, and such a suit would not address the irreparable harms Plaintiffs identify. *Cf. California*, 604 U.S. at 652 (stay would not cause states irreparable harm—unlike Plaintiffs' members here—because the states "have the financial wherewithal to keep their programs running," and any "irreparable harm would [have] be[en] of their own making"); *see Thakur III*, 148 F.4th at 1110 (distinguishing *California* on this basis).

**V.    The Balance of Equities and the Public Interest Weigh in Favor of an Injunction.**

Defendants' argument based on *California* is wrong for reasons explained *supra* at 7-10. Suspension of research funds caused immediate irreparable harm at UCLA and would cause similar harm at other UC campuses. *See* Mem. 14-17 (citing evidence); *supra* at 2-6; *Thakur III*, 148 F.4th at

---

[50] Defendants' authorities, Opp. 40, have no bearing on these non-financial harms. *See Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (legal remedy is adequate if "seek[] money damages and back pay for the loss of her job"); *Sampson v. Murray*, 415 U.S. 61, 91 (1974) (temporary income loss by terminated probationary employee not irreparable injury); *Fac. Senate of Fla. Int'l Univ. v. Winn*, 477 F.Supp.2d 1198, 1208 (S.D. Fla. 2007) (addressing tuition trust funds). Further, Plaintiffs *have* shown that the threatened monetary harms are comparable to a "threat of being driven out of business" for many members who work in the labs that are supported by federal grants. *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985); Mem. 16 n.26 (citing evidence).

1110. Plaintiffs document harm to the public interest from the coercive impact of Defendants' threats and harm that would result were UC to capitulate to Defendants' demands. *See* Mem. 17-20 (citing evidence); *supra* at 2-5; ECF 65-1 at 5-13 (describing injuries Defendants' actions are causing to UCLA students' rights to receive information, engage in free inquiry, speech, and association, as well as to their educational opportunities and student services). Meanwhile, "agencies are not harmed where an order requires them to disburse funds that Congress has appropriated and that agencies have already awarded," and the public interest is served by restraining unlawful agency action. *Thakur I*, 787 F.Supp.3d at 997 (cleaned up).

## VI.    The Scope of Requested Relief Is Appropriate and No Stay or Bond Should Issue.

Defendants barely dispute the proposed injunction's scope. ECF 26-1.[51] They may believe only Plaintiffs' members should be "covered by any injunction," Opp. 40, but the broad harms caused by Defendants' actions and demands make Plaintiffs' requested relief "necessary to redress the [harm to the] complaining parties." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). And requiring Plaintiffs to identify covered members would "raise additional constitutional problems regarding the freedom of association and privacy." *Vasquez Perdomo v. Noem*, 148 F.4th 656, 687 (9th Cir. 2025), *stayed*, 2025 WL 2585637 (Mem.) (citing *NAACP v. Alabama*, 357 U.S. 44 (1958)).[52]

Defendants do not support their stay request, Opp. 42, with the factors under *Nken v. Holder*, 556 U.S. 418, 434 (2009); *see also Thakur III*, 148 F.4th at 1109-10. And Defendants fail to refute Plaintiffs' authority that a bond need not be imposed. *See* Mem. 44 n.82.

## CONCLUSION

For the reasons discussed, Plaintiffs' motion should be granted.

---

[51] Defendants do dispute the disclosure requests. Opp. 38-39. Because Plaintiffs have the August 8 Demand Letter, the request in ¶6(b) of the Proposed Order is moot. The only investigatory findings appear to be the July 29, 2025 UCLA anti-Semitism investigation, Ex. 1, so Plaintiffs also withdraw ¶6(a). As far as ¶6(c), Defendants fault Plaintiffs for "speculat[ing]" about documents they have not seen, Opp. 1, 4, 15, even while acknowledging further secret settlement communications, *id.* 1. And Defendants are wrong to argue that discovery is unavailable "in what is, at its heart, an APA lawsuit," Opp. 38, including because Plaintiffs assert *ultra vires* claims. *See Am. Fed'n of Gov't Emps. v. Trump*, __ F.4th __, 2025 WL 2716266, *5 (9th Cir. Sept. 19, 2025). But Plaintiffs do not need these documents as support for this preliminary injunction given the current record.

[52] Also, Plaintiff labor unions have representational duties and interests as to all bargaining unit employees, not only those who have become members. Defendants also ask that Plaintiffs provide "Unique Entity Identifiers," Opp. 40, but they are the ones who maintain this information. If Defendants cannot identify which grants "fall within the UC umbrella," *id.*, the parties can work that out.

REPLY ISO MOT. FOR PRELIMINARY INJUNCTION                    Case No. 3:25-cv-07864-RFL

Respectfully submitted,

Dated:  October 31, 2025

By: */s/ Stacey M. Leyton*
STACEY M. LEYTON, SBN 203827
sleyton@altber.com
BARBARA J. CHISHOLM, SBN 224656
bchisholm@altber.com
CONNIE K. CHAN, SBN 284230
cchan@altber.com
AMANDA C. LYNCH, SBN 318022
alynch@altber.com
JUHYUNG H. LEE, SBN 315738
hlee@altber.com
SANDY PECHT, SBN 355877
specht@altber.com
**ALTSHULER BERZON LLP**
177 Post St., Suite 300
San Francisco, CA 94108
(415) 421-7151

*Counsel for Plaintiffs AAUP, AFT,*
*UC-AFT, CNA/NNU, UAW, and CIR*

By: */s/ Victoria S. Nugent*
SKYE L. PERRYMAN*
sperryman@democracyforward.org
VICTORIA S. NUGENT, *admitted pro hac vice*
vnugent@democracyforward.org
CYNTHIA LIAO, SBN 301818, *admitted pro hac vice*
cliao@democracyforward.org
ORLANDO ECONOMOS, *admitted pro hac vice*
oeconomos@democracyforward.org
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 448-9090

*Counsel for Plaintiffs AAUP, AFT,*
*CNA/NNU, UC-AFT, UAW, and CIR*

By: */s/ Veena Dubal*
VEENA DUBAL, SBN 249268*
vdubal@aaup.org
**AMERICAN ASSOCIATION OF**
**UNIVERSITY PROFESSORS**
555 New Jersey Avenue NW, Suite 600
Washington DC 20001
(202) 737-5900

*Counsel for Plaintiff AAUP*

REPLY ISO MOT. FOR PRELIMINARY INJUNCTION                    Case No. 3:25-cv-07864-RFL

By: /s/ Eleanor Morton
    ELEANOR MORTON, SBN 220407
    emorton@leonardcarder.com
    KATE HALLWARD, SBN 233419
    khallward@leonardcarder.com
    ARTHUR LIOU, SBN 252690
    aliou@leonardcarder.com
    HUGH SCHLESINGER, SBN 353569
    hschlesinger@leonardcarder.com
    **LEONARD CARDER LLP**
    1999 Harrison Street, Suite 2700
    Oakland, CA 94612
    (510) 272-0169

    *Counsel for Plaintiffs UPTE, AFSCME Local 3299,*
    *UC-AFT, CUCFA, and each of the UC Campus*
    *Faculty Associations*

By: /s/ Margo A. Feinberg
    MARGO A. FEINBERG, SBN 100655
    margo@ssdslaw.com
    DANIEL E. CURRY, SBN 297412
    dec@ssdslaw.com
    **SCHWARTZ, STEINSAPIR,**
    **DOHRMANN & SOMMERS LLP**
    888 W. 6th Street, 12th Floor
    Los Angeles, California 90017-2738
    (323) 655-4700

    *Counsel for Plaintiff UAW Local 4811*

By: /s/ Nicole J. Daro
    NICOLE J. DARO, SBN 276948
    ndaro@calnurses.org
    **CALIFORNIA NURSES ASSOCIATION/NATIONAL**
    **NURSES UNITED**
    155 Grand Ave.
    Oakland, CA 94612
    (510) 207-8291
    *Counsel for Plaintiff CNA/NNU*

By: /s/ Susan K. Garea
    SUSAN K. GAREA, SBN 260407
    sgarea@beesontayer.com
    **BEESON, TAYER & BODINE**
    492 Ninth Street, Suite 350
    Oakland, CA 94607
    (510) 625 9700

    *Counsel for Plaintiff Teamsters Local 2010*

REPLY ISO MOT. FOR PRELIMINARY INJUNCTION    Case No. 3:25-cv-07864-RFL

By: */s/ Hannah M. Shirey*
HANNAH M. SHIREY, SBN 332187
hshirey@cirseiu.org
**COMMITTEE OF INTERNS AND RESIDENTS/SEIU**
10-27 46th Avenue, Suite 300-2
Long Island City, NY 11101
(212) 356-8100

*Counsel for Plaintiff CIR*

\*   *Pro hac vice application forthcoming*
\*\* *Pro hac vice application pending*

REPLY ISO MOT. FOR PRELIMINARY INJUNCTION                    Case No. 3:25-cv-07864-RFL