STACEY M. LEYTON, SBN 203827
sleyton@altber.com
BARBARA J. CHISHOLM, SBN 224656
bchisholm@altber.com
CONNIE K. CHAN, SBN 284230
cchan@altber.com
AMANDA C. LYNCH, SBN 318022
alynch@altber.com
ALEXANDER PECHT, SBN 355877
specht@altber.com
**ALTSHULER BERZON LLP**
177 Post St., Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151

*Counsel for Plaintiffs AAUP, AFT, UC-AFT, CNA/NNU, UAW, and CIR*

[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, et al.,<br><br>Defendants. | Case No. 3:25-cv-07864-RFL<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL FURTHER PRODUCTION OF DOCUMENTS**<br><br>Judge: Hon. Rita F. Lin<br>Ctrm: 4, 17th Floor<br>Date: December 8, 2026<br>Time: 10:00 a.m. |

# TABLE OF CONTENTS

INTRODUCTION ..... 1
BACKGROUND ..... 1
I. Factual and Procedural Background ..... 1
II. Plaintiffs' Discovery Requests and Present Privilege Disputes ..... 4
ARGUMENT ..... 9
I. The Court Should Compel Defendants to Produce Relevant Documents Over Their Assertions of Deliberative Process Privilege. ..... 9
A. The Deliberative Process Privilege Is Inapplicable Because the Government's Intent is at Issue. ..... 9
B. Defendants Improperly Assert the Privilege Over Documents that are Post-Decisional or Nondeliberative. ..... 10
C. Plaintiffs' Need for the Documents Overcomes the Qualified Privilege. ..... 13
1. The Evidence Is Highly Relevant to the Central Issues in the Case. ..... 14
2. The Government Is the Defendant, and the Information Is Not Available From Other Sources. ..... 16
3. There Is No Legitimate Interest in Maintaining Secrecy Over Unconstitutional Government Misconduct. ..... 16
II. The Court Should Compel Defendants to Produce Relevant Documents Over Their Assertions of Presidential Communications Privilege. ..... 18
A. Defendants Improperly Assert Presidential Communications Privilege Over Documents that are Not Covered by the Privilege. ..... 18
B. Plaintiffs' Need for the Documents Overcomes the Qualified Privilege as to All Challenged Documents. ..... 19
III. The Court Should Compel Defendants to Produce Relevant Documents Over Their Assertions of Attorney Work Product. ..... 21
A. The Protection Does Not Apply to Certain Dual-Purpose Documents. ..... 21
B. The Protection is Outweighed for All Challenged Documents. ..... 22
IV. The Court Should Compel Defendants to Produce Relevant Documents Over Their Assertions of Attorney-Client Privilege. ..... 24
A. The Privilege Does Not Apply Where Legal Advice Is Not the Primary Purpose. ..... 25
1. Individuals Not Serving in Role of Legal Counsel ..... 25
2. Attorneys with Significant Non-Legal Responsibilities ..... 26
3. DOJ Attorneys Conducting Predetermined Investigations ..... 27
B. The Privilege Does Not Apply to Documents "Implementing" Legal Advice. ..... 28
V. The Court Should Order DOJ to Search the Records of AAG Harmeet Dhillon. ..... 29
VI. The Court Should Order DOJ to Conduct the Proposed Additional Searches. ..... 30
A. The Proposed Additional Searches Target Relevant Documents. ..... 30
B. The Remaining Rule 26(b)(1) Factors Support Plaintiffs. ..... 32
CONCLUSION ..... 32

## TABLE OF AUTHORITIES


**Page(s)**

**Cases**

*4WEB, Inc. v. NuVasive, Inc.*,
2025 WL 3190605 (S.D. Cal. Nov. 14, 2025) ....................25

*Am. Ass'n of Univ. Profs. v. Rubio*,
816 F.Supp.3d 216 (D. Mass. 2026) ....................16

*Am. Civ. Lib. Union of San Diego & Imperial Counties v. U.S. Dep't of Homeland Sec.*,
2017 WL 9500949 (C.D. Cal. Nov. 6, 2017) ....................28

*Am. Civ. Libs. Union of N. Cal. v. U.S. Dep't of Just.*,
880 F.3d 473 (9th Cir. 2018) ....................21, 22

*Am. Fed'n of Gov't Emps. v. Trump*,
791 F.Supp.3d 1065 (N.D. Cal. 2025), *aff'd*, 155 F.4th 1082 (9th Cir. 2025) ....................13

*Am. Fed'n of Gov't Emps. v. Trump*,
155 F.4th 1082 (9th Cir. 2025) ....................14, 16

*Amadei v. Nielsen*,
2019 WL 8165492 (E.D.N.Y. Apr. 17, 2019) ....................28

*Anthropic PBC v. U.S. Dep't of War*,
-- F.Supp.3d --, 2026 WL 2534714 (N.D. Cal. Aug. 27, 2026) ....................10

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents*,
824 F.3d 858 (9th Cir. 2016) ....................10

*Assembly of State of Cal. v. U.S. Dep't of Com.*,
968 F.2d 916 (9th Cir. 1992) ....................11, 12, 17

*Authors Guild v. Nat'l Endowment for the Humanities*,
2026 WL 550220 (S.D.N.Y. Feb. 27, 2026) ....................27

*Bank of N.Y. v. Meridien Biao Bank Tanzania Ltd.*,
1996 WL 474177 (S.D.N.Y. Aug. 21, 1996) ....................28

*Blankenship v. Hearst Corp.*,
519 F.2d 418 (9th Cir. 1975) ....................32

*United States ex rel. Brown v. Celgene Corp.*,
2015 WL 12731923 (C.D. Cal. July 24, 2015) ....................22

*Cal. Dep't of Soc. Servs. v. Leavitt*,
523 F.3d 1025 (9th Cir. 2008) ....................32

*Cheney v. U.S. Dist. Ct. for D.C.*,
542 U.S. 367 (2004) ........ 18

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*,
538 F.Supp.3d 124 (D.D.C. 2021) ........ 26, 28

*Cmte. On Oversight & Gov't Reform, U.S. House of Rep. v. Lynch*,
156 F.Supp.3d 101 (D.D.C. 2016) ........ 17

*Coleman v. Sterling*,
2011 WL 13176814 (S.D. Cal. June 13, 2011) ........ 15

*Dellums v. Powell*,
561 F.2d 242 (D.C. Cir. 1977) ........ 17, 20, 21

*Doe v. Kaiser Found. Health Plan, Inc.*,
2024 WL 3225904 (N.D. Cal. June 28, 2024) ........ 32

*Doubleday v. Ruh*,
149 F.R.D. 601 (E.D. Cal. 1993) ........ 23

*Dunnet Bay Constr. Co. v. Hannig*,
2012 WL 1599893 (C.D. Ill. May 7, 2012) ........ 9

*F.T.C. v. Warner Commc'ns Inc.*,
742 F.2d 1156 (9th Cir. 1984) ........ 11, 13, 14

*In re Facebook, Inc. Consumer Priv. User Profile Litig.*,
2021 WL 10282213 (N.D. Cal. Nov. 14, 2021) ........ 29

*In re Grand Jury*,
23 F.4th 1088 (9th Cir. 2021) ........ 26

*In re Grand Jury Investigation*,
974 F.2d 1068 (9th Cir. 1992) ........ 27

*Greer v. Cnty. of San Diego*,
127 F.4th 1216 (9th Cir. 2025) ........ 25

*Holmgren v. State Farm Mut. Auto. Ins. Co.*,
976 F.2d 573 (9th Cir. 1992) ........ 22, 23

*Jud. Watch, Inc. v. Dep't of Just.*,
365 F.3d 1108 (D.C. Cir. 2004) ........ 21

*Karnoski v. Trump*,
926 F.3d 1180 (9th Cir. 2019) (per curiam) ........ *passim*

*L.A. All. v. City of Los Angeles*,
2023 WL 5505037 (C.D. Cal. Aug. 2, 2023) ........ 29

*Lahr v. Nat'l Transp. Safety Bd.*,
569 F.3d 964 (9th Cir. 2009) ....................11, 12

*In re Lindsey*,
158 F.3d 1263 (D.C. Cir. 1998) ....................25, 27

*Llera v. Las Vegas Metro. Police Dep't*,
564 F.Supp.3d 914 (D. Nev. 2021) ....................14

*Louise Trauma Ctr., LLC v. Dep't of Just.*,
2022 WL 278771 (D.D.C. 2022) ....................28

*Maricopa Audubon Soc'y v. U.S. Forest Serv.*,
108 F.3d 1089 (9th Cir. 1997) ....................12

*Marilley v. McCamman*,
2012 WL 4120633 (N.D. Cal. Sept. 19, 2012) ....................15, 16

*N. Pacifica, LLC v. City of Pacifica*,
274 F.Supp.2d 1118 (N.D. Cal. 2003) ....................14

*N.Y. Times Co. v. Off. of Mgmt. & Budget*,
531 F.Supp.3d 118 (D.D.C. 2021) ....................19

*NAACP v. Bureau of Census*,
401 F.Supp.3d 608 (D. Md. 2019) ....................13

*Nat'l Res. Def. Council v. U.S. Dep't of Def.*,
388 F.Supp.2d 1086 (C.D. Cal. 2005) ....................12

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024) ....................15

*Natl Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 619 (2012) ....................15

*New York v. McMahon*,
826 F.Supp.3d 184 (D. Mass. 2026) ....................12

*Nixon v. Sirica*,
487 F.2d 700 (D.C. Cir. 1973) ....................21

*U.S. ex rel. Poehling v. UnitedHealth Grp., Inc.*,
2018 WL 8459926 (C.D. Cal. Dec. 14, 2018) ....................12, 14

*In re Premera Blue Cross Customer Data Sec. Breach Litig.*,
296 F.Supp.3d 1230 (D. Or. 2017) ....................28

*President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Human Servs.*,
798 F.Supp.3d 77 (D. Mass. 2025) ....................2, 10

*Prop. of the People, Inc. v. Off. of Mgmt. & Budget*,
330 F.Supp.3d 373 (D.D.C. 2018) .......... 19

*Protect Democracy Project, Inc. v. Nat'l Sec. Agency*,
10 F.4th 879 (D.C. Cir. 2021) .......... 19

*Qamhiyah v. Iowa State Univ. of Science & Tech.*,
245 F.R.D. 393 (S.D. Iowa 2007) .......... 9

*Roberts v. City of Fairbanks*,
2022 WL 889401 (D. Alaska Mar. 25, 2022) .......... 23, 24

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) .......... 10

*Scott v. Bd. of Educ. of the City of E. Orange*,
219 F.R.D. 333 (D.N.J. 2004) .......... 9

*In re Sealed Case*,
121 F.3d 729 (D.C. Cir. 1997) .......... 16, 17, 19, 20

*Sommer v. United States*,
2011 WL 4433631 (S.D. Cal. Sept. 22, 2011) .......... 23

*Stone v. Trump*,
453 F.Supp.3d 758 (D. Md. 2020) .......... 14, 16

*In re Subpoena Duces Tecum Served on Off. of Comptroller of Currency*,
145 F.3d 1422 (D.C. Cir. 1998) .......... 9

*Tax Reform Res. Grp. v. Internal Revenue Serv.*,
419 F.Supp. 415 (D.D.C. 1976) .......... 16

*Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs*,
60 F.3d 867 (1st Cir. 1995) .......... 16, 26, 27

*Thomas v. Cate*,
715 F.Supp.2d 1012 (E.D. Cal. 2010) .......... 14

*Toomey v. Arizona*,
2021 WL 3854860 (D. Ariz. Aug. 27, 2021) .......... 14

*Trump v. Thompson*,
20 F.4th 10 (D.C. Cir. 2021) .......... 17

*Upjohn Co. v. United States*,
449 U.S. 393, 389 (1981) .......... 24

*U.S. Dep't of Treasury v. Pension Benefit Guar. Corp.*,
351 F.Supp.3d 140 (D.D.C. 2018) .......... 17, 18, 20, 21

*U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*,
592 U.S. 261 (2021) ............ 12

*Ulrich v. City & Cnty. of San Francisco*,
308 F.3d 968 (9th Cir. 2002) ............ 10

*United States v. McGraw-Hill Cos.*,
2014 WL 8662657 (C.D. Cal. Sept. 25, 2014) ............ 23

*United States v. Rowe*,
96 F.3d 1294 (9th Cir. 1996) ............ 25

*United States v. Ruehle*,
583 F.3d 600 (9th Cir. 2009) ............ 24

*United States v. Sanmina Corp.*,
968 F.3d 1107 (9th Cir. 2020) ............ 22, 24

*Vietnam Veterans of Am. v. CIA*,
2011 WL 4635139 (N.D. Cal. Oct. 5, 2011) ............ 14

*In re Williams-Sonoma, Inc.*,
947 F.3d 535, 539 (9th Cir. 2020) ............ 32

*Woodall v. Phoenix Police Dep't*,
2025 WL 4733387 (D. Ariz. Mar. 13, 2025) ............ 28

**Other Authorities**

89 Fed. Reg. 100512 (Dec. 12, 2024) ............ 25

90 Fed. Reg. 12166 (Mar. 14, 2025) ............ 25

Executive Order 14,188 ............ 1

Fed. R. Civ. P. 26(b)(1) ............ 29, 30

## INTRODUCTION

In November 2025, this Court preliminarily enjoined the Trump administration's unprecedented weaponization of civil rights law and federal research funding to attack academic freedom, suppress disfavored speech, and impose the Trump administration's preferred policies at the University of California ("UC"). Since then, Plaintiffs have diligently sought document discovery to move the case toward final judgment. After months of extensive negotiations over Defendants' voluminous and facially deficient privilege logs, Defendants continue to withhold the vast majority of the centrally relevant documents at issue based on various assertions of privilege—principally deliberative process privilege, presidential communications privilege, attorney work product protection, and attorney-client privilege.

Plaintiffs now move to compel production of documents that are directly relevant to the issues in this case and critical to understanding Defendants' intent and motives in adopting and implementing the Task Force Policy at the UC and other targeted universities. The vast majority are withheld solely based on deliberative process privilege or based on a combination of deliberative process, presidential communications, and work product privileges. Many of the challenged documents are not in fact subject to the asserted privileges—for example, because they are not predecisional and deliberative. But the Court need not wade through Defendants' thousands of privilege log entries one-by-one, because these qualified privileges are easily overcome under the unique circumstances of this case. The centrality of the documents to Plaintiffs' claims, the seriousness of the government's alleged misconduct, and the public's interest in accurate fact-finding and enforcement of the Constitution vastly outweigh any purported interest the government may have in conducting its unconstitutional misconduct in secret. And Defendants' assertions of attorney-client privilege over many documents are improper, for example, because the attorney at issue was acting as a policymaker rather than providing legal advice.

Plaintiffs further move to compel Defendant Department of Justice ("DOJ") to add key decisionmaker Assistant Attorney General for Civil Rights ("AAG") Harmeet Dhillon as a document custodian and to conduct additional searches necessary to address deficiencies in their search protocol.

## BACKGROUND

### I. Factual and Procedural Background

On January 29, 2025, President Trump signed Executive Order 14,188, "Additional Measures to

Combat Anti-Semitism," followed by a February 3, 2025 announcement of a newly created multi-agency "Task Force to Combat Anti-Semitism," led by DOJ Senior Counsel Leo Terrell.[1] The Task Force immediately began targeting universities where faculty, students, and employees had expressed viewpoints with which the Trump administration disagrees. The Task Force did so pursuant to a "Task Force Policy," which "proceeds using a three-stage playbook … At stage one, a Task Force agency announces investigations or planned enforcement actions related to alleged civil rights violations at a school. At stage two, Funding agencies cancel the school's federal grants *en masse* without following Title VI and IX procedural requirements or limiting the scope of the terminations to non-compliant programs. At stage three, DOJ demands the payment of millions or billions of dollars—a penalty that Title VI and IX do not authorize—and requires a wide range of policy changes as a condition for restoring funding and avoiding further funding disruptions." Dkt. 90 at 10. In early July 2025, the Executive Office of the President ("EOP") appears to have taken over implementation of the Task Force Policy, with Senior Policy Strategist May Mailman informing Task Force members that the formal Task Force was "morphing" and that "[t]he project has grown far beyond its simple founding." Ex. 6.[2]

One of the earliest targets was Columbia. In March 2025, the Task Force announced a review of potential Title VI violations related to antisemitism, and days later cancelled $400 million in grants and contracts with threats to cancel more. Another week later the administration presented a demand letter requiring broad changes to student discipline, admissions, international recruiting, and protest rules, and placement of a disfavored department into receivership. Dkt. 90 at 13. In late July, Columbia entered into a settlement requiring it to pay $200 million to the United States and to make changes to its curriculum, admissions, and international student programs. *Id.* The same Task Force Policy was applied to Brown and Harvard, and when Harvard refused to capitulate, the Trump administration retaliated with ever increasing and unrelenting funding cuts that were subsequently held unlawful (*President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Human Servs.*, 798 F.Supp.3d 77 (D. Mass. 2025)).

The Trump administration also applied its Task Force Policy to UC. In February and March 2025, DOJ and other agencies opened Title VI and Title VII investigations against UC and certain UC campuses. Dkt. 90 at 15. Then, on May 9, 2025, DOJ opened an investigation "into the [UC's] response

[1] Other "core" Task Force members included Josh Gruenbaum for the General Services Administration ("GSA"), Sean Keveney (later replaced by Paula Stannard) for Department of Health and Human Services ("HHS"), and Thomas Wheeler for Department of Education ("ED"). Exs. 5, 6.

[2] All exhibits ("Ex.") are attached to the accompanying Declaration of Amanda Lynch.

to incidents of antisemitic discrimination …." *Id.* On July 29, 2025, DOJ issued a "Notice of Findings" finding UCLA in violation of Title VI. *Id.* at 16. Over the next several days, the National Institutes of Health ("NIH"), National Science Foundation ("NSF"), and Department of Energy ("DOE") summarily suspended $584 million in research grants to UCLA. *Id.* at 17. NSF also stopped funding any new UCLA grants, including for projects already recommended for funding. *Id.* A week later, on August 8, 2025, DOJ sent demands that UC pay $1.2 billion and agree to wide-ranging curricular and policy reforms (most having nothing to do with antisemitism) as a condition of restoring federal funding.[3]

Plaintiffs—a coalition of labor unions and faculty associations representing thousands of UC faculty, students, academic employees, and staff employees—filed this lawsuit on September 16, 2025 to enjoin President Trump and various federal agencies and officers from using pretextual civil rights investigations and massive unauthorized federal funding cuts to coerce UC into suppressing free speech and academic freedom rights and adopting the Trump administration's preferred policies and viewpoints. Dkt. 1. Plaintiffs asserted *ultra vires* claims under the First Amendment based on unconstitutional coercion, retaliation, and content and viewpoint discrimination (Count I); separation of powers (Count II); unconstitutional conditions and the Spending Clause (Count III); the Tenth Amendment (Count IV); and the Fifth Amendment (Count V). *Id.* at 92-101. Plaintiffs also asserted Administrative Procedure Act ("APA") claims for final agency action that is contrary to Title VI and Title IX (Counts VI & VII), arbitrary and capricious (Count VIII), and contrary to the Constitution (Counts IX-XIII). *Id.* at 101-110.

Plaintiffs promptly moved for a preliminary injunction, which the Court granted on November 14, 2025. The Court found that Plaintiffs' evidence showed that "the Administration and its executive agencies are engaged in a concerted campaign to purge 'woke,' 'left,' and 'socialist' viewpoints from our country's leading universities," and that "Defendants have engaged in coercive and retaliatory conduct in violation of the First Amendment and Tenth Amendment" and "flouted the requirements of Title VI and IX and cancelled funding in an arbitrary and capricious manner while ignoring required procedural safeguards." Dkt. 90 at 1-3. The Court held Plaintiffs likely to succeed on their First

[3] The letter required, among other things, that UCLA designate an administrator to supervise "'reforms to … scholarship … and campus climate,'" review diversity, equity, and inclusion programs, and ban personal statements discussing a job applicant's racial identity. *Id.* at 18. It also required that UCLA "revise its policies regarding 'demonstrations, protests, displays, and other expressive activities,'" "ban admission of 'foreign students likely to engage in anti-Western, anti-American, or antisemitic disruptions,'" "'issue a public statement to the UCLA community' adopting the definition of 'sex' and related terms consistent with Executive Order 14168 regarding 'Gender Ideology,'" and cease performing transgender surgeries on minors at affiliated hospitals. *Id.* at 18-19.

Amendment claims of unlawful coercion, retaliation, and unconstitutional conditions, as well as their Tenth Amendment/Spending Clause claim and APA claims. *Id.* at 25-69.[4]

**II. Plaintiffs' Discovery Requests and Present Privilege Disputes**

The Court authorized discovery on Plaintiffs' constitutional *ultra vires* claims, which includes claims for violations of the First Amendment, Tenth Amendment, Fifth Amendment, Due Process Clause, Spending Clause, and separation of powers. Dkt. 105.[5] On March 20, 2026, Plaintiffs served Requests for Production ("RFPs") on Defendants (and interrogatories), seeking six general categories of documents relevant to Plaintiffs' claims (as further described *infra*). In response, Defendants produced approximately 5,400 documents (approximately 4,000 of which are redacted), while withholding in full approximately 4,500 highly relevant, responsive documents based on boilerplate assertions of deliberative process privilege, presidential communications privilege, attorney work product protection, and attorney-client privilege. Many of these privileges were stacked. After extensive meet-and-confer efforts, Defendants re-produced their privilege logs with supplemental information and withdrew some of their stacked privilege assertions. However, Defendants continue to withhold the vast majority of the documents at the very core of Plaintiffs' claims. Based on Defendants' privilege logs, the withheld documents consist of thousands of intra- and inter-agency communications among the Task Force members and key defendant agencies DOJ, ED, GSA, HHS, NSF, and DOE, as well as communications with EOP officials, that are likely to be highly probative evidence that "Defendants engaged in a concerted policy to use allegations of antisemitism to justify funding cancellations, when their intent is to coerce universities into purging disfavored 'left' and 'woke' viewpoints from their campuses and replace them with views that the Administration favors." Dkt. 90 at 10.

***Category 1: Civil Rights Pretext.*** First, Plaintiffs sought documents relating to "stage one" of the Task Force Policy, namely Defendants' use of civil rights investigations as a pretext to exert pressure on

[4] Among other things, the Court preliminarily enjoined Defendants from "seeking payments of … penalties or fines or any other monies from the UC or any of its campuses or affiliated medical centers in connection with any civil rights investigation … or violations of Title VI, VII, and IX," Dkt. 113 ¶2, and "from violating the First Amendment or Tenth Amendment by refusing to grant, non-renewing, withholding, … or otherwise restricting use of federal funds to the UC, or threatening to do so, to coerce the UC to agree to any of the terms contained in the August 8, 2025 settlement offer, or substantially similar terms, or pursuant to the 'Task Force Policy,'" *id.* ¶3.

[5] Defendants' administrative record productions consisted mostly of documents relating to individual grant terminations (many from March and April 2025), with virtually none shedding light on the reasons for Defendants' funding suspensions and demands to UC in July and August 2025.

targeted universities. *See* RFP 12[6] (documents describing plan, methods, and objectives for investigating alleged civil rights violations at universities); RFP 16 (documents relating to any actual or planned use of civil rights investigations as means of obtaining curricular or other university policy changes); RFP 17 (documents relating to selection of UC and other targeted universities for civil rights investigations); RFPs 18-22 (documents relating to investigation of UC); RFP 23 (summaries or reports of civil rights investigations into universities); RFPs 24-25 (notices of civil rights investigations, investigatory findings, and EEOC charges issued or relating to UC or any targeted university).

Documents responsive to Category 1 that Defendants have withheld include highly relevant intra- and inter-agency communications and memoranda relating to Defendants' targeting of UC and other universities for civil rights investigations and charges, Defendants' methodology and plans for conducting these investigations, and the findings of such investigations, including, for example:

(1) February 28, 2025 email thread re: "UC Investigation Outline," *e.g.* CRT_1482[7];

(2) March 2, 2025 document titled, "UC Investigation Plan 3.2.25 (3 Part Plan)," CRT_2024;

(3) March 26, 2025 document titled, "UCLA Executive Summary 3.26.25.docx," CRT_2043;

(4) May 29, 2025 email thread re: "UC Memo," CRT_3452, attaching documents titled, "UC Berkeley Summary and Conclusions.pdf," CRT_3455, "UC Davis Summary and Conclusions.pdf," CRT_3454, "UC memo 5 29 2025 (to OAAG).docx," CRT_3453, and "UCSF Summary and Conclusions.pdf," CRT_3456;

(5) July 10, 2025 email thread re: "UCLA antisemitism – proposed game plan," CRT_1270; and

(6) July 25, 2025 email thread re: "University Next Steps – many documents to edit," containing "DOJ's calculations and rationales for employing civil rights authorities to implement Executive Orders," *e.g.* CRT_821.3.[8]

***Category 2: Funding Cutoffs.*** Second, Plaintiffs sought documents relating to "stage two" of the Task Force Policy, namely documents relating to Defendants' cancellation of federal funding at targeted

---

[6] Plaintiffs' RFPs are Exhibit 1 to the Lynch Declaration.

[7] All Bates number citations (omitting the "AAUP_" prefix and leading zeroes) refer to documents on Defendants' privilege logs and can be found in the Index attached to the accompanying Declaration of Alexander Pecht. Plaintiffs have also categorized all documents listed in the Index into Tables A-D, sorted by privilege(s) challenged and relevance category. *See* Pecht Decl. ¶¶4-13__ & Tables A-D.

[8] *See also, e.g.*, CRT_1856 (2/26/25 email thread between DOJ and EEOC re: "Comms – UC School System); CRT_10640 (3/3/25 email thread re: "Antisemitism Tour Proposal," discussing "progress and next steps to implement Executive Orders"); CRT_10658 ("Antisemitism Campus Tour 2025 Plan"); CRT_10601 (3/11/25 email thread re: "Antisemitism Visits Funding and Background"); CRT_10143, -10144, -10145, -10146 (3/11/25 email thread among Task Force members re: "California Letters" "discussing the costs and benefits of agency action" and containing "Task Force calculations and rationales for employing civil rights enforcement authorities to combat antisemitism and implement EO 13899 and 14188"); CRT_3556 (4/11/25 email thread re: "Antisemitism UC investigation for Title IV and VI"); CRT_10317 (5/15/25 email thread re: "UCLA DEI Litigation update"); CRT_10100 ("DOJ Task Force to Combat Antisemitism-Recent Activities and Strategic Objectives.07.15.25.pdf"); Pecht Decl. ¶9 & Tables A.1, B.1, C.1, D.1.

universities without following Title VI and IX procedural requirements or limiting the scope of the terminations to non-compliant programs. *See* RFPs 11, 13, 16, and 26-27 (documents authorizing, directing, discussing, or relating to actual or threatened suspension or termination of, or refusal to grant, funding at any university); RFPs 28-29 (such documents relating to UC, including to decisions about which UC grants would be canceled following DOJ's July 29, 2025 "Notice of Findings").

Category 2 documents include intra- and inter-agency communications reflecting Defendants' predetermined and coordinated plans to terminate grants and contracts at targeted universities, beginning long before the conclusion (or even initiation) of civil rights investigations, including, for example:

(1) February 21, 2025 email thread re: "Contracts and Grants Pilot," described as an "email thread between HHS, OAG, DOJ, CRT, ED, and GSA discussing initial potential steps to be taken by the Antisemitism Task Force," including "strategy for carrying out the administration's policy initiatives," *e.g.* ED_993;

(2) March 16, 2025 document titled, "Higher Education Actions-4.16.docx," attached to an "email thread between WH, ED, DOJ, GSA, HHS, and USDA gathering details as to funding suspensions at universities across the country pursuant to antisemitism actions, and pending Title VI, VII, and IX investigations," ED_1056;

(3) March 24, 2025 email thread between Task Force members re: "Next List (Post the 'Columbia Capitulation')," reflecting "consideration of next steps in resolution of ongoing investigations," *e.g.* ED_4154;

(4) July 18, 2025 email thread re: "UC System," regarding "funding priorities" and "implementation of Executive policy," *e.g.* DOE_1091;

(5) July 31, 2025 email thread re: "Funding freezes to UCLA, *e.g.* CRT_1170;

(6) August 14, 2025 email thread re: "Request regarding federal $$$ to UC System," containing "DOJ's calculations and rationales for employing civil rights authorities to implement Executive Orders," *e.g.* CRT_3823; and

(7) November 13, 2025 Excel spreadsheet titled, "Active Grants to the University of California Berkeley_as of 11.12.2025.xlsx," HHS_1505, suggesting Defendants were preparing to terminate grants at UC Berkeley just before the Court issued its preliminary injunction.[9]

***Category 3: Demands.*** Third, Plaintiffs sought documents relating to "stage three" of the Task Force Policy, involving Defendants' demands for policy changes and financial penalties. *See* RFPs 14-

[9] *See also, e.g.*, GSA_201 (2/21/25 email thread re: "Contract and Grant Files"); ED_1080 (2/22/25 spreadsheet, "Berk.xlsx," reflecting "considerations of UC grants in light of Executive priorities and policies" and containing "data compiled for consideration of ongoing award considerations"); GSA_104 (2/24/25 email thread re: "University Data Pull," relating to "awards to UC"); GSA_100, -102 (2/24/25 "University Active Contract Grant IDV Inventory" spreadsheet, logged as a "chart prepared to assist in the deliberations of UC awards"); GSA_003 (2/28/25 "GSA Columbia Memo.docx," a "draft letter to Columbia University regarding GSA's review of federal contracts pursuant to antisemitism EO"); GSA_726 (3/4/25 email thread re: "Next List," "reflecting deliberations regarding of awarding decisions in light of Task Force work, including compilation of award data across universities"); HHS_1947 (3/6/25 "University Spend.xlsx" spreadsheet, a "spreadsheet prepared to assist Task Force members in the evaluation of university awards"); GSA_340 (6/5/25 "Grants & Contracts to CA Public Entities – Categorized Terminations (6).pdf," reflecting "potential grant actions at universities"); CRT_611 (7/24/25 email thread re: "University Next Steps // Roundup," regarding "Executive policy on federal funding and … next steps"); *see* Pecht Decl. ¶9 & Tables A.2, B.2, C.2, and D.2.

15 (documents relating to demands for monetary payments as condition of restoring funding, future funding eligibility, and/or releasing liability for alleged civil rights violations); RFP 29-30 (intra- and inter-agency communications, communications with EOP, and communications with UC relating to imposition of monetary penalties on UC for alleged civil rights violations and to conditions for restoring canceled funds); RFP 10 (documents relating to "Compact for Academic Excellence in Higher Education" and drafts thereof, which relate to Defendants' objectives and demands from universities).

Category 3 withheld documents include intra- and inter-agency communications reflecting Defendants' objectives and demands in "negotiating" with UC and other targeted universities, such as:

(1) August 7, 2025 document titled, "Confidential Rule 408 Communication – UCLA CRT DRAFT 08.07.25.docx," which is a "preliminary draft of a resolution agreement between UC and the United States Government," CRT_11251;

(2) August 8, 2025 email thread re: "Rule 408 Proposed Voluntary Agreement," CRT_3831;

(3) August 12, 2025 email thread with the subject line, "Higher Education Settlements/Negotiations," *e.g.* CRT_11277;

(4) September 17, 2025 document titled, "Sketch of a Template Global Agreement.docx," regarding "the potential contents of resolution agreement with universities," ED_1760;

(5) September 18, 2025 email thread re: "University of California," regarding "UC's response to the Compact for Academic Excellent and strategy for next steps," *e.g.* GSA_1187; and

(6) September 29, 2025 document titled, "Template Global Agreement-Antisemitism and student discipline.docx," ED_120.[10]

***<u>Category 4: Targeted Speech and Policies.</u>*** Fourth, Plaintiffs sought documents that would further shed light on Defendants' intent to suppress disfavored speech, such as those referring to certain speech, policies, and practices disfavored by the Trump administration at targeted universities (RFPs 6-7), and those relating to President Trump's "American Academy" and campaign promise to "reclaim our once great educational institutions from the radical Left and Marxist maniacs" (RFPs 8-9).

Category 4 withheld documents include intra- and inter-agency communications reflecting Defendants' animus towards "DEI" and "hostile political conduct," including, for example:

(1) February 20, 2025 document titled, "DCL [Dear Colleague Letter] implementation.docx," "outlining potential next steps for achieving the administration's DEI policy goals across K-12 schools and universities," *e.g.* ED_964;

(2) April 23, 2025 email described in the log as "[n]otes taken … during meeting outlining potential next steps in addressing DEI and hostile political conduct at universities," ED_113, and attaching a withheld "ED spreadsheet tracking reversal of DEI policies and practices across

[10] *See also, e.g.*, HHS_1603 ("Compact for Academic Excellence in Higher Education [DRAFT] 6.9.25.docx"); HHS_1613; HHS_345 (other Compact drafts); ED_1789 ("University President Email_JG Comments_09.19.25+MM+EB.docx," regarding "Strategy as to presenting the Compact idea to universities"); ED_1428 (9/29/25 "Template Global Agreement-Transgender ideology.docx"); Pecht Decl. ¶9 & Tables A.3, B.3, C.3, and D.3.

universities," ED_114;

(3) June 13, 2025 document titled, "Policy Time Memo," described as a "document outlining steps taken and possible next steps to be taken by ED to further administrative priorities, including as tied to elimination of DEI and antisemitism at universities," ED_119; and

(4) July 28, 2025 document titled, "National Shifts Narrative Summaries," described as an "ED document outlining DEI policies and practices at universities across the country, including changes made to those policies pursuant to executive actions, in anticipation of agency and administration actions in furtherance of administrative policies," *e.g.* ED_116.[11]

***Category 5: Task Force.*** Fifth, Plaintiffs sought Task Force minutes, meeting agendas, and other documents relating to the formation and operation of the Task Force, the appointment of Leo Terrell as Chair, and directives to the Task Force, including from the EOP (RFPs 1-4; definition of "Document"). Category 5 withheld documents include those reflecting the Task Force's meeting agendas, minutes, and directives, including, for example:

(1) April 4, 2025 email thread re: "Additional Measures to Combat Anti-Semitism Implementation Check-In," *e.g.* CRT_3381;

(2) June 28, 2025 document titled, "DOJ Task Force to Combat Antisemitism Memo 06.25.2025.docx," that "discusses calculations and rationales for employing civil rights authorities to implement Executive Orders," CRT_2054;

(3) September 19, 2025 email thread re: "Higher Ed Regroup Meeting: Sept 23," "among the Anti-Semitism Task Force discussing the costs and benefits of agency action" and "next steps to implement Executive policy," CRT_3924.[12]

***Category 6: Other Agency Coordination.*** Finally, Plaintiffs sought documents relating to inter-agency coordination to implement Executive Order 14,188 and the Task Force Policy (RFP 5). Category 6 withheld documents include intra- and inter-agency communications regarding inter-agency coordination to implement Executive Order 14,188, including, for example:

(1) April 2, 2025 email thread re: "Title VI, IX – Combat Antisemitism, among USDA employees "regarding potential compliance with EO14188, including discussions regarding the draft report in response to the EO," USDA_544; and

(2) March 3, 2025 email thread "summarizing an interagency call coordinating agency efforts to implement the EO, including DOS, DHS, ICE, and E[D]," DOS_153.[13]

---

[11] *See also, e.g.*, ED_4009 (3/11/25 email thread re: "Colleges," regarding "coordination of ED DCL [Dear Colleague Letter] and discussion of next steps with universities" and discussing "implementation of Executive policy regarding higher education"); CRT_665 (6/21/25 "EO 14173 – Report – Final 06.09.2025.pdf," described as a "DOJ report on illegal DEI/A-based discrimination and preferences"); Pecht Decl. ¶9 & Tables A.4, B.4, and C.4.

[12] *See also, e.g.*, CRT_4139 ("CRT Combating Anti-Semitism Task Force – Memo to File (May 2025).docx"); GSA_869 (5/22/25 email thread re: "Task Force Cadence," regarding "operation of the Task Force, including general coordination of next steps"); CRT_10102 ("DOJ Task Force Antisemitism Memo 06.30.2025.pdf"); CRT_10103 ("Supplemental Memo—DOJ Task Force to Combat Antisemitism Memo 07.15.2025 final.pdf"); Pecht Decl. ¶9 & Tables A.5, B.5, C.5, and D.5.

[13] *See also, e.g.*, DOS_201 ("DOS Report on E.O.14188.pdf"); Pecht Decl. ¶9 & Tables A.6, B.6, and C.6.

## ARGUMENT

Plaintiffs move to compel production of these and similar documents, as set forth in the accompanying Tables A, B, C, and D (organized by asserted privilege and relevance category), over Defendants' assertions of deliberative process, presidential communications, attorney work product, and attorney-client privileges. The privileges are wholly inapplicable to many of the documents. And even assuming privileges apply to some, all but attorney-client are qualified privileges that may be overcome based on a balancing test, and Plaintiffs' need for the documents vastly outweighs any interest the government has in shielding its unconstitutional misconduct from public view.

### I. The Court Should Compel Defendants to Produce Relevant Documents Over Their Assertions of Deliberative Process Privilege.

#### A. The Deliberative Process Privilege Is Inapplicable Because the Government's Intent is at Issue.

Defendants have withheld the vast majority of documents at issue based on an assertion of deliberative process privilege,[14] but the "deliberative process privilege is not appropriately asserted … when a plaintiff's cause of action turns on the government's intent," as is the case here with respect to Plaintiffs' First Amendment retaliation claim. *See In re Subpoena Duces Tecum Served on Off. of Comptroller of Currency*, 145 F.3d 1422, 1424 (D.C. Cir. 1998). The deliberative process privilege "was fashioned in cases where the governmental decisionmaking process is collateral to the plaintiff's suit," but "[i]f the plaintiff's cause of action is directed at the government's intent," such as a discrimination or retaliation claim, "it makes no sense to permit the government to use the privilege as a shield." *Id.* Thus, if "the Constitution or a statute makes the nature of governmental officials' deliberations *the* issue, the privilege is a nonsequitur," and "the privilege's raison d'etre evaporates." *Id.* Although the Ninth Circuit has not addressed the issue, numerous courts across multiple circuits have similarly so held.[15]

Here, Defendants' intent is a central element of Plaintiffs' First Amendment retaliation claim on which Plaintiffs are entitled to discovery. To establish First Amendment retaliation, a plaintiff must show "that (1) it engaged in constitutionally protected activity; (2) the defendant's actions would 'chill a

---

[14] Defendants withheld approximately 2,500 responsive documents based *solely* on deliberative process (all of which Plaintiffs challenge, as identified in Table A), and approximately 2,400 based on deliberative process and at least one other privilege (Plaintiffs challenge a subset, as identified in Tables B, C & D).

[15] *See, e.g.*, *Dunnet Bay Constr. Co. v. Hannig*, 2012 WL 1599893, *3 (C.D. Ill. May 7, 2012); *Qamhiyah v. Iowa State Univ. of Science & Tech.*, 245 F.R.D. 393, 396-97 (S.D. Iowa 2007); *Scott v. Bd. of Educ. of the City of E. Orange*, 219 F.R.D. 333, 337-38 (D.N.J. 2004) (collecting cases).

person of ordinary firmness' from continuing to engage in the protected activity; and (3) the protected activity was a substantial motivating factor in the defendant's conduct—i.e., that there was a nexus between the defendant's actions and an intent to chill speech." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016); *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (First Amendment prohibits government from "regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction"). "As with proof of motive in other contexts," First Amendment retaliatory intent "may be met with either direct or circumstantial evidence." *Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 979 (9th Cir. 2002); *see also Anthropic PBC v. U.S. Dep't of War*, -- F.Supp.3d --, 2026 WL 2534714, at *13-14 (N.D. Cal. Aug. 27, 2026); *Harvard Coll.*, 798 F.Supp.3d at 120-23. Thus, the third element of Plaintiffs' First Amendment retaliation claim squarely places at issue whether Defendants' motives included an intent to punish or purge certain disfavored viewpoints from UC.

The withheld documents are all relevant and potentially highly probative of Defendants' intent in developing and implementing the Task Force Policy, and could further expose Defendants' civil rights investigations and enforcement actions as sham proceedings with predetermined outcomes used as a pretext to accomplish the Administration's ideological goals. For example, Category 1 documents will likely shed light on why UC was targeted for investigation.[16] Category 2 documents will likely reveal why the Administration summarily terminated $584 million in UCLA federal grants.[17] Categories 3, 4, and 5 documents will likely show the Administration's true objectives in applying the Task Force Policy to UC and other universities.[18] *See also infra* §I.C.1 (discussing relevance of categories). Because Defendants' intent is a central element of Plaintiffs' First Amendment retaliation claim, and the documents sought are relevant to establishing Defendants' intent, the deliberative process privilege is wholly inapplicable, and Defendants should not be permitted to withhold documents on that basis.

**B. Defendants Improperly Assert the Privilege Over Documents that are Post-Decisional or Nondeliberative.**

Even if there were no intent exception, Defendants bear the burden of establishing that each

[16] *See, e.g.*, CRT_2024 ("UC Investigation Plan 3.2.25 (3 Part Plan").

[17] *See, e.g.*, ED_993 (2/21/25 email thread re: "Contracts and Grants Pilot"); ED_4154 (3/24/25 email thread between Task Force members re: "Next List (Post the 'Columbia Capitulation')").

[18] *See, e.g.*, ED_113 (4/23/25 email thread reflecting a "meeting outlining potential next steps in addressing DEI and hostile political conduct at universities").

document they have withheld on the basis of deliberative process privilege is "both 'predecisional' and 'deliberative.'" *Karnoski v. Trump*, 926 F.3d 1180, 1204 (9th Cir. 2019) (per curiam) (citations omitted). Defendants have not met, and cannot meet, their burden as to the challenged documents.

***Post-Decisional.*** First, Defendants improperly assert the privilege over many documents that on their face are not *pre*-decisional but rather *post*-decisional documents implementing the Task Force Policy, such as final reports reflecting policy decisions, investigation plan documents, and communications executing or explaining decisions already made. For example, a March 2, 2025 document titled "UC Investigation Plan 3.2.25 (3 Part Plan)" on its face reflects a "3 Part Plan" to be executed, not a pre-decisional deliberation.[19] A July 31, 2025 email thread discusses "Funding freezes to UCLA," which freezes occurred that day.[20] Numerous other documents reflect "Next Steps" that appear to have already been determined.[21] Many others are draft notices about investigations or grant suspensions,[22] reports on actions taken to implement executive orders,[23] or draft press statements explaining actions taken.[24] But the deliberative process privilege applies only to "predecisional" documents "generated before the adoption of an agency's policy or decision." *F.T.C. v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984). "[P]ost-decisional records fall outside the deliberative process privilege if they follow a final decision and are designed to explain a decision already made." *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 981 (9th Cir. 2009); *Assembly of State of Cal. v. U.S. Dep't of Com.*, 968 F.2d 916, 920 (9th Cir. 1992) (documents merely "interpreting the

[19] CRT_2024. *See also, e.g.*, CRT_1482 (2/28/25 email thread re: "UC Investigation Outline"); CRT_10658 ("Antisemitism Campus Tour 2025 Plan"); CRT_3452 (5/29/25 email thread re: "UC Memo," attaching "UC Berkeley Summary and Conclusions.pdf," CRT_3455, "UC Davis Summary and Conclusions.pdf," CRT_3454, "UC memo 5 29 2025 (to OAAG).docx," CRT_3453, and "UCSF Summary and Conclusions.pdf," CRT_3456); CRT_665 ("EO 14173 – Report – Final 06.09.2025.pdf"); CRT_10103 ("Supplemental Memo—DOJ Task Force to Combat Antisemitism Memo 07.15.2025 final.pdf")).

[20] CRT_1170.

[21] *See, e.g.*, CRT_821 (7/25/25 email thread re: "University Next Steps – many documents to edit"); CRT_611 (7/24/25 email thread re: "University Next Steps // Roundup"); ED_4009 (3/11/25 email thread re: "Colleges," regarding "coordination of ED DCL [Dear Colleague Letter] and discussion of next steps with universities"); CRT_3381 (4/4/25 email thread re: "Additional Measures to Combat Anti-Semitism Implementation Check-In"); CRT_3924 (9/19/25 email thread re: "Higher Ed Regroup Meeting: Sept 23," discussing "next steps to implement Executive policy").

[22] *See, e.g.*, NSF_410, _412 ("NSF Draft CA Termination Notice.docx" and related email thread); NSF_456 ("Draft notification of UCLA award suspensions to Directorates/Offices"); DOE_1047 ("draft suspension notice"); DOE_680 (7/30/25 email thread re: "DOE's suspension notice").

[23] *E.g.*, ED_1508 (email "to brief the President on actions taken by ED to accomplish Title VI priorities and combat antisemitism").

[24] *See, e.g.*, GSA_253 (2/26/25 email thread re: "Anti Semitism Task Force Presser"); CRT_10223 ("UC 707 investigation press release DRAFT 3.4.25 (jgm).docx"); CRT_1377 (7/28/25 "For HKD Review: UCLA Title VII Pre-suit notice letter and Press Release").

decision after the fact" not protected). Defendants' many documents that simply memorialize, discuss, or explain decisions already made are not covered by the deliberative process privilege.[25]

Moreover, it is the agency's burden to "identify a specific decision to which the document is predecisional." *Maricopa Audubon Soc'y v. U.S. Forest Serv.*, 108 F.3d 1089, 1094 (9th Cir. 1997). "[T]he absence of an identifiable later decision is of considerable relevance to the deliberative process privilege, as evidence of whether a later decision was indeed under consideration. Otherwise, the privilege would be boundless, as '[a]ny memorandum will always be 'predecisional' if referenced to a decision that possibly may be made at some undisclosed time in the future.'" *Lahr*, 569 F.3d at 981 (quoting *Assembly of Cal.*, 968 F.2d at 921). Defendants largely fail to identify any specific subsequent decisions so do not meet this burden.[26] *See U.S. ex rel. Poehling v. UnitedHealth Grp., Inc.*, 2018 WL 8459926, *12-16 (C.D. Cal. Dec. 14, 2018) (compelling production of more than 20,000 documents withheld based on deliberative process privilege assertion; log description stating merely that document "'reflect[ed] internal agency deliberations regarding' any one of a number of subject areas" insufficient). This failure is particularly significant given Defendant Terrell's statements as early as February 2025 that he was going to "target[]" UCLA and use antisemitism investigations as justification to "take away [its] funding," Dkt. 27-35 at 3-4, indicating that the decision to apply the Task Force Policy to UC had already been made as early as February 2025, and rendering all subsequent documents that merely implement this decision post-decisional. *Cf. New York v. McMahon*, 826 F.Supp.3d 184, 197-98 (D. Mass. 2026) (Agency RIF and Reorganization Plans were post-decisional where administration's public statements indicated decision to implement the RIF pre-dated the plans, and thus "ARRPS were not created to decide whether the RIF should take place, but rather, they were created after the decision to implement the RIF had already been made"); *Lahr*, 569 F.3d at 981 (Ninth Circuit has "rejected the argument that 'a continuing process of agency self-examination is enough to render a document

[25] Nor does Defendants' mere labeling of documents as "drafts" or "proposals" render them predecisional. "[F]unctionally final decisions" labeled as "drafts" are not protected by the privilege. *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 273 (2021); *see also Nat'l Res. Def. Council v. U.S. Dep't of Def.*, 388 F.Supp.2d 1086, 1107 (C.D. Cal. 2005) ("[T]o the extent Defendants are withholding 'draft' data compilations because they may have been 'subject to revision,' such withholding appears to be improper."). Many withheld documents are labeled "drafts" or "proposals" but reflect functionally final decisions. *See, e.g.*, CRT_10144 (3/11/25 "TaskForce Letter-UCLA.docx"); CRT_10145 ("TaskForce Letter-UC Davis.docx); CRT_10146 ("TaskForce Letter-UC Berkeley.docx").

[26] *E.g.*, ED_93 ("deliberative draft 60-day report of the Antisemitism Task Force, including internal deliberations about the contents and phrasing of the report"); ED_2315, ED_2327, ED_2516, ED_4467 ("Email thread reflecting pre-decisional deliberations regarding investigation tactics and potential coordination in investigation of antisemitic discrimination at universities").

'predecisional'"). Accordingly, the Court should rule that the deliberative process privilege does not apply to documents that memorialize or post-date Defendants' development of the Task Force Policy, or at minimum, to documents that memorialize or post-date Defendants' February 2025 decision to apply the Task Force Policy to UC.

***Non-Deliberative.*** Second, Defendants improperly assert the deliberative process privilege over many documents that are factual, not deliberative. To be "deliberative," the document must contain "opinions, recommendations, or advice about agency policies." *Warner Commc'ns*, 742 F.2d at 1161. "Purely factual material that does not reflect deliberative processes is not protected." *Id.* Defendants have improperly asserted the privilege over hundreds of Excel spreadsheets and other documents that appear to contain only summaries or compilations of data, such as contracts and grants at UC, other California public entities, and other universities.[27] Many other documents appear to contain only non-deliberative summaries of policies, executive orders, or other factual developments.[28] Any factually segregable material is not subject to the privilege and must be produced. *See Karnoski*, 926 F.3d at 1204.

**C. Plaintiffs' Need for the Documents Overcomes the Qualified Privilege.**

Even if Defendants could demonstrate that any of these documents are deliberative and pre-decisional, the Court would nevertheless be justified in compelling production of *all* documents withheld based on the deliberative process privilege because Plaintiffs' need for the challenged documents far outweighs any interest the government may have in maintaining their secrecy.

"The deliberative process privilege is a qualified one" that may be overcome if a litigant's "need for the materials and the need for accurate fact-finding override the government's interest in non-

[27] *E.g.*, ED_1080 (2/22/25 spreadsheet, "Berk.xlsx," containing "data compiled for consideration of ongoing award considerations"); GSA_104 2/4/25 email thread re: "University Data Pull"); GSA_46 (2/21/25 spreadsheet, "Columbia Grants and Contracts.xlsx"); GSA_45 (2/21/25 spreadsheet, "UC Berkeley Grants.xlsx"); GSA_48 (2/21/25 "UC Davis Grants and Contracts.xlsx"); GSA_47 (2/21/25 "UCLA Grants and Contracts.xlsx."); GSA_97 (2/24/25 "University Active Contract Grant IDV Inventory.xlsx"); GSA_726 (3/4/25 email thread re: "Next List," containing "compilation of award data across universities"); HHS_1947 (3/6/25 "University Spend.xlsx"); CRT_3579 (3/7/25 "Copy of UC Federal Funding"); ED_1056 (3/16/25 "Higher Education Actions-4.16.docx," "gathering details as to funding suspensions at universities"); GSA_340 (6/5/25 "Grants & Contracts to CA Public Entities – Categorized Terminations (6).pdf"); HHS_1505 (11/13/25 "Active Grants to the University of California Berkeley_as of 11.12.2025.xlsx"); ED_114 ("ED spreadsheet tracking reversal of DEI policies and practices across universities"); ED_116 (7/28/25 "National Shifts Narrative Summaries," described as an "ED document outlining DEI policies and practices at universities across the country"); CRT_186 ("Executive Order tracker 2.17.25.xlsx"). *See, e.g.*, *NAACP v. Bureau of Census*, 401 F.Supp.3d 608, 615-16 (D. Md. 2019) (spreadsheets containing calculations and formulas not privileged).

[28] *See, e.g.*, CRT_791 ("Executive Order tracker 3.11.25.xlsx"); ED_111 ("Communications and Policy Tracker.xlsx"); ED_114 ("ED Action Result Inventory.xlsx").

disclosure." *Warner Commc'ns*, 742 F.2d at 1161; *accord Karnoski*, 926 F.3d at 1206; *see also, e.g.*, *Am. Fed'n of Gov't Emps. v. Trump*, 791 F.Supp.3d 1065, 1072-73 (N.D. Cal. 2025) (compelling disclosure because plaintiffs' need for documents outweighed interest in nondisclosure), *aff'd*, 155 F.4th 1082 (9th Cir. 2025); *Stone v. Trump*, 453 F.Supp.3d 758, 765-69 (D. Md. 2020) (compelling disclosure of three categories of deliberative documents).[29]

The Ninth Circuit considers four non-exclusive factors to determine whether a party's need for the evidence outweighs the government's interest in non-disclosure: "(1) the relevance of the evidence; (2) the availability of other evidence; (3) the government's role in the litigation; and (4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions." *Am. Fed'n of Gov't Emps. v. Trump ("AFGE")*, 155 F.4th 1082, 1092 (9th Cir. 2025) (quoting *Warner Commc'ns*, 742 F.2d at 1161). "Other factors that a court may consider include: (5) the interest of the litigant, and ultimately society, in accurate judicial fact finding[;] (6) the seriousness of the litigation and the issues involved[;] (7) the presence of issues concerning alleged governmental misconduct[;] and (8) the federal interest in the enforcement of federal law.'" *N. Pacifica, LLC v. City of Pacifica*, 274 F.Supp.2d 1118, 1122 (N.D. Cal. 2003). All factors weigh heavily for disclosure.

**1. The Evidence Is Highly Relevant to the Central Issues in the Case.**

First, all of the challenged documents, which fall within the six categories described above, are highly relevant to Plaintiffs' claims and likely probative of, *inter alia*: (1) the existence of the three-stage Task Force Policy; (2) Defendants' pretextual use of antisemitism allegations to target UC and other universities, and the predetermined outcomes of their civil rights investigations; (3) Defendants' retaliatory and coercive intent in opening civil rights investigations and then terminating federal funding at UC and other targeted universities; and (4) each Defendant's role and involvement in developing and implementing the Policy. *See supra* at 4-8, 10. Even if the Court declines to adopt the D.C. Circuit's intent exception to the deliberative process privilege, the centrality of the government's motives and intent weighs heavily in favor of compelling disclosure. *See, e.g.*, *Thomas v. Cate*, 715 F.Supp.2d 1012, 1021 (E.D. Cal. 2010) ("fact that the decision making process is at issue … weighs heavily" against privilege); *Toomey*, 2021 WL 3854860 at *5-6 (compelling disclosure of documents because they could

[29] *See also, e.g.*, *Llera v. Las Vegas Metro. Police Dep't*, 564 F.Supp.3d 914, 919-22 (D. Nev. 2021); *Toomey v. Arizona*, 2021 WL 3854860, *4-7 (D. Ariz. Aug. 27, 2021); *Vietnam Veterans of Am. v. CIA*, 2011 WL 4635139, *10-12 (N.D. Cal. Oct. 5, 2011); *Poehling*, 2018 WL 8459926, at *16.

"uncover the thought processes behind the decisions" and supply evidence of discriminatory intent); *N. Pacifica*, 274 F.Supp.2d at 1124 (disclosure favored in equal protection case where decisionmaking process "*is* the case") (citation omitted); *Marilley v. McCamman*, 2012 WL 4120633, *6-7 (N.D. Cal. Sept. 19, 2012) (same); *Coleman v. Sterling*, 2011 WL 13176814, *4-5 (S.D. Cal. June 13, 2011) (same).

As discussed *supra* at 10, the withheld documents are highly relevant to Plaintiffs' First Amendment retaliation claim, as they will likely shed light on Defendants' motives and intent in adopting the Task Force Policy and in implementing it at UC and other targeted universities. The documents are also highly relevant to Plaintiffs' coercion claims under the First and Tenth Amendments. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187-91 (2024); *Natl Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 619, 678-79 (2012). For example, Category 1 documents are likely to reveal the Administration's reasons for targeting UC and certain other universities with civil rights investigations and whether the outcome of those investigations was effectively predetermined.[30] Category 2 documents are likely to reveal whether the Administration's funding cuts at universities were calculated to be coercive rather than tethered to any actual findings of civil rights violations within the relevant program or activity.[31] Category 3 and 4 documents are likely to confirm the pretextual nature of the Administration's civil rights investigations and that the Administration's true objectives in launching civil rights investigations, indiscriminately canceling hundreds of millions of dollars in research funding, and demanding a billion-dollar monetary penalty not authorized by law were to suppress disfavored speech and to coerce universities into adopting the Administration's preferred policies.[32] And Category 5 and 6 documents are likely to show the

[30] *E.g.*, CRT_1856 (2/26/25 email thread between DOJ and EEOC re: "Comms – UC School System"); CRT_2024 ("UC Investigation Plan 3.2.25 (3 Part Plan"); CRT_10658 ("Antisemitism Campus Tour 2025 Plan"); CRT_10601 ("Antisemitism Visits Funding and Background"); CRT_10100 ("DOJ Task Force to Combat Antisemitism-Recent Activities and Strategic Objectives"); CRT_821 ("University Next Steps – many documents to edit"); Tables A.1, B.1, C.1, D.1.

[31] *E.g.*, ED_993 (2/21/25 email thread re: "Contracts and Grants Pilot"); ED_4154 (3/24/25 Task Force members email thread re: "Next List (Post the 'Columbia Capitulation')"); DOE_1091 (7/18/25 email thread re: "UC System," regarding "funding priorities" and "implementation of Executive policy"); CRT_3823 (8/14/25 email thread re: "Request regarding federal $$$ to UC System," containing "DOJ's calculations and rationales for employing civil rights authorities to implement Executive Orders"); Tables A.2, B.2, C.2, D.2.

[32] *E.g.*, ED_114 (4/23/25 email thread reflecting "meeting outlining potential next steps in addressing DEI and hostile political conduct at universities"); CRT_11277 (8/12/25 email thread re: "Higher Education Settlements/Negotiations"); ED_1429 ("Template Global Agreement-Antisemitism and student discipline.docx"); EC_1428 ("Template Global Agreement-Transgender ideology.docx"); ED_116 (7/28/25 "National Shifts Narrative Summaries," "outlining DEI policies and practices at universities across the country … in anticipation of agency and administration actions in furtherance of administrative policies"); CRT_3831 (8/8/25 email thread re: "Rule 408 Proposed Voluntary

coordinated nature of the Administration's Task Force Policy across all Defendants, as directed by the White House.[33] The documents at issue are central to Plaintiffs' claims and likely to be highly probative evidence that Defendants used civil rights enforcement as a pretext to pursue their true intent "to coerce universities into purging disfavored 'left and 'woke' viewpoints from their campuses and replace them with views that the Administration favors." Dkt. 90 at 10.[34]

**2. The Government Is the Defendant, and the Information Is Not Available From Other Sources.**

The second and third factors also strongly favor disclosure. The documents at issue are intra- and inter-agency communications, so are "primarily, if not exclusively, under Defendants' control." *Karnoski*, 926 F.3d at 1206; *see also, e.g.*, *Marilley*, 2012 WL 4120633, at *5 (agency's "draft advice, opinions, recommendations, and proposals" not available from other sources, weighing heavily for disclosure). And the federal agencies from which Plaintiffs seek discovery are defendants in this case. *See Karnoski*, 926 F.3d at 1206; *AFGE*, 155 F.4th at 1092.

**3. There Is No Legitimate Interest in Maintaining Secrecy Over Unconstitutional Government Misconduct.**

The remaining factors also favor disclosure. While the government's interest in frank policymaking discussions typically favors nondisclosure, "where there is reason to believe the documents sought may shed light on government misconduct, 'the [deliberative process] privilege is routinely denied,' on the grounds that shielding internal government deliberations in this context does not serve 'the public's interest in honest, effective government.'" *In re Sealed Case*, 121 F.3d 729, 738 (D.C. Cir. 1997) (citation omitted); *see Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 885 (1st Cir. 1995) (similar); *Am. Ass'n of Univ. Profs. v. Rubio*, 816 F.Supp.3d 216, 219-20 (D. Mass. 2026) (unsealing documents over deliberative process assertions where documents "shed light on … government misconduct" including the targeting of non-citizen pro-Palestinians for deportation

---

Agreement"); ED_1760 (9/17/25 "Sketch of a Template Global Agreement.docx," regarding "the potential contents of resolution agreement with universities"); ED_1789 (9/23/25 emails regarding "[s]trategy as to presenting the Compact idea to universities"); Tables A.3, A.4, B.3, B.4, C.3, C.4, D.3.

[33] *E.g.*, GSA_869 ("Task Force Cadence" emails); CRT_10102 ("DOJ Task Force Antisemitism Memo 06.30.2025.pdf"); CRT_10103 ("Supplemental Memo—DOJ Task Force to Combat Antisemitism Memo 07.15.2025 final.pdf"); CRT_3924 ("Higher Ed Regroup Meeting: Sept 23" email thread); Tables A.5, A.6, B.5, B.6, C.5, D.5.

[34] *Cf. Stone*, 453 F.Supp.3d at 763, 766-68 (compelling disclosure of three categories of deliberative documents, including those "relating to the … working groups tasked with developing a plan to study and implement that decision" and "relating to the [agency's] Implementation Plan").

"primarily on account of their First Amendment protected political speech").[35]

"The uniqueness of the circumstances prompting disclosure here further mitigates any potential harm to the 'full and frank' nature of presidential communications." *Trump v. Thompson*, 20 F.4th 10, 47 (D.C. Cir. 2021) (citation omitted). Plaintiffs are likely to prove that Defendants are "engaged in a concerted campaign to purge 'woke,' 'left,' and 'socialist' viewpoints from our country's leading universities" by suspending billions in critical research funding. Dkt. 90 at 1. This campaign is unprecedented in American history. *Cf. id.* at 51 (noting the government "cannot—and historically has not—moved to immediately terminate funds" in this manner); *id.* at 2 (noting UC President "called the situation 'one of the gravest threats in UC's 157-year history'"). "Advisors of the President are unlikely to 'be moved to temper the candor of their remarks' simply because of the 'infrequent occasions' on which an event as unparalleled as" this nationwide assault on free speech "might arise." *Thompson*, 20 F.4th at 47 (citation omitted); *see Dellums v. Powell*, 561 F.2d 242, 247 (D.C. Cir. 1977) (privilege overcome because "a charge of civil conspiracy among high officers of government to deny a class of citizens their constitutional rights" is so "infrequent," which "militate[s] against any substantial fear that the candor of Presidential advisers will be imperiled").[36]

Moreover, any secrecy interest is diminished in this case because much of the Task Force's inner workings and Task Force Policy's implementation is already in the public record, through either Defendants' own disclosures or whistleblower reports. *See Cmte. On Oversight & Gov't Reform, U.S. House of Rep. v. Lynch*, 156 F.Supp.3d 101, 111-12 (D.D.C. 2016) (plaintiffs' need outweighed government's interest in nondisclosure, when substance of documents already public); *U.S. Dep't of Treasury v. Pension Benefit Guar. Corp.*, 351 F.Supp.3d 140, 153-54 (D.D.C. 2018) (government's "interest in maintaining the confidentiality of conversations related to a subject[ ] 'substantially diminishes' when there is public testimony on that subject"); *cf. Assembly of State of Cal.*, 968 F.2d at 922-23 (privilege did not apply where agency had "already revealed most of its decisional process" and

[35] *Cf. Tax Reform Res. Grp. v. Internal Revenue Serv.*, 419 F.Supp. 415, 426 (D.D.C. 1976) (compelling disclosure of special counsel to president's memo to IRS relating "'to the recommendations and attempts to use the Internal Revenue Service in a selective and discriminatory fashion" against groups "oppos[ed] to the policies and programs of the Administration," as such documents are not "part of the legitimate governmental process intended to be protected by [FOIA] Exemption 5").

[36] Nor can Defendants seriously argue Plaintiffs have failed to provide "sufficient evidentiary substantiation to avoid the inference that the demand reflects mere harassment." *In re Sealed Case*, 121 F.3d at 744. Plaintiffs "submitted overwhelming evidence" to support their claims, and Defendants have "submit[ted] nothing to refute this." Dkt. 90 at 1; *see also id.* at 2 ("Defendants do not deny any of this.").

most of process' product already public). Several former DOJ attorneys recently filed a whistleblower complaint with the House Judiciary Committee explaining how the outcomes of the Harvard, Columbia, and Brown investigations "had been determined before the relevant evidence was collected." Exs. 44, 45. Former DOJ attorneys have also publicly shared information about the agency's sham civil rights investigations into targeted universities, which has been widely reported. *See, e.g.*, Exs. 7, 8, 9, 10, 11, 12, 36. Defendants' interest in confidentiality is diminished by these public disclosures to Congress and the media. *See Pension Benefit*, 351 F.Supp.3d at 154 (confidentiality interest reduced by "testimony before Congress" and "at least one book written by a former member of Treasury on the subject").

In sum, all four *Warner* factors weigh heavily in favor of disclosure. So do the additional discretionary factors. The documents at issue are of central relevance to Plaintiffs' claims and cannot be obtained from sources other than the governmental Defendants themselves; the government has a diminished interest in secrecy, as the litigation concerns serious claims of government misconduct, including the unprecedented weaponization of civil rights enforcement authority to quash disfavored speech and policies on university campuses; and the public has a strong interest in accurate judicial fact-finding and in enforcement of the First and Tenth Amendments.

## II. The Court Should Compel Defendants to Produce Relevant Documents Over Their Assertions of Presidential Communications Privilege.

Plaintiffs also challenge Defendants' assertion of the presidential communications privilege. *See* Tables B-D. As to some documents, Defendants have not met their burden of establishing the privilege applies. As to all, Plaintiffs' need for the documents overcomes the qualified privilege, particularly given the White House's central role in orchestrating the grant terminations at UC. *See* Exs. 6, 13, 14.

### A. Defendants Improperly Assert Presidential Communications Privilege Over Documents that are Not Covered by the Privilege.

The presidential communications privilege is narrow and "not to be lightly invoked." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 389 (2004) (citation omitted). It applies only to "communications directly involving and documents actually viewed by the President," as well as certain "documents 'solicited and received' by the President or his 'immediate White House advisers [with] … broad and significant responsibility for investigating and formulating the advice to be given the President.'" *Karnoski*, 926 F.3d at 1203 (citations omitted). Defendants do not assert that any withheld documents

were actually viewed by the President; they invoke the privilege based only on the involvement of certain White House advisors. But the privilege is inapplicable to many of these documents, for two reasons.

First, many privilege descriptions do not indicate that the documents were *solicited* (rather than merely received) by White House Office staff.[37] *See In re Sealed Case*, 121 F.3d at 758 (White House "[o]rdinarily … expected to demonstrate" that the "documents were in fact solicited"). Defendants' assertion of the privilege is insufficient as to these documents.[38] Second, for a subset of documents neither solicited nor received by White House Office staff, Defendants claim in conclusory fashion that the documents "reflect" privileged communications, but without confirmation that the document actually memorializes, summarizes, or describes privileged communications, as opposed to merely following such communications. *See Prop. of the People, Inc. v. Off. of Mgmt. & Budget*, 330 F.Supp.3d 373, 390 (D.D.C. 2018) (documents must "memorialize[ ], summarize[ ], describe[ ] or otherwise reflect[ ] the content of actual communications between … White House advisers … and agency personnel").[39]

Plaintiffs request an order requiring Defendants to produce (i) any documents that were not actually solicited by White House Office personnel, and (ii) those that merely result from or implement such communications but do not actually divulge the communications themselves, with the parties to meet and confer and submit for *in camera* review any documents over which they cannot agree. *See, e.g.*, *Protect Democracy Project, Inc. v. Nat'l Sec. Agency*, 10 F.4th 879, 886-87 (D.C. Cir. 2021) (conducting *in camera* review to determine if a document "memorialized" presidential communications); *N.Y. Times Co. v. Off. of Mgmt. & Budget*, 531 F.Supp.3d 118, 122, 125 (D.D.C. 2021) (same).

### B. Plaintiffs' Need for the Documents Overcomes the Qualified Privilege as to All Challenged Documents.

Even if the presidential communications privilege arguably applies to some documents, it is

---

[37] Plaintiffs do not challenge the privilege as to documents authored by White House Office staff.

[38] *See, e.g.*, ED_4164, 4166 ("Re: UC System" "email between White House advisors and agency"); ED_4609 ("Proposed Next Steps for Compact" thread where agency is "requesting advice" from White House); ED_1067 ("Higher Ed Actions Summary" "email thread between WH" and agencies); HHS_1309, 1311 ("HHS Funding" chain "between Task Force and WH"); DOE_22, 28 ("UC System" chain where "NSF is preparing draft notices" or "DOE is gathering data" "based on DOJ and EOP feedback," but no indication the draft notices or data were solicited); GSA_298, 526, 527, 529, 531 (chain merely "including a White House advisor"); GSA_510 ("UCLA -- Next steps" thread "between agency employees, counsel, and White House advisors"); CRT_11126, 11129, 11125, 11128 ("RE: University Next Steps -- many documents to edit" chain not listing White House advisors on email and not explaining privilege).

[39] HHS_1511, 1512, 1519 ("RE: UC Berkeley" emails "reflecting … deliberations with White House advisors" not on the email chain); HHS_1573 ("HUD CA Term Letter > suggested letter with new reasons" email, same).

overcome as to all. Like the deliberative process privilege, "the presidential communications privilege … is not absolute." *Karnoski*, 926 F.3d at 1205. Rather, a party may "'overcome a claim of presidential privilege'" by demonstrating, first, that the documents are "'directly relevant to issues that are expected to be central to the [case],'" and second, that the documents are "'not available with due diligence elsewhere.'" *Id.* (quoting *In re Sealed Case*, 121 F.3d at 754); *see In re Sealed Case*, 121 F.3d at 755 (explaining that "the factors of importance and unavailability" are the same ones used in evaluating whether the deliberative process is overcome). The court then weighs this showing of need against "the interest in secrecy or nondisclosure." *Karnoski*, 926 F.3d at 1205 (citation omitted).

For the same reasons that the deliberative process privilege is overcome for the six categories of documents, the presidential communications privilege is overcome as well. First, the documents are directly relevant to issues central to this case, including Plaintiffs' First and Tenth Amendment retaliation and coercion claims. *See supra* at 4-8, 10, 14-16. Moreover, because the White House was involved firsthand in directing implementation of the Task Force Policy at UC, the communications at issue are uniquely relevant and unobtainable elsewhere. *See* Exs. 13, 14; *Dellums*, 561 F.2d at 248 (court "can scarcely imagine what could be more relevant to the grave allegations in the present case than the actual words of those alleged to have been the conspirators" in conspiracy to violate civil rights). Plaintiffs seek documents that could reveal the White House's reasons for directing agencies to open civil rights investigations and suspend funds at UC and other targeted universities to be retaliatory and coercive in violation of the First and Tenth Amendments.[40] Plaintiffs also seek internal government emails shedding light on the government's motivations during its negotiations with UC after it terminated hundreds of millions of dollars in government funds, threatened to suspend more, and issued its demands for ideological policy changes and $1.2 billion.[41] Second, Plaintiffs seek internal government

[40] *See, e.g.*, CRT_825 (July 2025 "RE: Funding freezes to UCLA" chain about "calculations of funding freezes," "the content of grant suspension letters," "the nature of scope of grant actions); DOE_52 ("Re: UC System" chain about "UC grant continuity in light of Executive priorities," "all active grant awards and potential cuts" and "potential rollout strategy" of same); HHS_1574 (June 2025 "Follow up from Defund California" chain about "status of ongoing implementation actions" regarding "Executive policy on higher education and funding" and "strategy for potential future actions"); ED_1497, -1498 (memo to White House re: "ED Actions on DEI, Antisemitism, gender identity"); ED_1664 (memo to White House re: "Presidential Wins on Higher Education v.4[2].docx").

[41] *See, e.g.*, ED_1524 (September 2025 "UCLA -- Next steps" email chain between DOJ and White House, described as "including deliberations about potential settlement"); GSA_512 (same, described as "deliberations regarding ongoing dispute with UCLA"); ED_998 (August 2025 "Re: University Next Steps -- many documents to edit" email chain, described as reflecting "substance and phrasing of language for resolutions between the federal government and several major universities across the country"); NSF_387 (email chain including "discussion of a proposed settlement with UCLA").

communications, which are not available from other sources. *See supra* at 16. The privilege is overcome in these circumstances. *See Pension Benefit*, 351 F.Supp.3d at 157 (compelling documents "which relate to Treasury's interactions with" a government program where the plaintiffs alleged "Treasury … impermissibly pressured" that program "to acquiesce in … Treasury's political goals"); *id.* at 158 (compelling emails relating to discussions among White House staff sent "at a time during which there was a mediation with important parties including" the regulated entity).

Plaintiffs' showing of need far outweighs Defendants' interest in confidentiality. As an initial matter, "the privilege become[s] more attenuated the further away the advisers are from the President." *Jud. Watch, Inc. v. Dep't of Just.*, 365 F.3d 1108, 1115 (D.C. Cir. 2004). Defendants have invoked the privilege to protect communications involving not the president, but his advisors and their staff. *See, e.g.*, CRT_9983 (communications with "White House advisors"). Moreover, as explained *supra* at 17-18, much of the subject matter at issue has already been publicly disclosed by whistleblowers and is in the public record. *See Pension Benefit*, 351 F.Supp.3d at 154; *Nixon v. Sirica*, 487 F.2d 700, 718 (D.C. Cir. 1973) ("the public testimony given consequent to the President's decision substantially diminishes the interest in maintaining the confidentiality of conversations pertinent to Watergate").

In sum, the privilege is overcome for all the challenged documents. *See Dellums*, 561 F.2d at 248-49 (privilege overcome when party "established that [DOJ] played a leading role in the executive's efforts … and that there had ensued substantial violations of fundamental constitutional rights").

## III. The Court Should Compel Defendants to Produce Relevant Documents Over Their Assertions of Attorney Work Product.

Plaintiffs also challenge Defendants' assertions of attorney work product over 1,544 documents. *See* Tables C & D.[42] Of those, 15 do not qualify for work product protection at all, and even if they did, Plaintiffs' need for the documents overcomes the qualified privilege for all the reasons stated above.

### A. The Protection Does Not Apply to Certain Dual-Purpose Documents.

"The attorney work-product privilege protects from discovery in litigation 'mental impressions, conclusions, opinions, or legal theories of a party's attorney' that were 'prepared in anticipation of litigation or for trial.'" *Am. Civ. Libs. Union of N. Cal. v. U.S. Dep't of Just.* ("*ACLU v. DOJ*"), 880 F.3d

[42] Defendants initially withheld over 2,000 documents as work product. After Plaintiffs pointed out the facial deficiencies of their assertions, Defendants ultimately withdrew over 450 designations. Lynch Decl. ¶9.

473, 483 (9th Cir. 2018). However, the privilege does not apply to "dual purpose documents" that "serv[e] both a non-litigation and a litigation purpose," if the document would "have been created in substantially similar form" even absent "the prosect of … litigation." *Id.* at 485-86 (ellipsis in original).

Plaintiffs challenge Defendants' assertion of work product over the "Title VI Elements Memo," a dual-purpose document concerning "the potential legal standards applicable to Title VI antisemitism cases."[43] "Material that simply lists relevant case law and recites case holdings is not protected by the attorney work-product privilege." *ACLU v. DOJ*, 880 F.3d at 488. That is all this document appears to be, and the privilege log has no explanation of how the document is work product.

Plaintiffs also challenge Defendants' assertion of work product over certain dual-purpose emails "regarding investigation tactics … in investigation of antisemitic discrimination at universities." ED_2207.[44] Defendants' log descriptions do not explain how these emails constitute work product. In any event, the protection is inapplicable to "instructions to investigators" that "would have been created in 'substantially similar form' regardless of whether those investigations ultimately lead to criminal prosecutions." *ACLU v. DOJ*, 880 F.3d at 486; *see also id.* ("[T]he government must instruct its staff about how to conduct criminal investigations regardless of whether those investigations lead to later prosecutions."). The protection thus does not apply to the challenged documents.

**B. The Protection is Outweighed for All Challenged Documents.**

Even if it applies, "[t]he attorney work-product privilege is a qualified privilege." *ACLU v. DOJ*, 880 F.3d at 484 n. 8. For "ordinary" or "factual" work product, which "consists of factual material prepared in anticipation of litigation," *United States ex rel. Brown v. Celgene Corp.*, 2015 WL 12731923, at *7 (C.D. Cal. July 24, 2015), the protection can be overcome by showing that Plaintiffs "'ha[ve] substantial need for the materials … and cannot, without undue hardship, obtain their substantial equivalent by other means.'" *ACLU v. DOJ*, 880 F.3d at 484 n. 8 (quoting Fed. R. Civ. P. 26(b)(3)(A)(ii)) (ellipsis in original). A higher standard applies to "opinion work product—meaning, the attorney's 'mental impressions, conclusions, opinions or legal theories.'" *United States v. Sanmina Corp.*, 968 F.3d 1107, 1125 (9th Cir. 2020). "[O]pinion work product may be discovered and admitted when mental impressions are *at issue* in a case and the need for the material is compelling." *Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 577 (9th Cir. 1992); *Sanmina*, 968 F.3d at 1125 (same). Under either

[43] ED_920, -922, -1247, -1688, -1690.
[44] *See also* ED_2167, -2169, -2309, -4000, -4005, -4204, -4967, -4968, -4973.

standard, the protection is overcome for all challenged documents.

Where plaintiffs have alleged that the government's enforcement "action 'was motivated by a discriminatory purpose,'" such as "First Amendment retaliation," "the attorneys' 'mental impressions are the pivotal issue.'" *United States v. McGraw-Hill Cos.*, 2014 WL 8662657, at *6, 8 (C.D. Cal. Sept. 25, 2014); *see supra* at 9-10, 14-16. Here, the challenged documents are likely to shed light on government attorneys' skepticism of these groundless investigations.[45] They are also likely to reveal pressure from Defendants and the White House to sanction the universities regardless of the evidence uncovered by these investigations.[46] Given these documents' central relevance to issues in this case, the protection is overcome. *See McGraw-Hill*, 2014 WL 8662657, at *6 ("where the prosecutor's intent or motivation is put at issue, courts have ordered the production of opinion work product"); *Holmgren*, 976 F.2d at 577-78 (protection overcome where "the lawyers who managed and supervised the former litigation for the defendants" are asked about "the merits of the prior suits"). And "given that most of the materials are communications within the [federal government], it would likely be impossible to obtain equivalent materials from any other source." *McGraw-Hill*, 2014 WL 8662657, at *6; *see also Doubleday v. Ruh*, 149 F.R.D. 601, 608 (E.D. Cal. 1993) (compelling need for attorneys' notes in improper prosecution case); *Roberts v. City of Fairbanks*, 2022 WL 889401, at *6 (D. Alaska Mar. 25, 2022) (compelling need where "documents remain in the exclusive control of the State"). Courts regularly compel production of similar documents in analogous circumstances. *See Sommer v. United States*, 2011 WL 4433631, at *7 (S.D. Cal. Sept. 22, 2011) (protection overcome for "attorneys' evaluation of the criminal case" where plaintiff alleged prosecutors knew evidence was "corrupt, false, fabricated, and completely lacking in credibility").[47]

---

[45] *See, e.g.*, CRT_1481 ("UC Investigation Plan"); CRT_10639 ("UC Investigation Plan 3. 2. 25 (3 Part Plan)"); CRT_1487 ("RE: UC Investigation Plan" chain with Michael Gates and Karen Woodard); CRT_3452, 3453 (May 29, 2025 "UC memo" from Woodard to the Office of the Assistant Attorney General); CRT_1414 (July 30, 2025 "UCLA - suit notice letter research" chain). DOJ attorneys later told ProPublica that Gates "seemed upset we were spending so much time investigating." Ex. 8. On May 29, 2025, the DOJ team investigating UC sent a "47-page recommendation memo … to Dhillon" in which "the lawyers spelled out their concerns" that they "simply do not have strong evidence" of legal violations by UC. *Id.* Woodard, then-chief of DOJ's Employment Litigation Section, left DOJ later in 2025 and signed a letter stating Dhillon "demanded that we find facts to fit the Administration's predetermined outcomes." Ex. 15.

[46] *See, e.g.*, NSF_87 ("Funding freezes to UCLA" chain); CRT_11271 ("University Next Steps -- many documents to edit" chain days after suspending funds to UC); GSA_1193 ("UCLA -- next steps" chain three days after Plaintiffs filed complaint).

[47] *See also Doubleday*, 149 F.R.D. at 607-08 (protection overcome for "notes of a prosecutor's

Plaintiffs also seek documents directly relevant to the government's intent in negotiations with UC, such as draft resolution agreements,[48] and emails regarding "substance and phrasing of language for resolutions between the federal government and several major universities."[49] Because of their central relevance, the protection is overcome and such documents must be produced as well. *See City of Fairbanks*, 2022 WL 889401, at *6 (protection overcome for "documents relating to the negotiation of the [plaintiff's] … agreement" with the government because "'the propriety of the prosecutor's decisions' in negotiating and agreeing to the … agreement, [and] the contemporaneous documents memorializing the State's mental impressions in its decision-making[,] are directly at issue").

## IV. The Court Should Compel Defendants to Produce Relevant Documents Over Their Assertions of Attorney-Client Privilege.

Plaintiffs also challenge Defendants' withholding of 441 documents based on attorney-client privilege, which protects only "confidential communications between attorneys and their clients, which are made for the purpose of giving legal advice." *Sanmina*, 968 F.3d at 1116 (citing *Upjohn Co. v. United States*, 449 U.S. 393, 389 (1981)).[50] As "[t]he party asserting the privilege," Defendants "bear[] the burden of proving each essential element." *United States v. Ruehle*, 583 F.3d 600, 608 (9th Cir. 2009). Plaintiffs initially challenge the privilege's applicability to specific documents with descriptions that appear erroneous or fail to establish the privilege applies.[51] Plaintiffs also challenge Defendants' improper assertion of attorney-client privilege over documents where legal advice does not appear to have been the primary purpose of the communications, or where the document does not actually disclose the content of privileged communications.[52]

---

conversations with the [defendants]" that could "reveal … the pressures, if any, [defendants] brought to bear against them"); *McGraw-Hill*, 2014 WL 8662657, at *7 (compelling production of "communications between high-level [DOJ] officials" that "actually tend to exculpate the Government" because movant "is entitled to both the good and the bad").

[48] *See, e.g.*, GSA_511 ("Sketch of a Template Global Agreement"); NSF_84 ("draft resolution agreement between the United States and UCLA").

[49] *See, e.g.*, ED_1273 ("University Next Steps -- many documents to edit"), *see also* NSF_101 ("CONFIDENTIAL" chain discussing "proposed settlement with UCLA").

[50] *See also id.* (privilege applies only "(1) [w]here legal advice … is sought (2) from a professional legal adviser in his capacity as such" and "(3) the communications relating to that purpose [are] (4) made in confidence (5) by the client….") (citation omitted).

[51] *See, e.g.*, ED_1452 (Word document but privilege description describes an "email thread"); ED_1455 (same); NSF_328 (no explanation of attorney-client privilege); HHS_1739 (same); HHS_1879 (same); ED_1283 (same); ED_1289 (same).

[52] While many of Defendants' other assertions of the privilege appear deficient, to reduce the burden on the Court, this motion does not challenge them. For each document where Plaintiffs do not challenge the attorney-client privilege assertion, but do challenge other privilege assertions, Plaintiffs list the

/ / /

**A. The Privilege Does Not Apply Where Legal Advice Is Not the Primary Purpose.**

To be privileged, the "primary purpose of the communication" must be "to give or receive legal advice, as opposed to business or [other non-legal] advice." *Greer v. Cnty. of San Diego*, 127 F.4th 1216, 1224 (9th Cir. 2025) (alterations in original). "Fundamentally, legal advice involves the interpretation and application of legal principles to guide future conduct or to assess past conduct." *Greer*, 127 F.4th at 1225. The privilege does not "shield[] from disclosure" a government lawyer's "advice on political, strategic, or policy issues." *In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998). "Importantly … a dual-purpose communication can only have a single 'primary' purpose." *Greer*, 127 F.4th at 1224. The party asserting the privilege has the "burden of establishing … the primary purpose of the communication was to obtain legal advice." *4WEB, Inc. v. NuVasive, Inc.*, 2025 WL 3190605, at *4 (S.D. Cal. Nov. 14, 2025); *see also United States v. Rowe*, 96 F.3d 1294, 1297 (9th Cir. 1996) (defendants "ha[ve] the burden of showing that the communication was made for the purpose of securing *legal* advice").

**1. Individuals Not Serving in Role of Legal Counsel**

The privilege is wholly inapplicable to the following individuals who had law degrees but were not playing an attorney role in this administration.[53] *See In re Lindsey*, 158 F.3d at 1270 (privilege inapplicable because "consultation with one admitted to the bar but not in that other person's role as lawyer is not protected") (quoting Restatement 3d of the Law Governing Lawyers, § 122, cmt. c).

Josh Gruenbaum was commissioner of the Federal Acquisition Service ("FAS"), not counsel. In fact, it does not appear that Gruenbaum has ever been counsel for any client, as his professional experience seems to consist exclusively of investment banking. *See* Ex. 16, 17, 18. Both David Hyams and Daniel Shieh had policy roles, and neither served in HHS Office of General Counsel or Office of the Inspector General, which "serve[] as the sole officially designated source(s) of legal advice and services." 89 Fed. Reg. 100512, 100513 (Dec. 12, 2024).[54] Both were named in the recent whistleblower

---

document on Table A, B, or C, as appropriate. To the extent the Court finds the other privileges inapplicable or outweighed for a document in Table A, B, or C, Plaintiffs request the Court order Defendants to produce that document with the attorney-client privileged portion redacted.

[53] While it appears the privilege is improperly asserted as to all of these individuals' communications, Plaintiffs challenge only the assertions of attorney-client privilege listed in Table D in an effort to reduce the burden on the court. Plaintiffs do not challenge assertions of the privilege over communications involving more than forty individuals whose roles do appear to have been providing primarily legal advice, such as Yaakov Roth, Jason Altabet, Kathryn Barragan, and Joseph Borson, among many others.

[54] *See also* 90 Fed. Reg. 12166 (Mar. 14, 2025) (same). Hyams served as Supervisory Civil Rights

letter. *See* Ex. 44. Craig Trainor served as Principal Deputy Assistant Secretary for Policy in ED Office of Civil Rights. Ex. 19. He was a political appointee serving in an administrative role, not in an attorney position.[55] Finally, Lucas was commissioner, not counsel, for the EEOC. *See* Ex. 23. EEOC commissioners handle "the development and approval of Commission policies," among other duties. Ex. 24; *see also id.* (distinguishing commissioners from the general counsel, who "provide[s] direction, coordination, and supervision to the EEOC's litigation program").[56] *See Texaco Puerto Rico*, 60 F.3d at 884 (privilege does not attach where attorneys "function as regulators" rather than counsel).[57]

**2. Attorneys with Significant Non-Legal Responsibilities**

Plaintiffs request *in camera* review of the privilege assertions based on individuals who had significant policy and strategy roles so must be analyzed as "dual hat" actors.[58] Since they served in a "mixed capacity" their communications are "protected only to the extent that the lawyer offered it in their professional, legal capacity." *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.* ("*CREW*"), 538 F.Supp.3d 124, 135 (D.D.C. 2021). Given these individuals' roles in developing and applying the Task Force Policy, Defendants' privilege descriptions are too general and conclusory to establish that their communications were for the primary purpose of providing legal rather than political, strategic, or policy advice. Defendants may not "add layers of lawyers" "in hopes of insulating themselves from scrutiny in any future litigation." *In re Grand Jury*, 23 F.4th 1088, 1093-94 (9th Cir. 2021).

HHS Acting General Counsel Sean Keveney and ED Acting General Counsel Thomas Wheeler (and Gruenbaum) implemented the funding suspensions to targeted universities.[59] Documents already produced show Keveney, Wheeler, and Gruenbaum were central to shaping and executing the Task Force

---

Analyst in the HHS Office of Civil Rights and Shieh served as Associate Deputy Director in the Policy Division. Lynch Decl. ¶¶10, 31.

[55] *See* Ex. 20 (Trainor's job code listed as 0301); Ex. 21 at 2 (describing "administrative" nature of "Miscellaneous Administration and Program Series" positions with code 0301); *cf.* Ex. 22 (describing responsibilities for "General Attorney Series" positions with code 0905).

[56] *See, e.g.*, ED_1272 (chain reflects both "predecisional deliberations" and "legal advice" from Lucas "regarding civil rights remedies"); *cf.* ED_1098 (Lucas involved in a chain with GSA, HHS, and DOJ about "EEOC equities" in a "potential Columbia consent decree").

[57] At minimum, Plaintiffs have cleared the minimal threshold of providing a basis for a reasonable, good faith belief that *in camera* review would reveal the privilege is inapplicable.

[58] These rows are highlighted yellow in Table D. *See, e.g.*, DOE_84 ("DRAFT UCLA Suspension Letter" chain reflecting both "legal advice from S. Keveney" and "consideration of Executive policy"); GSA_734 ("UCLA -- Next steps" chain with "legal advice" from unspecified attorneys but merely "advice" from Dhillon on "implementation of Executive policy at UCLA"); GSA_1499-1510 (including both "deliberations" and "legal advice" from Wheeler on "potential Task Force actions").

[59] *See, e.g.*, Ex. 25 (Task Force letter from Keveney, Wheeler, and Gruenbaum to Columbia); Ex. 26 (same, to Harvard).

Policy.[60] Keveney was also closely involved in the negotiations with Columbia and Harvard. Ex. 44 at 13, 21. And Keveney disclaimed any role as legal advisor: "While Shieh … [had] a moment of pause regarding the integrity of the investigations and enforcement actions … Keveney responded, 'That's DOJ's problem.'" *Id.* at 19; *cf. id.* at 15 (Keveney: "White House Domestic Policy Council would determine the legality of funding decisions").

AAG Harmeet Dhillon and DOJ Principal Deputy AAG Gregory Brown threatened sanctions of and/or led negotiations with multiple universities and were central to negotiations with UC. *See* Ex. 27 (Dhillon led Harvard negotiations); Ex. 28, 46 (Dhillon and Brown threats to suspend funding to University of Virginia over "anti-Zionism" allegations and stating "Department's patience is wearing thin"); Ex. 29 (DOJ directing all communications from UC to Brown); Ex. 30 (UC addressing letter on negotiations to Dhillon and Brown, then DOJ scheduling negotiations around Dhillon's availability).

The logs demonstrate that Joshua Hoyt provided political, strategic, and policy advice in his dual role. *See* HHS_1580 ("White House advisor" Hoyt and "agency discuss strategy and advice for the implementation of Executive policy on federal funding"). "[W]hen White House Counsel acts in an advisory capacity, privilege rests on executive privilege doctrines—not on the type of inter-agency attorney-client theory asserted here." *Authors Guild v. Nat'l Endowment for the Humanities*, 2026 WL 550220, at *4 (S.D.N.Y. Feb. 27, 2026); *cf. also In re Lindsey*, 158 F.3d at 1288 (policy and political roles give White House counsel "particularly heavy burden" to establish privilege) (Tatel, J., dissenting).

Because these attorneys frequently "function[ed] as regulators" rather than counsel, *Texaco Puerto Rico*, 60 F.3d at 884, Plaintiffs easily meet the "minimal threshold" required for *in camera* review to determine whether the sole primary purpose of certain of their communications was to provide legal advice. *In re Grand Jury Investigation*, 974 F.2d 1068, 1074-75 (9th Cir. 1992) ("minimal threshold" required for *in camera* review requires only "a factual basis sufficient to support a reasonable, good faith belief that *in camera* inspection may reveal evidence that information in the materials is not privileged").

---

[60] *See* Ex. 6 (Mailman emailing Keveney, Wheeler, Gruenbaum, and non-lawyer Jonathan Pidluzny, and suggesting the Task Force "was basically you all"; Gruenbaum responding they were the "core team"). Defendants initially asserted that Pidluzny was also providing legal advice in dozens of communications, but withdrew such assertions after Plaintiffs pointed out that he is not an attorney. Lynch Decl. ¶36. However, because Defendants have not edited all privilege log entries to reflect this concession, Plaintiffs challenge all assertions of attorney-client privilege and attorney work product based on Pidluzny. *See, e.g.*, HHS_1960 (still stating "thread reflect[s] legal advice from J Pidluzny"); CRT_11271 (describing "communication from … ED counsel J Pidluzny"); CRT_9966 ("Email from ED counsel (J. Pidluzny) also reflect[s] legal work product[.]").

### 3. DOJ Attorneys Conducting Predetermined Investigations

Plaintiffs challenge certain documents allegedly containing legal advice regarding investigations into UC from Karen Woodard and Valerie Meyer, then leaders of DOJ's Employment Litigation Section ("ELS").[61] In *CREW*, "the Attorney General's advisors, at his request, create[d] a memorandum that evaluated the prosecutive merit of the facts" not for the purpose of "helping him make a decision about whether to initiate or decline a prosecution," but for "getting a jump on public relations," so it was not privileged. *CREW*, 538 F.Supp.3d at 142, 146. Likewise, here, DOJ officials asked Woodard and Meyer to investigate UC not to aid a decision whether to bring an enforcement action—that decision had already been made, and this was the first step of Defendants' playbook in targeting UC. "[T]he end goal was never to conduct a thorough, unbiased investigation" but "to file a damn complaint—or have something to threaten the university." Ex. 8 (quoting Jen Swedish, then-deputy chief of ELS).

Indeed, the whistleblower complaint states that when DOJ attorneys raised similar concerns about the baseless investigations into Harvard and Brown, Keveney "asserted that the DOJ attorneys' jobs were not to provide legal advice or make legal determinations." Ex. 44 at 15. The attorney-client privilege does not apply to documents requested for the primary purpose of creating leverage against UC, not for any interest in the attorneys' legal advice. *See CREW*, 538 F.Supp.3d at 147 (privilege inapplicable where officials requesting legal advice had already made relevant decision to prosecute).[62]

### B. The Privilege Does Not Apply to Documents "Implementing" Legal Advice.

Defendants assert attorney-client privilege over documents prepared by non-attorneys that merely "implement," "incorporate," or "reflect" legal advice, "feedback," or "edits" from attorneys.[63]

[61] Ex. 15; CRT_169, 10075 ("FW: Commissioner's charge"); CRT_170 ("Summary of EEOC charges for 2 4 25 meeting.docx"); CRT_10087 ("UC Executive Summary Update 4. 2. 25. docx"); CRT_10242 ("UCLA Executive Summary 3. 26. 25.docx"); CRT_10243 ("Summary of CP Interviews 3. 25. 25.docx"); CRT_10515 ("UC Executive Summary Update 4. 2. 25. docxkdw. docx").

[62] Plaintiffs also challenge the attorney-client privilege assertion over copies of the "Title VI Elements Memo," which discusses "potential legal standards applicable to Title VI antisemitism cases." ED_1247, 1688, 1690. This type of "general-purpose legal manual, teaching [government] officials about the laws they enforce and the constitutional and statutory constraints they must follow," "cannot be withheld under this privilege." *Am. Civ. Lib. Union of San Diego & Imperial Counties v. U.S. Dep't of Homeland Sec.*, 2017 WL 9500949, at *11 (C.D. Cal. Nov. 6, 2017); *see, e.g.*, *Amadei v. Nielsen*, 2019 WL 8165492, at *8 (E.D.N.Y. Apr. 17, 2019) (rejecting argument that government's training materials were "privileged because they involved 'determining the constitutionality of certain things and educating officers on that'"); *Louise Trauma Ctr., LLC v. Dep't of Just.*, 2022 WL 278771, at *9 (D.D.C. 2022); *Woodall v. Phoenix Police Dep't*, 2025 WL 4733387, at *1 (D. Ariz. Mar. 13, 2025).

[63] *See, e.g.*, NSF_173 ("[d]raft termination letter" between NSF staff regarding "terminating grants to California" that "reflects attorney legal advice" from White House Counsel's Office and DOGE);

But "[t]he privilege does not extend to shield opinions held and decisions taken by the client after obtaining legal advice." Paul R. Rice, Attorney-Client Privilege in the United States, § 5:14. "[E]nsuing client opinions or decisions" do not disclose "either the substance of the attorney's recommendation or the content of the client's privileged communications upon which the recommendation was based." *Id.*; *see Bank of N.Y. v. Meridien Biao Bank Tanzania Ltd.*, 1996 WL 474177, at *2 (S.D.N.Y. Aug. 21, 1996) ("[T]o the extent that a document … deals with the operations of [the company], that portion will not be covered by the attorney-client-privilege even if the underlying policy is shaped by advice of counsel."); *In re Premera Blue Cross Customer Data Sec. Breach Litig.*, 296 F.Supp.3d 1230, 1241 (D. Or. 2017) ("that attorneys may have provided initial guidance as to how [the company] should draft internal business documents does not make every internal draft … privileged"); *cf. id.* at 1242 (distinguishing underlying documents from edits communicating legal advice and holding that those "edit[s] or redline[s] need not be disclosed"). These documents must be produced.

**V. The Court Should Order DOJ to Search the Records of AAG Harmeet Dhillon.**

Dhillon indisputably played a central and singular role in targeting universities pursuant to the Task Force Policy, including UC, and possesses documents that are highly relevant to Plaintiffs' claims. *See, e.g.*, Ex. 31 (reflecting April 2025 Task Force meeting to ensure Dhillon was "more directly plugged into what the Task Force is doing and its strategy" going forward); ED_4166, ED_1524, GSA_859 (privilege log entries showing involvement in highly relevant email exchanges with White House officials regarding the UC system before and after the UCLA funding terminations at issue); Ex. 32 (DOJ response to Interrogatories 11, 12, and 13 that Dhillon "conducted negotiations with UC" and "was responsible for … the August 8, 2025 communication"); *see also* Fed. R. Civ. P. 26(b)(1).

DOJ's only basis for refusing to search and produce her custodial documents is that she works through and copied her deputies on communications, so her records will be duplicative. But Plaintiffs agreed that DOJ could de-duplicate documents and produce only those that are uniquely within Dhillon's possession. And there is good reason to believe Dhillon possesses such "uniquely relevant information that is not available from the sources already designated," *In re Facebook, Inc. Consumer Priv. User Profile Litig.*, 2021 WL 10282213, at *1 (N.D. Cal. Nov. 14, 2021), given her proximity to the White

---

DOE_41 (July 2025 "Re: UC System" chain "includes implementation of DOJ legal advice"); NSF_9 ("UCLA Suspsension Letter Jul 31 2025" [sic] draft "reflects legal advice" from DOJ); NSF_25 (draft of same that "reflects" unspecified "counsel's legal advice" and "incorporates DOJ and EOP feedback").

House and personal role in shaping the Trump administration's pressure campaign against universities.[64] *See also, e.g.*, *L.A. All. v. City of Los Angeles*, 2023 WL 5505037, at *6 (C.D. Cal. Aug. 2, 2023) (high-level public officials appropriately subject to written discovery requests). This is particularly important because the EOP assumed control of the Task Force Policy in July 2025, *see supra* at 2, and no EOP personnel are document custodians—so only Dhillon's records would have their communications.

Adding Dhillon as a custodian is also proportional to the needs of the case; all Rule 26(b)(1) factors favor Plaintiffs. This case presents issues of national importance concerning the constitutional and statutory rights of Plaintiffs and their members across UC's campuses. The financial stakes are high, given the scale of funding cuts implemented and demands leveled as part of the Task Force Policy. The government is in sole possession of Dhillon's records, and adding a single custodian is unlikely to significantly strain its resources. Further, Plaintiffs have narrowly tailored their request to minimize burden on DOJ by excluding duplicate documents, and any burden is outweighed given Dhillon's uniquely important role in efforts to extract concessions from targeted universities, including UC.

## VI. The Court Should Order DOJ to Conduct the Proposed Additional Searches.

Through the parties' meet-and-confer process, all Defendants *except* DOJ have agreed to the additional searches proposed by Plaintiffs to ensure that relevant documents are captured.[65] Only DOJ refuses to do so. *See* Lynch Decl. ¶¶26-33. But DOJ personnel played a central role in every aspect of the Task Force Policy, from pursuing investigations into targeted universities to handling the coercive ensuing negotiations, *see, e.g.*, CRT_2023-24, CRT_10451, Ex. 30, Ex. 32, and Plaintiffs' proposed additional searches are proportional to the needs of the case, *see* Fed. R. Civ. P. 26(b)(1). Thus, the Court should compel DOJ to conduct the searches identified in the attached Appendix of the records of DOJ's existing custodians and Dhillon, from January 20, 2025 through October 1, 2026, and to produce or log the responsive documents not already identified. *See* Ex. 4 ("App.").

### A. The Proposed Additional Searches Target Relevant Documents.

*Terms Addressing EOP Personnel.* As discussed *supra* at 2, the EOP assumed responsibility for

---

[64] *See, e.g.*, Ex. 27 (reporting Dhillon was "still pushing for a tougher bargain" with Harvard and "warning the White House against taking a deal that might be seen as too weak"); Ex. 33 (describing Dhillon engaging in "heated argument" from Oval Office with Harvard's spokesperson).

[65] As a result, Defendants have agreed to produce additional documents and privilege logs by November 20, 2026. *See* Dkt. 137. Because the additional searches address the same issues discussed in sections I-IV *supra*, the documents ultimately produced or logged will likely involve the same or similar privilege issues and any ruling will provide guidance to the parties.

overseeing the Task Force Policy beginning in early July 2025 and directed the UC implementation. Because the relevant EOP personnel are not document custodians, Plaintiffs proposed search terms to identify non-duplicative documents involving four key EOP personnel who were directly involved in strategy discussions about applying the Task Force Policy to UC and who *likely directed the grant terminations*—so DOJ custodians' correspondence with them, if responsive to Plaintiffs' RFPs, *see, e.g.*, RFP 30, is highly relevant.[66]

*UC Abbreviations and Other Targeted Universities.* DOJ's search terms omitted many common abbreviations of UC campuses, including those targeted for federal investigations (e.g., "UCSF"). *See* Ex. 3. DOJ has refused to augment its searches to include them. *See* Lynch Decl. ¶¶12, 32-33. Further, many of DOJ's searches aimed to identify only documents specifically relating to UC, but documents regarding DOJ's deployment of the Task Force Policy against other targeted schools, before UC, are highly likely to shed light on the existence and operation of the Task Force Policy, as well as Defendants' intent in implementing the Policy. *See* Dkt. 90 at 10, 13-15; *see also, e.g.*, RFPs 6-7, 11-17, 24-26.[67]

*Content of Academic Speech.* Aside from terms relating to "DEI" and gender, none of DOJ's searches addressed documents discussing the content of academic speech, despite such documents being important to Plaintiffs' claims. *See* Dkt. 90 at 10-12, 28-30, 45-46; RFP 6; Ex. 3. Plaintiffs propose a single additional search to address this issue. App. ¶3.

*Forward-Looking Refusals to Grant Funds.* As the Court found, following DOJ's Notice of Findings, NSF ceased approving grants to UCLA. Dkt. 90 at 2. Although clearly relevant, none of DOJ's searches targeted documents concerning forward-looking refusals to provide federal funds. *See* Ex. 3; *see also, e.g.*, RFPs 11, 13-15, 26-29. Plaintiffs propose one search to address this issue. App. ¶4.

*Searches Beyond November 14, 2025.* DOJ improperly limited its search to documents prior to November 14, 2025 (when the preliminary injunction issued), contending that is the "only period relevant to Task Force activities." Ex. 2 at 2. But later documents will likely shed light on Defendants'

[66] These individuals are Mailman, Policy Advisor Daniel Wasserman, Special Assistant to the President for Education Eric Bledsoe, and Associate Counsel Joshua Hoyt. *See, e.g.*, Ex. 13 (DOE Resp. to Pls.' Interrog. No. 3: "DOE suspended three awards to UCLA …. following interactions with representatives from the E[OP]," identifying all four); Ex. 14 (NSF Resp. to Pls.' Interrog. No. 3: similar, identifying Wasserman and Hoyt); Ex. 34 (Mailman 7/18/25: "We need to discuss policy concerns and the University of California system, including its HHS, NSF, and Energy funding."); Ex. 35 (Hoyt 7/22/25: coordinating "plan for terminations").

[67] DOJ agreed to perform a single additional search of four custodians' previously collected documents using search terms relating to other schools, but because many of DOJ's initial searches targeted only documents mentioning UC, the universe of previously collected documents is limited.

intent in implementing the Task Force Policy, in particular because DOJ has *continued* its effort to coerce UC by filing two federal lawsuits against UCLA (and intervening in a third)—seeking rescission of all federal funding and return of all previous funding in two of these—and by issuing Notices of Findings against three UC medical schools and two UC law schools.[68] DOJ's conclusory relevance objection cannot carry its "heavy burden" to show that conducting the proposed searches for the full date range Plaintiffs request is improper. *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975); *see also Doe v. Kaiser Found. Health Plan, Inc.*, 2024 WL 3225904, at *1 (N.D. Cal. June 28, 2024) ("Relevancy, for purposes of discovery, is broadly defined to encompass 'any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.'") (quoting *In re Williams-Sonoma, Inc.*, 947 F.3d 535, 539 (9th Cir. 2020)).

**B. The Remaining Rule 26(b)(1) Factors Support Plaintiffs.**

Plaintiffs' proposed searches are proportional to the needs of this case, which presents consequential issues affecting hundreds of thousands of UC students, faculty, and employees and the future of higher education in this country. DOJ has key information and the resources to produce it; the limited searches address specific gaps in DOJ's previous searches; Defendants need only review unique document hits; and responsive documents are highly likely to be important to Plaintiffs' claims.

**CONCLUSION**

For all the foregoing reasons discussed, Plaintiffs respectfully request that the Court grant their motion to compel and order Defendants to produce all documents identified in Tables A, B, C, and D, with documents highlighted yellow in Table D to be provided to the Court first for *in camera* review, and order DOJ to conduct the additional proposed searches of AAG Dhillon and the existing custodians.

Respectfully submitted,

Dated: October 19, 2026 By: */s/ Connie K. Chan*

STACEY M. LEYTON, SBN 203827
sleyton@altber.com
BARBARA J. CHISHOLM, SBN 224656
bchisholm@altber.com

[68] *See* Dkt. 1, *United States v. Regents of the Univ. of Cal.*, No. 2:26-cv-5589 (C.D. Cal. May 26, 2026) (Title VI antisemitism lawsuit seeking, *inter alia*, rescission of grant payments); Dkt. 77, *Do No Harm v. David Geffen Sch. of Medicine at UCLA*, No. 2:25-cv-04131 (C.D. Cal. Jan. 28, 2026) (Complaint-in-Intervention seeking same remedies); Exs. 37-43 (DOJ press releases postdating 11/14/25 announcing findings and lawsuits against UC schools); *cf. Cal. Dep't of Soc. Servs. v. Leavitt*, 523 F.3d 1025, 1034 (9th Cir. 2008) (in context of motion to enforce judgment, appropriate discovery should be granted "[i]f significant questions regarding noncompliance have been raised").

CONNIE K. CHAN, SBN 284230
cchan@altber.com
AMANDA C. LYNCH, SBN 318022
alynch@altber.com
SANDY PECHT, SBN 355877
specht@altber.com
**ALTSHULER BERZON LLP**
177 Post St., Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151

*Counsel for Plaintiffs AAUP, AFT, UC-AFT, CNA/NNU, UAW, and CIR*

SKYE L. PERRYMAN, *admitted pro hac vice*
sperryman@democracyforward.org
VICTORIA S. NUGENT, *admitted pro hac vice*
vnugent@democracyforward.org
CYNTHIA LIAO, SBN 301818
cliao@democracyforward.org
ORLANDO ECONOMOS, *admitted pro hac vice*
oeconomos@democracyforward.org
PABLO MORAGA, *admitted pro hac vice*
pmoraga@democracyforward.org
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 448-9090

*Counsel for Plaintiffs AAUP, AFT, CNA/NNU, UC-AFT, UAW, and CIR*

VEENA DUBAL, SBN 249268
vdubal@aaup.org
vdubal@aaup.org
**AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS**
555 New Jersey Avenue NW, Suite 600
Washington DC 20001

*Counsel for Plaintiff AAUP*

/s/ Eleanor Morton
ELEANOR MORTON, SBN 220407
emorton@leonardcarder.com
KATE HALLWARD, SBN 233419
khallward@leonardcarder.com
ARTHUR LIOU, SBN 252690
Aliou@leonardcarder.com
**LEONARD CARDER LLP**
1999 Harrison Street, Suite 2700
Oakland, CA 94612

(510) 272-0169

*Counsel for Plaintiffs UPTE, AFSCME Local 3299, UC- AFT, CUCFA, and each of the UC Campus Faculty Associations*

/s/ Margo A. Feinberg
MARGO A. FEINBERG, SBN 100655
margo@ssdslaw.com
DANIEL E. CURRY, SBN 297412
dec@ssdslaw.com
**SCHWARTZ, STEINSAPIR, DOHRMANN & SOMMERS LLP**
888 W. 6th Street, 12th Floor
Los Angeles, California 90017-2738
(323) 655-4700

*Counsel for Plaintiff UAW Local 4811*

DAVID B. WILLHOITE, SBN 294172
dwillhoite@calnurses.org
**CALIFORNIA NURSES ASSOCIATION/NATIONAL NURSES UNITED**
155 Grand Ave.
Oakland, CA 94612
(510) 207-8291

*Counsel for Plaintiff CNA/NNU*

/s/ Susan K. Garea
SUSAN K. GAREA, SBN 260407
SGarea@beesontayer.com
**BEESON, TAYER & BODINE**
492 Ninth Street, Suite 350
Oakland, CA 94607
(510) 625 9700

*Counsel for Plaintiff Teamsters Local 2010*

HANNAH M. SHIREY, SBN 332187
hshirey@cirseiu.org
**COMMITTEE OF INTERNS AND RESIDENTS/SEIU**
10-27 46th Avenue, Suite 300-2
Long Island City, NY 11101
(212) 356-8100

*Counsel for Plaintiff CIR*

## SIGNATURE ATTESTATION

Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that each of the other signatories have concurred in the filing of Plaintiffs' Memorandum of Points and Authorities in Support of Motion to Compel Discovery.

*/s/ Connie K. Chan*
Connie K. Chan