JONATHAN D. GUYNN
Acting Assistant Attorney General
JOSEPH BORSON
Assistant Branch Director
Heidy L. Gonzalez
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel: (202) 598-7409
Email: heidy.gonzalez@usdoj.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, et al., | Case No. 3:25-cv-07864-RFL |
| Plaintiffs, | DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL |
| v. | Hon. Rita F. Lin<br>Courtroom 15<br>January 12, 2027<br>10:00 a.m. |
| DONALD J. TRUMP, in his official capacity As President of the United States, et al., | |
| Defendants. | |

# TABLE OF CONTENTS

TABLE OF CONTENTS ........ I
TABLE OF AUTHORITIES ........ II
INTRODUCTION ........ 1
BACKGROUND ........ 1
I. Factual Background ........ 1
II. Plaintiffs' Discovery Requests ........ 2
ARGUMENT ........ 3
I. The Deliberative Process Privilege. ........ 3
A. The Deliberative Process Privilege Has Been Properly Asserted. ........ 4
B. Plaintiffs' Contention That The Deliberative Process Privilege Does Not Apply As A Categorical Matter Is Meritless. ........ 9
i. Relevance of Evidence ........ 10
ii. Availability of Other Evidence ........ 12
iii. The Extent to Which Disclosure Would Hinder Frank and Independent Discussion Regarding Contemplated Policies and Decisions. ........ 13
iv. The Government's Role in the Litigation ........ 14
II. The Presidential Communications Privilege. ........ 14
A. The Presidential Communications Privilege Has Been Properly Invoked. ........ 15
B. The Presidential Communications Privilege Is Not Categorically Overcome. ........ 16
III. The Work Product Doctrine. ........ 17
A. The Work Product Doctrine Applies to the Dual-Purpose Documents in this Case. ........ 18
B. The Work Product Assertions Are Not Overcome. ........ 18
IV. The Attorney-Client Privilege Has Been Properly Asserted. ........ 20
V. No Additional DOJ Searches Are Necessary. ........ 24
CERTIFICATE OF SERVICE ........ 29

## TABLE OF AUTHORITIES

**Cases**

*ACLU of N. Cal. v. U.S. Dep't of Justice*,
880 F.3d 473 (9th Cir. 2018) .......... 18

*All. for the Wild Rockies v. Pena*,
No. 2:16-CV-294-RMP, 2017 WL 8778579 (E.D. Wash. Dec. 12, 2017) .......... 13

*Ariz. Rehab. Hosp., Inc. v. Shalala*,
185 F.R.D. 263 (D. Ariz. 1998) .......... 20

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents*,
824 F.3d 858 (9th Cir. 2016) .......... 10

*Assembly of State of Cal. v. Dep't of Commerce*,
968 F.2d 916 (9th Cir. 1992) .......... 3

*Black v. Union Pac. R.R. Co.*,
No. 23-1218, 2025 WL 2770681 (D. Kan. Sep. 29, 2025) .......... 12

*Blackrock Allocation Target Shares: Series S Portfolio v. Bank of N.Y. Mellon*,
No. 14 Civ. 9372, 2018 WL 2215510 (S.D.N.Y. May 15, 2018) .......... 25

*Cal. Native Plant Soc'y v. U.S. Envtl. Prot. Agency*,
251 F.R.D. 408 (N.D. Cal. 2008) .......... 4

*Carey-Canada, Inc. v. California Union Ins. Co.*,
118 F.R.D. 242 (D.D.C. 1986) .......... 21

*Carter v. United States Dep't of Commerce*,
307 F.3d 1084 (9th Cir. 2002) .......... 4

*Cheney v. U.S. Dist. Court for D.C.*,
542 U.S. 367 (2004) .......... 1

*Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*,
538 F. Supp. 3d 124 (D.D.C. 2021) .......... 22, 23

*Coleman v. ABC*,
106 F.R.D. 201 (D.D.C. 1985) .......... 22

*Dep't of Homeland Security*,
No. 06-0173 (RJL), 2008 WL 2872183 (D.D.C. July 22, 2008) .......... 15

*Duwamish Tribe v. Haaland*,
No. 2:22-CV-633, 2023 WL 8597589 (W.D. Wash. Dec. 12, 2023) .......... 9

*Eisai v. Sanofi-Aventis U.S., L.L.C.*,
No., 08-41688, 2012 WL 1299379 (D.N.J. Apr. 16, 2012)........................................................... 25

*Enslin v. Coca-Cola Co.*,
No. 2:14-CV-06476, 2016 WL 7042206 (E.D. Pa. June 8, 2016) ........................................................ 24

*Enviro Tech Int'l, Inc. v. U.S. E.P.A.*,
371 F.3d 370 (7th Cir. 2004) ................................................................................................. 8

*F.T.C. v. Warner Comms., Inc.*,
742 F.2d 1156 (9th Cir. 1984) ........................................................................................ 9, 12, 14

*First Heights Bank, FSB v. United States*,
46 Fed. Cl. 312 (2000) ............................................................................................................11

*Fischer v. United States*,
425 U.S. 391 (1976)................................................................................................................ 20

*Fox News Network, LLC v. U.S. Dep't of The Treasury*,
739 F. Supp. 2d 515 (S.D.N.Y. 2010) ........................................................................................ 7

*Gonzalez v. Experian Info. Sols., Inc.*,
No. 8:24-CV-00389-FWS (JDE), 2025 WL 1712394 (C.D. Cal. Apr. 2, 2025)...................................... 28

*Handloser v. HCL Am., Inc.*,
No. 19-CV-01242, 2020 WL 7405686 (N.D. Cal. Dec. 17, 2020) ...................................................... 25

*Heffernan v. Azar*,
417 F. Supp. 3d 1 (D.D.C. 2019) ............................................................................................. 7

*Hickman v. Taylor*,
329 U.S. 495 (1947)....................................................................................................... 17, 18, 27

*Holmgren v. State Farm Mut. Auto. Ins. Co.*,
976 F.2d 573 (9th Cir. 1992)................................................................................................... 19

*Ideal Elec. Co. v. Flowserve Corp.*,
230 F.R.D. 603 (D. Nev. 2005) ............................................................................................... 21

*Ill. Coal. for Immigrant & Refugee Rts., Inc. v. Wolf*,
No. 19-C-6334, 2020 WL 7353408 (N.D. Ill. Dec. 15, 2020).........................................................11

*In re County of Erie*,
473 F.3d 413 (2d Cir. 2007) ................................................................................................... 20

*In re Ford Motor Co.*,
110 F.3d 954 (3d Cir.1997) ..................................................................................................... 21

*In re Grand Jury Subpoena Duces Tecum*,
731 F.2d 1032 (2d Cir. 1984) .................................................................................................. 21

*In re Grand Jury Subpoena*,
357 F.3d 900 (9th Cir. 2004) ........................................ 18

*In re Grand Jury Witness*,
695 F.2d 359 (9th Cir. 1982) ........................................ 21

*In re Sealed Case*,
121 F.3d 729 (D.C. Cir. 1997) ........................................ 14, 15, 16, 17

*In re Sealed Case*,
737 F.2d 94 (D.C. Cir. 1984) ........................................ 22

*In re Subpoena Duces Tecum Served on the Office of the Comptroller of the Currency*,
145 F.3d 1422 (D.C. Cir. 1998) ........................................ 10

*Jones v. Hernandez*,
No. 16-CV-1986-W(WVG), 2017 WL 3020930 (S.D. Cal. July 14, 2017) ........................................ 4

*Karnoski v. Trump*,
926 F.3d 1180 (9th Cir. 2019) ........................................ 15, 16, 17

*Lacy v. United States*,
No. SA CV 22-1065-DOC, 2023 WL 4317659 (C.D. Cal. May 3, 2023) ........................................ 15

*Lauris v. Novartis AG*,
No. 1:16-CV-00393, 2016 WL 7178602 (E.D. Cal. Dec. 8, 2016) ........................................ 24

*Loving v. Dep't of Def.*,
550 F.3d 32 (D.C. Cir. 2008) ........................................ 15

*Lutzeier v. Citigroup Inc.*,
No. 4:14-CV-00183, 2015 WL 430196 (E.D. Mo. Feb. 2, 2015) ........................................ 25

*Maricopa Audubon Soc'y v. United States Forest Serv.*,
108 F.3d 1089 (9th Cir. 1997) ........................................ 4

*Matter of Fischel*,
557 F.2d 209 (9th Cir. 1977) ........................................ 21

*Mfg. Auto. & Software Sys., Inc. v. Hughes*,
2017 WL 5641120 (C.D. Cal. Sept. 21, 2017) ........................................ 26

*Nat'l Sec. Archive v. CIA*,
752 F.3d 460 (D.C. Cir. 2014) ........................................ 13

*Nat'l Wildlife Fed'n v. U.S. Forest Serv.*,
861 F.2d 1114 (9th Cir. 1988) ........................................ 8

*NLRB v. Sears, Roebuck & Co.*,
421 U.S. 132 (1975) ........................................ 3, 6

*Noel v. City of New York*,
357 F. Supp. 3d 298 (S.D.N.Y. 2019) ........ 7

*North Pacifica, LLC v. City of Pacifica*,
274 F. Supp. 2d 1118 (N.D. Cal. 2003) ........ 22

*Quiroz v. Praetorian Ins. Co.*,
No. 5:14-CV-01652 HRL, 2014 WL 3845418 (N.D. Cal. Aug. 5, 2014) ........ 26

*Rivera v. NIBCO, Inc.*,
364 F.3d 1057 (9th Cir. 2004) ........ 28

*Roberts v. Clark Cnty. Sch. Dist.*,
312 F.R.D. 594 (D. Nev. 2016) ........ 25

*Roblox Corp. v. WowWee Group, Ltd.*,
No. 22-CV-04476, 2023 WL 5507176 (N.D. Cal. Aug. 25, 2023) ........ 25

*Sierra Club v. U.S. Department of Interior*,
384 F. Supp. 2d 1 (D.D.C. 2004) ........ 7, 9

*Thomas v. Cate*,
715 F. Supp. 2d 1012 (E.D. Cal. 2010) ........ 9, 10

*United States v. Bauer*,
132 F.3d 504 (9th Cir. 1997) ........ 20, 21

*United States v. Chen*,
99 F.3d 1495 (9th Cir. 1996) ........ 20

*United States v. Farley*,
11 F.3d 1385 (9th Cir. 1993) ........ 10

*United States v. Fernandez*,
231 F.3d 1240 (9th Cir. 2000) ........ 8

*United States v. McGraw-Hill Cos.*,
2014 WL 8662657 (C.D. Cal. Sept. 25, 2014) ........ 19, 20

*United States v. Nixon*,
418 U.S. 683 (1974) ........ 14

*United States v. Olano*,
62 F.3d 1180 (9th Cir. 1995) ........ 21

*United States v. Sanmina Corp.*,
968 F.3d 1107 (9th Cir. 2020) ........ 19

*Upjohn Co. v. United States*,
449 U.S. 383 (1981) ........ 20, 21

*Valero Energy Corp. v. United States*,
569 F.3d 626 (7th Cir. 2009) ....................11

*Vietnam Veterans of Am. v. C.I.A.*,
No. 09-CV-0037, 2011 WL 4635139 (N.D. Cal. Oct. 5, 2011) .................... 9, 10

**Rules**

Fed. R. Civ. P. 26.................... 7, 17, 19

## INTRODUCTION

In implementing Presidentially directed policy on higher education, Presidential advisers solicited agency input, prompting internal deliberations over how to carry out the President's direction. Plaintiffs seek to compel those very records, targeting information at the core of the deliberative process and presidential communications privileges. This dispute thus triggers the "[s]pecial considerations [that] control when the Executive's interests in maintaining its autonomy and safeguarding its communications' confidentiality are implicated." *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 370 (2004). Plaintiffs' arguments as to both categories of documents fail.

Plaintiffs claim that internal pre-decisional deliberations forfeit their protected status simply because they pertain to the implementation of an overarching Executive policy that Plaintiffs are challenging. That sweeping proposition finds no support in Ninth Circuit law, which recognizes privilege protections for pre-decisional agency deliberations regarding downstream policy implementation actions just as rigorously as it safeguards initial policy formulation. Plaintiffs further demand wholesale disclosure under the rubric of governmental intent, disregarding the document-by-document balancing required under Ninth Circuit precedent.

Plaintiffs' challenges regarding the presidential communications privilege also misapprehend its scope. Communications solicited and received by White House advisers who carry broad responsibility for formulating advice for the President are privileged. That privilege is not overcome by mere speculation and broad assertions. Instead, these documents require a showing of compelling need and constitutional balancing, and they should at a minimum first be subject to *in camera* review.

Finally, Plaintiffs' sprawling demands for additional discovery represent an unproportional fishing expedition that far outweighs any need articulated. Plaintiffs' motion should be denied in its entirety.

## BACKGROUND

### I. Factual Background

On February 3, 2025, the Department of Justice, Civil Rights Division ("DOJ"), announced the formation of a Multi-Agency Task Force to Combat Anti-Semitism. Pls' Memo. In Supp. of Mot. to

Compel at 1-2, ECF No. 140-1 ("Pls' Mot."). The Task Force was coordinated by DOJ and included representatives from the U.S. Department of Education (ED), U.S. Department of Health and Human Services (HHS), and the General Services Administration (GSA). *Id*. at 2 n.1. The Task Force's "first priority [was] to root out anti-Semitic harassment in schools and on college campuses." ECF No. 27-47 at 1.

On July 29, 2025, DOJ notified non-party University of California ("UC") of its findings following an investigation concerning UC's "response to allegations of discrimination against Jewish and Israeli students on the basis of race, religion and national origin." ECF No. 27-1 at 2. DOJ found that: (1) "Jewish and Israeli students at UCLA were subjected to severe, pervasive, and objectively offensive harassment that created a hostile environment by members of the encampment"; (2) "UCLA had actual notice that Jewish and Israeli students were subjected to severe, pervasive, and objectively offensive harassment that created a hostile environment by members of the encampment"; and (3) "UCLA was deliberately indifferent to the hostile environment for Jewish and Israeli students caused by the encampment." *Id*. at 8.

Between July 29, 2025 and August 1, 2025, Defendants National Science Foundation ("NSF"), National Institutes of Health ("NIH"), and Department of Energy ("DOE") notified non-party UC of their decisions to suspend certain awards issued to non-party UC. *See* ECF Nos 27-3, 27-6, 27-7, 27-8. Each agency cited non-party UC's "racism, in the form of illegal race-based preferences in admissions practices," non-party UC's failure "to promote a research environment free of antisemitism and bias," and non-party UC's "discriminat[ion] against and endanger[ing] [of] women by allowing men in women's sports and private women-only spaces." ECF No. 27-6 at 2; *see also* ECF Nos. 27-7, 27-8. All award suspensions were enjoined by this Court. *See* ECF No. 90.

## II. Plaintiffs' Discovery Requests

On March 20, 2026, Plaintiffs served 34 identical Requests for Production on each of the twenty Defendants. *See* ECF No. 142-1. Defendants have undertaken broad and comprehensive efforts to provide discovery to Plaintiffs. Across months of conferrals, Defendants have engaged in good-faith efforts to address each of Plaintiffs' concerns, have revisited and reconsidered their positions in earnest

to streamline discovery, and have successfully reduced the scope of the disputes. Defendants have asserted the available privileges, as appropriate.[1]

## ARGUMENT

### I. The Deliberative Process Privilege.

The deliberative process privilege protects the Government's decision-making process by shielding from disclosure documents "reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (quotation omitted). The purpose of the privilege "is to allow agencies freely to explore possibilities, engage in internal debates, or play devil's advocate without fear of public scrutiny." *Assembly of State of Cal. v. Dep't of Commerce*, 968 F.2d 916, 920 (9th Cir. 1992).

This case involves quintessential government deliberations. Agency officials engaged in pre-decisional deliberations regarding civil rights enforcement and funding actions at universities and relied on the expectation that officials would be free to have candid conversations, gather relevant information, explore alternatives, and provide fully informed recommendations. Specifically, agencies deliberated regarding (i) the nature of their policy recommendations as to civil rights enforcement efforts at universities and the continuation of higher education funding before those policies were consummated, (ii) whether to undertake particular funding actions at distinct universities including decisions regarding the discontinuation of funding and the contours and rationale for those contemplated decisions, (iii) discussion of mechanisms to enforce civil rights laws and whether to initiate investigations and undertake enforcement actions, (iv) the formulation of documents aimed at implementing Executive policy, and (v) the nature and content of press statements regarding ongoing agency efforts to carry out Executive priorities. The deliberative process privilege has been properly asserted to ensure that

---

[1] Document productions are ongoing and Defendants respond to Plaintiffs' motion *vis a vis* the productions completed as of the date of Plaintiffs' filing. To the extent Plaintiffs purport to extend their requests as to future productions, such requests are not ripe for consideration because the parties must confer as to any future productions and have the opportunity to brief the discovery issues with respect to those productions.

agencies remain free to discuss strategy candidly, express opinions, and explore options without fear that those deliberations will later be made public.

**a. The Deliberative Process Privilege Has Been Properly Asserted.**

To qualify for the deliberative process privilege, a document must be both predecisional and deliberative. *See Carter v. United States Dep't of Commerce*, 307 F.3d 1084, 1089 (9th Cir. 2002). "A 'predecisional' document is one 'prepared in order to assist an agency decisionmaker in arriving at his decision,' and may include recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Id.* (citations omitted). A document is "deliberative" if its disclosure "would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." *Id.* (citations omitted); *see also Maricopa Audubon Soc'y v. United States Forest Serv.*, 108 F.3d 1089, 1093 (9th Cir. 1997) (same). Once these two substantive requirements are established, the party challenging the assertion of the privilege bears the burden of demonstrating sufficient need to overcome the government's interest in non-disclosure. *See Cal. Native Plant Soc'y v. U.S. Envtl. Prot. Agency*, 251 F.R.D. 408 (N.D. Cal. 2008); *Jones v. Hernandez*, No. 16-CV-1986-W(WVG), 2017 WL 3020930, at *3 (S.D. Cal. July 14, 2017).

As demonstrated by the Government's privilege logs and supporting declarations, the deliberative process privilege has been properly invoked in all instances. The documents over which Defendants have asserted the deliberative process privilege can be grouped into five subject matter categories.

The first category consists of documents regarding executive order implementation efforts, and more specifically, agency deliberations on how to complete the policy direction of the President as set out in by executive order. The documents in this category include intra-agency deliberations regarding the content and drafting of reports solicited by the President of the United States in Section 3 of Executive Order 14,188, *Additional Measures to Combat Antisemitism*, as well as intra-government deliberations regarding agency resources and potential agency actions to combat antisemitism pursuant

to E.O. 14,188. *See* Exh. 1 ¶ 5, Exh. 3 ¶ 7, Exh. 5 ¶ 7, Exh. 6 ¶ 7, Exh. 7 ¶ 5, Ex. 8 ¶ 5, Exh. 9 ¶ 7, Exh. 11 ¶ 6, Exh. 12 ¶ 5.[2] The second category includes documents regarding deliberations on higher education funding priorities. The documents in this category reflect inter- and intra-agency deliberations regarding agency implementation of Executive policy on funding for higher education institutions, as well as communications with White House advisers regarding potential next steps in funding actions. These communications include deliberations about potential future award or grant actions at universities, including discussions of Executive priorities, Antisemitism Task Force considerations, and the potential scope of those actions. *See* Exh. 3 ¶ 8, Exh. 4 ¶¶ 6-9, Exh. 5 ¶ 8, Exh. 6 ¶ 8, Exh. 9 ¶ 8, Exh. 10 ¶¶ 6-10. The third category includes documents regarding ongoing or potential civil rights investigations and enforcement actions, and associated litigation. The documents in this category concern ongoing agency efforts to enforce civil rights laws through investigations and civil rights enforcement litigation at universities. These documents contain intra-government deliberations preceding any final decision to investigate universities or bring civil rights actions, or deliberations about potential future steps in an investigation or litigation. *See* Exh. 3 ¶ 9, Exh. 5 ¶ 9, Exh. 6 ¶ 9, Exh. 9 ¶ 9. The fourth category contains documents regarding the Compact for Academic Excellence. The documents in this category pertain to the creation of the Compact—an Executive led proposal to universities to align higher education funding with government priorities—and deliberations regarding communications with universities about the Compact. *See* Exh. 3 ¶ 10, Exh. 5 ¶ 10, Exh. 6 ¶ 10, Exh. 9 ¶ 10. The fifth category includes documents regarding media engagement. The documents in this category pertain to deliberations about press releases announcing agency action implementing Executive priorities. *See* Exh. 3 ¶ 11, Exh. 5 ¶ 11, Exh. 6 ¶ 11, Exh. 9 ¶ 11, Exh. 10 ¶ 10. Defendants assert deliberative process privilege only over documents that are both pre-decisional and deliberative, and Plaintiffs' contrary contentions are without merit.

*First*, Plaintiffs first insist that documents concerning the application of "Task Force Policy" are "*post*-decisional" rather than pre-decisional because they postdate adoption of the alleged policy. *See* Pls'

---

[2] All citations to "Exh." refer to the exhibits attached to the accompanying Declaration of Heidy Gonzalez in support of Defendants' Opposition.

Mot. at 11-12. Putting aside Defendants' final agency action arguments with respect to the purported "Task Force Policy," *see* ECF No. 61 at 34-35, each of the documents for which Plaintiffs challenge Defendants' assertion of deliberative process privilege concern the Defendants' ongoing deliberations and decision-making regarding potential, discrete agency action not yet undertaken and thus involving a separate decision-making process from the creation of the alleged Task Force Policy itself. In short, they are *pre-decisional* to decisions that implement (and thus post-date) the Task Force Policy itself. For example, Plaintiffs assert that draft notices about investigations or grant suspensions are necessarily post-decisional, *see* Pls' Mot. at 11, but the draft notices reflect evolving intra-government deliberations about the nature of those *future* funding decisions, including the basis and scope of such funding action. *See* Exh. 4 ¶ 8, Exh. 6 ¶¶ 8-9, Exh. 10 ¶ 9. Indeed, the elaboration of those notices requires multiple levels of review by agency decisionmakers such that the finalized notices often bear a limited resemblance to preliminary drafts. Simply put, even assuming that the agencies acted to implement the "Task Force Policy," the agencies did so through discrete agency decision-making that itself is subject to the deliberative process privilege. If it were otherwise, then every Government-wide policy announcement would strip agencies of privilege over all subsequent implementation decision-making—no matter how deliberative those decisions are. The deliberative process privilege is not subject to such categorical limitations, nor do Plaintiffs offer any authority to support this drastic rule. *See NLRB*, 421 U.S. at 153 (The deliberative process privilege permits "the withholding of all papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be[.]").

Plaintiffs' assertion that "draft press statements explaining actions taken" are necessarily post-decisional, Pls' Mot. at 11, must be met with the same logic. Indeed, a preliminary press release draft is subject to internal agency review and undergoes evolving deliberations about the best press rollout strategy—all of which contribute to the release's substantive transformation from inception to finalization. *See* Exh. 6 ¶ 11. To the extent Plaintiffs reference email threads described in Defendants' privilege logs as containing deliberations regarding the substance of a press release, these threads are plainly predecisional, as they contain deliberations as to the statement's content prior to the statement being drafted, finalized, and disseminated; indeed, "discussions regarding how to present an agency

decision to the public [are] covered by the deliberative process privilege." *Heffernan v. Azar*, 417 F. Supp. 3d 1, 17 (D.D.C. 2019) (quotation omitted). This is why deliberations regarding draft press statements are routinely held to be covered by deliberative process privilege. *See, e.g.*, *Fox News Network, LLC v. U.S. Dep't of The Treasury*, 739 F. Supp. 2d 515, 545 (S.D.N.Y. 2010) ("Although opinions and recommendations regarding press inquiries do not qualify as deliberations about substantive policy decisions, disclosure of the various drafts of the press release at issue here would reveal how Treasury's deliberations with respect to the underlying substantive policy progressed over the course of several days."); *Sierra Club v. U.S. Department of Interior*, 384 F. Supp. 2d 1, 23 (D.D.C. 2004) (deliberative process "privilege applies with respect to decisions regarding 'how to handle press inquiries and other public relations issues'"); *see also Noel v. City of New York*, 357 F. Supp. 3d 298, 303 (S.D.N.Y. 2019) ("Draft documents, by their very nature, are typically pre-decisional and deliberative. They reflect only the tentative view of their authors; views that might be altered or rejected upon further deliberation either by their authors or by superiors." (citation modified)).

Plaintiffs also assert that "Defendants largely fail to identify any specific subsequent decisions" to which documents are pre-decisional, Pls' Mot. at 12, and yet cite, as an example, a privilege description that plainly indicates the agency decisions yet to be made. *See id*. at 12 n.26 (citing to document described as "email thread reflecting pre-decisional deliberations regarding investigation tactics and potential coordination in investigation of antisemitic discrimination at universities"). Where a document is described as containing deliberations about investigation tactics and potential coordination, the document is plainly pre-decisional as to the agency's final decisions about what investigation tactic to adopt. Defendants have provided privilege descriptions sufficient to describe the documents but short of revealing the privileged material itself. *See* Fed. R. Civ. P. 26(b)(5)(A)(ii). To the extent the Court determines that certain details are missing from the privilege descriptions, Defendants should be afforded an opportunity to amend those privilege descriptions to provide necessary details.

*Second*, Plaintiffs claim that the deliberative process privilege does not apply to purely factual documents, including "Excel spreadsheets and other documents that appear to contain only summaries or compilations of data" or "summaries of policies, executive orders, or other factual developments[,]" rather

than "opinions, recommendations, or advice about agency policies" Pls' Mot. at 13 (internal citation omitted). However, "the scope of the deliberative process privilege should not turn on whether we label the contents of a document 'factual' as opposed to 'deliberative.'" *Nat'l Wildlife Fed'n v. U.S. Forest Serv.*, 861 F.2d 1114, 1119 (9th Cir. 1988). Instead, because "the ultimate objective [] is to safeguard the deliberative *process* of agencies . . . [f]actual materials" should "be exempt from disclosure to the extent that they reveal the mental processes of decisionmakers." *Id.* Moreover, factual material that "is so interwoven with the deliberative material that it is not severable" may be subject to the deliberative process privilege. *See United States v. Fernandez*, 231 F.3d 1240, 1247 (9th Cir. 2000); *see also Enviro Tech Int'l, Inc. v. U.S. E.P.A.*, 371 F.3d 370, 374-75 (7th Cir. 2004) ("[T]he deliberative process privilege typically does not justify the withholding of purely factual material, nor of documents reflecting an agency's final policy decisions, but it does apply to predecisional policy discussions, and to factual matters inextricably intertwined with such discussions." (internal citations omitted)).

Here, Plaintiffs' characterization of the documents as mere factual compilations overlooks the role such materials play in agency decisionmaking. Where agency officials selectively gather, organize, or present information to evaluate potential courses of action, disclosure may reveal the considerations deemed relevant to the decision, the alternatives under examination, and the analytical framework employed by agency decisionmakers. In the context of contemplated federal funding actions, compilations of award information, including in spreadsheets, may reflect more than the underlying grant data—their selection and organization may disclose which potential actions were being evaluated and the considerations informing those evaluations. The fact that the underlying information may be factual or independently available does not necessarily eliminate the deliberative character of the agency's selection and analysis of that information. Nor does the subsequent adoption of a final agency decision necessarily eliminate protection for preliminary analyses or alternatives that were considered but not adopted.

At the same time, Defendants recognize that the privilege does not extend to independently segregable factual information whose disclosure would not reveal protected deliberations. Accordingly, the relevant inquiry is not whether a document contains factual information, but whether disclosure of the particular information withheld would expose the agency's predecisional judgments, recommendations,

or evaluation of potential agency action. The spreadsheets here thus contain information that, if made public, would reveal the underlying deliberative process by which agencies reached funding decisions. Stated differently, the spreadsheets constitute the very deliberation that the privilege is intended to protect.

**b. Plaintiffs' Contention that the Deliberative Process Privilege Does Not Apply as a Categorical Matter is Meritless.**

Plaintiffs claim that the deliberative process privilege is wholly inapplicable in this case because the subject documents may be relevant to their First Amendment retaliation claim. *See* Pls' Mot. at 9-10. But, as Plaintiffs recognize, the Ninth Circuit has never held that claims of retaliatory intent vitiate the deliberative process privilege. *See id*. at 9. Rather, under controlling Ninth Circuit law, the deliberative process privilege is only overcome when a litigant shows that "his or her need for the materials and the need for accurate fact-finding override the government's interest in non-disclosure." *F.T.C. v. Warner Comms., Inc.*, 742 F.2d 1156,1161 (9th Cir. 1984) To make this determination, courts consider "1) the relevance of the evidence; 2) the availability of other evidence; 3) the government's role in the litigation; and 4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions." *Id*.

Courts in this Circuit have applied the *Warner* balancing test to determine whether plaintiffs' need for specific privileged documents or information outweighs the Government's interest in non-disclosure, even when intent is at issue. *See Vietnam Veterans of Am. v. C.I.A.*, No. 09-CV-0037, 2011 WL 4635139, at *10 (N.D. Cal. Oct. 5, 2011) ("VVA") (declining to adopt a categorical rule that the deliberative process privilege is inapplicable when plaintiffs challenge intent, and explaining that the issue of "intent is properly considered as a factor in the substantial need analysis" and applying the balancing test for each category of withheld documents); *Duwamish Tribe v. Haaland*, No. 2:22-CV-633, 2023 WL 8597589, at *4 (W.D. Wash. Dec. 12, 2023) (same); *Thomas v. Cate*, 715 F. Supp. 2d 1012, 1021 (E.D. Cal. 2010) ("adopt[ing] the balancing approach set forth in *Warner* . . . with respect to each individual discovery request"). To hold otherwise would have the extraordinary consequence of eviscerating the deliberative process privilege in any case simply because a plaintiff challenges the constitutionality of a government decision and alleges animus or discriminatory intent.

Moreover, even assuming that intent is at issue, Plaintiffs' argument misapplies nonbinding authority, in particular a D.C. Circuit case, *In re Subpoena Duces Tecum Served on the Office of the Comptroller of the Currency*, 145 F.3d 1422, 1424 (D.C. Cir. 1998). There, the D.C. Circuit held that the deliberative process privilege did not apply in a fraudulent transfer action in which the plaintiff was required to show that the transfers were made "with actual intent to hinder, delay, or defraud." *Id. at* 1423. The Ninth Circuit has not followed *In re Subpoena*, nor held that the deliberative process privilege categorically does not apply as matter of law in cases in which the plaintiffs challenge the Government's intent. *See VVA*, 2011 WL 4635139, at *10; *Thomas*, 715 F. Supp. 2d at 1021. Plaintiffs' demand, that the deliberative process privilege be overruled as to all documents, is extreme and there is no support in this Circuit for such approach. The contention that the deliberative process privilege is overruled by "need" will necessarily depend on a document-by-document, or at a minimum category-by-category, analysis of the contents and other context of a given communication. *VVA*, 2011 WL 4635139, at *10; *United States v. Farley*, 11 F.3d 1385, 1389 (9th Cir. 1993). Indeed, some documents may speak more directly to the facts, some may be more tangentially related, and some—although speaking to a central issue—may be particularly sensitive, such that the government's interest outweighs the plaintiff's purported need. *See id*. But none of this balancing can be undertaken as a categorical matter for all the thousands of documents for which the privilege is asserted.[3]

**i. Relevance of Evidence**

Plaintiffs argue that the documents "will likely shed light on Defendants' motives and intent in adopting the Task Force Policy and in implementing it at UC and other targeted universities." Pls.' Mot. 15. But, as Plaintiffs have already argued in this case, "motive may be established through direct or circumstantial evidence." ECF No. 31 at 28 (citing *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858 (9th Cir. 2016)); *see also* Pls' Mot. at 10. Because Plaintiffs have already presented what they

[3] Defendants do not make document-by-document arguments at this time because Plaintiffs have attempted to proceed in a categorical manner, without seeking document-specific relief. The Court should reject Plaintiffs' categorical arguments. If the Court wishes to proceed on a document-by-document basis, Plaintiffs must instead make document-by-document arguments, to which Defendants must have an opportunity to respond, before the privilege can be overcome in any specific instance.

categorize as “overwhelming” evidence of Defendants’ motivations, more is not required. This is particularly the case where Plaintiffs seek production of internal, pre-decisional, and deliberative documents disclosure of which would likely result in agency staff responsible for developing and implementing agency policy being chilled from having candid conversations with senior officials, gathering relevant information, exploring alternatives, and providing fully informed recommendations. If agency employees and officials knew their opinions, deliberations, and recommendations may be subject to public disclosure—and the scrutiny, potential misinterpretation, and criticism that may follow—the candor of their views would likely be diminished. Further, the release of the withheld documents could chill the exchange of information across agencies, again impeding the decision-making process. Without a robust exchange of ideas, the final calculations, analysis, and memoranda relied on by decisionmakers would be less accurate and thoroughly considered. In addition to the chill of candid and creative thinking that would result if government personnel feared that their deliberations about potential agency efforts to implement Executive policy could be made public, release of these deliberations risks Executive agencies being perceived as having committed to an agency action that ultimately was not pursued—in other words, release risks public confusion as to agency policy positions and decisionmaking.

Moreover, even if the relevance of the Government’s intent were sufficient to overcome the privilege as to any category, a document-by-document analysis would be necessary because the Court would need to perform the *Warner* balancing as to each document (or at a minimum, each category of documents). Courts require this analysis even when the government’s “intent” is supposedly at issue. *E.g.*, *First Heights Bank, FSB v. United States*, 46 Fed. Cl. 312, 322 (2000) (refusing to apply “automatic bar” on assertions of deliberative process privilege in “any case where the Government’s intent is potentially relevant”); *accord Ill. Coal. for Immigrant & Refugee Rts., Inc. v. Wolf*, No. 19-C-6334, 2020 WL 7353408, at *2 (N.D. Ill. Dec. 15, 2020) (emphasizing that plaintiff’s argument “for a categorical rule denying the [deliberative process] privilege” when the plaintiff’s claim “puts directly at issue the government’s subjective motivation” rests on the false premise that “relevance alone is sufficient to defeat the privilege”); *see also, e.g.*, *Valero Energy Corp. v. United States*, 569 F.3d 626,

630 (7th Cir. 2009) (questions of privilege are "fact-intensive"); *Black v. Union Pac. R.R. Co.*, No. 23-1218, 2025 WL 2770681, at *3 (D. Kan. Sep. 29, 2025) (declining categorical approach). Plaintiffs are thus not entitled to a finding that the deliberative process is wholly inapplicable absent a document-by-document consideration—which, again, could take place only after document-by-document briefing of the kind Plaintiffs have not submitted.

**ii. Availability of Other Evidence**

In Plaintiffs' own words, "evidence of Defendants' true motives—to purge 'woke' viewpoints from the UC and remake it in the mold of President Trump's favored ideology—is overwhelming." ECF No. 31 at 28 (relying on the "overwhelming" evidence in support of their request for a preliminary injunction). This Court has already concluded that Plaintiffs have furnished evidence in support of their claims:

> Plaintiffs have submitted overwhelming evidence. Across 74 declarations and more than 700 pages of supporting documents, Plaintiffs show that the Administration and its executive agencies are engaged in a concerted campaign to purge "woke," "left," and "socialist" viewpoints from our country's leading universities. Agency officials, as well as the President and Vice President, have repeatedly and publicly announced a playbook of initiating civil rights investigations of preeminent universities to justify cutting off federal funding, with the goal of bringing universities to their knees and forcing them to change their ideological tune. Universities are then presented with agreements to restore federal funding under which they must change what they teach, restrict student anonymity in protests, and endorse the Administration's view of gender, among other things. Defendants submit nothing to refute this.

ECF No. 90 at 1. And Plaintiffs' Motion now states that "much of the Task Force's inner workings and Task Force Policy's implementation is already in the public record, through either Defendants' own disclosures or whistleblower reports." Pls' Mot. at 17. In the same breath, though, Plaintiffs claim that the privileged documents are necessary to show that that "Defendants used civil rights enforcement as a pretext to pursue their true intent to coerce universities into purging disfavored left and woke viewpoints from their campuses and replace them with views that the Administration favors." Pls' Mot. at 16. It, therefore, follows that Plaintiffs have sufficient supporting evidence available. *See Warner*, 742 F.2d at 1161-62 (holding that, in affirmative antitrust case brought by the federal government, defendants had

little need for deliberative documents given the availability of other information concerning market structure and competitive effect).

Plaintiffs are not entitled to internal deliberations regarding policies and plans that ultimately culminated in discrete agency actions over which Plaintiffs have visibility when they cannot explain why the *deliberative* documents are critical for their overall legal theory. For example, Plaintiffs seek "Documents describing plan, methods, and objectives for investigating alleged civil rights violations at universities" and "summaries or reports of internal investigations into universities[,]" Mot. at 5, but Plaintiffs are already in receipt of the government's determinations regarding UC's alleged civil rights violations. *See, e.g.*, ECF No. 27-1 (DOJ's notice of findings). Also demonstrative, Plaintiffs seek "documents relating to Defendants' cancellation of federal funding at targeted universities[,]" including documents related to "decisions about which UC grants would be cancelled following DOJ's July 29, 2025 'Notice of Findings'[,]" Mot. at 5-6, but final funding decisions are memorialized in the correspondence issued by each agency to each impacted university, to which Plaintiffs have access. *See, e.g.*, ECF Nos. 27-3, 27-6, 27-7, 27-8 (agency letters regarding UCLA awards). Because the relevant documents are "already in the public record," including through the thousands of pages of non-privileged materials produced, there is a more-than-adequate basis for judicial review. The Court need not delve into internal, pre-decisional discussions about unmaterialized agency action. *See, e.g.*, *All. for the Wild Rockies v. Pena*, No. 2:16-CV-294-RMP, 2017 WL 8778579, at *6 (E.D. Wash. Dec. 12, 2017) ("The Court finds that Plaintiff's claims of relevance are likely, but too speculative to carry significant weight in the analysis because the final decision by the Forest Service likely subsumed any deliberative exchanges."). And the Court cannot, consistent with its earlier findings, conclude that Plaintiffs need additional, privileged documents.

**iii. The Extent to Which Disclosure Would Hinder Frank and Independent Discussion Regarding Contemplated Policies and Decisions.**

Wholesale disclosure of deliberative documents covering a range of government deliberations—regardless of their relevance to the claims at issue—plainly risks chilling future discussions on sensitive topics that require free and frank communications. *See Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 462 (D.C. Cir. 2014) ("Premature release of material protected by the deliberative process privilege would have the

effect of chilling current and future agency decisionmaking because agency officials . . . would no longer have the assurance that their communications would remain protected.”). Risk of disclosure would also disrupt various agencies’ ability to consult with others in the Executive Branch, depriving agencies of unique input and expertise that enhances the decisionmaking process. Without such candid discussion, both within and across agencies, decisionmaking would suffer. *See Warner*, 742 F.2d at 1161-62 (holding that disclosure of internal memoranda would “almost certainly injure[] the quality of agency decisions” because it “chills frank discussion and deliberation in the future among those responsible for making governmental decisions”). *See* Exh. 1 ¶ 4, Exh. 2 ¶ 4, Exh. 3 ¶ 6, Exh. 4 ¶ 5, Exh. 5 ¶ 6, Exh. 6 ¶ 6, Exh. 7 ¶ 4, Ex. 8 ¶ 4, Exh. 9 ¶ 6, Exh. 10 ¶ 5, Exh. 11 ¶ 5, Exh. 12 ¶ 4.

**iv. The Government’s Role in the Litigation**

Plaintiffs’ argument would have the Court eliminate the deliberative process privilege entirely, simply because Plaintiffs have asserted a constitutional claim against the Government. As explained, internal Government deliberations regarding policy formulation and implementation will not supply more, particularly where Plaintiffs have compiled evidence elsewhere.

**II. The Presidential Communications Privilege.**

The presidential communications privilege is “fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution.” *United States v. Nixon*, 418 U.S. 683, 708 (1974). While a qualified privilege, “[p]residential communications are presumptively privileged.” *Id.* at 707-08 (internal citation omitted). The privilege is properly invoked when the government is “asked to produce documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential.” *In re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997). The privilege is not limited to documents and communications where there was direct Presidential involvement; indeed, “communications made by presidential advisors in the course of preparing advice for the President come under the presidential communications privilege, even when these communications are not made directly to the President.” *Id.* at 747, 751-52. This makes sense, given that “[i]n performing his constitutional duties the President may obtain advice and assistance from a broad array of executive officials—cabinet officers, employees in the Executive Office of the President, and

agency staff with special expertise, as well as individuals whose sole function in the White House is to provide the President with advice and assistance." *Id.* at 749.

**a. The Presidential Communications Privilege Has Been Properly Invoked.**

The presidential communications privilege protects not only communications directly involving and documents actually viewed by the President, but also "documents 'solicited and received' by the President or his 'immediate White House advisers,'" regardless of their source. *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008) (citation omitted). "[T]he privilege protects both communications directly involving and documents actually viewed by the President, as well as documents solicited and received by the President or his immediate White House advisers [with] broad and significant responsibility for investigating and formulating the advice to be given the President." *Lacy v. United States*, No. SA CV 22-1065-DOC, 2023 WL 4317659, at *20 (C.D. Cal. May 3, 2023) (citation modified); *Karnoski v. Trump*, 926 F.3d 1180, 1203 (9th Cir. 2019) ("The privilege covers documents reflecting 'presidential decision making and deliberations,' regardless of whether the documents are predecisional or not, and it covers the documents in their entirety." (*quoting Loving v. Department of Defense*, 550 F.3d 32, 37-38 (D.C. Cir. 2008))). The privilege thus applies where communications with the President or his immediate advisers or their staff are memorialized in internal agency documents (that is, in documents that are not sent from or to the President or his advisers and staff). *See CREW v. Dep't of Homeland Security*, No. 06-0173 (RJL), 2008 WL 2872183, at *2-4 (D.D.C. July 22, 2008); *cf. In re Sealed Case*, 121 F.3d at 758 (privilege applies to "notes taken at meetings on the Espy investigation at which these advisers were present, since these notes reflect these advisers' communications").

The presidential communications privilege was properly asserted in all instances, including as to the examples Plaintiffs cite, because all documents were solicited and received by immediate White House advisers with broad and significant responsibility for investigating and formulating advice to be given the President regarding higher education and funding policies or otherwise reflect directives from presidential advisors. *See* Exh. 13 ¶¶ 4, 6. For example, the privilege log entries for all of the documents cited identify the White House advisers involved in the relevant issues, whether by identifying those individuals in the to, from, or cc columns or, if a subsequent email in the thread is logged such that the email is not directly

to or from a White House adviser, by identifying those White House individuals in the privilege descriptions. *See* Pls' Mot. at 19 n.38-39.

Specifically, ED_4164, ED_4166, ED_1067, DOE_22, DOE_28, CRT_11126, CRT_11129, CRT_11125, CRT_11128, HHS_1511, HHS_1512, HHS_1519, and HHS_1573—the documents specifically identified in Plaintiffs' Motion—are email threads reflecting White House adviser May Mailman's solicitation for input regarding funding actions at universities. These documents reflect the provision of advice to White House advisors regarding the implementation of Executive policy on funding for higher education institutions in response to White House requests for technical and policy input. *See* Exh. 13 ¶ 6. The privilege logs for each of these entries list the White House advisers involved in those discussions in their to, from, cc, or privilege description fields. *See* ECF No. 141-8 at 1, 49-50; ECF No. 141-22 at 252-53, 546, 672, 674, 682. ED_4609 is an email thread that copies where White House advisers—listed in the CC column—"request[] advice regarding implementation of Executive policy regarding higher education, including consideration of potential next steps" regarding the "Compact." *See* ECF No. 141-10 at 20. Documents regarding the Compact's creation embody the need to ensure the free exchange of ideas in support of official presidential decision-making that directly involves the President or his close advisors. *See* Exh. 13 ¶ 8. The presidential communications privilege is appropriately asserted as to each of these documents. To the extent the Court concludes that certain elements are missing from the privilege descriptions, Defendants request an opportunity to amend those descriptions to provide any additional details the Court deems necessary.

**b. The Presidential Communications Privilege Is Not Categorically Overcome.**

A plaintiff seeking to overcome the presidential communications privilege must make "a preliminary showing of need demonstrating "that the evidence sought is directly relevant to issues that are expected to be central to the trial and is not available with due diligence elsewhere." *Karnoski*, 926 F.3d at 1205 (citation modified). The plaintiff must then demonstrate "that each discrete group of [] materials likely contains important evidence" and "that this evidence is not available with due diligence elsewhere." *Id.* (quoting *In re Sealed Case*, 121 F.3d at 754-55). "The first component, likelihood of containing important evidence, means that the evidence sought must be directly relevant to issues that are expected

to be central to the trial." *Id.* "The second component, unavailability, reflects [the Supreme Court's's] insistence that privileged presidential communications should not be treated as just another source of information." *Id.*

Plaintiffs' arguments fail at all prongs. Plaintiffs' challenges are directed at the Defendant agencies' actions at UC. To the extent intent is at issue, only the agencies' intent in taking discrete action is relevant. Thus, although White House officials may have contributed to policy decisions, the resulting implementation actions were executed by the agencies under their own authority, not by the White House. Plaintiffs have already conducted extensive discovery into these agencies' internal decisionmaking such that documents reflecting "Article II prerogatives" and Executive "confidentiality and autonomy," *Karnoski*, 926 F.3d at (citation modified), are unnecessary for the adjudication of Plaintiffs' claims. Indeed, as Plaintiffs themselves have touted the "overwhelming" evidence they have already compiled, this unnecessary "confrontation between the two branches should be avoided." *Id.* Plaintiffs have not shown that documents subject to the presidential communications privilege contain evidence that is not available with due diligence elsewhere. Indeed, White House discussions regarding the implementation of Executive policy at universities are not dispositive where the agencies took independent action to execute any high-level policy directives, and only those agency documents would be relevant.

Finally, to the extent the Court concludes that Plaintiffs have met their burden, the Court "must conduct *in camera* review before any materials are turned over to Plaintiffs to excise non-relevant material and ensure that presidential confidentiality is not unnecessarily breached[.]" *Karnoski*, 926 F.3d at 1205 (quoting *In re Sealed Case*, 121 F.3d at 759).

**III. The Work Product Doctrine.**

The attorney work-product doctrine protects materials prepared by or for a party or its representative "in anticipation of litigation or for trial." Fed. R. Civ. P. 26(b)(3)(A). The doctrine safeguards the adversarial process by allowing attorneys to investigate claims, evaluate evidence, develop legal theories, and formulate litigation strategies without unwarranted intrusion by opposing parties. *Hickman v. Taylor*, 329 U.S. 495, 510–11 (1947). As the Supreme Court has explained, "proper preparation of a client's case demands that [an attorney] assemble information, sift what he considers to be the relevant

from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference." *Id.* at 511. Plaintiffs challenge 15 documents that were withheld under the work product doctrine. Mot. at 21.

**a. The Work Product Doctrine Applies to the Dual-Purpose Documents In this Case.**

To qualify for work-product protection, a document must have been prepared "in anticipation of litigation." *ACLU of N. Cal. v. U.S. Dep't of Justice*, 880 F.3d 473, 484 (9th Cir. 2018) (citation modified). The Ninth Circuit applies the "because of" standard when a "dual-purpose" document serves both litigation and non-litigation purposes. Under this standard, "a document should be deemed prepared in anticipation of litigation and thus eligible for work product protection . . . if in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation." *In re Grand Jury Subpoena*, 357 F.3d 900, 907 (9th Cir. 2004) (quotation omitted).

Here, Plaintiffs assert that a document titled "Title VI Elements Memo" described in Defendants' privilege logs as containing "attorney legal advice regarding the potential legal standards applicable to Title VI antisemitism cases" is a dual-purpose document that appears to simply list relevant case law and holding and is, therefore, not protected attorney work product. Pls' Mot. at 22. But this memo was drafted by DOJ attorneys, was written in response to a request by HHS for legal advice in a specific set of civil rights litigations, and contains suggested legal arguments tailored to the particular factual circumstances. Because this document was created for the specific purpose of developing arguments in advance of active litigation, the attorney work product protection applies. Upon further consideration, ED withdraws its work product assertions as to the following documents cited in Plaintiffs' Motion: ED_2207, 2167, -2169, -2309, -4000, -4005, -4204, -4967, -4968, -4973.[4]

**b. The Work Product Assertions Are Not Overcome.**

Work product protection distinguishes between "ordinary" or "factual" work product, and "opinion" work product. Ordinary work product includes factual material prepared in anticipation of

[4] ED has reviewed its work product and attorney client privilege assertions and has produced amended privilege logs to reflect any resulting changes. *See* Exh. 3 ¶ 13.

litigation, and it may be discovered only if the requesting party demonstrates a substantial need for the materials and an inability, "without undue hardship, to obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii). Opinion work product includes an attorney's mental impressions, conclusions, opinions, or legal theories, *United States v. Sanmina Corp.*, 968 F.3d 1107, 1125 (9th Cir. 2020), and receives even greater protection. The Ninth Circuit has held that such materials are discoverable only where the attorney's mental impressions themselves are directly at issue in the litigation and the requesting party demonstrates a compelling need for them. *Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 577 (9th Cir. 1992); *see also Sanmina Corp.*, 968 F.3d at 1124-25. Accordingly, a party seeking opinion work product must demonstrate more than the general relevance or potential usefulness of attorney analysis; it must show that the attorney's mental impressions are themselves directly at issue and that their disclosure is essential to resolving the case. *Id.*

Here, Plaintiffs contend that, even if the work protect protection applies, the need for those documents overcomes the qualified privilege under both the ordinary work product standard and the heightened opinion work product standard. *See* Pls' Mot. at 21-23. Plaintiffs posit that if a plaintiff alleges that the government's enforcement action constitute First Amendment retaliation, "attorney mental impressions are the pivotal issue." Pls' Mot. at 23 (citing *United States v. McGraw-Hill Cos.*, 2014 WL 8662657, at *6, 8 (C.D. Cal. Sept. 25, 2014) (ordering production of opinion work product documents in selective prosecution case)). Plaintiffs further insist that the challenged documents are likely to reveal attorney skepticism of "groundless investigations." *Id.* at 23. However, even if Plaintiffs outlined grounds for believing the withheld documents contain attorney skepticism—which they do not—the relevant issue for a claim of government enforcement action motivated by a discriminatory purpose, or a claim of First Amendment retaliation, is the motives of the government actors—here, the Defendant agencies and their respective decisionmakers—rather than the mental impressions of the advising attorneys. Regardless, attorney skepticism is not a basis to reveal work product. Indeed, if it were, lawyers would be chilled from exploring different options and strategies unlikely to be adopted by their clients. Plaintiffs' suggestion that their desire for documents that demonstrate "the government's intent in negotiations with UC," including throughout the resolution agreement drafting process, Pls' Mot. at 24, must be met with the same

logic. Here too, to the extent motivation and intent are relevant, the motivations and intent of the relevant government decisionmakers, rather than the advising attorneys, are not only of central significance, but directly at issue.

Finally, Plaintiffs assert that the challenged documents are likely to reveal "pressure from Defendants and the White House to sanction universities regardless of evidence uncovered by these investigations" and, because this is of central relevance to issues in the case, "the protection is overcome." *Id*. But Plaintiffs do not explain why documents containing attorney mental impressions, opinions, and legal theories are likely to contain evidence of this alleged pressure. Speculation is not enough to overcome work product protections.

**IV. The Attorney-Client Privilege Has Been Properly Asserted.**

The attorney-client privilege protects confidential communications between an attorney and client made for the purpose of obtaining and giving legal advice. *See United States v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996); *Fischer v. United States*, 425 U.S. 391, 403 (1976). It is one of the oldest recognized privileges, *see Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981), and is, perhaps, the most sacred. *See United States v. Bauer*, 132 F.3d 504, 510 (9th Cir. 1997). It exists to promote "full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice." *Upjohn*, 449 U.S. at 389. It applies equally to attorney-client relationships within the government, in which the agency is the client and the government attorney is counsel. *See In re County of Erie*, 473 F.3d 413, 419 (2d Cir. 2007) ("[T]he traditional rationale for the [attorney-client] privilege applies with special force in the government context. It is crucial that government officials, who are expected to uphold and execute the law and who may face criminal prosecution for failing to do so, be encouraged to seek out and receive fully informed legal advice." (citation omitted)); *Ariz. Rehab. Hosp., Inc. v. Shalala*, 185 F.R.D. 263, 269 (D. Ariz. 1998) ("Courts have applied this privilege to communications between government agencies and their counsel . . . .").

In the Ninth Circuit, the attorney-client privilege applies: (1) where legal advice of any kind is sought, (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at the client's insistence permanently

protected (7) from disclosure by himself or by the legal adviser (8) unless the protection is waived. *See Matter of Fischel*, 557 F.2d 209, 211 (9th Cir. 1977) (citation omitted). The privilege is a "two-way street" that protects "confidential disclosures made by a client to an attorney in order to obtain legal advice, . . . *as well as an attorney's advice in response to such disclosures*." *Bauer*, 132 F.3d at 507 (citation omitted) (emphasis in original). The Ninth Circuit has explained that the purpose of the privilege is "to encourage clients to confide fully in their attorneys without fear of future disclosure of such confidences. This in turn will enable attorneys to render more complete and competent legal advice." *Matter of Fischel*, 557 F.2d at 211.

Protected communications include, *inter alia*: confidential communications made by a client to an attorney to obtain legal services, *see United States v. Olano*, 62 F.3d 1180, 1205 (9th Cir. 1995); correspondence between an attorney and a client which reveals the client's motivation for litigation or possible litigation strategy, *see In re Grand Jury Witness*, 695 F.2d 359, 362 (9th Cir. 1982); legal advice given in the course of representing the client, *see Bauer*, 132 F.3d at 508-09; facts divulged by a client to his or her attorney in order to put the attorney in a position to render legal advice, *see Upjohn*, 449 U.S. at 393-94; and correspondence or statements from the attorney which "reveal the motive of the client in seeking representation, litigation strategy, or the specific nature of the services provided, such as researching particular areas of law." *Olano*, 62 F.3d at 1205 (quotation omitted). Numerous courts have also found that drafts of documents shared with attorneys are protected by the attorney-client privilege. *See, e.g., Ideal Elec. Co. v. Flowserve Corp.*, 230 F.R.D. 603, 607-08 (D. Nev. 2005) (finding that drafts of an affidavit containing communications with counsel were privileged); *Carey-Canada, Inc. v. California Union Ins. Co.*, 118 F.R.D. 242, 248-49 (D.D.C. 1986) (drafts of an annual report prepared by attorneys were privileged); *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1037 (2d Cir. 1984) (finding that drafts of documents sent to a law firm for review were privileged). Finally, courts have recognized that business and legal advice offered by an attorney may be inextricably intertwined:

> The line between business and legal advice may be gray, especially when the communication may have multiple functions. *See, e.g., In re Ford Motor Co.*, 110 F.3d 954, 966 (3d Cir.1997) (concluding that minutes of meeting privileged because, even if ultimate decision reached by committee could be characterized as a business decision, committee "reached that decision only after examining the legal implications of doing so"

> and decision was "infused with legal concerns"); *Coleman v. ABC*, 106 F.R.D. 201, 206 (D.D.C. 1985) (stating that "legal and business considerations may frequently be inextricably intertwined" and that "mere fact that business considerations are weighed in the rendering of legal advice does not vitiate the attorney-client privilege").

*North Pacifica, LLC v. City of Pacifica*, 274 F. Supp. 2d 1118, 1127-28 (N.D. Cal. 2003). (In the context of government, policy considerations are akin to "business considerations."). *See id.* In such circumstances, the attorney-client privilege protects the communication if the primary purpose of the communication is legal advice. *See id*. at 1128.

Here, Defendants did not assert the attorney-client privilege over all documents in which attorneys were involved; rather Defendants only asserted the privilege in those instances where a government attorney provided legal advice to an agency in a legal capacity. Plaintiffs, nonetheless, argue that Andrea Lucas and Joshua Hoyt were not capable of providing legal advice based on their positions in the government. *See* Pls' Mot. at 25-26.[5] However, Ms. Lucas is an attorney and the Chair and Commissioner of the Equal Employment Opportunity Commission (EEOC). *See* Exh. 9 ¶ 14. Ms. Lucas's responsibilities included providing legal advice and strategic counsel to the White House regarding matter within the EEOC's jurisdiction. *Id.* Ms. Lucas's title or position, including any political appointment, is not determinative and does not preclude her from providing legal advice. *See, e.g.*, *In re Sealed Case*, 737 F.2d 94, 99 (D.C. Cir. 1984) (company's vice-president was capable of providing legal advice). And although Ms. Lucas may serve in a mixed capacity to include "responsibilities that fall both within and outside the lawyer's sphere," her advice is protected when offered "in [her] professional, legal capacity." *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*, 538 F. Supp. 3d 124, 135 (D.D.C. 2021) (citation modified). The analysis for Mr. Hoyt is even more straightforward, as he has served as a counsel to the President and provides legal advice in that capacity. That attorneys within the White House Counsel's Office may sometimes also perform advisor functions does not categorically deprive them of the ability to furnish legal advice, which is in fact their core responsibility. Here, the limited number of documents over which Defendants claim attorney client privilege based on Mr. Hoyt's legal advice satisfy that standard.

---

[5] Defendants withdraw their attorney-client privilege assertions with respect to Joshua Gruenbaum, Craig Trainor, Daniel Shieh, and David Hyams. *See* Exh. 5 ¶ 13; Exh. 3 ¶ 14; Exh. 6 ¶¶ 14, 16.

The same applies to legal advice furnished by Sean Keveney (HHS), Thomas Wheeler (ED), Harmeet Dhillon (DOJ), Gregory Brown (DOJ), and Joshua Hoyt (WHCO). *See* Pls' Mot. at 26-27. Defendants have not issued blanket attorney-client assertions over documents that implicate these individuals merely because they are attorneys but instead asserted the privilege only when these individuals provided legal advice in their legal capacities. *See, e.g.*, Exh. 6 ¶¶ 17-19; Exh. 3 ¶¶ 15-17; Exh. 9 ¶¶ 13-17. Plaintiffs have not identified any issues with the privilege assertions based on the legal advice provided by these individuals and, as such, there is no basis for *in camera* review. And as Plaintiffs recognize, Defendants have already withdrawn any assertion of the attorney-client privilege as to Jonathan Pidluzny. *Id.* n.60.

Moreover, Plaintiffs claim that the attorney-client privilege does not apply to documents reflecting Karen Woodard and Valerie Meyer's legal advice based on alleged "concerns" regarding DOJ's enforcement actions. Pls' Mot. at 28. Plaintiffs' reliance on *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*, 538 F. Supp. 3d 124, 146 (D.D.C. 2021) ("*CREW*"), for that proposition is misplaced. In that case, the court concluded that a memorandum to the Attorney General regarding a prosecutorial decision was not subject to the attorney-client privilege because (1) it "contain[ed] no legal advice at all, but it offer[ed] only strategic, political, and public relations advice[,]" (2) "was being written at the same time and by the same people who were drafting the Attorney General's letter to Congress setting forth his views on the basis for a prosecution" such that the ultimate decision was not "based on the advice the memo contains[,]" and (3) there was not a sufficient showing as to the "roles played by played by [those] who were equally involved in the creation and revision of the memo" to support a conclusion that they were providing advice in a legal capacity. *Id.* 146-47. The court in that case thus analyzed the attorney-client privilege under the ordinary standards and merely considered the memorandum's timing to determine whether securing legal advice was a primary purpose of the communication in question and determined that the memorandum could not have provided legal guidance on the decision to prosecute because that decision had already been made. *Id.* at 135, 146-47. In short, *CREW* does not, as Plaintiffs suggest, stand for the proposition that the attorney-client privilege

is foregone for every document generated after a prosecutorial decision is made, *see* Pls' Mot. at 28, but instead reflects that standard privilege inquiry to ascertain the nature of the document at issue.

At bottom, each of the documents Plaintiffs specifically challenge in their brief reflect attorney-client advice regarding an ongoing matter. *See, e.g.*, Exh. 3 ¶ 17; Exh 4 ¶ 12; Exh. 9 ¶¶ 17-21; Exh. 10 ¶¶ 13-15.

**V. No Additional DOJ Searches Are Necessary.**

Plaintiffs seek to add the former Civil Rights Division's Assistant Attorney General (former AAG) as a custodian and to have DOJ perform additional searches. Both requests should be denied.

*First*, there is no basis to add the former AAG as a custodian. In response to Plaintiffs' wide-ranging requests for production, DOJ searches across seven custodians "who principally dealt with the investigations into colleges and universities, including any deliberations concerning federal funding to institutions of higher education." Exh. 9 ¶ 23. Plaintiffs now bear the burden of showing that Defendants' selected custodians are insufficient, so as to justify the need to collect the former AAG's ESI and to further show that the former AAG was in possession of relevant, responsive, and unique ESI that is not duplicative or cumulative of the ESI that has been and will be produced through the current document custodians, such that the burden and expense of their inclusion would not outweigh its likely benefit. *See, e.g., Lauris v. Novartis AG*, No. 1:16-CV-00393, 2016 WL 7178602, at *5 (E.D. Cal. Dec. 8, 2016). Plaintiffs cannot make such a showing.

Plaintiffs claim that there is "good reason to believe" that the former AAG possesses unique information given her leadership role. *See* Pls' Mot. at 29-30. However, "the fact that a person may have had some connection to the events in question does not automatically mean that such person must be included as an ESI custodian. To justify an order compelling a responding party to search the records of additional custodians, the requesting party 'must demonstrate that the additional requested custodians would provide unique relevant information not already obtained.'" *Enslin v. Coca-Cola Co.* No. 2:14-CV-06476, 2016 WL 7042206, at *3 (E.D. Pa. June 8, 2016) (quotation omitted). But the former AAG's "practice was to copy the relevant Deputy Assistant Attorney General on communications under that Deputy Assistant Attorney General's purview" and "[t]he Deputy Assistant

Attorneys General who oversaw matters relevant to education and employment are included among the seven custodians." Exh. 9 ¶ 25. And there is no indication that current custodians are without responsive information or that the AAG would be in possession of unique and relevant information. *Id.*; *see Eisai v. Sanofi-Aventis U.S., L.L.C.*, No., 08-41688, 2012 WL 1299379, at *9 (D.N.J. Apr. 16, 2012) (denying motion to compel discovery from "additional . . . custodians" because defendants had already produced discovery from relevant custodians and "the additional production" would be "unreasonably cumulative," "duplicative," and "burden[some]" (citations and quotation marks omitted)); *Blackrock Allocation Target Shares: Series S Portfolio v. Bank of N.Y. Mellon*, No. 14 Civ. 9372, 2018 WL 2215510, at *12-13 (S.D.N.Y. May 15, 2018) (denying plaintiff's request to designate additional custodians because the defendant "has produced or is producing" relevant documents from "[e]xisting [c]ustodians"); *Lutzeier v. Citigroup Inc.*, No. 4:14-CV-00183, 2015 WL 430196, at *7 (E.D. Mo. Feb. 2, 2015) (rejecting request to designate executives as custodians absent a showing that they had "unique or personal knowledge of the subject matter that warrants their information").

Because one "cannot discern why plaintiffs expect to discover information from [the AAG] that differs from discovery they have already obtained from the other . . . custodians" and Plaintiffs have not "articulate[d] a factual basis for this additional discovery [apart from] [c]onclusory assertions," the Court should deny the motion to compel. *Handloser v. HCL Am., Inc.*, No. 19-CV-01242, 2020 WL 7405686, at *2-3 (N.D. Cal. Dec. 17, 2020); *see Roblox Corp. v. WowWee Group, Ltd.*, No. 22-CV-04476, 2023 WL 5507176, at *3 (N.D. Cal. Aug. 25, 2023) (refusing to compel document discovery from executive where plaintiffs "made no showing that [executive] has relevant information, much less that he has information that would not be discoverable through the other custodians named by defendants [but] only speculate that [executive] must have relevant information").

*Second*, Plaintiffs' additional, proposed searches, including the addition of the AAG as a custodian, are not necessary and are disproportionate to the needs of the case. In considering whether a request is proportional to the needs of the case, courts evaluate the scope of the information sought and whether the requested searches are tailored to the issues in the case. *See Roberts v. Clark Cnty. Sch. Dist.*, 312 F.R.D. 594, 603-04 (D. Nev. 2016) ("The fundamental principle of amended Rule 26(b)(1) is

that lawyers must size and shape their discovery requests to the requisites of the case . . . [t]he pretrial process must provide parties with efficient access to what is needed to prove a claim or defense, but eliminate unnecessary or wasteful discovery."); *Mfg. Auto. & Software Sys., Inc. v. Hughes*, 2017 WL 5641120, at *3-5 (C.D. Cal. Sept. 21, 2017) (evaluating scope of requests in proportionality analysis).

Specifically, the additional, proposed searches are not likely to yield unique, non-privileged evidence. As to the proposed EOP searches, Plaintiffs make no attempt to add limitations to these terms that would tailor the searches to the subject matter of the requests. And in any event, the responsive documents part of any such search would have already been captured by DOJ's existing searches. *See* Exh. 9 ¶ 27.

As to UC abbreviations, DOJ's existing searches are sufficient. DOJ's searches include the terms "California," "UC," "UCLA," Berkley," "Berkeley," and "UCB." *Id.* ¶ 28. These searches "appropriately capture all University of California campuses that were subject to any consideration, deliberation, or action by the Task Force." *Id.*

As to the addition of other universities, "Plaintiffs are labor unions and associations that collectively represent tens of thousands of faculty, students, academic employees, and staff employees throughout the University of California." Am. Compl. at 1. Plaintiffs bring this lawsuit "to enjoin [] Defendants from continuing to use the unlawful threat of federal funding cuts not authorized by law to illegally coerce *the UC* into suppressing free speech and academic freedom rights, implementing harmful federal policies on the Trump administration's behalf, and otherwise violating the constitutional and state law rights *of UC* faculty, students, academic employees, and staff employees." *Id.* (emphasis added). Plaintiffs' requests would turn this single-university case into a universal survey across countless universities. Defendants cannot agree to these facially overbroad, unduly burdensome, and unproportional requests. *See Quiroz v. Praetorian Ins. Co.*, No. 5:14-CV-01652 HRL, 2014 WL 3845418, at *2 (N.D. Cal. Aug. 5, 2014) ("[D]iscovery cannot be used as a fishing expedition for evidence of claims that have not been asserted."). DOJ's existing searches appropriately captured the universe of relevant documents. DOJ conducted broad searches using the keywords in Plaintiffs' requests and manually reviewed thousands of documents and produced or logged those documents that

broadly pertain to all universities (such that UC was necessarily encompassed) and documents that pertain to UC, specifically. Only those documents that exclusively and entirely involve universities other than UC were excluded. This methodology appropriately captures the documents relevant to Plaintiffs' claims while minimizing the burden on the government in reviewing hundreds of thousands of irrelevant documents. *See Hickman* , 329 U.S. at 507-08 ("[F]urther limitations come into existence when the inquiry touches upon the irrelevant . . . .").

As to the additional keyword searches, DOJ's existing searches are sufficient. Plaintiffs request that DOJ search the term "curricul!" but DOJ's existing searches capture the curriculum subject-matter that Plaintiffs claim has been improperly targeted by Defendants' policies. *See* ECF No. 142-3 at 2 (listing DOJ's search for the terms "(protest* or Demonst* OR Polic* OR DEI OR trans OR gender)"). This reasonable and proportionate search encompasses the curriculum subject-matter that would purportedly be "contrary to the policy views of the federal government," ECF No. 142-1 at 10, including UC's general policies (polic! search term), Compl. ¶ 11; DEI programs (DEI search term), *id.* ¶ 10; campus "protest and other expressive activity" (protest OR demonstrat! search terms), *id.* ¶ 11; recognition of transgender individuals (trans search term), *id.*; and "gender-inclusive policies and gender-affirming medical care" (gender search term), *id.* Because DOJ's pointed search captures the allegedly targeted curriculum topics, the inclusion of the umbrella term would unreasonably expand the document universe and yield duplicative documents that have already been identified.

Plaintiffs also request that DOJ perform an additional search regarding the "forward-looking refusals to provide federal funds" based on alleged actions taken by a different agency, NSF. *See* Pls' Mot. at 31. But DOJ's already searched "(mone* w/3 penalt*) OR (settlement OR offer OR fine)," as well as various iterations of the search "(term! OR susp!)." *See* ECF No. 142-3 at 2. The inclusion of any prospective policy, including the alleged refusal to grant funds, that is the subject of this case would have occurred in conjunction with any decisions to terminate or suspend awards and would have been discussed in that context. As a result, the proposed search terms are not likely to yield any additional, relevant documents.

Finally, as to Plaintiffs' significantly expanded date range, the time period already searched is appropriate. The Court's November 14, 2025 Order prohibits Defendants from "seeking payments of or imposing penalties or fines or any other monies from the" University of California (UC) "or any of its campuses or affiliated medical centers in connection with any civil rights investigation" without complying with all relevant procedural and substantive requirements. ECF No. 91 at 1-2; ECF No. 113 at 1-2. DOJ's November 14, 2025 limitation appropriately captures the time period relevant to Plaintiffs' claims because it is the period during which the alleged actions at issue took place. *See Gonzalez v. Experian Info. Sols., Inc.*, No. 8:24-CV-00389-FWS (JDE), 2025 WL 1712394, at *1 (C.D. Cal. Apr. 2, 2025) ("Although relevance for discovery purposes is defined very broadly, it is not without boundaries."). To the extent Plaintiffs have any questions or concerns regarding DOJ's compliance with the Court's Order, Plaintiffs may raise those issues in the appropriate posture. *See Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1072 (9th Cir. 2004) ("District courts need not condone the use of discovery to engage in fishing expeditions." (citation modified)). To be sure, the ongoing civil rights proceedings that Plaintiffs reference, *see* Pls' Mot. at 31-32, are beyond the scope of this case.

In sum, Defendants have already performed extensive searches across all of the relevant agencies. The documents processed thus fully encompass DOJ's involvement with Task Force matters such that additional searches are unnecessary. In fact, Plaintiffs' proposed searches for the former AAG alone produced over 20,000 hits and the additional, proposed searches for Leo Terrell, Gregory Brown, Michael Gates, and Jeffrey Morrison produced 61,753 hits. *See* Exh. 9 ¶¶ 25, 29. Given the terms and the custodians involved, Defendants expect that most responsive documents will be privileged such that the searches are not likely to yield non-privileged documents and the burden imposed on the Government far outweighs Plaintiffs' need. *See id.* ¶¶ 24, 31. The Court should thus deny Plaintiffs' request.

Dated: November 20, 2026

Respectfully submitted,

JONATHAN D. GUYNN
Acting Assistant Attorney General
Civil Division

JOSEPH E. BORSON
Assistant Branch Director

_/s/ Heidy L. Gonzalez_
HEIDY L. GONZALEZ
(FL. Bar No. 1025003)
CALEB J.COFFELT
(VA Bar No. 101722)
*Trial Attorneys*
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 598-7409
Email: heidy.gonzalez@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 20, 2026, I electronically filed this document with the Court by using the CM/ECF system, and that this document was distributed via the Court's CM/ECF system.

_/s/ Heidy L. Gonzalez_
HEIDY L. GONZALEZ